No. 24-2121

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

SAMUEL ORTEGA and REBECCA SCOTT,

*Plaintiffs-Appellants*,

v.

MICHELLE LUJAN GRISHAM, in her official capacity as Governor of New Mexico,
and RAÚL TORREZ, in his official capacity as Attorney General of New Mexico,

*Defendants-Appellees*.

On Appeal from the United States District Court for the
District of New Mexico,
No. 1:24-CV-00471-JB-SCY (Hon. James O. Browning)

## BRIEF FOR APPELLANTS

MICHAEL D. MCCOY
D. SEAN NATION
ROBERT A. WELSH
MOUNTAIN STATES LEGAL
  FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227

JOSEPH G.S. GREENLEE
ERIN M. ERHARDT
NATIONAL RIFLE
  ASSOCIATION OF AMERICA
11250 Waples Mill Road
Fairfax, VA 22030

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

CARTER B. HARRISON IV
HARRISON & HART
924 Park Avenue SW, Suite E
Albuquerque, NM 87102

*Counsel for Plaintiffs-Appellants*

ORAL ARGUMENT REQUESTED

November 4, 2024

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ............................................................6

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW ..............................6

STATEMENT OF THE CASE ..................................................................6

    A.    Legal Background..................................................................6

    B.    Factual and Procedural Background ..................................14

STANDARD OF REVIEW .....................................................................19

SUMMARY OF ARGUMENT .................................................................20

ARGUMENT ....................................................................................24

I.    Plaintiffs' Second Amendment Claim Is Exceedingly Likely To Succeed .......................................................................................25

    A.    HB129 Regulates Conduct Covered by the Plain Text ......................26

    B.    HB129 Is Inconsistent With This Nation's Historical Tradition of Firearm Regulation .........................................31

    C.    The State Cannot Avoid *Bruen* by Invoking *Heller*'s "Presumptively Lawful" Language ....................................41

II.    The Remaining Factors Overwhelmingly Favor Injunctive Relief..............46

CONCLUSION ..................................................................................49

STATEMENT REGARDING ORAL ARGUMENT .............................................49

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State*,
  50 Tenn. 165 (1871) ....................................................................29, 33

*Aposhian v. Barr*,
  958 F.3d 969 (10th Cir. 2020) ...............................................25

*Att'y Gen. of Okla. v. Tyson Foods, Inc.*,
  565 F.3d 769 (10th Cir. 2009) ........................................19, 20

*Awad v. Ziriax*,
  670 F.3d 1111 (10th Cir. 2012)..............................................46

*Baird v. Bonta*,
  81 F.4th 1036 (9th Cir. 2023) ........................................12, 13

*Brown v. ATF*,
  704 F.Supp.3d 687 (N.D. W. Va. 2023)..............................29

*Chamber of Commerce v. Edmondson*,
  594 F.3d 742 (10th Cir. 2010) ........................................25, 48

*Colorado v. Griswold*,
  99 F.4th 1234 (10th Cir. 2024) ......................................19, 20

*Diné Citizens Against Ruining Our Env't v. Jewell*,
  839 F.3d 1276 (10th Cir. 2016) ...........................................25

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)..................................... 18, 20, 26-27, 34, 41–42, 44, 48–49

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ................................................29

*Fraser v. ATF*,
  672 F.Supp.3d 118 (E.D. Va. 2023)....................................30

*Free the Nipple Fort Collins v. City of Fort Collins*,
  916 F.3d 792 (10th Cir. 2019) ....................................5, 46, 47

*Hobby Lobby Stores, Inc. v. Sebelius*,
   723 F.3d 1114 (10th Cir. 2013) ..............................................25, 47, 48

*Little v. Jones*,
   607 F.3d 1245 (10th Cir. 2010) ...........................................................19

*Maryland Shall Issue, Inc. v. Moore*,
   116 F.4th 211 (4th Cir. 2024) ..............................................................29

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ..............................................................24, 29, 47

*Minneapolis Star Trib. Co. v. Minn. Comm'r*,
   460 U.S. 575 (1983) ..............................................................................29

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1 (2022) ...................2, 12, 20–21, 26–27, 29–33, 38, 40–42, 45, 47, 49

*NLRB v. Noel Canning*,
   573 U.S. 513 (2014) ..............................................................................33

*People v. Bickston*,
   154 Cal.Rptr. 409 (Cal. App. Dep't Super. Ct. 1979) ..........................11

*Planned Parenthood of Kan. v. Anderson*,
   882 F.3d 1205 (10th Cir. 2018) ...........................................................25

*Printz v. United States*,
   521 U.S. 898 (1997) ..............................................................................10

*Pub. Citizen v. U.S. Dep't of Just.*,
   491 U.S. 440 (1989) ..............................................................................48

*Renna v. Bonta*,
   667 F.Supp.3d 1048 (S.D. Cal. 2023) ..................................................29

*Rocky Mt. Gun Owners v. Polis*,
   701 F.Supp.3d 1121 (D. Colo. 2023) ........................................7, 34, 35

*Sekhar v. United States*,
   570 U.S. 729 (2013) ..............................................................................30

*Silvester v. Becerra*,
138 S.Ct. 945 (2018) ........................................................................24

*Silvester v. Harris*,
41 F.Supp.3d 927 (E.D. Cal. 2014) ............................................12, 33

*Silvester v. Harris*,
843 F.3d 816 (9th Cir. 2016) ........................................ 7-8, 11–12, 34

*Sprint Comm'cns Co., L.P. v. APCC Servs., Inc.*,
554 U.S. 269 (2008) ........................................................................45

*State v. Mendoza*,
920 P.2d 357 (Haw. 1996) ..................................................................8

*Teixeira v. Cnty. of Alameda*,
873 F.3d 670 (9th Cir. 2017) ...........................................................29

*Thomas v. Collins*,
323 U.S. 516 (1945) ........................................................................48

*United States v. Daniels*,
101 F.4th 770 (10th Cir. 2024) ...........................................5, 21, 36, 40

*United States v. Hicks*,
649 F.Supp.3d 357 (W.D. Tex. 2023) ...............................................29

*United States v. McFadden*,
116 F.4th 1069 (10th Cir. 2024) .......................................................20

*United States v. McNulty*,
684 F.Supp.3d 14 (D. Mass. 2023) ...................................................29

*United States v. Perez-Garcia*,
96 F.4th 1166 (9th Cir. 2024) ...............................................26, 28, 41

*United States v. Rahimi*,
144 S.Ct. 1889 (2024) ...............................2, 7, 13, 20–21, 26, 31–32, 37, 39, 42

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) ........................................................................38

*Voter Reference Found., LLDC v. Baldera*s,
   616 F.Supp.3d 1132 (D.N.M. 2022) .................................................................47

**Constitutional Provision**

U.S. Const. amend. II ..........................................................................................6

**Statutes and Rule**

18 U.S.C. §922(d).............................................................................................43

18 U.S.C. §922(t)(1)...................................................................................11, 14

1927 N.J. Laws 742 ...........................................................................................8

1995 Or. Laws ch. 729 (S.B. 1096) ..................................................................9

1997 Ind. Legis. Serv. P.L. 17-1997 (H.E.A. 1669) .......................................9

2009 S.D. Sess. Laws ch. 122 (SB 70).............................................................9

2015–2016 Wis. Legis. Serv. 22 (2015 S.B. 35) .............................................9

2023 Colo. Legis. Serv. Ch. 125 (H.B. 23-1219) .........................................13

Act of July 8, 1932, ch. 465, 47 Stat. 650 ......................................................8

Colo. Rev. Stat. §18-12-115 ...........................................................................13

Law of Mar. 14, 1935, ch. 208, 1935 S.D. Laws 355......................................8

Law of Mar. 30, 1927, ch. 321 ........................................................................8

Maine Bill LD 2238 (SP 958) (2024)..............................................................14

N.M. Stat. §30-7-7.3(A) ...............................................................14, 15, 27, 28

N.M. Stat. §30-7-7.3(D) ..................................................................................15

N.M. Stat. §30-7-7.3(G) ..................................................................................15

N.M. Stat. §30-7-7.3(H) ............................................................................15, 27

N.M. Stat. §30-7-7.3(I).....................................................................................27

Vt. Stat. Ann. Tit. 13, §4019a..................................................................13

Fed. R. App. P. 4(a) ...............................................................................6

**Other Authorities**

1975 Senate Bill 185, Wis. Legis. (Mar. 15, 1976),
    https://tinyurl.com/3f8xr6uy ..............................................................8

Greg Adomaitis, *N.J. gun association calls Berlin woman's
    death an 'absolute outrage'*, NJ.com (June 5, 2015),
    https://tinyurl.com/mn32h8f................................................................8

*Black's Law Dictionary* (12th ed. 2024)....................................................43

Everytown for Gun Safety, *Which states require a waiting
    period before gun purchases?*, https://tinyurl.com/6zpcnpkr
    (last visited Nov. 4, 2024) ..................................................................10

*Google Dictionary*, https://tinyurl.com/mvmvax6k
    (last visited Nov. 4, 2024) ..................................................................43

David B. Kopel, *Background Checks for Firearms Sales and Loans:
    Law, History, and Policy*, 53 Harv. J. Legis. 303 (2016) ..........................8, 9, 34

Brendan O'Brien, *Wisconsin Governor Signs Bill Repealing
    Handgun Waiting Period*, Reuters (June 24, 2015),
    https://tinyurl.com/228uby2t .................................................................9

Oxford English Dictionary (3d ed. 2015).....................................................28

Tenn. Bur. Invest., *Guidelines for Federal Firearms Licensees*,
    https://tinyurl.com/5yx9rc52 .................................................................9

U.S. Dep't of Justice, Off. Justice Prog., Bur. of Justice Stats.,
    *Identifying Persons, Other Than Felons, Ineligible to Purchase
    Firearms* (May 1990), https://tinyurl.com/2s3tpz8x .............................10

U.S. Dep't of Justice, Off. Justice Prog., Bur. of Justice Stats., *Presale
    Handgun Checks, the Brady Interim Period, 1994–98* (June 1999),
    https://tinyurl.com/2nrdckfs .................................................................11

Vt. J. Senate 1952 (May 12, 2023), https://tinyurl.com/25t3nfvs ...........................13

Vt. H.230, §1(10), https://tinyurl.com/msddz287 ...................................................13

## INTRODUCTION

In most of the country, once a law-abiding citizen passes a background check and confirms her eligibility to purchase a firearm, she can take possession and begin exercising her fundamental constitutional right to keep and bear arms without delay. That is no small matter in the Second Amendment context. When it comes to the need to defend oneself and one's loved ones, time is often of the essence: A victim of domestic violence facing a concrete threat of harm and seeking an effective means to defend herself and her children, for instance, does not have days to spare. Yet owing to a recently enacted New Mexico law, an individual facing down such dire straits would be left defenseless for a week. New Mexico House Bill 129 imposes a seven-day "cooling-off" period for nearly all firearm purchases in the state. It does not matter who the buyer is, what firearm she seeks to buy, or why she seeks to buy it. Nor does it matter whether the state has already assured itself that the buyer is a law-abiding, responsible citizen through a background check, or whether the buyer has satisfied all other criteria the state may impose. Under HB129, nearly everyone in New Mexico must wait seven days, no matter how many background checks they pass, on the theory that anyone who seeks to acquire a firearm—the only type of personal property that the Constitution explicitly marks for protection against government interference—may have fleeting murderous or suicidal intentions that will subside if they are forced to "cool off" for a week.

That sweeping, rights-defying restriction cannot be squared with our Nation's historical tradition of firearm regulation. To be sure, our Nation's tradition recognizes the government's ability to keep firearms out of the hands of "citizens who have been found to pose a credible threat to the physical safety of others." *United States v. Rahimi*, 144 S.Ct. 1889, 1901–02 (2024). That is why laws "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'" typically will pass constitutional muster. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022). But our Nation's tradition has never endorsed efforts to "broadly restrict arms use by the public generally," without regard to any individualized concerns. *Rahimi*, 144 S.Ct. at 1902. And HB129 falls decidedly in the latter camp. The only people who are exempt from HB129's state-mandated timeout are law enforcement officers, federally licensed firearm dealers, and individuals with a concealed-carry permit; everyone else in New Mexico must wait seven days before they can use arms at all. That is a classic "broad[] restrict[ion] [on] arms use by the public generally," *id.*, and it is one that finds no analogue at all in our Nation's historical tradition. A law that requires nearly all law-abiding citizens to "cool off" for a week *even after passing a background check* before they can exercise their Second Amendment rights is instead the very model of an unconstitutional effort to "deny ordinary citizens their right to [keep and] carry [arms]." *Bruen*, 597 U.S. at 38 n.9.

2

The district court thus should have made quick work of HB129 and granted Plaintiffs' motion for a preliminary injunction. Yet rather than give effect to the Framers' design and our Nation's traditions, the court dismissed and defied them at every turn. The court began by embracing the remarkable position that the Second Amendment has no relevance to this case at all. According to the district court, laws restricting citizens' ability to acquire firearms *do not even implicate the Second Amendment*. Never mind that a person cannot "keep" or "bear" an arm she does not have. Simply because the Second Amendment does not explicitly say "purchase" alongside "keep" and "bear," the district court ruled that "the Second Amendment's plain text does not cover … purchasing a firearm." App.792.

While the district court could have (prematurely) ended the analysis there, it instead proceeded to gratuitously opine on historical tradition—at which point things went even further off the rails. The court did not purport to discover a historical tradition of forcing members of the general public to wait a state-mandated period before exercising a fundamental right out of concern that people might engage in impulsive behavior. That is because none exists. There were no waiting periods of *any* kind until the 1920s, and even then waiting periods were embraced only as a means to facilitate conducting a background check. "Cooling-off" laws that are imposed *on top of* the time needed to conduct a background check did not emerge

3

until just a few decades ago, and they remain rare even today.  That total lack of historical support for HB129 should have been the end of the historical analysis.

Rather than faithfully follow precedent, the district court moved the goalposts, deeming HB129 relevantly similar to overtly racist laws from the darkest early days of our country's history.  That is gobsmacking.  No court would even think to uphold a modern restriction on the public's ability to exercise the right to assemble, vote, or pray by pointing to Slave Codes.  That the court here apparently saw nothing wrong with invoking historical laws that disarmed groups of people out of odious bigotry as support for a law that restricts the rights of everyone makes clear beyond cavil that it failed to abide by the Supreme Court's repeated admonition that Second Amendment rights are not second-class.  If anything, the fact that the court needed to scrape from the bottom of the historical barrel to "defend" HB129 confirms what should already have been clear:  HB129 is far out of step with historical tradition.  Plaintiffs are therefore exceedingly likely to succeed on their claim that it violates the Second Amendment.  The district court's contrary conclusion cannot stand.

The district court's analysis of the other preliminary injunction factors was just as flawed.  This Court has long held that "the infringement of a constitutional right [is] enough" to establish irreparable injury, and that "even a temporary loss" of a constitutional right tips the balance of harms decisively in favor of preliminary relief.  *Free the Nipple Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805–07

(10th Cir. 2019).  The district court brushed all of that aside.  Worse, the court callously ignored that HB129 imposes an irreparable injury on all law-abiding, responsible New Mexicans every day it remains on the books—and doubly so for those who find themselves in the unfortunate situation of having an acute need to defend themselves and their loved ones in the time between passing a background check and the conclusion of the state's arbitrary "cooling-off" period.

This Court recently recognized that, given the Second Amendment's now-settled place in our constitutional firmament, "we cannot look with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way." *United States v. Daniels*, 101 F.4th 770, 778 (10th Cir. 2024).  Yet HB129 does exactly that:  assuming that everyone who wants a firearm needs to take a weeklong "cool down" before they can be trusted to exercise their right to keep and bear arms. Nothing in our Nation's historical tradition supports such a sweeping, and frankly insulting, restriction on arms-bearing conduct.  And no state has a valid interest in enforcing such a blatantly unconstitutional law, no matter how (purportedly) well-intended the law may be.  The district court thus should have granted Plaintiffs' requested preliminary relief.  This Court should reverse and remand with instructions to enjoin enforcement of HB129 pending the termination of this litigation.

## JURISDICTIONAL STATEMENT

Plaintiffs seek injunctive relief under 42 U.S.C. §1983 and declaratory relief under 28 U.S.C. §2201. App.16. The district court thus had subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343. On July 22, 2024, the district court denied Plaintiffs' motion for preliminary injunction. App.738. Plaintiffs filed a timely notice of appeal on August 21, 2024. App.846; *see* Fed. R. App. P. 4(a). This Court has jurisdiction under 28 U.S.C. §1292(a)(1).

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

Whether HB129 should be enjoined pending final resolution of Plaintiffs' Second Amendment claim.

## STATEMENT OF THE CASE

### A.    Legal Background

1. The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. From the founding to the present, federal and state authorities have grappled with the best way to respect that right while keeping firearms out of the hands of those who pose a credible threat to the physical safety of others.

At the founding, some states limited firearm access for discrete segments of the population, on the theory that those segments were predisposed to violence. Some of these laws were rooted in virulent racism: Several states restricted gun sales to Blacks and Native Americans on the odious belief that these groups were

predisposed to violence (or, worse still, to deprive them of the means to defend themselves against violence perpetrated on them by others).  App.747.  Still more states restricted gun sales to people who expressed anti-government opinions.  App.747.  Other laws were rooted in common sense, including prohibitions on firearm use by intoxicated individuals, *see Rocky Mt. Gun Owners v. Polis*, 701 F.Supp.3d 1121, 1143 (D. Colo. 2023) (collecting examples), and restrictions on individuals found to pose a threat to others, *see Rahimi*, 144 S.Ct. at 1896–1903.  But while states experimented to find the best ways to keep firearms out of the hands of those deemed likely to misuse them, no state imposed any kind of "waiting period" to acquire a firearm "until 1923."  *Rocky Mt. Gun Owners*, 701 F.Supp.3d at 1137.

A handful of waiting-period laws were enacted in the following decade.  These early-twentieth-century laws were designed to facilitate the background-check process, which was a much more time-consuming endeavor back then.  For example, California—one of the first states to enact such a law, back in 1923—initially imposed a one-day wait for retail handgun purchases, during which dealers were required to provide information identifying the purchaser to the local police or county clerk.  *Silvester v. Harris*, 843 F.3d 816, 823–24 (9th Cir. 2016).  New Jersey, another early adopter in 1927, imposed a seven-day waiting period similarly requiring the dealer to forward the purchaser's information to the licensing authority

for a background investigation. *See* Law of Mar. 30, 1927, ch. 321, §6(4)(b), 1927 N.J. Laws 742, 746. The District of Columbia followed in 1932 with a 48-hour waiting period requiring the dealer to forward the purchaser's information to the D.C. police within six hours. *See* Act of July 8, 1932, ch. 465, §8, 47 Stat. 650, 652. Three years after that, in 1935, South Dakota passed its own 48-hour waiting period with a six-hour notification requirement. *See* Law of Mar. 14, 1935, ch. 208, §9, 1935 S.D. Laws 355, 357. In the 1970s, 1980s, and 1990s, waiting-period laws enjoyed a brief renaissance as additional states sought to facilitate background checks in the pre-Internet era. *Silvester*, 843 F.3d at 824; *see also, e.g.*, *State v. Mendoza*, 920 P.2d 357, 368 (Haw. 1996) (Hawaii); 1975 Senate Bill 185, Wis. Legis. (Mar. 15, 1976), https://tinyurl.com/3f8xr6uy (Wisconsin).

While these waiting periods helped facilitate investigations into the purchaser, they came at a significant cost to law-abiding citizens. In 2015, a New Jersey woman was fatally stabbed by her ex-boyfriend (against whom she had a restraining order) while waiting for the state to process her application to own a handgun. Greg Adomaitis, *N.J. gun association calls Berlin woman's death an 'absolute outrage'*, NJ.com (June 5, 2015), https://tinyurl.com/mn32h8f. And in Wisconsin, a woman was killed by her stalker before she could take possession of the handgun she was attempting to purchase. *See* David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. Legis. 303, 309 (2016).

8

With the advent of modern federal background check requirements and the National Instant Criminal Background Check System ("NICS"), fixed waiting-period laws no longer serve an investigatory purpose, as most background checks are completed in a matter of minutes. *See id.* at 310 (noting that "[t]he availability of NICS has led some states to repeal waiting periods"). Many states that used to have waiting periods have thus abandoned them over the past few decades. *See, e.g.*, 1995 Or. Laws ch. 729 (S.B. 1096) §13 (Oregon); 1997 Ind. Legis. Serv. P.L. 17-1997 §§6, 8 (H.E.A. 1669) (West) (Indiana; §6 repeals a 7-day waiting period while §8 adds an instant-background check requirement); 2009 S.D. Sess. Laws ch. 122 (SB 70) §1 (South Dakota); 2015–2016 Wis. Legis. Serv. 22 (2015 S.B. 35) (West) (Wisconsin); *see also* Brendan O'Brien, *Wisconsin Governor Signs Bill Repealing Handgun Waiting Period*, Reuters (June 24, 2015), https://tinyurl.com/228uby2t (observing that "the instant national background check system makes the waiting period law obsolete," and quoting the then-Governor's remark that repealing the waiting-period law "allows Wisconsin's law to catch up with the 21st century"); Tenn. Bur. Invest., *Guidelines for Federal Firearms Licensees* 1–2, https://tinyurl.com/5yx9rc52 (noting that Tennessee's "fifteen-day waiting period

between purchase and delivery of a handgun was eliminated effective November 1, 1998," the same day "[t]he Tennessee Instant Check Law became effective").[1]

Federal law followed a similar trajectory. Congress first mandated background checks for most firearm sales in the Brady Handgun Violence Prevention Act of 1993. Although the Brady Act contemplated a nationwide system of instant background checks, the technology necessary to facilitate that system did not yet exist when Congress passed the law. So the Brady Act gave the FBI five years to lay the groundwork for what ultimately became NICS, and, in the meantime, Congress embraced a five-day waiting period to facilitate local law enforcement officials conducting cumbersome background checks. *See Printz v. United States*, 521 U.S. 898, 902–04 (1997). But mindful of the constitutional concerns with that approach, once NICS came online, Congress abandoned the five-day waiting period and replaced it with an affirmative *protection* to ensure that delays in processing the

---

[1] Oregon, Indiana, Tennessee, South Dakota, and Wisconsin are not the only states that appear to have tried and abandoned waiting-period laws since they came on the scene in 1923. While Alabama, Connecticut, Iowa, Massachusetts, Missouri, New York, North Carolina, Pennsylvania, and Virginia had some version of a waiting-period law as of 1990, "during which at least some of the" buyer's eligibility "information … [was] verified," U.S. Dep't of Justice, Off. Justice Prog., Bur. of Justice Stats., *Identifying Persons, Other Than Felons, Ineligible to Purchase Firearms* 23, 107 (May 1990), https://tinyurl.com/2s3tpz8x, that no longer appears to be the case, *see* Everytown for Gun Safety, *Which states require a waiting period before gun purchases?*, https://tinyurl.com/6zpcnpkr (last visited Nov. 4, 2024) (listing the current 13 states with waiting-period laws, which do not include the aforementioned jurisdictions).

checks would not impede the lawful exercise of Second Amendment rights: A licensed firearms dealer may proceed with a sale three business days after requesting a background check, even if the background check has not yet been completed. *See* 18 U.S.C. §922(t)(1)(B)(ii); *see also* U.S. Dep't of Justice, Off. Justice Prog., Bur. of Justice Stats., *Presale Handgun Checks, the Brady Interim Period, 1994–98* (June 1999), https://tinyurl.com/2nrdckfs.

2. While Congress and some states with waiting periods responded to the advent of NICS and related improvements to background-check processes by abandoning lengthy waiting-period laws, a handful of others responded by trying to re-justify laws originally intended to facilitate a background check. California is illustrative. After adopting a one-day waiting period for retail sales of pistols, revolvers, and concealable firearms in 1923, California extended the period to five days in 1965, and then again to 15 days in 1975, both times primarily "to allow more time for more extensive background checks." *Silvester*, 843 F.3d at 824. It was not until 1979 that the state even hinted (as a litigating position) that the law might serve a "cooling-off" function too. *See People v. Bickston*, 154 Cal.Rptr. 409, 410 (Cal. App. Dep't Super. Ct. 1979). And the California legislature did not expressly embrace a cooling-off approach until 1996. *Silvester v. Harris*, 41 F.Supp.3d 927,

946–47 (E.D. Cal. 2014).[2]  By then, California had switched to an electronic background check system that allowed most checks to be processed far more expeditiously than previously.  Although the legislature apparently recognized at that point that it no longer had a good justification to force Californians to wait 15 days to acquire a firearm, it still was not willing to trust law-abiding citizens who have passed a background check with a firearm.  (Indeed, at the time, California was not even willing to admit that the Second Amendment protects the right to keep and bear arms.)  So California reduced its waiting period, but only to ten days, contending that law-abiding citizens should have to wait out a "'cooling off' period" before they can acquire a handgun, even if they have already passed the requisite background check.  *Id.* at 947.

The Ninth Circuit upheld California's "cooling-off period" law under the means-end balancing test that it used to apply in Second Amendment cases.  *See Silvester*, 843 F.3d at 828.  But *Bruen* subsequently—and emphatically—rejected any role for means-end balancing in the Second Amendment context, abrogating the Ninth Circuit's decision and others applying similar tests.  597 U.S. at 22–23.  And, to put it mildly, "cooling-off periods" do not sit comfortably with *Bruen* and *Rahimi*. The former explicitly cautioned against efforts to impose obstacles for the sole

---

[2] The district court opinion in *Silvester* was reversed on other grounds on appeal, but the Supreme Court abrogated the Ninth Circuit decision in *Bruen*.  *See Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023) (recognizing abrogation).

purpose of delaying a law-abiding citizen's ability to carry a firearm. *Id.* at 38 n.9. And the latter distinguished between permissible efforts to keep firearms out of the hands of "citizens who have been found to pose a credible threat to the physical safety of others" and constitutionally suspect efforts to "broadly restrict arms use by the public generally." *Rahimi*, 144 S.Ct. at 1900–01.

Unfortunately, those pronouncements have not stopped a handful of state legislatures from breaking with historical tradition and enacting unadorned "cooling-off period" laws for the first time in their histories. For example, Colorado recently passed a three-day cooling-off period that starts when the seller initiates a background check. *See* Colo. Rev. Stat. §18-12-115. Positing that "[d]elaying immediate access to firearms … can help prevent impulsive acts of firearm violence, including homicides and suicides," the legislature effectively subjected all firearm sales in Colorado to a three-day hold, even if the buyer passes a background-check instantly. 2023 Colo. Legis. Serv. Ch. 125 §1(2)(a) (H.B. 23-1219) (West). Vermont followed suit, enacting its own three-day "cooling-off" period that starts once a buyer passes a background check, on the theory that doing so will "help to prevent impulsive … violence," H.230, §1(10), https://tinyurl.com/msddz287, despite the Governor's "significant concerns about the provision's constitutionality," Vt. J. Senate 1952 (May 12, 2023), https://tinyurl.com/25t3nfvs. *See* Vt. Stat. Ann. Tit. 13, §4019a. And Maine recently enacted a statute transparently entitled "An Act To

Reduce Suicides and Violent Crimes by Requiring a 72-hour Waiting Period after the Sale of a Firearm," which imposes a "cooling off" period that likewise applies even after one passes a background check. Maine Bill LD 2238 (SP 958) (codified at Me. Stat. 25 §2015) (2024).

### B.    Factual and Procedural Background

1. Earlier this year, New Mexico joined this small, late-breaking party by enacting HB129. HB129 requires "[a] waiting period of seven calendar days … for the sale of a firearm and the transfer of the firearm to the buyer." N.M. Stat. §30-7-7.3(A). The statute's stated "primary purpose is to … prevent[] impulsive suicides and homicides." App.745. But the statutory waiting period is not keyed to the time it takes to complete a background check into someone's criminal and mental health history. It instead specifies that "[t]he seven-calendar-day waiting period shall include the period required to conduct a federal instant background check." N.M. Stat. §30-7-7.3(A). So even if the background check comes back clean instantly (as most do), the purchaser still must wait seven days. HB129 also purports to supersede the maximum-three-business-day delay under federal law, *see* 18 U.S.C. §922(t)(1)(B)(ii); pp.10-11, *supra*, prescribing that "if the seven-calendar-day waiting period has expired without the completion of a required federal instant background check, the seller shall not transfer the firearm to the buyer until the

federal instant background check is completed" or until "twenty days" have gone by. N.M. Stat. §30-7-7.3(A).

Transferring a firearm in violation of HB129 is a misdemeanor, *id.* §30-7-7.3(G), and "[e]ach party to an unlawful sale … may be separately charged," *id.* §30-7-7.3(D).  The only sales exempt from the cooling-off period are sales to federally licensed firearms dealers, sales to people with valid New Mexico concealed-handgun licenses, sales to law-enforcement agencies or between law-enforcement officers, and sales between immediate family members.  *See id.* §30-7-7.3(H).

2. HB129 took effect on May 15, 2024.  App.739–40.  Later that day, Plaintiff Paul Samuel Ortega traveled to a federally licensed firearm dealer in Albuquerque to purchase a handgun for self-defense.  App.742.  There is no dispute that Ortega is a law-abiding adult and former law-enforcement officer who has responsibly owned several firearms for many years.  App.742.  Nor is there any dispute that Ortega passed the federal background check in a matter of minutes and promptly paid for the handgun in full.  App.742.  Nevertheless, because of HB129, Ortega was unable to take possession of the firearm for seven days.  App.742.

A similar story played out for Plaintiff Rebecca Scott, who sought to purchase a handgun for self-defense from a federally licensed firearm dealer in Farmington, New Mexico.  App.743.  She promptly passed the federal background check, but the

15

dealer refused to let her pay for or take possession of the gun for seven days because of HB129.  App.743.

Both Plaintiffs plan to purchase at least one more firearm in the future. App.743 (Ortega); App.744 (Scott).  When they do so, they will have to wait out the seven-day "cooling-off" period yet again.

3. In the midst of their respective seven-day "cooling-off" periods, Ortega and Scott filed suit, seeking a declaration under 28 U.S.C. §2201 that HB129 violates the Second Amendment and an injunction under 42 U.S.C. §1983 blocking the law's enforcement.  App.16.  They also moved for a preliminary injunction preventing enforcement of HB129 during the pendency of the case.  App.24.  Following briefing and an evidentiary hearing, the district court denied the preliminary injunction motion in a 103-page opinion issued roughly a month after *Rahimi* came down.

After an extended exegesis contrasting various ways to approach the Second Amendment *other than* the one the Supreme Court has mandated, *see* App.777–89, the district court announced that it would evaluate HB129 in three steps, beginning with whether the Second Amendment's plain text covers "purchasing" a firearm. Only if the answer to that question was "yes" would what the district court called the second step—asking whether HB129 is "presumptively constitutional"— come into play.  And only if the answer to *that* question was "no" would the court proceed

16

to the third and final step, analyzing whether HB129 is consistent with the Nation's historical tradition of firearms regulation.  App.791–92.

The district court effectively ended the analysis before it began.  At the first step, the court concluded that a law that prevents people from keeping and bearing arms for seven days *does not even implicate the Second Amendment*:  Because the Second Amendment's plain text does not say "purchase" or "acquire" alongside "keep and bear," the court "conclude[d] that the Second Amendment's plain text does not cover the conduct that the Waiting Period Act implicates," and thus that HB129 "is not presumptively unconstitutional."  App.800–01.

The district court then went on to nakedly apply classic means-end balancing.  The court was willing to concede that "[l]ogic dictates" that "the right to acquire firearms" must "receive[] some Second Amendment protection."  App.801–02.  The court thus spotted Plaintiffs that there must at least be some penumbral or "ancillary right to acquire firearms."  App.802.  But, in the court's view, the only laws that presumptively violate that penumbral right are those that "function[] as a de facto prohibition on the right to keep and bear arms."  App.802.  And because HB129's prohibition lasts only a week, the court deemed it too insubstantial to outweigh the state's interest in public safety or even "to implicate rights the Second Amendment's plain text does cover—i.e., possessing and carrying firearms."  App.803.

Although the district court arguably could have stopped there, it went on to spill considerable digital ink analyzing whether HB129 is "presumptively constitutional." *District of Columbia v. Heller* contains a single sentence clarifying that the Court's decision invalidating the District of Columbia's flat ban on handguns was not meant to disrupt "longstanding" measures like "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. 570, 626–27 (2008). The district court took that ball and ran with it. Claiming that "[c]ourts have yet to agree upon" the meaning of "laws imposing conditions and qualifications on the commercial sale," the court articulated the view that the language represents a catch-all provision encompassing anything "cover[ing] the sale of firearms" that has a pedigree "extending back to some point in the twentieth century." App.806–13. Put differently, according to the district court, all 1990s-era regulations on "when," "where," "how," and perhaps even "to whom" a firearm may be sold are presumptively constitutional so long as they do not amount to "a total ban on buying a gun" or confer "an impermissible amount of discretion" to licensing officials. App.818–19.

Finally, in a second alternative holding, the district court concluded that HB129 could survive founding- and Reconstruction-era historical scrutiny—but not

on any theory that New Mexico advanced.  Rejecting the state's analogies to "laws involving intoxicated persons and licensing regimes," the court instead tried to analogize HB129 to laws "prohibiting and restricting the sale of firearms to large swaths of the population"—everyone from "blacks, slave and free; Indians; propertyless whites; non-Protestants or potentially unruly Protestants"—"out of a fear that some among these groups would use the purchased firearms to do harm." App.821, App.836.  According to the district court, "the Supreme Court's instruction to assess the Constitutionality of modern firearm regulations against those laws in existence in the eighteenth and early nineteenth century" required it to uphold HB129 as the modern successor to these laws, even though the historical examples were "undoubtably … repugnant," and even though "they applied to a narrower swath of the population than does" HB129.  App.833–34.

Plaintiffs timely appealed.  App.846.

## STANDARD OF REVIEW

The Court reviews a district court order denying a preliminary injunction for abuse of discretion.  *Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010).  "An abuse of discretion occurs when the district court commits an error of law or makes clearly erroneous factual findings."  *Colorado v. Griswold*, 99 F.4th 1234, 1240 (10th Cir. 2024) (quoting *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 775 (10th Cir. 2009)).  Indeed, "a legal error constitutes an abuse of discretion per se."  *United*

*States v. McFadden*, 116 F.4th 1069, 1082 (10th Cir. 2024).  This Court accordingly "examine[s] the district court's legal determinations de novo," without affording any deference.  *Colorado*, 99 F.4th at 1240 (quoting *Att'y Gen. of Okla.*, 565 F.3d at 776).

## SUMMARY OF ARGUMENT

This appeal turns on a novel question of exceptional importance:  whether the Second Amendment permits a state to force law-abiding citizens to wait out a week-long "cooling-off period" before taking possession of a firearm, even if the purchaser passes a background check instantly and has satisfied any other criteria necessary to obtain a firearm.  No court of appeals has had the occasion to consider this question since the Supreme Court decided *Bruen* in 2022.  But *Bruen* and *Rahimi* make the inquiry straightforward.  Because New Mexico has regulated arms-bearing conduct and placed restrictions on citizens' ability to have firearms, the state bears the burden to "demonstrate" that HB129 "is consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 17.  It cannot carry that burden.  While our Nation's historical tradition leaves room for regulatory measures "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" *id.* at 38 n.9 (quoting *Heller*, 554 U.S. at 635), it does not tolerate efforts to "broadly restrict arms use by the public generally"—i.e., by those the government has already assured itself *are* law-abiding, responsible citizens, *Rahimi*, 144 S.Ct. at 1902.  And while a brief, state-mandated delay for purposes of conducting a

background check may fall into the former category, delaying the exercise of Second Amendment rights just for the sake of delaying their exercise falls decidedly into the latter category.

That distinction dooms HB129.  By imposing a "cooling-off" period even *after* someone has passed a background check, HB129 unabashedly strays far beyond trying to ensure that someone is entitled to exercise Second Amendment rights, and instead just "look[s] with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way." *Daniels*, 101 F.4th at 778.  There is no historical tradition anything like that rights-impeding approach.  While *Bruen* is not "a regulatory straightjacket" that demands "a historical twin," 597 U.S. at 30, New Mexico still must "identify a well-established and representative historical analogue" from either the founding or Reconstruction eras, *id.*, that "impos[es] similar restrictions" on acquiring a firearm "for similar reasons"—in other words, an analog with a similar "how" and "why." *Rahimi*, 144 S.Ct. at 1898.  Here, no law imposed an unadorned cooling-off period, grounded in the notion that even law-abiding citizens cannot be trusted with firearms, until the late twentieth century.  So even if New Mexico could identify a historical analogue that delayed the exercise of Second Amendment rights in service of accomplishing a *different* purpose, to uphold HB129 on that basis would be to eliminate the "why" component of the test entirely.

In fact, that is exactly what the district court did.  After a five-page footnote bemoaning the Supreme Court's decision to incorporate the Second Amendment against the states, App.781–86 n.2, another lengthy footnote objecting to *Bruen*'s historical-tradition inquiry, App.787–88 n.3, and nearly 30 pages positing that a law restricting access to firearms does not even implicate the Second Amendment, App.792–820, the district court upheld HB129 by analogizing it to colonial laws restricting the sale of firearms to Native Americans, slaves, and people who spoke out against the government.  Trying to draw a historical tradition from laws governing groups that were not thought to possess Second Amendment rights at the time is always a perilous exercise.  But even setting that aside, there is an obvious difference between laws that burden discrete populations on the (odious) belief that they are predisposed to violence, and laws that burden the rights of *all* the people entitled to keep and bear arms, on the theory that everyone who seeks a firearm is probably inflamed by murderous or suicidal passions that need to "cool" before they can be entrusted with the exercise of a fundamental right.  The former are not even similar to the latter in their "how," let alone their "why."  The district court's contrary claim distorts the historical-tradition inquiry beyond recognition.

No less flawed was the district court's conclusion that HB129 "is presumptively constitutional because it is a condition or qualification on the commercial sale of arms."  App.804 (capitalization altered).  First of all, treating

certain categories of laws as presumptively constitutional makes little sense after *Bruen* and *Rahimi*, which make clear beyond cavil that when the government regulates arms-bearing conduct, the government must justify that restriction, not the other way around.  At any rate, HB129 is not a condition or qualification on sale.  Conditions and qualifications are things that people can satisfy.  But no one can satisfy a waiting period; all one can do is wait it out.  Laws that make people wait before they can take possession of a firearm thus do not in any way impose a condition or qualification on the sale of arms.  HB129 is just a time-limited prohibition against transferring a firearm.  The court's conclusion that HB129 is a "presumptively lawful" condition on the sale of arms was thus wrong twice over.  And there is a third strike against the district court's "presumptively lawful" detour too.  The court recognized that "the regulations that *Heller* identifies must be "longstanding" to be "presumptively constitutional."  App.806.  But since the first "cooling off" law was not enacted until the 1990s, the court moved the goalposts yet again, holding that, "to be longstanding, a regulation need only have a … historical tradition of enforcement[] extending back to *some point in the twentieth century*."  App.813 (emphasis added).  That is not so much an application as a nullification of *Bruen* and *Rahimi*.

The district court's analysis of the other preliminary injunction factors was equally erroneous.  It is black-letter law that the infringement of a constitutional right

suffices to establish irreparable injury, and that even a temporary loss of a constitutional right tips the balance of harms decisively in favor of preliminary relief. The district court concluded otherwise only by doing precisely what the Constitution prohibits: treating the Second Amendment as a second-class right (at best). If New Mexico enacted a "cooling-off" period on inflammatory speech, making citizens wait seven days before saying something the state thinks they might regret later, this Court would doubtless issue a preliminary injunction on First Amendment grounds, "notwithstanding a State's purported interest in giving the speaker time to calm down." *Silvester v. Becerra*, 138 S.Ct. 945, 951–52 (2018) (Thomas, J., dissenting). So too if New Mexico enacted a "cooling off" period of *any* length on a substantive-due-process right. In point of fact, courts *did* invalidate waiting periods while abortion was treated as a constitutional right. There is simply no reason to tolerate a different approach in the Second Amendment context—and, as this case illustrates, every reason not to. Rather than "single[] out" the Second Amendment "for special—and specially unfavorable—treatment," as the district court did, this Court should reverse and remand with instructions to enjoin HB129 forthwith. *McDonald v. City of Chicago*, 561 U.S. 742, 778–79 (2010).

## ARGUMENT

"In order to receive a preliminary injunction, [a] plaintiff must establish the following factors: (1) a substantial likelihood of prevailing on the merits;

(2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest." *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016). The first factor is the "most important." *Planned Parenthood of Kan. v. Anderson*, 882 F.3d 1205, 1229 (10th Cir. 2018). Indeed, when an "individual right[]" protected by the Bill of Rights is at stake, the first factor is usually dispositive, because "a violation of [the] constitutional right alone constitutes irreparable harm." *Aposhian v. Barr*, 958 F.3d 969, 990 (10th Cir. 2020). And "when the government is the opposing party," the third and fourth factors "merge," *id.* at 990–91, because a state "does not have an interest in enforcing a law that is likely constitutionally infirm," *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010), and "it is always in the public interest to prevent the violation of a party's constitutional rights," *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1147 (10th Cir. 2013).

Each of the preliminary injunction factors is satisfied here.

## I.    Plaintiffs' Second Amendment Claim Is Exceedingly Likely To Succeed.

The Supreme Court has left no doubt about how to resolve Second Amendment claims. "The threshold question in a Second Amendment claim is whether the Amendment presumptively protects the individual's conduct." *United*

*States v. Perez-Garcia*, 96 F.4th 1166, 1178 (9th Cir. 2024) (citing *Bruen*, 597 U.S. at 24); *see also Bruen*, 597 U.S. at 32 (asking "whether the plain text of the Second Amendment protects [the plaintiffs'] proposed course of conduct"). If the answer to that question is yes—i.e., if the government has "regulate[d] arms-bearing conduct"—then "the Constitution presumptively protects that conduct," and the government "bears the burden to 'justify its regulation.'" *Rahimi*, 144 S.Ct. at 1897, 1931. "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 17. The government, not the citizen, bears the burden of persuasion on that inquiry. *Id.* at 33–34. "[W]hen the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation,'" *Rahimi*, 144 S.Ct. at 1897 (quoting *Bruen*, 597 U.S. at 24), which it can do only if it "affirmatively prove[s] that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 597 U.S. at 19.

### A.    HB129 Regulates Conduct Covered by the Plain Text.

1. The threshold textual inquiry here is simple, as it will be in most cases. At the outset, the state does not contest that HB129 applies to "the people" that the Second Amendment protects. *Cf. Heller*, 554 U.S. at 579–81. That is wise, as HB129 applies to nearly every member of the general public. *See* N.M Stat. §30-7-

7.3(H); p.15, *supra*.  New Mexico likewise does not contest that the firearms HB129 makes it unlawful to "transfer" during a "seven-calendar-day waiting period," *id.* §30-7-7.3(A), qualify as "arms."  That too is wise.  HB129 applies to all firearm sales, *see id.* §30-7-7.3(A) ("A waiting period of seven calendar days shall be required for the sale of a firearm and the transfer of the firearm to the buyer."), and it defines the term "firearm" capaciously to "include[] any handgun, rifle or shotgun," *id.* §30-7-7.3(I).  Handguns, rifles, and shotguns are obviously "Arms" for purposes of the Second Amendment.  *See Heller*, 554 U.S. at 581 (defining "Arms" as bearable instruments "that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another"); *see also Bruen*, 597 U.S. at 28 (confirming that "that general definition covers modern instruments that facilitate armed self-defense").  Indeed, even "one founding-era thesaurus" that took a relatively "limited" view of the scope of the term "Arms" "stated that all firearms constituted 'arms.'"  *Heller*, 554 U.S. at 581.  And that "18th-century meaning" is "the meaning" that governs "today."  *Id.*

So the only question is whether HB129 restricts someone's ability to "keep" and "bear" those arms.  The answer is plainly yes.  "[T]he most natural reading of 'keep Arms' … is to 'have weapons,'" and "the natural meaning of 'bear arms' … implies [] the carrying of [a] weapon [] for the purpose of 'offensive or defensive action.'"  *Heller*, 554 U.S. at 582–83.  Plaintiffs would like to purchase firearms

("Arms") so that they may have ("keep") and carry ("bear") them.  HB129 restricts their ability to do so.  By criminalizing "the transfer of [a] firearm to [a] buyer" for at least seven days (and as many as "twenty days"), N.M. Stat. §30-7-7.3(A), HB129 constrains the buyer's ability to have or carry arms:  It precludes the buyer from acquiring the firearm she wants to have (and carry) for an arbitrary period of time.  *See Have*, Oxford English Dictionary (3d ed. 2015) ("to be in possession of (something received, acquired, earned, etc.); to possess").  The threshold textual inquiry here is thus quite simple:  Because "the challenged condition restricts [Plaintiffs'] ability to bear or keep [a] firearm—even those [they] would lawfully store at home for self-defense—[it] unquestionably implicates [their] Second Amendment rights."  *Perez-Garcia*, 96 F.4th at 1181.

2. The district court concluded that because the Second Amendment's plain text does not list a verb such as "purchase" or "acquire" alongside "keep" and "bear," challenges to state laws that restrict the people's ability to purchase or acquire arms do not implicate the Second Amendment at all.  App.792–93.  Nonsense.  Plaintiffs seek to keep and bear firearms—conduct that New Mexico could not seriously deny falls within the scope of the Amendment's plain text as interpreted by the Supreme Court.  And the state has unquestionably restricted that conduct by preventing Plaintiffs from taking possession of the firearms they wish to keep and bear for at least a week.  Just as a law restricting people to distributing one pamphlet a month,

28

or restricting their access to ink and paper, would plainly restrict the ability to speak, *see, e.g.*, *Minneapolis Star Trib. Co. v. Minn. Comm'r*, 460 U.S. 575, 592–93 (1983), a restriction on acquiring an arm plainly restricts the ability to keep and bear that arm.  Any other conclusion would turn the Second Amendment into "'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'"   *Bruen*, 597 U.S. at 70 (quoting *McDonald*, 561 U.S. at 780 (plurality)).

It should therefore come as little surprise that the commonsense proposition that "th[e] right of keeping arms" "necessarily involve[s] the right to purchase and use them" has been a feature of judicial opinions since at least 1871.  *Andrews v. State*, 50 Tenn. 165, 178 (1871); *see also, e.g.*, *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 230 (4th Cir. 2024) (en banc) (Rushing, J., concurring) ("Maryland's law regulates acquiring a handgun, and the Second Amendment's text encompasses that conduct."); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) ("the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms" (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *Brown v. ATF*, 704 F.Supp.3d 687, 700 (N.D. W. Va. 2023); *United States v. McNulty*, 684 F.Supp.3d 14, 20 (D. Mass. 2023); *Renna v. Bonta*, 667 F.Supp.3d 1048, 1065 (S.D. Cal. 2023); *United States v. Hicks*, 649 F.Supp.3d 357, 359 (W.D. Tex. 2023); *Fraser v. ATF*, 672 F.Supp.3d 118, 128

(E.D. Va. 2023).  The district court's seeming view that *Bruen* somehow gives states *more* leeway to prohibit ordinary citizens from keeping and bearing arms "sounds absurd, because it is."  *Sekhar v. United States*, 570 U.S. 729, 738 (2013).

Equally unavailing is the district court's conclusion that because HB129 "merely" prevents people from having their lawfully purchased firearm for a week, it does not impose enough of a burden on Second Amendment rights to constitute a presumptively unconstitutional "infringement."  *See* App.795–803.  After initially denying that the Second Amendment is even implicated here, the district court grudgingly acknowledged that HB129 imposes what it deemed a "minimal[] burden[]" on law-abiding New Mexicans' Second Amendment rights.  App.802.  But, claiming that "the founding generation's historical understanding" of "keep" and "bear" "cannot be indulged in" at this stage of the analysis, App.798, the court concluded that the "burden" HB129 imposes on Second Amendment rights is "not so onerous" as to trigger *Bruen*'s historical-tradition inquiry, App.803.

That is both flat wrong and entirely beside the point.  Laws requiring people to wait a set number of days before they can take possession of a firearm can be— and unfortunately have been—fatal.  *See* p.8, *supra*.  But more to the point, the district court's inquiry into the *degree* of the burden HB129 imposes was a category mistake.  The threshold textual inquiry focuses on the conduct in which the plaintiff seeks to engage, not the degree to which the state has restricted it.  *See, e.g.*, *Bruen*,

597 U.S. at 32. Here, Plaintiffs simply want to keep and bear arms, and the state has temporarily prohibited them from obtaining the arms they want to keep and bear. That is the end of the textual inquiry. Just as "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms," *id.*, nothing in the Amendment's text says that the right is safeguarded only against those restrictions that a court considers sufficiently burdensome. Whether New Mexico's law imposes a *permissible* burden on the right to keep and bear arms thus must be answered by looking to historical tradition, not by deferring to the state's value judgment that law-abiding citizens need to "cool down" for a week before they can take possession of property that is necessary to the exercise of a fundamental right.

### B.    HB129 Is Inconsistent With This Nation's Historical Tradition of Firearm Regulation.

1. Because Plaintiffs' proposed course of conduct is "presumptively protect[ed]" by the Constitution, the state must "affirmatively prove" that its restriction is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17, 19, 28, 33–34. "[I]f a challenged regulation fits within that tradition, it is lawful under the Second Amendment." *Rahimi*, 144 S.Ct. at 1897. Conversely, if a modern regulation does not fit within that tradition, it is unconstitutional.

A modern regulation fits within our historical tradition of firearm regulation if it "impos[es] similar restrictions" on the arms-bearing right "for similar reasons"

31

as a historical analog. *Id.* at 1898. "[C]entral to this inquiry" are two questions: the "why" and the "how." *Id.*; *see Bruen*, 597 U.S. at 29. As to the former, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Rahimi*, 144 S.Ct. at 1898. As to the latter, "[e]ven when a law regulates arms-bearing for a permissible reason, … it may not be compatible with the [Second Amendment] right if it does so to an extent beyond what was done at the founding." *Id.*

The Supreme Court has provided several signposts on this historical journey. First and foremost, the government bears the burden to justify a modern restriction on arms-bearing conduct by pointing to a "relatively similar" historical regulation— in effect, a historical regulation with a similar "why" and "how" as the challenged restriction. *Id.* at 1897–98. What is more, "post–Civil War discussions of the right to keep and bear arms … do not provide as much insight into [the Second Amendment's] original meaning." *Bruen*, 597 U.S. at 36. Although "belated innovations of the mid- to late-19th-century" can "confirm[]" original meaning, "to the extent [this] later history contradicts" earlier understandings of the pre-existing right, the earlier understanding "controls." *Id.* at 36–37.

2. With those signposts guiding the way, the path forward is clear—as are the district court's missteps. Since the advent of the firearm, it has been an unfortunate

reality that some people who try to acquire firearms want them for illicit (and immediate) purposes. Yet while many measures have been enacted over the centuries to address that concern—from penalty-backed prohibitions on using firearms for improper purposes, to bans on possession by individuals who are likely to misuse them, to background checks to identify individuals subject to such disqualifications, to permits and licenses to carry firearms outside the home—no state for 200 years forced law-abiding citizens to wait out an unadorned "cooling-off" period before they could acquire a firearm. *See* pp.6-12, *supra*.

In "the early days of the Republic," there was no "open, widespread, and unchallenged" practice, *Bruen*, 597 U.S. at 36 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)), of imposing a waiting period before someone could take possession of a firearm, *see, e.g.*, *Silvester*, 41 F.Supp.3d at 962 ("[T]here is no evidence to suggest that waiting periods imposed by the government would have been accepted and understood to be permissible under the Second Amendment."). To the contrary, from the very beginning, courts recognized that "the right of the people to keep and bear arms" "necessarily involves the right to purchase and use them in such a way as is usual" whenever the need to do so arises. *Andrews*, 50 Tenn. at 177–78.

Waiting-period provisions first came onto the scene in the twentieth century, around the same time that some states started adopting various types of background

checks. *See Silvester*, 843 F.3d at 831 (Thomas, C.J., concurring); *Rocky Mt. Gun Owners*, 701 F.Supp.3d at 1137 ("[N]o law requiring a waiting period was enacted in the United States until 1923."). These early waiting periods were not motivated by a suspicion that people who want to purchase a firearm to exercise their right to keep and bear arms are at risk of exercising that right impulsively. On the contrary, they were designed to facilitate the burgeoning background-check process, which was a much more time-consuming endeavor back then. For example, California— one of the first states to enact such a law back in 1923—imposed a one-day waiting period for retail handgun purchases, during which dealers were required to provide information identifying the purchaser to the local police or county clerk. *Silvester*, 843 F.3d at 823–24; p.7, *supra*. Several other states plus the District of Columbia passed waiting-period laws in the 1920s and 1930s, and a few more in later decades, with state-by-state variations on the duration of the waiting period and on whether it applied to all firearm sales or only to the sale of certain kinds of firearms. *See Silvester*, 843 F.3d at 831 (Thomas, C.J., concurring) (collecting examples); Kopel, 53 Harv. J. Legis. at 352–59; pp.7-8, *supra*. But it was not until after the Berlin Wall had fallen that the first state saw fit to make people wait to take possession of a firearm *even after they passed a background check* and demonstrated that they are indeed "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635; pp.11-12, *supra*.

"Cooling-off" laws like HB129 are thus a thoroughly modern innovation even as compared to administrative waiting-period laws—and one that would have been "unimaginable at the founding." *Rocky Mt. Gun Owners*, 701 F.Supp.3d at 1142. That is plainly *not* because the problem New Mexico claims its law is intended to solve—"preventing impulsive suicides and homicides committed with legally purchased firearms," App.745—arose only in recent years. To state the obvious, there have always been people who want to get their hands on a weapon to cause immediate harm to others or themselves. Yet there was no tradition—not at the founding, not in the Reconstruction era, and not even for the better part of the twentieth century—of making people "cool off" for a set number of days before they could take possession of a firearm, let alone of imposing a "cooling-off" period *on people who have already passed a background check*.

3. The district court did not conclude otherwise. Nowhere in its lengthy opinion did the court purport to identify a historical tradition of temporarily preventing the general public from exercising *any* fundamental right, let alone the fundamental right to keep and bear arms, out of concerns that some people who want to exercise that right are likely to engage in impulsive and harmful conduct unless given time to "cool off." And the district court conspicuously declined to rely on the measures that New Mexico offered to try to justify HB129: historical laws restricting

35

intoxicated individuals' ability to possess or use firearms and licensing schemes. That was eminently sensible, as neither is remotely analogous to HB129.

Start with laws restricting the right of the currently intoxicated. If one pitches things at a high-enough level of generality, perhaps the "why" animating such laws could be seen to faintly resemble the motivation behind cooling-off period laws: Both are nominally designed to prevent dangerous, impulsive behavior. But that is where any similarities end. Regulations on intoxicated individuals are narrowly tailored to burden the arms-bearing rights of only a narrow slice of the population—people in a temporary state of inebriation that predisposes them to dangerous or impulsive behavior. And those who wish to avoid that constraint can easily do so by refraining from getting intoxicated. HB129, by contrast, imposes a blunderbuss burden on nearly everyone's arms-bearing right, on the theory that anyone looking to acquire guns might be disposed to impulsive acts of violence. In other words, HB129 simply "look[s] with suspicion on citizens" who wish to "exercis[e] their Second Amendment rights," *but see Daniels*, 101 F.4th at 778, even when they—unlike the inebriated—have done nothing to deserve it. Indeed, HB129 continues to look with suspicion on individuals who want to exercise Second Amendment rights even after a background check has already dispelled any individualized basis for such suspicion. That radical overbreadth sunders the historical analogy.

*Rahimi* confirms the point. To be sure, the Court there recognized that America's "tradition of firearm regulation" allows "the Second Amendment right" to "be burdened once a defendant has been found to pose a credible threat to the physical safety of others" (as one could certainly say is the case for intoxicated individuals). 144 S.Ct. at 1902. But the Court made sure to underscore that laws such as HB129 that "broadly restrict arms use by the public generally" typically do *not* fit within our Nation's historical tradition, which has always "distinguishe[d] citizens who have been found to pose a credible threat to the physical safety of others from those who have not." *Id.* at 1901–02. So, properly understood, the historical regulations on intoxicated individuals actually underscore the problem with modern-day laws imposing unallayed "cooling-off" requirements.

Licensing schemes are even further afield. *See* App.756. Licensing schemes give the government time to ensure that the purchaser is a law-abiding citizen entrusted by the Framers with firearms. In stark contrast, "cooling-off" laws eschew any administrative process designed to ensure that the purchaser is a law-abiding citizen; their sole purpose and effect is to prevent someone who has *already* passed a background check from keeping and carrying a firearm. Once again, that runs head-on into Supreme Court precedent, as *Bruen* expressly distinguished (1) state-imposed delays "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'" (e.g., licensing schemes) from

(2) state-imposed delays designed to "prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry" (e.g., "cooling-off" laws). 597 U.S. at 38 n.9. Whatever our Nation's historical tradition may have to say about the former, it decidedly does not support the latter.

That should have been the end of the road for New Mexico's ahistoric law. Instead, the district court broke new ground—and, along the way, dug itself a veritable Gehenna. As noted, the district court conspicuously declined to credit the two purported historical analogues New Mexico offered to justify HB129. While that was understandable, the district court's next move was curious to say the least. "[I]n our adversarial system of adjudication, we follow the principle of party presentation." *Bruen*, 597 U.S. at 25 n.6 (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)). New Mexico bore the burden to justify HB129 by reference to historical tradition; the district court was thus under no obligation to go beyond the state's litigation position or do the state's job for it. *See id.* (courts are "entitled to decide a case based on the historical record compiled by the parties"). Put differently, upon concluding that the state's analogues were bunk, the district court could—and by all lights should—have ruled for Plaintiffs.

Instead, the district court lost the plot. After apparently conducting its own historical research, the court dug up colonial laws restricting firearm sales to Native Americans, slaves, and people who spoke out against the government. And from

these (odious) historical regulations that plainly could not be sustained today, the court purported to extrapolate "a deeply rooted historical tradition of restricting and even outright prohibiting the sale of firearms to large groups out of a fear that some among those groups might use those firearms to do harm in society."  App.825.

Respectfully, if cooling-off laws are "relevantly similar" to those overtly racist and obviously unconstitutional enactments, then that is reason to strike them down, not to uphold them.  But even accepting the district court's dubious premise, this analogy smacks of the same problems as the state's effort to analogize to restrictions on intoxicated individuals.  Rather than burdening the arms-bearing rights of discrete populations on the loathsome belief that they are predisposed to violence, cooling-off laws burden *everyone*'s rights, regardless of whether they are predisposed to violence, and even when a background check has dispelled concerns that they are. Again, that is flatly inconsistent with "our nation's tradition of firearm regulation," which "distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not."  *Rahimi*, 144 S.Ct. at 1902.

Ultimately, both New Mexico and the district court made the same basic mistake of assuming that if the government may delay the exercise of Second Amendment rights for *some* reasons, then it may delay them for *any*.  That logic ignores the Supreme Court's repeated admonitions that courts must focus on both "how" and "why" a law restricts Second Amendment rights.  *Id.* at 1898; *see also*

*Bruen*, 597 U.S. at 29–30.  It is one thing to delay the exercise of Second Amendment rights in service of accomplishing some other permissible regulatory purpose, like verifying that someone is not legally disqualified from keeping and bearing firearms. But it is another thing entirely to delay the exercise of a fundamental right on the theory that anyone who wants to exercise that right—even a law-abiding citizen who promptly passes a background check and satisfies any other criteria the state may impose—may be inflamed by violent passions that may subside if they are forced to wait a few days.  To ignore that commonsense distinction is to eliminate the "why" component of the test entirely—and to ignore this Court's recent admonition that "tak[ing]" the Supreme Court's decisions "seriously" means not "look[ing] with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way."  *Daniels*, 101 F.4th at 778.

At bottom, that is exactly what HB129 does, speculating that people who seek to purchase a firearm and pass a background check nonetheless remain inflamed by murderous or suicidal passions that need to "cool" before they can be entrusted with the exercise of a fundamental right.  Worse, HB129 follows that speculation to an extreme end, burdening the rights of all New Mexicans for seven days, with no exception for, e.g., people facing concrete, imminent threats of physical violence who otherwise lack means of effective self-defense.  That position is not only

illogical, but ahistoric in the extreme.  In short, HB129 is far out of step with our Nation's historical tradition of firearm regulation.

### C. The State Cannot Avoid *Bruen* by Invoking *Heller*'s "Presumptively Lawful" Language.

The district court devoted much of its opinion not to faithfully resolving the issues the Supreme Court has made dispositive in Second Amendment analysis, but instead to whether HB129 "is presumptively constitutional because it is a condition or qualification on the commercial sale of arms."  App.804 (capitalization altered).  That was a misguided detour, and the result the court reached was wrong even on its own terms.

1. "*Bruen* makes clear that text, history, and tradition are the '[o]nly' ways the Government can justify a regulation that implicates Second Amendment rights." *Perez-Garcia*, 96 F.4th at 1177 (quoting *Bruen*, 597 U.S. at 17).  Simply repeating *Heller*'s dictum about the "presumptive[] lawful[ness]" of certain types of restrictions on arms-bearing conduct, *see* 554 U.S. at 626–27 & n.26, thus will no longer do.  That is not just because the historical pedigree of conditions and qualifications on the commercial sale of arms was not squarely before the *Heller* Court (although that should be reason enough).  It is also because *Bruen* was emphatic that "a court [may] conclude that" a restriction on arms-bearing conduct "falls outside the Second Amendment's 'unqualified command'" "[o]nly if" the government proves that it "is consistent with this Nation's historical tradition."  597

41

U.S. at 17 (emphasis added)).  *Rahimi* doubled down on that point, underscoring that "when the Government regulates arms-bearing conduct, … it bears the burden to 'justify its regulation'" by showing that "the challenged regulation is consistent with the principles that underpin our regulatory tradition."  144 S.Ct. at 1897–98.  And for all the reasons already discussed, New Mexico cannot come close to making that showing, because HB129 is far out of step with our Nation's historical tradition.

2. Even if *Heller*'s dictum survived *Bruen* and *Rahimi*, it does not move the needle here, for the simple reason that HB129 is not a condition or qualification on sale.  App.806–10.  It is a near-blanket prohibition—albeit a time-limited one—on the transfer of firearms even to responsible, law-abiding citizens.

Consider a law-abiding citizen who owns no firearms.  Now imagine that, after a bad breakup and a violent encounter with her now-ex, she decides that she wants to buy a handgun, the "quintessential self-defense weapon," for personal protection.  *See Heller*, 554 U.S. at 629.  HB129 prohibits her from keeping or bearing a handgun *right now* and *for seven days hence*, no matter how many background checks she passes or how many hoops she jumps through, and no matter how acute her need to be armed and ready.  There is no condition or qualification she can satisfy to gain access to the firearm.  All she can do is wait.

That is not a condition or qualification on the sale of firearms.  Conditions and qualifications are things that people can satisfy.  *See* Condition, *Black's Law*

42

*Dictionary* (12th ed. 2024) ("an uncertain act or event that," if satisfied, "triggers or negates a duty to render a promised performance"); Qualification, *Google Dictionary*, https://tinyurl.com/mvmvax6k ("a condition that must be fulfilled before a right can be acquired; an official requirement"). The requirement to secure a background check, for instance, is a condition or qualification on the sale of a firearm (or, perhaps more precisely, a condition precedent to the transfer of a firearm). All a seller must do to satisfy that condition is procure a background check. To be sure, if the purchaser does not pass the background check, then the seller may be *independently* prohibited from transferring the firearm, because it is unlawful to transfer a firearm to persons falling within certain categories. *See* 18 U.S.C. §922(d). But the only piece of that process that could be understood as a condition on sale is the requirement to obtain a background check before making a transfer, as that is the only thing that involves something a seller can actually do. A waiting period does not fit that bill, as it is not something one can "satisfy"; all one can do is wait it out. Laws that simply prohibit the transfer of a firearm—whether permanently or temporarily—thus do not in any way impose a condition on the sale of arms. In point of fact, *Black's Law Dictionary* explicitly defines the term "condition precedent" *to exclude* "a lapse of time." Condition, *Black's Law Dictionary* (12th ed. 2024) ("An act or event, *other than a lapse of time*, that must exist or occur before a duty to perform something promised arises." (emphasis added)).

43

In short, a law like HB129 that outright forbids a law-abiding citizen from taking possession of a handgun is a prohibition of, not a condition on, sale, regardless of how long the prohibition lasts. The district court's conclusion that HB129 is a "presumptively lawful" condition on the sale of arms was thus wrong twice over.

3. In all events, *Heller* did not say that *all* "conditions and qualification[] on the commercial sale of arms" are "presumptively lawful"; it included the critical caveat that it was talking only about "longstanding" laws. 554 U.S. at 626–27 & n.26. In that respect, *Heller* is entirely consistent with *Bruen*, as the Court was simply acknowledging that a "longstanding" law likely *satisfies* the historical-tradition test. Even the district court recognized as much, admitting that "the regulations that *Heller* identifies must be 'longstanding' to be 'presumptively constitutional.'" App.806. That should have been the final straw for HB129: As explained above, the first law that made everyone wait to exercise their right to keep and bear arms *even after they passed a background check*, on the ground that some people might immediately act violently, was not enacted until the 1990s.

The district court concluded otherwise only by adopting a cartoonish view both of what laws are relevantly similar to HB129 and of what it means for a regulation to be "longstanding." As to the former, the district court concluded that HB129 was relevantly similar to laws "dating to the early twentieth century" that "impos[ed] a waiting period on the sale of firearms" to allow the state to conduct a

44

background check.  App.817.  The problems with treating such early-twentieth-century waiting-period laws as relevantly similar to HB129 should be clear enough by now, *see* pp.37-38, *supra*, but, to recap, the "whys" are decidedly different:  The early-twentieth-century waiting periods were designed to ensure that firearm purchasers are law-abiding; HB129 presumes that even those who have *passed* a background check and demonstrated their eligibility to possess a firearm are likely to be driven by impulsive passions and could benefit from a state-mandated timeout.

The district court's view of what "longstanding" means was even worse.  According to the district court, "to be longstanding, a regulation need only have a … historical tradition of enforcement[] extending back to *some point in the twentieth century*."  App.813 (emphasis added).  That is farcical.  The Supreme Court made crystal clear in *Bruen* that regulatory "innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]."  597 U.S. at 36–37 (alteration in original) (quoting *Sprint Comm'cns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting)).  Against that backdrop, to say that regulatory innovations that did not come around until the end of the *twentieth* century do not come too late is beyond the pale, no matter whether 1787 or 1868 is the right focal point.  Plaintiffs are therefore extraordinarily likely to prevail on their Second Amendment claim.

**II.    The Remaining Factors Overwhelmingly Favor Injunctive Relief.**

Because HB129 violates Second Amendment rights, the remaining preliminary injunction factors favor Plaintiffs.  As this Court has previously explained, "[a]ny deprivation of any constitutional right fits" the irreparable-harm "bill."  *Free the Nipple*, 916 F.3d at 806.  Likewise, "even a temporary loss" of a constitutional right causes the balance-of-harms and public-interest factors to tip decisively in favor of preliminary relief.  *Id.* at 806–07.

1. On irreparable harm, the district court nodded towards this Court's prior holdings that "[w]hen an alleged deprivation of a constitutional right is involved … most courts hold that no further showing of irreparable injury is necessary," *e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) (first alteration in original), but nonetheless ruled for New Mexico on the (mistaken) belief that Plaintiffs had not shown a deprivation of their Second Amendment rights.  App.835.  That conclusion is wrong for all the reasons explained above, so the concomitant irreparable-harm conclusion is wrong too.

That is reason enough to reverse on the second preliminary-injunction factor.  But the district court did not stop there.  In an aside, the court expressed the view that "a brief delay" in the exercise of a fundamental right "is insufficient to qualify as irreparable harm."  App.835–36.  That does not pass the straight-face test.  As this Court has recognized in the context of other Bill of Rights guarantees, "the loss of

[constitutional] freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury." *Hobby Lobby*, 723 F.3d at 1145 (emphasis added). Indeed, this very district court judge has himself recognized and applied this principle in the First Amendment context. *See, e.g.*, *Voter Reference Found., LLDC v. Baldera*s, 616 F.Supp.3d 1132, 1271 (D.N.M. 2022) (Browning, J.). That naked contradiction exposes the decision below for what it is: one "singl[ing] out" the Second Amendment "for special—and specially unfavorable—treatment." *McDonald*, 561 U.S. at 778–79. If anything, the principle that governs all other fundamental rights should apply with even *greater* force when it comes to the Second Amendment, as the ability to timely exercise the right to keep and bear arms can be quite literally a matter of life or death.

"What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial"—a difficulty that is equally present whether the First or Second (or Third) Amendment "hangs in the balance." *Free the Nipple*, 916 F.3d at 806. The district court's decision to treat the Second Amendment as "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees" was a manifest abuse of discretion. *Bruen*, 597 U.S. at 70 (quoting *McDonald*, 561 U.S. at 780).

2. Finally, casting off this Court's repeated holdings that a state "does not have an interest in enforcing a law that is likely constitutionally infirm," *Chamber of*

47

*Commerce*, 594 F.3d at 771, and that "it is always in the public interest to prevent the violation of a party's constitutional rights," *Hobby Lobby*, 723 F.3d at 1147, the district court tasked itself with balancing "the public's interest in preserving its constitutional rights against" the "tidal wave of gun violence" in New Mexico. App.838–39. Conducting some back-of-the-envelope math, the court then posited that HB129 "stands to save the lives of approximately thirty-seven New Mexicans per year," a figure that (in the eyes of the court) "significantly outweighs" the injury that countless other New Mexicans will suffer from a "temporary delay" in acquiring a firearm. App.839–40.

That reasoning took the district court far outside of its proper lane. "[I]t is not [the] function [of] judges to read [their] views of policy into a Constitutional guarantee," *Thomas v. Collins*, 323 U.S. 516, 557 (1945), or "to arrogate to [themselves] the power to adjust a balance settled by the explicit terms of the Constitution," *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 486 (1989) (Kennedy, J., concurring). And *Heller* makes plain that the judicial role does not change in the Second Amendment context just because public safety may be at stake: "A Constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." 554 U.S. at 634. "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really*

*worth* insisting upon" based on vaguely Orwellian statistics that leave domestic-violence victims and others with an acute self-defense need out in the cold. *Id.*

Properly understood, the third and fourth preliminary-injunction factors are a rout, not a balancing act. "The Second Amendment 'is the very *product* of an interest balancing by the people'" that "'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635). "It is this balance—struck by the traditions of the American people—that demands our unqualified deference." *Id.*

## CONCLUSION

For the foregoing reasons, this Court should reverse and remand with instructions to preliminarily enjoin enforcement of HB129.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants believe oral argument would assist the Court in deciding the important and novel constitutional issues presented by this appeal.

Respectfully submitted,

<u>s/Erin E. Murphy</u>

| | |
|---|---|
| MICHAEL D. MCCOY | PAUL D. CLEMENT |
| D. SEAN NATION | ERIN E. MURPHY |
| ROBERT A. WELSH | *Counsel of Record* |
| MOUNTAIN STATES LEGAL | MATTHEW D. ROWEN |
|   FOUNDATION | KEVIN WYNOSKY |
| 2596 South Lewis Way | CLEMENT & MURPHY, PLLC |
| Lakewood, CO 80227 | 706 Duke Street |
| | Alexandria, VA 22314 |
| JOSEPH G.S. GREENLEE | (202) 742-8900 |
| ERIN M. ERHARDT | |
| NATIONAL RIFLE | CARTER B. HARRISON IV |
|   ASSOCIATION OF AMERICA | HARRISON & HART |
| 11250 Waples Mill Road | 924 Park Avenue SW, Suite E |
| Fairfax, VA 22030 | Albuquerque, NM 87102 |

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,921 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(B).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

November 4, 2024

s/Erin E. Murphy
Erin E. Murphy

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

a.     All required privacy redactions have been made.

b.     The hard copies submitted to the clerk are exact copies of the ECF submission.

c.     The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Kaseya Antivirus, and according to the program is free of viruses.


November 4, 2024

s/Erin E. Murphy
Erin E. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy