**No. 24-2121**

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

Samuel Ortega and Rebecca Scott,
Plaintiffs-Appellants,

v.

Michelle Lujan Grisham, in her official capacity as Governor of the State of New
Mexico and Raul Torrez, in his official capacity as Attorney General of the State of
New Mexico,
Defendants-Appellees.

On Appeal from the United States District Court for the District of New Mexico
No. 24-CV-00471-JB-SCY James O. Browning

**APPELLANT'S APPENDIX VOLUME II**

Michael D. McCoy
Sean D. Nation
Robert Welsh
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
mmccoy@mslegal.org

Joseph G.S. Greenlee
Erin M. Erhardt
NATIONAL RIFLE ASSOCIATION OF AMERICA
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org

Paul D. Clement
Erin E. Murphy
*Counsel of Record*
MATTHEW D. ROWEN KEVIN
WYNOSKY CLEMENT & MURPHY,
PLLC
706 Duke Street Alexandria, VA
22314 (202) 742-8900

Carter B. Harrison IV
Attorney and Partner
HARRISON & HART, LLC
924 Park Ave SW, Suite E
Albuquerque, NM 87102
(505) 303-1835
carter@harrisonhartlaw.com

*Attorneys for Plaintiffs-Appellants*

# APPENDIX INDEX

*Samuel Ortega and Rebecca Scott v. Michelle Lujan Grisham, in her official capacity as Governor of the State of New Mexico and Raul Torrez, in his official capacity as Attorney General of the State of New Mexico*

*No. 24-2121*

Exhibit A-5 to Governor Lujan Grisham's Response to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction
(ECF No.15-6) .......................................................................... App. 0227

Exhibit B to Governor Lujan Grisham's Response to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction
(ECF No.15-7) .......................................................................... App. 0344

Exhibit B-1 to Governor Lujan Grisham's Response to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction
(ECF No.15-8) .......................................................................... App. 0392

Statement Respecting Plaintiffs' Request for Temporary Restraining Order [ECF #2]
(ECF No. 16)............................................................................. App. 0420

Attorney General Raúl Torrez' Notice of Joinder to Governor Lujan Grisham's Response to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction
(ECF No. 18)............................................................................. App. 0426

Defendants' Answer and Affirmative Defenses
(ECF No. 19)............................................................................. App. 0428

Governor Lujan Grisham's Notice of Supplemental Authority
(ECF No. 20)............................................................................. App. 0434

Exhibit A to Governor Lujan Grisham's Notice of Supplemental Authority
(ECF No. 20-1) .......................................................................... App. 0437

Exhibit B to Governor Lujan Grisham's Notice of Supplemental Authority
(ECF No. 20-2) .......................................................................... App. 0476

**EXHIBIT A-5**

**App. 0227**

# LICENSE AND LICENSING
## LAWS

## ALABAMA

Harry Toulmin, A Digest of the Laws of the State of Alabama: Containing the Statutes and Resolutions in Force at the End of the General Assembly in January, 1823. To which is Added an Appendix; Containing the Declaration of Independence; the Constitution of the United States; the Act authorizing the People of Alabama to form a Constitution and State Government; and the Constitution of the State of Alabama Page 627, Image 655 (1823) available at The Making of Modern Law: Primary Sources. 1805

Negroes and Mulattoes, Bond and Free – 1805, Chapter I, An Act respecting Slaves. – Passed March 6, 1805: Sec. 4. And be it further enacted, that no slave shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, except the tools given him to work with, or that he is ordered by his master, mistress, or overseer, to carry the said articles from one place to another, but all and every gun , weapon, or ammunition, found in the possession or custody of any slave, may be seized by any person, and upon due proof made thereof, before any justice of the peace of the county or corporation where such seizure shall be made, shall, by his order, be forfeited to the seizer, for his own use; and moreover, every such offender shall have and receive, by order of such justice, any number of lashes, not exceeding thirty-nine, on his bare back for every such offense : Provided nevertheless, That any justice of the peace may grant, in his proper county, permission in writing to any slave, on application of his master or overseer, to carry and use a gun and ammunition within the limits of his said master's or owner's plantation, for a term not exceeding one year, and revocable at any time within such term, at the discretion of the said justice, and to prevent the inconveniences arising from the meeting of slaves.

[REGULATORY TAX] The Revised Code of Alabama Page 169, Image 185 (1867) available at The Making of Modern Law: Primary Sources. 1867

Taxation, § 10. On All pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and such tax must be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment when demanded by the assessor, such pistols, revolvers, bowie knives, or knives of like description, must be seized by him, and unless redeemed by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same must be sold at public outcry before the court house door, after five days notice; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, must be paid over to the person from whom the said pistol, revolver, bowie knife, or knife of like description, was taken, and the net amount collected by him must be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto.

2

**App. 0228**

J. M. Falkner, The Code of Ordinances of the City Council of Montgomery, with the Charter Page151, Image 151 (1879) available at The Making of Modern Law: Primary Sources. 1879 [Ordinances of the City of Montgomery,] § 449. Any person who fires or discharges, or causes to be fired or discharged, any pistol, gun, cannon, anvil, or anything of like kind or character; or who lets off or discharges any rocket, fire-crackers, squib or other fire-works, without first having obtained permission of the Mayor, who shall designate the place where such firing may be done, must, on conviction, be fined not less than one nor more than one hundred dollars.

William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, Entitled "An Act to Adopt a Code of Laws for the State Alabama " with Such Statutes Passed at the Session of 1896-97, as are Required to be Incorporated Therein by Act Approved February 17, 1897; and with Citations to the Decisions of the Supreme Court of the State Construing or Mentioning the Statutes Page 1137, Image 1154 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources. 1892
[License Taxes; From Whom and For What Business Required; Prices; County Levy,] Taxation, § 27. For dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars. Any cartridges, whether called rifle or pistol cartridges, or by any other name, that can be used in a pistol, shall be deemed pistol cartridges within the meaning of this subdivision. Any person or firm who orders for another, or delivers any cartridges within this state, shall be deemed a dealer under this provision.

1898 Ala. Acts 190, An Act To Amend The Revenue Laws Of The State Of Alabama, pt. 66-67. 66th. For dealers in pistol, bowie or dirk knives, whether principal stock in trade or not, one hundred dollars. 67th. For wholesale dealers in pistol or rifle cartridges in towns or cities of twenty thousand or more inhabitants, ten dollars. In all other places, five dollars: Provided, That the wholesale dealers license shall entitle them to sell at retail.

## ARKANSAS

Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A. D. 1837, in the Year of Our Independence the Sixty-second, and of the State of Second Year Page 587, Image 602 (1838) available at The Making of Modern Law: Primary Sources. 1838
Negroes and Mulattoes, § 17. No free negro shall be suffered to keep or carry any gun or rifle, or weapon of any kind, or any ammunition without a license first had and obtained, for that purpose, from some justice of the peace of the county in which such free negro or mulatto resides, and such license may be granted and revoked by any justice of the peace of the county. §18. Every gun, rifle, or weapon of any kind, or ammunition, found in the possession or custody of any free negro or mulatto, not having a license as required by the preceding section, may be seized by any person, and upon due proof thereof made before some justice of the peace of the county in which such seizure was made, shall by order of such justice be forfeited to the use of the person making the seizure, and such justice shall also impose a fine on such negro or mulatto, for the use of the county, not exceeding twenty dollars.

George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City Page 231, Image 231 (1871) available at The Making of Modern Law: Primary Sources. 1871
[Offenses Affecting the Public Safety, § 288. No person shall fire or discharge any cannon, gun, fowling piece, pistol, or fire-arms, of any description, or fire, explode, or set off any squibs, cracker, or other thing containing powder or other combustible or explosive material, without permission from the may which permission shall limit the time of such firing, and shall be subject to be revoked by the mayor at any time after it has been granted. Any violation hereof shall subject the party to a fine of not less than two nor more than ten dollars.]

John H. Herry, Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of the State of Arkansas; General Incorporation Laws; and All Acts of the General Assembly Relating to the City; in Force March 10, 1882 Page 149, Image 334 (1882) available at The Making of Modern Law: Primary Sources. 1882
[Ordinances of the] City of Little Rock, [§ 344. That it shall be unlawful for any person to engage in, exercise or pursue any of the following avocations or business without first having obtained and paid for a license therefor from the proper city authorities the amount of which licenses are hereby fixed as follows, to wit: . . . ]§ 27. Shooting galleries, or pistol galleries, $25 per annum, in advance.

1923, An Act to Regulate the Ownership of Pistols and Revolvers, No. 430, 1-4, Ark. Acts 379, 379-80 (requiring persons having pistols and revolvers to present such firearms to the county clerk for registration and requiring such persons to apply for a license to possess the firearm).

1931 Ark. Laws 704, 704-6
ACT 225.
AN ACT to Prohibit the Possession, Transportation or Sale of Machine Guns, and Inflicting Penalty for Violation Thereof.
SECTION 1. It shall be unlawful for any person or persons in any manner to transport from one place to another in this State, or for any railroad company, or express company, or other common carrier, or any officer, agent; or employee of any of them, or any other person acting in their behalf knowingly to ship or to transport from one place to another in this State in any manner or by any means whatsoever, except as hereinafter provided, any firearm of the type commonly known as a machine gun.
SECTION 2. It shall be unlawful for any person to store, keep, possess, or have in possession, or permit another to store, keep, possess, or have in possession, except as hereinafter provided, any firearm of the type commonly known as a machine-gun.
SECTION 3. It shall be unlawful for any person to sell, or give away, or be interested directly or indirectly, in the sale or giving away, of any firearm of the type commonly known as a machine-gun.
SECTION 4. Provided, this Act shall not apply to the military authorities of the State or nation, and provided further, that any peace officer of the State, counties or political subdivision thereof, may possess machine-guns when required in the performance of their duties. After April 1, 1931, every person permitted by this Act to possess a machine-gun, shall file in the office of the Secretary of State, on a blank to be supplied by the Secretary of State, an application to be

4

**App. 0230**

properly sworn to, which shall include his name and address, and the serial number of the machine-gun which he desires to possess. Thereupon, the Secretary of State shall file such application his office, registering such officer in a book or index to be kept for that purpose, and assign to him a number, and issue to him a card, which he shall keep with him while he has such machine-gun in his possession. Such registration shall be made on the date application is received and filed with the Secretary of State, and shall expire on December 31, of the year in which said license is issued.

SECTION 5. Any person violating any part of this law shall upon conviction be fined in any sum not more than $1,000.00, and not less than $100.00, and the machine-gun or guns found in his possession shall be confiscated and-the title thereof shall pass to the political subdivision of the State making the capture.

SECTION 6. All laws and parts of laws in conflict herewith are hereby repealed, and whereas criminals are using machine-guns for illegal purposes, this Act being necessary for the immediate preservation of the public peace, health, and safety, an emergency is hereby declared, and it shall be in force and effect from and after its passage.

Approved: March 26th, 1931.

1935 Ark. Laws 171, 171-75

ACT 80.

"AN ACT Relating to Machine Guns, and to Make Uniform the Law With Reference Thereto."

Be It Enacted by the General Assembly of the State of Arkansas;

SECTION 1. "Machine Gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. . . .

SECTION 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of (not less than twenty years).

SECTION 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of (not less than ten years).

SECTION 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose;

(a) when the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or

(b) when in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or

(c) when the machine gun is of the kind described in Section 8 and has not been registered as in said section required; or

(d) when empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been or are susceptible of use in the machine gun are found in the immediate vicinity thereof.

SECTION 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

App. 0231

SECTION 6. Nothing contained in this act shall prohibit or interfere with 1. the manufacture for, and sale of, machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; 2. the possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; 3. the possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifestly not aggressive or offensive.

SECTION 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given, or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned, given or delivered, or from whom received. Upon demand every manufacturer shall permit any 'marshal, sheriff or police officer to inspect his entire stock of machine guns, parts, and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provision of this section shall be punishable by a fine of (not less than ............ hundred dollars).

SECTION 8. Every machine gun now in this State adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the (Secretary of state), on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the (secretary of State), and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section, shall be presumed to possess the same for offensive or aggressive purpose.

SECTION 9. Warrant to search any house or place and seize any machine gun adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber possessed in violation of this act, may issue in the same manner and under the same restrictions as provided by law for stolen property, and any court of record upon application of the (district attorney), shall have jurisdiction and power to order any machine gun, thus or otherwise legally seized, to be confiscated and either destroyed or delivered to a peace officer of the State or a political subdivision thereof. . . .

SECTION 14. WHEREAS, under the present law of the state of Arkansas the officers of the state are powerless to effectively combat crime, therefore, it being necessary for the preservation of the public peace, health and safety, an emergency is hereby declared, and this act shall take effect and be in force from and after its passage and approval.

APPROVED: February 26, 1935.

## CALIFORNIA

Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council Page 220, Image 256 (1854) available at The Making of Modern Law: Primary Sources. 1854

**App. 0232**

Ordinances of the [City of San Francisco], § 13. Every person, house, or firm engaged in keeping a pistol or rifle shooting gallery, shall pay for a license to carry on the same, the sum of ten dollars per quarter, in addition to the amount of the powder license.

General orders of the Board of Supervisors providing regulations for the government of the City and County of San Francisco. 1869
[Discharge of Cannon: Permit to be given by Mayor, and filed in office of Chief of Police. Discharge of Fire Arms prohibited within certain limits.]Sec. 22. No person shall discharge any cannon within that portion of this city and county lying between Larkin and Ninth Streets and the outer line of the streets forming the water-front, except by special permission, in writing, from the Mayor, which permit shall designate the time and particular locality of the firing, and the number of discharges which are authorized. A copy of such permit shall be filed by the person obtaining the same, in the office of the Chief of Police, at least two hours before the time of such firing; and the person or persons engaged in the discharge of such cannon, shall, on the demand of any citizen or peace officer, exhibit the permit by which such firing is authorized; and no person shall discharge any fire-arm of any other description in that portion of the city and county bounded by Devisadero, Ridley, Market, and Ninth streets, and the outer line of the streets forming the water-front, or within three hundred yards of any public highway, or upon any ground set apart as a cemetery, or public square, or park, or within three hundred yards of any dwelling-house. But this section shall not be construed so as to prohibit any person from shooting destructive animals within or upon his own inclosure. Any person who shall violate any of the provisions of this section shall be deemed guilty of a misdemeanor; and upon conviction thereof, shall be punished by a fine of not less than one hundred dollars, or by imprisonment in the county jail out more than thirty days.

Prohibiting the Carrying of Concealed Deadly Weapons, § 22 of General Order no. 1,603—Relating to the Police Department, General Orders of the Board of Supervisors Providing Regulations for the Government of the City And County of San Francisco (1880).
    "Sec. 22. It shall be unlawful for any person, not being a public officer or traveler, or not having a permit from the Police Commissioners of this city and county, to wear or carry concealed, in this city and county, any pistol, dirk or other dangerous or deadly weapon.
    Every person violating any of the provisions of this Order shall be deemed guilty of a misdemeanor, and punished accordingly. Such persons and no others shall be termed " travelers," within the meaning of this Order, as may be actually engaged in making a journey at the time.
    The Police Commissioners may grant written permission to any peaceable person, whose profession or occupation may require him to be out at late hours of the night, to carry concealed deadly weapons for his own protection."
1880, CA, General Order no. 1,603—Relating to the Police Department, § 22—Prohibiting the Carrying of Concealed Deadly Weapons

1883 Cal. Stat. 156, § 153.
The Municipal Council shall provide by ordinance, for the payment into a "Fireman's Charitable Fund" of such city, or city and county, of all moneys received for licenses for the storage, manufacture, or sale of gunpowder, blasting powder, gun cotton, fireworks, nitro-glycerine, dualine, or any explosive oils or compounds, or as a municipal tax upon the same; also all fines collected in the police court for violations of fire ordinances.

**App. 0233**

Nathan Newmark, The Political Code of the State of California. As Enacted in 1872, and Amended in 1889. With Notes and References to the Decisions of the Supreme Court Page 963 (1889) available at The Making of Modern Law: Primary Sources. 1889
[Political Code of the State of California,] Charitable Fund, §153. The Municipal Council shall provide, by ordinance, for the payment into a "Fireman's Charitable Fund" of such city, or city and county, of all moneys received for licenses for the storage, manufacture, or sale of gunpowder, blasting powder, gun cotton, fireworks, nitro-glycerine, dualine, or any explosive oils or compounds, or as a municipal tax upon the same; also, all fines collected in the Police Court for violations of fire ordinances. Said fund shall be under the direction and control of and subject to such regulations as may be prescribed by the Board of Fire Commissioners.

Fred L. Button, ed., General Municipal Ordinances of the City of Oakland, California (Oakland, CA; Enquirer, 1895), p. 218, Sec. 1, An Ordinance to Prohibit the Carrying of Concealed Weapons, No. 1141. 1890
Section 1 . It shall be unlawful for any person in the City of Oakland, not being a public officer or a traveler actually engaged in making a journey, to wear or carry concealed about his person without a permit, as hereinafter provided, any pistol, slung-shot, brass or iron knuckles, sand club, dirk or bowie knife, or iron bar or other dangerous or deadly weapon, or any sling or other contrivance by which shot or other missiles are or may be hurled or projected. A written permit may be granted by the Mayor for a period of not to exceed one year to any peaceable person whose profession or occupation may require him to be out at late hours of the night to carry a concealed deadly weapon upon his person.

Charter and Ordinances of the City of Stockton (Stockton, CA: Stockton Mail Printers and Bookbinders, 1908), p. 240, Ordinance No. 53. 1891
Be it ordained by the City Council of the City of Stockton as follows:
One-Concealed Weapons, Burglars' Tools.
Section 1. It shall be unlawful and a misdemeanor: 1. For any person not being a peace officer or actually prosecuting a journey to or from the town, city or county of his residence, to wear or carry concealed about his person any pistol, dirk, bowie-knife, slungshot, sand-club, metallic knuckles or any other deadly or dangerous weapon, except he first have a written permit to so do from the Mayor of the City of Stockton.

L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources. 1896
Ordinances of the City of Fresno, § 8. Any person excepting peace officers and travelers, who shall carry concealed upon his person any pistol or firearm, slungshot, dirk or bowie-knife, or other deadly weapon, without a written permission (revocable at any time) from the president of the board of trustees, is guilty of a misdemeanor.

1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons

in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, §§ 3-4.

SEC. 3. Every person who carries in any city, city and county, town or municipal corporation of this state any pistol, revolver, or other firearm concealed upon his person, without having a license to carry such firearm as hereinafter provided in section six of this act, shall be guilty of a misdemeanor, and if he has been convicted previously of any felony, or of any crime made punishable by this act, he is guilty of a felony.

SEC 4. The unlawful possessing or carrying of any of the instruments, weapons, or firearms enumerated in section one to section three inclusive of this act, by any person other than those authorized and empowered to carry or possess the same as hereinafter provided, is a nuisance, and such instruments, weapons or firearms are hereby declared to be nuisances, and when any of said articles shall be taken from the possession of any person the same shall be surrendered to the magistrate before whom said person shall be taken, except that in any city, city and county, town or other municipal corporation the same shall be surrendered to the head of the police force, or police department thereof. The officers to whom the same may be so surrendered, except upon certificate of a judge of a court of record, or of the district attorney of any county that the preservation thereof is necessary or proper to the ends of justice, shall proceed at such time or times as he deemds proper, and at least once in each year to destroy or cause to be destroyed such instruments, weapons, or other firearms in such manner and to such extent that the same shall be and become wholly and entirely ineffective and useless for the purpose for which it was manufactured.

SEC 6. It shall be lawful for the board of police commissioners, chief of police, city marshal, town marshal, or other head of the police department of any city, city and county, town, or other municipal corporation of this state, upon proof before said board, chief, marshal or head, that the person applying therefor is of good moral character, and that good cause exists for the issuance thereof, to issue to such person a license to carry concealed a pistol, revolver or other fire-arm; provided, however, that the application to carry concealed such firearm shall be filed in writing and shall state the name and residence of the applicant, the nature of applicant's occupation, the business address of applicant, the nature of the weapon sought to be carried and the reason for the filing of the application to carry the same.


1923 Cal. Stat. 696, An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person; To Prohibit the Manufacture, Sale, Possession or Carrying of Certain Other Dangerous Weapons Within this State; To Provide for Registering All Sales of Pistols, Revolvers or Other Firearms Capable of Being Concealed Upon the Person; To Prohibit the Carrying of Concealed Firearms Except by Lawfully Authorized Persons; To Provide for the Confiscation and Destruction of Such Weapons in Certain Cases; To Prohibit the Ownership, Use or Possession of Any of Such Weapons by Certain Classes of Persons; To Prescribe Penalties for Violations of This Act and Increased Penalties for Repeated Violations Hereof; To Authorize, In Proper Cases, The Granting of Licenses or Permits to Carry Firearms Concealed Upon the Person; To Provide for Licensing Retail Dealers in Such Firearms and Regulating Sales Thereunder; And To Repeal Chapter One Hundred Forty-Five of California Statutes of 1917, Relating to the Same Subject, ch. 339, § 3, 8. Sec. 2. On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of

another or against the government of the United States or of the State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person. The terms "pistol," "revolver," and "firearms capable of being concealed upon the person" as used in this act shall be construed to apply to and include all firearms having a barrel less than twelve inches in length. Any person who shall violate the provisions of this section shall be guilty of a felony and upon conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.

Sec. 3. If any person shall commit or attempt to commit any felony within this state while armed with any of the weapons mentioned in section one hereof or while armed with any pistol, revolver or other firearm capable of being concealed upon the person, without having a license or permit to carry such firearm as hereinafter provided, upon conviction of such felony, he shall in addition to the punishment prescribed for the crime of which he has been convicted, be punishable by imprisonment om a state prison for not less than five nor more than ten years…

Sec. 8. It shall be lawful for the sheriff of a county, and the board of police commissioners, chief of police, city marshal, town marshal, or other head of the police department of any city, city and county, town, or other municipal corporation of this state, upon proof before said board, chief, marshal or other police head, that the person applying therefor is of good moral character, and that good cause exists for the issuance thereof, to issue such person a license to carry concealed a pistol, revolver or other firearm for a period of one year from the date of such license…

1923 Cal. Stat. 698–99, An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person; To Prohibit the Manufacture, Sale, Possession or Carrying of Certain Other Dangerous Weapons Within this State; To Provide for Registering All Sales of Pistols, Revolvers or Other Firearms Capable of Being Concealed Upon the Person; To Prohibit the Carrying of Concealed Firearms Except by Lawfully Authorized Persons; To Provide for the Confiscation and Destruction of Such Weapons in Certain Cases; To Prohibit the Ownership, Use or Possession of Any of Such Weapons by Certain Classes of Persons; To Prescribe Penalties for Violations of This Act and Increased Penalties for Repeated Violations Hereof; To Authorize, In Proper Cases, The Granting of Licenses or Permits to Carry Firearms Concealed Upon the Person; To Provide for Licensing Retail Dealers in Such Firearms and Regulating Sales Thereunder; And To Repeal Chapter One Hundred Forty-Five of California Statutes of 1917, ch. 339, § 8.

Sec. 8. It shall be lawful for the sheriff of a county, and the board of police commissioners, chief of police, city marshal, town marshal, or other head of the police department of any city, city and county, town, or other municipal corporation of this state, upon proof before said board, chief, marshal or other police head, that the person applying therefor is of good moral character, and that good cause exists for the issuance thereof, to issue such person a license to carry concealed a pistol, revolver or other firearm for a period of one year from the date of such license…

1931 Cal. Stat. 2317, An Act to Control and Regulate the Possesion, Sale and Use of Pistols, Revolvers and Other Firearms Capable of Being Concealed Upon the Person, ch. 1098, §9. Every person in the business of selling, leasing, or otherwise transferring a pistol, revolver or other firearm, of a size capable of being concealed upon the person, whether such seller, lessor or transferor is a retail dealer, pawnbroker, or otherwise, except as hereinafter provided, shall keep a register in which shall be entered the time of sale, the date of sale, the name of the salesman

making the sale, the place where sold, the make, model, manufacturer's number, caliber, or other marks of identification on such pistol, revolver or other firearm. Such register shall be prepared by and obtained from the state printer and shall be furnished by the state printer to such dealers on application at a cost of three dollars per one hundred leaves in triplicate . . . [t]he purchaser of any firearm capable of being concealed upon the person shall sign, and the dealer shall require him to sign his name and affix his address to said register in triplicate, and the salesman shall affix his signature in triplicate as a witness to the signature of the purchaser. . . [t]his section shall not apply to wholesale dealers in their business intercourse with retail dealers.

## **COLORADO**

Thomas M. Patterson, The Charter and Ordinances of the City of Denver, as Adopted Since the Incorporation of the City and Its Organization, November, 1861, to the First Day of February, A.D., 1875, Revised and Amended, Together with an Act of the Legislature of the Territory of Colorado, in Relation to Municipal Corporations, Page 78, Image 78 (1875) available at The Making of Modern Law: Primary Sources. 1875
[City of Denver,] Charter and Ordinances: Offenses Affecting Public Safety, § 1. If any person shall, within this city, fire or discharge any cannon, gun, fowling piece, pistol or fire arms of any description, or fire, explode or set off any squib, cracker, or other thing containing powder or other combustible or explosive material, without permission from the Mayor (which permission shall limit the time of such firing, and shall be subject to be revoked by the Mayor or City Council at any time after the same has been granted), every such person shall, on conviction, be fined in a sum not less than one dollar and not exceeding one hundred dollars: Provided, that no permission shall be granted to any person or persons to hold or conduct any shooting match or competitive trial of skill with fire arms within the limits of this city.

1911 Colo. Sess. Laws 408
Section 3. Every individual, firm or corporation engaged, within this commonwealth, in the-retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and., if residing in a city, the street and number therein where he resides; the make, calibre and finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record- book shall be open at all times to the inspection of any duly authorized police officer.
Section 4. Every individual, firm or corporation fail- ng to keep the record provided for in the first section of this act, or who shall refuse to exhibit such record when requested by a police officer, and any purchaser, lessee or exchanger of a pistol or revolver, who shall, in connection with the making of such record, give false information, shall be guilty of a Misdemeanor, and shall, upon conviction, be punished by a fine of not less than twenty-five, nor more than one hundred dollars, or by imprisonment in the county jail for a term not exceeding one year, or by both such fine and imprisonment.

## **CONNECTICUT**

11

The Public Records Of The Colony Of Connecticut, Prior To The Union With New Haven Colony, May, 1665 Page 79, Image 91 (1850) available at The Making of Modern Law: Primary Sources. 1665
It is ordered, that no man within this Jurisdiction shall directly or indirectly amend, repair, or cause to be amended or repaired, any gun small or great belonging to any Indian, nor shall endure the same, nor shall sell or give to any Indian, directly or indirectly, any such gun or gunpowder, or shot, or lead, or mold, or military weapons, or armor, nor shall make any arrow heads, upon pain of a ten pound fine for every offense at least, nor sell nor barter any guns, powder, bullets or lead, whereby this order might be evaded, to any person inhabiting out of this Jurisdiction, without license of this or the particular court, or some two magistrates, upon pain of ten pound for every gun, five pound for every pound of powder, 40s for every pound of bullets or lead, and so proportionately for any greater or lesser quantity.

The Public Records Of The Colony Of Connecticut. Hartford, 1890 Page 190-192, Image 194-196, available at The Making of Modern Law: Primary Sources. 1775
An Act for Encouraging the Manufacture of Salt Petre and Gun Powder. . .Be it enacted, That no salt petre, nitre or gun-powder made and manufactured, or that shall be made and manufactured in this Colony, shall be exported out of the same by land or water without the license of the General Assembly or his Honor the Governor and Committee of Safety, under the penalty of twenty pounds for every hundred weight of such salt petre, ntire or gun-powder, and proportionately for a greater or lesser quantity so without license exported; to be recovered by bill, plaint, or information, in any court of record in this Colony by law proper to take cognizance thereof. . . Be it further enacted by the authority aforesaid, That no powder-mill shall be erected in this Colony for the manufacture of gun-powder without the license of the general assembly, or in their recess the Governor and Council, first had and obtained under the penalty of thirty pounds for every such offence; to be recovered as the other forgoing personalities in this act are above directed to be recovered.

Charter and By-Laws of the City of New Haven, November, 1848 Page 48-49, Image 48-49 (1848) available at The Making of Modern Law: Primary Sources. 1827
A By-Law Relative to the Storage and Sale of Gunpowder. Be it ordained by the Mayor, Aldermen, and Common Council of the city of New Haven, in Court of Common Council assembled, 1st. That hereafter no person or persons shall, within the limits hereafter described, either directly or indirectly, sell and deliver any gunpowder, or have, store, or keep any quantity of gunpowder greater than one pound weight, without having obtained a license for that purpose from said Court of Common Council, in the manner herein prescribed. Provided, that nothing in this by-law contained shall be construed to prevent any person or persons from having or keeping in his or their possession, a greater quantity of powder than one pound weight, during any military occasion or public celebration, while acting under any military commander, and in obedience to his orders, or under permission and authority therefor, first had and obtained of the Mayor or some one of the Aldermen of said city. Provided also, That any person or persons purchasing gunpowder, shall be allowed between the rising and setting of the sun, sufficient time to transport the same from any place without said limits, through said limits to any place without the same. 2d. The Court of Common Council aforesaid, shall have power, on application to them made, to grant and give any meet person or persons a license to sell gunpowder, and for that

12

**App. 0238**

purpose to have, store, and keep gunpowder in quantity not exceeding at any one time seven pounds weight, and that well secured in a tin canister or canisters, and at such place or places within said limits and for such term of time, not exceeding one year, as said Court shall deem fit; which license shall be signed by the Clerk of said Court, and shall be in the form following, viz — Whereas the Mayor, Aldermen, and Common Council of the City of New Haven, in Court of Common Council convened, have approved of ___, as a suitable and proper person to keep, store, and sell gunpowder within the City of New Haven: We do therefore give license to said ____, to sell gunpowder at (describe the place) and for the purpose aforesaid, to have, keep, and store in said building any quantity of gunpowder not exceeding at any one time seven pounds weight, until the ___ day of ___. Dated, Signed per order, A.B., Clerk. For which license the person receiving the same shall pay the City Clerk twenty-five cents; and the same shall be by said Clerk recorded at full length. And before any license shall be given as aforesaid, the person or persons receiving the same shall pay to the Clerk aforementioned, for the use of said city, a sum after the rate of five dollars per annum. 3d. Before any shall proceed to sell or to store or keep gun-powder by virtue of any such license so given as aforesaid, such person shall put in a conspicuous place upon the front part of the building in which such powder is to be stored or sold, a sign, with the following words plainly and legibly inscribed thereon, viz., "Licensed to keep Powder," and shall continue the same during the time he shall keep, store, or sell gunpowder in said building. 4th section repealed. 5th. That no person or persons shall put or receive or have any quantity of gunpowder on board of any steamboat, for transportation therein in any of the waters within the limits of said city. 6th. If any person shall sell, keep, or store any gunpowder within the limits aforesaid, contrary to the true intent and spirit of this by-law, or without complying with all the pre-requisites enjoined thereby; or if any person or persons shall put or receive, or have on board of any steamboat for transportation on any of the waters within the limits of said city, any quantity of gunpowder, such person or persons shall forfeit and pay the sum of thirty-four dollars, one half to him who shall give information, and the other half to the use of the city.

The By-Laws of the City of New London, with the Statute Laws of the State of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855) available at The Making of Modern Law: Primary Sources. 1835

Chapter 26. A ByLaw in relation to the Firing of Guns and Pistols, within the limits of the city of New-London, and making parents and guardians, and masters, liable for breaches of by-laws by minors and apprentices. Be it ordained by the mayor and aldermen, and common council and freemen of the city of New-London, That no gun or pistol shall be fired at any time within the limits of said city, unless on some public day of review, and then by order of the officers of the military companies of said city, or by permission of the mayor, or one of the aldermen of said city; and whosoever shall fire any gun or pistol, contrary to the form and effect of this by-law, shall for every such offence, forfeit and pay the sum of two dollars, to be recovered by due process in any court in said city, proper to try the same. § 2. And whereas the firing of guns and pistols, crackers, or other fire works is most frequently done by apprentices and minors under age, who are unable to pay the forfeiture incurred by the by-law of this city – be it also ordained that where any minor or apprentice shall be guilty of any breach of the by-laws relating to the firing of guns, pistols, crackers, or other fire-works, the parent, guardian, or master of such minor or apprentice, shall be liable to pay the forfeitures incurred by said by-law, and the same shall be recoverable of any parent, guardian or master, by action of debt brought on said by law, before

13

any court in said city proper to try the same. And it shall be the duty of the city attorney and lawful for any other person to prosecute for said penalty; and one-half of said penalty shall go to the informer, or the person prosecuting for the same, and the other half to the use of the city.

1845 Conn. Acts 10, An Act Prohibiting the Firing of Guns and Other Fire Arms in the City of New Haven, chap. 10.
[E]very person who shall fire any gun or other fire-arm of any kind whatever within the limits of the city of New Haven, except for military purposes, without permission first obtained from the mayor of said city, shall be punished by fine not exceeding seven dollars, or by imprisonment in the county jail not exceeding thirty days.

Charles L. Upham, The Charter and By-Laws of the City of Meriden. With Extracts from the Public and Private Acts of the State of Connecticut, Applicable to the City of Meriden; Together with Certain Votes of the Common Council; the Rules and Regulations of the Board of Water Commissioners, and of the Police Department; and the Rules of Order of the Common Council of the City of Meriden Page 135, Image 140 (1875) available at The Making of Modern Law: Primary Sources. 1869
A by-law concerning the discharge of fire-arms and fire-works [, City of Meriden, Conn.], § 1. Be it enacted by the Court of Common Council of the City of Meriden, § 1. That no person shall discharge any pistol, gun, cannon, or other fire-arm of any sort or description, within the limits of said city, unless on occasion of some public festivity, and then by permission of the mayor or one of the aldermen of said city, or unless on occasion of military exercises and parade, and then by order of some military officer; and whoever shall discharge any pistol, gun, cannon, or other fire-arm of any sort, contrary to the form and effect of this by-law, shall, for every such offense, forfeit and pay, for the use of the treasury of said city, a fine of five dollars.

Charter and Ordinances of the City of Bridgeport: as Amended and Adopted Page 194 (1874) available at The Making of Modern Law: Primary Sources. 1874
An Ordinance Relative to Gunpowder and Explosive Substances. Be it ordained by the Common Council of the City of Bridgeport, § 1. No person shall have, or keep for sale or for any other purpose, within the limits of this city, any quantity of gunpowder or gun-cotton, exceeding one pound in weight; no person shall have, keep for sale, use, or other purpose, within the city limits, any quantity of nitro-glycerine, or other explosive substances or compounds exceeding six ounces, without special license thereof from the common council. No person shall transport any gunpowder through said city without a permit first had and obtained from the fire marshal, and in accordance with such rules and regulations as may be established by said fire marshal. No person shall, within said city, place, receive, or have any gunpowder on board of any steamboat used for the carrying of passengers, with intent to transport the same therein.

J. M. Meech, Charter and Revised Ordinances of the City of Norwich With the Amendments Thereto, and Statutes of the State Relating to Municipal Corporations, in Force January 1st, 1877 Page 178, Page 185 (1876) available at The Making of Modern Law: Primary Sources. 1877
Ordinances of Norwich. § 15. No person or persons shall fire any swivel, musket, fowling-piece, pistol, or other gun of any description within said city at a less distance than fifty rods from any dwelling house, or public highway, or street without written permission from the Mayor or one of the aldermen of said city; and every person so offending shall, for every such offence, forfeit

and pay for the use of said city the sum of three dollars: Provided always, that nothing herein contained shall be construed to extend to the members of any military company when under the command of any military officer, not to prevent the firing of any gun or guns for the destruction of any noxious birds or animals by any person or persons upon his or their premises.

Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources. 1890
Good Order and Decency § 192. Every person who shall carry in said City, any steel or brass knuckles, pistol, or any slung shot, stiletto or weapon of similar character, or shall carry any weapon concealed on his person without permission of the Mayor or Superintendent of Police in writing, shall, on conviction, pay a penalty of not less than five, nor more than fifty dollars for every such offense.

1901 Conn. Pub. Acts 602, § 20.
The warden and burgesses, when assembled according to law, shall have power to make, alter, repeal, and enforce such bylaws, orders, ordinances, and enactments as they deem suitable and proper, not inconsistent with this resolution or contrary to the laws of this state or of the United States, for the following purposes: . . . to license, regulate, or prohibit the manufacture, keeping for sale, or use of fireworks, torpedoes, firecrackers, gunpowder, petroleum, dynamite, or other explosive or inflammable substance, and the conveyance thereof through any portion of the borough . . . .

Sale of Firearms, ch. 137, Conn. Gen. Stat. 2678 (1918) (requiring any person engaged in the business of selling or exchanging firearms to keep a register).

1923 Conn. Pub. Acts 3707, An Act Concerning the Possession, Sale and Use of Pistols and Revolvers, ch. 252, § 2, 3.
No person shall advertise, sell, deliver, offer or expose for sale or delivery or have in his possession with intent to sell or deliver any pistol or revolver at retail without having a permit therefor issued as hereinafter provided.
The chief of police or, where there shall be no chief of police, the warden of the borough of the first selectman of the town, as the case may be, may, upon the application of any person, issue a permit in such form as may be prescribed by the superintendent of state police for the sale at retail of pistols and revolvers within the jurisdiction of the authority issuing such permit. Upon the application of any person having a bona fide residence or place of business within the jurisdiction of any such authority or, upon the application of any bona fide resident of the United States having a permit or license to carry any firearm issued by the authority of any state or sub-division of the United States, such chief of police, warden or selectmen may issue a permit to such person to carry a pistol or revolver within the jurisdiction of the authority issuing the same, provided such authority shall find that such applicant intends to make no use of the pistol or revolver thereunder other than a proper use and that such person is a suitable person to receive such permit. The superintendent of state police may, upon application, issue to any holder of any permit to carry any pistol or revolver hereinbefore provided for, a permit to carry a pistol or a revolver within the state . . . .

App. 0241

Sec. 5. No sale of any pistol or revolver shall be made except in the room, store or place described in the permit for the sale of pistols and revolvers, and such permit or a copy thereof certified by the authority issuing the same shall be exposed to view within the room, store or place where pistols or revolvers shall be sold or offered or exposed for sale, and no sale or delivery of any pistol or revolver shall be made unless the purchaser or person to whom the same is to be delivered shall be personally known to the vendor of such pistol or revolver or the person making delivery thereof or unless the person making such purchase or to whom delivery thereof is to lic made shall provide evidence of his identity. The vendor of any pistol or revolver shall keep a record of every pistol or revolver sold in a book kept for that purpose, which record shall be in such form as shall be prescribed by the superintendent, of state police and shall include the date of the sale, the caliber, make, model and manufacturer's number of such pistol or revolver and the name, address and occupation of the purchaser thereof, which record shall be signed by the purchaser and by the person making the sale, each in the presence of the other, and shall be preserved by the vendor of such pistol or revolver for a period of at least six years.

Sec. 7. No person, firm or corporation shall sell at retail, deliver or otherwise transfer any pistol or revolver to any alien, nor shall any person deliver any pistol or revolver at retail except upon written application therefor and no sale or delivery of any pistol or revolver shall be mode upon the date of the filing or receipt of any written application for the purchase thereof, and when any pistol or revolver shall b delivered in connection with the sale or purchase, such pistol or revolver shall be enclosed in a package, the paper or wrapping of which shall be securely fastened, and no pistol or revolver when delivered on tiny sale or purchase shall be loaded or contain therein any gunpowder or other explosive or any bullet, ball or shell. Upon the delivery of any pistol or revolver the purchaser shall sign in triplicate a receipt for such pistol or revolver which shall contain the name, address and occupation of such purchaser, the date of sale, caliber, make, model and manufacturer's number and a general description thereof. One of such triplicate receipts shall, within twenty-four hours thereafter, be forwarded by the vendor of such pistol or revolver to the superintendent of state police and one to the authority issuing the permit for the sale of such pistol or revolver and the other shall be retained by such vendor for at least six years.

Sec. 8. No person shall make any false statement or give any false information connected with any purchase, sale or delivery of any pistol or revolver, and no person shall sell, barter, hire, lend, give or deliver to any minor under the age of eighteen years any pistol or revolver.

1930 Conn. Stat. 903, Dealing in Explosives; License., ch. 147, § 2644. 1909
No person shall manufacture, store, sell, or deal in gunpowder or any material or compound . . . unless he shall first obtain from the commissioner of state police or the fire marshal of the town where such business is conducted a written license therefor . . . which license shall specify the building where such business is to be carried on or such material deposited or used.

1935 Conn. 389, 389-94
CHAPTER 152
AN ACT CONCERNING MACHINE GUNS.
Be it enacted by the Senate and House of Representatives in General Assembly convened:
SECTION 1. The term "Machine Gun," as used in this act, shall apply to and include a weapon of any description, loaded or unloaded, from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically, discharged from a magazine, by a single function of the firing device. . . .

**App. 0242**

SEC. 2. Any person who shall possess or use a machine gun in the perpetration or attempted perpetration of a crime of violence shall be imprisoned not more than twenty years.

Sc. 3. Any person who shall possess or use a machine gun for an offensive or aggressive purpose shall be imprisoned not more than ten years.

SEC. 4. The possession or use of a machine gun shall be presumed to be for an offensive or aggressive purpose: (a) When the machine gm shall be on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun was found; or (b) when in the possession of, or use by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any state or federal court of record of the United States of America, its territories or insular possessions; or (e) when the machine gun shall be of the kind described in section seven hereof and has not been registered as in said section required; or (d) when empty or loaded pistol shells of thirty (.30 in. or 7.63 mm.) or larger caliber which have been or are susceptible of use in the machine gun shall be found in the immediate vicinity thereof.

SEc. 5. The presence of a machine gun in any room, boat or vehicle shall be presumptive evidence of the possession or use of the machine gun by each person occupying such room, boat or vehicle.

SEc. 6. Each manufacturer shall keep a register of all machine guns manufactured or handled by him. Such register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of each machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned, given or delivered. Upon demand, any manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, and parts and supplies therefor, and shall produce the register, herein required, for inspection. Any person who shall violate any provision of this section shall be fined not more than two thousand dollars.

SEc. 7. Each machine gun in this state on July 1, 1935, adapted to use pistol cartridges of thirty (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the commissioner of the state police on July 1, 1935, and annually thereafter on the first day of July. If acquired after July 1, 1935, it shall be registered within twenty-four hours after its acquisition and, thereafter, annually, on the first day of July. Blanks for registration shall be prepared by said commissioner and furnished upon application. To comply with this section, the application as filed shall show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which the gun was acquired. The registration data shall not be subject to inspection by the public. Any person who shall fail to register any gun as required by this section shall be presumed to possess the same for an offensive or aggressive purpose. The provisions of this section shall not apply to any machine gun which has been registered under the provisions of section six of this act and which is still in the actual possession
of the manufacturer.

SEC. 8. A warrant to search any house or place and seize any machine gun adapted to use pistol cartridges of thirty (.30 in. or 7.63 mm.) or larger caliber possessed in violation of this act, may issue in the same manner and under the same restrictions as provided by law for stolen property, and any court of record, upon application of the state's attorney, shall have authority to order any machine gun, thus or otherwise legally seized, to be confiscated and either destroyed or delivered to a peace officer of the state or of a political subdivision thereof.

**App. 0243**

SEC. 9. No provision of this act shall apply to the manufacture of machine guns for sale or transfer to the United States government, to any state, territory or possession of the United States or to any political subdivision thereof or to the District of Columbia.

Sec. 10. This act shall take effect from its passage.

## DELAWARE

1797 Del. Laws 104, An Act For the Trial Of Negroes, ch. 43, §6.

And be it further enacted by the authority aforesaid, That if any Negro or Mulatto slave shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same, and be convicted thereof before a magistrate, he shall be whipped with twenty-one lashes, upon his bare back.

1832 Del. Laws 208, A Supplement to an Act to Prevent the Use of Firearms by Free Negroes and Free Mulattoes, and for Other Purposes, chap. 176, § 1.

. . . it shall not be lawful for free negroes and free mulattoes to have, own, keep or possess any gun, pistol, sword or any warlike instruments whatsoever: Provided however, that if upon application of any such free negro or free mulatto to one of the justices of the peace of the county in which such free negro or free mulatto resides, it shall satisfactorily appear upon the written certificate of five or more respectable and judicious citizens of the neighborhood, that such free negro or free mulatto is a person of fair character, and that the circumstances of his case justify his keep and using a gun, then and in every such case it shall and may be lawful for such justice to issue a license or permit under his hand and authorizing such free negro or free mulatto to have use and keep in his posession a gun or fowling piece.

1841 Del. Laws 430, An Act Concerning Fees, ch. 368, § 1.

Justices of the Peace shall receive . . . For licenses to negroes to keep a gun, twenty five cents.

9 Del. Laws 552 (1843), A Further Supplement To An Act Entitled "An Act To Prevent The Use Of Fire-arms By Free Negroes And Free Mulattoes And For Other Purposes, § 1. 1843

That the proviso in the first section of the act to which this is a further supplement, and all and every the provisions of the said act, or any other supplemental act thereto, which authorizes the issuing, by a justice of the peace, of a license or permit to a free negro or free mulatto to have, use and keep in his possession, a gun or fowling piece, be and the same are hereby repealed, made null and void.

1909 Del. Laws 577, House Joint Resolution Providing for Increase in Non-Resident Gunners License Fee, ch. 271.

Whereas, there are numerous gunners from other States who make it a practice to gun in this State, and under existing laws a license fee of Five Dollars is collected from them. And Whereas, our neighboring States charge non-resident gunners a license fee of more than Five Dollars. Therefore be it resolved by the Senate and House of Representatives of the State of Delaware in General Assembly met: That from and after the passage of this Resolution up to and including April 30th, 1911, all non-resident gunners shall be required to pay a license fee of Ten Dollars per annum, said license fee to be collected in the same manner and by the same agency as non-resident gunners' licenses are now collected.

Vol. 26 Del. Laws 28, 28- 29 (1911)

Section 1. That from and after the first day of June, in the year of our Lord, one thousand nine hundred and eleven, it shall be unlawful for any person or persons, firm, company or corporation, to sell, or expose to sale, any pistol or revolver, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made especially for the defense of one's person, without first having obtained a license therefor, which license shall be known as "Special License to Sell Deadly Weapons;" provided, however, that this provision shall not relate to toy pistols, pocket knives, or knives used in the domestic household, or surgical instruments or tools of any kind.

Section 2. Any person or persons, firm, company or corporation, desiring to engage in the business of selling revolvers, pistols, or revolver or pistol cartridges, stilettos, steel or brass knuckles, or other weapons made for the defense of one's person, shall, after the above mentioned date, apply to the Clerk of the Peace of the County in which it is desired to conduct such business and shall obtain a license therefor, for which he, they, or it shall pay the sum of twenty-five dollars, which said license shall entitle the holder thereof to conduct said business for the term of one year from its date.

Section 3. It shall be unlawful for any person or per- sons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons, made especially for the defense of one's person.

Section 4. It shall be the duty of any person or persons, firm, company or corporation, desiring to engage in the business aforesaid, to keep and maintain in his place of business at all times, a book which shall be furnished him by the Clerk of the Peace of the County wherein he does business in which said book he shall enter the date of the sale, the name and address of the person purchasing any such deadly weapon, the number and kind of deadly weapon so pur- chased, the color of the person so purchasing the same, and the apparent age of the purchaser; and no sale shall be made weapon, etc. until the purchaser has been positively identified. This book shall at all times be open for inspection by any Judge, Justice of the Peace, Police Officer, Constable, or other Peace Officer of this State.

## **DISTRICT OF COLUMBIA**

Washington D.C. 27 Stat. 116 (1892)

CHAP. 159.–An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles.

SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of a misdemeanor, and upon conviction thereof shall, for the first offense, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall

be paid to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such fine and imprisonment, in the discretion of the court: Provided, That the officers, non-commissioned officers, and privates of the United States Army, Navy, or Marine Corps, or of any regularly organized Militia Company, police officers, officers guarding prisoners, officials of the United States or the District of Columbia engaged in the execution of the laws for the protection of persons or property, when any of such persons are on duty, shall not be liable for carrying necessary arms for use in performance of their duty: Provided, further, that nothing contained in the first or second sections of this act shall be so construed as to prevent any person from keeping or carrying about his place of business, dwelling house, or premises any such dangerous or deadly weapons, or from carrying the same from place of purchase to his dwelling house or place of business or from his dwelling house or place of business to any place where repairing is done, to have the same repaired, and back again: Provided further, That nothing contained in the first or-second sections of this act shall be so construed as to apply. to any person who shall have been granted a written permit to carry such weapon or weapons by any judge of the police court of the District of Columbia, and authority is hereby given to any such judge to grant such permit for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof; and further, upon the filing with such judge of a bond, with sureties to be approved by said judge, by the applicant for such permit, conditioned to the United States in such penal sum as said judge shall require for the keeping of the peace, save in the case of necessary self defense by such applicant during the continuance of said permit, which bond shall be put in suit by the United States for its benefit upon any breach of such condition.

SEC. 3. That for the second violation of the provisions of either of the preceding sections the person or persons offending shall be proceeded against by indictment in the supreme court of the District of Columbia, and upon conviction thereof shall be imprisoned in the penitentiary for not more than three years.

SEC. 4. That all such weapons as hereinbefore described which may be taken from any person offending against any of the provisions shall, upon conviction of such person, be disposed of as may be ordered by the judge trying the case, and the record shall show any and all such orders relating thereto as a part of the judgment in the case.

SEC. 5. That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months. No person shall engage in or conduct  the business of selling, bartering, hiring, lending, or giving any weapon or weapons of the kind hereinbefore named without having previously obtained from the Commissioners of the District of Columbia a special license authorizing the conduct of such business by such person, and the said Commissioners are hereby authorized to grant such license, without fee therefor, upon the filing with them by the applicant therefor of a bond with sureties, to be by them approved, conditioned in such penal sum as they shall fix to the United States for the compliance by said applicant with all the provisions of this section; and upon any breach or breaches of said condition said bond shall be put in suit by said United States for its benefit, and said Commissioners may revoke said license. Any person engaging in said business without having previously obtained said special license shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to pay a fine of not less than one hundred dollars nor more

**App. 0246**

than five hundred dollars, of which one half shall be paid to the informer, if any, whose information shall lead to the conviction of the person paying said fine. All persons whose business it is to sell barter, hire, lend or give any such weapon or weapons shall be and they hereby, are, required to keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon or weapons, which register shall be subject to the inspection of the major and superintendent of Metropolitan Police of the District of Columbia, and further to make a weekly report, under oath to said major and superintendent of all such sales, barterings, hirings, lendings or gifts. And one half of every fine imposed under this section shall be paid to the informer, if any, whose information shall have led to the conviction of the person paying said fine. Any police officer failing to arrest any person guilty in his sight or presence and knowledge, of any violation of any section of this act shall be fined not less than fifty nor more than five hundred dollars.

SEC 6. That all acts or parts of acts inconsistent with the provisions of this act be, and the same hereby are, repealed.

Washington D.C. 47 Stat. 650, 651-652 (1932)

CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business-within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason

App. 0247

given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

SELLING TO MINORS AND OTHERS

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

## **FLORIDA**

Leslie A. Thompson, A Manual or Digest of the Statute Law of the State of Florida, of a General and Public Character, in Force at the End of the Second Session of the General Assembly of the State, on the Sixth Day of January, 1847 Page 547, Image 582 (1847) available at The Making of Modern Law: Primary Sources. 1847

For the Prevention of Indians Roaming at Large Throughout the State, § 1. From and after the passage of this act, if any male Indian of the years of discretion, venture to roam or ramble beyond the boundary lines of the reservations, which have been assigned to the tribe or nation to which said Indian belongs, it shall and may be lawful for any person or persons to apprehend, seize, and take said Indian, and carry him before some Justice of the Peace, who is hereby authorized, empowered, and required, to direct (if said Indian have not a written permission from the agent to do some specific act) not exceeding thirty-nine stripes, at the discretion of the Justice, to be laid on the bare back of said Indian; moreover, to cause the gun of said Indian (if he has one) to be taken from him, and deposited with the colonel of the county, or captain of the district, in which said Indian may be taken, subject to the order of the superintendent of Indian Affairs.

1887 Fla. Laws 164-165, An Act to Establish the Municipality of Jacksonville Provide for its Government and Prescribe it's jurisdiction and powers, chap. 3775, § 4.

The Mayor and City Council shall within the limitations of this act have power by ordinance to . . . regulate and license the sale of firearms and suppress the carrying of concealed weapons.

1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, chap. 4147, §§ 1-4. 1898

§ 1. That in each and every county of this State, it shall be unlawful to carry or own a Winchester or other repeating rifle or without first taking out a license from the County Commissioner of the respective counties, before such persons shall be at liberty to carry around with him on his person and in his manual possession such Winchester rifle or other repeating rifle. § 2. The County Commissioners of the respective counties in this State may grant such licenses at any regular or special meeting. § 3. The person taking out such license shall give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the County Commissioners, and at the same time there shall by kept by the County Commissioners granting the same a record of the name of the person taking out such license, the name of the maker of the firearm so licensed to be carried and the caliber and number of the same. § 4. All persons violating the provisions of Section 1 of this Act shall be guilty of a misdemeanor, and on conviction shall be fined not exceeding one hundred dollars or imprisonment in the county jail not exceeding sixty days.

1895 Fla. Laws 14

Fourteenth. No merchant, store-keeper or dealer shall keep for sale or sell pistols, Springfield rifles, repeating rifles, bowie knives or dirk knives, without first paying a license tax of ten dollars; Provided, Said pistols, Springfield rifles, repeating rifles, bowie knives or dirk knives, shall not be sold to minors. Every violation of this paragraph shall be punished by a fine of fifty dollars, or by imprisonment in the county jail not more than six months.

1931 Fla. Laws 2069, § 7.

The village shall have the following rights and powers . . . To license, tax, regulate, or prohibit, within the village or any part thereof . . . explosives, guns, pistols and other weapons . . . .

## GEORGIA

A Digest of the Laws of the State of Georgia. From Its First Establishment as a British Province down to the Year 1798, Inclusive, and the Principal Acts of 1799: In Which is Comprehended the Declaration of Independence; the State Constitutions of 1777 and 1789, with the Alterations and Amendments in 1794. Also the Constitution of 1798 Page 153-154, Image 160-161 (1800) available at The Making of Modern Law: Primary Sources. 1768

Laws of Georgia, An Act to amend and Continue "An Act for the Establishing and Regulating Patrols, and for Preventing any Person from Purchasing Provisions or any Other Commodities from, or Selling Such to any Slave, Unless Such Slave Shall Produce a Ticket from His or Her Owner, Manager or Employer . . . Be it enacted, That immediately from and after passing of this act, it shall not be lawful for any slave, unless in the presence of some white person, to carry or make use of fire arms, or any offensive weapon whatsoever, unless such slave shall have a ticket or license in writing from his master, mistress, or overseer, to hunt and kill game, cattle, or mischievous birds or beasts of prey, and that such license be renewed every week, or unless there be some white person of the age of sixteen years or upwards in the company of such slave when he is hunting or shooting, or that such slave be actually carrying his master's arms to or from his master's plantation by a special ticket for that purpose, or unless such slave be found in the day-time, actually keeping off birds within the plantation to which such slave belongs, loading the same gun at night, within the plantation to which such slave belongs, loading the same gun at night, within the dwelling house of his master, mistress or white overseer: Provided always, That no slave shall have liberty to carry any gun, cutlass, pistol, or other offensive weapon, abroad at any time between Saturday evening after sunset and Monday morning before sun rise, notwithstanding a license or ticket for so doing. II. And be it further enacted, That in case any or either of the patrols, established or to be established within this province, by virtues of the said act, on searching and examining any negro house for offensive weapons, fire arms and ammunition, shall find any such, or in case any person shall find any slave using or carrying fire arms or other offensive weapons, contrary to the intent and meaning of this act, such patrol, or person or persons, may lawfully seize and take away such offensive weapons, fire arms, and ammunition, but before the property thereof shall be vested in the person or persons who shall seize the same, such person or persons shall, within three days next after such seizure, go before a justice of the peace, and shall make oath of the manner of taking thereof, and if such justice of the peace, after such oath made, or upon due examination, shall be satisfied that the said fire arms, offensive weapon, or ammunition, shall have been seized according to the directions, and

agreeable to the true intent and meaning of this act, the said justice shall, by certificate under his hand and seal, declare them forfeited, that the property is lawfully vested in the person or persons who seized the same.

1866 Ga. Laws 27-28, An Act to Authorize the Justices of the Inferior Courts of Camden, Glynn and Effingham Counties to Levy a Special Tax for County Purposes, and to regulate the same, §§ 3-4.

§ 1. . . . collect a tax of two dollars per head on each and every dog over the number of three, and one dollar a piece on every gun or pistol, musket or rifle over the number of three kept or owned on any plantation in the counties aforesaid; the said tax to be applied to such county purposes as the said courts shall direct. § 2. That the owner of every plantation in said counties shall be required to render, upon oath, a full return of every dog, gun, pistol, musket, or rifle so held or kept as aforesaid, and shall be held responsible for the tax imposed upon them, which tax the said Inferior Courts are hereby authorized and empowered to enforce, as in other cases.

1902 Ga. Laws 434-35, § 16.

Be it further enacted by the authority aforesaid, That the mayor and aldermen of the said city of Forsyth shall have full power to license, regulate and control by ordinance all . . . gun shops, dealers in guns or pistols . . . .

Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d). 1910

§ 348 (a). Carrying pistols without license. [It shall be unlawful for any person to have or carry about his person, in any county in the State of Georgia, any pistol or revolver without first taking out a license from the ordinary of the respective counties in which the party resides, before such person shall be at liberty to carry around with him on his person, or to have in his manual possession outside of his own home or place of business: Provided that nothing in this law shall be construed to alter, affect, or amend any laws now in force in this State relative to the carrying of concealed weapons on or about one's person, and provided further, that this shall not apply to sheriffs, deputy sheriffs, marshals, or other arresting officers of this State or United States, who are now allowed, by law, to carry revolvers; nor to any of the militia of said State while in service or upon duty; nor to any students of military colleges or schools when they are in the discharge of their duty at such colleges.] § 348 (b). License, how obtained. [The ordinary of the respective counties of this State in which the applicant resides may grant such license, either in term time or during vacation, upon the application of party or person desiring to apply for such license; provided applicant shall be at least eighteeen years old or over, and shall give a bond payable to the Governor of the State in the sum of one hundred dollars, conditioned upon the proper and legitimate use of said weapon with a surety approved by the ordinary of said county, and the ordinary granting the license shall keep a record of the name of the person taking out such license, the name of the maker of the fire-arm to be carried, and the caliber and number of the same.] § 348 (c). Fee for license. [The person making such application and to whom such license is granted, shall pay to the ordinary for granting said license the sum of fifty cents, which license shall cover a period of three years from date of granting same.] § 348 (d). Punishment. [Any person violating any of the provisions of the three preceding sections shall be punished as for a misdemeanor, as prescribed in section 1065 of this Code.]

App. 0250

1921 Ga. Laws 248, Explosives, Use of Regulated, § 1.
That from and after the passage of this Act, It shall be unlawful for any person, association of persons, co-partnerships or corporations to have, own, possess or control within the State of Georgia, any dynamite, nitro-glycerine, gun cotton, or any other high explosive of any name whatsoever, without first having registered his, their or its name with the Ordinary of the County where such person, association or persons, co-partnership or corporation resides, or does business, in a book to be kept by said Ordinary to be known as the Explosive Register . . . .

## HAWAII

1870 Haw. Sess. Laws 26, An Act to License the Carrying of Fowling Pieces and Other Firearms, chap. 20, §§ 1 to 3.
Lawrence McCully, Compiled Laws of the Hawaiian Kingdom Page 539, Image 545 (1884) available at The Making of Modern Law: Primary Sources. 1870
An Act to License the Carrying of Fowling Pieces and Other Fire-Arms. Whereas, the Act for the protection of Kolea or Plover and other useful birds, approved on the 20th day of April, A.D. 1859, has proved ineffectual for the purposes intended thereby, and Whereas, The general and indiscriminate use of fire-arms, which are frequently used for the destruction of useful, imported and migratory insectivorous birds and their progeny, is an injury to the agricultural and pastoral interests of this Kingdom, therefore, Be it Enacted by the King and Legislative Assembly of the Hawaiian Islands in the Legislature of the Kingdom assembled: § 1. That the Minister of the Interior may at any time license for a term of one year, any applicant for such license, to use and carry fire-arms for sporting purposes, in the District of Kona, Island of Oahu, on receiving for such license the sum of five dollars. § 2. Any person in said district who shall use or carry for sporting purposes, any gun, carbine, rifle, pistol, or other fire-arms, without having at first obtained a license as hereinbefore provided, shall, upon conviction therefor, before any police or district justice, be fined in a sum not to exceed fifty dollars for every such offense, and in default of payment of such sum, shall be imprisoned at hard labor, until such fine and costs are paid, according to law. § 3. All such licenses shall be signed by the Minister of the Interior, numbered according to their respective dates and impressed with the seal of his department, and no such license shall be transferable.

Revised Laws of Hawaii 1925, 791-92 (1925).
Section 2137. Form or report. It shall be the duty of the sheriff to prepare and furnish to all persons applying therefor [meaning applying under Section 18 of 1927 Haw. Sess. Laws 209-217], proper blanks upon which such information shall be furnished, in the following form: [requiring name of owner, name of possessor, number, description, makers name, factory number, and number disposed of and date].

1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), §§ 10-11, § 17.
Section 1. Definitions. "Pistol" or "revolver" as used in this Act, means any firearm with barrel less than twelve inches in length. "Crime of Violence", as used in this Act means any of the following crimes, namely, murder, manslaughter, rape, mayhem, assault to do great bodily harm,

25

robbery, larceny, burglary and house-breaking. <u>Section 2</u>. Committing crime when armed. If any person, when armed with a pistol or revolver, shall commit or attempt to commit an act constituting a crime of violence, he may in addition to the punishment otherwise provided for the crime, be punished by imprisonment for not more than one year or by a fine of not more than one thousand dollars ($1,000.00) or by both; provided, that the act aforesaid be one which is capable of being committed or facilitated by means of a pistol or revolver. <u>Section 3</u>. Being armed prima facie evidence of intent. In the trial of a person for committing or attempting to commit a crime of violence, the fact that he was armed with a pistol or revolver and had no license to carry the same, shall be prima facie evidence of his intention to commit said crime of violence; provided, that the criminal act committed or attempted be one which is capable of being committed or facilitated by means of a pistol or revolver.

Section 5. Carrying or keeping small arms by unlicensed persons. Except as otherwise provided in Sections 7 and 11 hereof in respect of certain licensees, no person shall carry, keep, possess, or have under his control a pistol or revolver; provided, however, that any person who shall have lawfully acquired the ownership or possession of a pistol or revolver may, for purposes of protection and with or without a license, keep the same in the dwelling house or business office personally occupied by him, and, in case of an unlawful attack upon any person or property in said house or office, said pistol or revolver may be carried in any lawful, hot pursuit of the assailant.

Section 6. Exceptions. The provisions of the preceeding section shall not apply to marshals, sheriffs, prison or jail wardens or their deputies, policemen, mail carriers, or other duly appointed law enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States, or of the National Guard, when on duty, or of organizations by law authorized to purchase or receive such weapons from the United States or this territory, or to officers or employees of the United States authorized by law to carry a concealed pistol or revolver, or to duly authorized military organizations when on duty, or to the members thereof when at or going to or from their customary places of assembly, or to the regular and ordinary transportation of pistols or revolvers as merchandise, or to any person while carrying a pistol or revolver unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

Section 9. Transfers regulated. No person shall transfer by way of sale, gift, loan or otherwise, a pistol or revolver unless the prospective transferee, when he applies for the transfer, presents a permit duly granted under Section 2141 of the Revised Laws of Hawaii 1925; nor shall he make such transfer unless the transferee be a person in respect of whom there is no reasonable cause, known to the transferor, for believing that such transferee has committed or attempted, or has been convicted of committing or attempting, a crime of violence. No seller shall in any event deliver a pistol or revolver on the day when the application to purchase and the statement hereinafter mentioned shall be made. When delivered, said pistol or revolver shall be securely wrapped and shall be unloaded. Before a delivery be made the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, race, nationality, color and place of birth, the date of sale, the caliber, make, model, and manufacturer's number of the weapon, and stating that he has never been convicted of a crime of violence. The seller shall promptly sign and forward by registered mail one copy thereof to the treasurer of the territory, and one copy thereof to the sheriff of the county or city and county of which the seller is a resident, and shall retain the other copy for six years. A statement shall be

**App. 0252**

deemed promptly forwarded if it is forwarded within seven days, unless a shorter time is provided therefor in regulations established by the Governor.

Section 10. Dealers to be licensed. No retail dealer or selling agent shall sell or otherwise transfer, or expose for sale or transfer, or have in his possession with intent to sell, or otherwise transfer, any pistol or revolver without being licensed as hereinafter provided.

Section 11. Dealers' Licenses; by whom granted, and conditions thereof. The duly constituted licensing authorities of any political subdivision of this territory may grant licenses in form prescribed by the treasurer of the territory, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political subdivision, pistols and revolvers, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol or revolver shall be delivered unless the purchaser either is personally known to the seller or shall present clear evidence of his identity.

4. The seller shall faithfully comply with the requirements of Section 9 hereof and with all other provisions of this Act and of Chapter 128, Revised Laws of Hawaii 1925. A copy of the statement required by Section 9 hereof shall be entered by the seller in a book of record to be kept in his place of business and to be always open to the inspection of the officers and authorized representatives of the territorial government, including the police. Said book shall be preserved for six years.

5. No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed in any part of said premises where it can readily be seen from the outside.

No license to sell at retail shall be granted to anyone except as provided in this section.

Section 12. False information forbidden. No person shall, in purchasing or otherwise securing delivery of a pistol or revolver, or in applying for a license to carry the same, give false information or offer false evidence of his identity.

Section 17. Penalties. Any violation of any provision of this Act shall constitute an offense punishable by a fine of not more than one thousand dollars ($1,000.00) or imprisonment for not more than one year, or both.

Section 25. Section 2143 of the Revised Laws of Hawaii 1925, is hereby amended by inserting, after the first sentence in said section ["The permit mentioned in section 2141 shall not be issued to any alien until the applicant has filed with the sheriff or a deputy sheriff of the county or city and county a request in writing, signed by two responsible citizens requesting that such permit be issued, and recommending and vouching for the applicant."], the following: "The request aforesaid shall include (1) an expression of the belief of such citizens that the applicant has never committed or attempted a crime of violence, as that phrase is defined in the Small Arms Act; that he has never been convicted thereof anywhere and that he is not likely to commit or attempt any such crime and (2) a brief statement of the facts relating to the age, character, nativity and personal history of the applicant, insofar as these facts are within the personal knowledge of such responsible citizens. Such facts as are within the personal knowledge of one of them, only, shall be included in a supplemental written statement signed by the person having such knowledge."

[The rest of Section 2143 reads: "Aliens obtaining a permit as prescribed by the above section shall be required to secure an annual license from the treasurer of the county or city and county,

**App. 0253**

and to pay to the treasurer an annual license tax of five dollars; provided, however, that to aliens who must necessarily use fire-arms in carrying on their business, such as rice planting, such license shall be issued free of charge upon a certificate from the sheriff of the county or city and county in which they carry on such business to the effect that the fire-arms and ammunition mentioned in their permit are necessary to the conduct of their business."]

Section 26. Section 2146 of the Revised Laws of Hawaii 1925, is hereby amended to read as follows: "Section 2146. Penalties. Any person who shall be found in the possession of any firearm or firearms or any ammunition without having complied with the provisions of this chapter, or who shall fail to give, file or forward required information, reports or statements, or who shall otherwise violate the provisions of this chapter in matters not covered by Section 2142 hereof, shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be fined by the court of appropriate jurisdiction in a sum of not more than five hundred dollars ($500.00). Any person, firm, corporation, copartnership, failing to file any information herein required to be filed, shall be deemed guilty of a misdemeanor and upon conviction shall be fined by the court of appropriate jurisdiction not more than five hundred dollars ($500.00).

The divulging of official information recorded or on file in a public office shall be punishable in like manner; provided, however, that where the information divulged has not tended, or been designed to encourage, or to render formidable armed resistance to the law, the fine shall not exceed twenty-five dollars ($25.00)."

1933 Haw. Sess. Laws 36-37, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 3.

Every person residing or doing business or temporarily sojourning within the Territory on the effective date of this Act who possesses a firearm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, not already registered in the name of the present possessor, or who possesses ammunition of any kind or description, except shotgun ammunition, shall, within ten days of said effective date, register the same with the chief of police of the city and county of Honolulu or the sheriff of the county, other than the city and county of Honolulu, wherein is his place of business, or if there be no place of business, his residence, or if there be neither place of business nor residence, his place of sojourn. Every person arriving in the Territory after the effective date of this Act, who brings with him firearms or ammunition of the type and description set out in this section, shall register the same in similar manner within forty-eight hours after arrival. The registration shall be on such forms as may be designated by the bureau of crime statistics and shall include a description of the class of firearm or firearms and ammunition owned by him, or in his possession, together with the name of the maker and the factory number, if known or ascertainable, and the source from which possession was obtained. Within sixty days after the effective date of this Act, the chief of police of the city and county of Honolulu and the sheriffs of the several counties, other than the city and county of Honolulu, shall furnish the bureau of crime statistics a record of all registrations now on file in their respective offices. Within ten days after the end of each month the chief of police of the city and county of Honolulu and the sheriffs of the several counties, other than the city and county of Honolulu, shall furnish to the bureau of crime statistics duplicate copies of all registrations made during the preceding month. No fee shall be charged for such registration. Any person who fails to comply with the provisions of this section shall he punished by a fine of not more than two hundred and fifty dollars ($250.00).

1933 Haw. Sess. Laws 37-38, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 4.

§ 4. No person residing or doing business or temporarily sojourning within the Territory shall take possession of any fire arm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, registered under prior Acts or unregistered, or of any ammunition of any kind or description, except shotgun ammunition, either through sale, gift, loan, bequest, or otherwise, whether procured in the Territory or imported by mail, express, freight, or otherwise, until he shall first have procured from the chief of police of the city and county of Honolulu or the sheriff of the county, other than the city and county of Honolulu, wherein is his place of business, or if there be no place of business, his residence, or if there be neither place of business nor residence, his place of sojourn, a permit to acquire as prescribed herein. The chief of police of the city and county of Honolulu or the sheriffs of the several counties, other than the city and county of Honolulu, are hereby authorized, within their discretion, to issue permits, within their respective jurisdictions, to acquire rifles, pistols, and revolvers to citizens of the United States, of the age of twenty years or more, and to duly accredited official representatives of foreign nations. Permits to acquire ammunition for rifles, pistols and revolvers acquired prior to the effective date of this Act and registered in accordance with the provisions hereof, may be granted persons [sic] of the age of twenty years or more irrespective of citizenship. Permits to acquire shotguns may be granted to persons of the age of sixteen years or more, irrespective of citizenship. Applications for such permits shall be signed by the applicant upon forms to be specified by the bureau of crime statistics, and shall be signed by the issuing authority. One copy of such permit shall be retained by the issuing authority, as a permanent official record. Such permit shall be void unless used within ten days after the date of issue. In all cases where possession is acquired from another person in the Territory the permit shall be signed in ink by the holder thereof and shall thereupon be delivered to and taken up by the person selling, loaning, giving or delivering the firearm or ammunition, who shall make entry thereon setting forth in the space provided therefor the name of the person to whom the firearm or ammunition was delivered, and the make, style, caliber, and number, as applicable. He shall then sign it in ink and cause it to be delivered or sent by registered mail to the issuing authority within forty-eight hours. In case receipt of such firearms or ammunition is had by mail, express, freight, or otherwise, from sources outside the Territory, the person to whom such permit has been issued, shall make the prescribed entries thereon, sign in ink, and cause it to be delivered or sent by registered mail to the issuing authority within forty-eight hours after taking possession of the firearms or ammunition. No person shall sell, give, loan, or deliver into the possession of another any firearm or ammunition except in accordance with the Provisions of this section. Any person acquiring a firearm or ammunition under the provisions of this section shall, within five days of acquisition, register same in the manner prescribed by Section 3 of this Act. No fee shall be charged for permits under this section. Any person who violates any provision of this section shall be punished by a fine of not more than five hundred dollars ($500.00) or imprisonment for not more than one year, or by both.

1933 Haw. Sess. Laws 38, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 5. 1933
Any person who has procured a hunting license under the provisions of Sections 2028-2032, inclusive, of the Revised Laws of Hawaii 1925, as amended, shall, while actually engaged in

App. 0255

hunting or while going to or from the place of hunting, be authorized to carry and use any lawfully acquired rifle or shotgun and suitable ammunition therefor.

1933 Haw. Sess. Laws 39, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 8, 10-16.

§ 8. In an exceptional case, when the applicant shows good reason to fear injury to his person or property, the chief of police of the city and county of Honolulu or the sheriff of a county, other than the city and county of Honolulu, may grant a license to a citizen of the United States or a duly accredited official representative of a foreign nation, of the age of twenty years or more, to carry concealed on his person within the city and county or the county in which such license is granted, a pistol or revolver and ammunition therefor. Unless renewed, such license shall automatically become void at the expiration of one year from date of issue. No such license shall issue unless it appears that the applicant is a suitable person to be so licensed, and in no event to a person who has been convicted of a felony, or adjudged insane, in the Territory or elsewhere. All licenses to carry concealed weapons heretofore issued shall expire at midnight on the effective date of this Act. No person shall carry concealed on his person a pistol or revolver or ammunition therefor without being licensed so to do under the provisions of this section. For each such license there shall he charged a fee of ten dollars ($10.00), which shall be covered into the treasury of the city and county or the county in which such license is granted. Any person violating this section shall be punished by a fine of not more than one thousand dollars ($1,000.00) or by imprisonment for not more than one year, or by both.

1933 Haw. Special Sess. Laws 117, An Act . . . Regulating The Sale, Transfer And Possession Of Certain Firearms, Tear Gas And Ammunition: § 2.

Except as permitted under the provisions of this Act, no person, firm or corporation shall own, possess, sell, offer for sale or transport any firearm of the kind commonly known as a machine gun or any shell cartridge or bomb containing or capable of emitting tear gas or any other noxious gas. Provided, however, that nothing in this Act contained shall prohibit the sale to, purchase by, or possession of such firearms by any city and county, county, territorial or federal officer where such firearms are required for professional use in the discharge of his duties, nor to the transportation of such firearms for or on behalf of police departments and members thereof, sheriffs, or the military or naval forces of this Territory or of the United States and "Provided, further that nothing in this Act shall prohibit police departments and members thereof, sheriffs, or the military or naval forces of the territory or of the United States from possessing or transporting such shells, cartridges or bombs for professional use in the discharge of their duties. "The term 'shell, cartridge or bomb', as used in this Act shall be construed to apply to and include all shells, cartridges, or bombs capable of being discharged or exploded through or by the use of percussion caps, fuses, electricity, or otherwise, when such discharge or explosion will cause or permit the release or emission of tear gases. The term 'machine gun' as used in this Act shall be construed to apply to and include machine rifles, machine guns and submachine guns capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical device."

**ILLINOIS**

30

**App. 0256**

An Act concerning the Kaskaskia Indians, in Nathaniel Pope, Laws of the Territory of Illinois (1815). 1814
That it shall not be lawful for any person whatever without license from the Governor or some sub-agent appointed by him to purchase or receive by gift or other wise of any of the before mentioned Indians, any horse, mare, gun, tomohawk, knife, blanket, shrouding, calico, saddle, bridle, or any goods wares or merchandize whatever, that all such sales or gifts shall be considered as fraudulent on the part of the buyer or receiver and that any white person or free person of coulour whatever so buying or receiving any such articles of any one of those Indians shall be liable to pay a fine of twenty dollars to be recovered before a justice of the peace . . . ."

Samuel P. Church, The Revised Ordinances of the City of Quincy, Ill. to Which are Prefixed the Charter of the City of Quincy, and the Amendment Thereto Page 47, Image 47 (1841) available at The Making of Modern Law: Primary Sources. 1841
[An Ordinance Regulating the Police of the City of Quincy], § 5. Be it further ordained by the City Council of the City of Quincy, That no person shall, within the limits of said city, fire or discharge any cannon, musket, rifle, fowling piece, or other fire arms, or air-gun, except in cases of necessity, or in the performance of a public or lawful act of duty, or discharge or set of any cracker, rocket, torpedo, squib, or other fire works, within the limits of said city, without permission first obtained from the Mayor or one of the Aldermen, or Marshal of said city; and every person so offending shall forfeit and pay, for the use of said city, not less than one dollar, nor more than three dollars, for every such offense.

George Manierre, The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois Page 123-125, Image 131-133 (1851) available at The Making of Modern Law: Primary Sources. 1851
Ordinances of the City of Chicago: Regulating the Keeping and Conveying Gun Powder and Gun Cotton; § I. (Be it ordained by the Common Council of the city of Chicago) That no person shall keep, sell, or give away gun powder or gun cotton in any quantity without permission of the common council or mayor in writing, signed by the mayor and clerk and sealed with the corporate seal, under a penalty of twenty-five dollars for every offence. § II. All applications for permits shall be addressed to the common council or mayor in writing, signed by the applicant. Not exceeding four permits shall be granted in any block. When the number of applications in any block shall at any time exceed the number to be granted, the requisite number shall be chosen by ballot. When issued the clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business and date of permit. Persons to whom permits may be issued shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gun powder or gun cotton than fifty pounds at one time, and the same shall be kept in tin canisters or cases containing not to exceed thirteen pounds each, and in a situation remote from fires or lighted lamps, candles or gas from which they may be easily removed in case of fire. Nor shall any person sell or weigh any gun powder or gun cotton after the lighting of lamps in the evening, unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business with the words "gun powder and gun cotton" painted or printed theron in large letters. A violation of any clause of this section shall subject the offender to a fine of not less than ten dollars nor exceeding one hundred dollars. § III. No person shall convey or carry any gun or carry any gun powder or gun cotton, (exceeding one pound in quantity), through any

App. 0257

street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the gun powder or gun cotton be secured in tight cases or kegs well headed and hooped, and put into and entirely covered with a leather bag or case, sufficient to prevent such gun powder or gun cotton from being spilled or scattered under a penalty of one hundred dollars. IV. No vessel, laden in whole or in part with gun powder or gun cotton, shall land at, or make fast to any dock or wharf upon the Chicago river, or either branch thereof, between the south line of the school section and Chicago avenue, or to discharge such gun powder or gun cotton within said limits. If any master, or owner of any vessel, or other person shall violate any provision of this section, he shall be subject to a fine of not less then twenty-five dollars and not exceeding one hundred dollars. § V. The mayor shall have power to cause any vessel to be removed form the limits mentioned in the previous section, to any place beyond the same, by a written order, which shall be executed by the marshal or some other member of the police. If any person shall neglect or refuse to obey such order, or shall resist any officer in the execution of the same, he shall be subject to a penalty of one hundred dollars. § VI. Al permissions granted under this ordinance shall expire on the tenth day of June each year. And no permit shall be granted to any retailer of intoxicating liquors or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit so issued. § VII. It shall be the duty of the officers of the police department, fire-wardens, and firemen, to report all violations of this ordinance which may come to the knowledge of the city attorney for prosecution.

James M. Cunningham, The City Charter and the Revised Ordinances of the City of Peoria, Illinois; Also, the Original City Charter, and the Several Amendments Thereto, and the State Laws Relating to the City or Specially Affecting Its Interests; Together with the Rules of Order and Business for the Government of the City Council. Arranged, Revised, and Published, Under the Authority of the City Council, in the Year 1869 Page 254, Image 284 (1869) available at The Making of Modern Law: Primary Sources. 1869
Revised Ordinances [of the City of Peoria: Public Safety and Convenience], § 1. That it shall not be lawful for any person in said city, without permission from the mayor or superintendent of police, to fire or discharge any cannon, musket, rifle, fowling-piece, pistol, or other fire-arms or air guns, except it is done in cases of necessity, or in the performance of a public act of lawful duty, or by military companies when on parade or in the discharge of duty; and every person violating the provisions of this section shall, on conviction, forfeit and pay not less than one dollar nor more than one hundred dollars for every offense.

Revised Ordinances of the City of Galesburg, the Charter and Amendments, State Laws Relating to the Government of Cities and Appendix Page 122-123, Image 127-128 (1869) available at The Making of Modern Law: Primary Sources. 1869
Revised Ordinances [of Galesburg, Ill.], Gunpowder-Fires, Fire-Arms, § 1. The keeping for sale or selling gunpowder, without a license therefor, is prohibited, and no license shall be issued allowing the keeping in store more than twenty-five pounds of gun powder at any one time, unless kept in some secure magazine or fire-proof powder house, located at least one hundred feet from any other occupied building, and when kept in a store or place for retail it shall be kept in tin or other metallic canisters or cases, and in a part of the building remote from any fire, lamp, candle or burning matter liable to produce explosion, and whoever shall violate this section, or any provision of it, shall be subject to a penalty of twenty dollars. § 2. Each person licensed to sell gunpowder shall keep a sign, with the words "Gunpowder for Sale," in plain

letters, in some conspicuous place in the front of the building where such powder is kept. And no sales of gunpowder, except in unopened cans shall be sold after night, and any person convicted of violation of any of the provisions of this section shall be subject to a penalty of ten dollars. § 3. Whoever shall bring or cause to be brought into the city any gunpowder concealed in any box or other package, or in any package marked as containing other articles, in which such powder is contained, shall be subject to a penalty of twenty-five dollars. §4. The carrying gunpowder through the streets or other public places, in a careless or negligent manner, or the remaining with such powder in any place longer than necessary for the transportation of the same from one place to another, shall subject the party offending to a penalty of not less than five dollars. . .

Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources. 1876 Misdemeanors, § 39. No person, except peace officers, shall carry or wear under their clothes, or concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie-knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except by written permission of the Captain of Police.

Egbert Jamieson, The Municipal Code of Chicago: Comprising the Laws of Illinois Relating to the City of Chicago, and the Ordinances of the City Council; Codified and Revised Page 301-304, Image 309-312 (1881) available at The Making of Modern Law: Primary Sources. Ordinances of Chicago, § 1264. No person shall keep, sell or give away any gunpowder or gun-cotton in any quantity, without permission in writing, signed by the mayor and city clerk, and sealed with the corporate seal, under a penalty of twenty-five dollars for every offense: Provided, any person may keep for his own use a quantity of gunpowder or guncotton not exceeding one pound. . . § 1271. It shall be unlawful for any person or persons to carry or convey any gunpowder or guncotton (exceeding fifty pounds in quantity) through any street, alley, highway or road in the city, or within one miles of the limits thereof, in any cart, carriage, wagon, dray or wheelbarrow, or otherwise, unless the said gunpowder or guncotton be secured in tight cases or kegs well headed and hooped, and put into and entirely covered with a good tight and substantial leather bag sufficient to prevent the same from being spilled or scattered or unless the same is put into a well covered and perfectly water tight box, the bottom and sides which shall be completely covered with zinc, or unless such gunpowder or guncotton be secured in water tight patent metallic cases or kegs. . . § 1275. Any person or persons, corporation or corporations, violating any of the provisions of sections (storage, manufacturing and sale §§) shall be subject to a fine of not less than fifty dollars, and not exceeding two hundred dollars, for each and every offense, and each and every day that gunpowder or guncotton shall be kept in any place contrary to any provision of this article shall constitute a violation thereof. § 1276. No vessel laden in whole or in part with gunpowder or guncotton shall land or make fast to any dock or wharf upon the Chicago river, or either branch thereof between the south line of the school section and Chicago avenue, or discharge such gunpowder or guncotton within said limits. If any master or owner of any vessel or other person shall violate any provision of this section he shall be subject to a fine of not less than twenty dollars, and not exceeding one hundred dollars.

Merritt Starr & Russell H. Curtis, Annotated Statutes of the State of Illinois in Force (1885), Criminal Code Ch. 38, para. 90.

All persons dealing in deadly weapons, hereinbefore mentioned, at retail within this State shall keep a register of all such weapons sold or given away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is purchased or obtained. The said register shall be in the following form. [Form of Register] Said register is to be kept open for inspection of the public, and all persons who may wish to examine the same may do so at all reasonable times during business hours. A failure to keep such register, or to allow an examination of the same, or to record therein any sale or gift of a deadly weapon, or the keeping of a false register, shall be a misdemeanor, and shall subject the offender to a fine of not less than twenty-five dollars ($25) nor more than two hundred dollars ($200).

George W. Hess, Revised Ordinances of the City of Evanston : Also Special Laws and Ordinances of General Interest Page 131-132, Image 143-144 (1893) available at The Making of Modern Law: Primary Sources. 1893

Concealed Weapons, §531. It shall be unlawful for any person within the limits of the city of Evanston to carry or wear under his clothes or concealed about his person, any pistol, colt or slung shot, cross knucklet, or knuckles of lead, brass or other metal, or bowie knife, dirk, dagger, or any other dangerous or deadly weapon. . . § 537. The Mayor may grant to so many and such persons as he may think proper, licenses to carry concealed weapons, and may revoke any and all such licenses at his pleasure. § 538. Applications for such licenses shall be made to the city clerk, and when granted, the applicant therefor shall pay to the said clerk, for the use of the city, the sum of two dollars. § 539. Every such license shall state the name, age and occupation and residence of the person to whom it is granted.

Samuel A. Ettelson, Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916 Page 458-459, Image 458-459 (Vol. 7, 1916) available at The Making of Modern Law: Primary Sources. 1914

Ordinance of May 25, 1914, § 4a. It shall be unlawful for any person, firm or corporation to sell, barter or give away to any person within the City of Chicago, any pistol, revolver, derringer, bowie knife, dirk or other weapon of like character which can be concealed on the person, except to licensed dealers and to persons who have secured a permit for the purchase of such articles from the general superintendent of police as hereinafter required; provided, this section shall not apply to sales made of such articles which are delivered or furnished outside the City of Chicago. § 5. It shall be unlawful for any person to purchase any pistol, revolver, derringer, bowie knife, dirk or other weapon of like character, which can be concealed on the person, without first securing from the General Superintendent of Police a permit so to do. Before any such permit is granted, an application in writing shall be made therefor, setting forth in such application the name, address, age, height, weight, complexion, nationality and other elements of identification, of the person desiring such permit, and the applicant shall present such evidence of good character as the General Superintendent of Police in his discretion may require. § 6. It shall be the duty of the General Superintendent of Police to refuse such permit to (a) All persons having been convicted of any crime. (b) all minors. "Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the General Superintendent of Police to grant such permit, upon the payment of a fee of one dollar. § 8. Any person, firm or

App. 0260

corporation violating any of the provisions of this ordinance, shall be fined not less than Fifty Dollars ($50.00) nor more than Two hundred Dollars ($200.00) for each offense, and every purchase, sale or gift of any weapon mentioned in this ordinance shall be deemed a separate offense.

Samuel Irwin, Reports of Cases At Law And In Chancery 566 (vol. #278, Chicago, Ill, 1917). 1917
It shall be the duty of the general superintendent of police to refuse such permit to (a) all persons having been convicted of any crime; (b) all minors. Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the general superintendent of police to grant such permit upon the payment of a fee of one dollar.

1931 Ill. Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4.
Every manufacturer or merchant shall keep a register of all machine guns manufactured or handled by him. This register shall show the date of the sale, loan, gift, delivery or receipt of any machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received, and the purpose for which the person to whom the machine gun was sold, loaned, given or delivered, purchased or obtained said machine gun. Upon demand, every manufacturer or merchant shall permit any sheriff or deputy sheriff, or any police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register herein required and all written permits to purchase or possess a machine gun, which he has retained and filed in his place of business for inspection by such officer.

## INDIANA

1847 Ind. Acts 93, An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory Thereto Into One Act, and to Amend the Same, chap 61, § 8, pt. 4.
To regulate and license, or provide by ordinance for regulating and licensing . . . the keepers of gunpowder and other explosive compounds . . . .

W. G. Armstrong, The Ordinances and Charter of the City of Jeffersonville Page 15-17, Image 15-17 (1855) available at The Making of Modern Law: Primary Sources. 1855
Ordinances [of Jeffersonville], § 3, Pt. 11. It shall also be a nuisance and unlawful . . . To discharge or cause to be discharged any fire arms, squibs, bombs or fire works of any kind without license being first obtained therefor.

Revision of 1895. The General Ordinances of the City of Indianapolis. Containing also, Acts of the Indiana General Assembly so far as they Control Said City, to which Prefixed a Chronological Roster of Officers from, 1832 to 1895 and Rules Governing the Common Council Page 290-291, Image 372-373 (1895) available at The Making of Modern Law: Primary Sources. 1895
Laws and Ordinances [of the City of Indianapolis], An Ordinance Licensing Rifle and Pistol Practice in the City of Indianapolis, § 1. Be it ordained by the Common Council and Board of Aldermen of the City of Indianapolis, That it shall hereafter be unlawful for any person to

conduct or carry on any shooting gallery or room where rifle or pistol shooting is practiced, in the City of Indianapolis, without first having procured a license so to do, as hereinafter provided. § 2. A license fee of twenty-five dollars for six months and fifty dollars for one year shall be paid by the person conducting such business. Upon the payment of twenty-five dollars to the City Treasurer by any person desiring to carry on such a gallery or room, the City Treasurer shall issue to him a receipt therefor, designating therein what said money is paid for; and upon the surrender thereof to the City Clerk [Comptroller] that officer shall issue to such person a license for the said term of six months; and likewise, upon the payment of fifty dollars, a license for one year shall issue. The Clerk [Comptroller] shall be entitled to charge one dollar for the issue of every such license. Said license shall be in the usual form. § 3. Any person opening or carrying on such a gallery or room without such license shall be fined in any sum not exceeding fifty dollars; and every day's continuance shall constitute a spate offense.

1925 Ind. Acts 495, 495-98
Pistols and Revolvers Defined.
SECTION 1. Be it enacted by the general assembly of the State of Indiana, That the term "pistol or revolver," as used in this act, shall be construed as meaning any firearm with a barrel less than twelve inches in length.
Crime-Committing When Armed With Pistol or Revolver.
SEc. 2. If any person shall, within the State of Indiana, commit or attempt to commit a crime, when armed with a pistol or revolver, and having no permit to carry the same, he shall, in addition to the punishment provided for the crime, be guilty of a felony and shall be punished by imprisonment for not less than one year and not more than five years.
Subsequent Offenses.
SEc. 3. The judge shall have the power to sentence any person who may be convicted for a second or third, or other subsequent offense under section 2 of this act, to double or triple the penalty imposed thereby.
Felony-Conviction For-Prohibited From Possessing Pistol.
SEC. 4. No person who has been convicted of a felony committed against the person or property of another shall own or have in his possession or under his control, within the State of Indiana, a pistol or revolver. A violation of this section shall constitute a felony and be punishable by imprisonment for not less than one year, and not more than five years.
Pistol or Revolver-Possession Without Permit.
SEc. 5. No person shall carry, within the State of Indiana, a pistol or revolver concealed in any vehicle or upon his person, except in his dwelling house or place of business, without a permit therefor as hereinafter provided. Violations of this section shall constitute a misdemeanor and be punished by a line of one hundred dollars ($100.00), to which may be added imprisonment for not more than one year, and upon conviction the pistol or revolver shall be confiscated and destroyed by the sheriff on order of the court.
Persons Exempt From Act.
SEc. 6. The provisions of the preceding section shall not apply to marshals, sheriffs, deputy sheriffs, policemen or any other duly appointed peace officers, nor the pistols or revolvers of any bank, trust company, or common carriers, or to the officers or employes of any bank, trust company, or common carriers, while such officers or employes are guarding money or valuables within the line of their duties as such employes, nor to the regular and ordinary transportation of pistols or revolvers as merchandise, nor to members of the army, navy, or marine corps or the

36

mail service of the United States, or the national guard, when on duty, or organizations by law authorized to purchase or receive such weapons from the United States, or the State of Indiana, nor to duly authorized military or civil organizations when parading, nor to the members thereof when at .or going to or from their customary places of assembly.

Permits-Clerk of Circuit Court-Application-Form Fee.

SEC. 7. The clerk of any circuit court of the State of Indiana, shall, upon application of any citizen having a bona fide residence or place of business within the State of Indiana, or of any person having a bona fide residence or place of business within the United States, and a permit to carry a firearm concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a permit to such citizen to carry a pistol or revolver within the State of Indiana, during the period of one year or until revoked, as herein provided. Such application for permit Shall be signed by two resident householders and freeholders of the county in which the applicant lives, and it shall appear from such application that the applicant is a suitable person to be granted a

permit under the law. The permit shall be in duplicate, in form to be prescribed by the adjutant general of the State of Indiana, and shall bear the name, address, description and signature of the applicant and reason given for desiring a permit. The original thereof shall be delivered to the applicant, the duplicate shall be preserved for six years by the clerk of the circuit court issuing the same. For each permit so issued, the applicant shall pay the sum of one dollar ($1.00).

Minors-Sale of Pistols or Revolvers to Prohibited.

SEc. 8. Any person or persons who shall, within the State of Indiana, sell, barter, hire, lend, or give to any minor under the age of twenty-one years, any pistol or revolver shall be deemed guilty of a misdemeanor and shall upon conviction thereof be fined not more than one hundred dollars ($100.00), or be imprisoned for not more than three months, or both, except for uses as hereinbefore provided.

Sale of Pistols and Revolvers-Record-Penalty.

SEc. 9. No person shall within the State of Indiana sell, deliver or otherwise transfer a pistol or revolver to a person who he has reasonable cause to believe either is not a citizen or has been convicted of a felony against the person or property of another, nor in any event shall he deliver a pistol or revolver on the day of the application for the purchase thereof, and when delivered said pistol or revolver shall be securely wrapped and shall be unloaded. Before a delivery be made, the purchaser or his duly authorized agent and the seller or his duly authorized agent shall in the presence of each other sign in duplicate a statement containing the purchaser's full name, age, dress, place of birth, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, forward by registered mail, to the clerk of the circuit court of the county in which the seller resides, one copy thereof and shall retain the other copy for six years. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall constitute a misdemeanor and shall be punished by a fine of not less than one hundred dollars ($100.00), or by imprisonment for not more than one year, or by both such fine and imprisonment.

Pistols and Revolvers-Sale Without License.

SEC. 10. Whoever, within the State of Indiana, without being licensed as hereinafter provided, sells, delivers, transfers, advertises, or exposes for sale, or has in his possession with intent to

App. 0263

sell, pistols or revolvers, shall be deemed guilty of a felony and upon conviction thereof shall be punished by imprisonment for not less than one year nor more than two years.

Dealers' Licenses-Conditions on Which Sold-Record Advertisement.

SEC. 11. The clerk of the circuit court of any county may grant licenses, to any reputable, established dealer, on forms to be prescribed by the adjutant general, permitting the licensee to sell at retail within the State of Indiana pistols and revolvers, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol or revolver shall be delivered: (a) On the day of the application for the purchase, and when delivered shall be unloaded and securely wrapped; nor, (b) Unless the purchaser either is personally known to the seller or shall present clear evidence of his identity; nor, (c) If the seller has reasonable cause to believe that the purchaser is an unnaturalized foreign-born person or has been convicted of a felony against the person or property of another.

4. A true record, in duplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which shall be prescribed by the adjutant general and shall be signed by the purchaser and by the person effecting the sale, and in the presence of each other, and shall include the date of sale, the caliber, make, model, and manufacturer's number of the weapon, the name, address, age, place of birth, nationality of the purchaser. One copy of said record shall,

within seven days, be forwarded by registered mail to the clerk of the circuit court of the county in which the seller resides, and the other copy shall be retained by the seller for six years.

5. No pistol or revolver, or placard advertising the sale thereof, or imitation thereof, shall be displayed in any part of said premises where it can readily be seen from the outside.

False Information.

SEC. 12. If any person in purchasing or otherwise securing delivery of a pistol or revolver or applying for a permit to carry same within the State of Indiana shall give false information or offer false evidence of his identity he shall be deemed guilty of a felony and upon conviction shall be punished by imprisonment for not less than one year nor more than five years.

Obliteration of Make, Model, Number-Penalty.

SEC. 13. No person shall within the State of Indiana, change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any pistol or revolver. Possession of any such firearms upon which the same shall have been changed, altered, removed, or obliterated, shall be prima facie evidence that such possessor has changed, altered, removed, or obliterated the same. Violations of this section shall be a misdemeanor and shall be punished by imprisonment for not less than six months nor more than one year.

Felony-Possession of Revolver Prima Facie Evidence.

SEC. 14. In the trial of a person charged with committing or attempting to commit a felony against the person or property of another while armed with a pistol or revolver, without having a permit to carry such firearm as hereinbefore provided, the fact that such person was so armed shall be prima facie evidence of his intent to commit such felony.

Weapons Exempt.

SEC. 15. This act shall not apply to antique pistols or revolvers incapable of use as a deadly weapon.

Prior Licenses.

SEC. 16. Any or all licenses heretofore issued to carry or possess revolver or pistol shall be revoked and rendered null and void on and after thirty days from the taking effect of this act. Revocation of License.

SEC. 17. Hereafter in any court of record upon trial of any person for a penal offense, and upon a showing that such person is not a fit person to carry concealed weapons, the court may enter an order revoking such person's license to carry concealed weapons and such fact shall be communicated to the public officer issuing the same.

Licensed Dealers-Statement–Penalty.

SEC. 17 1/2. It shall be unlawful from and after the taking effect of this act, for any person, firm or corporation to receive or have in his or its possession within the State of Indiana any pistol or revolver purchased or acquired after the taking effect of this act, except a licensed dealer, who shall not have signed and forwarded to the clerk of the county in which he resides the statements provided for in section 9 of this act, before or at the time of taking possession of such pistol or revolver. Whoever shall violate the provisions of this section of this act shall be deemed guilty of a misdemeanor and shall upon conviction thereof be- fined not more than $100, to which may be added imprisonment for not more than sixty days.

Repeal.

SEC. 18. All laws and parts of laws in conflict herewith are hereby repealed.

Unconstitutional Provisions.

SEC. 19. If any provision or section of this act shall be held void or unconstitutional, all other provisions and all other sections of this act, which are not expressly held to be void or unconstitutional, shall remain in full force and effect.

## IOWA

John F. Dillon, The Revised Ordinances of the City of Davenport, Revised and Digested by Order of the City Council, Containing the Original and Amended City Charters, with Notes and References to Judicial Decisions Page 145, Image 145 (1866) available at The Making of Modern Law: Primary. 1855

[Ordinances of Davenport Iowa,] Chapter 19, An Ordinance to Prohibit the Discharge of fire-arms, fire-crackers, and rockets within the city, § 1. No person shall discharge any gun, pistol or other fire-arms, or use or discharge any fire-crackers, rockets, or any other description of fire-works, within the limits of said city, without permission in writing from the Mayor. § 2. Any person violating any provision of this ordinance, shall pay a fine of not less than two dollars nor more than ten dollars for each offense.

The Code: Containing All the Statutes of the State of Iowa, of a General Nature, Passed at the Adjourned Session of the Fourteenth General Assembly Page 76-77, Image 88-89 (1873) available at The Making of Modern Law: Primary Sources. 1873

Cities and Incorporated Towns, Powers, § 456. They shall have power to prevent injury or annoyance from anything dangerous offensive or unhealthy, and to cause any nuisance to be abated; to regulate the transportation and keeping of gunpowder or other combustible, and to provide or license magazines for the same; to prevent and punish fast or immoderate riding through the streets; to regulated the speed of trains and locomotives on railways running over the streets or through the limits of the city or incorporated town by ordinance, and enforce the same by a fine not exceeding one hundred dollars: to establish and regulate markets; to provide for the

measuring or weighing of hay, coal, or any other article of sale; to prevent any riots, noise, disturbance, or disorderly assemblages; to suppress and restrain disorderly houses, houses of ill fame, billiard tables, nine or ten pin alleys, or tables and ball alleys, and to authorize the destruction of all instruments or devices used for purposes of gaming, and to protect the property of the corporation and its inhabitants and to preserve peace and order therein.

E. E. Aylesworth, Compiled Ordinances of the City of Council Bluffs; Containing the Original and Amended City Charter, with Statutes, Notes and References to Judicial Decisions Page 175, Image 175 (1880) available at The Making of Modern Law: Primary Sources. 1880 [Ordinances of the] City of Council Bluffs, [Misdemeanors,] § 16. Whoever shall discharge any cannon, gun, pistol or other fire-arms in or across any street or other public place, or in or across any private lot, tract of land or other place not of his own property, without first obtaining a permit to do so from the Mayor of the city, if in a public place, or from the owner of the lot or land if in a private place, shall be deemed guilty of misdemeanor, and on conviction thereof shall be punished by a fine of not less than three nor more than thirty dollars.

Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 168-169, Image 171-172 (1887) available at The Making of Modern Law: Primary Sources. 1887 Ordinances, City of Council Bluffs, Shooting Gallery, § 5. No person shall carry on or take part in carrying on any pistol gallery or shooting gallery without license therefor from said city, and the charge for such license shall be ten dollars per month, or fifty dollars per annum. §6. No licensee or his employee, or any person in charge of any pin alley, ball alley, pistol gallery or shooting gallery, shall at any time, without gain or profit, permit or allow any minor to be or remain in or about the same to play thereat, under penalty of the same fine and forfeiture as set forth in section 2 of this chapter.

## KENTUCKY

Charter of the City of Covington, and Amendments Thereto up to the Year 1864, and Ordinances of Said City, and Amendments Thereto, up to the Same Date Page 148-149, Image 148-149 (1864) available at The Making of Modern Law: Primary Sources. 1864 Ordinances of the City of Covington, An Ordinance Regulating the Sale of Powder in the City of Covington, § 1. Be it ordained by the City Council of Covington, That it shall not be lawful for any person or persons to erect, within the limits of the corporation, any powder magazine, or any other building for the purpose of storing gun powder in greater quantities than is hereinafter specified; and any person violating the provision of this section, shall, on conviction before the Mayor, forfeit and pay a fine of one hundred dollars, and ten dollars for every twenty-four hours said building shall be used or occupied for the storage of more than twenty-five pounds of powder. § 2. Be it further ordained, That it shall not be lawful for any person to keep, in storage or for sale, more than one hundred pounds of powder in any one house in said city, at any one time: and that amount, or any part thereof, shall be securely and carefully kept, and closed up in a good and sufficient safe, so that it can not by any means be exposed. A violation of this section shall subject the person to a fine, on conviction, of five dollars for every offense. § 3. Be it further ordained, That no person or persons shall sell, or keep for sale, in said city, any gun powder without having first obtained a permission so to do from the Mayor of said city, who

App. 0266

shall, before said license is granted, be fully assured and satisfied that the applicant has good and sufficient safes to keep powder in, in conformity with the second section of this ordinance; and when the Mayor is satisfied that the license may be granted, without too much risk to the community at large, he shall issue said license to the applicant, upon his paying into the City Treasury the sum of twenty dollars for one year's license, and to the Mayor fifty cents, and to the City Clerk twenty-five cents, for their certificates. Any person who shall sell any gun powder in said city from and after the passage of this ordinance, without having first obtained a license therefor, shall, for each and every offense, forfeit, pay, on conviction, the sum of five dollars and costs.

1874 Ky. Acts 327, An Act to Revise and Amend the Charter of the City of Newport, § 6.
To prohibit the manufacture of gunpowder or other explosive, dangerous, or noxious compounds or substances in said city, and to regulate their sale and storage by license.

## LOUISIANA

John C. White, Digest of the Laws and Ordinances of the Parish of East Feliciana, Adopted by the Police Jury of the Parish Page 68, Image 70 (1848) available at The Making of Modern Law: Primary Sources. 1848
[Ordinances of the Parish of East Feliciana,] Of Slaves, § 5. No slave shall carry a gun to hunt, except on the plantation of his master or mistress; nor then unless accompanied by the overseer or some other free white member of the family, or has a written permit from his owner or overseer, which permit shall state for what said slave is hunting: Any person having the charge of slaves, who shall permit this section to be violated, shall pay a fine of twenty dollars, for the use of the parish, upon information to any Justice, whose duty it is to take cognizance of the case.

Henry Jefferson Leovy, The Laws and General Ordinances of the City of New Orleans, Together with the Acts of the Legislature, Decisions of the Supreme Court, and Constitutional Provisions, Relating to the City Government. Revised and Digested, Pursuant to an Order of the Common Council Page 242, Image 268 (1857) available at The Making of Modern Law: Primary Sources. 1857
[Ordinances of the City of New dueOrleans,] Revenue – Taxes and Licenses, § No. 680. Every keeper of a pistol gallery, the whole tax being levied on each and every gallery, sixty dollars.

Henry Jefferson Leovy, The Laws and General Ordinances of the City of New Orleans, Together with the Acts of the Legislature, Decisions of the Supreme Court. And Constitutional Provisions Relating to the City Government. Revised and Digested, Pursuant to an Order of the Common Council Page 257, Image 257 (1870) available at The Making of Modern Law: Primary Sources. 1870
[Ordinances of the City of New Orleans,] Offences and Nuisances, § 635. No person shall fire or discharge any gun, pistol, fowling piece or fire-arms, within the limits of the city, or set fire to, or discharge any rocket, cracker, squib or serpent, or shall throw any lighted rocket, cracker, squib or serpent, within the limits of the city, without the license of the common council; Provided, that nothing herein contained shall apply to military reviews or to the lawful use of weapons in self defense.

## **MAINE**

The Revised Ordinances of the City of Portland, 1848 Page 22, Image 22 (1848) available at The Making of Modern Law: Primary Sources.
[Ordinances of the City of Portland,] Of Gunpowder, § 1. No person not licensed to keep and sell gunpowder shall keep or have in his shop, store, dwelling house or other tenement, at any one time, a larger quantity of gunpowder than one pound. § 2. No person licensed to keep and sell gunpowder shall have or keep in his store, shop, dwelling house or in any other tenement or place whatever at any one time, a larger quantity of gunpowder then twenty-five pounds. § 3. Every person licensed to keep and sell gunpowder shall provide himself with a strongly made copper chest or box with a copper cover well secured, with hinges and a lock of the same material, and the keg or canister in which said powder may be, shall be kept in said copper chest or box, which shall at all times be placed near the outer door of the building in which it is kept, in convenient place to remove in case of fire. § 4. No person shall haul unto, or lay at any wharf in the city, any vessel having on board a quantity of gunpowder exceeding twenty-five pounds, or receive gunpowder on board exceeding twenty-five pounds, without first having obtained a permit from the mayor and aldermen, and said permit shall designate the wharf at which said powder may be landed, or received on board.

The Charter, Amendments, and Acts of the Legislature Relating to the Municipal Court, and the Ordinances of the City of Lewiston, Together with the Boundaries of the Several Wards, Regulations Respecting Gunpowder, and an Abstract of the Laws Relating to the Powers and Duties of Cities and Towns Page 43, Image 43 (1873) available at The Making of Modern Law: Primary Sources. 1873
Regulations Relating to Gunpowder, § 1. No person shall keep or have in any shop, store, dwelling house or tenement, in the city of Lewiston, at any one time a larger quantity of gun-powder than one pound, unless he is licensed by the mayor and aldermen to keep and sell gunpowder, or except as hereinafter provided. § 2. It shall not be lawful for any person or persons to sell any gunpowder which may at the time be within said city, in any quantity, by wholesale or retail, without having first obtained from the mayor and aldermen a license to sell gunpowder, and every license shall be written or printed, and duly signed by the mayor, on a paper upon which shall be written or printed a copy of the rules and regulations established by the city relative to keeping, selling and transporting gunpowder within said city; and every such license shall be in force one year from the date thereof, unless revoked by the mayor and aldermen; but such license may, prior to its expiration, be renewed by an endorsement thereon by the mayor, for the further term of one year, and so from year to year, provided, always, that it may at any time be rescinded or revoked by the mayor and aldermen, for good and sufficient reasons. § 3. Every person who shall receive a license to sell gunpowder, as aforesaid, shall pay for the same to the treasurer of the city the sum of three dollars, and for each renewal of the same, the sum of one dollar.

A.G. Davis, City Clerk, Charter and Ordinances, and Rules and Orders of the City Council. Revised February 1874 Page 52, Image 53 (1874) available at The Making of Modern Law: Primary Sources. 1874

City Ordinances, § 4. No person shall haul unto, or lay at any wharf in the city, any vessel having on board more than twenty-five pounds of gun-powder, nor discharge or receive on board exceeding that quantity, without having first obtained from the Mayor a permit therefor, designating the wharf at which said powder may be landed or received on board.

## MARYLAND

1806 Md. Laws 44, An Act To Restrain The Evil Practices Arising From Negroes Keeping Dogs, And To Prohibit Them From Carrying Guns Or Offensive Weapons, ch. 81
…it shall not be lawful for any negro or mulatto within this state to keep any dog, bitch or gun , except he be a free negro or mulatto, and in that case he may be permitted to keep one dog, provided such free negro or mulatto shall obtain a license from a justice of the peace for that purpose, and that the said license shall be in force for one year, and no longer, and if any dog or bitch owned by any negro, not possessed of such license, shall be seen going at large, it shall be lawful for any person to kill the same, and in case of any suit instituted therefor, the person or persons killing the said dog or bitch may plead the general issue, and give this act in evidence. II. …it shall not be lawful for any free negro or mulatto to go at large with any gun, or other offensive weapon; and in case any free negro or mulatto shall be seen going at large carrying a gun, or other offensive weapon, he shall be liable to be carried before any magistrate, in virtue of a warrant to be issued by any justice of the peace, directed to a constable of the county, and on conviction of having violated the provisions of this section of the act, such offender shall thereupon forfeit, to the use of the informant, such gun, or other offensive weapon, which shall thus have been found in his or her possession, and be subject to the payment of the costs which shall have accrued in such prosecution; provided, that nothing in this act shall extend to prevent any free negro or mulatto from carrying a gun, or other offensive weapon, who shall, at the time of his carrying the same, have a certificate from a justice of the peace, that he is an orderly and peacable person, which certificate shall be in force for one year from the date thereof and no longer.

Lewis Mayer, Revised Code of the Public General Laws of the State of Maryland, with the Constitution of the State Page 173, Image 202 (1879) available at The Making of Modern Law: Primary Sources. 1876
Wild Fowl and Game, § 23. The clerk of the Circuit Court for Harford county, and the clerk of the Circuit Court for Cecil county, shall upon the application of any resident of the State of Maryland, being the owner of any sink-box, craft or sneak-boat, such as is allowed by this act to be used and employed in shooting at wild water fowl therefrom; and giving satisfactory evidence to said clerk that the said applicant is a resident of the State of Maryland, and is the bona fide owner of the sink-box, craft, or sneak-boat, grant a license under the seal of his court, to such applicant to gun after and shoot at wild water-fowl from such sink-box or sneak-boat northward of the line named and described in first section of this act from the first day of November in each and every year to the thirty-first day of March next succeeding thereafter in each and every year; provided that such license shall not authorize any person using such sink-box or sneak-boat to gun after or shoot at wild water-fowl therefrom within a less distance than half a mile from any shore in Harford or Cecil County, or southward of the line particularly described in the first section of this act.

App. 0269

1882 Md. Laws 257, An Act to . . . Exempt All That Portion of the Waters of the Chesapeake Bay Lying Northward of a Certain Line Therein Described from the Operation and Effect of Sections One and Three . . ., ch. 180, § 8

. . . the special police appointed by this act are authorized to arrest any person or persons who may be discovered in the act of hunting or shooting crippled ducks, or in purloining ducks that have been killed by other persons having a proper license to shoot, as well as other persons violating the provisions of this section, and upon conviction thereof before any justice of the peace of Cecil or Harford Counties, the license of such persons or persons shall be revoked, and such persons or persons, whether licensed or not, shall be fined not less than twenty dollars for each offense, and shall forfeit the boat and gun or guns, and material so employed in violation of the provisions of this section, which boat and gun or guns, and material shall be sold, and the proceeds of such fine and sale, after the costs of prosecution have been paid, shall go to the officer or officers making the arrest. . .

1882 Md. Laws 656

Section 1. Be it enacted by the General Assembly of Maryland, That it shall be unlawful for any person or persons within the State of Maryland to manufacture or sell, barter or give away the cartridge toy pistol to any one whomsoever Sec. 2. Be it enacted, That it shall be unlawful for any person, be he or she licensed dealer or not, to sell, barter or give away any firearm whatsoever or other deadly weapons, except shotgun, fowling pieces and rifles, to any person who is a minor under the age of twenty-one years. Any person or persons violating any of the provisions of this act shall, on conviction thereof, pay a fine of not less than fifty nor more than two hundred dollars, together with the cost of prosecution, and upon failure to pay said fine and cost, be committed to jail and confined therein until such fine and costs are paid, or for the period of sixty days, whichever shall first occur.

## MASSACHUSETTS

William Henry Whitmore, The Colonial Laws of Massachusetts: Reprinted From the Edition of 1672, with the Supplements Through 1686: Containing Also, a Bibliographical Preface and Introduction, Treating of All the Printed Laws From 1649 to 1686: Together with the Body of Liberties of 1641, and the Records of the Court of Assistants, 1641-1644 Page 126, Image 330 (1890) available at The Making of Modern Law: Primary Sources. 1651 Prescriptions, (1651) § 2. And it is further ordered; that no person (except for the defence of themselves and their vessels at Sea) shall transport any gunpowder out of this jurisdiction, without license first obtained from some two of the Magistrates, upon penalty of forfeiting all such powder as shall be transporting or transported, or the value thereof.

A Collection Of Original Papers Relative To The History Of The Colony Of Massachusetts-Bay Page 492, Image 497 (1769) available at The Making of Modern Law: Primary Sources. 1769 Laws of the Colony of Massachusetts, That notwithstanding the ancient law of the country, made in the year 1633, that no person should sell any arms or ammunition to any Indian upon penalty of 10l. for every gun, 5l. for a pound of powder, and 40s. for a pound of shot, yet the government of the Massachusetts in the year 1657, upon the design to monopolize the whole Indian trade did publish and declare that the trade of furs and peltry with the Indians in their jurisdiction did solely and properly belong to their commonwealth and not to every indifferent person, and did

App. 0270

enact that no person should trade with the Indians for any fort or peltry, except such as were authorized by the court, under the penalty of 100l. for every offence, giving liberty to all such as should have license from them to sell, unto any Indian, guns, swords, powder and shot, paying to the treasurer 3d. for each gun and for each dozen of swords; 6d. for a pound of powder and for every ten pound of shot, by which means the Indians have been abundantly furnished with great store of arms and ammunition to the utter ruin and undoing of many families in the neighboring colonies to enrich some few of their relations and church members.

The Revised Ordinances of 1885, of the City of Boston, as Passed and Approved December 14, 1885. (With Amendments Thereto, Passed and Approved, to May 1, 1886): Being the Ninth Revision. To Which are Added the Revised Standing Regulations of the Board of Aldermen. 9th Rev. Page 172, Image 182 (1886) available at The Making of Modern Law: Primary Sources. 1884
Ordinances of the City of Boston. Of Fire-Arms, Bonfires, and Brick-Kilns. § 4. No person shall sell to any child under the age of sixteen years without the written consent of a parent or guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component part, or any gun, pistol, or other mechanical contrivance arranged for the explosion of such cartridge, or of any fulminate. But the provisions of this section shall not apply to paper caps of which the only component parts are chlorate of potash and sulphide of antimony, nor to any appliance for exploding the same. The provisions of this section shall be inserted in every license granted for the sale of gunpowder.

Revised Ordinances of 1892, of the City of Boston, and the Revised Regulations of 1892, of the Board of Aldermen of the City of Boston, Being the Eleventh Revision, Third Edition, Containing All Ordinances Passed Between March 3, 1892, and February 1, 1895, and All Regulations of the Board of Aldermen Passed Between July 22, 1892, and February 1, 1895 Page 115, Image 129 (1895) available at The Making of Modern Law: Primary Sources. 1895
Ordinances of Boston, Prohibitions and Penalties, § 91. No person shall manufacture or sell, or expose for sale, any guncotton, nitro-glycerine, or any compounds of the same, nor any fulminate or substance, except gunpowder, intended to be used by exploding or igniting it, in order to produce a force to propel missiles, or to rend substances apart, except in accordance with a permit from the board of fire commissioners; nor shall any person send or carry through the public streets any such substance, except in the manner and in the quantities allowed by statute or ordinance.

Revised Ordinances of the City of Woburn. Revised Woburn, Massachusetts Page 91 Image 91 (1898) available at The Making of Modern Law: Primary Sources. 1898
License to Sell Gunpowder in the City of Woburn. No person shall sell any gunpowder within the city, without such license. Every license shall be in force one year from the date thereof; provided, that any license may be rescinded by the City Council, at their discretion. § 3. Every person so licensed shall keep a sign over and outside of the principal entrance from the street of the building in which the powder is kept, in which shall be printed in capitals the words: "License to keep and sell gunpowder" § 4. The city clerk shall keep a record of all licenses, and of the places designated therein, which places shall not be changed, unless by consent of the City Council, in writing. Every person who receives a license shall sign his name to a copy of the rules prescribed in this chapter, as evidence of his assent thereto. §5. The provisions of the

**App. 0271**

foregoing four sections shall not apply or extend to the keeping or storing of metallic cartridges in fire proof magazines, nor to cartridge manufacturers, so long as they shall keep their powder in canisters, as prescribed in section one, and in fire proof magazines, located and built to the satisfaction of the City Council so long as such manufacturers allow no more than one hundred pounds of gunpowder in any magazine, or five pounds of gunpowder not made into cartrdiges, in any workshop at any one time.

1906 Mass. Acts 150, ch. 172, An Act to Regulate by License the Carrying of Concealed Weapons
Section 2. Whoever, except as provided by the laws of this Commonwealth, carries on his person a loaded pistol or revolver, without authority or permission as provided in section one of this act, or whoever carries any stiletto, dagger, dirk-knife, slung-shot or metallic knuckles, shall upon conviction be punished by a fine of not less than ten nor more than one hundred dollars, or by imprisonment for a term not exceeding one year, or by both such fine and imprisonment.

1922 Mass. Acts 563, ch. 485, An Act Relative to the Sale and Carrying of Firearms, ch. 485, § 8 (amending § 130)
§ 8 (amending § 130). Whoever sells or furnishes to a minor under the age of fifteen, or to an unnaturalized foreign born person who has who has not a permit to carry firearms under section one hundred and thirty-one, any firearm, air gun or other dangerous weapon or ammunition therefor shall be punished by a fine of not less than ten nor more than fifty dollars, but instructors and teachers may furnish military weapons to pupils for instruction and drill.

1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123)
In sections one hundred and twenty-two to one hundred and twenty-nine, inclusive, "firearms" includes a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel, not including any revolving, detachable or magazine breach, does not exceed twelve inches, and a machine gun, irrespective of the length of the barrel. Any gun of small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by gas action or recoil action, shall be deemed to be a machine gun for the purposes of said sections, and of sections one hundred and thirty–one and one hundred and thirty one B. . . § 2. . . Eighth, That no pistol or revolver shall be sold, rented or leased to a person who has not a permit, then in force, to purchase, rent or lease the same issued under section one hundred and thirty-one A, and that no machine gun shall be sold, rented or leased to a person who has not a license to possess the same issued under section one hundred and thirty-one. . .

## MICHIGAN

The Revised Charter and Ordinances of the City of Detroit Page 150, Image 151 (1848) available at The Making of Modern Law: Primary Sources. 1848
[Ordinances of Detroit,] Prevention of Fires, § 9. No person shall fire or set off any squib, cracker, gunpowder or fire works, or fire any gun or pistol in any part of this city, unless by written permission of the Mayor or two Aldermen, which permission shall limit the time of such firing, and shall be subject to be revoked at any time by the Common Council; and any person or

persons violating any of the provisions of this section, shall forfeit the penalty of five dollars for each and every offence. § 10. Every person firing a cannon within this city, unless by permission of the Mayor or two Aldermen, shall forfeit the penalty of twenty-five dollars: Provided, that nothing in this or the preceding section shall be construed to prohibit any military company from firing any gun or cannon when authorized by their commanding officer or officers.

1895 Mich. Local Acts 596, § 44
SEC. 44.  No person shall fire or discharge any gun or pistol firearms or fireworks. or carry firearms, or throw stones or other missiles within said park or boulevard, nor shall any person fire, discharge or set off any rocket, cracker, torpedo, squib or other fireworks or things containing any substance of any explosive character on said park or boulevard, without the permission of said commissioners, and then only under such regulations as they shall prescribe.

1913 Mich. Pub. Acts 472, An Act Providing for the Registration of the Purchasers of Guns, Pistols, Other Fire-arms and Silencers for Fire-arms and Providing a Penalty for Violation, § 1-2. Every person, firm or corporation engaged in any way or to any extent in the business of selling at retail guns, pistols, other fire-arms and silencers for fire-arms shall keep a register in which shall be entered the name, age, occupation and residence (if residing in the city with the street number of such residence) of each and every purchaser of such guns, pistols, other fire-arms or silencers for fire-arms together with the number or other mark of identification, if any, on such gun, pistol, other fire-arms or silencer for firearms which said register shall be open to the inspection of all peace officers at all times. § 2. Every person violating any of the provisions of this act shall be deemed guilty of a misdemeanor and shall upon conviction be subject to a fine of not more than fifty dollars or to imprisonment in the county jail for not more than ten days or to both such fine and imprisonment in the discretion of the court.

1925 Mich. Pub. Acts 473, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 2-4.
§ 2. Any person who shall commit or attempt to commit a felony when armed with a pistol, revolver or gun, as defined in section one, shall, in addition to the punishment provided for committing the crime, be punished by imprisonment for not less than two nor more than five years within the discretion of the court. § 3. The court shall have power to sentence any person who may be convicted of a second offense to double the addition penalty imposed under section two thereof for carrying such concealed weapon without a license. § 4. In the trial of a person for the commission of murder, assault with intent to do great bodily harm, robbery, larceny, or any attempt to commit any of such offenses, the fact that he was armed with a pistol, revolver or gun as herein defined and had no permit to carry the same, shall be prima facie evidence of his intention to commit the crime with which he is charged[.]
No person shall carry a pistol, revolver or gun concealed on or about his person or in any vehicle owned or operated by him, except in his dwelling house, place of business or on his premises, without a license therefor, as hereinafter provided. The provisions of this section, however, shall not apply to the regular and ordinary transportation of pistols, revolvers or guns as merchandise, or to any member of the army, navy or marine corps of the United States, or to the national guard when on duty, or organizations by law authorized to purchase or receive such weapons from the United States or from this state, nor to duly authorized military organizations when on duty, nor

47

to the members thereof when going to or returning from their customary places of assembly, nor to wholesale or retail dealers therein, nor to peace officers of the state.

1925 Mich. Pub. Acts 47, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 7.
No person shall deliver or otherwise transfer a pistol, revolver or gun as defined in this act, to a person unless it be securely wrapped and unloaded. Before the same is delivered to the purchaser, he shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, nationality, the date of sale, the caliber, make, model and manufacturer's number of the weapon. The seller shall, within thirty days thereafter, sign and mail by registered letter one copy thereof to the secretary of state, one copy to the chief of police of the city or village in which the same was sold or to the sheriff of the county of which the seller is a resident and shall retain the other copy. This section shall not apply to sales at wholesale. Any person convicted of wilfully violating the provisions of this section shall be punished by a fine of not less than one hundred dollars or by imprisonment of not more than one year or by both such fine and imprisonment in the discretion of the magistrate.

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1927 Mich. Pub. Acts 891, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 9.
SEC. 9. On or before the first day of November, nineteen hundred twenty-seven, any person within this state who owns or has in his possession a pistol as defined in this act, shall, if he reside in an incorporated city or an incorporated village having an organized police department, present such weapon for safety inspection to the commissioner or chief of police of such city or village; if such person reside in a part of the county not included within the corporate limits of such city or village he shall so present such pistol for safety inspection to the sheriff of such county. Any person owning or coming into possession of a pistol after the first day of November, nineteen hundred twenty-seven, shall forthwith present such pistol for safety inspection in the manner provided in this section. A certificate of inspection shall thereupon be issued in triplicate on a form provided by the commissioner of public safety, containing the name, age, address, description and signature of the person presenting such pistol for inspection, together with a full description thereof; the original of such certificate shall be delivered to the registrant; the duplicate thereof shall be mailed to the commissioner of public safety and field and indexed by him and kept as a permanent official record for a period of six years, and the triplicate of such certificate shall be retained and filed in the office of said sheriff, or commissioner or chief of police, as the case may be. The provisions of this section shall not apply to wholesale or retail

48

dealers in firearms or to collections of pistols kept solely for the purpose of display, as relics, souvenirs, curios or antiques, nor to weapons heretofore registered under the provisions of section eleven of act number three hundred thirteen of the public acts of nineteen hundred twenty-five. Any person who fails to comply with the provision of this section shall be guilty of a misdemeanor and shall be punished by a fine not exceeding one hundred dollars or imprisonment in the county jail not exceeding ninety days, or by both such fine and imprisonment in the discretion of the court.

## MINNESOTA

Henry John Horn, The Charter and Ordinances of the City of St. Paul, Together with Legislative Acts Relating to the City, and the State Constitution, in an Appendix Page 113, Image 114 (1858) available at The Making of Modern Law: Primary Sources. 1858
Revised Ordinances [of the City of St. Paul], An Ordinance to Restrain the Use of Fire Arms and the Exhibition of Fire Works. The Common Council of the City of Saint Paul do ordain as follows: § 1. It shall not be lawful for any person to fire or discharge any cannon, gun, fowling piece, pistol or fire arms of any description, or fire, explode or set off any squib, cracker or other thing containing powder or other combustible or explosive material, or to exhibit any fire works or make or exhibit any bonfire, within the limits of said city, without permission from the Common Council or written permission from the Mayor, which permission shall limit the time of such firing, and shall be subject to be revoked by the Common Council at any time after it has been granted. §2. Any person violating any provision of this ordinance, shall on conviction thereof, be punished by a fine not exceeding one hundred dollars.

The Charter and Ordinances of the City of St. Paul, (To August 1st, 1863, Inclusive,) Together with Legislative Acts Relating to the City. Page 166-167, Image 167-168 (1863) available at The Making of Modern Law: Primary Sources. 1858
Ordinances of the City of St. Paul, An Ordinance to Regulate the Sale of Gunpowder, § 1. No person shall keep, sell or give away gunpowder or guncotton in any quantity without first having paid into the City Treasurer the sum of five dollars, and obtain from the Common Council a permission in writing, signed by the Mayor and Clerk, and sealed with the corporate seal, under a penalty not exceeding fifty dollars, for every offence, provided any person may keep for his own use not exceeding one pound of powder or one pound of gun cotton, at one and the same time. § 2. All applications for permits shall be addressed to the Common Council, in writing, signed by the applicant. Not exceeding four permits shall be granted in any one block; when the number of applications in any block shall at any time exceed the numbers to be granted, the requisite number shall by chosen by ballot. When issued, the Clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business, and date of permits. Persons to whom permits may be issued, shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gunpowder or guncotton than fifty pounds at one time, and the same shall be kept in tin canisters or cans, or kegs securely looped and headed, containing not to exceed twenty-five pounds each and in a situation remote from fires or lighted lamps, candles or gas, from which they may be easily removed in case of fire. Nor Nor shall any person sell or weigh any gunpowder or guncotton, after the lighting of lamps in the evening, unless in sealed canisters or cans. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business, with the word

49

"gunpowder" painted or printed thereon in large letters. Any person violating any clause of this section, shall, upon conviction therof be punished by a fine of not less than ten, nor more than one hundred dollars. § 3. No person shall convey or carry any gunpowder or guncotton, exceeding (one pound in quantity) through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the said gunpowder or guncotton be secured in tight cans or kegs well headed and hooped, sufficient to prevent such gunpowder or guncotton from being spilled or scattered, under a penalty of fifty dollars. § 4. All permissions granted under this ordinance shall expire on the second Tuesday of May in each year; and no permit shall be granted to any retailer of intoxicating liquors, or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit which may be issued.

W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources. 1882
Concealed Weapons – License, § 1. It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon. § 2. Any such weapons or weapons, duly adjudged by the municipal court of said city to have been worn or carried by any person, in violation of the first section of this ordinance, shall be forfeited or confiscated to the said city of St. Paul, and shall be so adjudged. § 3. Any policeman of the city of St. Paul, may, within the limits of said city, without a warrant, arrest any person or persons, whom such policeman may find in the act of carrying or wearing under their clothes, or concealed about their person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon, and detain him, her or them in the city jail, until a warrant can be procured, or complaint made for the trial of such person or persons, as provided by the charter of the city of St. Paul, for other offenses under said charter, and for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to, as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889 Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources. 1888.
Making, Selling, etc., Dangerous Weapons, § 333. A person who manufactures, or causes to be manufactured, or sells, or keeps for sale, or offers or gives or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles, or who, in any city of this state, without the written consent of a magistrate, sells or gives any pistol or fire-arm to any person under the age of eighteen years, is guilty of a misdemeanor. Carrying, using, etc., certain Weapons, § 334. A person who attempts to use against another, or who, with intent so to use, carries, conceals, or possesses any instrument or weapon of the kind commonly known as a slung-shot, sand-club, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon, is guilty of a misdemeanor.

App. 0276

Harry Toulmin, Ordinances of the City of Saint Paul, from May, 1887, to July, 1889 Page 90, Image 90 (1889) available at The Making of Modern Law: Primary Sources. 1889 Ordinances of the City of St. Paul, [Establishing and Fixing the License to be Paid to the City of St. Paul for Conducting, Managing or Carrying on Either or any of the Different Branches of Business Hereinafter Mentioned and Limiting the Duration Thereof, and Also Repealing Certain Ordinances Herein Named,] § 2. The different and various kinds of business, employments and avocations for which licenses are hereby fixed and established, and the sum and amount of the license for each separate one are as follows, to wit: Gun powder ……………..$15.00.

1933 Minn. Laws 231-33, An Act Making It Unlawful to Use, Own, Possess, Sell, Control or Transport a "Machine Gun", as Hereinafter Defined, and Providing a Penalty for the Violation Thereof, ch. 190, §§ 1-3.
§ 1. Definitions. (a) Any firearm capable of loading or firing automatically, the magazine of which is capable of holding more than twelve cartridges, shall be a machine gun within the provisions of the Act. (b) Any firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure; which said firearm shall have been changed, altered or modified to increase the magazine from the original design as manufactured by the manufacturers thereof, or by the addition thereto of extra and/or longer grips or stocks to accommodate such extra capacity, or by the addition, modification and/or attachment thereto of any other device capable of increasing the magazine capacity thereof, shall be a machine gun within the provisions of this Act. (c) A twenty-two caliber light sporting rifle, capable of firing continuously by continuous trigger pressure, shall be a machine gun within the provisions of this Act. But a twenty-two caliber light sporting rifle, capable of automatically reloading but firing separately by separate trigger pressure for each shot, shall not be a machine gun within the provisions of this Act and shall not be prohibited hereunder, whether having a magazine capacity of twelve cartridges or more. But if the same shall have been changed, altered, or modified, as prohibited in section one (b) hereof, then the same shall be a machine gun within the provisions of this Act.
§ 2. Application. This Act shall not apply to sheriffs, coroners, constables, policemen or other peace officers, or to any warden, superintendent or head keeper of any prison, penitentiary, county jail or other institution for retention of any person convicted or accused of crime, while engaged in the discharge of official duties, or to any public official engaged in the enforcement of law; nor to any person or association possessing a machine gun not usable as a weapon and possessed as a curiosity, ornament or keepsake; when such officers and persons and associations so excepted shall make and file with the Bureau of Criminal Apprehension of this state within 30 days after the passage of this Act, a written report showing the name and address of such person or association and the official title and position of such officers and showing a particular description of such machine gun now owned or possessed by them or shall make such report as to hereinafter acquired machine guns within 10 days of the acquisition thereof; nor to any person legally summoned to assist in making arrests or Preserving peace, while said person so summoned is engaged in assisting such officer; nor shall this Act apply to the armed forces of the United States or of the State of Minnesota.
§ 3. Machine guns prohibited. Any person who shall own, control, use, possess, sell or transport a machine gun, as herein defined, in violation of this Act, shall be guilty of a felony.

**MISSISSIPPI**

App. 0277

1804 Miss. Laws 90-91, An Act Respecting Slaves, § 4.

[Slaves not to carry offensive or defensive weapons]. [N]o Slave shall keep or carry any gun, powder, shot, club or other weapon whatsoever offensive or defensive, except tools given him to work with, or that he is ordered by his master, mistress or overseer to carry the said articles from one place to another, but all, and every gun, weapon or ammunition found in the possession or custody of any slave, may be seized by any person, and upon due proof thereof made before any justice of the peace of the county or corporation, where such seizure shall be made, by his order, be forfeited to the seizer for his own use; and moreover, every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty nine, on his bare back for every such offence: Provided nevertheless, That any justice of the peace may grant, in his proper county, permission in writing, to any slave, on application of his master, or overseer to carry and use a gun and ammunition within the limits of his said master's or owner's plantation, for a term not exceeding one year, and recoverable, at any time within such term, at the discretion of said justice.

[REGULATORY TAX] 1867 Miss. Laws 327-28, An Act To Tax Guns And Pistols in The County Of Washington, ch. 249, § 1.

[A] tax of not less than five dollars or more than fifteen dollars shall be levied and assessed annually by the board of Police of Washington county upon every gun and pistol which may be in the possession of any person in said county, which tax shall be payable at any time on demand, by the Sheriff, and if not so paid, it shall be the duty of the Sheriff to forthwith distrain and seize such gun or pistol, and sell the same for cash at the door of the Court House, after giving ten days notice by advertisement, posted in front of said Court House, and out of the proceeds of such sale, there shall be paid the amount of such tax and the cost of sale, and if any surplus remains, it shall be paid to the owner of such gun or pistol. The amount of the tax so assessed and collected, shall be paid to the county Treasurer, and shall constitute a part of the bridge fund of said county.

1900 Miss. Laws 51-52, An Act to Amend Chapter 32 of the Acts of 1894 Relating to Personal Assessment Rolls, ch. 49, § 1.

The auditor of the public accounts shall, by the first day of February in each year, furnish the clerk of the board of supervisors of each county with three copies of blank assessment rolls, and counties having two judicial districts shall be furnished with four copies; said roll shall be made of good paper, neatly and substantially bound and properly ruled and headed for the assessment of personal property and polls, in which to enter the following items: . . . sixteenth column, number of guns over one; seventeenth column, number of pistols, bowie knives, dirks or sword canes[.]

1906 Miss. Laws 367, Privilege Taxes, ch. 114, § 3887.

Dealers in Deadly Weapons: On each person or firm dealing in pistols, dirk knives, sword canes, brass or metallic knuckles, or other deadly weapons (shotguns and rifles excepted) – 100.00. And which shall be in addition to all and any other taxes or privileges paid. On each firm or dealer selling air guns, target or flobert rifles (and this shall apply even if the same has a license to sell merchandise, pistols or cartridges) – $25.00.

## MISSOURI

Henry S. Geyer, A Digest of the Laws of Missouri Territory. Comprising: An Elucidation of the Title of the United States to Louisiana:-Constitution of the United States:-Treaty of Session:-Organic Laws:-Laws of Missouri Territory, (Alphabetically Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates Page 374, Image 386 (1818) available at The Making of Modern Law: Primary Sources. 1818
Slaves, § 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offence. § 4. Every free negro or mulatto, being a housekeeper may be permitted to keep one gun, powder and shot; and all negroes or mulattoes bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder shot and weapons, offensive and defensive, by license from a justice of the peace of the district [county] wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes or of the owners of such as are slaves.

Adam B. Chambers, The Revised Ordinances of the City of Saint Louis, Revised and Digested by the Fifth City Council during the First Session, Begun and Held in the First Session of St. Louis, on the Second Monday of May, A. D. 1843. with the Constitutions of the United States and the State of Missouri, and the City Charter Page 304, Image 305 (1843) available at The Making of Modern Law: Primary Sources. 1843
[Ordinances of Kansas City,] Misdemeanors, § 10. Every person who shall discharge any cannon or other ordinance, or fire off any carbine, fusil, rifle, musket, gun, pistol, or other arms, or set off any squib or cracker, or fly any kite in the air, within the city, shall be deemed guilty of a misdemeanor. This section shall not apply to the firing of salutes by any military corps, or to the firing of salutes upon any occasion of general public interest. Provided, such firing be caused by persons, associations or companies, volunteers or otherwise, who may be engaged in lawful celebrations of public rejoicings, or in the lawful military exercises of said companies or volunteers; nor to prevent any manufacturer from trying or proving the articles manufactured by him within the limits of the city, provided the same be done without danger or injury to the neighborhood. § 11. Every person who shall fire any heavy cannon, or set off any rockets or fire works, or illuminate in any unusual manner any house or building, without first having obtained written permission from the Mayor, specifying the time and place, when and where the same shall be allowed, shall be deemed guilty of a misdemeanor.

1844 Mo. Laws 577, An Act To Restrain Intercourse With Indians, ch. 80, § 4.
No person shall sell, exchange or give, to any Indian, any horse, mule, gun, blanket, or any other article or commodity whatever, unless such Indian shall be traveling through the state, and leave a written permit from the proper agent, or under the direction of such agent in proper person.

1854 Mo. Laws 1094, An Act Concerning Free Negros and Mulattoes, ch. 114, §§ 2-3.

§ 2. No free negro or mulatto shall be suffered to keep or carry any firelock, or weapon of any kind, or any ammunition, without license first had and obtained for the purpose, from a justice of the peace of the county in which such free negro or mulatto resides, and such license may be revoked at any time by the justice granting the same or by any justice of the county. § 3. Any gun, firelock, or weapon of any kind, or any ammunition, found in the possession of any free negro or mulatto not having a license, as required by the last preceding section, may be seized by any person, and upon due proof thereof, before any justice of the peace of the county in which such seizure shall have been made, shall be forfeited by order of such justice, to the person making the seizure, for his own use.

Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871) available at The Making of Modern Law: Primary Sources. 1871
Ordinances of the City of St. Louis, Misdemeanors, § 9. Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol, or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the Mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offence. § 10. Nothing in the preceding section shall be so construed as to prevent any United States, State, county or city officer, or any member of the city government, from carrying or wearing such weapons as may be necessary in the proper discharge of his duties.

An Ordinance in the Revision of the Ordinances Governing the City of Kansas (Kansas City, MO; Isaac P. Moore's Book and Job, 1880), p. 264, Sec. 3. 1880
Chapter XXXIV. Public Safety. . . .
Sec. 3. No person shall, in this city, wear under his clothes or concealed about his person, any pistol or revolver, except by special permission from the Mayor; nor shall any person wear under his clothes, or concealed about his person, any slung-shot, cross knuckles, knuckles of lead, brass or other metal, or any bowie knife, razor, billy, dirk, dirk-knife or dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon. Any person, violating any provision or requirement of this section, shall be deemed guilty of a misdemeanor, and, upon conviction thereof before the City Recorder, shall be fined not less than fifty dollars nor more than five hundred dollars : Provided, however, That this section shall not be so construed as to prevent any United States, State, County or City officer, or any member of the City government, from carrying such weapons as may be necessary in the proper discharge of his duties.

Henry Smith Kelley, Laws Applicable to and Governing the City of Saint Joseph, Mo., As a City of the Second Class, Contained in the Revised Statutes of 1879, and Subsequent Legislative Enactments; Also the General Ordinances Now in Force, Revised and Made to Conform to the Laws Governing Such Cities Page 192, Image 222 (1888) available at The Making of Modern Law: Primary Sources. 1888
General Ordinances [of the City of St. Joseph], [Amusement-Shows,] Shooting Gallery; license for. — § 3. No person shall carry on or take part in carrying on, any pistol gallery or shooting

**App. 0280**

gallery, without a license therefor from said city; and the charge for such license shall be five dollars per month.

The Municipal Code of St. Louis (St. Louis: Woodward 1901), p.738, Sec. 1471. 1892 Chapter 18. Of Misdemeanors.
Sec. 1471. Concealed weapons – carrying of, prohibited.
Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offense.

The Revised Ordinances of the City of Huntsville, Missouri, of 1894. Collated, Revised, Printed and Published by Authority of the Mayor and Board of Aldermen of the City of Huntsville, Missouri, Under an Ordinance of the Said City, Entitled: "An Ordinance in Relation to Ordinances, and the Publication Thereof." Approved on the 11th Day of June, 189 Page 58-59, Image 58-59 (1894) available at The Making of Modern Law: Primary Sources. 1894 Ordinances of the City of Huntsville, An Ordinance in Relation to Carrying Deadly Weapons, § 1. If within the city any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under militia law of the state, having upon or about his person any kind of fire arms, bowie-knife, dirk, dagger, sling-shot, or other deadly weapon or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, he shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than five nor more than one hundred dollars, or by imprisonment in the city prison not exceeding thirty days nor less than five days or by both such fine and imprisonment; provided, the Mayor may grant permission to any person to discharge gun, pistol or other firearms under the proper circumstances shown to him. § 2. The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to exercise process or warrants, or to suppress breaches of the peace or to make arrests, nor to persons moving or travelling peaceably through this state; and it shall be good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his home, person or property.

Francis M. Wilson, The Revised Statutes of the State of Missouri, 1899. To This Volume are Annexed the Acts of Congress in Relation to the Election of United States Senators, in Relation to Fugitives from Justice, Concerning Naturalization and the Authentication of Public Records; an Appendix Containing the Scheme and Charter of and Laws Specially Applicable to the City of St. Louis and the Acts Establishing the Criminal Court of the Fifteenth Circuit, the Criminal

Court of Jackson County, the Criminal Court of Buchana County, the Criminal Court of Greene County, the Louisiana Court of Common Pleas, the Hannibal Court of Common Pleas, the Cape Girardeau Court of Common Pleas and the Sturgeon Court of Common Pleas. Revised and Promulgated by the Fortieth General Assembly Page 1752, Image 645 (Vol. 2, 1899) available at The Making of Modern Law: Primary Sources. 1899

[Permit to Keep Explosives, § 7457. No person, corporation or joint-stock company shall, on and after ten days after this article shall take effect, have retain or keep in his possession or under his or her control, nor sell, give away or in any manner or way dispose of dynamite, giant powder, nitro-glycerine or any explosive substance, except gunpowder and blasting powder for ordinary purposes, without first obtaining a permit authorizing the same from the clerk of the county court, or mayor of the city of St. Louis, in whichever county or city such applicant may desire to do such business, nor without first making and delivering the affidavit required by the next succeeding section of this article.]

1921 Mo. Laws 691, 692

Section 1. Pistol, revolver or firearms to be plainly marked. No wholesaler or dealer therein shall have in his possession for the purpose of sale, or shall sell, any pistol, revolver, or other firearm of a size which may be concealed upon the person, which does not have plainly and permanently stamped ,upon the metallic portion thereof, the trademark or name of the maker, the model and the serial factory number thereof, which number shall not be the same as that of any other such weapon of the same model made by the same maker, and the maker, and no wholesale or retail dealer therein shall have in his possession for the purpose of sale, or shall sell, any such weapon unless he keep a full and complete record of such description of such weapon, the name and address of the person from whom purchased and to whom sold, the date of such purchase or sale, and in the' case of retailers the date of the permit and the name of the circuit clerk granting the same, which record shall be open to inspection at all times by any police officer or other peace officer of this state.

Sec. 2. Shall secure permit to acquire weapon.-No person, other than a manufacturer or wholesaler thereof to or from a wholesale or retail dealer therein, for the purposes of commerce, shall directly or indirectly buy, sell, borrow, loan, give away, trade, barter; deliver or receive, in this state, any pistol, revolver or other firearm of a size which may be concealed upon the person, unless the buyer, borrower or person receiving such weapon shall first obtain and deliver to, and the same be demanded and received by, the seller, loaner, or person delivering such weapon, within thirty days after the issuance thereof, a permit authorizing such person to acquire such weapon. Such permit shall be issued by the circuit clerk of the county in which the applicant for a permit resides in this state, if the sheriff be satisfied that the person applying for the same is of good moral character and of lawful age, and that the granting of the same will not endanger the public safety. The permit shall recite the date of the issuance thereof and that the same is invalid after thirty days after the said date, the -name and address of the person to whom granted and of the person from whom such weapon is to be acquired, the nature of the transaction, and a full description of such weapon, and shall be countersigned by the person to whom granted in the presence of the circuit clerk. The circuit clerk shall receive therefor a fee of $0.50. If the permit be used, the person receiving the same shall return it to the circuit clerk within thirty days after its expiration, with a notation thereon showing the date and manner of the disposition of such weapon. The circuit clerk shall keep a record of all applications for such permits and his action thereon, and shall preserve all returned permits. No person shall in any manner transfer, alter or

App. 0282

change any such permit or make a false notation thereon or obtain the same upon any false representation to the circuit clerk granting the same, or use or attempt to use a permit granted to another.

Sec. 3. Weapons must be stamped.-No person within this state shall lease, buy or in anywise procure the possession from any person, firm or corporation within or without the state, of any pistol, revolver or other firearm of a size which may be concealed upon the person, that is not stamped as required by section 1 of this act; and no person shall buy or otherwise acquire the possession of any such article unless he shall have first procured a written permit so to do from the circuit clerk of the county in which such person resides, in the manner as provided in section 2 of this act.

Sec. 4. Manufacture not prohibited.-Nothing herein contained shall be considered or construed as forbidding or making it unlawful for a dealer in or manufacturer of pistols, revolvers or other firearms of a size which may be concealed upon the person, located in this state, to ship into other states or foreign countries, any such articles whether stamped as required by this act or not so stamped.

## MONTANA

Decius Spear Wade, The Codes and Statutes of Montana. In Force July 1st, 1895. Including the Political Code, Civil Code, Code of Civil Procedure and Penal Code. As Amended and Adopted by the Fourth Legislative Assembly, Together with Other Laws Continued in Force Page 873, Image 914 (Vol. 2, 1895) available at The Making of Modern Law: Primary Sources. 1895 Crimes Against the Public Peace, § 759: Every person who brings into this state an armed person or armed body of men for the preservation of the peace or the suppression of domestic violence, except at the solicitation and by the permission of the legislative assembly or of the governor, is punishable by imprisonment in the state prison not exceeding ten years and by a fine not exceeding ten thousand dollars.

1913 Mont. Laws 53, An Act to Provide that Aliens Shall Pay a Gun License, and Providing a Penalty for Failure to Obtain License; to Provide for and Regulate the Duties of the Game and Fish Warden and His Deputies, and to Provide for the Disposition of the Fines so Collected, ch. 38, § 1.

There is hereby created a gun license for aliens. No person not a bona fide citizen of the United States shall own or have in his possession, in the State of Montana, any gun, pistol or other firearm without first having obtained from the Game and Fish Warden a license therefor, which said license shall cost the owner of said firearm the sum of Twenty-five ($25) Dollars, and shall expire one year from date of issuance thereof; provided, however, that this section shall not apply to one who has obtained the Twenty-five ($25) Dollar hunting license required by the laws of Montana; provided, further, that the provisions of this section shall not apply to any alien who is a bona fide resident of the State of Montana and the owner of not less than one hundred and sixty acres of land therein, nor shall it apply to any settler on the public lands of the State of Montana who shall have begun to acquire land under the laws of the United States by filing thereon, nor shall it apply to persons engaged in tending or herding sheep or other animals, held in herd.

App. 0283

1918 Mont. Laws 6-7,9, An Act Entitled "An Act Providing for the Registration of All Fire Arms and Weapons and Regulating the Sale Thereof and Defining the Duties of Certain County Officers and Providing Penalties for a Violation of the Provisions of This Act," ch. 2, §§ 1, 3, 8. § 1. Within thirty days from the passage and approval of this Act, every person within the State of Montana, who owns or has in his possession any fire arms or weapons shall make a full, true, and complete verified report upon the form hereinafter provided to the sheriff of the County in which such person lives, of all fire arms and weapons which are owned or possessed by him or her or are in his or her control, and on sale or transfer into the possession of any other person such person shall immediately forward to the sheriff of the County in which such person lives the name and address of that purchaser and person into whose possession or control such fire arm or weapon was delivered. § 3. Any person signing a fictitious name or address or giving any false information in such report shall be guilty of misdemeanor, and any person failing to file such report as in this Act provided, shall be guilty of a misdemeanor. § 8. For the purpose of this Act a fire arm or weapon shall be deemed to be any revolver, pistol, shot gun, rifle, dirk, dagger, or sword.

1935 Mont. Laws 57, 57-60
CHAPTER 43
An Act Relating to Machine Guns, and Their Association with Crimes of Violence as Herein Defined, Providing Presumptions Respecting the Use or Possession Thereof, Search Warrants for Machine Guns, Registration of the Same, and to Make Uniform the Law with Reference Thereto. Be it enacted by the Legislative Assembly of the State of Montana:
Section 1. Definitions. "Machine Gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than six shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. . . .
Section 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the State Penitentiary for a term of not less than twenty years.
Section 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State Penitentiary for a term of not less than ten years.
Section 4. Possession or use of a machine gun shall be used for presumed to be for offensive or aggressive purpose: offensive or aggressive purpose:
(a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or
(b) When in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or
(c) When the machine gun is of the kind described in Section 8 and has not been registered as in said section required; or
(d) When empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been or are susceptible of use in the machine gun are found in the immediate vicinity thereof.

App. 0284

Section 5. The presence evidence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

Section 6. Exceptions. Nothing contained in this Act shall prohibit or interfere with:

1. The manufacture for, and sale of, machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose;

2. The possession of a machine gun for scientific purpose, or the possession of a machine gun not useable as a weapon and possessed as a curiosity, ornament, or keepsake;

3. The possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifestly not aggressive or offensive.

Section 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned, given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts, and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provision of this section shall be punishable by a fine of not less than One Hundred Dollars ($100.00).

Section 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this Act, and annually thereafter. If acquired hereafter it shall be registered within twenty-four hours after its acquisition. Blanks for registration shall be prepared by the Secretary of State, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which, the gun was acquired. The registration date shall not be subject to inspection by the public. Any person failing to register any gun as required by this Section, shall be presumed to possess the same for offensive or aggressive purpose.

Section 9. Warrant to search any house or place and seize any machine gun adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber possessed in violation of this Act, may issue in the same manner and under the same restrictions as provided by law for stolen property, and any court of record, upon application of the County Attorney, shall have jurisdiction and power to order any machine gun, thus or otherwise legally seized, to be confiscated and either destroyed or delivered to a peace officer of the state or a political subdivision thereof.

Section 10. If any provision of this Act or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are declared to be severable. . . .

Approved February 20, 1935.

## **NEBRASKA**

**App. 0285**

1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47.
The City Council shall have power to license all . . . vendors of gunpowder[.]

1895 Neb. Laws 210, Laws of Nebraska Relating to the City of Lincoln, An Ordinance Regulating and Prohibiting the Use of Fire-arms, Fire-works and Cannon in the City of Lincoln . . . Prescribing Penalties for Violation of the Provisions of This Ordinance, and Repealing Ordinances in Conflict Herewith, Art. XVI, § 6.
The Mayor may grant to so many and such persons as he may think proper, licenses to carry concealed weapons, and may revoke any and all of such licenses at his pleasure. Every such license shall state the name, age, occupation, and residence, of the person to whom granted, and shall be good for one year. A fee of fifty cents shall be paid therefor to the City Treasurer, and by him placed in the police fund.

## NEW HAMPSHIRE

1820 N.H. Laws 274-76, An Act to Provide for the Appointment of Inspectors and Regulating the Manufacture of Gunpowder, ch. 25, §§ 1-9.
§ 1. [T]he Governor . . . is hereby authorized to appoint an inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state, and such other places as may by him thought to be necessary[.] § 2. [F]rom and after the first day of July next, all gunpowder which shall be manufactured within this state shall be composed of the following proportions and quality of materials . . . § 3. It shall be the duty of each of said inspectors to inspect, examine and prove all gunpowder which after the first day of July shall not be deposited at any publick [sic] powder magazine, or manufactory of this state . . . § 4. [N]o gunpowder within this state shall be considered to be of proof unless one ounce thereof, placed in a chamber of a four and an half inch howitzer, with the howitzer elevated so as to form an angle of forty-five degrees with the horizon, will, upon being fired throw a twelve pound shot seventy-five yards at the least. § 5. [W]henever any of said inspectors shall discover any gunpowder, deposited at any public powder magazine, or any other place within this state, which is not well manufactured or which is composed of impure materials . . . the inspector in such case, shall mark each cask containing such impure, ill manufactured, or deficient gunpowder, with the word "Condemned" on both heads of the cask . . . § 6. [I]f any person shall knowingly sell any condemned gunpowder . . . every such person, so offending, shall forfeit and pay not less than two hundred nor more than five hundred dollars . . . § 7. [E]ach inspector . . . be sworn to the faithful and impartial discharge of the duties of his office, and each inspector shall be allowed one cent for each pound of gunpowder, by him examined, inspected and proved . . . to be paid by the owner or owners of the gunpowder. § 8. [I]f any manufacturer of gunpowder shall sell or dispose of, or shall cause or permit to be sold or disposed of, or shall export or cause to be exported withou the limits of this state, any powder of his manufacture, before the same has been inspected and marked agreeably to the provisions of this act, he shall forfeit and pay the sum of fifty cents for every pound of powder so sold, disposed of, or exported, to be recovered in the manner provided in the sixth section of this act. § 9. [I]f any person with within this state . . shall knowingly sell, expose, or offer for sale, within this state, any gunpowder which is not well manufactured, or which is composed of impure materials, and which shall not be composed of the proof herein before required, shall forfeit and pay not less than five dollars nor more than

fifty dollars for each and every offence, to be recovered in the manner provided in the sixth section of this act.

1823 N.H. Laws 73-74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.
That if any person or persons shall within the compact part of the town of Portsmouth, that is to say, within one mile of the courthouse, fire or discharge any cannon, gun, pistol or other fire arms, or beat any drum, (except by command of a military officer, having authority therefor) or fire or discharge any rockets, squibs, crackers, or any preparation of gunpowder, (except by the permission of the police officers, or of a major part of them first had in writing) . . . every such person, for every such act shall be taken and deemed to be an offender against the police of Portsmouth, and shall be liable to the penalties hereinafter expressed.

The Charter, with Its Amendments and the General Ordinances of the City of Dover Page 32, Image 32 (1870) available at The Making of Modern Law: Primary Sources. 1870
General Statutes [Ordinances of the City of Dover, [New Hampshire] Offences Against the Police of Towns,] § 5. No person shall, within the compact part of any town, fire or discharge any cannon, gun, pistol, or other fire-arms, or beat any drum, except by command of a military officer having authority therefor, or fire or discharge any rockets, squibs, crackers, or any preparation of gunpowder, except by permission of a majority of the police officers or selectmen in writing, or make any bonfire, or improperly use or expose any friction matches, or knowingly raise or repeat any false cry of fire.

1917 N.H. Laws 727-28, An Act for the Regulation of the Sale and Use of Explosives and Firearms, ch. 185, §§ 1-3, 6.
§ 1. No person shall manufacture, sell, or deal in firearms or in gunpowder, dynamite, nitro-glycerine, or other form of high explosive, unless he shall first obtain, from the selectmen of the town or the chief of police of the city where such business is to be conducted, a written license therefor, and no person shall conduct such business within the state but outside the limits of any organized town or city, unless he shall first obtain such license from the county commissioners of the county in which such business is to be conducted; which license shall specify the building where such business is to be carried on or material deposited or used. § 2. No such licensed person shall sell or deliver firearms to any person not a citizen of the United States, unless he shall have legally declared his intention of becoming a citizen, or any such explosive material or compound to any person, except upon presentation of a permit such as is hereinafter provided for, nor unless satisfied that the same is to be used for a lawful purpose. § 3. Every person so licensed shall keep, on blanks to be furnished by the secretary of state, a record of the names and residences of all persons to whom he shall sell or deliver firearms or any such explosive material or compound, the purpose of which the same is to be used¸ the date of sale, the amount paid, the date of the purchaser's permit, the name and title of the person by whom the permit was issued, and, within five days after such sale or delivery, shall file such record thereof with the clerk of the city or town wherein he sale or delivery was made, or with the county commissioners in case of sales or deliveries within the state, but outside the limits of any organized city or town. The records thus filed shall at all times be open to the inspection of the police departments, or other public authorities. He shall also affix to the receptacle containing such explosive material or compound a label with the name of the compound, his own name, and the date of sale.

§ 6. No person not a citizen of the United States or one who has legally declared his intention of becoming such a citizen shall have in his possession any firearm or firearms of whatsoever kind or description unless he has a written permit to have such possession issued and signed as hereinafter provided. Any such person desiring to possess a firearm or firearms for any lawful purpose shall first make written application to the chief of police or selectmen of the town wherein he resides . . . stating the purposes for which the possession of the firearm or firearms is desired and a description of the firearm or firearms. The applicant shall also state his full name, occupation, place of residence and if in a city the street and number. If such chief of police or selectmen or county commissioners are satisfied that the applicant intends to use the firearm or firearms in a lawful manner and as set forth in his application, a permit shall be issued, signed by the chief of police of the city, a selectmen of the town, or county commissioners, as the case may be, giving to the applicant the right to have in his possession such firearm or firearms. The holder of any such permit shall keep the permit on his person at all times when he is in possession of the firearm or firearms as authority for such possession and shall exhibit the same when so requested by any person.

1917 N.H. Laws 728-29, An Act for the Regulation of the Sale and Use of Explosives and Firearms, ch. 185, § 6.

No person not a citizen of the United States or one who has legally declared his intention of becoming such a citizen shall have in his possession any firearm or firearms of whatsoever kind or description unless he has a written permit to have such possession issued and signed as hereinafter provided. Any such person desiring to possess a firearm or firearms for any lawful purpose shall first make written application to the chief of police or selectmen of the town wherein he resides . . . stating the purposes for which the possession of the firearm or firearms is desired and a description of the firearm or firearms. The applicant shall also state his full name, occupation, place of residence and if in a city the street and number. If such chief of police or selectmen or county commissioners are satisfied that the applicant intends to use the firearm or firearms in a lawful manner and as set forth in his application, a permit shall be issued, signed by the chief of police of the city, a selectmen of the town, or county commissioners, as the case may be, giving to the applicant the right to have in his possession such firearm or firearms. The holder of any such permit shall keep the permit on his person at all times when he is in possession of the firearm or firearms as authority for such possession and shall exhibit the same when so requested by any person.

1923 N.H. Laws 138

SECTION 1. Pistol or revolver, as used in this act shall be construed as meaning any firearm with a barrel less than twelve inches in length.

SECT. 2. If any person shall commit or attempt to commit a crime when armed with a pistol or revolver, and having no permit to carry the same, he shall in addition to the punishment provided for the crime, be punished by imprisonment for not more than five years.

SECT. 3. No unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another shall own or have in his possession or under his control a pistol or revolver, except as hereinafter provided. Violations of this section shall be punished by imprisonment for not more than two years and upon conviction the pistol or revolver shall be confiscated and destroyed.

App. 0288

SECT. 4. No person shall carry a pistol or revolver concealed in any vehicle or upon his person, except in his dwelling house or place of business, without a license therefor as hereinafter provided. Violations of this section shall be punished by a fine of not more than one hundred dollars or by imprisonment not exceeding one year or by both fine and imprisonment.

SECT. 5. The provisions of the preceding sections shall not apply to marshals, sheriffs, policemen, or other duly appointed peace and other law enforcement officers, nor to the regular and ordinary transportation of pistols or revolvers as merchandise, nor to members of the army, navy, or marine corps of the United States, nor to the national guard when on duty, nor to organizations by law authorized to purchase or receive such weapons, nor to duly authorized military or civil organizations when parading, or the members thereof when at or going to or from their customary places of assembly.

SECT. 6. The selectmen of towns or the mayor or chief of police of cities may, upon application of any person issue a license to such person to carry a loaded pistol or revolver in this state, for not more than one year from date of issue, if it appears that the applicant has good reason to fear an injury' to his person or property or for any other proper purpose, and that he is a suitable person to be licensed. The license shall be in duplicate and shall bear the name, address, description, and signature of the licensee. The original thereof shall be delivered to the licensee, the duplicate shall be preserved by the selectmen of towns and the chief of police of the cities wherein issued for a period of one year.

SECT. 7. Any person or persons who shall sell, barter, hire, lend or give to any minor under the age of twenty-one years any pistol or revolver shall be deemed guilty of a misdemeanor and shall upon conviction thereof be fined not more than one hundred dollars or be imprisoned not more than three months, or both. This section shall not apply to fathers, mothers, guardians, administrators, or executors who give to their children, wards, or heirs to an estate, a revolver.

SECT. 8. No person shall sell, deliver, or otherwise transfer a pistol or revolver to a person who is an unnaturalized foreign-born person or has been convicted of a felony against the person property of another, except upon delivery of a written permit to purchase, signed by the selectmen of the town or the mayor or chief of police of the city. Before a delivery be made the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, sign and forward to the chief of police of the city or selectmen of the town one copy thereof and shall retain the other copy for one year. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall be punished by a fine of not more than one hundred dollars or by imprisonment for not more than one year, or by both such fine and imprisonment.

SECT. 9. Whoever, without being licensed as hereinafter provided, sells, advertises, or exposes for sale, or has in his possession with intent to sell, pistols or revolvers, shall be punished by imprisonment for not more than two years.

SECT. 10. The selectmen of towns and the chief of police of cities may grant licenses, the form of which shall be prescribed by the secretary of state, effective for not more than one year from date of issue, permitting the licensee to sell at retail pistols and revolvers subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol or revolver shall be delivered (a) to a purchaser not personally known to the seller or who does not present clear evidence of his identity; nor (b) to an unnaturalized foreign-born person or a person who has been convicted of a felony and has no permit as required by section 8 of this act.

A true record, in duplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which shall be prescribed by the secretary of state and shall be signed by the purchaser and by the person effecting the sale, and shall include the date of sale, the caliber, make, model, and manufacturer's number of the weapon, the name, address, and nationality of the purchaser. One copy of said record shall, within seven days, be forwarded to the selectmen of the town or the chief of police of the city and the other copy retained for one year.

SECT. 11. If any person in purchasing or. otherwise securing delivery of a pistol or revolver shall give false information or offer false evidence of his identity he shall be punished by imprisonment punished, for not more than two years.

SECT. 12. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any pistol or revolver. Possession of any such firearms upon which the same shall have been changed, altered, removed, or obliterated, shall be presumptive evidence that such possessor has changed, altered, removed or obliterated the same. Violations of this section shall be punished by a fine of not more than two hundred dollars or by imprisonment for not more
than one year, or both.

SECT. 13. All licenses heretofore issued within the state permitting the carrying of pistols or revolvers upon the person shall expire at midnight of July 31, 1923.

SECT. 14. This act shall not apply to antique pistols or revolvers incapable of use as such.

SECT. 15. All acts and parts of acts inconsistent herewith are hereby repealed, and this act shall take effect upon its passage.


## NEW JERSEY

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 46, Image 46 (1874) available at The Making of Modern Law: Primary Sources. 1871

[Ordinances of Jersey City, NJ, In Relation to the Sidewalks, Public Grounds and Streets in Jersey City,] § 26. No person shall, within this city, fire or discharge any gun, pistol, cannon, or fowling piece or other fire-arms, unless in defense of his property or person; nor let off any squibs, crackers or other fireworks, unless by permission of the city authorities, under the penalty of ten dollars for each and every offense; provided, however, that this section of the ordinance shall not apply to the Fourth of July.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources. 1873

An Ordinance In Relation to the Carrying of Dangerous Weapons. The Mayor and Aldermen of Jersey City do ordain as follows: § 1. That with the exceptions made in the second section of this ordinance, no person shall, within the limits of Jersey City, carry, have or keep on his or her person concealed, any slung-shot, sand-club, metal knuckles, dirk or dagger not contained as a blade of a pocket knife, loaded pistol or other dangerous weapon. § 2. That policemen of Jersey City, when engaged in the performance of police duty, the sheriff and constables of the County of Hudson, and persons having permits, as hereinafter provided for, shall be and are excepted from the prohibitions of the first section of this ordinance. § 3. The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper. All applications for permits shall be made in open court, by the applicant in person, and in all cases the court shall require a written endorsement of the propriety of granting a permit from at least three reputable freeholders; nor shall any such permit be granted to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control . Permits shall not be granted for a period longer than one year, and shall be sealed by the seal of the court. The possession of a permit shall not operate as an excuse unless the terms of the same are strictly complied with. In cases of emergency, permits may be granted by a single Justice of the Municipal Court, or by the Chief of Police, to be in force not longer than thirty days, but such permit shall not be renewable. §4. That no person shall, within the limits of Jersey City, carry any air gun or any sword cane. § 5. The penalty for a violation of this ordinance shall be a fine not exceeding fifty dollars, or imprisonment in the city prison not exceeding ten days, or both fine and imprisonment not exceeding the aforesaid amount and time, in the discretion of the court.

1902 N.J. Laws 780, An Act to Require Non-residents to Secure Licenses before Hunting or Gunning within the State of New Jersey and Providing Penalties for Violation of Its Provisions, ch. 263, § 1.
Every non-resident of this state shall be required to take out a license before he shall begin hunting or gunning in this state, which license the several county clerks of this state, and each of them, are hereby authorized and required to issue upon the payment by the applicant of a license fee of ten dollars, and an issuance fee of fifty cents to the county clerk issuing the same; such license shall be a certificate of permission to hunt and gun within the state of New Jersey and shall include the name, age and place of residence and business of the applicant with his description as nearly as may be[.]

1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.
Any person who shall carry any revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor or any knife with a blade of five inches in length or over concealed in or about his clothes or person, shall be guilty of a misdemeanor, and upon conviction thereof shall be punishable by a fine not exceeding two hundred dollars or imprisonment at hard labor, not exceeding two years, or both; provided, however, that nothing in this act shall be construed to prevent any sheriff, deputy sheriff, police officer, constable, state detective, member of a legally organized detective agency or any other peace officer from

carrying weapons in the discharge of his duty; nor shall this act apply to any person having a written permit to carry such weapon, firearm, stiletto, razor, dagger or knife, from the mayor of any city, borough or other municipality, having a mayor, or from the township committee or other governing body of any township or other municipality not having a mayor, which permits such officers and governing bodies are hereby authorized to grant; said permits shall be issued at the place of residence of the person obtaining the same and when issued shall be in force in all parts of the state for a period of one year from date of issue unless sooner revoked by the officer or body granting the same; and provided further, that nothing contained herein shall prevent any person from keeping or carrying about his or her place of business, dwelling house or premises any such weapon, firearm, stiletto, dagger, razor or knife, or from carrying the same from any place of purchase to his or her dwelling house, or place of business, or from his or her dwelling house or place of business to any place where repairing is done to have the same repaired and returned; and provided further, that nothing in this act shall be construed to make it unlawful for any person to carry a gun, pistol, rifle or other firearm or knife in the woods or fields or upon the waters of this state for the purpose of hunting; a fee of twenty-five cents may be lawfully charged by such officer or body granting such permit.

1914 N.J. Laws 65, Supplement to an Act Entitled "An Act to License Citizens of this State to Hunt and Pursue Wild Animals and Fowl," ch. 43, § 1.
No license to hunt, pursue or kill with a gun or any fire-arm any of the game birds¸ wild animals or fowl of this State, shall be issued to any person under the age of fourteen years, and if any applicant for license shall misrepresent his age he shall be liable to a penalty of twenty dollars, to be sued for and recovered as other penalties under the fish and game laws.

1916 N.J. Laws 275-76, An Act to Prohibit Any Person from Going into the Woods or Fields with a Gun or Other Firearm when Intoxicated, or under the Influence of any Drug or Intoxicating Liquor, ch. 130, §§ 1-2.
1. It shall be unlawful for any person to go into the woods or fields at any time with a gun or firearm when intoxicated or under the influence of any drug or drugs or of intoxicating liquor. 2. Any person violating any of the provisions of this act shall be liable to a penalty of fifty dollars for each offense, to be sued for and recovered in the manner provided and by the persons authorized to sued for and recover penalties. . . . Upon the conviction of any person for violating the provisions of this act, the license to hunt and fish of such person issued to him . . . shall become void, and the justice of the peace, District Court judge, or police magistrate before whom such conviction is had, shall take from the person so convicted the license, mark the same "revoked" and send it to the Board of Fish and Game Commissioners. If such conviction is reversed on appeal the license shall be restored to the defendant. Any license to hunt or fish issued to any person convicted of a violation of this act during the calendar year in which such offense occurred shall be null and void.

1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.
1. The term "machine gun or automatic rifle," as used in this act, shall be construed to mean any weapon, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots

to the second. 2. Any person who shall sell, give, loan, furnish or deliver any machine gun or automatic rifle to another person, or any person who shall purchase, have or possess any machine gun or automatic rifle, shall be guilty of a high misdemeanor; provided, the provisions of this section shall not apply to any person who has procured and possesses a license to purchase, have and possess a machine gun or automatic rifle as hereinafter provided for; nor to the authorized agents and servants of such licensee; or to the officers and members of any duly authorized military organization; nor to the officers and members of the police force of any municipality, nor to the officers and members of the State Police force; nor to any sheriff or undersheriff; nor to any prosecutor of the pleas, his assistants, detectives and employees.

1927 N.J. Laws 742

No retail dealer shall sell or expose for sale, or have in his possession with intent to use, any of the firearms or instruments enumerated in section one hereof without being licensed as hereafter provided. The Common Pleas judge of any court of this State, by the Secretary of State, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political-division, pistols or revolvers, subject to the follow-ing conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building or buildings designated in the license.
2. The license or a copy thereof certified by the issuing authority shall be displayed in a conspicuous place on the premises where it can be easily read.
3. No pistol or revolver, or imitation thereof, or placard advertising the sale thereof, shall be placed in any window or in any part of said premises where it can be readily seen from the outside.
4. No pistol or revolver shall be delivered (a) unless the purchaser shall have obtained a permit to purchase days shall have elapsed after the application for the permit; (c) unless the purchaser either is personally known to the seller or shall present evidence of his identity; (d) unless the pistol or revolver shall be unloaded and securely wrapped; provided, however, a permit to cover a pistol or revolver shall, for the purposes of this section and of section nine of this act, be equivalent to a permit to purchase a pistol or revolver. 5. A true record of every pistol shall be made in a book kept for the purpose, the form of which shall be prescribed by the Secretary of State and shall be personally signed by the person effecting the sale, and shall contain the date of the sale, the calibre, make, model, and manufacturer's number of the weapon, and the name, address and permit number of the purchaser.

Any person who shall knowingly sell any of the firearms or instruments enumerated in section one hereof to a minor under the age of eighteen years, or to a person not of sound mind, or to a drug addict, or to a person who has been convicted of committing or attempting to commit any of the crimes enumerated in section two hereof when armed with any of the firearms or instruments enumerated in section one hereof, shall he guilty of misdemeanor.

No person shall sell a pistol or revolver to another person unless the purchaser has first secured a permit to purchase or carry a pistol or revolver. No person of good character and who is of good repute in the community in which he lives, and who is not subject to any of the disabilities set forth in other sections of this act, shall be denied a permit to purchase a pistol or revolver. The judge of any court within this State (except, however, justices of the peace), the sheriff of a county or the chief of police of a city, town or municipality shall upon application issue-to any person qualified under the provisions of this section a permit to purchase a pistol or revolver, and the Secretary of State shall have concurrent jurisdiction to issue such permit in any

case, notwithstanding it has been refused by any other licensing official, if in his opinion the applicant is qualified.

Applications for such permits shall be in form as prescribed by the Secretary of State and shall set forth the name, residence, place of business, age, occupation, sex, color, and physical description of the applicant, and shall state whether the applicant is a citizen, and whether he has ever been convicted of any of the crimes enumerated in section two hereof as defined in this act. Such application shall he signed by the applicant and shall contain as reference the names and addresses of two reputable citizens personally acquainted with him. Application blanks shall be obtainable from the Secretary of State and from any other officers authorized to grant such permit.. and may be obtained from licensed retail dealers. The application, together with a fee of fifty cents. shall be delivered or forwarded to the licensing authority who shall investigate the same, and unless food cause for the denial thereof shall appear, shall rant said permit within seven days from the date of the receipt of the application. The permit shall be in form prescribed by the Secretary of State and shall be issued to the applicant in triplicate. The applicant shall deliver to the seller the permit in triplicate and the seller shall indorse on the back of each copy the make, model, calibre and serial number of the pistol or revolver, sold tinder the permit. One copy shall then be returned to the purchaser with the pistol or revolver, one copy shall be kept by the seller as a permanent record, and the third copy shall be forwarded by the seller within three days to the Secretary of State. If the permit is not granted, the fee shall be returned to the applicant.

All fees for permits shall be paid into the general fund of the State if the permit be issued by the Secretary of State; to the municipality if the permit be issued by a municipal officer; in all other instances to the general fund of the county wherein the officer acts or the licensee resides or does business.

A person shall not be restricted as to the number of pistols or revolvers he may purchase, if he applies for and obtains permits to purchase the same, but only one pistol or revolver shall be purchased or delivered on each permit.


1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

1. A gangster is hereby declared to be an enemy of the state. 2. Any person in whose possession is found a machine gun or a submachine gun is declared to be a gangster; provided, however, that nothing in this section contained shall be construed to apply to any member of the military or naval forces of this State, or to any police officer of the State or of any county or municipality thereof, while engaged in his official duties. 3. Any person, having no lawful occupation, who is apprehended while carrying a deadly weapon, without a permit so to do and how has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster. 4. Any person, not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster; provided, however, that nothing in this section contained shall in any wise be construed to include any participant or sympathizer in any labor dispute. 5. Any person convicted of being a gangster under the provisions of this act shall be guilty of a high misdemeanor, and shall be punished by a fine not exceeding ten thousand dollars ($10,000.00), or by imprisonment not exceeding twenty years, or both.

**App. 0294**

## NEW MEXICO

1915 N.M. Law 153, An Act to Amend Sections . . . of Chapter 85 of the Laws of 1912 Relative to the Protection of Game and Fish, ch. 101, §7.

. . . No person shall at any time shoot, hunt or take in any manner any wild animals or birds or game fish as herein defined in this state without first having in his or her possession a hunting license as hereinafter provided for the year in which such shooting, fishing or hunting is done. The presence of any person in any open field, prairie or forest, whether enclosed or not with traps, gun or other weapon for hunting, without having in possession a proper hunting license as herein provided, shall be prima facie evidence of the violation of this section.

## NEW YORK

The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775 Inclusive Page 40-41, Image 62-63 (1896) available at The Making of Modern Law: Primary Sources. 1680. Laws of the Colony of New York, Indians. No person shall sell, give or barter directly or indirectly any gun or guns, powder, bullet, shot, lead nor any vessel or burthen, or row boat, canoes only excepted without license first had and obtained under the governors hand and seal to any Indian whatsoever, nor to any person inhabiting out of this Government, nor shall amend or repair any gun belonging to any Indian, nor shall sell any armor or weapons, upon penalty of ten pounds for every gun, armor, weapon, vessel, or boat so sold given or bartered, five pounds for every for every pound of powder, and forty shillings for every pound of shot or lead and proportionately for any greater or lesser quantity.

1763 N.Y. Laws 442
LAWS OF NEW-YORK
1. In order therefore the more effectually to punish and prevent such Abuses as foresaid, . . .That if any Person or Persons whatsoever, other than the Owner, Proprietor, or Possessor, or his or her white Servant or Servants, do and shall, at any Time or Times from and after the Publication of this Act, carry, shoot, or discharge any Musket, Fowling-Piece, or other Fire-Arm whatsoever, into, upon, or through any Orchard, Garden, CornField, or other inclosed Land whatsoever, within the City of New-York, or the Liberties thereof, without Licence in Writing first had and obtained for that Purpose from such Owner, Proprietor, or Possessor of such Orchard, Garden, Corn-Field, or other inclosed Land; or shall enter into, or pass through any Orchard, Garden, Corn-Field or Moving-Ground, in any of the aforesaid Places without Fire-Arms, and thereof shall be convicted before any Member of his Majesty's Council, either of the Justices of the Supreme Court, or the Mayor, Recorder, or any one of the Aldermen of the City of New-York, for the Time being, by the Oath of one credible Witness, or by Confession of the Party offending, he, she, or they so offending, shall severally forfeit and pay for every such Offence, the Sum of twenty Shillings; to be recovered and applied in the Manner herein after directed.

Laws of the State of New-York, Relating to the City of Schenectady: And the Laws and Ordinances of the Common Council of the City of Schenectady Page 58, Image 58 (1824) available at The Making of Modern Law: Primary Sources. 1824
[Ordinances of the City of Schenectady,] XI. And be it further ordained, That if any person shall fire or discharge any gun, pistol, rocket, cracker, squib or other fire works, in any street, lane or alley, or in any yard, garden or other enclosure, or in any place which persons frequent to walk within the limits aforesaid, without permission of the mayor or one of the aldermen or assistants of this city, such person shall forfeit for every such offence the sum of one dollar…

Elliott Fitch Shepard, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their Authority Page 214-215, Image 214-215 (1881) available at The Making of Modern Law: Primary Sources. 1881
Carrying of Pistols, § 264. Every person except judges of the federal, state and city courts, and officers of the general, state and municipal governments authorized by law to make arrests, and persons to whom permits shall have been issued, as hereinafter provided, who shall have in his possession within the city of New York a pistol of any description concealed on his person, or not carried openly, shall be deemed guilty of a misdemeanor, and shall be punished, on conviction by a fine not exceeding ten dollars, or, in default of payment of such fine by imprisonment not exceeding ten days. § 265. Any person, except as provided in this article, who has occasion to carry a pistol for his protection, may apply to the officer in command at the station-house of the precinct where he resided, and such officer, if satisfied that the applicant is a proper and law abiding person, shall give said person a recommendation to the superintendent of police, or the inspector in command at the central office in the absence of the superintendent, who shall issue a permit to the said person allowing him to carry a pistol of any description. Any non-resident who does business in the city of New York, and has occasion to carry a pistol while in said city, must make application for permission to do so to the officer in command of the station-house of the police precinct in which his so does business, in the same manner as is required by residents of said city, and shall be subject to the same conditions and restrictions.

Charles Wheeler, By-Laws of the Village of Mechanicville. Adopted by the Trustees October 18, 1881 Page 7, Image 8 (1881) available at The Making of Modern Law: Primary Sources. 1881
[Ordinances of the Village of Mechanicville, NY,] Fires and Their Prevention, Fire Arms and Fire Works, § 20. No person, except on the anniversary of our national independence, and on that day only, at such place or places as the President or Trustees shall permit, shall fire, discharge or set off, in the village, any gun, cannon, pistol, rocket, squib, cracker or fire ball, under the penalty of five dollars for each offense.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources. 1884
Carrying, Using, Etc., Certain Weapons, § 410. A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this

**App. 0296**

state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5. Fourth Edition Page 298, Image 824 (1885) available at The Making of Modern Law: Primary Sources. 1885
An Act to Limit the Carrying and Sale of Pistols and other fire arms in the cities of this state. Chap. 375, § 1. No person under the age of eighteen years shall have, carry or have in his possession in any public street, highway or place in any of the cities of this state, any pistol or other firearms of any kind, and no person shall in such cities sell or give any pistol or other fire-arms to any person under such age. § 2. Any person violating any of the provisions of this act shall be guilty of a misdemeanor, and in all trials or examinations for said offense the appearance of the person so alleged or claimed to be under the age of eighteen years shall be evidence to the magistrate or jury as to the age of such person. § 3. Nothing herein contained shall apply to the regular and ordinary transportation of pistols or fire-arms as articles of merchandise in said cities, or to the carrying of a gun or rifle through a street or highway of any city, with the intent to use the same outside the said city; nor to any person under such age carrying an pistol or firearms under license given by the mayor of said cities; but no license so given shall be in force more than one year from its date; and all such licenses may be revoked at the pleasure of the mayor, and a full complete and public record shall be kept by the mayor of said cities of all such licenses and the terms and date thereof.

Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations Page 184, Image 185 (1885) available at The Making of Modern Law: Primary Sources. 1885
Ordinances of [the City of Syracuse,] Gunpowder, Etc. § 1. No person except when on military duty in the public service of the United States, or of this State, or in case of public celebration with permission of the mayor or common council, shall have, keep or possess in any building, or carriage, or on any dock, or in any boat or other vessel, or in any other place within the city limits, gun-powder, giant- powder, nitro-glycerine, dynamite or other explosive material, in quantity exceeding one pound, without written permission from the chief engineer of the fire department. Any person violating any of the provisions of this section shall be liable to a fine of not less than ten nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor more than three months, for each offense.

Mark Ash, The New York City Consolidation Act, as in Force in 1891: With Notes Indicating the Statutory Sources, References to Judicial Decisions, and All Laws Relating to New York City, Passed Since January 1, 1882, Together with an Appendix of the Royal English Colonial Charters of New York City Page 209, Image 233 (Vol. 1, 1891) available at The Making of Modern Law: Primary Sources. 1890

Ordinances of the City of New York, § 455. No person shall manufacture, have, keep, sell, or give away any gunpowder, blasting powder, gun-cotton, niro-glycerine, dualin, or any explosive oils or compounds, within the corporate limits of the city of New York, except in the quantities limited, in the manner, and upon the conditions herein provided, and under such regulations as the board of fire commissioners shall prescribe : and said board shall make suitable provision for the storage and safe keeping of gunpowder and other dangerous and explosive compounds or articles enumerated under this title, beyond the interior line of low water-mark in the city and county of New York. The said board may issue licenses to persons desiring to sell gunpowder or any of the articles mentioned under this section at retail, at a particular place in said city to be named in said license (provided that the same shall not be in a building used in any part thereof as a dwelling unless specially authorized by said license), and persons so licensed may on their premises, if actually kept for sale, persons so licensed may have on their premises, if actually kept for sale, a quantity not exceeding at any one time, of nitro-glycerine, five pounds; of gun-cotton, five pounds of gunpowder, fourteen pounds; blasting powder, twenty-five pounds. . .

1891 N.Y. Laws 129, 177, An Act to Revise the Charter of the City of Buffalo, ch. 105, tit. 7, ch. 2, § 209.
No person other than members of the police force, regularly elected constables, the sheriff of Erie county, and his duly appointed deputies, shall, in the city, carry concealed upon or about his person, any pistol or revolver, or other dangerous weapon or weapons, without first obtaining a permit, as hereinbefore provided; and such permit shall be produced and exhibited by any person holding the same, upon the request of a member of the police force. A violation of any of the provisions of this section shall be a misdemeanor and punishable as such; and all fines imposed and collected for such violations shall be deposited to the credit of said pension fund by the clerk of the court imposing the same.

Rules, By-Laws and Ordinances of the Village of Wappingers Falls. Adopted September 13, 1898 Page 34, Image 32.(Wappingers Falls, 1898) available at The Making of Modern Law: Primary Sources. 1898
Ordinances of Wappinger Falls. Park Ordinances. § 1. No person or persons shall fire or discharge any gun or pistol or other firearm, or any rocket torpedo, or other fireworks of any description, nor send up any balloon, nor throw stones or missiles, nor play ball within the limits of Mesier Park, without the permission obtained of the Park Commissioners at a meeting of the Board.

An Ordinance to regulate the government of parks and other public pleasure grounds of The City of New York, at 600 (1903). 1903
Be it Ordained by the Board of Aldermen of The City of New York, as follows: All persons are forbidden . . .
XXIV. No one shall fire or carry any firearm, fire cracker, torpedo or fire-works, nor make a fire, nor make any oration, nor conduct any religious or other meeting or ceremony within any of the parks, parkways, squares or places in The City of New York under the jurisdiction of the Department of Parks without special permission from the Commissioner having jurisdiction.

1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, §1.

**App. 0298**

Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: § 1897. Carrying and use of dangerous weapons. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slunghsot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor. . . . Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony.

1911 N.Y. Laws 443, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, §1.
Any person over the age of sixteen years, who shall have in his possession in any city, village or town of this state, any pistol, revolver or other firearm of a size which may be concealed upon the person, without a written license therefor, issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance in such city, village or town, shall be guilty of a misdemeanor.

1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2.
Such chapter is hereby amended . . . § 1914. Sale of pistols, revolvers and other firearms. Every person selling a pistol, revolver or other firearm of a size which may be concealed upon the person whether such seller is a retail dealer, pawnbroker or otherwise, shall keep a register in which shall be entered at the time of sale, the date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or other firearm, together with the calibre [sic], make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm. Such person shall also, before delivering the same to the purchaser, require such purchaser to produce a permit for possessing or carrying the same as required by law, and shall also enter in such register the date of such permit, the number thereon, if any, and the name of the magistrate or other officer by whom the same was issued. Every person who shall fail to kep a register and enter therein the facts required by this section, or who shall fail to exact the production of a permit to possess or carry such pistol, revolver or other firearm, if such permit is required by law, shall be guilty of a misdemeanor. Such register shall be open at all reasonable hours for the inspection of any peace officer. Every person becoming the lawful possessor of such pistol, revolver or other firearm, who shall sell, give or transfer the same to another person without first notifying the police authorities, shall be guilty of a misdemeanor. This section shall not apply to wholesale dealers.

1923 N.Y. Laws 140–141, An Act to Amend the Conservation Law in Relation to Aliens, ch. 110, § 2.

**App. 0299**

2. It shall be unlawful for any unnaturalized foreign born person to hunt for, or capture or kill, in this state any wild bird or animal, either game or otherwise, of any description except in defense of person or property or except under a special license issued directly by the conservation commission; and to that end it shall be unlawful for any unnaturalized foreign born person within this state, to own or be possessed of a shotgun or rifle of any make, unless he possess such special license.

## NORTH CAROLINA

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation Has Ceased to Exist Page 73, Image 73 (1847) available at The Making of Modern Law: Primary Sources. 1840
Crimes and Punishments, 1840 – 1. – Ch. 30, If any free negro, mulatto, or free person of color shall wear, or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger, or bowie knife, unless he or she shall have obtained a license therefor from the Court of Pleas and Quarter Sessions of his or her county, within one year preceding the wearing, keeping or carrying thereof, he or she shall be guilty of a misdemeanor and may be indicted therefor.

1909 N.C. Sess. Laws 777, Priv. Laws, An Act for a New Charter for the City of Southport, North Carolina, ch. 345, § 23, pt. 14.
[O]n dealers in pistols, guns, dirks, bowie knives, sling shots, brass or metal knuckles or other like deadly weapons, in addition to all other taxes, a license tax not exceeding fifty dollars; on dealers in firecrackers, Roman candles, skyrockets, toy pistols or fireworks of any kind, a tax not exceeding fifty dollars.

1919 N.C. Sess. Laws 397-99, Pub. Laws, An Act to Regulate the Sale of Concealed Weapons in North Carolina, ch. 197, §§1, 5.
§ 1. That it shall be unlawful for any person, firm, or corporation in this State to sell, give away or dispose of, or to purchase or receive, at any place within the State from any other place within or without the State, without a license or permit therefor shall have first been obtained by such purchaser or receiver from the clerk of the Superior Court of the county in which such purchase, sale, or transfer is intended to be made, any pistol, so-called pump-gun, bowie knife, dirk, dagger or metallic knucksn[sic]. . . § 5. That each and every dealer in pistols, pistol cartridges and other weapons mentioned in section one of this act shall keep and accurate record of all sales thereof, including the name, place of residence, date of sale, etc., of each person, firm, or corporation, to whom or which any and all such sales are made, which said record shall be open to the inspection of any duly constituted State, county or police officer, within this State.

## NORTH DAKOTA

1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or

**App. 0300**

Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5.

§ 1. Any person other than a public officer, who carries concealed in his clothes any instrument or weapon of the kind usually known as a black-jack, slung-shot, billy, sand club, sand bag, bludgeon, metal knuckles, or any sharp or dangerous weapon usually employed in attack or defense of the person, or any gun, revolver, pistol or other dangerous fire arm loaded or unloaded, or any person who carries concealed nitro-glycerin, dynamite, or any other dangerous or violent explosive, or has the same in his custody, possession or control, shall be guilty of a felony, unless such instrument weapon or explosive is carried in the prosecution of or to effect a lawful and legitimate purpose. § 2. The possession, in the manner set forth in the preceeding Section, of any of the weapons or explosives mentioned therein, shall be presumptive evidence of intent to use the same in violation of this act. § 3. Penalty – Any person upon conviction of violating the provisions of this Act, shall, in the discretion of the court, be imprisoned in the State Penitentiary nor more than two years, or in the county jail not more than one year, or by a fine of not more than one hundred dollars, or by both such fine and imprisonment. Provided, however, that any citizen of good moral character may, upon application to any district court, municipal, or justice of the court, be granted the permission to carry a concealed weapon upon the showing of reasonable cause. . . . § 5. Emergency. An emergency is hereby declared to exist in that professional criminals are frequently found to carry concealed about their persons, the dangerous weapons or explosives mentioned in Section 1 of this Act. And, whereas, the present law is inadequate to prevent such criminals from carrying concealed weapons or explosives; therefore, this Act shall take effect and be in force from and after its passage and approval.


1923 N.D. Laws 379, 380-82 ch. 266

Sec. 2. Commiting Crime When Armed. If any person shall commit or attempt to commit a crime when armed with a pistol or revolver, and having no permit to carry the same, he shall be in addition to the punishment provided for the crime, be punished by imprisonment for not less than ten years.

Sec. 6. Carrying Pistol Concealed. No person shall carry a pistol or revolver concealed in any vehicle or in any package, satchel, grip, suit case or carry in any way or upon his person, except in his dwelling house or place of business, without a license therefor as hereinafter provided. Violations of this section shall be punished by imprisonment for not less than one year, and upon conviction the pistol or revolver shall be confiscated or destroyed.

Sec. 8. Issue of Licenses to Carry. The justice of a court of record, the chief of police of a city or town and the sheriff of a county, or persons authorized by any of them shall upon the application of any person having a bonafide residence or place of business within the jurisdiction of said licensing authority, or of any person having a bona fide residence or place of business within the United States and license to carry a fire arm concealed upon his person issued by the authorities of any State or sub-division of the United States, issue a license to such person to carry a pistol or revolver within this State for not more than one year from date of issue, if it appears that the applicant has good reason to fear an injury to his person or property or for any other proper purpose, and that he is a suitable person to be so licensed . . .

Sec. 10. SALES REGULATED. No person shall sell, deliver, or otherwise transfer a pistol or revolver to a person who he has reasonable cause to believe either is an unnaturalized foreign born person or has been convicted of a felony against the person or property of another, or against the Government of the United States or any State or subdivision thereof, nor in any event

App. 0301

shall he deliver a pistol or revolver on the day of the application for the purchase thereof, and when delivered, said pistol or revolver shall be securely wrapped and shall be unloaded. Before a delivery be made the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, sign and forward by registered mail one copy thereof to the Secretary of State, and one copy thereof to the chief of police of the city or town, or the sheriff of the county of which the seller is a resident, and shall retain the other copy for six years. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall be punished by a fine of not less than $100 or imprisonment for not less than one year, or by both such fine and imprisonment.

Sec. 11. DEALERS TO BE LICENSED. Whoever, without being licensed as hereinafter provided, sells, or otherwise transfers, advertises, or exposes for sale, or transfers or has in his possession with intent to sell, or otherwise transfer, pistols or revolvers, shall be punished by imprisonment for not less than two years.

Sec. 12. DEALERS' LICENSES: By WHOM GRANTED, AND CONDmoNs THEREOF.) The duly constituted licensing authorities of any city, town or subdivision of this state, may grant licenses in form prescribed by the Secretary of State, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political subdivision, pistols and revolvers, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

   The business shall be carried on only in the building designated in the license.

   The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

   No pistol or revolver shall be delivered-

(a) On the day of the application for the purchase, and when delivered shall be unloaded and securely wrapped; nor

(b) Unless the purchaser either is personally known to the seller or shall present clear evidence of his identity; nor

(c) If the seller has reasonable cause to believe that the purchaser either is an unnaturalized foreign born person or has been convicted of a felony against the person or property of another, or against the Government of the United States or any State or subdivision thereof.

   A true record, in triplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Secretary of State, and shall be personally signed by the purchaser and by the person affecting the sale, each in the presence of the other, and shall include the date of sale, the caliber, make, model, and manufacturer's number of the weapon, the name, address, occupation, and nationality of the purchaser. One copy of said record shall, within seven days, be forwarded by registered mail to the Secretary of State and one copy thereof to the chief of police of the city or town or the sheriff of the county of which the seller is a resident, and the other copy retained for six years.

   No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed in any part of said premises where it can readily be seen from the outside.

1925 N.D. Laws 216–17, Pistols and Revolvers, ch. 174, § 2.

**App. 0302**

§ 2 Committing Crime When Armed. If any person shall commit, or attempt to commit, a crime when armed with a pistol or revolver, and has no permit to carry the same, he may be punished by imprisonment for not more than ten years, in addition to the punishment provided for the crime. Such imprisonment, if not exceeding one year, to be in the County jail, and if exceeding one year to be in the State Penitentiary.

1931 N. D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.
§ 1. The term "machine gun, sub-machine gun or automatic rifle" as used in this act shall be construed to mean a weapon mechanism or instrument not requiring the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second. § 2. Any person who shall sell, give, loan, furnish or deliver any machine gun, sub-machine gun, automatic rifle of a caliber larger than twenty-two, or a bomb loaded with explosives or poisonous or dangerous gases to another person, or any person who shall purchase, have or possess any machine gun, sub-machine gun¸ automatic rifle, or a caliber larger than twenty-two or a bomb loaded with explosives or poisonous or dangerous gases, shall be guilty of a felony and shall be punished by imprisonment in the state penitentiary not to exceed ten years, or by a fine of not more than three thousand dollars, or both. Provided, that the provisions of this act shall not apply to any person who has procured and possesses a license to purchase, sell, have or possess a machine gun, sub-machine gun, automatic rifle, of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases, as hereinafter provided for, nor to the authorized agents and servants of such licensee or to the officers and members of any duly authorized military organization, nor to the officers and members of the police force of any municipality, nor to any Sheriff, deputy sheriff, nor any other officer having police powers under the laws of the State.


## OHIO

The Act of Incorporation, and the Ordinances and Regulations of the Town of Marietta, Washington County, Ohio Page 17-18, Image 17-18 (1837) available at The Making of Modern Law: Primary Sources. 1823
[Ordinances of Marietta, Ohio; An Ordinance For Preventing the Wanton Use of Fire Arms, Etc., § 1. Be it ordained by the Town of Marietta, in Town meeting legally assembled, and by the authority thereof it is ordained and enacted , That if any person, after this ordinance takes effect, shall discharge or explode, or aid or assist in discharging or exploding any gun powder, from guns, fire arms, or by any other means, within the limits of the town plot of Marietta, where by the quiet of any of the inhabitants may be disturbed, or their lives and safety endangered (unless such firing shall by authorized by permission in writing from the town council then in office, or by the command of some military officer in discharge of his duty as such,) the person so offending may be complained of before any justice of the peace for the town and upon conviction, shall be fined by such justice not than less one dollar (sic), nor more than five dollars for the first offence, and for the second and all subsequent offences against this ordinance, such person shall be fined not less than five, nor more than ten dollars, and pay all costs, to be collected as other penalties by law are. . .

App. 0303

An Act Incorporating the City of Cincinnati: And a Digest of the Ordinances of Said City, of a General Nature, Now in Force, with an Appendix Page 57-58, Image 58-59 (1835) available at The Making of Modern Law: Primary Sources. 1835
Ordinances of the City of Cincinnati, An Ordinance to Regulate the Keeping of Gunpowder, § 1. Be it ordained by the City Council of the City of Cincinnati, That no person or persons in the city of Cincinnati, shall keep, have, or possess, in any house, warehouse, shop, shed, or other building, nor in any street, side walk, lane, alley, passage, way, or yard, nor in any cellar, wagon, cary, or carriage, of any kind whatever; nor in any other place, within said city, Gun Powder, in any way or manner, other than as provided for by this ordinance; nor in any quantity exceeding twenty-five pounds, to be divided into six equal parts. § 2. Be it further ordained, That it shall not be lawful for any person or persons to sell gun powder by retail within said city, without having first obtained a license from the city council for that purpose; and every person obtaining a grant for a license to sell gun powder, shall receive a certificate of such grant from the city clerk, and pay into the city treasury, a sum not exceeding one hundred dollars, nor less than ten dollars; besides fifty cents to the Mayor for issuing the same; Provided that license be granted to not more than four persons in any one ward, and so that they be separated from each other, by at least two entire blocks or squares; and all applications for such license, shall be in writing, stating the situation where such gunpowder is to be kept. § 3. Be it further ordained, That every person who obtains a license as aforesaid to retail gun powder, shall keep the same in tin canisters, well secured with good and sufficient covers; and shall place on the store or building containing the same, a sign with the words, LICENSED TO SELL GUN POWDER, Provided that nothing in this ordinance shall be so construed to prevent any person from carrying gun powder through the streets in its exportation, or to some place of deposit, without the limits of the corporation, if the same be put up in tight and well secured kegs or vessels. § 4. Be it further ordained, That it shall be the duty of the city marshal and his deputies, and any of the fire wardens, on any day, (Sundays excepted) between sun rising and setting, to enter into any house or building, or any other place within said city, where gun powder is kept or suspected to be kept, and examine the premises, and if they or either of them shall find any gun powder, contrary to the provisions of this ordinance, they or either of them shall seize such powder, together with the vessel containing the same, in the name of the city of Cincinnati; and the officer making such seizure, if he be other than the marshal, shall forthwith report such seizure to the marshal, who shall immediately take charge of the gun powder so seized, as if in case of seizure by himself; and in either case he shall immediately take charge of the gun powder so seized; to be conveyed to some safe place of deposit without the limits of the city. And the marshal shall, moreover, forthwith report such seizure to the mayor, with the name of the person in whose possession such gun powder was seized, or with the name of the owner, if his name be known, whereupon the mayor shall issue a citation against the owner, if known and within his jurisdiction, and if not, then against the person whose possession such gunpowder was seized, citing the defendant to appear on a day to be named in such citation, and show cause, if any he have, why the gun powder so seized should not be forfeited to the city, and a fine imposed agreeably to the provisions of this ordinance; upon which citation proceedings shall be had as in other cases upon the city ordinances, and if a final judgment of forfeiture be pronounced against the gun powder so seized, the marshal shall proceed to sell and dispose of the same for the benefit of said city, after having given three days notice of such sale, by advertisement in at least three public places in the city, and at one of the market houses on market day, to the highest bidder; and the net

proceeds thereof shall be credited on the execution against the person fined for keeping the same contrary to the provisions of this ordinance: Provided, that, of any lot of powder seized according to the provisions of this ordinance, not more shall be sold by the marshal than will pay the fine and costs of suit and expense attending the seizure.

George W. Malambre, Laws and General Ordinances of the City of Dayton, Containing the Laws of the State upon Municipal Government; All the General Ordinances in Force August 30th, 1855; a List of the Officers of the City under the New Act of Incorporation, Together with the Amount of Taxes Levied in Each Year for General and Special Purposes, since 1851, and the Total Amount in Each Year, of Property Subject to Taxation Page 214, Image 219 (1855) available at The Making of Modern Law: Primary Sources. 1855
Ordinances of the City of Dayton. Offenses. § 38. Sec. XXXIX. If any person, or persons, shall fire any cannon, gun, or other firearms, within the bounds of the building lots, or cemetery ground in this city, or within one hundred yards of any public road, within this corporation, except by permission of council, and except in proper situations for firing salutes, or by command of a military officer in performance of military duty, every person, so offending, on conviction thereof, shall pay a fine not exceeding ten dollars, and costs.

W. H. Gaylord, Standing Rules of Order of the Cleveland City Council: With a Catalogue of the Mayors and Councils of the City of Cleveland, from Its Organization, April, 1836, to April, 1871, and Officers of the City Government for 1872 Page 101, Image 124 (1872) available at The Making of Modern Law: Primary Sources. 1856
[Ordinances of the City of Cleveland,] An Ordinance to Prevent the Firing of Guns and Fire-works, § 1. Be it ordained by the City Council of the City of Cleveland, That no person shall fire any cannon, gun, rifle, pistol, or fire-arms of any kind, or fire or explode any squib, rocket, cracker, Roman candle, or other combustible fire-works within the city. § 2. This ordinance shall not apply to any military company, when drilling under command of any officer thereof, or to the use of fire-arms in the lawful defense of the person, family or property of any person, or to the killing of any dog whose owner or possessor has not complied with the provisions of the ordinance relating to dogs. § 3. The board of city improvements may, at its discretion, give permission to any person or persons to discharge fire-arms or fire-works on the fourth day of July; such permission may be given through any public paper of the city, or otherwise. § 4. That any person violating any provision of this ordinance shall, on conviction thereof, be fined in any sum not exceeding twenty dollars.

1878 Ohio Laws 199, An Act to Amend, Revise, and Consolidate the Statutes Relating to Municipal Corporations, to Be Known as Title Twelve, Part One, of the Act to Revise and Consolidate the General Statutes of Ohio, div. 3, ch. 3, § 1, pt. 14.
To regulate the transportation and keeping of gunpowder, and other explosive and dangerous combustibles, and to provide or license magazines for the same.

M. Augustus Daugherty, Supplement to the Revised Statutes of the State of Ohio Containing All the Statutes Amendatory of or Supplementary to the Revised Statutes, Together with the Miscellaneous Acts, General or Permanent in Their Nature, In Force January 1, 1884. 3d ed. Edited by James M. Williams Page 633, Image 641 (1884) available at The Making of Modern Law: Primary Sources. 1884

**App. 0305**

Licenses, § 24. All vendors of gunpowder shall pay a license fee of fifteen (15) dollars per annum. All keepers or owners of gunpowder magazines shall pay a license fee of one hundred (100) dollars per annum.

1889 Ohio Laws 164, An Act to Amend Section 2669 of the Revised Statutes, as Amended April 22, 1885, § 1.
The council of the city or village may provide by ordinance for licensing all exhibiters of shows or performances of any kind, not prohibited by law, hawkers, peddlers, auctioneers of horses and other animals on the highways or public grounds of the corporation, venders [sic] of gun powder and other explosives, taverns and houses of public entertainment, and hucksters in the public streets or markets, and in granting such license, may extract and receive such sum of money as it may think reasonable[.]

1900 Ohio Laws 730, An Act to Provide a License on Trades, Business and Professions Carried on . . . , §§24-25.
§ 24. All keepers or owners of gun powder magazines shall pay a license fee of one hundred dollars ($100) per annum, and shall notify the chief of the fire department, in writing, of the place where the same is kept or stored; but no license shall be issued under this section without the consent of the mayor. § 25. All keepers of shooting galleries shall pay a license fee of fifty dollars ($50) per annum, or for a less period of one year at a rate of ten dollars ($10) per month, no license to be issued for a less period than one month.

1902 Ohio Laws 23, Extraordinary Sess.,  An Act to Provide for the Organization of Cities and Incorporated Villages . . . and to Repeal All Sections of the Revised Statutes Inconsistent Herewith, § 7, pt. 11.
To regulate the transportation, keeping and sale of gunpowder and other explosives or dangerous combustibles and materials and to provide or license magazines for the same.

1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.
That § 12819 of the General Code be supplemented . . . to read as follows:  Definitions. § 12819-3. For the purpose of this act, a machine gun, a light machine gun or a sub-machine gun shall be defined as any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading. Automatically as above used means that class of firearms which, while the trigger on the firearm is held back continues to fire successive shots. Semi-automatically means that class of firearm which discharges one shot only each time the trigger is pulled, no manual reloading operation being necessary between shots. Machine gun permit; application; bond or applicant; exceptions. § 12819-4. No person shall own, possess, transport, have custody of or use a machine gun, light machine gun or sub-machine gun, unless he first procures a permit therefor from and at the direction of the adjutant general of Ohio, who shall keep a complete record of each permit so issued. A separate permit shall be obtained for each gun so owned, possessed or used. The adjutant general shall require each applicant for such permit to give an accurate description of such weapon, the name of the person from whom it was or is to be obtained, the name of the person or persons to have custody thereof and the place of residence of the applicant and custodian. Before obtaining such permit each applicant shall give bond to the state of Ohio, to be approved by the adjutant general in the sum of five thousand

dollars, conditioned to save the public harmless by reason of any unlawful use of such weapon while under the control of such applicant or under the control of another with his consent; and any person injured by such improper use may have recourse on said bond. Provided, however, that this section shall not affect the right of the national guard of Ohio, sheriffs, regularly appointed police officers of incorporated cities and villages, regularly elected constables, wardens and guards of penitentiaries, jails, prisons, penal institutions or financial institutions maintaining their own police force and such special officers as are now or may be hereafter authorized by law to possess and use such weapons when on duty.  Any person who owns, possesses or has custody of a machine gun, light machine gun or sub-machine gun at the time when this section shall become effective, shall have thirty days thereafter in which to comply with the provisions of this section. Penalty for possession, transportation, etc., without permit. § 12819-5. Whoever owns, possesses, transports or has custody of or uses a machine gun, light machine gun or sub-machine gun without a permit, as provided by section 12819-4 of the General Code, or whoever having such permit, uses or consents to the use by another of such weapon in an unlawful manner, shall be guilty of a felony and upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than ten years. [War trophies excepted].

## OKLAHOMA

General Laws Relating to Incorporated Towns of Indian Territory Page 43, Image 39 (1890) available at The Making of Modern Law: Primary Sources. 1890
Revised Ordinances of the Town of Checotah, [An Ordinance Requiring Persons Engaged in Certain Businesses or Avocations to Procure a License for so Doing and Providing of Penalty for Failure so to do, § 1. That the licenses hereinafter named shall be fixed, imposed and collected at the following rates and sums, and it shall be unlawful for any person or persons to exercise or pursue any of the following avocations or businesses within the corporate limits of Checotah without having first obtained a license therefor from the proper authority, having paid for the same in lawful money of the united States as hereinafter provided,] 29th. Pistol or shooting Gallery – For each and every pistol and shooting gallery, per month, five dollars.

## OREGON

Charter of the City of Portland, Street and Fire Department Laws, Ordinances, Regulations &C. Page 205-206, Image 206-207 (1872) available at The Making of Modern Law: Primary Sources. 1868
[Concerning Offences and Disorderly Conduct, § 2. That any person or persons who shall fire any pistol, gun or rifle, or any other species of fire-arms within the following limits: the Willamette river on the east and (10) Tenth Street on the west, Caruther's Addition on the south nd F Street on Couch's Addition on the north, shall on conviction thereof before the Recorder, be subject to a penalty of not less than five nor more than fifty dollars, or imprisonment, at the discretion of the Recorder, not exceeding twenty days. Provided that the Marshal shall permit upon the national holidays and other days of public celebration, any appropriate display of fire-arms and other instruments named in this section.]

App. 0307

Charter of the City of Portland, Street and Fire Department Laws, Ordinances, Regulations &C. Page 225-227, Image 226-228 (1872) available at The Making of Modern Law: Primary Sources. 1872

Ordinances of the City of Portland, To Regulate the Storage and Sale of Gunpowder, and Other Explosive Materials, § 1. No person shall keep for sale any gunpowder in any building, store or place in the City of Portland, without having first obtained a license therefor. § 2. The license for selling gunpowder shall be five dollars per quarter, to be issued as other licenses are issued under the provisions of Ordinance 984, entitled "An Ordinance to impose and regulate licenses in the City of Portland." § 3. No person shall receive, keep or store, or aid or assist any person in receiving, keeping or storing gunpowder in a larger quantity than five pounds, in or into any building, or upon any premises, unless the person receiving, keeping or storing the same is duly licensed to sell gunpowder. § 4. No person or persons duly authorized to sell gunpowder, as hereinbefore provided, shall keep, store, or have in any one place more than twenty five pounds of powder, which shall be kept in any air-tight metallic vessel marked with the word "Gunpowder," in plain Roman letters, not less than three inches in height, and of proportionate width, which vessel shall be placed or kept at all times, conspicuously in view near the entrance of the premises where kept, and convenient for removal therefrom. § 5. Upon the front of every building or premises where powder is kept in a conspicuous place a sign with the word "gunpowder" painted thereon in Roman letters, not less than three inches in height. § 6. No person shall convey, cause to be conveyed, or assist in conveying in any vehicle and gunpowder, unless the same shall be securely packed in close packages, nor unless such packages shall be securely covered while on the vehicle. § 7. No vessel shall be allowed to remain at any wharf more than twenty-four hours with gunpowder on board, except such as may be kept for ship's use, and if such vessel shall be at the wharf overnight, a watchman shall be kept on duty on board all night. All gunpowder landed or placed on a wharf, sidewalk, street or public way for forwarding or shipment shall be forwarded or shipped immediately after it shall be so landed or placed. § 8. The provisions of this Ordinance shall be deemed to apply to "giant powder" "gun cotton" or any other explosive substance having an explosive power equal to that of ordinary gunpowder. § 9. Any person or persons violating any of the provisions of this ordinance, shall be deemed guilty of a misdemeanor, and on conviction before the Police Judge, shall be fined not less than ten nor more than one hundred dollars, or by imprisonment in the city jail not less than two nor more than twenty days, or both, at the discretion of the Police Judge. § 10. The officers of the Fire Department and Police are directed to see that the provisions of this Ordinance are enforced, and to make complaint before the Police Judge for the violation of its provisions.

J.C. Moreland, Charter and Ordinances of the City of Portland and Table of Grades: Together with the Rules of Order, Reports of officers, etc. Page 207, Image 212 (1879) available at The Making of Modern Law: Primary Sources. 1879

Ordinances [of the City of Portland], Concerning Offenses and Disorderly Conduct, § 2. The City of Portland does ordain as follows… That any person or persons who shall fire any pistol, gun or rifle, or any other species of fire-arms, within the corporate limits of the city, shall, on conviction thereof before the Police Court, be fined not less than five dollars nor more than fifty dollars: Provided, That all circumstances of necessity may be plead as a defense to the offense described in this section; and, provided further, that the Chief of Police may permit upon the national holidays and other days of public celebration any appropriate display of firearms named in this section.

App. 0308

The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order Page 259, Image 261 (1898) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Oregon | 1898

An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.

It shall be unlawful for any person to carry any sling shot, billy, dirk, pistol or any concealed deadly weapon or to discharge any firearms, air gun, sparrow gun, flipper or bean shooter within the corporate limits of the city, unless in self-defense, in protection of property or an officer in the discharge of his duty; provided, however, permission may be granted by the mayor to any person to carry a pistol or revolver when upon proper representation it appears to him necessary or prudent to grant such permission.


1913 Or. Laws 497

Section 1. It shall be unlawful for any person, firm or corporation to display for sale at retail any pocket pistol or revolver or to sell at retail, barter, give away or dispose of the same to any person whomsoever, excepting a policeman, member of the militia or peace officer of the State of Oregon, unless the purchaser or person attempting to procure the same shall have a permit for the purpose of procuring such pocket pistol or revolver signed by the municipal judge or city recorder of the city or county judge or a justice of the peace of the county wherein such person resides.

Section 2. Provided, that no judge, city recorder or justice of the peace shall issue such permit until said applicant has furnished him with an affidavit from at least two reputable freeholders as to the applicant's good moral character.

Section 3. All persons, firms or corporations engaged in the retail sale of pocket pistols or revolvers shall keep a record of the sale of such pocket pistols or revolvers by registering the name of the person or persons and the number of the pocket pistol or revolver and shall transmit same to the sheriff of the county in which purchase is made on the 1st and 15th day of each calendar month.


1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 9.

Section 1. No person shall carry in any city, town, or municipal corporation of this State any pistol, revolver or other firearm concealed upon his or her person, or of a size which may be concealed upon his or her person, without a license or permit therefor, issued to him or her by a chief of police or sheriff of such city, town or municipal corporation, or in such manner as may be prescribed by ordinance of such city, town or municipal corporation. This section, however, shall not apply to sheriffs and their deputies, constables, marshals, police officers or any other duly appointed peace officers, nor to any person or persons summoned by such officers to assist in making arrest or preserving the peace while said person or persons are engaged in assisting such officers; nor to duly authorized military organizations when parading, nor to members thereof when going to and from places of meeting of their respective organizations.

App. 0309

Section 3-A. Any person who violates the provisions of Section 1, Section 2, or Section 3 of this Act, shall be fined in a sum no greater than $100.00, or be imprisoned in the county jail for a term no longer than three months, or by both such fine and imprisonment.

Section 4. Any person who violates the provisions of Section 1, Section 2 or Section 3 of this Act, who theretofore has once been convicted of a violation of any of said sections, is guilty of a misdemeanor, and upon conviction thereof shall be imprisoned in a county jail or reformatory for not less than thirty days nor for more than one year.

Section 4-A. Any person who violates the provisions of Section 1, Section 2 or Section 3 of this Act, who theretofore has more than once been convicted of a violation of any of said sections, is guilty of a felony, and shall be punished by imprisonment in the State prison for a term not exceeding three years.

Section 4-B. Any person who violates any of the provisions of Section 1, Section 2 or Section 3 of this Act, who theretofore has been convicted of a felony, upon conviction thereof shall be imprisoned in the penitentiary of this State for a period not exceeding five years.

Section 4-C. For the purposes of this Act any pistol, revolver, or other firearm of a size which may be concealed upon his or her person shall be deemed a dangerous weapon.

Section 9. It shall be lawful for the sheriff of any county, chief of police, city or town marshal, or other head of the police department of any city, town or other municipal corporation of this State, upon proof before him that the person applying therefor is of good moral character, and that proper cause exists for the issuance thereof, to issue to such person a license for one year, to have and carry concealed a pistol, revolver or other firearm; provided, however, that no such license shall be issued to any person under the age of twenty-one years.

The person obtaining a permit to carry a concealed pistol or revolver shall pay to the officer issuing such permit the sum of One Dollar. Said license for carrying a concealed pistol or revolver is revocable at any time and must be immediately surrendered on demand. The license while in force entitles the holder to carry the said arm in any county in the State of Oregon.

1925 Or. Laws 468, 469-471

Section 5. Except as otherwise provided in this act, it shall be unlawful for any person within this state to carry concealed upon his person or within any vehicle which is under his control or direction any pistol, revolver or other firearm capable of being concealed upon the person without having a license to carry such firearm, as hereinafter provided in section 8 hereof. Any person who violates the provisions of this section shall be guilty of a misdemeanor, and if he has been convicted previously of any felony, or of any crime made punishable by this act, he is guilty of a felony. This section shall not be construed to prohibit any citizen of the United States, over the age of eighteen years, who resides or is temporarily sojourning within this state, and who is not within the excepted classes prescribed by section 2 hereof, from owning, possessing or keeping within his place of residence or place of business any pistol, revolver or other firearm capable of being concealed upon the person, and no permit or license to purchase, own, possess or keep any such firearm at his place of residence or place of business shall be required of any such citizen. Firearms carried openly in belt holsters shall not be deemed to be concealed within the meaning of this section.

## **PENNSYLVANIA**

Charter To William Penn, And Laws Of The Province Of Pennsylvania, Passed Between The Years 1682 And 1700 Page 32, Image 37 (1879) available at The Making of Modern Law: Primary Sources. 1676
Laws of the Duke of York, Indians (1676). No person shall sell give or barter directly or indirectly any gun or guns powder, bullet, shot, lead nor any vessel of burthen, or row boat canoes only excepted without license first had and obtained under the Governor's hand and Seal, to any Indian whatsoever, nor to any person inhabiting out of this government nor shall amend or repair any gun belonging to any Indian, nor shall sell any armor or weapons, upon penalty of ten pounds for every gun, armor, weapons, vessel or boat, so sold given or bartered, five pounds for every pound of shot or lead and proportionally for any greater or lesser quantity.

Pennsylvania Archives. Selected And Arranged From Original Documents In The Office Of The Secretary Of The Commonwealth, Conformably To Acts Of The General Assembly, February 15, 1851, & March 1, 1852 Page 160, Image 162 (1852) available at The Making of Modern Law: Primary Sources. 1713
Pennsylvania Archives 1713, The Act for the Better Government of the City of Philadelphia (1713), This Act inflicts 5s penalty on persons riding a gallop and 10s for persons trotting, with Drays or their Teams in the streets, and 5th for suffering a Dog or a Bitch going at large; or firing a Gun without license, or if a Negro be found in any disorderly practices or other Misbehaviors may be whipped 21 lashes for any one offence or committed to prison, which words "other misbehaviors," are very uncertain and give very arbitrary power where the punishment is great. [(Summary of Statute from Archive compilation)].

Act of 26th August 1721. 1721
[An Act of 9th of February, 1750-51, § 1. If any person or persons whatsoever, within any county, town or within any other town or borough in this province, already built and settled, or hereafter to be built and settled , not hitherto restricted nor provided for by our laws, shall set on fire their chimneys to cleanse them, or shall suffer them or any of them to take fire, and blaze out at the top, or shall fire any gun or other fire arm, or shall make or cause to be made, or sell or utter, or offer to expose to sale, and squibs, rockets, or other fire works, or shall cast, throw or fire any squibs, rockets, or other fire works within any of the said towns or boroughs without the governor's special license for the same, every such person or persons so offending shall be subject to the like penalties and forfeitures, and be recovered in like manner, as in and by an act, passed in the eighth year of the reign of king George the first, entitled 'An act for preventing accidents that may happen by fire are directed to be levied and recovered.]

John C. Lowber, Ordinances of the Corporation of the City of Philadelphia; to Which are Prefixed, the Original Charter, the Act of Incorporation, and Other Acts of Assembly Relating to the City; with an Appendix, Containing the Regulation of the Bank of the River Delaware, the Portraiture of the City, as Originally Laid Out by the Proprietor, &c. &c. Page 15-16, Image 18-19 (1812) available at The Making of Modern Law: Primary Sources. 1721
[An Act for Preventing Accidents that may Happen by Fire, § IV. And whereas much mischief may happen by shooting of guns, throwing casting and firing of squibs, serpents, rockets, and other fire-works, within the city of Philadelphia, if not speedily prevented: Be it therefore enacted, That if any person or persons, of what sex, age, degree or quality soever, from and after publication hereof, shall fire any gun or other fire-arms, or shall make, or cause to be made, or

sell or utter, or offer to expose to sale, any squibs, rockets or other fire works, or shall cast, throw or or fire, any squibs, rockets, or other fire works, within the city of Philadelphia, without the governor's special license for the same, of which license due notice shall first be given to the mayor of the said city, such person or persons so offending, and being thereof convicted before any one justice of the peace of the said city, either by confession of the party so offending, or by the view of any of the said justices, or by the oath or affirmation of one or more witnesses, shall for every such offence forfeit and pay the sum of five shillings; one half to the use of the poor of the said city, and the other half to the use of him or them who shall prosecute, and cause such offender to be as aforesaid convicted; which forfeitures shall be levied by distress and sale of the offenders goods as aforesaid; and for want of such distress, if the offender refuse to pay the said forfeiture, he shall be committed to prison, for every such offence the space of two days without bail or main-prize; Provided, that such conviction be made within ten days after such offence committed [ and if such offender be a negro or Indian slave, he shall instead of imprisonment be publically whipped, at the discretion of the magistrate.]

1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries
That if any persons or persons whatsoever, within any county town, or within any other town or borough, in this province, already built and settled, or hereafter to be built and settled . .. shall fire any gun or other fire-arm, or shall make or cause to be made, or sell or utter, or offer or expose for sale, any squibs, rockets or other fire-works, … within any of the said towns or boroughs without the Governor's special license for the same, every such person or persons, so offending shall be subject to the like penalties and forfeitures, and to be recovered in like manner, as in and by an act, passed in the eighth year of the reign of King George the first, entitled, An act for preventing accidents that may happen by fire, are directed to be levied and recovered.

Ordinances of the Corporation of the District of Southwark and the Acts of Assembly Relating Thereto Page 49, Image 47 (1829) available at The Making of Modern Law: Primary Sources. 1750
[Ordinances of the District of Southwark,] An Act for the More Effectual Preventing [of] Accidents, etc. § 1. Be it enacted, That if any person shall fire any gun or other fire-arm, or shall make, or cause to be made, or sell or utter, or offer to expose to sale, any squibs, rockets or other fire-works, or shall cast, throw or fire any squibs, rockets or other fire-works, within any of the said towns or boroughs, without the Governor's special license for the same, every such person or persons, so offending, shall be subject to the like penalties and forfeitures, and to be recovered in like manner, as in and by an act, passed in the eighth year of the reign of King George the first, entitled, " An Act for Preventing Accidents, Etc

1763 Pa. Laws 319, An Act to Prohibit the Selling of Guns, Gunpowder or Other Warlike Stores to the Indians, § 1.
If any person or persons whatsoever shall directly or indirectly give to, sell barter or exchange with any Indian or Indians whatsoever any guns, gunpowder, shot, bullets, lead or other warlike stores without license . . . every such person or persons so offending, being thereof legally convicted . . . shall forfeit and pay the sum of five hundred pounds . . . and shall be whipped with

**App. 0312**

thirty-nine lashes on his bare back, well laid on, and be committed to the common gaol(jail) of the county, there to remain twelve months without bail or mainprise.

An Act of Incorporation for that Part of the Northern Liberties, Lying between the Middle of Sixth Street and the River Delaware, and between Vine Street and Cohocksink Creek, with Ordinances for the Improvement of the Same Page 51, Image 52 (1824) available at The Making of Modern Law: Primary Sources. 1824
[An Ordinance for the Suppression of Nuisance, and for the regulation of drivers of carriages and horses, in and through the streets, lanes and alleys, within the incorporated part of the township of the Northern Liberties, and for enforcing useful regulations therein.] § 8. And be it further ordained and enacted by the authority aforesaid, That no person or persons shall fire, or discharge any cannon, or piece of artillery, or small arms, or prove any pistol, gun, musket barrels, or cannon, or illuminate, or cause to be illuminated, any house within the regulated parts, incorporated as aforesaid, in said township, without permission from the president of the board of commissioners, under the penalty of forfeiting and paying for every piece of cannon or other artillery, or small arms, or pistol, gun, or musket barrel so fired, or house so illuminated, the sum of two dollars.

1903 Pa. Laws 178, An Act Requiring non-resident hunters, and unnaturalized, foreign born, resident-hunters, to procure a license before hunting in the Commonwealth … §§1 and 2
§ 1. . . . every non-resident and every unnaturalized foreign-born resident of this Commonwealth shall be required to take out a license from the treasurer of the county in which he proposes to hunt. . . § 2. Possession of a gun, in the fields or in the forests or on the waters of this Commonwealth, by an unnaturalized, foreign-born resident or a non-resident of this Commonwealth, without having first secured the license required by this act, shall be prima facie evidence of a violation of its provisions; and any person so offending shall be liable to a penalty of twenty-five dollars for each offense. . .

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: §§1 and 2
§ 1. Be it enacted, etc., That the term "machine gun" as used in this act, shall mean any firearm that fires two or more shots consecutively at a single function of the trigger or firing device. § 2. It shall be unlawful for any person, copartnership, association or corporation to sell, or give, or transfer, any machine gun to any person, copartnership, association or corporation within this Commonwealth; and it shall be unlawful for any person, copartnership, association, or corporation to purchase, own or have in possession any machine gun. Any person violating any of the provisions of this section shall be guilty of a felony, and, on conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding five years. § 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall, upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence. § 4. Nothing contained in this act shall prohibit the manufacture for, and sale of, machine guns to the

App. 0313

military forces of the United States, or of the Commonwealth of Pennsylvania, or to any police department of this Commonwealth, or of any political subdivision thereof, nor to the purchase or possession of machine guns by such governments and departments; and nothing contained in this act shall prohibit any organization, branch, camp or post of veterans, or any veteran of any war in which the United States was engaged, from owning and possessing a machine gun as a relic, if a permit for such ownership or possession has been obtained from the sheriff of the county, which permit is at all times attached to such machine gun. The sheriffs of the several counties are hereby authorized, upon application and the payment of a fee of one dollar, to issue permits for the ownership and possession of machine guns by veteran and organizations, branches, camps or posts of veterans and organizations, branches, camps or posts of veterans, upon production to the sheriff of such evidence as he may require that the organization, branch, camp or post is a bona fide organization of veterans, or that any such veteran applicant is a veteran of good moral character and reputation, and that the ownership and possession of such machine gun is actually desired as a relic.

1931 PA. Laws 498, No. 158
Sec. 4. No person who has been convicted in this Commonwealth or elsewhere of a crime of violence shall own a firearm, or have one in his possession or under his control.
Sec. 5. No person shall carry a firearm in any vehicle or concealed on or about his person, except in his place of abode or fixed place of business, without a license therefor as hereinafter provided.

## **RHODE ISLAND**

The Charter and Ordinances of the City of Providence, Together with the Acts of the General Assembly Relating to the City Page 89-96, Image 89-96 (1854) Available at The Making of Modern Law: Primary Sources. 1821
An Act Regulating the Storage, Safe Keeping and Transportation of Gunpowder in the Town of Providence, (1821) § 2. And be it further enacted, That is shall not be lawful for any person or persons to sell any gunpowder which may at the time be within the town of Providence in any quantity, by wholesale or retail, without first having obtained from the town council of said town a license to sell gunpowder; and every such license shall be written or printed, and signed by the president of said council or their clerk, on a paper upon which shall be written or printed a copy of this act; and every such license shall be in force for one year from the date thereof, unless annulled by said council, and no longer; but such license may, prior to the expiration of that time, be renewed, by endorsement thereon, for a further term of one year, and so from year to year: provided, always, that the said town council may annul any such license, if in their opinion the person or persons licensed have forfeited the right of using the same by any violation of the law relative thereto; and every person who shall receive a license as aforesaid shall pay therefor the sum of five dollars, and on having the same renewed shall pay therefor the sum of one dollar, which shall be paid to the clerk of said council, for their use, for the purpose of defraying the expense of carrying this act into execution. § 3. And be it further enacted, That any person or persons who shall keep, have, possess or transport any gunpowder within the town of Providence, contrary to the provisions of this act, or who shall sell any gunpowder therein, without having a license therefor, then in force, shall forfeit and pay a fine of not less than twenty dollars, and not exceeding five hundred dollars, for each and every offence; and if any

**App. 0314**

gunpowder kept contrary to the provisions of this act shall explode in any shop, store, dwelling-house, ware-house or other building, or in any place in said town, the occupant, tenant or owner of which has not a license in force to keep and sell gunpowder therein, or which gunpowder shall have been kept in a manner contrary to the terms and conditions of such license, such occupant tenant or owner shall forfeit and pay a fine of not less than twenty dollars nor more than five hundred dollars. . . § 6. And be it further enacted, That the said firewards, or any of them, may enter the store or place of any person or persons licensed to sell gunpowder, to examine and ascertain whether the laws relating thereto are strictly observed; and also whenever there may be an alarm or fire; and in such last case may cause the powder there deposited to be removed to a place of safety, or to be destroyed by wetting or otherwise, as the exigency of the case may require; and it shall be lawful for any one or more of the firewards aforesaid to enter any dwelling house, store, building or other place in said town to search for gunpowder which they may have reason to suspect to be concealed or unlawfully kept therein; first having obtained from some justice of the peace of said town a search warrant therefor; which warrant any one of the justices of said town is hereby respectively authorized to issue, upon the complaint of such fireward or firewards, supported by his or their oath or affirmation. . . And be it further enacted, That all persons who wish have a license to keep and sell gunpowder within the town shall make application to the town council in writing, stating the place of business and whether they wish to sell by wholesale or retail, or both; and to each person or firm who may be approbated, a certificate of license shall be granted, on payment of the fee established by law. § 14. And be it further enacted, That every person or firm who may be licensed to sell gunpowder by retail, shall be allowed to keep in the place or building designated in the license, twenty-five pounds of gunpowder, and no more, at one time, which shall always be kept in tin or copper canisters, capable of containing no more than twelve and a half pounds each with a small aperture at the top, and a tin or copper cover thereto. § 15. And be it further enacted, That every person or firm who may be licensed to sell gunpowder by wholesale, shall provide and keep a tine or copper chest, with two handles and a tight cover, furnished with a hinge, and secured with a padlock, all of tin or copper chest, with two handles and a tight cover furnished with a hinge and secured padlock, all of tin or copper; such chest shall always be kept on the lower floor, on the right side of and close to the principal door or entrance from the street into the building so licensed, except when otherwise designated by the council and shall always be kept locked, except when powder is put in or taken out; and such person or firm, so licensed shall be allowed to deposit and keep, in such tin or copper chest, a quantity of gunpowder not exceeding four casks of twenty-five pounds each; the heads of each cask not to be opened, and each cask to be kept in a strong leather bag, closely tied and marked as aforesaid. § 16. And be it further enacted, that every person or firm licensed to keep and sell gunpowder as aforesaid, by wholesale or retail, shall have and keep a signboard placed over the door or building in which such powder is kept, on which shall be painted in Roman capitals the words "Licensed to sell Gunpowder"

1902 R.I. Pub. Laws 67, An Act in addition to chapter 40 of the General Laws, Entitled "Of the Town Council": § 1.
Town councils and city councils may from time to time make and ordain all ordinances and regulations for their respective towns, not repugnant to law, which they may deem necessary for the safety of their inhabitants from the manufacture, storage, keeping, having in possession, transportation, sale, or use of gunpowder, gun-cotton, dynamite, nitro-glycerine, nitro-gelatine, lyddite, chlorate of potash, picric acid, sodium calcium carbide, acetylene gas, gasoline gas, and

any and all other explosives and explosive chemicals; and may prohibit the manufacture, storage, keeping having in possession, transportation , sale , or use by any and all persons or persons of any or all said substances and gases in their respective towns, unless a license for the same shall be first obtained from the town council or board of aldermen, which license shall be for the term of one years from the date thereof unless sooner revoked by order of said town council or board of aldermen. Any person violating any provision of any such ordinance or regulation, or any such prohibition, shall be fined not less than twenty dollars nor more than one hundred dollars for each such offense.

1907 R.I. Pub. Laws 66, An Act for the Protection of Deer

§ 1. It shall be unlawful to pursue or shoot deer in this state except in accordance with the provisions of this act. § 2. Any person owning or occupying any farm or orchard and any person in his employ may, while on his own premises or the premises of his employer, kill any deer which shall be found destroying any crops, vegatables, or fruit trees belonging to such person or his employer: Provided, however, that no such person shall shoot any deer unless he has obtained from the secretary of state a permit so to do; and the secretary of state shall, upon application, issue to any responsible land owner, or his employees, a permit authorizing such person to shoot deer in accordance with the provisions of this section. No person shall pursue or shoot any deer except with a shot gun, or employ any missile larger than buck shot. § 3. Any person violating the provisions of this act shall be fined not less than one hundred dollars nor more than five hundred dollars for each offence.

1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: § § 1, 4, 5 and 6

§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly.

§ 2. If any person shall commit or attempt to commit a crime of violence when armed with or having available any firearm, he may in addition to the punishment provided for such crime of violence be punished as provided in this act. In the trial of a person for committing or attempting to commit a crime of violence the fact that he was armed with or had available a pistol without license to carry the same, or was armed with or had available a machine gun, shall be prima facie evidence of his intention to commit said crime of violence.

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act. § 5. The provisions of section four shall not apply to sheriffs, deputy sheriffs, the superintendent and members of the state police, prison

**App. 0316**

or jail wardens or their deputies, members of the city or town police force or other duly appointed law enforcement officers, nor to members of the army, navy or marine corps of the United States, or of the national guard, when on duty, or of organizations by law authorized to purchase or receive firearms from the United States or this state, nor to officers or employees of the United States authorized by law to carry a concealed firearm, nor to duly authorized military organizations when on duty, nor to members thereof when at or going to or from their customary places of assembly, nor to the regular and ordinary transportation of pistols as merchandise, nor to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business, or in moving goods from one place or abode or business to another. § 6. The licensing authorities of any city or town shall upon application of any person having a bona fide residence or place of business within such city or town, or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a license to such person to carry concealed upon his person a pistol within this state for not more than one years from date of issue, if it appears the applicant has good reason to fear an injury to his person or property or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed. The license shall be in triplicate, in form to be prescribed by the attorney-general and shall bear the fingerpring, name, address, description and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent to the attorney-general and the triplicate shall be preserved for six years by the licensing authorities issuing said license. A fee of two dollars may be charged and shall be paid for each license, to the officer issuing the same. Before issuing any such permit the applicant for the same shall be required to give bond to the city or town treasurer in the penal sum of three hundred dollars, with surety satisfactory to the authority issuing such permit, to keep the peace and be of good behavior. Every such permit shall be valid for one year from the date when issued unless sooner revoked. The fee charged for the issuing of such license or permit shall be applied in accordance with the provisions of section thirty-three of chapter 401 of the general laws.

§ 7. The attorney-general may issue a permit to any banking institution doing business in this state or to any public carrier who is engaged in the business of transporting mail, money, securities or other valuables, to possess and use machine guns under such regulations as the attorney general may prescribe.

§ 8. It shall be unlawful within this state to manufacture, sell, purchase or possess except for military or police purposes, any muffler, silencer or device for deadening or muffling the sound of a firearm when discharged.

## **SOUTH CAROLINA**

1731-43 S.C. Acts 168, § 23.  1740

It shall not be lawful for any slave, unless in the presence of some white person, to carry or make use of firearms or any offensive weapon whatsoever, unless such negro or slave shall have a ticket or license in writing from his master, mistress or overseer, to hunt and kill game, cattle, or mischievous birds or beasts of prey, and that such license be renewed once every month, or unless there be some white person of the age of 16 or upwards, in the company of such slave when he is hunting or shooting; or that such slave be actually carrying his masters arms to or

**App. 0317**

from his masters plantation, by a special ticket, for that purpose, or unless such slave be found in the day time actually keeping off rice birds, or other birds within the plantation to which such slave belongs, lodging the same gun at night within the dwelling house of his master, mistress or white overseer. And provided also that no negro or other slave shall have liberty to carry any guns, cutlass, pistol or other weapon abroad form at any time between Saturday evening after sunset and Monday morning before sunrise notwithstanding a license or ticket for so doing. And in case any person shall find any slave using or carrying fire-arms, or other offensive weapons, contrary to the true intention of this act; every such person may lawfully seize and take away such fire-arms or offensive weapons; but before the property of such goods shall be vested in the person who shall seize the same, such person shall, within 48 hours next after such seizure, go before the next justice of the peace, and shall make oath of the manner of the taking; and if such justice of the peace after such oath shall be made, or upon any other examination, he shall be satisfied, that the said fire-arms or other offensive weapons, shall have been seized according to the directions and agreeable to the true intent and meaning of this act, the said justice shall, by certificate under his hand and seal, declare them forfeited, and that the property is lawfully vested in the person who seized the same. Provided that no such certificate shall be granted by any justice of the peace until the owner or owners of such fire-arms or other offenisve weapons so to be seized as aforesaid, or the overseer or overseers who shall or may have the charge of such slave or slaves from, whom such fire-arms or other offensive weapons shall be taken or seized shall be duly summoned, to show cause (if any such they have) why the same should not be condemned as forfeited; or until 48 hours after the service of such summons and oath made of the service thereof before the said justice.

Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a Resolution of the Council Page 289, Image 299 (1802) available at The Making of Modern Law: Primary Sources. 1802
[Ordinances of the City of Charleston, An Ordinance for Appointing Commissioners of the Streets, Defining their Powers, and for other Purposes therein Mentioned, § 8. And be it further ordained by the authority aforesaid, That no person or persons, shall fire any squibs, crackers, or other fireworks, except at times of public rejoicing, and at such places as the intendant for the time being may permit, by license under his hand; nor burn any chips, shavings, or other combustible matters, in any of the streets, lanes, wharves, alleys, or open or enclosed lots of the city, nor fire any gun, pistol, or fire arms, within the limits of the city, except on occasion of some military parade, and then by the order of some officer having the command, under the penalty of ten dollars, for every such offense; nor shall any person or persons, raise or fly any paper or other kite, within the said city, under the said penalty of ten dollars.]

John E. Breazeale, The Revised Statutes of South Carolina, Containing the Code of Civil Procedure, and the Criminal Statutes. Also The Constitutions of the United States and of the State, and the Rules of the Supreme and of the Circuit Courts of the State Page 431, Image 529 (Vol. 2, 1894) available at The Making of Modern Law: Primary Sources. 1890
Chapter XXVIII Violations of the License Laws by Insurance and Other Companies, Emigrant Agents, owners or shows, etc., Persons Selling Pistols, etc. §490. No person or corporation within the limits of this State shall sell or offer for sale any pistol, rifle, cartridge or pistol cartridge less than .45 caliber, or metal knuckles, without first obtaining a license from the

App. 0318

county in which such person or corporation is doing business so to do. The County Board of Commissioners of the several Counties of this State are authorized to issue licenses in their respective Counties for the sale of pistols and pistol and rifle cartridges of less than .45 caliber, and metal knuckles, upon the payment to the County Treasurer by the person or corporation so applying for said license of the sum of twenty-five dollars annually; and any person who shall sell or offer for sale any pistol, or pistol or rifle cartridge of less than .45 caliber, or metal knuckles, without having obtained the license provided in this Section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine not exceeding five hundred dollars, or by imprisonment not exceeding one year, or both, at the discretion of the court.

1893 S.C. Acts 426, An Act To Amend An Act Entitled "An Act To Provide For A License For The Sale Of Pistols Or Pistol Cartridges Within The Limits Of This State", § 2
. . . That the County Commissioners of the Several Counties of the State be, and they are herby, authorized to issue licenses in their respective Counties for the sale of pistols and pistol cartridges upon the payment to County Treasurer by the person or corporation so applying for said licenses of the sum of twenty-five dollars annually.

1923 S.C. Acts 19-20, License Tax on Ammunition — Candy — Admissions — Regulations to have force of law.
That every person, firm or corporation doing business within the State of South Carolina and engaging in the business of selling at retail or in any individual instance selling to the final consumer, such articles as are named in this section, for the privilege of carrying on such business, shall be subject to the payment of a license tax which shall be measured by and graduated in accordance with the volume of sales of such person, firm or corporation as follows: (a) There shall be levied, assessed, collected and paid upon all ammunition, including shells for shotguns and cartridges for rifles, pistols, revolvers, automatic pistols, rifles and machine guns, and upon such shells and cartridges partially prepared for use but lacking powder or shot or other necessary constituent, and upon blank shells and cartridges (but not upon powder or shot or caps not prepared and not in form to use in modern firearms), when sold at retail or to the ultimate consumer, the following: Upon all shotgun or other shells, two ($2.00) dollars per thousand rounds; Upon all cartridges, twenty-five (25) caliber or greater, two ($2.00) dollars per thousand rounds. (b) The license taxes imposed upon ammunition shall be paid by stamps to be affixed and cancelled by the retailer or other final seller, and said stamps shall be affixed to the smallest container in which or from which articles are sold, as soon as the original packages are opened or broken, or if received in no other form than that in which sold, as soon as the containers are placed in the place of business of the retailer; in the case of articles inteneded for sale in the packages in which received from outside the State of South Carolina without opening or alteration of any sort, each package must be immediately marked with the date of receipt and the place from which received and no stamps need be affixed so long as such package remains unopened and unaltered.

1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns: §§ 1 to 6.
§ 1. "Machine gun" defined. – Be it enacted by the General Assembly of the State of South Carolina: For the purposes of this Act the word "machine gun" applies to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively

App. 0319

without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device. § 2. Transportation of Machine Gun. – It shall be unlawful for any person or persons in any manner to transport from one place to another in this State, or from any railroad company, or express company, or other common carrier, or any officer, agent or employee of any of them, or any other person acting in their behalf knowingly to ship or to transport form one place to another in this State in any manner or by any means whatsoever, except as hereinafter provided, any firearm as described hereinabove or commonly known as a machine gun. § 3. Storing, Keeping, and/or Possessing Machine Gun. – It shall be unlawful for any person to store, keep, possess, or have in possession, or permit another to store, keep, possess, or have in possession, except as hereinafter provided, any firearm of the type defined above or commonly known as a machine gun. § 4. Selling, Renting or Giving away Machine Gun. – It shall be unlawful for any person to sell, rent, or give away, or be interested directly or indirectly, in the sale, renting or giving away, or otherwise disposing of any firearm of the type above described or commonly known as a machine gun. § 5. Exceptions – Register Machine Guns. – The provisions of this Act shall not apply to the army, navy or marine corps of the United States, the National Guard, and organizations authorized by law to purchase or received machine guns from the United States, or from this State, and the members of such corps. National Guard and organizations while on duty or at drill, may possess, carry and transport machine guns, and, Provided, further, That any peace officer of the State, counties or political sub-division thereof. State Constable, member of the Highway patrol, railway policemen, warden, superintendents, headkeeper or deputy of any State prison, penitentiary, workhouse, county jail, city jail, or other institution for detention of persons convicted or accused of crime, or held as witnesses in criminal cases, or persons on duty in the postal service of the United States, or common carrier while transporting direct to any police department, military or naval organization, or persons authorized by law to possess or use a machine gun, may possess machine guns when required in the performance of their duties, nor shall the provisions of this Act be construed to apply to machine guns kept for display as relics and which are rendered harmless and not useable. Within thirty days after the passage of this Act every person permited by this Act to possess a machine gun or immediately after any person is elected to or appointed to any office or position which entitles such person to possess a machine gun, shall file on the office of the Secretary of State on a blank to be supplied by the Secretary of State on application therefor, an application to be properly sworn to, which shall be approved by the Sheriff of the county in which the applicant resides or has its principal place of business, which shall include the applicants name, residence and business address, description including sex, race, age weight, height, color of eyes, color of hair, whether or not ever charged or convicted of any crime, municipal, State or otherwise, and where, if so charged, and when same was disposed of. The applicant shall also give the description including the serial number and make the machine gun which he possesses or desires to possess. Thereupon the Secretary of State shall file such application in his office, registering such applicant togther with the information required in the application in a book or index to be kept for that purpose, and assign to him a number, an dissue to him a card which shall bear the signature of the applicant, and which he shall keep with him while he has such machine gun in his possession. Such registeration shall be made on the date application is received and filed iwth the Secretary of State, and shall expire on December 31, of the year in which said license is issued. § 6. Penalty – Any person violating any of the provisions of this Act shall be guilty of a felony, and, on conviction thereof shall be sentenced to pay a fine not exceeding One Thousand Dollars, and

**App. 0320**

undergo imprisonment by separate or solitary confinement at labor not exceeding twenty (20) years.

## SOUTH DAKOTA

1899 S.D. Sess. Laws 112, An Act For The Protection Of Game And The Appointment Of Wardens, And The Licensing Of Hunters And Prescribing Penalties For The Violation Of Its Provisions, pt. 3
At any time kills or shoots any wild duck, goose or brant with any swivel gun or other gun, except as is commonly shot form the shoulder, or in hunting such birds makes us of any artificial light or battery. . .

1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8.
§ 1. "machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. "Crime of Violence" apples to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault to do great bodily harm, robbery, burglary, housebreaking, breaking and entering, and larceny. "Person" applied to and includes firm, partnership, association or corporation. § 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than twenty years. § 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than fifteen years. § 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented for bona fide permanent residence or business occupancy by the person in whose possession the machine gun may be found; or (b) when in the possession of, or used by, an unnaturalized foreign born person, who has been convicted of a crime of violence in any court of record, state or federal of the United States of America, its territories or insular possessions; or (c) when the machine gun is of the kind described in §8 and has not been registered as in said section required; or (d) when empty or loaded pistol shells of 30 or larger caliber which have been or are susceptible or use in the machine gun are found in the immediate vicinity thereof. § 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found. § 6. Exceptions. Nothing contained in this act shall prohibit or interfere with (1.) the manufacture for, and sale of, machine guns to the miltary forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; (2.) The possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; (3.) The possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifstly not aggresive or offensive. § 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the

App. 0321

person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provisions of this section shall be punishable by a fine of not more than five hundred dollars, or by imprisonment in the county jail, nfor not exceeding six months or by both such fine and imprisonment. § 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the Secretary of State, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which, the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section shall be presumed to possess the same for offensive and aggressive purpose.

## **TENNESSEE**

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 148-149, Image 149-150 (1863) available at The Making of Modern Law: Primary Sources. 1863 [Ordinances of the City of Memphis, Shooting Galleries, § 1. That no person or persons shall set up or use any pistol gallery, or place for the discharging of pistols, guns or other firearms in the first story of any building in the city; nor shall any gallery be used in any manner involving risk or danger to any person in the city; nor shall any person setting up or using such pistol gallery be exempt from the ordinance and penalties now in force, for discharging or shooting any pistol, gun or firearms within the city limits, until such person or persons have applied and paid for license to set up and use such pistol gallery, according to the provisions of this ordinance. § 2. That the person or persons applying for license to keep such pistol gallery, shall, at the time of obtaining such license, enter into bond with good security, to be approved by the City Register, in the sum of three thousand dollars, payable as other city bonds, conditioned that no gambling of any kind be permitted in such pistol gallery, or in the room used for such pistol gallery, or any room adjacent thereto, under the control and connected with said pistol gallery, or its proprietors or keepers; and that all shooting or discharging of firearms shall be done only with the perfect security against any harm to persons or property in the vicinity of such pistol gallery; such penalty to be recoverable for every violation of this section of this ordinance, and of the conditions of said bond. § 3. That the proprietors or persons keeping such pistol gallery shall not permit any minors to shoot in such gallery without the written consent of the lawful guardian of such minor, unless such guardian be personally present, and consenting to such shooting; nor shall the proprietors or keepers of such gallery permit any shooting in the same after eleven o'clock at night, or on Sunday, nor shall such shooting gallery be allowed to be kept open for shooting after eleven o'clock at night or on Sunday. Any violation of this ordinance is hereby declared a misdemeanor, and each offender, on conviction shall be fined in any sum not less than five nor more than fifty dollars for any violation of this ordinance, recoverable as other fines. § 4.

App. 0322

Any person or persons shall before putting up or using such pistol or shooting gallery, first apply for, and obtain license, as other licenses are obtained, and shall pay for such license the sum of one hundred dollars per annum for each and every pistol or shooting gallery establishment under the provision of this ordinance. § 5. That the board of Mayor and Aldermen retain the power and right to, at any time, repeal this ordinance and revoke and recall any license to keep a pistol gallery, by refunding a pro rata part of the amount paid for any license then outstanding.]

1879 Tenn. Pub. Acts 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1.
It shall be a misdemeanor for any person to sell, or offer to sell, or to bring into the State for the purpose of selling, giving away, or otherwise disposing of belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol; Provided that this act shall not be enforced against any persons now having license to sell such articles until the expiration of such present license.

## TEXAS

Charter and Revised Ordinances of the City of Galveston, and All Ordinances in Force to April 2d, 1872 Page 94, Image 107 (1873) available at The Making of Modern Law: Primary Sources. 1872
[Ordinances of the City of Galveston, Taxes – License Tax and Ad-Valorem Tax,] Art. 418, § 26. Every keeper of a billiard or other like table, for public use, a tax of twenty dollars for each and every table so kept; and every keeper of a tenpin alley, a tax of thirty dollars for each and every alley so kept for public use. Every keeper of a pistol or rifle gallery, a tax of twenty-five dollars.

Revised Ordinances of the City of Fort Worth, Texas, 1873-1884 Page 64-65, Image 62-63 (1885) available at The Making of Modern Law: Primary Sources. 1880
Ordinances of the City of Fort Worth, An Ordinance prohibiting the shooting off, firing or discharging of Fire-arms; the firing, exploding or setting off of Squibs, Firecrackers, Torpedoes, Roman Candles, Sky-rockets or other things containing powder or other explosive matter, or the throwing of any fire balls, or making of any bon-fires in the corporate limits of the City of Fort Worth. Be it ordained by the City Council of the City of Fort Worth: § 1. It shall be unlawful for any person or persons to shoot off, fire, or discharge any gun, pistol, revolver or any firearm of any description, or to fire, explode or set off any squib, firecracker, torpedo, roman candle, sky-rocket, or other thing containing powder or other explosive matter, or to throw any fire-ball or make any bon-fire in the corporate limits of this city, and that any person or persons violating the provisions of this ordinance, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be fined in any sum not less than one dollar nor more than one hundred dollars. Provided that this shall not apply to any licensed shooting gallery nor to the shooting of dogs running at large in violation of the city ordinances

The Laws of Texas 1822-1897. Austin's Colonization Law and Contract; Mexican Constitution of 1824; Federal Colonization Law; Colonization Laws of Coahuila and Texas; Colonization Law of State of Tamaulipas; Fredonian Declaration of Indpendence; Laws and Decrees, with Constitution of Coahuila and Texas; San Felipe Convention; Journals of the Consultation; Proceedings of the General Council; Goliad Declaration of Independence; Journals of the

App. 0323

Convention at Washington; Ordinances and Decrees of the Consultation; Declaration of
Independence; Constitution of the Republic; Laws, General and Special, of the Republic;
Annexation Resolution of the United States; Ratification of the Same by Texas; Constitution of
the United States; Constitutions of the State of Texas, with All the Laws, General and Special,
Passed Thereunder, Including Ordinances, Decrees, and Resolutions, with the Constitution of the
Confederate States and the Reconstruction Acts of Congress Page 234-235, Image 734-735 (Vol.
6, 1898) available at The Making of Modern Law: Primary Sources. 1898
[An Act to Incorporate the Town of Round Top, County of Fayette, . . . Article Tenth. That from
and after the passage of this act it shall be unlawful to fire any pistol, rifle, shot gun, or other
kind of fire-arms, within the limits of the town of Round Top, and any person violating this act
shall be guilty of a misdemeanor, and on conviction thereof shall be fined not less than five nor
more than twenty-five dollars, to be collected by the mayor of the town; but this act shall not
prevent any gunsmith, within the limits of the town, from discharging on the premises thereof,
fire-arms made or repaired in his shop, for the purpose of training such fire-arms; provided, that
none but gunsmiths shall have the privilege of being authorized to discharge fire-arms; and for
that purpose each gunsmith shall build a rock wall, in front of which he shall cause a target to be
placed, The mayor shall issue a permit to any gunsmith applying for the same, for the period of
one year, which permit may be renewed after its expiration.]

Revised Ordinances of the City of Victoria Texas Page 75, Image 77 (1899) available at The
Making of Modern Law: Primary Sources. 1899
[Ordinances of the City of Victoria,] Revised Penal Ordinances: Discharging Firearms, § 1. If
any person shall discharge any gun, pistol or firearm of any description on or across any public
square, street or alley, or elsewhere within the corporate limits of the City of Victoria, whether
the premises on or across which such fire arm is discharged be public or private he shall be fined
in any sum not to exceed ten dollars. § 2. Exceptions. The provisions of the foregoing section
shall not be construed to apply to gunsmiths discharging fire arms brought to them for repairs, or
to training guns or pistols of their own make, when done with the permission and at a place
approved by the City Marshal; nor shall parties shooting in galleries licensed by the city come
within the meaning of the preceding article. § 3. If any person shall discharge any gun, pistol or
fire arm of any description as alarm for fire, or upon the discovery of any fire, or during the
progress of any fire, he shall be fined in any sum not to exceed twenty-five dollars.

1919 Tex. Gen. Laws 297-98, An Act to Preserve, Propagate, Distribute, and Protect the Wild
Game, Wild Birds, Wild Fowl of the State . . . , ch. 157, § 42.
It shall be unlawful for any citizen of this State to hunt outside of the county of his residence
with a gun without first having procured from the Game, Fish and Oyster Commissioner or one
of his deputies or from the County Clerk of the County in which he resides a license to hunt, and
for which he shall pay to the officer from whom he secures such license the sum of two ($2.00)
dollars. . . Any person hunting any game or birds protected by the laws of the State, and who
shall refuse to show his license herein provided for to any sheriff . . . on demand shall be deemed
guilty of a violation of the provisions of this law, and any person violating any of the provisions
of this Section shall be deemed guilty of a misdemeanor, and upon conviction shall be fined in a
sum of not less than ten (10.00) dollars nor more than one hundred (100.00) dollars.

App. 0324

1931 Tex. Gen. Laws 447, Occupation Tax on Sale of Pistols, ch. 267, 3, 447 (requiring retail dealers to keep registries of sales of firearms).

## UTAH

An Ordinance Prohibiting the Sale of Arms, Ammunition, or Spiritous Liquors to the Indians, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 63 (Henry McEwan 1866). 1850
"Sec. 1. Be it ordained by the General Assembly of the State of Deseret: That if any person shall hereafter trade or give any guns, rifles, pistols or any other deadly weapons, ammunition or spirituous liquors to any Indian, without having a license, he shall, on conviction thereof before any Justice of the Peace, he fined in a sum not exceeding one hundred dollars for each offense, and also forfeit all the property received from the Indian, which shall be sold and the proceeds thereof paid into the public treasury."

Revised Ordinances and Resolutions of the City Council of Salt Lake City, in the Territory of Utah, with Congressional and Territorial Laws on Townsites and Great Salt Lake City Charter, and Amendments Page 161-162, Image 196-197 (1875) available at The Making of Modern Law: Primary Sources. 1875
Ordinances of Salt Lake City, Relating to Gunpowder, Gun Cotton and Nitro-Glycerine, § 1. Be it ordained, by the City Council of Salt Lake City, that it shall not be lawful for any person or persons to keep, sell or give away, gunpowder, gun-cotton, or nitro-glycerine, in any quantity without permission of the City Council; Provided, any person may keep, for his own use, not exceeding five pounds of gun powder, one pound of gun cotton, or one ounce of nitro-glycerine. § 2. All permits , when issued , shall be registered by the Recorder, and shall state the name and place of business, and date of permit, and the same shall not be granted for a longer time than one year; and no person to whom any permits may be issued, shall have or keep, at his place of business or elsewhere, within the city, (except in such places as may be approved by the City Council), a greater quantity of gunpowder or guncotton than twenty-five pounds, and the same shall be kept in tin canisters or cases, and nitro-glycerine not to exceed five ounces, and in a situation remote from fires lighted lamps or candles. Nor shall any person sell or weigh gunpowder, gun cotton, or nitro-glycerine, after the lighting of lamps or gas in the evening , unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business, with the word gunpowder painted or printed thereon in large letters. § 3. No person shall convey or carry any gunpowder exceeding one pound in quantity through any street or alley in the city, unless the said gunpowder is secured in tight cans, kegs or cases, sufficient to prevent the same from being spilled or scattered , and in no quantity exceeding one hundred pounds, except under the direction of a police officer. § 4. A violation of any clause of this ordinance shall subject the offender to a fine, for each offence, in any sum not exceeding one hundred dollars.

The Revised Ordinances of Salt Lake City, Utah, Chapter XXVI, Misdemeanors, p. 283 Sec. 14 (1888)
Dangerous and Concealed Weapons.

**App. 0325**

SEC. 14. Any person who shall carry any slingshot, or any concealed deadly weapon , without the permission of the mayor first had and obtained, shall, upon conviction, be liable to a fine not exceeding fifty dollars.

1905 Utah Laws 197, An Act for the Protection of Fish, Game, and Birds . . . , ch. 118, § 30. It shall be unlawful for any non-resident person or for resident who is not a citizen of the United States to kill any game, animals, birds or fish in this State, without first having procured the license to do so hereinafter provided for. Any non-resident person or any resident who is not a citizen of the United States, upon the payment to the State Commissioner, of the sum of twenty-five dollars, shall be entitled to receive a license, from said commissioner, which will entitle him to hunt and kill game, animals, birds and fish, for the period of one year subject to all the laws of this State for the protection of fish and game.

## VERMONT

Act of Incorporation and By-Laws of the Village of Bradford Page 14, Image 15 (1890 ) available at The Making of Modern Law: Primary Sources. 1890
[Ordinances of the Village of Bradford] By-laws, Miscellaneous, § 6. Any person who shall fire any cannon, swivel gun, pistol, torpedo, squib, cracker, or throw any fire ball, in any street, alley or lane, except by permission of the trustees, shall be fined five dollars.

Act of Incorporation and By-Laws of the Village of Bradford. 1890 Page 12-13, Image 13-14 (1891) available at The Making of Modern Law: Primary Sources.
Ordinances of the Village of Bradford, § 11. The Trustees may grant licenses, for one year or less, to keep gun powder or gun cotton or other explosives for sale, if in their opinion the public safety is not endangered thereby. Said gun powder or gun cotton or other explosive shall be kept in close tin canisters which shall only be opened in the day time. § 12. The license shall specify the quantity allowed and the place where such gun powder or gun cotton and other explosives shall be kept, and on every building in which such gunpowder or gun cotton or other explosives is kept for sale shall be placed in a conspicuous position a sign with the words, "Licensed to sell Powder," printed or painted thereon. § 13. The Trustees may also grant licenses to store gun powder and other explosives in larger quantities in places used for no other purpose which they consider at a safe distance from other buildings. § 14. The Trustees may at any time inspect the premises where gun powder, gun cotton and other explosives are kept, in order to satisfy themselves that the regulations are complied with. § 15. Any person who shall without license keep in any building in the Village any nitro-glycerine, or more than half a pound of gun powder or two ounces of gun cotton, which shall be only for his own use, shall be fined five dollars for every day so offending. § 16. All licenses granted by the Trustees by virtue of these by-laws shall be signed by a majority of the Trustees and recorded in the office of the Clerk of the Corporation at the expense of the person licensed and shall not become valid until so recorded. § 17. The Trustees are authorized to revoke any license mentioned in these by-laws, whether granted by themselves or their predecessors in office, whenever in their opinion the public good requires it. Such revocation shall be recorded in the Clerk's office, and shall become operative whenever the Trustees shall deliver a written notice thereof to the person whose license is revoked.

Act of Incorporation and By-Laws of the Village of Northfield Page 19-20, Image 19-20 (1894) available at The Making of Modern Law: Primary Sources. 1894

Regulations for Handling Explosives, Artcle XV., § 1. No person shall at any time keep within the limits of said Village, any powder, or guncotton, without a written license, signed by a majority of the trustees, who shall have discretionary power to grant the same for retailing purposes ; not, however, exceeding twenty pounds shall be kept in any one building at a time, and that to be kept in close metal cans, or flasks, which are not to be opened except in the day time, Said license specify the building, or place where said powder or guncotton shall or may be kept, the quantity such person may keep, and shall be conditional that any Trustee may at any time make inspection of the quantity of powder or gun-cotton kept, and the manner of keeping the same; said license to be in force until revoked by a majority of the Trustees. And it shall be the duty of the person or persons so licensed to procure said license to be recorded in the records of said Village, and to put up, in some conspicuous place on every building within the limits of the Village in which he has powder or guncotton stored, a sign with the words "LICENSED TO SELL GUNPOWDER." Provided, that a majority of the Trustees may grant license for storing or keeping larger quantities, and that any person may keep not over two pounds which shall be kept in a metallic flask or a powder horn. Article XVI. PENALTY FOR VIOLATION OF ABOVE ARTICLE. § 1. If any person shall keep, without a license therefore, or as provided in the XVth article, any powder, or gun cotton, or either of said articles, or shall keep either of said articles in any buildings or places except those mentioned in his license, he shall forfeit and pay to the treasurer of said Village Five dollars for each day said powder or guncotton shall be suffered to remain within the limits of said village.

Quoted in Brief of Amicus Curiae Patrick J. Charles at App. 13, N.Y. State Rifle & Pistol Ass'n, v. City of New York (Ordinances of the City of Barre, Vermont). 1895

CHAPTER 16, SEC. 18. No person, except on his own premises, or by the consent and permission of the owner or occupant of the premises, and except in the performance of some duty required by law, shall discharge any gun, pistol, or other fire arm loaded with ball or shot, or with powder only, or firecrackers, serpent, or other preparation whereof gunpowder or other explosive substance is an ingredient, or which consists wholly of the same, nor shall make any bonfire in or upon any street, lane, common or public place within the city, except by authority of the city council.

CHAPTER 38, SEC. 7. No person shall carry within the city any steel or brass knuckles, pistol, slung shot, stilletto, or weapon of similar character, nor carry any weapon concealed on his person without permission of the mayor or chief of police in writing.

1908 Vermont Session Laws 132, § 1.

No person shall at any time hunt, shoot, pursue, take or kill any of the wild animals, wild fowl or birds of this state, nor use a gun for hunting the same, without having first procured a license therefor as hereinafter provided, and then only during the respective periods of the year when it shall be lawful, and subject to all the provisions of chapter 220 of the Public Statutes. . .

## VIRGINIA

Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the

Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) available at The Making of Modern Law: Primary Sources. 1792
[An Act to Reduce into one, the Several Acts Concerning Slaves, Free Negroes, and Mulattoes (1792),] § 8. No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, but all and every gun, weapon, and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person, and upon due proof thereof made before any Justice of the Peace of the County or Corporation where such seizure shall be, shall by his order be forfeited to the seizor for his own use ; and moreover, every such offender shall have and receive by order of such Justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense. § 9. Provided, nevertheless, That every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves.

1805 Va. Acts 51, An Act Concerning Free Negroes and Mulatoes
That no free negro or mulato shall be suffered to keep or carry any firelock of any kind… without first obtaining a license from the court…

1806 Va. Acts 51, ch. 94
Required every "free negro or mulatto" to first obtain a license before carrying or keeping "any fire-lock of any kind, any military weapon, or any powder or lead."

The Charters and Ordinances of the City of Richmond, with the Declaration of Rights, and Constitution of Virginia Page 227, Image 274 (1859) available at The Making of Modern Law: Primary Sources. 1859
[Ordinances of Richmond,] Nuisances Not in Streets, § 11. If any person shall sell, or expose for sale in this city, any torpedos, popcrackers, squibs, or other fire-works, of any kind whatever, except in packages containing each at least one hundred, or shall without permission in writing from the mayor, discharge, or set off, in any street or alley of the city, any balloon, rocket, torpedo, popcracker, fireworks or any combination of gunpowder, or any other combustible or dangerous material; or if any person shall, except under the fortieth section of the ordinance concerning streets, without necessity fire or discharge in this city any cannon, gun, pistol, or other fire-arms of any kind, or shall make therein any unusual noise, whereby the inhabitants thereof may be alarmed, or raise or fly a kite in this city, or if any auctioneer shall use any bell or herald to notify the public of any sale, except of real property, every such person herein offending, shall pay a fine of not less than one nor more than twenty dollars.

1908 Va. Laws 381, An Act To Amend And Re-Enact Section 3780 Of The Code In Relation To Carrying Concealed Weapons, § 3780
If any person carry about his person, hid from common observation, any pistol, dirk, bowie knife, razor, slungshot, or any weapon of like kind he shall be fined not less than twenty dollars nor more than one hundred dollars, or be committed to jail not more than thirty days, or both, in the discretion of the court, or jury, trying the case: and such pistol, dirk, bowie knife, razor,

slungshot, or any weapon of like kind, shall be forfeited to the Commonwealth and may be seized by an officer as forfeited. Upon conviction of the offender the said weapon shall be sold by the officer and the proceeds accounted for and paid over as provided in section twenty-one hundred and ninety; provided, that this section shall not apply to any police officer, town or city sergeant, constable, sheriff, conservator of the peace, collecting officer while in the discharge of his official duty: provided the judge of any circuit or hustings court in term time, upon a written application and satisfactory proof of the good character and necessity of the applicant to carry concealed weapon may grant such permission for one year; the order making same shall be entered in the order book of such court.

1926 Va. Acts. 285-87, CHAP. 158-An ACT to improve a license tax on pistols and revolvers; to regulate the sale thereof and of ammunition therefor; and to provide that the proceeds of such tax shall be used for the establishment of a diseased and crippled children's hospital, §§ 1-9.

1. Be it enacted by the general assembly of Virginia, That it shall be the duty of every person residing in this State and owning a pistol or revolver therein, to pay on or before the first day of January of each year a license tax of one dollar on each pistol or revolver so owned, or in the event that such pistol or revolver shall be acquired by any such person on or after the first day of February, such license tax shall be forthwith paid thereon. The application for the license shall give the name of the owner, and the number, make and calibre [sic] of such pistol or revolver, which shall be set forth in the license. All pistol or revolver licenses shall run from the first day of January to the first day of the following January. Such license taxes shall be paid to the treasurer of the city or county whrein the said owner resides, and the said treasurer shall not receive more for handling the funds arising from the tax imposed by this act than he receives for handling other State funds. The treasurers shall not receive compensation for their services in issuing the license cards herein provided for. Upon payment of the tax provided for in this section the person paying the same shall be entitled to a license card therefor, showing the year for which the license is paid, the county or city issuing the card, the serial number of the license, and the number, calibre [sic], make and owner of the pistol or revolver. When the license card is issued the treasurer shall record the name of the owner of the pistol or revolver, and the number, calibre [sic] and make thereof with the number of the license, in a book prepared for the purpose. The license cards and book shall be furnished by the boards herein provided and shall be paid out of the funds derived from the pistol and revolver licenses. If any such card should be lost the owner of the card shall pay to the treasurer twenty-five cents for a duplicate card.

2. It shall be the duty of every retailer selling a pistol or revolver in this State, at the time of such sale, to keep a record of the name and address of the purchaser and the number, make and calibre [sic] of the pistol or revolver, and to report once a month to the treasurer of his county or city the names of such purchasers, if any, together with the number, make and calibre [sic] of each pistol or revolver purchased; and all persons receiving or having in their possession a pistol or revolver for the purpose of repairing the same shall report to the treasurer of his county or city once a month giving the name and address of the owner and the calibre [sic], make and serial number of such pistol or revolver.

3. It shall be unlawful for any retailer in this State to sell ammunition for any pistol or revolver to any person unless the person desiring to make such purchase displays the license card for the current year provided for in this act.

4. Any person violating any provision of this act or using a license card not issued to him, for the purpose of purchasing ammunition, or using a license card for the purchase of pistol or revolver

ammunition unless the ammunition is intended to be used for the weapon mentioned in the license card shall be guilty of a misdemeanor, and upon conviction shall be fined not less than twenty-five nor more than fifty dollars, or sentenced to the State convict road force for not less than thirty or not more than sixty days, or both, in the discretion of the tribunal trying the case.

5. The provisions of this act shall not apply to any officer authorized by law to carry a pistol or revolver nor to the pistol or revolver of such officer when such pistol or revolver is carried in discharge of his official duty, except that every officer shall list his pistol or revolver with the treasurer of his county or city annually by January first; nor to a pistol of an obsolete type kept as a souvenir, memento or relic, such as cap and ball type, etcetera, or souvenir used or captured by any person or relative in any war. But such pistol shall be registered as herein provided, upon satisfactory proof to the officer issuing such license that the pistol in question comes properly within this exception, in which case, no license tax shall be charged.

6. The tax hereby imposed shall be in lieu of all other taxes on such pistols and revolvers; but nothing in this act shall be construed to apply to such weapons in the stocks of licensed wholesaler or retailers.

7. All funds arising from pistol and revolver licenses, except as hereinbefore provided, shall be kept separate from other funds and shall be paid into the State treasury to establish a fund known as the diseased and crippled children's hospital fund, which shall be used for the purpose of establishing and maintaining within the State at such place or places as may be selected by the board hereinafter provided for, a hospital or hospitals for the care, treatment and vocational training of diseased and crippled children resident in Virginia, or for any such rehabilitation work that the board may deem wise.

Each treasurer shall between the first and fifteenth of July and between the first and fifteenth of January report to the auditor of public accounts collections, which he is required to make by this act, and shall at the same time pay into the State treasury the amount collected less the commissions which he is authorized to retain for collecting same as provided for in this act, and the auditor of public accounts shall keep said funds separate from other funds to be designated and known as "the diseased and cripple children's hospital fund."

8. The administration of the aid fund shall be under the direction of a board of seven physicians to be appointed by the governor. . . . [Description of board and its functions].

9. The State treasurer shall make payments from the fund hereinabove created on warrants from the auditor of public accounts, issued on vouchers certified by the chairman of the board hereinabove created on authority of the board.


1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7.

§ 1. Where used in this act; (a) "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading. (b) "Crime of violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, . . .

§ 2. Possession or use of machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by death or by imprisonment in the State penitentiary for a term not less than twenty years.

§ 3. Unlawful possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State penitentiary for a term of not less than ten years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (b) When in the possession of , or used by, an unnaturalized foreign born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (c) When the machine gun is of the kind described in section eight and has not been registered as in said section required; or (d) When empty or loaded pistol shells of thirty (thirty one-hundredths inch or seven and sixty-three one hundredths millimeter ) or larger caliber which have been or are susceptible to use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be prima facie evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. (excludes military police etc. )

§ 7. Every manufacturer or dealer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, load, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold. . .

## WASHINGTON STATE

1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15. [T]o regulate the transportation, storage and sale of gunpowder, giant powder, dynamite, nitro-glycerine, or other combustibles, and to provide or license magazines for the same, and to prevent by all possible and proper means, danger or risk of injury or damages by fire arising from carelessness, negligence or otherwise . . . to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols and firearms, firecrackers, and detonation works of all descriptions[.]

1881 Wash. Sess. Laws 93, An Act to Incorporate the City of Dayton, chap. 2, § 20.
The city of Dayton shall have power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy, and . . . to regulate the transportation, storing and keeping of gunpowder and other combustibles and to provide or license magazines for the same[.]

1881 Wash. Sess. Laws 121-22, An Act to Incorporate the City of Port Townsend, ch. 2, § 21.
The City of Port Townsend has power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy, and . . . to regulate the transportation and keeping of gunpowder, or other combustibles, and to provide or license magazines for the same[.]

App. 0331

1883 Wash. Sess. Laws 161, An Act to Incorporate the City of Ellensburgh, ch. 2, § 20.
The city of Ellensburg shall have power to prevent injury or annoyance from anything
dangerous, offensive, or unhealthy . . . to regulate the transportation storing and keeping of
gunpowder and other combustibles and to provide or license magazines for the same[.]

Del Cary Smith, Ordinances of the City of Port Townsend, Washington, Comprising the General
Ordinances of the City, Together with the Private Ordinances Now in Force Page 27, Image 28
(1890) available at The Making of Modern Law: Primary Sources. 1890
[Ordinances of Port Townsend, WA,] Division III, Offenses Against Public Safety, Convenience
and Health, § 15. Whoever shall fire or discharge any cannon, gun, pistol revolver or any firearm
of any description, or shall fire, or explode or set off any squib, firecracker, torpedo or other
thing containing powder or other explosive material, without permission from the Mayor or
common council so to do, within the city limits, shall, on conviction, be punished by a fine of not
less than five nor more than twenty dollars; provided that such permission, when given, shall
definitely limit the time of such firing, and may at any time be revoked. But nothing in this
section shall prevent the ordinary and usual fireworks demonstration on National holidays;
subject, however, to such regulation, control and orders as the City Marshal may deem proper to
make for the protection of property from fire.

Albert R Heilig, Ordinances of the City of Tacoma, Washington Page 334, Image 335 (1892)
available at The Making of Modern Law: Primary Sources. 1892
Ordinances of Tacoma, Defining Disorderly persons and Prescribing the Punishment for
disorderly conduct within the city of Tacoma, § 1. . . . All persons (except police officers as
aforesaid) who shall draw, exhibit or attempt to use any deadly weapon upon, to or against
another person, in said city with intent to do bodily injury to such person; and All persons
(except peace officers as aforesaid and persons practicing at target shooting in a shooting gallery
duly licensed) who shall, within the city limits, fire off or discharge any gun, pistol or fire arm
of any kind, or bomb, shall be deemed and are disorderly persons, and guilty of a misdemeanor.

Rose M. Denny, ed., The Municipal Code of the City of Spokane, Washington (Spokane, WA;
W.D. Knight, 1896), p. 309-10, Ordinance No. A544, Sec. 1. 1895
ORDINANCE No. A544. AN ORDINANCE TO PUNISH THE CARRYING OF
CONCEALED WEAPONS WITHIN THE CITY OF SPOKANE.
The City of Spokane does ordain as follows:
SECTION I. If any person within the City of Spokane shall carry upon his person any concealed
weapon, consisting of either a revolver, pistol or other fire-arms, or any knife (other than an
ordinary pocket knife ), or any dirk or dagger, sling-shot or metal knuckles, or any instrument by
the use of which injury could be inflicted upon the person or property of any other person, shall
be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than
twenty dollars, nor more than one hundred dollars and costs of prosecution, and be imprisoned
until such fine and costs are paid; provided, that this section shall not apply to police officers and
other persons whose duty it is to execute process or warrants or make arrests, or persons having a
special written permit from the Superior Court to carry weapons.
SECTION 2. This ordinance shall take effect and be in force ten days after its passage.
Passed the City Council January 2, 1895.

Rose M. Denny, The Municipal Code of the City of Spokane, Washington. Comprising the Ordinances of the City (Excepting Ordinances Establishing Street Grades) Revised to October 22, 1896 Page 309-310, Image 315-316 (1896) available at The Making of Modern Law: Primary Sources. 1896

Ordinances of Spokane, An Ordinance to Punish the Carrying of Concealed Weapons within the City of Spokane, § 1. If any person within the City of Spokane shall carry upon his person any concealed weapon, consisting of either a revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars, nor more than one hundred dollars and costs of prosecution, and be imprisoned until such fine and costs are paid; provided, that this section shall not apply to police officers and other persons whose duty is to execute process or warrants or make arrests, or persons having a special written permit from the Superior Court to carry weapons.

1911 Wash. Sess. Laws 303, An Act Relating to the Carrying of Firearms, Requiring Licenses of Certain Persons, and Fixing a Penalty for the Violation Thereof, ch. 52, § 1.

It shall be unlawful for any person who is not a citizen of the United States, or who has not declared his intention to become a citizen of the United States, to carry or have in his possession at any time any shot gun, rifle or other firearm, without first having obtained a license from the state auditor, and said license is not to be issued by said state auditor except upon the certificate of the consul domiciled in the State of Washington and representing the country of such alien, that he is a responsible person and upon the payment for said license of the sum of fifteen dollars ($15.00)[.]

## WEST VIRGINIA

J. Nelson Wisner, Ordinances and By-Laws of the Corporation of Martinsburg: Berkeley Co., West Virginia, Including the Act of Incorporation and All Other Acts of a Special or General Nature Page 25, Image 25 (1875) available at The Making of Modern Law: Primary Sources. 1875

[Ordinances of Martinsburg, An Ordinance to Prevent Certain Improper Practices Therein Specified,] § 3. If any person shall fire or discharge within such parts of the town which are or shall be laid out into lots, or within two hundred yards of said limits, any cannon, gun, pistol or fire-arms, or any cracker, squib, rocket or fire-works, except it be in case of necessity, or in the discharge of some public duty, or at a military parade by order of the officer in command, or with the permission of the Mayor or Council of the town, such person for every such offence shall forfeit any pay to the town not less than one nor more than five dollars.

J. Nelson Wisner, Ordinances and By-Laws of the Corporation of Martinsburg: Berkeley Co., West Virginia, Including the Act of Incorporation and All Other Acts of a Special or General Nature Page 76, Image 76 (1875) available at The Making of Modern Law: Primary Sources. 1876

[Ordinances of Martinsburg,] An Ordinance in Relation to Pistol Galleries, § 1. Be it ordained by the Council of the Corporation of Martinsburg, That no pistol gallery, in which air guns or

pistols, or guns or pistols in which are fired powder, is used, shall be established or carried on within the limits of the Corporation of Martinsburg by any person or persons, until the person or persons desiring to establish or carry on the same shall first obtain from the Mayor, attested by the Clerk of the Corporation, a permit authorizing the person or persons therein named to prosecute said business, and designating the place at which the same is to be carried on. § 2. That the Mayor shall not issue the permit authorized by the first section of this ordinance, unless the building to be used for said pistol gallery, is so detached from adjacent or surrounding private dwellings, that the noise incident to the carrying on of said business, shall not render the said gallery a nuisance to the surrounding or adjacent dwellings. § 3. Any person or persons violating the provisions of this ordinance, shall be fined for the first offense, not less than two nor more than ten dollars, at the discretion of the Mayor, and for any subsequent offence, not less than two or more than thirty dollars, and commitment in the county jail not exceeding thirty days, either or both of said punishment, at the discretion of the Mayor.

Laws and Ordinances for the Government of the City of Wheeling, West Virginia (Wheeling, WV: W. Va. Printing 1891), p.206. 1881
An Ordinance in relation to offenses . . .
SEC. 14. It shall be unlawful for any person to carry any slung shot, colt, or knucklers of lead, brass or other metal or material, or to carry about his person, hid from common observation, any pistol, dirk , bowie knife, or weapon of the like kind, without a permit in writing from the mayor so to do. It shall also be unlawful for any person or persons to sell or give away to a person not of age, any slung shot, colt, or knuckler or knucklers of lead, brass or other metal or material, or any pistol, dirk, bowie knife or weapon of the like kind.

1909 W.Va. Acts 479-80, An Act to Amend and Re-Enact Sections . . . Relating to the Protection and Preservation of Certain Animals, Birds, and Fishes and of Forests and Streams, ch. 60, § 19. The carrying of any uncased gun in any of the fields or woods of this state, by any person not having the lawful right to hunt, pursue or kill game, birds or animals in such fields or woods shall, as to such person, other than the bona fide owner, or owners of such fields or woods, his or their child or children, tenant or tenants, lessee or lessees, be deemed prima facie evidence of a violation of this section; and any person claiming to hold a license to hunt in this state, having in his possession any gun or other hunting paraphernalia in such woods, or fields, shall, on failure to produce such license for inspection to any warden of this state or owner or agent of the owner of such woods and fields on demand, be deemed guilty of a misdemeanor and shall be punished on conviction, as provided later in this section. Provided, however, that any resident owner, or owners, of farm lands, their resident child or children, or bona fide tenants, shall have the right to hunt, kill and pursue birds or game on such farm lands of which he, or they, are the bona fide owners or tenants, during the season when it is lawful to kill, catch or pursue birds or game, without securing such resident license; and provided, further, that the owners of adjoining lands may each have the privilege of reciprocating the non-licensed privilege, by giving each other written privilege to exchange hunting rights only, on land immediately joining each other, and upon which each party resides.

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses

App. 0334

and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a.

Section 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court; and it shall be the duty of the prosecuting attorney in all cases to ascertain whether or not the charge made by the grand jury is the first or second offense, and if it shall be the second offense, it shall be so stated in the indictment returned, and the prosecuting attorney shall introduce the record evidence before the trial court of said second offense, and shall not be permitted to use his discretion in charging said second offense nor in introducing evidence to prove the same on the trial; provided, that boys or girls under the age of eighteen years, upon the second conviction, may, at the discretion of the court, be sent to the industrial homes for boys and girls, respectively, of the state. Any person desiring to obtain a state license to carry any such weapon within one or more counties in this state shall first publish a notice in some newspaper, published in the county in which he resides, setting forth his name, residence and occupation, and that on a certain day he will apply to the circuit court of his county for such state license; and after the publication of such notice for at least ten days before said application is made and at the time stated in said notice upon application to said court, it may grant such person a license in the following manner, to-wit: The applicant shall file with said court his application in writing, duly verified, which said application shall show: First: That said applicant is a citizen of the United States of America. Second: That such applicant has been a bona fide resident of this state for at least one year next prior to the date of such application, and of the county sixty days next prior thereto. Third: That such applicant is over twenty-one years of age; that he is a person of good moral character, of temperate habits, not addicted to intoxication, and has not been convicted of a felony nor of any offense involving the use on his part of such weapon in an unlawful manner. Fourth: The purpose or purposes for which the applicant desires to carry such weapon and the necessity therefor and the county or counties in which said license is desired to be effective. Upon the hearing of such application the court shall hear evidence upon all matters stated in such application and upon any other matter deemed pertinent by the court, and if such court be satisfied from the proof that there is good reason and cause for such person to carry such weapon, and all of the other conditions of this act be complied with, said circuit court or the judge thereof in vacation, may grant said license for such purposes, and no other, as said a circuit court may set out in the said license (and the word "court" as used in this act shall include the circuit judge thereof, acting in vacation); but before the said license shall be effective such person shall pay to the sheriff, and the court shall so certify in its order granting the license, the sum of twenty dollars, and shall also file a bond with the clerk of said court, in the penalty of three thousand five hundred dollars, with good security, signed by a responsible person or persons, or by some surety company, authorized to do business in this state, conditioned that such applicant will not carry such weapon except in accordance with his said application and as authorized by the court, and that he will pay all costs and damages accruing to any person by the accidental discharge or improper, negligent or illegal use of said weapon or weapons. Any such license granted after this act becomes effective shall be

App. 0335

good for one year, unless sooner revoked, as hereinafter provided, and be co-extensive with the county in which granted, and such other county or counties as the court shall designate in the order granting such license; except that regularly appointed deputy sheriffs having license shall be permitted to carry such revolver or other weapons at any place, within the state, while in the performance of their duties as such deputy sheriffs and except that any such license granted to regularly appointed railway police shall be co-extensive with the state, and all license fees collected hereunder shall be paid by the sheriff and accounted for to the auditor as other license taxes are collected and paid, and the state tax commissioner shall prepare all suitable forms for licenses and bonds and certificates showing that such license has been granted and to do anything else in the premises to protect the state and see to the enforcement of this act. The clerk of the court shall immediately after license is granted as aforesaid, furnish the superintendent of the department of public safety a certified copy of the order of the court granting such license, for which service the clerk shall be paid a fee of two dollars which shall be taxed as cost in the proceeding; within thirty days after this act becomes effective it shall be the duty of the clerks of each court in this state having jurisdiction to issue pistol licenses to certify to the superintendent of the department of public safety a list of all such licenses issued in his county. Provided, that nothing herein shall prevent any person from carrying any such weapon, in good faith and not for a felonious purpose, upon his own premises, nor shall anything herein prevent a person from carrying any such weapon (unloaded) from the place of purchase to his home or place of residence, or to a place of repair and back to his home or residence; but nothing herein shall be construed to authorize any employee of any person, firm or corporation doing business in this state to carry on or about the premises of such employer any such pistol, or other weapon mentioned in this act for which a license is herein required, without having first obtained the license and given the bond as herein provided; and, provided, further, that nothing herein shall prevent agents, messengers and other employees of express companies doing business as common carriers, whose duties require such agents, messengers and other employees to have the care, custody or protection of money, valuables and other property for such express companies, from carrying any such weapon while actually engaged in such duties, or in doing anything reasonably incident to such duties; provided, such express company shall execute a continuing bond in the penalty of thirty thousand dollars, payable unto the state of West Virginia, and with security to be approved by the secretary of state of the state of West Virginia, conditioned that said express company will pay all damages, accruing to anyone by the accidental discharge or improper, negligent or illegal discharge or use of such weapon or weapons by such agent, messenger or other employee while actually engaged in such duties for such express company, in doing anything that is reasonably incident to such duties; but the amount which may be recovered for breach of such condition shall not exceed the sum of three thousand five hundred dollars in any one case, and such bond shall be filed with and held by the said secretary of state, for the purpose aforesaid, but upon the trial of any cause for the recovery of damages upon said bond, the burden of proof shall be upon such express company to establish that such agent, messenger or other employee was not actually employed in such duties for such express company nor in doing anything that was reasonably incident to such duties at the time such damages were sustained; and, provided further, that nothing herein shall prevent railroad police officers duly appointed and qualified under authority of section thirty-one of chapter one hundred forty-five of Barnes' code or duly qualified under the laws of any other state, from carrying any such weapon while actually engaged in their duties or in doing anything reasonably incident to such duties; provided, such railroad company shall execute a continuing bond in the

App. 0336

penalty of ten thousand dollars payable unto the state of West Virginia and with security to be approved by the secretary of state of the state of West Virginia conditioned that said railroad company will pay all damages accruing to anyone by the accidental discharge or improper, negligent or illegal discharge or use of such weapon or weapons by such railroad special police officer whether appointed in this or some other state while actually engaged in such duties for such railroad company, in doing anything that is reasonably incident to such duties, but the amount which may be recovered for breach of such condition shall not exceed the sum of three thousand five hundred dollars in any one case, and such bond shall be filed with and held by the said secretary of state for the purpose aforesaid but upon the trial of any cause for the recovery of damages upon said bond, the burden of proof shall be upon such railroad company to establish that such railroad police officer was not actually employed in such duties for such railroad company nor in doing anything that was reasonably incident to such duties at the time such damages were sustained; and provided, further, that in case of riot, public danger and emergency, a justice of the peace, or other person issuing a warrant, may authorize a special constable and his posse whose names shall be set forth in said warrant, to carry weapons for the purpose of executing a process, and a sheriff in such cases may authorize a deputy or posse to carry weapons, but the justice shall write in his docket the cause and reasons for such authority and the name of the person, or persons, so authorized, and index the same, and the sheriff or other officer shall write out and file with the clerk of the county court the reasons and causes for such authority and the name, or names of the persons so authorized, and the same shall always be open to public inspection, and such authority shall authorize such special constable, deputies and posses to carry weapons in good faith only for the specific purposes and times named in such authority, and upon the trial of every indictment the jury shall inquire into the good faith of the person attempting to defend such indictment under the authority granted by any such justice, sheriff or other officer, and any such person or persons so authorized shall be personally liable for the injury caused to any person by the negligent or unlawful use of any such weapon or weapons. It shall be the duty of all ministerial officers, consisting of the justices of the peace, notaries public and other conservators of the peace of this state, to report to the prosecuting attorney of the county the names of all persons guilty of violating this section, and any person willfully failing so to do, shall be guilty of a misdemeanor and shall be fined not exceeding two hundred dollars, and shall, moreover, be liable to removal from office for such willful failure; and it shall likewise be the duty of every person having knowledge of the violation of this act, to report the same to the prosecuting attorney, and to freely and fully give evidence concerning the same, and any one failing so to do, shall be guilty of a misdemeanor and upon conviction thereof shall be fined not exceeding one hundred dollars; provided, further, that nothing herein contained shall be so construed as to prohibit sheriffs, their regularly appointed deputies, who actually collect taxes in each county, and all constables in their respective counties and districts, and all regularly appointed police officers of their respective cities, towns or villages, all jailors and game protectors who have been duly appointed as such, and members of the department of public safety of this state, from carrying such weapons as they are now authorized by law to carry, who shall have given bond in the penalty of not less than three thousand five hundred dollars, conditioned for the faithful performance of their respective duties, which said officers shall be liable upon their said official bond, for the damages done by the unlawful or careless use of any such weapon or weapons, whether such bond is so conditioned or not. It shall be unlawful for any person armed with a pistol, gun, or other dangerous or deadly weapon, whether licensed to carry same or not, to carry, expose, brandish, or use, such weapon in a way or manner to

cause, or threaten, a breach of the peace. Any person violating this provision of this act shall be guilty of a misdemeanor, and upon conviction, shall be fined not less than fifty nor more than three hundred dollars or imprisoned in the county jail not less than thirty nor more than ninety days, or be punished by both fine and imprisonment in the discretion of the court. Any circuit court granting any such license to carry any of the weapons mentioned in this act, the governor, or the superintendent of the department of public safety, with the consent of the governor, may, for any cause deemed sufficient by said court, or by the governor or by the superintendent of the department of public safety with the approval of the governor aforesaid, as the case may be, revoke any such license to carry a pistol or other weapon mentioned in this act for which a license is required, and immediate notice of such revocation shall be given such licensee in person, by registered mail or in the same manner as provided by law for the service of other notices, and no person whose license has been so revoked shall be re-licensed within one year thereafter; provided, that the authority so revoking such license may, after a hearing, sooner reinstate such licensee.

1925 W.Va. Acts 30-31, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms . . . , ch. 3, § 7, pt. b.

(b) It shall be unlawful for any person to carry, transport, or have in his possession any machine gun, sub-machine gun, and what is commonly known as a high powered rifle, or any gun of a similar kind or character, or any ammunition therefor, except on his own premises or premises leased to him for a fixed term, until such person shall have first obtained a permit from the superintendent of the department of public safety of this state, and approved by the governor, or until a license therefore shall have been obtained from the circuit court as in the case of pistols and all such licenses together with the numbers identifying such rifle shall be certified to the superintendent of the department of public safety. Provided, further, that nothing herein shall prevent the use of rifles by bona fide rifle club members who are freeholders or tenants for a fixed term in this state at their usual or customary place of practice, or licensed hunters in the actual hunting of game animals. No such permit shall be granted by such superintendent except in cases of riot, public danger, and emergency, until such applicant shall have filed his written application with said superintendent of the department of public safety, in accordance with such rules and regulations as may from time to time be prescribed by such department of public safety relative thereto, which application shall be accompanied by a fee of two dollars to be used in defraying the expense of issuing such permit and said application shall contain the same provisions as are required to be shown under the provisions of this act by applicants for pistol licenses, and shall be duly verified by such applicant, and at least one other reputable citizen of this state. Any such permit as granted under the provisions of this act may be revoked by the governor at his pleasure upon the revocation of any such permit the department of public safety shall immediately seize and take possession of any such machine gun, sub-machine gun, high powered rifle, or gun of similar kind and character, held by reason of said permit, and any and all ammunition therefor, and the said department of public safety shall also confiscate any such machine gun, sub-machine gun and what is commonly known as a high powered rifle, or any gun of similar kind and character and any and all ammunition therefor so owned, carried, transported or possessed contrary to the provisions of this act, and shall safely store and keep the same, subject to the order of the governor.

App. 0338

1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b.

It shall be unlawful for any person, firm or corporation to place or keep on public display to passersby on the streets, for rent or sale, any revolver, pistol, dirk, bowie knife, slung shot or other dangerous weapon of like kind or character or any machine gun, sub-machine gun or high powered rifle or any gun of similar kind or character, or any ammunition for the same. All dealers licensed to sell any of the forgoing arms or weapons shall take the name, address, age and general appearance of the purchaser, as well as the maker of the gun, manufacturer's serial number and caliber, and report the same at once in writing to the superintendent of the department of public safety. It shall be unlawful for any person to sell, rent, give or lend any of the above mentioned arms to an unnaturalized person.

## WISCONSIN

Charter and Ordinances of the City of La Crosse [WI], with the Rules of the Common Council Page 202, Image 205 (1888) available at The Making of Modern Law: Primary Sources. 1888 An Ordinance in Relation to the Discharge of Firearms and firecrackers and to the use and exhibition of fireworks, § 1. No person shall fire or discharge any cannon, gun, fowling piece, pistol or firearms of any description, or fire, explode or set off any squib, cracker or other thing containing powder or other combustible or explosive material, or set off or exhibit any fireworks within the limits of the city of La Crosse, without having first obtained written permission from the mayor, which permission shall limit the time and fix the place of such firing, and shall be subject to be revoked at any time after the same may have been granted. Any violation of this ordinance shall subject the person or persons so violating the same to a fine of not less than one dollar nor exceeding twenty-five dollars; but this ordinance shall not be construed to prohibit the discharge of firearms by the chief of police or any of his subordinates or any peace officer when required or made necessary in the performance of any duty imposed by law.

Charter and Ordinances of the City of La Crosse, with the Rules of the Common Council Page 239-242, Image 242-245 (1888) available at The Making of Modern Law: Primary Sources. 1888 Ordinances of La Crosse, An Ordinance to Provide for Licensing Vendors of Gunpowder and Other Explosive Substances and to Regulate the Storing, Keeping and Conveying of all Dangerous and Explosive Materials and Substances within the City of La Crosse, and in relation to the Storage and Sale of Lime Therein, § 1. It shall be unlawful for any person to keep for sale, sell or give away any gunpowder, giant powder, nitro-glycerine, gun-cotton, dynamite or any other explosive substance of like nature or use without having first obtained a license therefor from the city of La Crosse in the manner hereinafter provided. Any person convicted of a violation of this section shall be punished by a fine of twenty-five dollars for each offense. . . § 3. It shall be unlawful for any person licensed pursuant to the foregoing sections of this ordinance to have or keep at his or her place of business an amount of gunpowder or other explosive material greater in the aggregate than fifty pounds at any one time, or to keep the same in any other than cases or canisters made of tin, or other metal holding not to exceed ten pounds each. Such gunpowder or other explosive materials shall be kept in places remote from fires and lighted lamps or candles, and where the same may be easily accessible so as to be removed in

App. 0339

case of fire. No person shall sell any gunpowder or other explosive material after the lighting of lamps in the evening unless in sealed canisters or cases; and all places where business is carried on under any such license shall have a sign put up in a conspicuous place at or near the front door thereof with the word "gunpowder" painted thereon in large letters. Any person violating any provision of this section shall, upon conviction, be punished by a fine of not less than five dollars nor more than fifty dollars for each offense; and upon any such conviction the common council may at its discretion by resolution duly passed revoke the license of the person so convicted. This ordinance shall not be construed as to prevent persons who are not vendors of the articles mentioned in the title thereof from keeping gunpowder in quantities not exceeding one pound for their own use.

Charles H. Hamilton, ed., The General Ordinances of the City of Milwaukee to January 1, 1896: With Amendments Thereto and an Appendix (Milwaukee, WI: E. Keough, 1896), pp.692-93, Sec. 25. 1896
Chapter XX. Misdemeanors.
Section 25.  It shall be unlawful for any person except policemen, regular or special, or any officer authorized to serve process, to carry or wear concealed about his person, any pistol or colt, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or bowie -knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon, within the limits of the city of Milwaukee; provided, however, that the chief of police of said city may upon any written application to him made, issue and give a written permit to any person residing within the city of Milwaukee, to carry within the said city a pistol or revolver when it is made to appear to said chief of police that it is necessary for the personal safety of such person or for the safety of his property or of the property with which he may be entrusted, to carry such weapon; and the holding of such permit by such person shall be a bar to prosecution under this ordinance. Said chief of police shall keep the names and residences of all persons to whom he may grant such permits, in a book to be kept for that purpose, and he shall have power to revoke such permit at any time.
Said chief of police shall, upon granting each and every such permit, collect from the person to whom the same is granted, the sum of three ( 3 ) dollars, and he shall pay all moneys so collected by him upon granting such permits, into the city treasury.
Any person who shall wear or carry any such pistol , slung-shot, cross-knuckles, knuckles of brass, lead or other metal, knife, dirk or dagger, or any other dangerous or deadly weapon, within the limits of the city of Milwaukee, contrary to the provisions of this chapter, shall be liable to a penalty of not less than ten nor more than one hundred dollars for each and every offense.

1931-1933 Wis. Sess. Laws 245-47, An Act . . .Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06.
164.01 Definitions (a) "Machine gun" applies to and includes a weapon of any description by whatever name known from which more than two shots or bullets may be discharged by a single function of the firing device. . .
164.02 Use of Machine Gun is a Separate Crime. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not less than twenty years.

**App. 0340**

164.03 Possession for Aggressive Purpose. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term not less than ten years.

164.04 Possession when Presumed For Aggressive Purpose. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (1) when the machine gun is on premises not owned or rented, for a bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (2) when in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (3) When the machine gun is of the kind described in section 164.08 and has not been registered as in said section required; or (4) When empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been used or are susceptible of use in the machine gun are found in the immediate vicinity thereof.

164.05 Presumptions from Presence of Gun. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

164.06 Exceptions. Nothing contained in this chapter shall prohibit or interfere with the manufacture for, and sale of , machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; the possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; the possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifestly not aggressive or offensive. . . [manufacturers and owners required to register].

## **WYOMING**

A. McMicken, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming Page 115-116, Image 116-117 (1893) available at The Making of Modern Law: Primary Sources. 1893

[Ordinances of the] City of Rawlins, Article II, Protection of Persons and Property, § 1. If any person shall within this city fire or discharge any cannon, gun, fowling piece, pistol or firearms of any description, or fire, explode, or set off any squib, cracker, or anything containing powder or other combustible or explosive material, without permission of the Board of Trustees, or the written permission of the mayor (which permission shall limit the time of the firing and shall be subject to be revoked by the mayor or Board of Trustees at any time after the same has been granted) every such person shall, on conviction, be fined in a sum of not less than five dollars and not exceeding one hundred dollars.

1899 Wyo. Sess. Laws 32-33, An Act for the Better Protection of the Game and Fish of this State . . . , ch. 19, § 14.

Any person who is a bona fide citizen of the State of Wyoming shall, upon payment of one dollar to any Justice of the Peace of the county in which he resides, be entitled to receive from said Justice of the Peace, a gun license, which license shall permit such person to pursue, hunt and kill any of the animals mentioned in this Section, during the time allowed therefor. . . . Any

**App. 0341**

person who is not a resident of the State of Wyoming, shall upon payment to any Justice of the Peace of this State of the sum of forty dollars to be entitled to receive from such Justice of the Peace a license, which license shall permit such person to pursue, hunt and kill any of the animals mentioned in this Section, during the time allowed therefor of the current year.

1913 Wyo. Sess. Laws 165, An Act . . . Relating to the Duties of the State Game Warden, Assistant and Deputy Game Wardens, and the Preservation of the Game Animals and Game Birds and Fish of the State of Wyoming . . . , ch. 121, § 38.
That Section 20 . . . be . . . amended . . . § 20. Any person who is not a bona fide elector of this state, or the child or legal ward of a bona fide elector of this state, or a soldier or sailor who is a bona fide elector of the United States, and has been stationed at a government post within this state for one year past, or non-residents having property in this state on which they pay taxes to the amount of $100.00 or over annually, but who shall be a citizen of the United States or a free-holder in this state, shall upon payment of five dollars to any Justice of the Peace . . . be entitled to receive from such officer a gunner's license, which license shall permit such person to kill any of the game birds of this state during the current season under the restrictions heretofore and hereinafter imposed.

1915 Wyo. Sess. Laws 91, An Act Relating to the Preservation of the Game Animals, Game Birds, and Fish of the State of Wyoming . . . , ch. 91, § 13.
There is hereby created a special gun and fish license for aliens. No person, not a bona fide citizen of the United States, shall own or have in his possession, in the State of Wyoming, any gun, pistol or other firearm, or any fishing tackle, without first having obtained the specified license therefor, which such special gun and fish license shall cost the owner the sum of Twenty-five Dollars[.]

1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4.
§ 1. All wholesalers, retailers, dealers and pawn brokers are hereby required to keep a record of all firearms which may come into their possession, whether new or second hand, which record shall be known as the Firearms Register. Such register shall contain the following information, to wit: the name of the manufacturer, person, persons, firm or corporation from whom the firearm was obtained, the date of its acquisition, its manufacturer's number, its color, its caliber, whether the same is new or second hand, whether it is automatic, a revolver, a single shot pistol, a rifle, a shot gun or a machine gun, the name of the party to whom said firearm is sold in such purchasers handwriting and the date of such sale. § 2. Every person who purchases any firearm from any retailer, pawn broker or dealer, shall sign his name or make his mark properly witnessed, if he cannot write, on said Firearm Register, at the time of the delivery to him of any firearm so purchased. § 3. The firearm register, herein required to be kept, shall be prepared by every wholesaler, retailer, pawn broker and dealer in firearms in the state of Wyoming within 30 days after this Act shall become effective and shall thereafter be continued as herein provided. It shall be kept at the place of business of said wholesaler, retailer, pawn broker or dealer, and shall be subject to inspection by any peace officer at all reasonable times. § 4. Any person, firm or corporation who shall fail or refuse to comply with the provisions of this Act shall be deemed

guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not to exceed $100.00, or imprisoned in the County Jail for a period of not to exceed six months, or by both such fine and imprisonment.


Sources: https://firearmslaw.duke.edu/repository/search-the-repository/; Genesa C. Cefali and Jacob D. Charles, "A Brief Overview of Gun Registration in U.S. History," *New Histories of Gun Rights and Regulation,* Joseph Blocher, Jacob D. Charles and Darrell A.H. Miller, eds. (NY: Oxford University Press 2023), 167-94.

**App. 0343**

**EXHIBIT B**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SAMUEL ORTEGA, and**
**REBECCA SCOTT,**

      **Plaintiffs,**

**vs.**                         **No. 1:24-cv-00471-JB-SCY**

**MICHELLE LUJAN GRISHAM, in her**
**official capacity as Governor of the State of**
**New Mexico, and RAÚL TORREZ, in his**
**official capacity as Attorney General of the**
**State of New Mexico,**

      **Defendants.**

### <u>DECLARATION OF RANDOLPH ROTH</u>

I, Randolph Roth, pursuant to 28 U.S.C. § 1746, do depose and state as follows:

1.      I am an Arts and Sciences Distinguished Professor of History and Sociology at The Ohio State University.  I have personal knowledge of the facts set forth in this declaration, and if called upon as a witness, I could and would testify competently as to those facts.

2.      I have been retained by the Office of the Governor Michelle Lujan Grisham of the State of New Mexico to render expert opinions in this case.  I am being compensated at a rate of $250 per hour.

### BACKGROUND AND QUALIFICATIONS

3.      I received a B.A. in History with Honors and Distinction in 1973 from Stanford University, where I received the James Birdsall Weter Prize for the outstanding honors thesis in History.  I received a Ph.D. in History in 1981 from Yale University, where I received the Theron Rockwell Field Prize for the outstanding dissertation in the humanities and the George

**App. 0345**

Washington Eggleston Prize for the outstanding dissertation in American history.  I have taught courses in history, the social sciences, and statistics since 1978, with a focus on criminology and the history of crime.  A true and correct copy of my curriculum vitae is attached as **Exhibit B-1** to this declaration.

4.      I am the author of *American Homicide* (The Belknap Press of the Harvard University Press, 2009), which received the 2011 Michael J. Hindelang Award from the American Society of Criminology awarded annually for the book published over the three previous years that "makes the most outstanding contribution to research in criminology over the previous three years,"[1] and the 2010 Allan Sharlin Memorial Book Award from the Social Science History Association for outstanding books in social science history.[2]  *American Homicide* was also named one of the Outstanding Academic Books of 2010 by *Choice*, and the outstanding book of 2009 by *reason.com*.  The book is an interregional, internationally comparative study of homicide in the United States from colonial times to the present.  I am a Fellow of the American Association for the Advancement of Science, and I have served as a member of the National Academy of Sciences Roundtable on Crime Trends, 2013-2016, and as a member of the Editorial Board of the *American Historical Review*, the most influential journal in the discipline. And in 2022 I received the inaugural Distinguished Scholar Award from the Historical Criminology Division of the American Society of Criminology.

5.      I am the principal investigator on the National Homicide Data Improvement Project, a project funded by the National Science Foundation (SES-1228406, https://www.nsf.

---

[1] See American Society of Criminology, Michel J. Hindelang outstanding Book Award Recipients, https://asc41.com/about-asc/awards/michael-j-hindelang-outstanding-book-award-recipients/.
[2] See Social Science History Association, Allan Sharlin Memorial Book Award, https://ssha.org/awards/sharlin_award/.

**App. 0346**

gov/awardsearch/showAward?AWD_ID=1228406) and the Harry Frank Guggenheim

Foundation to improve the quality of homicide data in the United States from 1959 to the

present.  The pilot project on Ohio has drawn on a wide range of sources in its effort to create a

comprehensive database on homicides (including narratives of each incident) based on the

mortality statistics of the Ohio Department of Health, the confidential compressed mortality files

of the National Center for Health Statistics, the F.B.I.'s Supplementary Homicide Reports, death

certificates, coroner's reports, the homicide case files of Cincinnati, Cleveland, and Columbus,

obituaries, and newspaper accounts.

6.      I have published numerous essays on the history of violence and the use of

firearms in the United States, including a) "Guns, Gun Culture, and Homicide: The Relationship

between Firearms, the Uses of Firearms, and Interpersonal Violence in Early America," *William

and Mary Quarterly* (2002) 59: 223-240 (https://www.jstor.org/stable/3491655#metadata_info_

tab_contents); b) "Counting Guns: What Social Science Historians Know and Could Learn about

Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social Science History*

(2002) 26: 699-708 (https://www.jstor.org/stable/40267796#metadata_info_tab_contents); c)

"Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in

American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to

Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment*

(Washington, D.C.: Smithsonian Institution Scholarly Press, 2019); d) "The Opioid Epidemic

and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman, in

the *Journal of Research in Crime and Delinquency* (2021) (https://www.researchgate.net/

publication/348513393_The_Opioid_Epidemic_and_Homicide_in_the_United_States), and e)

"Government Legitimacy, Social Solidarity, and American Homicide in Historical Perspective"

**App. 0347**

(New York: Harry Frank Guggenheim Foundation, 2024) (https://www.hfg.org/hfg_reports/government-legitimacy-social-solidarity-and-american-homicide-in-historical-perspective/).

      7.      I am also co-founder and co-director of the Historical Violence Database.  The web address for the Historical Violence Database is: http://cjrc.osu.edu/research/interdisciplinary/hvd.  The historical data on which this declaration draws are available through the Historical Violence Database.  The Historical Violence Database is a collaborative project by scholars in the United States, Canada, and Europe to gather data on the history of violent crime and violent death (homicides, suicides, accidents, and casualties of war) from medieval times to the present.  The project is described in Randolph Roth et al., "The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death." *Historical Methods* (2008) 41: 81-98 (https://www.tandfonline.com/doi/pdf/10.3200/HMTS.41.2.81-98?casa_token=PfjkfMsciOwAAAAA:1HrNKToUGfQT4T-L4wqloRc2DFsM4eRmKEc346vchboaSh-X29CkEdqIe8bMoZjBNdk7yNh_aAU).  The only way to obtain reliable historical homicide estimates is to review every scrap of paper on criminal matters in every courthouse (indictments, docket books, case files, and judicial proceedings), every jail roll and coroner's report, every diary and memoir, every article in every issue of a number of local newspapers, every entry in the vital records, and every local history based on lost sources, local tradition, or oral testimony. That is why it takes months to study a single rural county, and years to study a single city.[3]

---

[3] It is also essential, in the opinion of historians and historical social scientists involved in the Historical Violence Database, to use capture-recapture mathematics, when multiple sources are available, to estimate the number of homicides where gaps or omissions exist in the historical record. The method estimates the percentage of the likely number of homicides that appear in the surviving records by looking at the degree to which homicides reported in the surviving legal sources overlap with homicides reported in the surviving non-legal sources (newspapers, vital records, diaries, etc.). A greater degree of overlap means a higher percentage in the surviving

(continued…)

**App. 0348**

8.      My work on data collection and my research for *American Homicide*, together
with the research I have conducted for related essays, has helped me gain expertise on the causes
of homicide and mass violence, and on the role technology has played in changing the nature and
incidence of homicide and mass violence.  I hasten to add that the insights that my colleagues
and I have gained as social science historians into the causes of violence and the history of
violence in the United States stem from our tireless commitment to empiricism.  Our goal is to
gather accurate data on the character and incidence of violent crimes and to follow the evidence
wherever it leads, even when it forces us to accept the fact that a hypothesis we thought might be
true proved false.  As my colleagues and I are fond of saying in the Criminal Justice Network of
the Social Science History Association, the goal is not to be right, but to get it right.  That is the
only way to design effective, pragmatic, nonideological laws and public policies that can help us
address our nation's problem of violence.

9.      I have previously served as an expert witness in cases concerning the
constitutionality of state and municipal gun laws, including *Miller v. Bonta*, No. 3:19-cv-1537
(S.D. Cal.); *Duncan v. Bonta*, No. 3:17-cv-1017 (S.D. Cal.); *Steven Rupp et al. and California
Rifle and Pistol Association v. Bonta*, 8:17-cv-00746-JLS-JDE (CA. Central District Western
Division); *Jones v. Bonta*, No. 3:19-cv-01226-L-AHG (S.D. Cal.); ); *Richards v. Bonta* 3:23-cv-

---

records and a tighter confidence interval. A lesser degree of overlap, which typically occurs on
contested frontiers and during civil wars and revolutions, means a lower percentage and a wider
confidence interval. See Randolph Roth, "American Homicide Supplemental Volume: Homicide
Estimates" (2009) (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Homicide-Estimates.pdf);
Roth, "Child Murder in New England," *Social Science History* (2001) 25: 101-147
(https://www.jstor.org/stable/1171584#metadata_info_tab_contents); Roth and James M.
Denham, "Homicide in Florida, 1821-1861: A Quantitative Analysis," *Florida Historical Quarterly*
86 (2007): 216-239; and Douglas L. Eckberg, "Stalking the Elusive Homicide: A Capture-
Recapture Approach to the Estimation of Post-Reconstruction South Carolina Killings." *Social
Science History* 25 (2001): 67-91 (https://www.jstor.org/stable/1171582#metadata_info_tab
_contents).

**App. 0349**

00793-LAB-AHG (S.D.Calif): *Ocean State Tactical v. Rhode Island*, No. 22-cv-246 (D.R.I.);

*Hanson v. District of Columbia*, No. 1:22-cv02256-RC (D.C.); *State of Vermont v. Max B.*

*Misch*, Docket No. 173-2-19 Bnrc (Superior Court, Criminal Division, Bennington Unit, VT.);

*National Association for Gun Rights and Capen v. Campbell*, No. 22-cv-11431-FDS (D.MA.);

*National Association for Gun Rights, and Susan Karen Goldman v. City of Highland Park,*

*Illinois*, No. 1:22-cv-04774 (N.D. Ill. Eastern Division); *Association Of New Jersey Rifle and*

*Pistol Clubs v. Platkin*, No. 3:18-cv-10507 (D.N.J.); *Cheeseman v. Platkin*, No. 7-:22-cv-04360

(D.N.J.); *Ellman v. Platkin*, No. 3:22-cv-04397 (D.N.J.); *Oregon Firearms Federation, et al. v.*

*Brown and Roseblum*, No. 2:22-cv-01815-IM (D.OR.); *National Association for Gun Rights v.*

*Brown*, No 22-cv-00404-DKW-RT (D.HI.); *National Association for Gun Rights v. Lamont*, No.

3:22-cv-01118 (D.CT.); *Barnett v. Raoul*, 3:23-cv-209-SPM (S.D. Ill.); and *Rocky Mountain Gun*

*Owners et al. v. Polis*, No. 23-cv-01076-PAB (D.CO).

<div align="center">OPINIONS</div>

## I.   SUMMARY OF OPINIONS

1.     I have been asked by the State of New Mexico to provide opinions on the history

of homicides and mass murders in the United States, with special attention to the role that

technologies have played in shaping the character and incidence of homicides and mass murders

over time, and the historical restrictions that local and federal authorities have imposed in

response to new technologies that they deemed particularly lethal, prone to misuse, and a danger

to the public because of the ways in which they reshaped the character and incidence of

homicides and mass murders. Since 1791, local, state, and federal governments have responded

in measured ways whenever new weapons, including certain classes of firearms, or new uses of

**App. 0350**

deadly weapons have posed a threat to the safety of law enforcement, government officials, or the public.

2.      For the past thirty-five years, I have dedicated my career to understanding why homicide rates rise and fall over time, in hopes of understanding why the United States—which, apart from the slave South, was perhaps the least homicidal society in the Western world in the early nineteenth century—became by far the most homicidal, as it remains today.  I discovered that the key to low homicide rates over the past 450 years has been successful nation-building.  High homicide rates among unrelated adults—friends, acquaintances, strangers—coincide with political instability, a loss of trust in government and political leaders, a loss of fellow feeling among citizens, and a lack of faith in the justice of the social hierarchy.[4]  As a nation, we are still feeling the aftershocks of our failure at nation-building in the mid- and late-nineteenth century, from the political crisis of the late 1840s and 1850s through the Civil War, Reconstruction, and the rise of Jim Crow.

3.      Our nation's homicide rate would thus be high today even in the absence of modern technologies that have made firearms far more capable of injuring multiple people over a short span of time than they were in colonial and Revolutionary era.  But the evidence also shows that the availability of guns and changes in firearms technology, especially the emergence of modern breech-loading firearms in the mid-nineteenth century, and of rapid-fire

---

[4] See Randolph Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217, (https://citeseerx.ist.psu.edu/document?repid=rep1&type=pdf&doi=99e1b9b2cccce19ceeb33808f90f75b7c8e835d0), for an introduction to the ways that social science historians can measure the feelings and beliefs that lead to successful nation-building. My research has shown that those measures have gone up and down with homicide rates among unrelated adults in the United States from colonial times to the present. In social science history, as in the non-experimental historical sciences (geology, paleontology, evolutionary biology), correlations that persist across wide stretches of time and space are not random. They reveal deep patterns that are causal.

**App. 0351**

semiautomatic weapons and extended magazines in the late twentieth century, have pushed the

homicide rate in United States well beyond what it would otherwise have been.

4.      My opinion will address in turn:

a.      firearms restrictions on colonists from the end of the seventeenth

century to the eve of the Revolution, when homicide rates were low among

colonists and firearms were seldom used in homicides among colonists when they

did occur;

b.      the development during the Founding and Early National periods

of laws restricting the use or ownership of concealable weapons in slave and

frontier states, where homicide rates among persons of European ancestry soared

after the Revolution in large part because of the increased manufacture and

ownership of concealable percussion cap pistols and fighting knives;

c.      the spread of restrictions on carrying concealed weapons in every

state by World War I, as homicide rates rose across the nation, beginning around

the time of the Mexican War of 1846-1848 and lasting until World War I—a rise

caused in part by the invention of modern revolvers, which were used in a

majority of homicides by the late nineteenth century;

d.      the difficulty that local and federal officials faced from the colonial

era into the early twentieth century in addressing the threat of mass murders,

which, because of the limitations of existing technologies, were carried out by

large groups of individuals acting in concert, rather than by individuals or small

groups;

**App. 0352**

  e.  the spread of restrictions in the twentieth and early twenty-first centuries on new technologies, including rapid-fire firearms and large capacity magazines, that changed the character of mass murder, by enabling individuals or small groups to commit mass murder; and

  f.  the advent of waiting period laws in response to the rise since the late eighteenth century in suicides by firearm.

## II. GOVERNMENT REGULATION OF FIREARMS IN RESPONSE TO HOMICIDE TRENDS

### A. Homicide and Firearms in the Colonial Era (1688-1763)

  5.  In the eighteenth century, the use and ownership of firearms by Native Americans and African Americans, enslaved and free, were heavily regulated.[5]  But laws restricting the use or ownership of firearms by colonists of European ancestry were rare, for two reasons.  First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in patriotic fellow feeling within the British empire, and greater trust in government.[6]  By the late 1750s and early 1760s, the rates at which adult colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England.[7]  Violence among colonists was not a pressing problem on the eve of the Revolution.

---

[5] Clayton E. Cramer, "Colonial Firearms Regulation" (April 6, 2016). Available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2759961.

[6] Randolph Roth, *American Homicide* (Cambridge: The Belknap Press of Harvard University Press, 2009), 63, noting that "Fear of Indians and slaves, hatred of the French, enthusiasm for the new colonial and imperial governments established by the Glorious Revolution, and patriotic devotion to England drew colonists together. The late seventeenth century thus marks the discernible beginning of the centuries-long pattern linking homicide rates in America with political stability, racial, religious, and national solidarity, and faith in government and political leaders."

[7] Roth, *American Homicide*, 61-63, and especially the graphs on 38, 39, and 91. By way of comparison, the average homicide rate for adults in the United States from 1999 through

(continued…)

**App. 0353**

6.      Second, the impact of firearms on the homicide rate was modest, even though household ownership of firearms was widespread.  Approximately 50 to 60 percent of households in the colonial and Founding eras owned a working firearm, usually a musket or a fowling piece.[8]  Fowling pieces, like muskets, were muzzle-loading. But unlike muskets, which were heavy, single-shot firearms used for militia service, fowling pieces were manufactured specifically to hunt birds and control vermin, so they were designed to fire shot, primarily, rather than ball, and were of lighter construction than muskets.[9] Family, household, and intimate partner homicides were rare, and only 10 to 15 percent of those homicides were committed with guns.  In New England, the rate of family and intimate partner homicides stood at only 2 per million persons per year for European Americans and 3 per million for African Americans for the seventeenth and most of the eighteenth century, and fell to 1 per million for both European and African Americans after the Revolution.  The rates in the Chesapeake were likewise low, at 8 per million per year for European Americans and 4 to 5 per million for African Americans.[10] And because the homicide rate among unrelated adults was low, the proportion of nondomestic homicides committed with guns was similarly low—never more than 10 to 15 percent.[11]

---

2016—an era in which the quality of emergency services and wound care was vastly superior to that in the colonial era—was 7 per 100,000 per year. See CDC Wonder Compressed Mortality Files, ICD-10 (https://wonder.cdc.gov/cmf-icd10.html, accessed September 8, 2022).

[8] Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *Firearms and the Common Law: History and Memory* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116.

[9] *See, e.g.,* Kevin M. Sweeney, "Firearms, Militias, and the Second Amendment," in Saul A. Cornell and Nathan Kozuskanich, eds., *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (University of Massachusetts Press, 2013), 310, 327 & nn. 101-102.

[10] Roth, "Why Guns Are and Aren't the Problem," 116.

[11] Ibid., 116-119.

**App. 0354**

7.      Firearm use in homicides was generally rare because muzzle-loading firearms, such as muskets and fowling pieces, had significant limitations as murder weapons in the colonial era.[12] They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology; and with the exception of a few double-barreled pistols, they could not fire multiple shots without reloading.[13]  They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat.  They had to be reloaded manually to enable the firing of another shot, which was a time-consuming process that required skill and experience.[14]  And more important, muzzle-loading firearms could not be used impulsively unless they were already loaded for some other purpose.[15]  It took at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand.[16]  The user had to pour powder down the barrel, hold it in place with wadding, and drop or ram the shot or ball onto the charge.[17]  The firing mechanism also had to be readied, often with a fresh flint.[18]  And muzzle-loading guns were difficult to keep loaded for any length of time, because black powder absorbed moisture and could corrode the barrel or firing mechanism or make the charge liable to misfire.[19]  The life of a charge could be extended by storing a gun in a warm, dry place, typically over a fireplace, but even there, moisture from boiling pots, drying

---

[12] Ibid., 117.

[13] Ibid.

[14] Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783* (New York: Bramhall House, 1956), 155-225; Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* (New York: Penguin Press, 2018), 9-10; and Satia, "Who Had Guns in Eighteenth Century Britain?" in Tucker, Hacker, and Vining, *Firearms and the Common Law*, 41-44.

[15] Roth, "Why Guns Are and Aren't the Problem," 117.

[16] Ibid.

[17] Ibid.

[18] Ibid.

[19] Ibid.

**App. 0355**

clothes, or humid weather could do damage.[20]  That is why most owners stored their guns empty, cleaned them regularly, and loaded them anew before every use.[21]

8.      The infrequent use of guns in homicides in colonial America reflected these limitations.  Family and household homicides—most of which were caused by abuse or fights between family members that got out of control—were committed almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives.[22]  It did not matter whether the type of homicide was rare—like family and intimate homicides—or common, like murders of servants, slaves, or owners committed during the heyday of indentured servitude or the early years of racial slavery.[23]  Guns were not the weapons of choice in homicides that grew out of the tensions of daily life.[24]

9.      When colonists anticipated violence or during times of political instability gun use was more common.  When homicide rates were high among unrelated adults in the early and mid-seventeenth century, colonists went armed to political or interpersonal disputes,[25] so the proportion of homicides committed with firearms was at that time 40 percent and rose even higher in contested areas on the frontier.[26]  Colonists also armed themselves when they anticipated hostile encounters with Native Americans, so 60 percent of homicides of Native Americans by European Americans in New England were committed with firearms.[27]  And slave

---

[20] Ibid.

[21] Ibid.; and Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* (New York: Bonanza Books, 1959), 11-40, 180-183.

[22] Roth, "Why Guns Are and Aren't the Problem," 117.

[23] Ibid.

[24] Ibid. Contrary to popular belief, dueling was also rare in colonial America. Roth, *American Homicide*, 45, 158.

[25] Roth, "Why Guns Are and Aren't the Problem," 118-119.

[26] Ibid., 116-117.

[27] Ibid., 118-119 (reporting that "In New England, 57 percent of such homicides were committed with guns between the end of King Phillip's War in 1676 and the end of the eighteenth century").

**App. 0356**

catchers and posses kept their firearms at the ready, so 90 percent of runaway slaves who were

killed in Virginia were shot.[28]  Otherwise, however, colonists seldom went about with loaded

guns, except to hunt, control vermin, or muster for militia training.[29]  That is why firearms had a

modest impact on homicide rates among colonists.

**B.**     **The Rise in Violence in the South and on Contested Frontiers during the Early National Period, the Role of New Technologies and Practices, and Regulations on Concealable Weapons (1790s-1840s)**

10.     The Founding Generation was zealous in its defense of the people's rights, and so

enshrined them in the Constitution.  At the same time, they recognized that some citizens could

be irresponsible or motivated by evil intent and could thus threaten the security of the

government and the safety of citizens.[30]  The threats that such citizens posed to public safety

could be checked in most instances by ordinary criminal statutes, drawn largely from British

common law.  But at times those threats could be checked only by statutes that placed limits on

basic rights.[31]

---

[28] Ibid., 118 (reporting that "Petitions to the Virginia House of Burgesses for compensation for outlawed slaves who were killed during attempts to capture them indicate that 90 percent were shot").

[29] Ibid., 118-119.

[30] On the fears of the Founders that their republic might collapse because selfish or unscrupulous citizens might misuse their liberties, see Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969), 65-70, 282-291, 319-328, 413-425, 463-467; Drew R. McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989), 42-45; and Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003), 6-9, 60-65, 86-104, 113-114.

[31] On the Founders' belief that rights might have to be restricted in certain instances, see Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016), 1-8, on restraints on freedom of speech and the press during the administration of John Adams; Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963), 93-141, on loosening restrictions on searches and seizures during the administration of Thomas Jefferson; and Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (New York: Prometheus Books, 2018), 70-121, especially 108-109, as well as Saul

(continued…)

**App. 0357**

11.     The Founders were aware that the rate at which civilians killed each other or were killed by roving bands of Tories or Patriots rose during the Revolution.[32]  And they recognized that more civilians, expecting trouble with neighbors, public officials, and partisans, were likely to go about armed during the Revolution, which is why the proportion of homicides of European Americans by unrelated adults rose to 33 percent in Virginia and 46 percent in New England.[33]  But the surge in violence ended in New England, the Mid-Atlantic states, and the settled Midwest once the Revolutionary crisis was over.  In those areas homicide rates fell to levels in some instances even lower than those which had prevailed in the early and mid-eighteenth century.  By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and

Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 39-70, and Jack N. Rakove, "The Second Amendment: The Highest State of Originalism," in Carl T. Bogus, ed., *The Second Amendment in Law and History: Historians and Constitutional Scholars on the Right to Bear Arms* (New York: The New Press, 2000), 74-116, on the limited scope of the Second Amendment. Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996), 291, notes that "Nearly all the activities that constituted the realms of life, liberty, property, and religion were subject to regulation by the state; no obvious landmarks marked the boundaries beyond which its authority could not intrude, *if* its actions met the requirements of law." See also Rakove, "The Second Amendment: The Highest State of Originalism," Chicago-Kent Law Review 76 (2000), 157 (https://scholarship.kentlaw.iit.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=3289&context=cklawreview): "[At] the time when the Second Amendment was adopted, it was still possible to conceive of statements of rights in quite different terms, as assertions or confirmations of vital principles, rather than the codification of legally enforceable restrictions or commands."

[32] Roth, *American Homicide*, 145-149; Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017), 308-322; Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006), 91-102; George C. Daughan, *Revolution on the Hudson: New York City and the Hudson River Valley in the American War for Independence* (New York: W. W. Norton, 2016), 137-138; John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998), 42-43, 141-145, 149-152; Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000), 25-27, 32, 64-65, 91-92, 114; and Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 1996), 3-18.

[33] Roth, "Why Guns Are and Aren't the Problem," 119-120.

**App. 0358**

Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England. Only New York City stood out, at 6 per 100,000 adults per year.[34]  And the proportion of domestic and nondomestic homicides committed with firearms was correspondingly low—between 0 and 10 percent—because people once again generally refrained, as they had from the Glorious Revolution through the French and Indian War, from going about armed, except to hunt, control vermin, or serve in the militia.[35]

12.     The keys to these low homicide rates and low rates of gun violence in New England, the Mid-Atlantic states, and the settled Midwest were successful nation-building and the degree to which the promise of the democratic revolution was realized.  Political stability returned, as did faith in government and a strong sense of patriotic fellow feeling, as the franchise was extended and political participation increased.[36]  And self-employment—the bedrock of citizenship, self-respect, and respect from others—was widespread.  By 1815, roughly 80 percent of women and men owned their own homes and shops or farms by their mid-thirties; and those who did not were often white-collar professionals who also received respect from their peers.[37]  African Americans still faced discrimination and limits on their basic rights in most Northern states.  But despite these barriers, most African Americans in the North were

---

[34] Roth, *American Homicide,* 180, 183-186; and Eric H. Monkkonen, *Murder in New York City* (Berkeley: University of California Press, 2001), 15-16.

[35] For detailed figures and tables on weapons use in homicides by state, city, or county, see Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Weapons-10-2009.pdf).  On weapons use in homicides in the North, see Figures 25 through 46.

[36] Roth, *American Homicide*, 180, 183-186.

[37] Ibid., 180, 183-186.

**App. 0359**

optimistic, after slavery was abolished in the North, about earning their own living and forming

their own churches and voluntary organizations.[38]

13.     That is why there was little interest among public officials in the North in

restricting the use of firearms during the Early National period, except in duels.  They took a

strong stand against dueling in the wake of Alexander Hamilton's death, because of the threat the

practice posed for the nation's democratic polity and the lives of public men: editors, attorneys,

military officers, and politicians.[39]

14.     Laws restricting the everyday use of firearms did appear, however, in the early

national period in a number of slave states,[40] where violence among citizens increased after the

Revolution to extremely high levels.  Revolutionary ideas and aspirations wreaked havoc on the

status hierarchy of the slave South, where homicide rates ranged from 8 to 28 per 100,000 adults

per year.[41]  Poor and middle-class whites were increasingly frustrated by their inability to rise in

a society that remained class-bound and hierarchical.[42]  Prominent whites were subjected to the

rough and tumble of partisan politics and their position in society was threatened by people from

---

[38] Ibid., 181-182, 195-196; Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); and Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999).

[39] Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); and C. A. Harwell, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," *Vanderbilt Law Review* 54 (2001): 1805-1847 (https://scholarship.law.vanderbilt.edu/cgi/viewcontent.cgi?article=1884&context=vlr).

[40] Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (Westport, Connecticut: Praeger, 1999); and Cornell, *Well-Regulated Militia*, 141-144.

[41] Roth, *American Homicide*, 180, 199-203.

[42] Ibid., 182.

**App. 0360**

lower social positions.[43]  African Americans despaired over the failure of the abolition

movement in the South, and whites were more fearful than ever of African American rebellion.[44]

As a result, impatience with restraint and sensitivity to insult were more intense in the slave

South, and during this period the region saw a dramatic increase in the number of deadly

quarrels, property disputes, duels, and interracial killings.[45]  The violence spread to frontier

Florida and Texas, as well as to southern Illinois and Indiana—wherever Southerners settled in

the early national period.[46]  During the Early National period, the proportion of homicides

committed with firearms went up accordingly, to a third or two-fifths, as Southerners armed

themselves in anticipation of trouble, or set out to cause trouble.[47]

15.     Citizens and public officials in these states recognized that concealable

weapons—pistols, folding knives, dirk knives, and Bowie knives—were used in an alarming

proportion of the era's murders and serious assaults.[48]  They were used to ambush both ordinary

citizens and political rivals, to bully or intimidate law-abiding citizens, and to seize the

advantage in fist fights.  As the Grand Jurors of Jasper County, Georgia, stated in a plea to the

state legislature in 1834 for restrictions on concealable weapons,

> The practice which is common amongst us with the young the middle aged and the
> aged to arm themselves with Pistols, dirks knives sticks & spears under the specious
> pretence of protecting themselves against insult, when in fact being so armed they
> frequently insult others with impunity, or if resistance is made the pistol dirk or club

---

[43] Ibid.

[44] Ibid.

[45] Ibid., 182, 199-203.

[46] Ibid., 162, 180-183, 199-203; Roth and James M. Denham, "Homicide in Florida, 1821-1861," *Florida Historical Quarterly* 86 (2007): 216-239; John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); and Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

[47] Roth, "American Homicide Supplemental Volume: Weapons," Figures 51 through 57.

[48] Roth, *American Homicide*, 218.

**App. 0361**

is immediately resorted to, hence we so often hear of the stabbing shooting &
murdering so many of our citizens.[49]

The justices of the Louisiana Supreme Court echoed these sentiments—"unmanly" men carried

concealed weapons to gain "secret advantages" over their adversaries.[50] These concealed

weapons laws were notably difficult to enforce, however, and did not address underlying factors

that contributed to rising homicide rates. Nevertheless, these laws represent governmental

efforts at that time to address the use of new weapons in certain types of crime.

16.      The pistols of the early national period represented a technological advance.

Percussion-lock mechanisms enabled users to extend the life of a charge, because unlike flint-

lock mechanisms, they did not use hydroscopic black powder in their priming pans; they used a

sealed mercury-fulminate cap as a primer and seated it tightly on a small nipple (with an inner

diameter the size of a medium sewing needle) at the rear of the firing chamber, which restricted

the flow of air and moisture to the chamber. Percussion cap pistols, which replaced flint-lock

pistols in domestic markets by the mid-1820s, could thus be kept loaded and carried around for

longer periods without risk of corrosion.[51] The new types of knives available in this era also

represented technological advances over ordinary knives because they were designed expressly

for fighting. Dirks and Bowie knives had longer blades than ordinary knives, crossguards to

protect the combatants' hands, and clip points to make it easier to cut or stab opponents.[52]

17.      The violence in the slave South and its borderlands, and the technological

advances that exacerbated it, led to the first prohibitions against carrying certain concealable

---

[49] Ibid., 218-219. See also the concerns of the Grand Jurors of Wilkes County, Georgia,
Superior Court Minutes, July 1839 term.

[50] Roth, *American Homicide*, 219.

[51] Roth, "Why Guns Are and Aren't the Problem," 117.

[52] Harold L. Peterson, *American Knives: The First History and Collector's Guide* (New
York: Scribner, 1958), 25-70; and Peterson, *Daggers and Fighting Knives in the Western World,
from the Stone Age till 1900* (New York: Walker, 1968), 67-80.

**App. 0362**

weapons, which appeared in Kentucky, Louisiana, Indiana, Arkansas, Georgia, and Virginia between 1813 and 1838.  These laws differed from earlier laws that restricted access to arms by Native Americans or by free or enslaved African Americans, because they applied broadly to *everyone* but also applied more *narrowly* to certain types of weapons and to certain types of conduct.  Georgia's 1837 law "against the unwarrantable and too prevalent use of deadly weapons" was the most restrictive.  It made it unlawful for merchants

> and any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere . . . Bowie, or any other kind of knives, manufactured or sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c.

The sole exceptions were horseman's pistols—large weapons that were difficult to conceal and were favored by travelers.  But the laws in the other five states were also strict: they forbid the carrying of concealable weapons in all circumstances.  Indiana made an exemption for travelers.[53]

18.     Thus, during the lifetimes of Jefferson, Adams, Marshall, and Madison, the Founding Generation passed laws in a number of states that restricted the use or ownership of certain types of weapons after it became obvious that those weapons, including certain fighting knives and percussion-cap pistols, were being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates.[54]

---

[53] Cramer, *Concealed Weapons Laws*, especially 143-152, for the texts of those laws. Alabama and Tennessee prohibited the concealed carrying of fighting knives, but not pistols. See also the Duke Center for Firearms Law, Repository of Historical Gun Laws (https://firearmslaw. duke.edu/search-results/?_sft_subjects=dangerous-or-unusual-weapons, accessed September 9, 2022). Note that the Georgia Supreme Court, in *Nunn v. State*, 1 Ga. 243 (1846), held that prohibiting the concealed carry of certain weapons was valid, but that the state could not also prohibit open carry, which would destroy the right to bear arms. That decision put Georgia in line with the five other states that had prohibited the carrying of concealable firearms.

[54] Cramer, *Concealed Weapons Laws*, 69-96; Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*

(continued…)

**App. 0363**

**C.    Homicide, Concealable Weapons, and Concealable Weapons Regulations from the Mexican War through the Early Twentieth Century (1846-1920s)**

19.    By the early twentieth century, every state either banned concealed firearms or placed severe restrictions on their possession.[55]  They did so in response to two developments: the nationwide surge in homicide rates, from the North and South to the Trans-Mississippi West; and the invention of new firearms, especially the revolver, which enabled the firing of multiple rounds in succession without reloading and made the homicide problem worse.  Between the mid-nineteenth and the early twentieth century homicide rates fell in nearly every Western nation.[56]  But in the late 1840s and 1850s those rates exploded across the United States and spiked even higher during the Civil War and Reconstruction, not only in the South and the Southwest, where rates had already risen in the early national period, but in the North.  Rates that had ranged in the North in the 1830s and early 1840s from a low of 1 per 100,000 adults per year

(Westport, Connecticut: Praeger Publishers, 1994); Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., *Restricting Handguns: The Liberal Skeptics Speak Out* (Croton-on-Hudson, New York: North River Press, 1979), 7-30; and Philip D. Jordan, *Frontier Law and Order—10 Essays* (Lincoln: University of Nebraska Press, 1970), 1-22. Thomas Jefferson and John Adams died on July 4, 1826, John Marshall on July 6, 1835, and James Madison on July 28, 1836. On the history of firearms regulations that pertained to African Americans, see Robert J. Cottrol and Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," *Georgetown Law Journal* 80 (1991): 309-361 (https://digitalcommons.law.lsu.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1283&context=faculty_scholarship); Cottrol and Diamond, "Public Safety and the Right to Bear Arms" in David J. Bodenhamer and James W. Ely, Jr., eds., *The Bill of Rights in Modern America*, revised and expanded (Bloomington: Indiana University Press, 2008), 88-107; and Cramer, *For the Defense of Themselves and the State*, 74, 83-85, 97-140.

[55] Kates, "Toward a History of Handgun Prohibition," 7-30; and Jordan, *Frontier Law and Order*, 17-22. These sources identify laws that either banned concealed firearms or placed severe restrictions on their possession in every state except Vermont. However, Vermont also had such a law by the early twentieth century. *See* An Act Against Carrying Concealed Weapons, No. 85, § 1 (12th Biennial Session, General Assembly of the State of Vermont, Nov. 19, 1892) ("A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.").

[56] Roth, *American Homicide*, 297-300.

**App. 0364**

in northern New England to 6 per 100,000 in New York City, rose to between 2 and 33 per 100,000 in the northern countryside and to between 10 and 20 per 100,000 in northern cities. In the South, rates in the plantation counties of Georgia rose from 10 per 100,000 adults to 25 per 100,000, and rates soared even higher in rural Louisiana to 90 per 100,000 and in mountain communities in Georgia and Missouri from less than 5 per 100,000 adults per year to 60 per 100,000. And in the West, the rates reached 65 per 100,000 adults per year in California, 76 per 100,000 in Texas, 119 per 100,000 in mining towns in South Dakota, Nevada, and Montana, and 155 per 100,000 in cattle towns in Kansas. Americans, especially men, were more willing to kill friends, acquaintances, and strangers.  And so, the United States became—and remains today— by far the most murderous affluent society in the world. [57]

20.     The increase occurred because America's heretofore largely successful effort at nation-building failed at mid-century. [58]  As the country struggled through the wrenching and divisive changes of the mid-nineteenth century—the crises over slavery and immigration, the decline in self-employment, and rise of industrialized cities—the patriotic faith in government that most Americans felt so strongly after the Revolution was undermined by anger and distrust. [59]  Disillusioned by the course the nation was taking, people felt increasingly alienated from both their government and their neighbors. [60]  They were losing the sense that they were participating in a great adventure with their fellow Americans. [61]  Instead, they were competing

---

[57] Ibid., 199, 297-300, 302, 337, 347; and Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 173-195 (https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents).

[58] Ibid., 299-302, 384-385; and Roth, "American Homicide: Theory, Methods, Body Counts," *Historical Methods* 43 (2010): 185-192.

[59] Roth, *American Homicide*, 299-302, 384-385. See also Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide."

[60] Roth, *American Homicide*, 300.

[61] Ibid.

**App. 0365**

in a cutthroat economy and a combative political system against millions of strangers whose interests and values were antithetical to their own.[62]  And most ominously, law and order broke down in the wake of the hostile military occupation of the Southwest, the political crisis of the 1850s, the Civil War, and Reconstruction.[63]

21.     The proportion of homicides committed with firearms increased as well from the Mexican War through Reconstruction, as it had during previous increases in nondomestic homicides during the Revolution, in the postrevolutionary South, and on contested frontiers.[64] Because the pistols, muskets, fowling pieces, and rifles in use in the early years of the crisis of the mid-nineteenth century were still predominantly single-shot, muzzle-loading, black powder weapons, the proportion of homicides committed with guns stayed in the range of a third to two-fifths, except on the frontier.[65]  Concealable fighting knives, together with concealable percussion-cap pistols, remained the primary murder weapons.  But in time, new technologies added to the toll in lives, because of their lethality and the new ways in which they could be used.

22.     Samuel Colt's cap-and-ball revolvers, invented in 1836, played a limited role in the early years of the homicide crisis, but they gained popularity quickly because of their association with frontiersmen, Indian fighters, Texas Rangers, and cavalrymen in the Mexican War.[66]  They retained some of the limitations of earlier firearms, because their rotating cylinders—two of which came with each revolver—had to be loaded one chamber at a time.

---

[62] Ibid.

[63] Ibid., 299-302, 332, 337, 354.

[64] Roth, "Why Guns Are and Aren't the Problem," 116-117.

[65] Roth, "American Homicide Supplemental Volume: Weapons," Figures 25 through 46, and 51 through 57.

[66] Patricia Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016).

**App. 0366**

Users had to seat a percussion cap on a nipple at the rear of each chamber, pour powder into each chamber, secure the powder with wadding, and ram the bullet down the chamber with a rod or an attached loading lever.  Thus cap-and-ball revolvers, like muzzle-loaders, could not be loaded quickly, nor could they be kept loaded indefinitely without risk of damaging the charge or the gun.  But they were deadlier than their predecessors, because they made it possible for a person to fire five or six shots in rapid succession and to reload quickly with the second cylinder.[67]

23.     Smith and Wesson's seven-shot, .22 caliber, breech-loading, Model 1 rimfire revolver, invented in 1857, appeared on the market when the homicide crisis was already well underway.  But it had none of the limitations of percussion-cap pistols or cap-and-ball revolvers. It could be loaded quickly and easily because it did not require powder, wadding, and shot for each round; and it could be kept loaded indefinitely because its corrosive powder was encapsulated in the bullet.[68]  And it did not require a new percussion cap for each chamber, because the primer was located in a rim around the base of the bullet, set to ignite as soon as it was hit by the hammer.[69]  As Smith and Wesson noted in its advertisements,

Some of the advantages of an arm constructed on this plan are:

- The convenience and safety with which both the arm and ammunition may be carried;
- The facility with which it may be charged, (it requiring no ramrod, powder-flask, or percussion caps);
- Certainty of fire in damp weather;

---

[67] Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945* (Harrisburg, Pennsylvania: Stackpole Books, 1981), 24-28; Julian S. Hatcher, *Pistols and Revolvers and Their Use* (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927), 8-11; and Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 17-43.
[68] Roy G. Jinks, *History of Smith and Wesson* (North Hollywood: Beinfeld, 1977), 38-57.
[69] Ibid., 38-57.

**App. 0367**

- That no injury is caused to the arm or ammunition by allowing it to remain charged any length of time.[70]

24.     Smith and Wesson had created a near-perfect murder weapon.  It was lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time.[71]  Its only drawbacks were its small caliber and low muzzle velocity, which limited its ability to stop an armed or aggressive adversary on the first shot, and the difficulty and danger of reloading. The reloading problem was remedied by Colt's development in 1889 of the first double-action commercial revolver with a swing-out cylinder and Smith and Wesson's addition in 1896 of an ejector to push out spent cartridges.[72]

25.     These new weapons were not the primary cause of the surge in violence that occurred in the United States from the Mexican War through Reconstruction.  But they did contribute to the later stages of the crisis, as they superseded knives and black powder handguns as the primary weapons used in interpersonal assaults, not only because of their greater lethality, but because they were used in novel ways.[73]  Easily concealed, they became the weapons of choice for men who stalked and ambushed estranged spouses or romantic partners, for suspects who killed sheriffs, constables, or police officers, and for self-styled toughs who engaged in shootouts in bars, streets, and even churchyards.[74]  And as modern, breech-loading firearms replaced the muzzle-loading and cap-and-ball gunstock from the late 1850s through World War

---

[70] Ibid., 39.

[71] Ibid., 38-57.

[72] Rick Sapp, *Standard Catalog of Colt Firearms* (Cincinnati: F+W Media, 2011), 96; Jeff Kinard, *Pistols: An Illustrated History of Their Impact* (Santa Barbara: ABC-CLIO, 2003), 163; and Jinks, *History of Smith and Wesson*, 104-170.

[73] Roth, "Why Guns Are and Aren't the Problem," 124-126 (recognizing that "Americans used the new firearms in ways they could never use muzzle-loading guns [. . .] The ownership of modern breech-loading [firearms] made the homicide rate worse in the United States than it would have been otherwise because it facilitated the use of *lethal* violence in a *wide variety of circumstances*.") (emphasis added).

[74] Ibid., 124-125.

**App. 0368**

I, the proportion of homicides committed with firearms continued to climb even when homicide

rates fell for a short time, as they did at the end of Reconstruction.  By the eve of World War I,

rates had fallen in the New England states to 1 to 4 per 100,000 adults per year, to 2 to 5 per

100,000 in the Prairie states, and 3 to 8 per 100,000 in the industrial states. In the West, rates had

fallen to 12 per 100,000 adults per year in California, 15 per 100,000 in Colorado, and

approximately 20 to 30 per 100,000 in Arizona, Nevada, and New Mexico.  Homicide rates

whipsawed, however, in the South.  They fell in the late 1870s and 1880s, only to rise in the

1890s and early twentieth century, to just under 20 per 100,000 adults in Florida, Kentucky,

Louisiana, Missouri, and Tennessee, and 35 per 100,000 in Virginia and North Carolina.[75]

Ominously, too, firearms invaded families and intimate relationships, so relatives, spouses, and

lovers were as likely to be killed with guns as unrelated adults—something that had never

happened before in America's history.[76]  That is why the proportion of homicides committed

with firearms—overwhelmingly, concealed revolvers—reached today's levels by the 1920s,

ranging from a median of 56 percent in New England and over 70 percent in the South and

West.[77]  And that is why every state in the Union restricted the right to carrying certain

concealable weapons.

     26.     It is important to note that state legislators experimented with various degrees of

firearm regulation, as the nation became more and more violent.  In Texas, where the homicide

rate soared to at least 76 per 100,000 adults per year from June, 1865, to June, 1868,[78] the

---

     [75] Ibid., 125-127, 388, 403-404; and Roth, "American Homicide Supplemental Volume: American Homicides in the Twentieth Century," Figures 4a and 5a.
     [76] Ibid., 125.
     [77] Roth, "American Homicide Supplemental Volume: Weapons," Figures 2 through 7.
     [78] Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 192, (https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents).

**App. 0369**

legislature passed a time-place-manner restriction bill in 1870 to prohibit the open or concealed

carry of a wide range of weapons, including firearms, on social occasions;[79] and it followed in

1871 with a bill banning in most circumstances the carrying, open or concealed, of small deadly

weapons, including pistols, that were not designed for hunting or militia service.[80]  These laws

---

[79] Brennan Gardner Rivas, "Enforcement of Public Carry Restrictions: Texas as a Case Study," *UC Davis Law Review* 55 (2021): 2609-2610 (https://lawreview.law.ucdavis.edu/issues/55/5/articles/files/55-5_Rivas.pdf). "Be it enacted by the Legislature of the State of Texas, That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six-shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law." An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63. See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930" (Ph.D. dissertation: Texas Christian University, 2019) (https://repository.tcu.edu/handle/116099117/26778).

[80] Rivas, "Enforcement of Public Carry Restrictions," 2610-2611. Rivas, quoting the law, says that "The first section stated, 'That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; provided that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the

(continued…)

**App. 0370**

were enforced with little or no racial bias until the 1890s, when white supremacists disfranchised

African Americans, legalized segregation, and took firm control of the courts and law

enforcement.[81]

27.     Tennessee and Arkansas went farther than Texas to stem the tide of post-Civil

War interpersonal violence.  In 1871, Tennessee flatly prohibited the carrying of pocket pistols

and revolvers, openly or concealed, except for the large army and navy pistols commonly carried

---

State from keeping or carrying arms with their baggage; provided, further, that members of the
Legislature shall not be included under the term "civil officers" as used in this act.' An Act to
Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, § 1,
1871 Tex. Gen. Laws 25. The third section of the act reads, 'If any person shall go into any
church or religious assembly, any school room, or other place where persons are assembled for
amusement or for educational or scientific purposes, or into any circus, show, or public
exhibition of any kind, or into a ball room, social party, or social gathering, or to any election
precinct on the day or days of any election, where any portion of the people of this State are
collected to vote at any election, or to any other place where people may be assembled to muster,
or to perform any other public duty, (except as may be required or permitted by law,) or to any
other public assembly, and shall have or carry about his person a pistol or other firearm, dirk,
dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife
manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he
shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be
punished by fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the
county the weapon or weapons so found on his person; and for every subsequent offense may, in
addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than
ninety days.' Id. § 3." The law did not apply, however, 'to a person's home or business, and there
were exemptions for "peace officers" as well as travelers; lawmakers and jurists spent
considerable time fleshing out who qualified under these exemptions, and how to allow those
fearing an imminent attack to carry these weapons in public spaces. Also, the deadly weapon law
did not apply to all guns or firearms but just pistols. The time-place-manner restrictions,
however, applied to any "fire-arms . . . gun or pistol of any kind" and later "pistol or other
firearm," as well as "any gun, pistol . . . .'" See also Brennan Gardner Rivas, "The Deadly
Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-
1930 (Ph. D. dissertation: Texas Christian University, 2019), 72-83, 124-163 (https://repository
.tcu.edu/handle/116099117/26778).

[81] Rivas, "Enforcement of Public Carry Restrictions," 2609-2620. The study draws on
enforcement data from four Texas counties, 1870-1930: 3,256 total cases, of which 1,885 left a
record of final adjudication. See also Rivas, "Deadly Weapon Laws of Texas," 164-195.

**App. 0371**

by members of the military, which could be carried openly, but not concealed.[82]  Arkansas

followed suit in 1881.[83]  Tennessee's law withstood a court challenge, and Arkansas's was never

challenged.[84]  And both states moved to prevent the sale or transfer of pocket pistols or ordinary

revolvers.  In 1879, Tennessee prohibited "any person to sell, or offer to sell, or bring into the

State for the purpose of selling, giving away, or otherwise disposing of, belt or pocket pistols, or

revolvers, or any other kind of pistol, except army or navy pistols."[85]  Arkansas passed a similar

prohibition in 1881, but went even further by prohibiting the sale of pistol cartridges as well:

"Any person who shall sell, barter, or exchange, or otherwise dispose of, or in any manner

furnish to any person any dirk or bowie knife, or a sword or a spear in a cane, brass or metal

knucks, or any pistol, of any kind of whatever, except as are used in the army or navy of the

United States, and known as the navy pistol, or any kind of cartridge for any pistol, or any person

who shall keep such arms or cartridges for sale, shall be guilty of a misdemeanor."[86]

--------

[82] 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872) ("It shall not be lawful for any person to publicly carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands.").

[83] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.").

[84] See Brennan Gardner Rivas, "The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan. 20, 2022), https://firearmslaw.duke.edu/2022/01/the-problem-with-assumptions-reassessing-the-historical-gun-policies-of-arkansas-and-tennessee/.

[85] 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; *State v. Burgoyne*, 75 Tenn. 173, 173-74 (1881).

[86] Acts of the General Assembly of Arkansas, No. 96 § 3 (1881).

**App. 0372**

28.     California's legislature, recognizing that the homicide rate had reached catastrophic levels (over 65 per 100,000 adults per year),[87] banned concealed weapons in 1863, because, as the editor of the *Daily Alta Californian* declared,

> During the thirteen years that California has been a State, there have been more deaths occasioned by sudden assaults with weapons previously concealed about the person of the assailant or assailed, than by all other acts of violence which figure on the criminal calendar…. For many sessions prior to the last, ineffectual efforts were made to enact some statute which would effectually prohibit this practice of carrying concealed weapons.  A radical change of public sentiment demanded it, but the desired law was not passed until the last Legislature, by a handsome majority.[88]

29.     But the legislature repealed the law in 1870, as public sentiment veered back toward the belief that the effort to make California less violent was hopeless, and that the only protection law-abiding citizens could hope for was to arm themselves.  And the legislature once again had the enthusiastic support of the editor of the *Daily Alta Californian*, which then opined, "As the sovereignty resides in the people in America, they are to be permitted to keep firearms and other weapons and to carry them at their pleasure."[89]  A number of counties dissented, however, and made it a misdemeanor to carry a concealed weapon without a permit—ordinances that they enforced.[90]  In 1917, the state made it a misdemeanor to carry a concealed weapon in incorporated cities and required that gun dealers register handgun sales and send the Dealer's

---

[87] Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 183. On violence in California and across the Far West, see Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 173-195; Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); and John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* (New York: W. W. Norton, 2016); and Roth, *American Homicide*, 354.

[88] Clayton E. Cramer and Joseph Olson, "The Racist Origins of California's Concealed Weapon Permit Law," Social Science Research Network, posted August 12, 2016, 6-7 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2599851).

[89] Cramer and Olson, "Racist Origins of California's Concealed Weapon Permit Law," 7-10.

[90] Ibid., 11.

**App. 0373**

Record of Sale to local law enforcement.[91]  And in 1923, the state extended the licensing requirement to unincorporated areas and prohibited non-citizens from carrying concealed weapons.[92]

30.     Other states, like Ohio, tried to have it both ways.  The Ohio legislature banned the carrying of concealable weapons in 1859, citing public safety.  But it directed jurors, in the same law, to acquit persons who carried such weapons,

> If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family.[93]

The burden of proof remained with the person who carried the concealed weapon.

31.     It is important to remember, however, that even when states enacted different types of firearms restrictions, the fact remains that many jurisdictions enacted statutory restrictions at that time to ensure the safety of the public and law enforcement.

## III.   ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM MASS MURDERERS FROM THE REVOLUTION INTO THE EARLY TWENTIETH CENTURY

32.     The Republic faced threats not only from individual murderers, but from groups of murderers.  Mass murder has been a fact of life in the United States since the mid-nineteenth century, when lethal and nonlethal violence of all kinds became more common.  But mass murder was a group activity through the nineteenth century because of the limits of existing

---

[91] Ibid., 11-13.

[92] Ibid., 13-15. Note that the title of the Cramer and Olson essay is misleading. It does not refer to the origins of the laws discussed here or to the ways in which they were enforced. It refers instead to an unsuccessful effort in 1878 and a successful effort in 1923 to deny resident aliens the right to bear arms.

[93] Joseph R. Swan, *The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860* (Cincinnati: Robert Clarke & Co., 1860), 452.

**App. 0374**

technologies.[94]  The only way to kill a large number of people was to rally like-minded

neighbors and go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons

that were certainly lethal but did not provide individuals or small groups of people the means to

inflict mass casualties on their own.  Mass killings of this type were rare in the colonial,

Revolutionary, and Early National eras, outside of massacres of Native Americans, irregular

warfare among citizens seeking political power, or public demonstrations that turned deadly, like

the Boston Massacre, in which seven soldiers opened fire on a crowd of roughly fifty men and

boys, killing five and wounding six.[95] But from the 1830s into the early twentieth century, mass

killings were common.

33.     Examples include Nat Turner's rebellion in Southampton County, Virginia, in

1831, which claimed sixty-nine lives; the murder of seventeen Mormons, perpetrated by militia

men and vigilantes at Haun's Mill, Missouri in 1838; Bloody Monday in Louisville, Kentucky,

---

[94] On the history of mob violence, including riots and popular protests that led to mass casualties, see Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996). On the Boston Massacre, see Alan Taylor, *American Revolutions: A Continental History, 1750-1804* (New York: W. W. Norton, 2016), 109-110; Eric Hinderaker, *Boston's Massacre* (Cambridge: The Belknap Press of Harvard University Press, 2017); Bernard Bailyn, *The Ordeal of Thomas Hutchinson* (Cambridge: Belknap Press of Harvard University Press, 1974), 156-163; and Alfred F. Young, *The Shoemaker and the Tea Party: Memory and the American Revolution* (Boston: Beacon Press, 1999), 36-41.

[95] For examples of massacres of unarmed Native Americans, see the murder in 1623 of six Massachusetts men by a party from Plymouth Colony, led by Captain Miles Standish [Roth, *American Homicide*, 42]; and the massacre in 1782 of 96 pacifist Moravian Delaware Indians at Gnadenhutten in present-day Ohio [Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," *William and Mary Quarterly* (2007) 64: 621-644 (https://www.jstor.org/stable/25096733#metadata_info_tab_contents)]. For examples of political conflict among colonists that led to mass killings, see the confrontation in 1655 at Severn River in Maryland between opposed factions in the English Civil War [Aubrey C. Land, *Colonial Maryland: A History* (Millwood, New York: Kato Press, 1981), 49-54] and the slaughter in 1782 of rebel prisoners at Cloud's Creek, South Carolina, by Tory partisans under the leadership of William Cunningham [J. A. Chapman, *History of Edgefield County* (Newberry, South Carolina: Elbert H. Aull, 1897), 31-34]; see also Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 2008), 5-6.

where an assault by nativist Protestants on Irish and German Catholics in 1855 left twenty-two

people dead; and the murder of nineteen Chinese Americans by a racist mob in Los Angeles in

1871.  Because these mass killings were almost always spontaneous and loosely organized, they

were difficult for government to prevent.  Worse, in some incidents, such as the Haun's Mill

Massacre, state and local governments were complicit; and in others, state and local governments

turned a blind eye to the slaughter, as was the case in the murder of Chinese farm workers in

Chico, California, in 1877.[96]

34.     The Federal government did act during Reconstruction, however, to prevent mass

murder when formally organized white supremacist organizations engaged in systematic efforts

to deprive African Americans of their civil rights, which had been guaranteed by the Thirteenth,

Fourteenth, and Fifteenth Amendments.  The Ku Klux Klan Acts of 1870 and 1871, meant to

prevent assassinations and mass shootings and lynchings by white supremacist terrorists, were

effective when enforced by the federal government and the U.S. Army.[97]  But when federal

troops were withdrawn, white supremacist mass killings resumed.  In New Orleans, for example,

an ultimately successful effort by white-supremacist Democrats to seize control of the city's

government by violent means left dozens of Republican officials and police officers shot dead

---

[96] David F. Almendinger, Jr., *Nat Turner and the Rising in Southampton County* (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Stephen C. LeSueur, *The 1838 Mormon War in Missouri* (Columbia: University of Missouri Press, 1987), 162-168; Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Mary Alice Mairose, "Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855" (M.A. thesis, Ohio State University, 1993); W. Eugene Hollon, *Frontier Violence: Another Look* (New York: Oxford University Press, 1974), 93-95; Faragher, *Eternity Street*, 463-480; and Sucheng Chan, *The Bitter-Sweet Soil: The Chinese in California Agriculture, 1860-1910* (Berkeley: University of California Press, 1986), 372.

[97] Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975).

**App. 0376**

and scores wounded.[98] And the Klan Acts did nothing to prevent mass murders by spontaneous mobs and loosely organized vigilantes. Rioters and vigilantes remained a threat well into the twentieth century. In 1921 more than three hundred African American citizens were murdered in the Tulsa Race Massacre in Oklahoma.[99]

## IV. ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM MASS MURDERERS FROM THE EARLY TWENTIETH CENTURY TO THE PRESENT

35.     The character of mass murder began to change in the late nineteenth and early twentieth century with the invention and commercial availability of new technologies that gave individuals or small groups of people the power to kill large numbers of people in a short amount of time. These technologies proved useful to criminal gangs, anarchists, and factions of the labor movement intent on killing adversaries, public officials, and law enforcement officers. The technologies that were most widely used by criminals and terrorists were dynamite, invented by Alfred Nobel in 1866, and the Thompson submachine gun, invented in 1918 by General John T. Thompson, who improved upon a pioneering German design.

36.     The advantage of dynamite over nitroglycerin and other explosives used in mining and construction was its power and its stability, which made accidental explosions rare. The advantages of submachine guns over existing machine guns as weapons of war were that they were light enough to be carried and operated by a single individual, and they were capable

---

[98] Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889* (Baton Rouge: Louisiana State University Press, 1996), 151-158. See also LeeAnna Keith, *The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); and Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884* (Columbus: Ohio State University Press, 2000), 67-109.

[99] On the deadly race riots of 1919-1921, see William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); and Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books/St. Martin's Press, 2001).

**App. 0377**

of firing .45 caliber bullets from 20-round clips or 50- or 100-round drum magazines at a rate of 600 to 725 rounds per minute.[100]

37.   Criminals and terrorists quickly discovered how accessible and useful these new technologies were.  They could be purchased legally by private citizens.  In the 1920s, Thompson submachine guns were expensive.  They sold for $175 to $225 each, at a time when a new Ford cost $440 (the rough equivalent of $2996 to $3852 today, while now a base model of the AR-15 semiautomatic rifle can be purchased for less than $400 and a 30-round magazine for as little as $10).[101]   That is why Thompsons were favored by those with resources: law enforcement, the Irish Republican Army, Sandinista rebels in Nicaragua, and bank robbers.  Dynamite, however, cost only 18 cents a pound (the rough equivalent of $3.08 today), so it was favored by labor activists and anarchists.[102]   Federal, state, and local officials and law enforcement officers suddenly confronted novel threats to their personal safety.  Submachine guns were used most notoriously in gangland slayings in Chicago during the Prohibition Era,

---

[100] Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); and Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* (New York: Thomas Dunne Books, 2009).

[101] Yenne, *Tommy Gun*, 86. Estimates vary on the purchasing power of 1919 dollars in today's dollars, but $1.00 in 1919 was worth roughly $17.12 today. See the CPI Inflation Calculator (https://bit.ly/3CS5UNl), accessed April 17, 2024. The prices of AR-15 style rifles today are from guns.com (https://www.guns.com/firearms/ar-15-rifles?priceRange=%24250%20-%20%24499), accessed April 17, 2024. The prices of 30-round magazines of .233 caliber ammunition are from gunmagwarehouse.com (https://gunmagwarehouse.com/all-magazines/rifles/magazines/ar-15-magazines), accessed April 17, 2024.

[102] Department of Commerce, Bureau of the Census, *Fourteenth Census of the United States Manufactures: Explosives* (Washington, D.C.: Government Printing Office, 1922), 6. Note that a pound of dynamite would be far more expensive today—potentially hundreds of thousands of dollars—because it would require the purchase of a blasting license, a storage bunker, and an isolated plot of land for the storage bunker. See U.S Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, *ATF Federal Explosives Law and Regulations, 2012* (https://www.atf.gov/explosives/docs/report/publication-federal-explosives-laws-and-regulations-atf-p-54007/download), accessed April 17, 2024.

**App. 0378**

such as the St. Valentine's Day Massacre and the Kansas City Massacre.[103]  Dynamite was used

in a string of anarchist bombings in 1919-1920.  Those included the murder of 38 people and the

wounding of 143 in an attack on Wall Street, 36 dynamite bombs mailed to justice officials,

newspaper editors, and businessmen (including John D. Rockefeller), and a failed attempt to kill

Attorney General A. Mitchell Palmer and his family.[104]  Dynamite was also used effectively for

malicious, private ends.  For example, Osage Indians were murdered by an individual in

Oklahoma in an attempt to gain their headrights and profit from insurance policies on them.[105]

38.     Because of the threats these new technologies posed for public safety, public

officials widened their regulatory focus beyond concealed and concealable weapons.  Thirteen

states restricted the capacity of ammunition magazines for semiautomatic and automatic firearms

between 1927 and 1934,[106] and Congress passed the National Firearms Acts of 1934 and 1938,

which restricted ownership of machine guns and submachine guns (known today as automatic

weapons) because of their ability to fire rapidly from large-capacity magazines.[107]  And the

Organized Crime Control Act of 1970 restricted ownership of a wide range of explosives,

---

[103] William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); and Yenne, *Tommy Gun*, 74-78, 91-93.

[104] Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* (Princeton: Princeton University Press, 1991), 140-156, 181-195; Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* (New York: Columbia University Press, 2022), 65-110. Consider also the bombing of the office of the *Los Angeles Times* in 1910 by two union activists, which killed 21 persons and injured 100 more, in Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931).

[105] For this and other murders of Osage people see David Grann, *Killers of the Flower Moon: The Osage Murders and the Birth of the FBI* (New York, Doubleday, 2017).

[106] Robert J. Spitzer, "Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," *Law and Contemporary Problems* 83 (2020): 238 (https://scholarship.law.duke.edu/lcp/vol83/iss3/13). In the same period, five additional states restricted magazine capacity for fully automatic weapons, but not semiautomatic weapons.

[107] The National Firearms Act of 1934, ch. 757, 48 Stat. 1236; and the National Firearms Act of 1938, Pub. L. No. 75-785, 52 Stat. 1250.

**App. 0379**

building upon regulations that began in 1917 with the passage of the Federal Explosives Act, which restricted the distribution, storage, possession, and use of explosive materials during the time of war.[108]

39.    Since 1970, public officials have continued to reserve the right to regulate the sale, ownership, and control of new technologies that can be used by individuals or small groups to commit mass murder. The Homeland Security Act of 2002 improved security at airports and in cockpits to ensure that airplanes could not be used by terrorists to commit mass murder. The Secure Handling of Ammonium Nitrate Act of 2007 restricted access to large quantities of fertilizer to prevent terrorist attacks like the one that killed 165 people in Oklahoma City in 1995.[109] And in the wake of the massacre of 58 people and wounding of hundreds of others at a concert in Las Vegas in 2017, the Trump administration issued a regulation that banned the sale or possession of bump stocks. It gave owners 90 days to destroy their bump stocks or turn them in to the Bureau of Alcohol, Tobacco, Firearms, and Explosives.[110]

40.    In recent decades, criminal organizations, terrorists, and lone gunmen with an intent to commit mass murder have also discovered the effectiveness of rapid-fire semiautomatic weapons with large capacity magazines. These weapons, which were designed for offensive military applications rather than individual self-defense, emerged from technologies developed for military use during the Cold War, beginning with the Soviet AK-47 assault rifle, which was

---

[108] The Organized Crime Control Act of 1970, 84 Statute 922; and the Federal Explosives Act of 1917, 40 Statute 385.

[109] Public Law 107-296, November 25, 2002, "To Establish the Department of Homeland Security" (https://www.dhs.gov/xlibrary/assets/hr_5005_enr.pdf); and 6 U.S. Code § 488a - Regulation of the sale and transfer of ammonium nitrate (https://www.law.cornell.edu/uscode/text/6/chapter-1/subchapter-VIII/part-J). The ammonium nitrate regulations were to be enforced no later than 90 days after December 26, 2007. Accessed August 31, 2022.

[110] *New York Times*, December 18, 2018 (https://www.nytimes.com/2018/12/18/us/politics/trump-bump-stocks-ban.html), accessed April 17, 2024.

**App. 0380**

invented in 1947, adopted by the Soviet Army in 1949, and used in the 1950s by the Soviets or

their allies during the Hungarian Revolution, the Vietnam War, and the Laotian Civil War. [111]

The signature military firearm of that era—the M-16 rifle with a 30-round magazine and a

muzzle velocity of over 3,000 feet per second [112]—was capable of firing 750 to 900 rounds per

minute when set on fully automatic. [113]  But the M-16 was used more often in combat—and more

accurately, effectively, and sustainably as a weapon for inflicting mass casualties—when set on

semiautomatic, which was standard military procedure.  That is why the U.S. Army defines

"rapid fire" as 45 rounds per minute (the rate of fire of an M-16 when set on semiautomatic), not

750 to 900. [114]  And that is why in 1998 the U.S. Marine Corps adopted the M-16A4, which

replaced the "fully automatic" switch with a three-round burst (but otherwise the same weapon

as the M-16)—an alteration that slows the potential rate of fire, conserves ammunition, and

improves accuracy. [115] The civilian version of the M-16—the ArmaLite AR-15—has

approximately the same muzzle velocity as the M-16 (3,300 feet per second) and the same rate of

fire as the M-16 on semiautomatic: 45 rounds per minute. [116]

---

[111] Edward and Ezell, *The AK-47 Story: Evolution of the Kalashnikov Weapons* (Harrisburg, Pennsylvania: Stackpole Books, 1986); and Ian V. Hogg and John S. Weeks, *Military Small Arms of the 20th Century*, 7th ed. (Iola, Wisconsin: Krause Publications, 2000).

[112] Muzzle velocity is the speed at which a round exits the barrel of a firearm.

[113] Edward Ezell, *The Great Rifle Controversy: Search for the Ultimate Infantry Weapon from World War II through Vietnam and Beyond* (Harrisburg, Pennsylvania: Stackpole Books, 1984).

[114] Sections 8-17 through 8-22 (Rates of Fire), Sections 8-23 and 8-24 (Follow Through), and Sections B-16 through B22 (Soft Tissue Penetration), in *TC 3-22.9 Rifle and Carbine Manual*, Headquarters, Department of the Army (May 2016). Available at the Army Publishing Directorate Site (https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/ARN19927_TC_3-22x9_C3_FINAL_WEB.pdf), accessed April 17, 2024.

[115] See military-today.com (http://www.military-today.com/firearms/m16.htm), accessed April 17, 2024.

[116] Ezell, *The Great Rifle Controversy, 177-192*.

**App. 0381**

41.     The muzzle velocity of semiautomatic handguns, like the Glock 17, is far lower

than that of an M-16 or its civilian counterparts: around 1,350 feet per second.  But technological

advances have increased the speed at which semiautomatic handguns can be fired.  An expert can

fire an entire 30-round clip from a Glock 17 handgun in five seconds.[117] And they are

affordable.  A new semiautomatic handgun can be purchased for less than $200 and equipped

with a 33-round magazine for less than $15.[118]

42.     It did not take criminals, terrorists, and lone gunmen long to adopt the rapid-fire

semiautomatic handguns and rifles with large capacity magazines that arrived on the domestic

market in the 1970s and 1980s.  These firearms can inflict mass casualties in a matter of seconds

and maintain parity with law enforcement in a standoff, which is why many police and sheriff

departments across the United States have purchased semiautomatic rifles and armored vehicles

to defend themselves and decrease the likelihood that officers are killed or wounded.[119]

43.     Manufacturers soon discovered ways to increase the rate of fire of these new

semiautomatic weapons even further.  Some innovations, such as bump stocks and modification

kits, allowed owners to transform semiautomatic rifles into fully automatic rifles.  And in

response to the Trump administration's regulatory ban on the production and sale of bump stocks

and modification kits, the firearms industry has developed "binary" triggers that fire when pulled

---

[117] See Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM."
YouTube (https://www.youtube.com/watch?v=1H5KsnoUBzs), accessed September 1, 2022.

[118] See guns.com for the price of semiautomatic handguns
(https://www.guns.com/firearms/handguns/semi-auto?priceRange=Less%20than%20%24250)
and bymymags.com for the price of large capacity magazines (https://www.buymymags.com/),
accessed April 17, 2024.

[119] Sam Bieler, "Police Militarization in the USA: The State of the Field," Policing: An
International Journal 39 (2016): 586-600, available at https://www.emerald.com/insight/content/
doi/10.1108/PIJPSM-03-2016-0042/full/pdf?casa_token=TYUuIouUCc8AAAAA:IWXQRQO
tW90KZ2AKwzHNMX2tfRix0zAxRRkjQSy3rA-uUpnylZrnp0Xolhj7UFIf05WGZkr_92L__Q
Gk_OAxnSH-3h26oxKC4e7vM79VCBpFl9_cHg.

**App. 0382**

*and when released*—a modification that doubles the rate at which semiautomatic weapons can be fired.[120]

44.     Just as dangerous, however, were modifications that helped users fire more rapidly with semiautomatic firearms.  The modifications included "fixes" as simple as stretching a rubber band from the trigger to the trigger guard of an AR-15—the civilian version of the M-16, which differs from the military model only in its lack of a switch for fully automatic.  The band pushes the trigger forward more rapidly after each round and enables users to fire rapid semiautomatic bursts with help of the weapon's natural recoil.  The rubber band method works because manufacturers have increased the fire rate of semiautomatic weapons by decreasing the pressure it takes to pull the trigger.[121]

45.     The threat to public safety and law enforcement posed by semiautomatic rifles—with or without dangerous modifications—is a modern phenomenon that has a direct correlation with mass murder and mass shootings.  The danger these firearms pose is intrinsically different from past weaponry.  In the same way that the Colt cap-and-ball revolvers and breech-loaded firearms resulted in increased deaths by firearms, the development of semiautomatic rifles and handguns dramatically increased the number killed or wounded in mass shootings from 1966 to the present (see Figure 1, below).

---

[120] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, "Open Letter to All Federal Firearms Licensees," March 22, 2022 (https://www.atf.gov/firearms/docs/open-letter/all-ffls-mar-2022-open-letter-forced-reset-triggers-frts/download), accessed April 17, 2024. The ATF has not banned the production, sale, or ownership of binary triggers, but the several states have done so, citing the threat they pose to the safety of the public and law enforcement. Those states include North Dakota, Hawaii, Connecticut, New Jersey, Maryland, Washington, California, D.C., Iowa, New York, Rhode Island, and Florida. (https://lundestudio.com/are-binary-triggers-legal/), accessed April 17, 2024. See also americanfirearms.org, "A Complete Guide to Binary Triggers," (https://www.americanfirearms.org/guide-to-binary-triggers/), accessed April 17, 2024.
[121] See "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube (https://www.youtube.com/watch?v=PVfwFP_RwTQ), accessed April 17, 2024.

**App. 0383**

Figure 1

|  | Mass shootings with non-semiautomatic/non-automatic firearm | Mass shootings with semiautomatic handgun | Mass shootings with semiautomatic rifle | Mass shootings with automatic firearms |
|---|---|---|---|---|
| Average Killed | 5.4 | 6.5 | 9.2 | 8.1 |
| Average Wounded | 3.9 | 5.8 | 11.0 | 8.1 |
| Average Victims | 9.3 | 12.3 | 20.2 | 16.2 |
| Number of Mass Shootings | 52 | 82 | 40 | 8 |

Note that mass shootings with semiautomatic rifles have been as deadly as mass shootings with fully automatic weapons.

46.    And the threat posed by semiautomatic rifles is amplified when they are used in conjunction with extended magazines (more than 10 rounds) (see figure 2, below).

Figure 2

|  | No extended magazine | Extended magazine |
|---|---|---|
| Mass shootings with semiautomatic handgun | 10.3 | 26.4 |
| Mass shootings with semiautomatic rifle | 13.0 | 37.1 |

47.    Without extended magazines, semiautomatic rifles cause an average of 40 percent more deaths and injuries in mass shootings than regular firearms, and 26 percent more than semiautomatic handguns.  But with extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and 41 percent more than semiautomatic handguns.  And extended magazines are two-and-a-half times more likely to be used in mass shootings with semiautomatic rifles than with semiautomatic handguns: in 30

**App. 0384**

percent versus 12 percent of incidents. Semiautomatic rifles and extended magazines are deadly on their own. But in combination, they are extraordinarily lethal.

48. The data in Figures 1 and 2, and in the immediately above paragraph, are from the Violence Project.[122] The Violence Project, which has compiled data on mass shootings from 1966 through 2021, defines a mass shooting as "a multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)." Other authorities have adopted similar definitions of "mass shootings" and "mass murder." For example, the FBI has defined mass murder as "a number of murders (four or more) occurring during the same incident, with no distinctive time period between the murderers."[123] Federal

---

[122] The Violence Project (https://www.theviolenceproject.org/mass-shooter-database/), accessed April 17, 2024. The Violence Project database provides information on the weapons used in the shootings. It notes, for instance, that two shooters who possessed semiautomatic rifles at the times of their crimes did not use them, and that 8 shooters had illegal, fully automatic weapons. Those automatic weapons included 2 Uzi submachine guns, 3 machine pistols, 1 M-16, and 2 AK-47 rifles converted to automatic. I have not participated in Violence Project or in the collection of their data. In Figure 1, however, I have added the data from the six mass shootings that occurred from January through August, 2022, not yet included in the Violence Project's data, that fit the Violence Project's definition of a mass shooting: the Buffalo, New York, supermarket shooting on May 14; the Robb Elementary School shooting in Uvalde, Texas, on May 24; the Tulsa, Oklahoma medical center shooting on June 1; the concrete company shooting in Smithsburg, Maryland, on June 9; the Highland Park, Illinois, Fourth of July Parade shooting; and the Greenwood, Indiana, Park Mall shooting on July 17. Three were committed with semiautomatic rifles and three with semiautomatic handguns. The table in this declaration, unlike the tables in the Violence Project, does not include the Las Vegas shooting of 2017 (58 killed, 887 wounded). The Las Vegas shooting is an outlier in the number killed and wounded which would skew the results of the analysis.

[123] FBI, *Serial Murder: Multi-Disciplinary Perspectives for Investigators* at 8 (2005) (https://www.fbi.gov/stats-services/publications/serial-murder#two), accessed January 3, 2023.

**App. 0385**

legislation enacted in 2013 authorized the Attorney General to assist in the investigation of mass killings, defined to mean "3 or more killings in a single incident."[124]

49.     What is remarkable about the mass shootings that have plagued the United States since 1965 is that all but four involved a lone shooter, and those that have involved more than one assailant have involved only two: in 1998 in Jonesboro, Kentucky; in 1999 in Littleton, Colorado; in 2015 in San Bernardino, California; and in 2019 in Jersey City, New Jersey. In the nineteenth and early twentieth centuries, it required scores of individuals to gather together as mobs, rioters, vigilantes, or terrorists to kill or wound dozens of people in a short space of time— generally because of their race, ethnicity, or faith.

50.     Today, thanks especially to extended magazines and certain classes of semiautomatic firearms, it requires only one or two individuals to kill or wound that many people. And because of these modern technologies, which were developed for warfare, angry, alienated individuals can commit mass murder for reasons that are simply personal. Mass murderers no longer require collaborators to rally to a cause.  For example, they can kill large numbers of people simply because they feel slighted at school, because they don't get along with their coworkers, because they were rejected romantically, or because they simply want to make a name for themselves.  And since it is impossible in our society—indeed, in any society—to ensure that no one is angry or alienated, restricting access to extended magazines and certain classes of semiautomatic firearms mitigates the risk to every American.

51.     For these reasons, local governments have enacted bans on the sale of semiautomatic rifles with features that enhance their military utility, as the federal government did from 1994 to 2004.  And local governments have banned the sale of large capacity

---

[124] 28 U.S.C. § 530C(b)(1)(M).

**App. 0386**

magazines, because they allow mass murderers to prolong their attacks before citizens or law

enforcement can intervene—usually when the shooter is reloading.  For example, the shooter

who wounded U.S. House Representative Gabby Giffords in Tucson, Arizona, in 2011 was able

to fire 31 rounds with a Glock 19 semiautomatic handgun in a matter of seconds before

bystanders could disarm him as he changed magazines.  Every one of those rounds hit an

individual, killing six and injuring twelve. [125]

## V.   THE HISTORICAL CONTEXT FOR NEW MEXICO'S 2024 WAITING PERIOD LAW: THE PROBLEM OF FIREARMS SUICIDES

52.     Scholars have long understood that suicides are impulsive rather than

premeditated. The decision to commit suicide comes in the great majority of cases less than a day

before the attempt. [126] That is why access to a firearm—the deadliest means for attempting

suicides—can have such dire consequences when a citizen experiences a sudden burst of anger

---

[125] John Newport, *The Tucson Tragedy: Lessons from the Senseless Shooting of Gabrielle Giffords* (Denver: Outskirts Press, 2011), 5-9, 81-100.

[126] See, for example, Harvard T. H. Chan School of Public Health Duration of Suicidal Crises, https://www.hsph.harvard.edu/means-matter/means-matter/duration/; Yari Gvion, Yossi Levi-Belz, Gergö Hadlaczky, and Alan Apter, "On the Role of Impulsivity and Decision-Making in Suicidal Behavior. World Journal of Psychiatry 5:3 (2015): 255–259, https://www.wjgnet.com/2220-3206/full/v5/i3/255.htm; O. R. Simon, A. C. Swann, K. E. Powell, L. B. Potter, M. Kresnow, and P. W. O'Carroll, "Characteristics of Impulsive Suicide Attempts and Attempters" Suicide Life Threat Behavior 32 (2001): supplement, 49-59, https://pubmed.ncbi.nlm.nih.gov/11924695/; and Eberhard A. Deisenhammer, Chy-Meng Ing, Robert Strauss, et al.. "The Duration of the Suicidal Process: How Much Time Is Left for Intervention between Consideration and Accomplishment of a Suicide attempt? Journal of Clinical Psychiatry 70:1 (2009):19-24.

**App. 0387**

or despair.[127] That is why scholars have found a strong correlation between firearms regulations and lower rates of suicides with firearms and suicides as a whole.[128]

53.     At the time of the nation's founding, suicides—and especially gun suicides—were rare, which is why today's gun suicide problem did not come to the attention of citizens or legislators in the early national period. I completed a historical analysis of suicides in Vermont and New Hampshire, 1783-1824, with evidence drawn from newspapers, coroner's inquests, and town histories. Using estimation techniques, I determined with 95 percent confidence that the suicide rate over those years was remarkable low by today's standards: between 3.1 and 5.7 per 100,000 persons ages 16 and older per year for all suicides, and 0.19 and 0.35 per 100,000 per year for suicides by firearm, because only 6 percent of suicides were committed with firearms. That is remarkable, because 50 to 60 percent of households in northern New England owned a working muzzle-loading firearm.[129] Fifty-two percent of suicide victims in New Hampshire and Vermont hanged themselves, while another 35 percent drowned or cut themselves with knives or

---

[127] See for example L. G. Peterson, M. Peterson, G. J. O'Shanick, and A. Swann, "Self-Inflicted Gunshot Wounds: Lethality of Method versus Intent. American Journal of Psychiatry" 142 (1985): 228-231, https://pubmed.ncbi.nlm.nih.gov/3970248/; and Ziyi Cai, Alvin Junus, Qingsong Chang, and Paul S.F. Yip, "The Lethality of Suicide Methods: A Systematic Review and Meta-Analysis," Journal of Affective Disorders 300 (2022): 121-129, https://pubmed.ncbi.nlm.nih.gov/34953923/.

[128] Patrick Sharkey and Megan Kang, "The Era of Progress on Gun Mortality: State Gun Regulations and Gun Deaths from 1991 to 2016." Epidemiology 34 (2023): 786-792, https://journals.lww.com/epidem/abstract/2023/11000/the_era_of_progress_on_gun_mortality__state_gun.3.aspx; and Ziyi Cai, Alvin Junus, Qingsong Chang, and Paul S.F. Yip, "The Lethality of Suicide Methods: A Systematic Review and Meta-Analysis." Journal of Affective Disorders 300 (2022): 121-129, https://pubmed.ncbi.nlm.nih.gov/34953923/.

[129] Roth, "Guns, Gun Culture, and Homicide," 232-234; and James Lindgren and Justin L. Heather, "Counting Guns in Early America." *William & Mary Law Review* 43:1 (2002): 1777-1824. Of the 244 suicides for which the means is known, 15 were committed with a firearm.

**App. 0388**

razors. Muzzle loading firearms were not the preferred means for committing impulsive suicides, just as they were not for committing homicides.[130]

54.     As breech loading firearms replaced muzzle loading firearms, however, the proportion of suicides committed with firearms rose, as did the suicide rate, because of they could be kept loaded all the time and thus used readily on impulse. By the late 1920s and early 1930s, when the transition to breech loaders was complete, the suicide rate in New Hampshire had risen to 22 per 100,000 persons ages fifteen and older per year and the rate with firearms to 9 per 100,000, because 41 percent of suicides were committed with guns. The suicide rate in Vermont had risen 24 per 100,000 persons ages 15 and older per year and the rate with firearms to 11 per 100,000, because 47 percent of suicides were committed with guns. And the suicide rate in New Mexico was 19 per 100,000 persons ages 15 and older per year and the rate with firearms 11 per 100,000, because 55 percent of suicides were committed with firearms. Indeed, the suicide rate by firearms was highest in the late 1920s and early 1930s in the Southwest (New Mexico, Arizona, California, Colorado, Nevada) and the Mountain West (Idaho, Montana, Utah, Wyoming) (Figure 3).[131]

---

[130] Red flag laws that required domestic abusers to surrender their firearms for a specified period were absent in the early national period for a similar reason. Domestic homicides were rare by today's standards, and few of those that occurred were committed with firearms, because muzzle-loading firearms were difficult to use on impulse. Roth, *American Homicide*, 115-116; Roth, "Why Guns Are and Aren't the Problem," 113, 117; and Roth's contribution to "Brief for Amici Curiae Professors of History and Law in Support of Petitioner," *United States of America v. Zachary Rahimi*, Supreme Court of the United States, No. 22-915, 23-24.

[131] Bureau of the Census, "Mortality Statistics," 1929-1933. Washington, D. C.: Government Printing Office, 1931-1935.

**App. 0389**

Figure 3



55.    In recent years, 2018-2022, the suicide rate in New Mexico has been 30 per 100,000 persons ages 15 and older, and 17 per 100,000 with firearms (57 percent of all suicides). [132] When New Mexico passed its 2024 statute (NMSA 1978, Section 30-7-7.3) to establish a seven-day waiting period for the purchase of a firearm, it addressed a new and pressing problem—a problem that the nation's Founding Generation had not faced.

**VI.    CONCLUSION**

56.    From the Founding Generation to the present, the people of the United States and their elected representatives have recognized that there are instances in which the security of the republic and the safety of its citizens require government-imposed restrictions.  That is why the majority of states passed and enforced laws against the carrying of concealable weapons, why

---

[132] CDC Wonder, Underlying Cause of Death by Single-Race Categories, 2018-2022, Centers for Disease Control and Prevention, https://wonder.cdc.gov/Deaths-by-Underlying-Cause.html, accessed June 3, 2024.

**App. 0390**

the federal government passed the Ku Klux Klan Acts during Reconstruction, and why states, municipalities, and the federal government have passed and enforced laws since World War I to restrict ownership or control of modern technologies that enable criminals, terrorists, and malicious or delusional individuals to commit mass murder.  Public officials are not required to pass such laws, of course, but historically, they have always retained the ability to do so.  There is no evidence in the historical record to suggest that they took their decisions lightly when they imposed these restrictions on weapons and armed voluntary organizations.  And mass murders by individuals, including mass shootings, are a recent phenomenon, caused by changes in technology that emerged in the late nineteenth through the late twentieth century.  Public officials today are confronting a criminological problem that did not exist in the Founding Era, nor during the first century of the nation's existence.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on June 4, 2024, in Franklin County, Ohio.

Randolph Roth

47

**App. 0391**

**EXHIBIT B-1**

Randolph Roth                                                       Page 1


Curriculum Vitae

RANDOLPH ROTH

Department of History                          6987 Grandee Cliffs Drive
The Ohio State University                       Dublin, OH  43016
Columbus, OH  43210-1367
(614) 292-6843                                  (614) 889-5043
FAX:  614-292-2822
E-mail:  roth.5@osu.edu

**Table of Contents**

**Personal**                                                        2

Education                                                           2
Academic Positions                                                  2
Honorary Positions                                                  2
Professional Honors and Awards for Scholarship                      2
Professional Honors and Awards for Teaching                         3
Grants                                                              3

**Bibliography and Research**                                       4-17

**Teaching**                                                        18-20

**Service**                                                         21-26

**App. 0393**

Randolph Roth                                                        Page 2

**Personal**

    Marital Status:              Married           Allison Sweeney
    Children:                    Alexander

**Education**

    1981, Ph.D. in History, Yale University (thesis, "Whence This Strange Fire?
Religious and Reform Movements in Vermont, 1791-1843," David Brion Davis
and Howard R. Lamar, advisors)

    1973, B.A., with honors and distinction, in History, Stanford University (thesis,
"Progressive Reform and Socialism in Berkeley, California, 1877-1924," Carl
Degler and Barton Bernstein, advisors)

**Academic Positions**

    1985-present, The Ohio State University: College of Arts and Sciences
Distinguished Professor of History and Sociology
1978-1985, Grinnell College: Assistant Professor of History
1978, University of Vermont: Instructor in History
1974-1977, Graduate Teaching Assistant, Yale University

**Honorary Positions**

    2012, Wayne N. Aspinall Visiting Chair Professor, University of Colorado Mesa

**Professional Honors and Awards for Scholarship**

    2022, Inaugural Distinguished Scholar Award, Division of Historical
Criminology, American Society of Criminology

    2013-2016, Member, Roundtable on Crime Trends in America, National Research
Council, National Academy of Sciences

    2012, Fellow, American Association for the Advancement of Science

    2011, Michael J. Hindelang Award, American Society of Criminology, for the
outstanding contribution to criminology over the previous three years

    2010, Allan Sharlin Memorial Award, Social Science History Association,

**App. 0394**

Randolph Roth                                                                 Page 3

for an outstanding book in social science history

2010, Outstanding Academic Books, *Choice*

1988, E. Harold Hugo Memorial Book Prize, Old Sturbridge Village
Research Society, for distinguished work in the history of rural society

1982, Theron Rockwell Field Prize, Yale University, for the outstanding
dissertation in the Humanities

1982, George Washington Eggleston Prize, Yale University, for the
outstanding dissertation in American history

1973, James Birdsall Weter Prize, Stanford University, for the outstanding
senior thesis in history

**Professional Honors and Awards for Teaching**

2017, Rodica C. Botoman Award for Distinguished Undergraduate Teaching and
Mentoring, College of Arts and Humanities

2013, Outstanding Teaching Award, College of Arts and Sciences Student
Council

2009, Ohio State University Alumni Award for Distinguished Teaching

2007, Distinguished Teaching Award, Ohio Academy of History

1995, Clio Award, Phi Alpha Theta Honor Society, for Distinguished Teaching in
History at Ohio State University

**Grants**

2013-2014, Research Grant, Harry Frank Guggenheim Foundation

2012-2015, Research Grant, National Science Foundation (SES-1228406)

2000, Fellowship for University Teachers, National Endowment for the
Humanities

1998-2000, Research Grant and Supplemental Research Grant, National Science
Foundation (SBR-9808050)

**App. 0395**

Randolph Roth                                                                 Page 4

        1992, Fellow, Workshop on the Rhetoric of Social History, University of
        Iowa

        1989-1990, Research Fellowship, Harry Frank Guggenheim Foundation

        1987, National Endowment for the Humanities, Summer Stipend

        1983, Research Fellowship for Recent Recipients of the Ph.D., American Council
        of Learned Societies

        1981, Fred Harris Daniels Fellowship, American Antiquarian Society


                              **Bibliography and Research**


**Books**

        *American Homicide* (an interregional study of violent crime and violent death in
        America from colonial times to the present). The Belknap Press of Harvard
        University Press (2009), 655 pp.

        *The Democratic Dilemma:  Religion, Reform, and the Social Order in the
        Connecticut River Valley of Vermont, 1791-1850*. Cambridge University Press
        (1987), 399 pp.


**Edited Volumes**

        Co-founder and co-director, Historical Violence Database (on-line database on
        violent crime, violent death, and collective violence).  Web address:
        www.sociology.ohio-state.edu/cjrc/hvd

        American Homicide Supplementary Volume (on-line supplement to *American
        Homicide*, including detailed appendices on methods, supplemental tables, graphs,
        and statistical analyses), approx. 750 pp. Web address:
        http://cjrc.osu.edu/researchprojects/hvd/AHsup.html


**Essays on Historical Subjects**

        "Government Legitimacy, Social Solidarity, and America Homicide in Historical
        Perspective." (New York: Harry Frank Guggenheim Foundation, 2024).


**App. 0396**

Randolph Roth                                                          Page 5

"Defining, Recording, and Measuring Crime in the United States from Colonial Times to the Present," in James Campbell and Vivien Miller, eds., *The Routledge History of Crime in America* (New York: Routledge, forthcoming, 2024).

"Data Drudges Unite! Taking Stock of Historical Studies of Homicide," in Karen F. Parker, Richard Stansfield, and Ashley Mancik, eds., *Taking Stock of Homicide: Trends, Emerging Themes and Challenges* (Philadelphia: Temple University Press, 2023), 11-24.

"Homicide and the Opioid Epidemic: A Longitudinal Analysis," co-authored with Richard Rosenfeld and Joel Wallman. *Homicide Studies* 27:3 (2023), 321-337.

"The Opioid Epidemic and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman. *Journal of Research in Crime and Delinquency* 58: 1 (2021): 1-46.

"Homicide-Suicide by Women against Intimate Partners," co-authored with Wendy C. Regoeczi, in Todd Shackelford, ed., *Sage Handbook of Domestic Violence* (Newbury Park: Sage Publications, 2020), v 1, 318-329.

"Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 113-133.

"Does Better Angels of Our Nature Hold Up as History?" *Historical Reflections* 44: 1 (2018): 91-103.

"Criminologists and Historians of Crime: A Partnership Well Worth Pursuing." *Crime, History, and Societies* 21: 2 (2017): 387-399.

"How Exceptional Is the History of Violence and Criminal Justice in the United States? Variation across Time and Space as the Keys to Understanding Homicide and Punitiveness," in Kevin Reitz, ed. *American Exceptionalism in Crime and Punishment* (Oxford University Press, 2017).

"Getting Things Wrong Really Does Help, as Long as You Keep Trying to Get Things Right: Developing Theories About Why Homicide Rates Rise and Fall" in Michael D. Maltz and Stephen Rice, eds., *Envisioning Criminology: Researchers on Research as a Process of Discovery* (Springer Verlag, 2015), 143-150.

"Roundtable on History Meets Biology: Introduction," *American Historical Review* (2014) 119: 1492-1499. Principal author and organizer of the Roundtable.

Randolph Roth                                                                 Page 6

"Emotions, Facultative Adaptation, and the History of Homicide," *American Historical Review* (2014) 119: 1529-1546.

 "Gender, Sex, and Intimate-Partner Violence in Historical Perspective," in Rosemary Gartner and William McCarthy, eds., *Oxford Handbook on Gender, Sex, and Crime* (Oxford University Press, 2014), 175-190.

"The Importance of Testing Criminological Theories in Historical Context: The Civilization Thesis versus the Nation-Building Hypothesis," *Criminology* online: Presidential Session Papers from the American Society of Criminology (2014)

"Making Sense of Violence? Reflections on the History of Interpersonal Violence in Europe," *Crime, History, and Societies* (2013) 17: 5-26. Richard McMahon, Joachim Eibach, and Randolph Roth. Introduction to a special issue solicited by the Board of Editors of *Crime, History, and Societies*, co-edited with Joachim Eibach, University of Berne, and Richard McMahon, University of Liverpool.

"Scientific History and Experimental History," *Journal of Interdisciplinary History* (2013) 43: 443-458.

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217.

"Yes We Can: Working Together toward a History of Homicide That Is Empirically, Mathematically, and Theoretically Sound," *Crime, History, and Societies* (2011) 15: 131-145.

"Biology and the Deep History of Homicide," *British Journal of Criminology* (2011) 51: 535-555.

"Homicide Rates in the Old West." *Western Historical Quarterly*. Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg (2011) 42: 173-195.

"American Homicide: Theory, Methods, Body Counts." *Historical Methods* (2010) 43: 185-192.

"The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death." *Historical Methods*. Randolph Roth, Cornelia Hughes Dayton, Kenneth Wheeler, James Watkinson, Robb Haberman, James M. Denham, and Douglas L. Eckberg (2008) 41: 81-98.

"Homicide in Florida, 1821-1861: A Quantitative Analysis." *Florida Historical Quarterly*. Randolph Roth and James M. Denham (2007) 86: 216-239.

 "Guns, Murder, and Probability: How Can We Decide Which Figures to Trust?"

Randolph Roth                                                              Page 7

*Reviews in American History* (2007) 35: 165-75.

"Twin Evils?  Slavery and Homicide in Early America," in Steven Mintz and
John Stauffer, eds., *The Problem of Evil: Slavery, Freedom, and the Ambiguities
of American Reform*. Amherst: University of Massachusetts Press (2007), 74-88.

"Rural Communities," in Feintuch, Burt and David H. Watters, eds.,
*Encyclopedia of New England*. Yale University Press (2005), 53-55.

"Counting Guns: What Social Science Historians Know and Could Learn about
Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social
Science History* (2002) 26: 699-708.

"Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses
of Firearms, and Interpersonal Violence in Early America," *William and Mary
Quarterly* (2002) 59: 223-240.

"Homicide in Early Modern England, 1549-1800: The Need for a Quantitative
Synthesis." *Crime, History, and Societies* (2001) 5: 33-67.

"Child Murder in New England," *Social Science History* (2001) 25: 101-147.

"Spousal Murder in Northern New England, 1791-1865," in Christine Daniels,
ed., *Over the Threshold: Intimate Violence in Early America, 1640-1865*.
Routledge Press (1999), 65-93.

"`Blood Calls for Vengeance!': The History of Capital Punishment in Vermont,"
in Michael Sherman, ed., *Vermont State Government*. Vermont Secretary of State
and Vermont Historical Society (1997), 10-25.

"The Generation Conflict Reconsidered," in *American Vistas*, ed. Leonard
Dinnerstein & Kenneth T. Jackson. Oxford University Press (7th ed. 1995), 116-
127.

"The Other Masonic Outrage: The Death and Transfiguration of Joseph
Burnham," *Journal of the Early Republic* (1994) 14: 35-69.

"The First Radical Abolitionists: The Reverend James Milligan and the Reformed
Presbyterians of Vermont," *New England Quarterly* (1982) 55: 540-563.


**Essays on Methods and Theory**

"'To Err Is Human': Uniformly Reporting Medical Errors and Near Misses, a
Naïve, Costly, and Misdirected Goal." *Journal of the American College of*

Randolph Roth                                                                 Page 8

*Surgeons*. Charles H. Andrus, Eduardo G. Villasenor, John B. Kettelle, Randolph
Roth, Allison M. Sweeney, and Nathaniel M. Matolo (2003) 196: 911-918.

"Is There a Democratic Alternative to Republicanism?  The Rhetoric and Politics
of Synthesis in American History," in Jeffrey Cox and Sheldon Stromquist, eds.,
*Contesting the Master Narrative: Essays in Social History*. University of Iowa
Press (1998), 210-256.

"Did Class Matter in American Politics? The Importance of Exploratory Data
Analysis," *Historical Methods* (1998) 31: 5-25.

"Is History a Process? Revitalization Theory, Nonlinearity, and the Central
Metaphor of Social Science History," *Social Science History* (1992) 16: 197-243.

"Ecological Regression and the Analysis of Voter Behavior," *Historical Methods*
(1986) 19: 103-117.


**Public History Essays**

"Can Faith Change the World?  Religion and Society in Vermont's Age of
Reform," *Vermont History* (2001) 69: 7-18.

"Wayward Youths:  Raising Adolescents in Vermont, 1777-1815," *Vermont
History* (1991) 59: 85-96.

"Why Are We Still Vermonters?  Vermont's Identity Crisis and the Founding of
the Vermont Historical Society," *Vermont History* (1991) 59: 197-211.


**Works in Progress**

*Child Murder in America*. An interregional study of murders of and by children
from colonial times to the present (in manuscript through early 20th century)

"How Scientific Is Environmentalist History? The Rhetoric and Politics of
Speaking for Nature" (essay in manuscript)


**Editorial Boards**

2014-2017, *American Historical Review*
2012-2016, 1995-2005, *Historical Methods*
2011- , *Homicide Studies*
2004- , *Crime, History, and Societies*

Randolph Roth                                                            Page 9

**Invited Lectures**

"Why Have Homicide Rates Gone Up since 2015? A Historical Perspective."
Knowledge against Violence Series, Harry Frank Guggenheim Foundation, March
30, 2023.

"Trust, Legitimacy, and the Recent Rise in Homicide in the United States,"
Council on Criminal Justice, Washington, D.C., October 19, 2022.

"The History of Police Involved Homicides in the United States," Mary
Immaculate College & the University of Limerick, Ireland, October 26, 2021.

"Firearms and Homicide in the United States: A History," British Crime
Historians Symposium, Leeds University, Great Britain, Scheduled for September
2-3, 2021.

"The History of Cross-National Homicide Rates: What We Can Learn from the
Available Historical Data, and Why We Have to Worry about Learning the
Wrong Lessons," Bielefeld University, Germany, scheduled for April 29, 2020.
Postponed.

"Inequality," Ashland University, October 16, 2019.

"The History of Gun Violence in America," Shasta Seminar, Wesleyan
University, October 28, 2017.

"Why Guns Are and Aren't the Problem," Ashland University Center for the
Study of Nonviolence, Ashland University, April 1, 2017.

"Firearms and Violence in American History," Aspen Institute, September 15,
2016, Washington, D.C.

"Homicide in the United States: The Long History and Recent Trends," The
Donald and Margaret Sherman Violence Prevention Lecture, Jerry Lee Center of
Criminology, University of Pennsylvania, April 10, 2015.

"The History of Child Murder," Andrew Young School of Public Policy, Georgia
State University, January 28, 2014.

"The Causes of Homicide," National Institute of Justice, December 2, 2013.

"Biology, History, and the Causes of Homicide," School of Law, University of
Buffalo, October 10, 2013.

Randolph Roth                                                    Page 10

"Bio-Historical Co-Evolution and the Biology of Social Behavior: The Prospects for a New Institute on History and the Sciences," Max Planck Institutes, Berlin, Germany, June 27, 2013.

"Deterrence, Judicial Tolerance, and the Homicide Problem in America," Robina Institute of Criminal Law and Justice, University of Minnesota, April 26, 2013

"Child Murder in America: A History," Population Studies Center and Department of History, University of Michigan, April 8, 2013

"America's Homicide Problem," Northwestern University School of Law, November 16, 2012

"American Homicide," Aspinall Lecture, Colorado Mesa University, April 5, 2012

"Quantitative Analysis of the History of Crime and Violence: Achievements and Prospects," Keynote Address, Conference on "Making Sense of Violence," University of Bern, September 8, 2011

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences, and the Social Sciences in the Study of Violence." Conference on Emerging Disciplines, Humanities Research Center, Rice University, February 25, 2011

"American Homicide," Washington Forum, Ohio University, Athens, Ohio, May 25, 2010

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences, and the Social Sciences in the Study of Violence." Presidential Plenary Address, Southwestern Social Science Association, Houston, Texas, April 1, 2010

"Homicide on Florida's Antebellum Frontier," Robert and Rose Stahl Criminal Justice Lecture, Lawton M. Chiles Center for Florida History, Florida Southern College, Lakeland, Florida, March 25, 2010

"Homicide in the American Backcountry, 1717-1850," Keynote Address at the "From Borderland to Backcountry Conference: Frontier Communities in Comparative Perspective" at the University of Dundee, Scotland, July 7, 2009

"Research Strategies for Studying the History of Crime and Violence," Seminar on Crime and Criminal Justice, Northwestern University School of Law, Nov. 15, 2007

 "American Homicide: Its History," Ohio State University at Newark, Nov. 6,

Randolph Roth                                                                                    Page 11

2007

 "American Homicide: A Political Hypothesis" and "The Case for Social Science History," Northern Illinois University, April 4-5, 2007

"What Historians Can and Might Learn from Legal Sources." Seminar in Early American History, Northwestern University, Jan. 31, 2007

"Why Is America a Homicidal Nation? A Political Hypothesis," lecture in the Historical Approaches in the Social Sciences series, State University of New York at Binghamton, Oct. 12, 2006

 "The History of American Homicide," Winter College, Ohio State University, Sarasota, Florida, February 24, 2006

"The Role of Small Arms in American History," Small Arms Working Group, Harry Frank Guggenheim Foundation, Columbia University, June 2005

"Why is the United States So Homicidal Compared to Other Western Democracies?  A Political and Psychological Hypothesis," Center for Historical Research and Documentation on War and Contemporary Societies, Belgian Ministry of Scientific Research, Brussels, Belgium, December 2004

"The History of American Homicide," Center for Law, Policy, and Social Science, Moritz College of Law, Ohio State University, November 2004

"Peaceable Kingdoms? Harmony and Hostility in the Early American Family," Plenary Session, Society of Historians of the Early American Republic, July 22, 2004

"American Homicide," Department of History, Miami University, March, 2004

"Slavery, Freedom, and the History of African-American Homicide." School of Law and Department of History, University of Chicago, January, 2003

"American Homicide," School of Law, Stanford University, February, 2003

Workshop of the Study of the History of Homicide, Department of History, Stanford University, February, 2003

"American Homicide," Social Science Faculty Seminar, Stanford University, February, 2003

"American Homicide," School of Law, Northwestern University, September, 2003

**App. 0403**

Randolph Roth                                                                                    Page 12

"American Homicide," School of Law, University of Chicago, November, 2002

"Twin Evils?: The Relationship between Slavery and Homicide," Department of History, Yale University, May, 2002

"The Puzzle of American Homicide," School of Law, Northwestern University, November, 2001

"Why Northern New Englanders Seldom Commit Murder:  An Interregional History of Homicide in America," and "The Historical Database Project on Crime and Violence in America," two lectures presented at the Charles Warren Center, Harvard University.  May, 2000

"Understanding Homicide in America:  An Interregional Approach," presentation to the Early American History Seminar, University of Pennsylvania, October, 1999

"Can Faith Change the World?"  Keynote address, Conference on Reform in Antebellum Vermont, Vermont Historical Society, September, 1999

"Why Northern New Englanders Seldom Commit Murder," presentation to the Center for Research on Vermont, the University of Vermont, and the Vermont Council on the Humanities.  The presentation was televised in Vermont.  It also made the evening news in Burlington and an AP wire story on my presentation was printed widely in newspapers in New Hampshire and Vermont, April, 1999


**Papers Delivered at Professional Meetings (recent)**

"The Social and Geographical Context of Child Homicides in the United States, 1989-2015," Homicide Research Working Group, June 2, 2022, Excelsior Springs, Missouri, and Social Science History Association, November 17, 2022, Chicago.

"The Difficulty of Counting the Number of Children Killed in Homicides in the United States, 1959-Present." Social Science History Association, November 23, 2019, Chicago.

"Police Involved Homicides in Ohio, 1959-1988," American Society of Criminology, November 13, 2019, San Francisco, with Wendy Regoczi and Rania Issa.

"Can Criminologists and Historians of Crime Work Together More Fruitfully in the Future?" Social Science History Association, November 3, 2017, Montreal.

**App. 0404**

Randolph Roth                                                          Page 13

"Comparing Data Sources on the Police Use of Lethal Force," American Society of Criminology, November 15, 2017, Philadelphia, with Wendy Regoczi and Rania Issa.

 "The History of Mass Murder," American Historical Association, January 6, 2017, Denver.

"The Historians' Role in Criminal Justice Research," American Society of Criminology, November 16, 2016, New Orleans

"Police and Security Guard Involved Homicides in Ohio, 1959-1988," American Society of Criminology, November 18, 2016, New Orleans

"Why History and Biology Matter to One Another: The Epigenetics of Social Behavior," American Historical Association, New York City, January 4, 2015

"The National Homicide Data Improvement Project, 1959-Present: Why Research in Multiple Sources Changes Dramatically Our Understanding of the Incidence and Character of Homicides in the United States," American Society of Criminology, San Francisco, November 19, 2014

"The Relationship between Guns, Homicides, and Suicide in American History," Organization of American Historians, Atlanta, April 4, 2014

"Situating Crime in Macro-Social and Historical Context," Presidential Panel, American Society of Criminology, Atlanta, November 22, 2013

"Has Violence Declined since the Middle Ages?" Presidential Panel, American Society of Criminology, Chicago, November 15, 2012

"The Sudden Appearance of Sexual Serial Killers in Late-Nineteenth Century America," Organization of American Historians, Houston, March 20, 2011

"The Biology of Social Behavior" at the annual conference of the Society of Historians of the Early American Republic, Philadelphia, July 15, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the American Society of Criminology meeting in Washington, D.C., November 16, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the Social Science History Association meeting in Boston, November 20, 2011

"Author Meets Critics" session on *American Homicide* at the European Social

**App. 0405**

Science History conference in Ghent, Belgium, April 13, 2010. Discussants: Manuel Eisner, Peter King, and Pieter Spierenburg

"The Relationship between Guns and Homicide in American History," American Society of Criminology conference in San Francisco, November 18, 2010

"Author Meets Critics" session on American Homicide at the Social Science History Association conference in Chicago, November 20, 2010. Discussants: Richard McMahon, Douglas Eckberg, Donald Fyson, and John Carter Wood

"Does Honor Hold the Key to Understanding Violence in the Early Republic,"Society for Historians of the Early American Republic, Springfield, Illinois, July 2009.

"The Difficulty of Reconciling the Homicide Counts in the National Center for Health Statistics Mortality Data and the FBI Supplementary Homicide Reports," Social Science History Association, Long Beach, California, November, 2009

"Homicide in American History," Ohio Academy of History, Dayton, Ohio, April 12, 2008

"Quantification and Social Theory in the Study of Crime and Violence," in the Presidential Panel on "History in the Social Science History of Association: Disciplinary Developments," Social Science History Association, Chicago, Nov. 15-18, 2007

"Are Modern and Early Modern Homicide Rates Comparable?  The Impact of Non-Emergency Medicine," Social Science History Association, Chicago, Nov. 15-18, 2007

"How Homicidal Was Antebellum Florida?" Gulf South History and Humanities Conference, Pensacola, Florida, Oct. 6, 2006

"Probability and Homicide Rates: Why We Can Be Certain the Nineteenth-Century West Was Violent."  Social Science History Association convention in Minneapolis, Nov. 2-5, 2006

"The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death."  Social Science History Association convention in Minneapolis, Nov. 2-5, 2006

"Big Social Science: What Could We Learn about Violent Crime If We Had Enough Money to Study It Properly? Possibilities for Collaborative Research Projects," Social Science History Association, Portland, Oregon, November 3-6, 2005

Randolph Roth                                                    Page 15

**Reviews**

Nicholas Keefauver Roland, *Violence in the Hill Country: The Texas Frontier in the Civil War Era* (New Mexico Historical Review 2023).

T. Cole Jones, *Captives of Liberty: Prisoners of War and the Politics of Vengeance in the American* Revolution (American Historical Review, 2021).

Chris Murphy, *The Violence Inside Us: A Brief History of an Ongoing American Tragedy* (Criminal Law and Criminal Justice Books, 2020).

Jeffrey S. Adler, *Murder in New Orleans: The Creation of Jim Crow Policing*. (Punishment and Society, 2020).

Heidi J. Osselaer, *Arizona's Deadliest Gunfight: Draft Resistance and Tragedy at the Power Cabin, 1918*. (Western Historical Quarterly, 2020).

Iain McGilchrist, *The Master and His Emissary: The Divided Brain and the Making of the Western World*. (Journal of Interdisciplinary History, 2011).

Heather Cox Richardson, *Wounded Knee: Party Politics and the Road to an American Massacre*. (*Journal of the Civil War Era*, 2011).

Bill Neal, *Sex, Murder, and the Unwritten Law: Gender and Judicial Mayhem, Texas Style*. (New Mexico Historical Quarterly, 2010).

Gordon Morris Bakken and Brenda Farrington, *Women Who Kill Men: California Courts, Gender, and the Press*. (Pacific Northwest Quarterly, 2010).

Jack D. Marietta and Gail S. Rowe, *Troubled Experiment: Crime, Justice, and Society in Pennsylvania, 1682-1800*. (William and Mary Quarterly, 2010).

Mark R. Pogrebin, Paul B. Stretesky, and N. Prabha Unnithan, *Guns, Violence, and Criminal Behavior: The Offender's Perspective*. (Criminal Justice Review, 2010)

Nicole Rafter, *The Criminal Brain: Understanding Biological Theories of Crime*. (Journal of Interdisciplinary History, 2009.)

Laura Browder, *Her Best Shot: Women and Guns in America* (Winterthur Portfolio 2007).

Paul M. Searls, *Two Vermonts: Geography and Identity, 1865-1910* (Vermont

Randolph Roth                                                          Page 16

History, 2006).

Anu Koskivirta, *The Enemy Within: Homicide and Control in Eastern Finland in the Final Years of Swedish Rule, 1748-1808* (English Historical Review 2005).

Irene Quenzler Brown and Richard D. Brown, *The Hanging of Ephraim Wheeler: A Story of Rape, Incest, and Justice in Early American* (H-SHEAR, 2003).

T. D. S. Bassett, *The Gods of the Hills* (New England Quarterly, 2001).

Karen Halttunen, *Murder Most Foul: The Killer and the American Gothic Imagination* (H-SHEAR, 1999).

Charles E. Clark, *The Meetinghouse Disaster* (Journal of American History, 1999).

Nicholas N. Kittrie and Eldon D. Wedlock, Jr., *The Tree of Liberty:  A Documentary History of Rebellion and Political Crime in America* (Journal of the Early Republic, 1998).

Robert E. Shalhope, *Bennington and the Green Mountain Boys: The Emergence of Liberal Democracy in Vermont, 1790-1850* (Reviews in American History, 1997).

Daniel Doan, *Indian Stream Republic:  Settling a New England Frontier* (Journal of the Early Republic, 1997).

Thomas H. Jeavons, *When the Bottom Line is Faithfulness:  Management of Christian Service Organizations* (American Historical Review, 1996).

N. Prabha Unnithan, *The Currents of Lethal Violence:  an Integrated Model of Suicide & Homicide* (Justice Quarterly, 1995).

Edward Jarvis, *Traditions and Reminiscences of Concord, Massachusetts, 1779-1878* (Journal of the Early Republic, 1995).

Charles Hoffman and Tess Hoffman, *Brotherly Love:  Murder and the Politics of Prejudice in Nineteenth-Century Rhode Island* (American Historical Review, 1994).

Richard Bushman, *The Refinement of America:  Persons, Houses, Cities* (Pennsylvania History, 1994).

Michael Bellisiles, *Revolutionary Outlaws:  Ethan Allen and Vermont's Struggle for Independence* (William and Mary Quarterly, 1994).

Randolph Roth                                                    Page 17

David G. Hackett, *The Rude Hand of Innovation:  Religion and Social Order in Albany, New York, 1652-1836* (American Historical Review, 1992).

Nat Brandt, *The Congressman Who Got Away With Murder* (New York History, 1992).

Tamara Plakins Thornton, *Cultivating Gentlemen:  The Meaning of Country Life Among the Boston Elite, 1785-1860* (American Historical Review, 1991).

George M. Thomas, *Revivalism and Cultural Change:  Christianity, Nation Building, and the Market in the Nineteenth-Century United States* (Pennsylvania History, 1991).

Richard D. Brown, *Knowledge is Power:  The Diffusion of Information in Early America, 1700-1865* (The History of Education Quarterly, 1990).

William J. Gilmore, *Reading Becomes a Necessity of Life:  Material and Cultural Life in Rural New England, 1780-1865* (Vermont History, 1990).

Ruth Alden Doan, *The Miller Heresy, Millennialism, and American Culture* (Journal of the Early Republic, 1988).

William Lynwood Montell, *Killings:  Folk Justice in the Upper South* (International Journal of Oral History, 1987).

David R. Kasserman, *Fall River Outrage:  Life, Murder, and Justice in Early Industrial New England* (Journal of American History, 1987).

Robert J. Wilson III, *The Benevolent Diety:  Ebenezer Gay and the Rise of Rational Religion in New England* (New England Quarterly, 1985).


**Languages**

German
Spanish
French (reading)


**Quantitative Skills**

Probability and Statistics (including econometric techniques of political analysis, exploratory data analysis, and log-linear and logit analysis)
Calculus and Analytical Geometry

Randolph Roth                                                                     Page 18

     Linear Algebra and Nonlinear Dynamics
     Differential and Series Equations
     Abstract Algebra

**App. 0410**

Randolph Roth                                                                    Page 19

## Teaching

### Graduate

| | |
|---|---|
| History 7000 | Topics in American History to 1877 |
| History 7003 | Readings in the Early Republic and Antebellum America |
| History 7650 | Studies in World History |
| History 7900 | Colloquium in the Philosophy of History, Historiography, and the Historian's Skills |
| History 8000 | Seminar in Early American History |

### Undergraduate

| | |
|---|---|
| History 2001 | American Civilization, 1607-1877 (and Honors) |
| History 2015 | History of American Criminal Justice |
| History 2650 | World History since 1914 |
| History 2800 | Introduction to Historical |
| History 3164 | World History since 1914: Readings |
| History 3193 | Individual Studies / Research Internships in History |
| History 3700 | American Environmental History |
| History 4650 | History of Violence: Readings in World / Global / Transnational History |
| History 4675 | Global History of Violence: Research Seminar |
| History 5900 | Introduction to Quantitative Methods in History |
| History 598 | Religious and Reform Movements (Senior Colloquium) |
| History 598 | Research Seminar on Violent Crime and Death in the U.S. |
| History 557.02 | Jeffersonian and Jacksonian Democracy, 1800-1840 Thought |
| History 282 | American Religious History |

## Publications on Teaching

Founder and contributor to *Retrieving the American Past*, Department of History and Pearson Publishing, a flexible, problem-oriented publication for teaching classes in American History. Author of modules on "Violent Crime in Early America," "Marriage in Colonial America," and "Growing Up in Nineteenth-Century America."

## Ph.D Students Supervised

Daniel Vandersommers, "Laboratories, Lyceums, and Lords: Zoos, Zoology, and the Transformation of Humanism in Nineteenth-Century America," August 2014. Recipient of a Presidential Fellowship, 2013-2014, the most prestigious

**App. 0411**

Randolph Roth                                                    Page 20

University fellowship for senior graduate students. Assistant Professor of History, University of Dayton.

Michael Alarid, ""Caudillo Justice: Intercultural Conflict and Social Change in Santa Fe, New Mexico, 1837-1853," June 2012. Associate Professor of History, University of Nevada at Las Vegas.

Matthew Foulds, "Enemies of the State: Methodists, Secession and Civil War in Western Virginia, 1844-1865," December 2011. Former Assistant Professor of History, Shepherd University

Jeanette Davis Mantilla, "Hush, Hush Miss Charlotte: Twenty-Five Years of Civil Rights Struggles in San Francisco, 1850-1875," April 2000. Administrator in Charter School Division of the Department of Education, State of Ohio

Ken Wheeler, "The Antebellum College in the Old Northwest: Higher Education and the Defining of the Midwest," January 1999. Professor of History, Reinhardt College. Author of *Cultivating Regionalism: Higher Education and the Making of the American Midwest* (Northern Illinois University Press, 2011)

Ross Bagby, "The Randolph Slave Saga." July 1998. Librarian and independent scholar

Marianne Holdzkom, "Parody and Pastiche Images of the American Revolution in Popular Culture, 1765-1820," May 1995. Professor of Social and International Studies, Southern Polytechnic State University

David Thomas, "Religion in the Far West: Oregon's Willamette Valley, 1830-1850," November 1993. Professor of History, Union College

**Recent Senior Honors Thesis Students Supervised (recently)**

Maggie Seikel, "The Great Depression in More Ways than One: Why Do Americans Commit Suicide More Often during Economic Crises?" (Anticipated 2021).

Margo Hertzer, "Police Involved Homicides in Ohio, 1959-1988." (Anticipated 2021).

Laura Janosik, "Homicides Involving Women in Ohio, 1959-1988." (2020). Prospective applicant to graduate school in history.

Randolph Roth                                                                Page 21

Ben St. Angelo, "How Labor Disputes Led to Violence: Personalities, Paternalism, and Power at Republic Steel in Youngstown, Ohio: 1937." (2017). Ph.D. student in History at Ohio State University.

Sarah Paxton, "The Bloody Ould Sixth Ward: Crime and Society in Five Points, New York" (2012). Ph.D. candidate in criminal justice history J.D. candidate at the Moritz School of Law at Ohio State University (twin degree program).

Kristen Gaston, "Restoration of the Cuyahoga River" (2012). Ph.D. candidate in Environmental History at the University of Cincinnati.

Alexandra Finley, "Founding Chestnut Ridge: The Origins of Central West Virginia's Multiracial Community" (2010). Ph.D. candidate in early American history at the College of William and Mary. Recipient of the first Annual Prize at Ohio State for the outstanding senior honors thesis in the Department of History.

**App. 0413**

Randolph Roth                                                           Page 22

<div align="center">

**Service**

</div>

**Service in Professional Organizations**

2013-present, Grant Review Board, Harry Frank Guggenheim Foundation

2008-present, Editorial Board, *Crime, History, and Societies*.

2011-present, Editorial Board, *Homicide Studies*.

2022 Michael J. Hindelang Award Committee, American Society of Criminology, for the outstanding book published over the previous three years.

2018-2019 Allen Sharlin Book Prize Committee, Social Science History Association

2014-2017, Board of Editors, *American Historical Review*

2014-15, 2016-17, Program Committee, American Society of Criminology

2014-2017, Research Awards Committee, Ohio Academy of History.

2011-2014, Chair, Distinguish Teaching Award Committee, Ohio Academy of History

2010-2011, Allan Sharlin Memorial Prize Committee, Social Science History Association

2010- ,Ohio Violent Death Reporting System Advisory Board

2010-2013, Advisory Board, Society for Historians of the Early American Republic

2008- , Society for the Scientific Detection of Crime, Columbus, Ohio

2009-2011, Youth Violence Prevention Advisory Board (Columbus)

2003, Nominating Committee, Social Science History Association

2002- , Co-founder and co-director, Historical Violence Database

1995-1997, ABC-Clio America:  History and Life Award Committee, Organization of American Historians

<div align="right">

**App. 0414**

</div>

Randolph Roth                                                        Page 23

      1987-1993, Chair, Methods and Theory Network, Social Science History
      Association

      1987, Program Committee, Social Science History Association


## Reviews of Manuscripts

      American Historical Review
      Journal of American History
      William and Mary Quarterly
      Journal of the Early Republic
      Social Science History
      Journal of Interdisciplinary History
      Historical Methods
      Journal of Women's History
      Journal of the Family
      Crime, History, and Societies
      European Journal of Criminology
      American Journal of Sociology
      Sociological Quarterly
      Criminology
      Criminal Justice Review
      Journal of Criminal Law and Criminology
      Law and Social Inquiry
      Homicide Studies
      International Criminal Justice Review
      International Journal of Law, Crime, and Justice
      Law and Society Review
      City and Community
      Eras Review
      Western Historical Quarterly
      Canadian Journal of Sociology
      Journal of the Gilded Age


## Memberships in Professional Organizations (current)

      American Historical Association
      Organization of American Historians
      Social Science History Association
      European Social Science History Association
      American Society of Criminology
      Homicide Studies Working Group
      American Association for the Advancement of Science

Randolph Roth                                                                 Page 24


**Service at Ohio State University**

    **Department**

    2006-2010, 2018-present, Undergraduate Placement / Enhancement Officer

    1994-2015, 2018-present, Undergraduate Teaching Committee

    2017-2018, Chair of Grievance Committee

    2015-2017, 1991-1993, Chair of Graduate Studies

    2012-2013, Chair of Undergraduate Studies

    2011-2013, Advisory Committee and Salary Committee

    1987-1991, History Department Promotion & Tenure Committee


    **College of Humanities**

    2007-2009, Curriculum Committee, College of Humanities

    2002-2005, College of Humanities Computing Advisory Committee

    1996-1997, College of Humanities Committee on the Center for the Study and
    Teaching of Writing, 1996-7; Affiliated Faculty Member, 2000-


    **College of Arts and Sciences**

    2006-2009, Alternate, Arts and Sciences Faculty Senate

    2006- , Advisory Board, Criminal Justice Research Center, Department of
    Criminology and Sociology

    2004- , Fellow, Center for Law, Policy, and Social Science, Moritz College of
    Law

    2000- , Fellow, Criminal Justice Research Center, College of Social and Behavior
    Sciences

Randolph Roth                                                                    Page 25

**Graduate School**

2018- , Graduate Awards Review Committee

**Ohio Department of Higher Education**

2020- , Transfer Assurance Guide Review Panel, Ohio Articulation and Transfer Network

**Service at Grinnell College**

Chairman, African-American Studies Committee

Rosenfield Program on Public Affairs Committee

Faculty-Trustee Committee

**Community Service**

2001-2008, Chair, Community Services Advisory Commission, City of Dublin: advises City Council on all matters concerning utilities, policing, transportation, parks, recreation, waste management, etc.,

2004-present, Green Team, environmental projects volunteer organization, City of Dublin

2003-12, Committee to create an Indian burial mound and pioneer historic park at the Wright-Holder earthworks, City of Dublin

1997-present, Assistant Scoutmaster, Troop 299, Dublin / Citizenship Merit Badge Counselor / Eagle Scout Association / Philmont Staff Association / Distinguished Service Award, 2014 / Meritorious Service Award, 2006 / Bridge Builder Award, 2002

1997-2003, Good Schools Committee, Dublin City Schools, campaign committee for school bond and levy issues

1995-2005, President, Citizens for Dublin, city-wide association of civic association officers and city commission members

Randolph Roth                                                                                    Page 26

    1995-1998, Vice-Chair, Transportation Task Force, City of Dublin

    1995-1997, Community Plan Steering Committee, City of Dublin

    1988-present, President / Vice President / Trustee, East Dublin Civic Association

    1987-present, Nature Conservancy / Volunteer Service Awards / Volunteer Crew
    Leader


**Outreach / Media Appearances**

    Testimony to Oversight Committee of the Ohio Senate, December 22, 2020, on
    so-called "Stand Your Ground" laws.

    B.R.E.A.D. (an interfaith organization dedicated to Building Responsibility
    Equality and Dignity), January 13, 2020, on gun violence in central Ohio.

    Testimony to Federalism Committee of the Ohio House of Representatives, June
    12, 2019, on concealed carry laws.

    Worthington Senior Citizen Center, Inequality in the U.S., April 15, 2019

    Canfield Residence Hall, Discussion of History of Criminal Enterprise in the U.S.
    with Undergraduate Students, April 10, 2019

    "Gun Ownership in Decline," *Columbus Dispatch*, December 11, 2017.

    "How the Erosion of Trust Leads to Murders and Mass Shootings," invited
    editorial, *Washington Post*, October 6, 2017

    "Mass Murder in American History," CSpan-3, April 2, 2017

    All Sides with Ann Fisher, WOSU Radio, "Mass Murder and Terrorism,"
    December 9, 2015 and June 13, 2106; "The Recent Rise in Homicide in the
    United States," March 14, 2017.

    Consultant for the TLC Channel, "Who Do You Think You Are Anyway?" 2013-
    2014

    Appeared on the CSPAN Book Channel on September 1, 2012 (http://www.c-
    span.org/LocalContent/Columbus/)

    Appeared on the History Channel, "Seven Deadly Sins," January 3, 2009 (A&E
    Home Video)

Randolph Roth                                                    Page 27

"It's No Mystery: Why Homicide Declined in American Cities during the First Six Months of 2009," History News Network, November 22, 2009 (http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%2011-22-2009%205-2010.pdf and http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%20Further%20Thoughts%201-1-2010%205-2010.pdf)

Radley Balko, editor of reason.com, named *American Homicide* the best book of 2009 (http://reason.com/archives/2009/12/30/the-year-in-books)

"American Homicide," address to Columbus Rotary Club, October 24, 2011

Radio interviews: Execution Watch with Ray Hill on KPFT Houston, Texas, and WPFW Washington, D.C., Nov. 10, 2009; Focus 580 with David Inge, WILL, Champaign-Urbana, Illinois, December 7, 2009; RadioWest with Doug Fabrizio, KUER and XM Public Radio Channel 133, Salt Lake City, Utah, Dec. 17, 2009; The Mark Johnson Show of the Radio Vermont Group, WDEV, Waterbury, Vermont, Dec. 30, 2009; The Current with Anna Maria Tremonti on the CBC, Toronto, Canada, January 6, 2010; The Marc Steiner Show on WEAA in Baltimore, January 26, 2010; by ABC Radio, Sydney, Australia, interviewed on March 3, 2010 for broadcast the week of March 8, 2010; by the Extension with Dr. Milt Rosenberg on WGN Radio 720 AM Chicago, broadcast December 9, 2010; the Gil Gross Show, KKSF Radio 910 AM, San Francisco, July 27, 2012; and The Marc Steiner Show on WEAA in Baltimore, December 17, 2012; *American Homicide* was the subject of an editorial by op-ed writer Gregory Rodriguez in the *Los Angeles Times*, Sunday, April 12, 2010 (**http://www.latimes.com/news/opinion/commentary/la-oe-rodriguez12-2010apr12,0,3217212.column**)

*American Homicide* was the subject of an editorial by Raina Kelley in *Newsweek*, Nov. 5, 2009 (http://www.newsweek.com/id/221271).

*American Homicide* was cited favorably in the *New York Times Sunday Magazine* in an article by Jeffrey Rosen, "Prisoners of Parole," January 10, 2010; and in the *Washington Post*, Nov. 22, 2009

Newspaper articles: quoted and/or reviewed in the *Washington Post*, the *Washington Times*, the *National Review*, the *Economist*, the *Wall Street Journal*, the *Boston Globe*, the *Chicago Tribune*, the *San Francisco Chronicle*, the *Los Angeles Times*, the *New York Times*, New York *Newsday*, the *Chronicle of Higher Education*, and the *Columbus Dispatch*, which ran a front-page article on Roth's work in a Sunday edition

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| SAMUEL ORTEGA and REBECCA SCOTT, <br><br> Plaintiffs, <br><br> v. <br><br> MICHELLE LUJAN GRISHAM, in her official capacity as Governor of the State of New Mexico, and RAÚL TORREZ, in his official capacity as Attorney General of the State of New Mexico, <br><br> Defendants. | No. 1:24-cv-00471-JB-SCY |

### STATEMENT RESPECTING PLAINTIFFS' REQUEST FOR TEMPORARY RESTRAINING ORDER [ECF #2]

1

**App. 0420**

Plaintiffs have sought both a Temporary Restraining Order and a Preliminary Injunction in this case. [ECF #2]. A full hearing on Plaintiffs' request for a preliminary injunction is set to start on June 27, 2024. However, Plaintiffs respectfully state that nothing in Defendants' Opposition brief, filed on June 4, 2024, adequately responds to Plaintiffs' motion; as such, the Court may issue a short ruling on Plaintiffs' Temporary Restraining Order motion based on the briefs that have been filed by the parties, without oral argument.

## I.      INTRODUCTION

The law at issue here—New Mexico Statute § 30-7-7.3 (the "Unlawful Sale of a Firearm Before Required Waiting Period Ends Act" or the "Waiting Period Act")—was effective on May 15, 2024. Plaintiffs have already been injured by the Waiting Period Act's burden on the right to keep and bear arms, along with numerous other residents of the State of New Mexico. Given that irreparable injury is ongoing, Plaintiffs respectfully request that the Court issue a ruling on the Temporary Restraining Order portion of their Motion *in advance of* the evidentiary hearing on the Preliminary Injunction.

## II.      RELEVANT PROCEDURAL HISTORY

1.      With limited exceptions, the Waiting Period Act makes it unlawful for any person who sells a firearm to a purchaser to deliver the purchaser's property to them until a minimum of seven calendar days after the sale has occurred, even if a clean background check comes back immediately.[1]

2.      On the day that the Waiting Period Act went into effect, Plaintiffs Paul Samuel Ortega and Rebecca Scott, both of whom are adult, law-abiding residents of New Mexico, attempted to

---

[1] The provisions of the Waiting Period Act do not apply to: (1) a buyer who holds a valid federal firearms license, (2) a buyer who holds a valid New Mexico concealed handgun license, (3) a law enforcement agency, (4) a transaction between two law enforcement officers; and (5) a transaction between immediate family members.

**App. 0421**

purchase firearms at two different gun stores in the state. Although both Plaintiffs cleared their federal background checks and paid or offered to pay the purchase price for the firearms, they were told by gun store employees that they could not take possession of the firearms because of the Waiting Period Act.

3.      On May 15, 2024, Plaintiffs filed a Complaint in the District of New Mexico challenging the constitutionality of the Waiting Period Act. Plaintiffs also filed a Motion for a Temporary Restraining Order and Preliminary Injunction (hereinafter, the "Motion").

4.      On May 21, 2024, a scheduling conference was held in the case. At that time, the Court ordered that a hearing on the Motion would be held on June 27, 2024.[2] In addition, Defendants were ordered to file their Response to the Motion by May 31, 2024, with Plaintiffs' Reply Brief to be filed by June 14, 2024.

5.      On June 4, 2024, Defendants timely filed their Response to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.[3]

### III.      LEGAL ARGUMENT

#### A.  Standard of Review

6.      Temporary restraining orders, like the one requested in the present case, are intended to be "stopgap measures" that preserve the status quo pending the complete briefing and thorough consideration contemplated by a full evidentiary hearing for a preliminary injunction. *See Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438–39, (1974) (temporary restraining orders "should be restricted to serving their underlying purpose of preserving the status quo and

---

[2] The Court also provided additional time on June 28th if the hearing needs to be extended into a second day.

[3] On May 31, 2024, the parties agreed that Defendants would have until June 4, 2024.

**App. 0422**

preventing irreparable harm just so long as is necessary to hold a hearing [on the preliminary injunction], and no longer.").

7.      To obtain a temporary restraining order, the movant must show that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the threatened injury outweighs the harm that the temporary restraining order may cause the opposing party; and (4) the temporary restraining order, if issued, is in the public interest. *Winters v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1139 (D.N.M. 2018).

8.      Pursuant to the Local Rules of Civil Procedure for the District of New Mexico, "[a] party may (but need not) request oral argument on any motion. Unless otherwise ordered by the Court . . . all motions will be decided on the briefs without a hearing." *See Local R. 7.6(a)*.

**B. While reserving judgement on the issuance of a Preliminary Injunction until after an evidentiary hearing is held, Plaintiffs invite the Court – in the interim – to rule on their motion for a Temporary Restraining Order.**

9.      There appears to be no dispute between the parties on the underlying facts in this matter. Instead, the debate surrounds the issue of the applicability of the Second Amendment to the Plaintiffs' conduct, and whether the Defendants can identify an analogous historical tradition of firearm regulation.

10.     The Court has now received briefing covering both sides of this issue. Plaintiffs contend, after reviewing Defendants' opposition, that this Court has sufficient evidence to grant the Temporary Restraining Order portion of Plaintiffs' original Motion, which is incorporated here by reference.

11.     Because an evidentiary hearing is still over three weeks away, and because Plaintiffs and all law-abiding residents of the State of New Mexico who wish to purchase a firearm continue to be irreparably harmed by the Waiting Period Act, the issuance of a Temporary Restraining Order

**App. 0423**

as a stopgap measure pending a full evidentiary hearing on the request for a Preliminary Injunction is appropriate.

**C. Independent of the Court's decision on the Temporary Restraining Order, Plaintiffs reserve the right to file a Reply Brief in answer to Defendants' Response Brief.**

12.      Although Plaintiffs are requesting a ruling on the Temporary Restraining Order based on the parties' written filings submitted to the Court thus far, Plaintiffs still intend to file a Reply Brief to Defendants' Response Brief on or before the filing deadline of June 14, 2024, in compliance with the local rules. *See Local R. 7.4(a).*

**IV.      CONCLUSION**

13.      For the foregoing reasons, Plaintiffs respectfully request the Court enter a Temporary Restraining Order of the Waiting Period Act prior to the currently scheduled June 27, 2024, hearing on the motion for a Preliminary Injunction.

DATED: June 4, 2024

Respectfully submitted,

Carter B. Harrison IV
Attorney and Partner
**Harrison & Hart, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102
carter@harrisonhartlaw.com

Michael D. McCoy
Sean D. Nation
**Mountain States Legal Foundation**
2596 South Lewis Way
Lakewood, Colorado 80227
Phone: (303) 292-2021
mmccoy@mslegal.org

Joseph Greenlee
Erin M. Erhardt
**National Rifle Association of America**

**App. 0424**

11250 Waples Mill Road
Fairfax, VA 22030
Email: jgreenlee@nrahq.org
Email: eerhardt@nrahq.org

*Attorneys for Plaintiffs*

**App. 0425**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**SAMUEL ORTEGA, and
REBECCA SCOTT,**

       **Plaintiffs,**

**vs.**                                                          **No. 1:24-cv-00471-JB-SCY**

**MICHELLE LUJAN GRISHAM, in her
official capacity as Governor of the State of
New Mexico, and RAÚL TORREZ, in his
official capacity as Attorney General of the
State of New Mexico,**

       **Defendants.**

**ATTORNEY GENERAL RAÚL TORREZ' NOTICE OF JOINDER TO GOVERNOR
LUJAN GRISHAM'S RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY
<u>RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

Defendant Attorney General Raúl Torrez, by and through his counsel of record, hereby

submits this Notice of Joinder to Governor Lujan Grisham's Response to Plaintiff's Motion for

Temporary Restraining Order and Preliminary Injunction [Doc. 15].

                        Respectfully submitted,

                        */s/ ~~Mark~~ W. Allen*
                        Mark W. Allen
                        Assistant Attorney General
                        New Mexico Department of Justice
                        408 Galisteo St.
                        Santa Fe, NM 87501
                        505.490.4825
                        mallen@nmdoj.gov

                        *Attorney for Raúl Torrez*

**App. 0426**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 5, 2024, I filed the foregoing via the CM/ECF filing system,

which caused all counsel of record to be served by electronic means.


Respectfully submitted,

<u>/s/ Mark W. Allen</u>
Mark W. Allen

**App. 0427**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SAMUEL ORTEGA, and**
**REBECCA SCOTT,**

     **Plaintiffs,**

**vs.**                            **No. 1:24-cv-00471-JB-SCY**

**MICHELLE LUJAN GRISHAM, in her**
**official capacity as Governor of the State of**
**New Mexico, and RAÚL TORREZ, in his**
**official capacity as Attorney General of the**
**State of New Mexico,**

     **Defendants.**

### DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES

Defendants Governor Michelle Lujan Grisham and Attorney General Raúl Torrez (collectively, "Defendants"), by and through their counsel of record, hereby answer Plaintiffs' Complaint [Doc. 1] as follows:

### I. INTRODUCTION

With respect to the allegations contained in the introductory paragraph, Defendants admit the Governor signed into law House Bill 129 on March 4, 2024, which enacted a seven-day waiting period for most commercial firearm sales and became effective on May 15, 2024. Defendants further admit the seven-day waiting period applies regardless of whether the purchaser has passed all required background checks and that both the seller and the purchaser can be charged with violating the law. The remainder of the introductory paragraph states a legal conclusion to which no response is required. To the extent that the remainder of the introductory paragraph can be construed to make factual allegations, Defendants deny them.

**App. 0428**

## II. PARTIES

1.      Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 1 and therefore deny the same.

2.      Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 2 and therefore deny the same.

3.      With respect to the allegations in Paragraph 3, Defendants admit Michelle Lujan Grisham is the Governor of the State of New Mexico and that the New Mexico constitution provides that the "supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed." The remainder of Paragraph 3 states a legal conclusion to which no response is required. To the extent that the remainder of Paragraph 3 can be construed to make factual allegations, Defendants deny them.

4.      With respect to the allegations in Paragraph 4, Defendants admit that Raúl Torrez is the Attorney General for the State of New Mexico. The remainder of Paragraph 4 states a legal conclusion to which no response is required.

5.      With respect to the allegations in Paragraph 5, Defendants admit the Attorney General and district attorneys will enforce NMSA 1978, Section 30-7-7.3 (2024). The remainder of Paragraph 5 states a legal conclusion to which no response is required. To the extent that the remainder of Paragraph 5 can be construed to make factual allegations, Defendants deny them.

## III. JURISDICTION AND VENUE

6.      Paragraph 6 states a legal conclusion to which no response is required.

7.      Paragraph 7 states a legal conclusion to which no response is required.

8.      Paragraph 8 states a legal conclusion to which no response is required.

**App. 0429**

## IV. GENERAL ALLEGATIONS

9.      With respect to the allegations in Paragraph 9, Defendants admit that the Second

Amendment provides: "A well regulated Militia, being necessary to the security of a free State,

the right of the people to keep and bear Arms, shall not be infringed."

10.     Paragraph 10 states a legal conclusion to which no response is required.

11.     With respect to the allegations in Paragraph 11, Defendants state that NMSA 1978,

Section 30-7-7.3 (2024), speaks for itself.

12.     Paragraph 12 states a legal conclusion to which no response is required. To the

extent that Paragraph 12 can be construed to make factual allegations, Defendants deny them.

13.     Defendants are without knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations contained in the first sentence of Paragraph 13 and therefore

deny the same.  Defendants deny the remainder of Paragraph 13.

14.     Paragraph 14 states a legal conclusion to which no response is required. To the

extent that Paragraph 14 can be construed to make factual allegations, Defendants deny them.

15.     Paragraph 15 states a legal conclusion to which no response is required. To the

extent that Paragraph 15 can be construed to make factual allegations, Defendants deny them.

16.     Paragraph 16 states a legal conclusion to which no response is required. To the

extent that Paragraph 16 can be construed to make factual allegations, Defendants deny them.

17.     Paragraph 17 states a legal conclusion to which no response is required. To the

extent that Paragraph 17 can be construed to make factual allegations, Defendants deny them.

18.     Paragraph 18 states a legal conclusion to which no response is required. To the

extent that Paragraph 18 can be construed to make factual allegations, Defendants deny them.

**App. 0430**

19.     Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in the first sentence of Paragraph 19 and therefore deny the same.  The remainder of Paragraph 19 states a legal conclusion to which no response is required. To the extent that the remainder of Paragraph 19 can be construed to make factual allegations, Defendants deny them.

20.     Paragraph 20 states a legal conclusion to which no response is required. To the extent that Paragraph 20 can be construed to make factual allegations, Defendants deny them.

## V. FIRST CLAIM FOR RELIEF
### Right to Keep and Bear Arms
### U.S. Const., amends. II and XIV

21.     The foregoing answers and denials are incorporated by reference.

22.     Paragraph 22 states a legal conclusion to which no response is required. To the extent that Paragraph 22 can be construed to make factual allegations, Defendants deny them.

23.     Paragraph 23 states a legal conclusion to which no response is required. To the extent that Paragraph 23 can be construed to make factual allegations, Defendants deny them.

24.     Paragraph 24 states a legal conclusion to which no response is required. To the extent that Paragraph 24 can be construed to make factual allegations, Defendants deny them.

25.     With respect to the allegations in Paragraph 25, Defendants admit Section 30-7-7.3's waiting period applies to commercial transactions even if the purchaser has passed all required background checks and does not contain an exception based on the reasons for the firearm purchase. Defendants deny the remainder of Paragraph 25.

26.     Admit.

27.     Paragraph 27 states a legal conclusion to which no response is required. To the extent that Paragraph 27 can be construed to make factual allegations, Defendants deny them.

App. 0431

**AFFIRMATIVE DEFENSES**

**First Affirmative Defense**:  Plaintiffs' complaint fails to state a claim upon which relief may be granted.

**Second Affirmative Defense**:   Plaintiffs' complaint is barred by sovereign immunity.

**Third Affirmative Defense**:  Plaintiffs' complaint is barred by qualified immunity.

**Fourth Affirmative Defense**:  Plaintiffs lack standing to bring this case.

Respectfully submitted,

/s/ Holly Agajanian
**HOLLY AGAJANIAN**
*Chief General Counsel to Governor Michelle Lujan Grisham*
**KYLE P. DUFFY**
*Deputy General Counsel to Governor Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2200
holly.agajanian@exec.nm.gov
kyle.duffy@exec.nm.gov

and

/s/ Mark W. Allen
**MARK W. ALLEN**
*Assistant Attorney General*
**BILLY JIMENEZ**
*Assistant Attorney General*
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 490-4825
mallen@nmdoj.gov
bjimenez@nmdoj.gov

**App. 0432**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 7, 2024, I filed the foregoing via the CM/ECF filing system,

which caused all counsel of record to be served by electronic means.

Respectfully submitted,

*/s/ Holly Agajanian*
Holly Agajanian

**App. 0433**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SAMUEL ORTEGA, and
REBECCA SCOTT,

   Plaintiffs,

vs.             No. 1:24-cv-00471-JB-SCY

MICHELLE LUJAN GRISHAM, in her
official capacity as Governor of the State of
New Mexico, and RAÚL TORREZ, in his
official capacity as Attorney General of the
State of New Mexico,

   Defendants.

## GOVERNOR LUJAN GRISHAM'S NOTICE OF SUPPLEMENTAL AUTHORITY

   Governor Michelle Lujan Grisham hereby files the attached Expert Reports and Declarations of Professors Christopher Poliquin and Eric Ruben filed in *Richards v. Bonta*, No. 3:23-cv-00793-LAB-AHG, (S.D. Cal., Sep. 21, 2023), to supplement the Court on pertinent and significant authorities central to the issues of this case pursuant to D.N.M.LR-Civ 7.8. *See Hernandez v. Lujan Grisham*, 494 F. Supp. 3d 1044, 1067 n.2 (D.N.M. 2020) (Browning, J.) (finding declarations filed in another court "persuasive").

   Professor Ruben explains how American society's treatment of suicide evolved since the founding and how gun-related suicides did not emerge as a widespread issue until relatively recently, which demonstrates that the challenged waiting period satisfies the history and tradition test established in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). *See* [Doc. 15 at 14-15]. Professor Poloquin explains the beneficial impact of firearm purchase waiting periods on firearm deaths, which is relevant to the Court's consideration of the balance of the equities and

**App. 0434**

public interest elements required for a preliminary injunction under *Winter v. Nat. Res. Def.*

*Council, Inc.*, 555 U.S. 7 (2008). *See* [Doc. 15 at 19-20].

<div style="margin-left:auto">

Respectfully submitted,

*/s/ Holly Agajanian*
**HOLLY AGAJANIAN**
*Chief General Counsel to Governor*
*Michelle Lujan Grisham*
**KYLE P. DUFFY**
*Deputy General Counsel to Governor*
*Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2200
holly.agajanian@exec.nm.gov
kyle.duffy@exec.nm.gov

</div>

App. 0435

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2024, I filed the foregoing via the CM/ECF filing system, which caused all counsel of record to be served by electronic means.

<div align="right">

*/s/ Holly Agajanian*_____
Holly Agajanian

</div>

**App. 0436**

**EXHIBIT A**

1
Rob Bonta
Attorney General of California
2
Mark R. Beckington
Paul Stein
3
Supervising Deputy Attorneys General
Sebastian Brady
4
Kevin L. Kelly
Robert L. Meyerhoff
5
Deputy Attorneys General
State Bar No. 298196
6
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
7
  Telephone:  (213) 269-6177
  Fax:  (916) 731-2144
8
  E-mail:  Robert.Meyerhoff@doj.ca.gov
*Attorneys for Defendant Rob Bonta in his*
9
*official capacity as Attorney General of the*
*State of California and Defendant Allison*
10
*Mendoza in her official capacity as Director*
*of the Bureau of Firearms*

11

<div align="center">IN THE UNITED STATES DISTRICT COURT</div>

12

<div align="center">FOR THE SOUTHERN DISTRICT OF CALIFORNIA</div>

13

14

15

16
**Claire Richards, et al.,**

17
Plaintiffs,

18
v.

19
**Rob Bonta, in his official capacity**
**as Attorney General of**
20
**California, et al.,**

21

22
Defendants.

23

Case No. 3:23-CV-00793

**EXPERT REPORT AND**
**DECLARATION OF PROFESSOR**
**ERIC RUBEN**

24
<div align="center">**EXPERT REPORT AND DECLARATION OF**
**PROFESSOR ERIC RUBEN**</div>

25
I, Eric Ruben, declare under penalty of perjury that the following is true and

26
correct:

27

28

<div align="center">1</div>

1    The California Department of Justice has asked me to provide an expert

2    opinion pertaining to firearms waiting periods and related restrictions in the United

3    States in the above-captioned matter. This expert report and declaration

4    ("Declaration") provides that opinion, and is based on my own personal knowledge

5    and experience; if I am called as a witness, I could and would testify competently to

6    the truth of the matters discussed in this Declaration.

7                    **BACKGROUND AND QUALIFICATIONS**

8        1.    I am a legal scholar whose work spans the fields of legal history, legal

9    empirics, criminal law, constitutional law, and legal ethics. A true and correct copy

10   of my curriculum vitae is attached as **Exhibit A** to this declaration.

11       2.    I received a Bachelor of Arts degree from Dartmouth College in 2003,

12   graduating *magna cum laude*, and a Juris Doctorate degree from New York

13   University School of Law ("NYU Law") in 2007, graduating *cum laude*.

14       3.    Since 2023, I have served as an Associate Professor of Law with

15   tenure at the Dedman School of Law at Southern Methodist University ("SMU

16   Law"). From 2019 to 2023, I was an Assistant Professor of Law at SMU Law.

17   From 2018 to 2019, I was an Adjunct Professor of Law at NYU Law. Since 2014, I

18   have served as a fellow at the Brennan Center for Justice at NYU Law.

19       4.    I have taught law school courses at SMU Law or NYU Law on

20   criminal law, professional responsibility, the Second Amendment, and the

21   regulation of weaponry in democratic societies.

22       5.    My research investigates how the substantive law regulates violence

23   and the instruments of violence. I draw heavily on criminological, sociological, and

24   public health research, and deploy methodologies including doctrinal, historical,

25   and empirical analysis.

26       6.    I have written extensively about firearm regulations, defensive force,

27   and the right to keep and bear arms. That work has appeared in leading law

28   journals, including the CALIFORNIA LAW REVIEW, DUKE LAW JOURNAL,

1    GEORGETOWN LAW JOURNAL, HARVARD LAW REVIEW FORUM, IOWA LAW REVIEW,

2    SOUTHERN CALIFORNIA LAW REVIEW, VIRGINIA LAW REVIEW ONLINE, YALE LAW

3    JOURNAL, and YALE LAW JOURNAL FORUM. My work has served as the basis for

4    written and oral testimony before the U.S. Senate Judiciary Committee, amicus

5    briefs, and popular commentary appearing in various outlets including *ABC News*,

6    *MSNBC*, *CNN*, *Atlantic*, *New York Times*, *Vox*, *Wall Street Journal*, *Washington*

7    *Post*, *USA Today*, and *NPR*.

8    7.    My scholarship on the Second Amendment has been cited in numerous

9    federal and state court opinions, including both the majority and dissenting opinions

10   in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). It also

11   informed an amicus brief I co-filed in *United States v. Rahimi*, 143 S.Ct. 2688

12   (2023). *See* Brief of Second Amendment Law Scholars as Amici Curiae in Support

13   of Petitioner, *United States v. Rahimi*, 143 S.Ct. 2688 (2023) (No. 22-915).

14   8.    My next article, forthcoming in the MINNESOTA LAW REVIEW, is

15   entitled *Scientific Context, Suicide Prevention, and the Second Amendment After*

16   Bruen. Among other things, it explores the historical legal treatment of suicide,

17   contextualizing that legal treatment against the backdrop of religion and medicine.

18   This declaration draws on my research for that project.

19                    **RETENTION AND COMPENSATION**

20   9.    I have been retained by the California Department of Justice to render

21   expert opinions in this case. I am being compensated at a rate of $500 an hour for

22   my work on this declaration, and at a rate of $750 an hour for time spent on

23   depositions or testimony. My compensation is not contingent on the results of my

24   expert analysis or the substance of my opinions or testimony in this matter.

25           **BASIS FOR OPINION AND MATERIALS CONSIDERED**

26   10.   The opinions I provide in this report are based on my review of the

27   complaint filed in this lawsuit, my review of the statutes at issue in this lawsuit, and

28   my education, expertise, and research into relevant legal history—including a

1    variety of scholarly works, laws, cases, popular and learned commentaries, and

2    various other related materials I have reviewed in forming my opinions.  The

3    opinions contained herein are made pursuant to a reasonable degree of professional

4    certainty.

5                    **SCOPE OF ANALYSIS AND PROFESSIONAL OPINION**

6            11.    I have been retained by the California Department of Justice to provide

7    my professional opinion on the legal treatment of suicide prevention at the

8    Founding and today, contextualizing that treatment to better understand why

9    different approaches were pursued during both time periods.

10           12.    Suicide history is an extensive topic. My declaration focuses on

11   aspects of that history that I believe are most relevant in comparing modern-day

12   efforts at means restriction, such as post-firearm-purchase waiting periods, to

13   historical practices and understandings.

14           13.    Based on extensive reviews and analysis of the relevant evidence, it is

15   my professional opinion that:

16           •   In the Founding era, against a backdrop of the dominant

17               moral/religious view of suicide at the time, the law's treatment of

18               suicide was focused on after-the-fact criminal punishment.

19           •   Founding-era medicine and science, which generally misunderstood

20               the causes of mental illness and suicide, exerted less influence than

21               religion on suicide prevention policy.

22           •   Over time, the societal approach to suicide followed a process of

23               secularization, decriminalization, and medicalization. Along with these

24               trends, twentieth-century scientific research has illuminated the crucial

25               relationship between access to lethal means and suicide risk. It is this

26               scientific understanding, which is the result of population-level

27               analyses unavailable and likely unimaginable at the Founding, that

28

informs suicide-prevention measures like the firearm waiting period law at issue here.

## I.  THE RELIGIOUS AND MORAL TREATMENT OF SUICIDE AT THE FOUNDING AND ITS CORRESPONDING CRIMINALIZATION

14.  America has grappled with the problem of suicide since the Colonial Era.  The first newspaper printed in America—on September 25, 1690—recounted a suicide on the front page, beginning a pattern of frequent newspaper complaints about how regular suicide was becoming. That article also highlighted a predominant way that suicide was understood at the time: through religion. The article provided a then-familiar explanation: "The Devil [then] took Advantage of the Melancholy which he thereupon fell into."[1]

15.  Though some cultures took different approaches, even sanctioning suicide,[2] Founding-era American suicide law reflects the strong moral opposition to suicide that itself was rooted in the dominant Christian teachings of the time. Before the rise of secular, scientific understandings, pre-modern societies often viewed suicide and mental illness through the lens of religion. They expressed concern that mental illness was a result of demonic possession and that evil spirits would be released upon an individual's self-destruction.[3] That general view was

---

[1] RICHARD BELL, WE SHALL BE NO MORE: SUICIDE AND SELF-GOVERNMENT IN THE NEWLY UNITED STATES 16 (2012) (citing Publick Occurences (Boston), Sept. 25, 1690)). Bell notes that American interest in suicide at the Founding is also reflected in the fact that one-third of all American novels published between 1789 and 1800 built plots around suicides. *Id.* at 60. The very first American novel, William Hill Brown's *The Power of Sympathy*, featured three characters contemplating suicide. *Id.* at 59.

[2] *See, e.g.*, Thomas J. Marzen, et al., *Suicide: A Constitutional Right?*, 24 DUQUESNE L. REV. 1, 17 (1985) (discussing ancient Chinese and Indian approval of the suicide of widows); *see also Washington v. Glucksberg*, 521 U.S. 702 (1997) (citing Marzen, et al.'s analysis).

[3] Daniel M. Crone, *Historical Attitudes Toward Suicide*, 35 DUQ. L. REV. 7, 7 (1996) ("Most of the ancient societies seemed to regard suicide with a horror that

incorporated into early Christian teachings that "greatly dominated Western attitudes" and connected melancholy and suicide with the workings of the devil.[4] As one historian wrote, "[i]t was Satan, condemned to despair for eternity, who filled humans with desperation by distancing them from divine grace."[5] Influential Christian scholars such as Martin Luther linked their opposition to suicide to their opposition to the devil.[6]

16.    Community standards of morality are closely intertwined with criminal law.[7] Suicide, deemed an immoral act against God, was also considered a crime before and at the Founding. Leading jurists from Matthew Hale to William Blackstone juxtaposed the religious wrongfulness of suicide and its criminality. Matthew Hale explained that "[n]o man hath the absolute interest of himself but: 1. God almighty hath an interest and propriety in him, and therefore self-murder is a sin against God. 2. The king hath an interest in him, and therefore the inquisition in case of self-murder is *felonice and voluntarie seipsum interfecit and murderarit*

_____

was often associated with fear of the evil spirits that suicide was believed to set loose."); A.M. Foerschner, *The History of Mental Illness: From Skull Drills to Happy Pills*, 2 INQUIRIES J. (2010), http://www.inquiriesjournal.com/articles/1673/the-history-of-mental-illness-from-skull-drills-to-happy-pills.

[4] Marzen et al., *supra* note 2, at 26, 29.

[5] MARZIO BARBAGLI, FAREWELL TO THE WORLD 53 (Lucina Byatt trans., 2015) (1938); *see also* JENNIFER MICHAEL HECHT, STAY: A HISTORY OF SUICIDE AND THE PHILOSOPHIES AGAINST IT 46-58 (2013) (discussing how in medieval Christianity, "suicide became viewed as [connected to] the devil's temptations").

[6] HECHT, *supra* note 5 at 60 ("In 1544, writing about a woman who had killed herself, Luther speculated that she had been possessed and that she might be considered a victim of the devil.")

[7] *See* Henry M. Hart, Jr., *The Aims of the Criminal Law*, 23 LAW & CONTEMP. PROBS. 401, 405 (1958) (observing how criminal law declares "a formal and solemn pronouncement of the moral condemnation of the community"); United States v. Cordoba-Hincapie, 825 F. Supp. 485, 491 (E.D.N.Y. 1993) (Weinstein, J.) ("It was inevitable that the development of the criminal law, based as it is upon general and evolving societal mores, would track the development of prevailing views about moral wrongdoing.").

*contra pacem domini regis* [feloniously and voluntarily killed and murdered himself against the peace of the lord king]."[8] William Blackstone characterized suicide as "[a] double offence; one spiritual, in invading the prerogative of the Almighty, and rushing into his immediate presence uncalled for; the other temporal, against the king, who hath an interest in the preservation of all his subjects; the law has therefore ranked this among the highest crimes, making it a peculiar species of felony committed on one's self."[9] As a corollary to criminalizing suicide, the criminal law also criminalized aiding and abetting suicide.[10]

17.     The religious-moral opprobrium and corresponding criminalization of suicide was adopted in the American colonies. A Massachusetts statute in 1661 criminalized the "damnable Practice" of suicide that showed "how far Satan doth prevail."[11] Those adjudicated to have died by suicide in sound mind "shall be buried in some Common high-way . . . and a Cart-load of Stones laid upon the Grave as a Brand of Infamy."[12] Massachusetts was not alone; colonial legislatures in New Hampshire, Rhode Island, New Jersey, Maryland, Virginia, South Carolina, and North Carolina also followed the English practice of punishing willful suicide, or felo-de-se, with a dishonorable burial, such as in a potter's field, as well as forfeiture of goods.[13]

---

[8] MATTHEW HALE, HISTORIA PLACITORUM CORONAE: THE HISTORY OF THE PLEAS OF THE CROWN 411-12 (1736).

[9] 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 189 (1765).

[10] Later, when suicide itself was decriminalized, assisting suicide became a separate substantive offense. *See Washington v. Glucksberg*, 521 U.S. 702, 774 n.13 (1997) (Souter, J., concurring) (quoting State of New York, report of the Law Revision Commission for 1937, p. 831) ("Since liability as an accessory could no longer hinge upon the crime of a principal, it was necessary to define it as a substantive offense.").

[11] BELL, *supra* note 1 at 18.

[12] *Id.* at 18.

[13] *Id.* at 19; *see also Glucksberg*, 521 U.S. at 712-13 (discussing early Rhode

7

18.     At the Founding, in the case of a suspected suicide, a coroner, accompanied by an inquest jury, investigated the deceased's death and the jury issued a posthumous verdict regarding whether a suicide had taken place; if so, the punishment included forfeiture of goods.[14] If the inquest jury determined that the deceased was insane at the time of the act, however, there would be no forfeiture.[15]

19.     Over time, inquest jurors in America increasingly attributed suicide to causes that would not result in forfeiture. According to one account, "no more than 20 percent of inquest verdicts after 1780" were for felo-de-se, compared with "more than 80 percent of decisions before 1720."[16] The move away from forfeiture for suicides accelerated after the Revolution when four states outlawed forfeiture of property as a punishment for suicide.[17] The shift away from forfeiture as a punishment is generally understood as reflecting concern about punishing families for the decedent's offense, not as reflecting a view that suicide was not morally condemnable.[18]

20.     Through the 1800s, states decriminalized suicide, through law or practice, at the same time that mental health and suicide became increasingly

---

Island law).

[14] SAMUEL MILLER, THE GUILT, FOLLY, AND SOURCES OF SUICIDE: TWO DISCOURSES 68–69 (1805) (stating the jury's duties, and noting that "the punishment of suicide prescribed by the common law of England is twofold—ignominious burial . . . and forfeiture of all the criminal's goods and chattels to the king.").

[15] Id. at 68 (encouraging jurors not to illegitimately declare a decedent's "lunacy").

[16] BELL, supra note 1, at 20.

[17] Id. (describing the actions of the states of New Jersey, Maryland, Virginia, and North Carolina).

[18] See id. (attributing much of "this tidal shift in judgment" to "petty officials and reluctant volunteers . . . simply submitting to rising pressure from increasingly acquisitive neighbors eager to assume ownership of their loved ones' property"); Glucksberg, 521 U.S. at 713 (crediting the "growing consensus that it was unfair to punish the suicide's family for his wrongdoing").

secularized and medicalized.[19] Thomas Marzen and coauthors observed how "[d]ecriminalization occurred because of a concern for the despondency or mental disorder that was believed to prompt such deeds . . . ."[20]

21.     Meanwhile, reducing access to suicidal means was not a primary focus of suicide prevention efforts at the Founding, though at least one advertisement urged pharmacists to take care when prescribing arsenic. In particular, in March 1800, Boston's *Columbian Centinel* published a column repeating "observations" from the Royal Humane Society in London ranging from how to avoid lightning to resuscitating still-born babies.[21] One of the column's "cautions" advised druggists to "limit the sale of arsenic to buyers accompanied by 'two or more creditable persons' who could 'testify to the vender [sic] the purpose for which its use is designed.'"[22] There is no record of compliance by pharmacists to this advice.[23]

## II.   FOUNDING ERA MEDICAL PERSPECTIVES ON MENTAL ILLNESS AND SUICIDE

22.     Today, as discussed below in ¶ 34 to ¶ 41, secular, scientific understandings of mental illness and suicide prevention guide policymakers, including with respect to reducing access to lethal means. To contextualize why there was not a similar focus at the Founding, it is relevant to consider the relatively

---

[19] *See* Marzen, et al., *supra* note 2, at 98-99; Helen Y. Chang, *A Brief History of Anglo-Western Suicide: From Legal Wrong to Civil Right*, 46 S.U.L. REV. 150, 168 (2018) (observing that once "the association between mental health treatment and suicide became more substantiated, the criminality of suicide became less defensible").

[20] Marzen et al., *supra* note 2, at 99; *see also id.* (quoting Commonwealth v. Wright, 11 Pa. D. 144, 146 (1902)) ("Calling suicide self-murder is a curt way of justifying an indictment and trial of an unfortunate person who has not the fortitude to bear any more the ills of this life. His act may be a sin, but it is not a crime; it is the result of disease. He should be taken to a hospital and not sent to a prison.").

[21] 33 COLUMBIAN CENTINEL (Boston), Mar. 22, 1800.

[22] *Id.*

[23] BELL, *supra* note 1, at 287 n.23.

rudimentary state of medical science at the time as regards mental illness and suicide prevention.

23.    From the fifth century to not long before the Second Amendment's enactment, the dominant theory of physical and psychological disease was the "humoral theory," which maintained that "health was a function of the proper balance of four humors: blood, black bile, yellow bile, and phlegm."[24] Under this conception, depression, or as it was then known, "melancholy," was frequently attributed to an excess of black bile.[25]

24.    English scholar Robert Burton's 1621 book, *The Anatomy of Melancholy*, describes the humoral theory as it applied to melancholy.[26] Burton attributed melancholy to a range of causes, both "supernatural" (including "God," "Devils," "Witches," and "Stars") and "natural" (including "our temperature . . . which we receive from our parents," "diet, retention and evacuation," "bad air," "solitariness," "immoderate exercise," "passions and perturbations of the mind," "imagination," "shame and disgrace," and "overmuch study").[27] Whatever the cause, the somatic effect was the "corruption of humours, which produce [melancholy] and many other diseases."[28]

25.    Burton's proposed solutions sought to rebalance the humors. "Purges" required consuming substances that caused either vomiting ("upward" purges) or diarrhea ("downward" purges).[29] Burton also recommended intentionally bleeding

---

[24] *Humoral Theory*, APA DICTIONARY OF PSYCHOLOGY, AM. PSYCH. ASS'N, https://dictionary.apa.org/humoral-theory (last visited Jan. 2, 2024).

[25] George Dunea, *Review, The Anatomy of Melancholy*, 335 BR. MED. J. 351, 351 (2007); *see also Humoral Theory*, *supra* note 24  (noting that black bile was associated with melancholy).

[26] ROBERT BURTON, THE ANATOMY OF MELANCHOLY (New York Farrar & Rinehart ed. 1927) (1577–1640).

[27] *Id.*at 157–282.

[28] *Id.* at 210.

[29] *Id.* at 574–80.

1   patients either by cutting or by applying leeches.[30] Indeed, bloodletting was the first

2   recommended medical intervention "[w]here the melancholy blood possesseth the

3   whole body with the brain."[31]

4       26.    By the 1700s, the humoral theory of medicine was becoming

5   discredited,[32] but new theories and solutions reflected continuity with the humoral

6   theory in various ways. Benjamin Rush wrote the first American textbook on what

7   is now known as mental illness, *Medical Inquiries and Observations Upon the*

8   *Diseases of the Mind*, in 1812.[33] Rush became known as "the father of American

9   psychiatry."[34]

10       27.    Rush attributed mental illness to disease in the blood vessels of the

11   brain.[35] To remedy that disease, Rush prescribed different solutions, many of which

12   mirrored the solutions that were embraced under the humoral theory. Bloodletting

13   was the first remedy prescribed, which results in "relief . . . by the loss of blood

14   from the haemorrhoidal vessels, and by other accidental haemorrhages."[36] "After

15   bleeding, if it be required," doctors should move on to the other treatments like

16   purges to "bring away black bile, and sometimes worms."[37] In addition, Rush

---

17       [30] *Id.* at 584–85.

18       [31] *Id.* at 600.

19
20       [32] Indeed, according to one review, "the 1000 year old humoral theory of disease . . . was beginning to be discredited" even when Burton wrote his tome on melancholy. Dunea, *supra* note 25, at 351.

21       [33] *See* BENJAMIN RUSH, M.D., MEDICAL INQUIRIES AND OBSERVATIONS UPON
22   THE DISEASES OF THE MIND (1812); *see also* STEPHEN FRIED, RUSH: REVOLUTION, MADNESS AND THE VISIONARY DOCTOR WHO BECAME A FOUNDING FATHER 451
23   (2018) (observing that *Medical Inquiries and Observations Upon the Diseases of the Mind* was "the first American book specifically on mental illness and addiction").

24       [34] *Dr. Benjamin Rush, "Father of American Psychiatry"*, PENN MEDICINE,
25   https://www.uphs.upenn.edu/paharc/features/brush.html.

26       [35] BENJAMIN RUSH, MEDICAL INQUIRIES AND OBSERVATIONS, UPON THE DISEASES OF THE MIND 24-25 (4th ed. 1830).

27       [36] *Id.* at 97.

28       [37] *Id.* at 98.

11

recommended ingesting "aloes, jalap, and calomel," each of which is now known to be toxic, [38] to promote diarrhea.[39] He incorrectly attributed the resulting bloody stool to mental illness and not the toxic substances he prescribed.[40] Rush also recommended emetics to promote vomiting and thereby "remove morbid excitement from the brain, and thus restore the mind to its healthy state."[41] In addition to bloodletting, purges, and emetics, patients were to consume "little nourishment"[42] and drink warm sherry wine and diluted porter.[43] In the alternative, people suffering from mental illness should take opium, a "noble medicine" that "has many advantages over ardent spirits," like operating faster and "not pollut[ing] the breath."[44] Rush recommended warm baths, cold baths, and exercise, as well as trying to increase salivation.[45] Salivation could be increased by ingesting mercury to "abstract[] morbid excitement from the brain to the mouth" and thereby "chang[e] the cause of our patient's complaints, and fix[] them wholly upon his sore mouth,"[46] ultimately "restor[ing] the mind to its native seat in the brain."[47] Doctors should not converse with patients about their melancholy because that would only worsen the condition.[48]

---

[38] *See e.g.*, Xiaoqing Guo & Nan Mei, Aloe Vera*: A Review of Toxicity and Adverse Clinical Effects*, 34 J. ENV'T SCI. & HEALTH, PART C. ENV'T CARCINOGENESIS & ECOTOXICOLOGY REVS. 77 (2016) (discussing toxicity of aloe vera); Guenter B. Risse, M.D., PhD., *Calomel and the American Medical Sects During the Nineteenth Century*, 48 MAYO CLINIC PROC. 57–58 (Jan. 1973) (discussing Rush's recommendations regarding jalap and calomel).
[39] RUSH, *supra* note 35, at 98.
[40] Risse, *supra* note 38, at 58-59.
[41] RUSH, *supra* note 35, at 98.
[42] *Id.*
[43] *Id.* at 99.
[44] *Id.* at 100-101.
[45] *Id.* at 101-03.
[46] *Id.* at 103.
[47] *Id.* at 103.
[48] *Id.* at 115.

28.     Rush's treatments were not the only ones used by practitioners at the Founding. One medical practitioner, Thomas Gale, published a book in 1802 called *Electricity, or the Ethereal Fire, Considered*, which espoused "medical electricity" to cure a wide variety of ailments, including mental illness.[49] Gale complained that bloodletting only offered "temporary relief," but "strong electric shock" could more effectively "restore an equilibrium in the circulations."[50] Gale "found, by experience, that gentle shocks through every part of the system upon the nerves, and through the stomach, and down the back of the head, upon the top of the head, through the brain to the feet, have assisted in restoring a person to the use of reason."[51]

29.     Meanwhile, other doctors looked to anatomical causes besides blood disease to explain mental illnesses. Jean-Etienne-Dominique Esquirol (1772-1840), an influential French doctor, for example, "championed a theory that lodged 'mental life solely in the nervous system,'"[52] and many in the medical community similarly came to view mental illness as related to a breakdown of the nervous system (hence, "nervous breakdown").[53] To be sure, *some* illnesses, like epilepsy and dementia, have connections to neurological disorders.[54] But throughout the

---

[49] THOMAS GALE, ELECTRICITY, OR THE ETHEREAL FIRE, CONSIDERED 70-71 (1802).

[50] *Id.* at 124.

[51] *Id.* at 125.

[52] JOHN C. WEAVER, A SADLY TROUBLED HISTORY: THE MEANINGS OF SUICIDE IN THE MODERN AGE 35 (2009) (quoting JAN GOLDSMITH, CONSOLE AND CLASSIFY: THE FRENCH PSYCHIATRIC PROFESSION IN THE NINETEENTH CENTURY (Cambridge U. Press 1987)).

[53] *See From Nerves to Neurosis*, SCIENCE MUSEUM, (June 12, 2019), https://www.sciencemuseum.org.uk/objects-and-stories/medicine/nerves-neuroses (discussing the popularization of the term "nervous breakdown" to describe a medical disorder).

[54] *See id.* (discussing how German neurologists of the early 1900s came to "distinguish[] neurological diseases from neuroses").

13

1800s, the list of perceived neurological disorders was quite different than doctors accept today. For example, a common diagnosis beginning in 1886 was "neurasthenia," whose "[c]ommon mental symptoms" included depression.[55]

30.    The state of medical science at the Founding influenced limited approaches to stopping suicide attempts that were already in motion. For example, humane societies at the Founding recommended taking down a person who was attempting to hang themselves and immediately bleeding them.[56] Such efforts and others conducted by Founding-era humane societies do not appear to have had a meaningful impact on suicide prevention.[57] Overall, "[m]ost failed suicides . . . were not thwarted; they were botched. They did not fail because of a stranger's or a neighbor's intervention but because the methods chosen were not sufficiently lethal."[58]

31.    Firearms were, no doubt, lethal, but the evidence we have suggests they were not used as frequently for suicide at the Founding compared to today. To be sure, the government did not systematically collect data on the prevalence of different means of suicide until the mid- to late-1800s, making it impossible to know with modern-day precision the breakdown of different methods. According to press coverage, which is admittedly an imprecise proxy, three means of suicide—drowning, poison, and hanging—accounted for about half of reported-upon suicides

---

[55] Ruth E. Taylor, *Death of neurasthenia and its psychological reincarnation: A study of neurasthenia at the National Hospital for the Relief and Cure of the Paralysed and Epileptic, Queen Square, London, 1870–1932*, 179 BRITISH J. PSYCHIATRY 550, 550 (2001) (citing F. G. GOSLING, BEFORE FREUD: NEURASTHENIA AND THE AMERICAN MEDICAL COMMUNITY, 1870–1910 (U. Ill. Press 1987)).

[56] BELL, *supra* note 1, at 94.

[57] Three decades' worth of records documenting people saved by the Humane Society of the Commonwealth of Massachusetts "described exactly seven as unmistakably suicidal," six of them by drowning, though the actual number of disrupted suicide attempts is likely higher given ambiguity in the records. *Id.* at 98–99.

[58] *Id.* at 96.

14

in early America.[59] Even in the mid-1800s, after handgun technology improved, evidence suggests that firearms did not account for nearly the proportion of suicides that they do today.[60] The first U.S. census to report suicide by method was in 1860.[61] That census reported that 112 people died by suicide by firearm, compared to 306 by hanging and 137 by poison.[62]

32.    In the mid-1800s, some prominent researchers cast doubt on the efficacy of bloodletting. Pierre Charles Alexandre Louis, a French doctor "considered the founder of modern epidemiology," was at the forefront of that effort.[63] Louis's *Research on the Effects of Bloodletting in Some Inflammatory Diseases* was published in French in 1828 but then expanded into a book, translated into English, and published in the United States in 1836.[64] In it, Louis compared the results of 77 patients who had been bled at different times in order to treat pneumonia.[65] He found that those who were bled later in the disease had a higher survival rate than those who were bled earlier in the disease, a finding he concluded

---

[59] *Id.* ("According to newspaper coverage, about half of the reported suicides in early national America were attempted or completed by drowning, asphyxiation, or poisoning.").

[60] An 1845 review of suicides reported in a New York City newspaper during the course of a year counted sixty-four suicides by hanging, compared to twenty-six by firearm. *See* E. K. Hunt, *Statistics of Suicide in the United States* 1 AM. J. INSANITY 225, 230 (1845).

[61] BELL, *supra* note 1, at 252.

[62] SECRETARY OF THE INTERIOR, STATISTICS OF THE UNITED STATES (INCLUDING MORTALITY, PROPERTY, &c.,) IN 1860; COMPILED FROM THE ORIGINAL RETURNS AND BEING THE FINAL EXHIBIT OF THE EIGHTH CENSUS 253 (1866).

[63] THEODORE H. TULCHINSKY & ELENA VARAVIKOVA, THE NEW PUBLIC HEALTH 12 (3d ed. 2014).

[64] Alfredo Morabia, *Pierre-Charles-Alexandre Louis and the Evaluation of Bloodletting*, 99 J. ROYAL SOC'Y MED. 156, 158–59, 160 n.5 (2006) (discussing Louis's experiments with bloodletting).

[65] *Id.* at 158.

15

was "startling and apparently absurd."[66] Though Louis did not discount entirely the usefulness of bloodletting, he concluded that its salutary effects were limited.[67]

33.    Beginning in the late 1800s and into the 1900s, researchers like Sigmund Freud began to acknowledge the psychological determinants of suicidal behavior.[68] In the mid-1900s, American researchers "would take the lead" from their French counterparts in suicide studies.[69] As historian John C. Weaver has described, "[c]ontemporary political, academic, and medical research currents in the United States furthered an abundance of innovative studies" with the assistance of a "surge of statistical manuals."[70] As a result of increasing scientific innovation, new medicines, therapies, and interventions were established.

## III.    MODERN TREATMENT OF SUICIDE IN LAW AND MEDICINE AS RELATES TO MEANS RESTRICTION

34.    Today, scientific methods, more than religious or pseudo-scientific beliefs, inform societal and legal approaches to suicide prevention. One of the most relevant discoveries, as it relates to firearm regulations targeting suicide prevention, is the relationship between access to common, lethal suicidal means and suicide rates.

---

[66] *Id.*

[67] P. CH. A. LOUIS, RESEARCHES ON THE EFFECTS OF BLOODLETTING IN SOME INFLAMMATORY DISEASES, AND THE INFLUENCE OF TARTARIZED ANTIMONY AND VESICATION IN PNEUMONITIS 13 (1836) ("Thus, the study of the general and local symptoms, the mortality and variations in the mean duration of pneumonitis, according to the period at which bloodletting was instituted; all establish narrow limits to the utility of this mode of treatment.").

[68] Taylor, *supra* note 55, at 550. For one example, see Sigmund Freud, *On the Grounds for Detaching a Particular Syndrome from Neurasthenia under the Description Anxiety Neurosis* (1895), *reprinted in* 3 STANDARD EDITION OF THE COMPLETE WORKS OF SIGMUND FREUD 90 (trans. and ed. J. Strachey).

[69] WEAVER, *supra* note 52, at 23, 62.

[70] *Id.* at 62-63.

35.    The research supporting means restriction as a method for suicide prevention first arose in the context of reducing suicidal means other than firearms, like domestic gas asphyxiation.[71] Asphyxiation from high carbon monoxide concentrations in domestic gas was the leading cause of suicide in the United Kingdom between the early 1900s and the early 1960s.[72] Suicidal people would close windows and turn on unlit gas jets, or stick their heads into turned-on, unlit ovens.[73] Death by this method was "almost entirely due to carbon monoxide poisoning," with coal-based gas at the time containing about 14 percent carbon monoxide.[74] After the introduction of oil-based gas, and then natural gas, however, the carbon monoxide content plummeted, rendering domestic gas asphyxiation much less fatal.[75]

36.    Contemporaneous with the drop in carbon monoxide levels in home gas, researchers noticed that suicide rates declined.[76] Norman Kreitman, who studied the connection between carbon monoxide poisoning and suicide,

---

[71] *See* Deborah Azrael & Matthew J. Miller, *Reducing Suicide Without Affecting Underlying Mental Health*, in THE INTERNATIONAL HANDBOOK OF SUICIDE PREVENTION 637–41 (Rory C. O'Connor & Jane Pirkis, eds., 2016) (discussing methods of suicide and their relationship to means restriction).

[72] R. D. T. Farmer, *Suicide by Different Methods*, 55 POSTGRADUATE MED. J. 775, 778 (1979); *accord* N. Kreitman and S. Platt, *Suicide, Unemployment, and Domestic Gas Detoxification in Britain*, 38 J. OF EPIDEMIOLOGY AND CMTY. HEALTH 1, 1 (1984) (further developing Farmer's findings).

[73] *See, e.g.*, ANNE STEVENSON, BITTER FAME: A LIFE OF SYLVIA PLATH 296 (1989) ("The smell of gas was unmistakable. Forcing open the door to the kitchen, they found Sylvia sprawled on the floor, her head on a little folded cloth in the oven. All the gas taps were full on.").

[74] Kreitman & Platt, *supra* note 72, at 1; Norman Kreitman, *The Coal Gas Story*, 30 BRIT. J. PREV. SOC. MED. 86, 87 (1976). *See also id.* ("Since the lethal agent in domestic gas is carbon monoxide it is convenient to refer to the former simply as CO suicides.").

[75] Kreitman & Platt, *supra* note 72 (discussing the hypothesis that the reduction in suicides was from reduced availability of carbon monoxide in domestic gas).

[76] Kreitman, *supra* note 74, at 88-89.

17

documented an increase in suicide by other means among men and women aged 15-24, but the dramatic decrease in home gas suicides dwarfed those increases.[77] Meanwhile, some age groups, like the elderly, experienced especially pronounced suicide rate declines.[78] Kreitman observed that "the close temporal association between the declining [carbon monoxide] content of domestic gas and the fall in suicides due to this agent while those from other causes have followed a quite different trend, lead to the conclusion that there is a direct causal relationship between the two phenomena."[79]

37.    Kreitman's subsequent work highlighted how the experience in Britain was anomalous when compared to other European countries where carbon monoxide poisoning was not a primary means of suicide.[80] He also observed that unemployment—a social condition usually correlated with increased suicide rates—rose by about 50 percent at the same time suicide rates dropped by 34 percent between 1961 and 1971, implying that the impact of the means restriction at issue (reduced access to carbon monoxide) may have been even greater than observed at first glance.[81] The usual research focus at the time was on the relationship between suicide, on the one hand, and psychiatric morbidity or social factors, on the other.[82] Kreitman concluded that "[i]t would appear that an additional variable—namely, availability of method—may now have to be added."[83]

---

[77] *Id.* at 88.

[78] *Id.*

[79] *Id.* at 92.

[80] Kreitman & Platt, *supra* note 72, at 3-4 ("It seems then, that in relation to the other countries of Europe, as analysed by Sainsbury et al, or with respect to the group of developed countries examined by Boor, the United Kingdom is conspicuously anomalous." (footnotes omitted)).

[81] *Id.*

[82] *Id.* at 5.

[83] *Id.*

18

38.     Subsequently, researchers observed similar effects in different parts of the world following the removal of common suicidal means. One set of studies, for example, evaluated the effects of removing access to highly toxic pesticides on suicide rates in South Asia. Globally, pesticide poisoning, not firearm discharge, is the most common means of suicide.[84] This was true of Sri Lanka, which "had one of the highest suicide rates in the world" in the 1990s.[85] After the Sri Lankan government imposed bans on highly toxic pesticides frequently used for suicide, however, far fewer people died by pesticide ingestion and the overall suicide rate dropped by 50 percent.[86]

39.     When Kreitman conducted his studies, he commented that "[v]irtually nothing is known" about *why* limiting access to suicidal means brings down suicide rates in light of alternative means.[87] Subsequent studies have started to fill in the gaps, including by documenting the impulsivity of many suicide attempts[88] and the generally positive prognosis following a failed attempt.[89] As public health researchers Deborah Azrael and Matthew Miller summarize:

---

[84] José M Bertolote et al., *Suicide, Suicide Attempts and Pesticides: A Major Hidden Public Health Problem*, 84 BULL. WORLD HEALTH ORG. 260, 260 (2006) (extrapolating from recent analyses that "pesticide ingestion [is] the most common method of suicide on a worldwide basis").

[85] Azrael & Miller, *supra* note 71, at 643.

[86] *Id.*

[87] Kreitman, *supra* note 74, at 92.

[88] *See, e.g.*, Thomas R. Simon et al., *Characteristics of Impulsive Suicide Attempts and Attempters*, 32 SUICIDE & LIFE-THREATENING BEHAV. 49, 52 (2001) (providing results of a study of 153 nearly lethal suicide attempts among thirteen to thirty-four-year-olds in Houston, Texas which found that 24 percent of study participants spent less than five minutes between the decision to attempt and the attempt).

[89] *See, e.g.*, David Owens et al., *Fatal and Non-Fatal Repetition of Self-Harm*, 181 BRITISH J. OF PSYCHIATRY 193, 193–94 (2002) ("[I]t seems that a reasonable estimate of non-fatal repetition [of suicide attempts] is 15-16% at 1 year with a slow rise to 20-25% over the following few years.").

The argument that restricting access to a highly lethal method can save lives rests on three well-established observations. . . . First, many suicidal crises are fleeting. . . . Second, the method people use in suicidal acts depends, to a vital extent, on the method's ready availability, over and above—and perhaps even independent of—the attempter's assessment of a method's intrinsic lethality. . . . Third, the prognosis if one survives a suicide attempt is excellent. . . . [F]ewer than 10% of people who attempt suicide and live later go on to die by suicide.[90]

40.     Today, in contrast to at the Founding, firearms are the most commonly used method in U.S. suicides, despite being used in a relatively small proportion of suicide attempts.[91] According to provisional data, 26,993 people in the United States took their lives by self-inflicted gun shots in 2022, the highest number since the Centers for Disease Control began recording suicide data in 1968.[92] Moreover, 2022 was not an outlier year; the gun suicide rate—7.65 per 100,000 in 2022—has been on an upward trajectory since 2006,[93] further cementing the United States' status as the country with the highest gun suicide rate in the world.[94]

41.     While suicide has long been a societal problem, contemporary perspectives on the nature of mental illness and the increasingly scientific understanding of how to reduce suicide rates help shed light on any absence of

---

[90] *See* Azrael & Miller, *supra* note 71, at 638-39.

[91] *See* PHILIP J. COOK & KRISTIN A. GOSS, THE GUN DEBATE: WHAT EVERYONE NEEDS TO KNOW 42 (2020) (describing statistics); Andrew Conner, Deborah Azrael, and Matthew Miller, *Suicide Case-Fatality Rates in the United States, 2007 to 2014*, 171 ANNALS OF INTERNAL MED. 885, 888 (2019) (estimating that firearms accounted for 4.8 percent of suicide attempts but 50.6 percent of suicide deaths).

[92] *CDC Provisional Data: Gun Suicides Reach All-time High in 2022, Gun Homicides Down Slightly from 2021*, JOHN HOPKINS BLOOMBERG SCH. OF PUB. HEALTH (Jul. 27, 2023), https://publichealth.jhu.edu/2023/cdc-provisional-data-gun-suicides-reach-all-time-high-in-2022-gun-homicides-down-slightly-from-2021.

[93] *Id.*

[94] *See* Champe Barton & Daniel Nass, *Exactly How High Are Gun Violence Rates in the U.S., Compared to Other Countries?*, THE TRACE (Oct. 5, 2021), https://www.thetrace.org/2021/10/why-more-shootings-in-america-gun-violence-data-research (noting that the U.S. was the "global leader" in gun suicides).

20

1  means restrictions during the Founding era. In light of subsequent research—

2  unavailable and in many ways inconceivable at the Founding—regarding the

3  relationship between access to lethal means of suicide and suicide rates, and the

4  proportion of overall suicides caused by gun shots, researchers and policymakers

5  have focused on the connection between access to firearms and suicide rates, and

6  the potential to reduce suicide rates by policies that reduce immediate access to

7  firearms, such as waiting periods.[95]

8

9

10  **DECLARATION UNDER PENALTY OF PERJURY PURSUANT TO 28**

11  **U.S.C. § 1746**

12      I declare under penalty of perjury that the foregoing is true and correct, and if

13  called as a witness would testify competently to the above.

14

15      Executed in Dallas, Texas on March  11 , 2024.

16

17                                                      */s/ Eric Ruben*

                                        _____

18                                                      Eric Ruben

19

20

21

22

23

24

25

26  _____

27      [95] *See, e.g.*, *Effects of Waiting Periods on Suicide*, RAND, (Jan. 10, 2023),
    https://www.rand.org/research/gun-policy/analysis/waiting-periods/suicide

28  (surveying studies of waiting periods' effect on suicide rates).

**EXHIBIT A**

# ERIC RUBEN

SMU Dedman School of Law
3315 Daniel Avenue • Dallas, TX 75205
214-768-2581 • eruben@smu.edu
http://ssrn.com/author=2436317

## ACADEMIC EXPERIENCE

**SMU Dedman School of Law**, Dallas, TX
> *Associate Professor of Law* (with tenure), May 2023-present
> *Assistant Professor of Law*, August 2019-May 2023
> *Courses*: Criminal Law; Professional Responsibility; Second Amendment and Weapons Regulation
> *Honors*: Robert G. Storey Distinguished Faculty Fellow, 2023-2024; Elected Graduation Hooder, 2022, 2023

**Brennan Center for Justice at New York University School of Law**, New York, NY
> *Fellow*, December 2014-Present

**New York University School of Law**, New York, NY
> *Adjunct Professor*, January 2018-January 2019
> *Course*: The Regulation of Weaponry in Democratic Society

## EDUCATION

**NEW YORK UNIVERSITY SCHOOL OF LAW**, New York, NY
J.D., May 2007, *cum laude*
> *New York University Law Review*, Articles Editor
> Florence Allen Scholar (top 10% after 4 semesters)
> Law Students for Human Rights, Board Member and Treasurer
> Administrative and Regulatory State, T.A. for Prof. Peggy Cooper Davis

**DARTMOUTH COLLEGE**, Hanover, NH
B.A. in Government, Minor in Mathematics, June 2003, *magna cum laude*
> Honors in writing and philosophy; recipient of Lombard Post-Graduate Fellowship

## JUDICIAL CLERKSHIP

**The Honorable Julio M. Fuentes, U.S. Court of Appeals, Third Circuit**, Newark, NJ
> *Judicial Clerk*, August 2007-August 2008

## ACADEMIC PUBLICATIONS

*Scientific Context, Suicide Prevention, and the Second Amendment After* Bruen, 108 MINN. L. REV. (forthcoming 2024)

*One Year Post-*Bruen*: An Empirical Assessment*, 110 VA. L. REV. O. 20 (2024) (with Rosanna Smart & Ali Rowhani-Rahbar)

ERIC RUBEN                                                    MARCH 2024

_Originalism-by-Analogy and Second Amendment Adjudication_, 133 YALE L.J. 99 (2023) (with Joseph Blocher)
- *cited in* various briefs submitted in United States v. Rahimi, No. 22-915 (U.S. Aug. 21, 2023)
- *cited in* Ocean State Tactical, LLC v. Rhode Island, __ F.4th __, 2024 WL 980633 (1st Cir. Mar. 7, 2024); Lara v. Comm'r Pennsylvania State Police, 91 F.4th 122 (3d Cir. 2024); Range v. Att'y Gen. United States of Am., 69 F.4th 96 (3d Cir. 2023) (Krause, J., dissenting)

_Self-Defense Exceptionalism and the Immunization of Private Violence_, 96 S. CAL. L. REV. 509 (2023)

_Public Carry and Criminal Law After_ Bruen, 135 HARV. L. REV. F. 505 (2022)
- *formed basis for* quotes in the New York Times and Washington Post, as well as interview on Vox's Today Explained podcast

_"Second-Class" Rhetoric, Ideology, and Doctrinal Change_, 110 GEO. L.J. (2022) (with Joseph Blocher)
- *companion piece* published in the Washington Post
- *featured in* episodes of Strict Scrutiny and Vox's The Most Dangerous Branch podcasts

_Law of the Gun: Unrepresentative Cases and Distorted Doctrine_, 107 IOWA L. REV. 173 (2021)
- *cited in* the brief filed by the Giffords Law Center to Prevent Gun Violence in *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Apr. 26, 2021)

_The Gun Rights Movement and "Arms" Under the Second Amendment_, BRENNAN CTR. FOR JUST. (2021)

_An Unstable Core: Self-Defense and the Second Amendment_, 108 CALIF. L. REV. 63 (2020)
- *cited in* various briefs including those filed by Criminal Law Scholars and United States Senators in *Bruen*, *supra*

_You Can Lead a Horse to Water:_ Heller _and the Future of Second Amendment Scholarship_, 68 DUKE L.J. O. 1 (2018) (with Joseph Blocher)

_From Theory to Doctrine: An Empirical Analysis of the Right to Keep and Bear Arms After_ Heller, 67 DUKE L.J. 1433 (2018) (with Joseph Blocher)
- *cited in* various briefs including one filed by Second Amendment Law Professors in *Bruen*, *supra*
- *cited in* Mance v. Sessions, 896 F.3d 390 (5th Cir. 2018)
- *featured in* the New York Times, Wall Street Journal, and USA Today, among others

_Justifying Perceptions in First and Second Amendment Doctrine_, 80 LAW & CONTEMP. PROBS. 149 (2017)

_Preface: The Second Generation of Second Amendment Law & Policy_, 80 LAW & CONTEMP. PROBS. 1 (2017) (with Darrell A. H. Miller)

_Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context_, 125 YALE L.J. F. 121 (2015) (with Saul Cornell)
- *cited in* the majority opinion and quoted in the dissenting opinion in *Bruen*, *supra*
- *cited in* various briefs including those filed by the NAACP Legal Defense & Education Fund and New York State in *Bruen*, *supra*
- *cited in* Young v. Hawaii, 992 F.3d 765 (9th Cir. 2021), among others
- *companion piece* published in The Atlantic

**App. 0461**

ERIC RUBEN                                                                      MARCH 2024

**Work-in-Progress**

*Numeracy and Constitutional Interpretation*

*Gun-Free Zones* (with Ali Rowhani-Rahbar & Rosanna Smart)

*Felons, Firearms, and Restoration*

**Edited Volumes**

*Protests, Insurrection, and the Second Amendment*, BRENNAN CTR. FOR JUST. (2021)

*Second Generation of Second Amendment Law and Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017) (with Darrell Miller)

---

**GRANTS**

---

**Arnold Ventures**, "Gun-Free Zones: Legislative Landscape and Relationship with Firearm Violence," Co-Principal Investigator with Ali Rowhani-Rahbar (Lead) and Rosanna Smart, ~$600,000 (2024-2026)

---

**ACADEMIC PRESENTATIONS**

---

"Social and Non-Physical Impacts of Guns," Everytown for Gun Safety Research Convening (February 2024)

"Scientific Context, Suicide Prevention, and the Second Amendment After *Bruen*," William & Mary Law School (January 2024)

"One Year Post-*Bruen*: An Empirical Assessment," National Research Conference for the Prevention of Firearm-Related Harms (November 2023)

"Scientific Context, Suicide Prevention, and the Second Amendment After *Bruen*," Minnesota Law School (October 2023)

"One Year Post-*Bruen*: An Empirical Assessment," Fordham Law School (October 2023)

"Public Carry and Gun-Free Spaces After *Bruen*," Southeastern Association of Law Schools Conference (July 2023)

"The Second Amendment and the Supreme Court After *Bruen*," Brennan Center for Justice at New York University School of Law (May 2023)

"Gun Laws in Tennessee: Understanding the Current Landscape," University of Tennessee College of Law (April 2023)

"The History of the Second Amendment: How We Got to Bruen–and Where We Go from Here," UCLA Criminal Justice Law Review Symposium (October 2022)

"Felons, Firearms, and Restoration," N.Y.U. L. Rev. & Duke Ctr. for Firearms Law Symposium (September 2022)

App. 0462

ERIC RUBEN                                                                    MARCH 2024

"Felons, Firearms, and Restoration," Duke Law School Firearms Law Workshop (June 2022)

"Public Carry and Criminal Law after *Bruen*," Harvard Law Review Symposium (March 2022)

"Self-Defense Exceptionalism," UC Davis Law Review Symposium (October 2021)

"Gun Law Reform: The Current Legal Landscape," NYU School of Law Symposium (March 2021)

"The Gun Rights Movement and 'Arms' Under the Second Amendment," Brennan Center Workshop (February 2021)

"Unrepresentative Litigation and Constitutional Distortion: The Case of the Gun-Centric Second Amendment," Drexel University School of Law Faculty Workshop (November 2020)

"An Unstable Core: Self-Defense and the Second Amendment," Video Interview, Duke Law (May 2020)

"'The Second Amendment Is Not a Second-Class Right': A Case Study in Constitutional Rhetoric," AALS Conference (January 2020)

"Mistake, Self Defense, and the Role of the Jury: Framing the Botham Jean/Amber Guyger Case," SMU Dedman School of Law (flash class) (October 2019)

"The Second Amendment After *Heller* and *Caetano*: Overlooked Implications for the Future of Weapons Regulation," Duke Law School Workshop (August 2019)

"The Second Amendment and Self-Defense," Hastings School of Law (January 2019); New York University School of Law (April 2018); and University of New Hampshire School of Law (April 2018)

"Guns and Free Speech," New York University School of Law (November 2017)

"Justifying Perceptions in First and Second Amendment Doctrine," Guns in a Civil Society Summit, Washington Alliance for Gun Responsibility (November 2017) and Symposium on Second Generation of Second Amendment Law & Policy, New York University School of Law (April 2016)

"Preemption and Firearms Law," Constitutional Governance Practicum at the Columbia Law School (September 2017)

"The Second Amendment: A Discussion," Fordham Law Chapter of the American Constitutional Society (September 2017)

"Discussion on Second Amendment Jurisprudence and Advocacy," NYU Law Chapter of the American Constitution Society (March 2016)

"An Introduction and Discussion on the Second Amendment," Cardozo Law Chapter of the American Constitution Society (March 2016)

"The Second Amendment: Gun Rights in America," John Jay College, New York, NY (November 2015)

**App. 0463**

ERIC RUBEN                                                            MARCH 2024

## SELECTED PUBLICATIONS, PRESENTATIONS, AND MEDIA APPEARANCES FOR A GENERAL AUDIENCE

**Publications**

*Second Amendment Meets Domestic Violence in the Supreme Court*, BRENNAN CENTER BLOG (November 2023)

"Research Priorities for Gun Violence Prevention After *Bruen*," RAND (with Ali Rowhani-Rahbar and Rosanna Smart) (May 2023)

Written Testimony, Senate Judiciary Committee, "Protecting Public Safety After New York State Rifle & Pistol Association v. Bruen," Washington, D.C., March 15, 2023

*A Smarter Path to Gun Safety Through Property Rights*, N.Y. DAILY NEWS (July 2022)

*Three Supreme Court Cases to Watch Beyond Abortion Rights*, BRENNAN CENTER BLOG (with Alicia Bannon and Harry Isaiah Black) (June 2022)

*A Right to Conceal and Carry?*, BRENNAN CENTER BLOG (with Emil Mella Pablo) (May 2022)

*No, Courts Don't Treat the Second Amendment as a "Second-Class Right,"* WASH. POST (November 2021) (with Joseph Blocher)

*First Major Second Amendment Case Before the Supreme Court in Over a Decade Could Topple Gun Restrictions*, THE CONVERSATION (October 2021)
> Republished in over a dozen other publications across the country and online, including MarketWatch, Iowa Capital Dispatch, Houston Chronicle, St. Louis Post-Dispatch, Idaho Press-Tribune, NewsBreak, and The Raw Story

*Claiming Self-Defense Isn't a Get-Out-of-Jail-Free Card*, BRENNAN CENTER BLOG (July 2020)

*The Supreme Court's Second Amendment Surprise*, BRENNAN CENTER BLOG (June 2020)

*What the Supreme Court's Latest Second Amendment Ruling Means for Future Cases*, BRENNAN CENTER BLOG (May 2020)

*The Supreme Court Shouldn't Disrupt the Judicial Consensus on the Second Amendment*, SCOTUSBLOG (November 2019) (with Joseph Blocher)

*Is the Handgun America's "Most Popular" Self-Defense Weapon? It's a Crucial Question at the Supreme Court*, BRENNAN CENTER BLOG (November 2019)

*Misguided 'Second Amendment Protection Acts' Have the Opposite Effect of Their Intent*, BRENNAN CENTER BLOG (June 2019) (with Adam B. Sopko)

*What to Know About the Supreme Court's First Gun Case in 9 Years*, THE TRACE (April 2019) (print interview)

*The Second Amendment Allows for More Gun Control Than You Think*, VOX.COM (May 2018) (with Joseph Blocher)

**App. 0464**

ERIC RUBEN                                                    MARCH 2024

*There Is No Constitutional Bar to Further Gun Control*, N.Y. TIMES (June 2016)

*Exaggerated Claims of "Judicial Nullification" in Gun Cases*, THE JURIST (May 2016)

*Justice Scalia, the Second Amendment, and Judicial Conservatives*, CASETEXT (February 2016)

*The Slave-State Origins of Modern Gun Rights*, THE ATLANTIC (September 2015) (with Saul Cornell)

**Presentations**

Testifying Witness, Senate Judiciary Committee, Senate Judiciary Committee, "Protecting Public Safety After New York State Rifle & Pistol Association v. Bruen," Washington, D.C., March 15, 2023

"*NYSRPA v. Bruen*—Challenges and Responses to NY's Concealed Carry Laws," New Yorkers Against Gun Violence (November 2022)

"From *Heller* to *Bruen*: The Past and Future of the Second Amendment," Potomac Law Group PLLC (July 2022)

"Public Carrying of Firearms: Understanding the Impact of the Supreme Court's Decision," John Hopkins Center for Gun Violence Solutions (July 2022)

"Guns vs. Speech: Does the 2nd Amendment Threaten the 1st?," Brennan Center for Justice Live Event (September 2021)

"The Second Amendment and State Efforts in Gun Violence Prevention," American Constitution Society Northeast Regional Convening (October 2019)

"The Gun Shop," Fulbright Film Series Panel Discussion (February 2018)

"The Second Amendment and Gun Laws: A Primer for Advocates," New York Lawyer Chapter of the American Constitution Society (October 2017)

"When the First and Second Amendment Collide," League of Women Voters Gun Safety Committee (September 2017)

"*Binderup* and the Future of As-Applied Second Amendment Challenges," Consortium for Risk-Based Firearm Policy (February 2017)

"2nd Amendment - Protecting Rights, Protecting People," The Liberty Series, Union League of Philadelphia (January 2017)

"As-Applied Second Amendment Challenges," Second Amendment Litigation and Jurisprudence Conference, Washington, D.C. (December 2016)

"David v. Goliath: The Gun Violence Prevention Movement and Challenging the NRA," Annual RebLaw Conference, Yale University Law School (February 2016)

**Media Appearances**

John Simerman, *Concealing Guns Without a Permit: Some New Orleans Officials Fear the Worst*, NEW ORLEANS ADVOCATE (March 2024) (print)

**App. 0465**

ERIC RUBEN                                                    MARCH 2024

Lydia Wheeler, *Bump Stock Ban Brings Agency Power Dispute to Supreme Court*, BLOOMBERG NEWS (February 2024) (print)

Heather Hollingsworth, Summer Ballentine & Jim Salter, *Could Missouri's 'Stand Your Ground' Law Apply to the Super Bowl Celebration Shooters?*, AP NEWS (February 2024) (print)

Marco Poggio, *For Immigrants, Gun Rights Debate Goes Beyond Firearms*, LAW360 (January 2024) (print)

Michael Heise, *The Bruen Decision After One Year: An Empirical Look*, EMPIRICAL LEGAL STUDIES BLOG (December 2023) (print)

David W. Chen, *Courts Strike Down Gun Control Measures in Two States*, N.Y. TIMES (November 2023) (print)

Tom Brune, *Supreme Court Wrestles with Gun Limits After Ruling in New York Case*, NEWSDAY (November 2023) (print)

Michael Smerconish, SIRIUS XM POTUS 124 (November 2023) (radio)

Henry Gass, *Second Amendment Rights for Abusers? Justices Seem Skeptical*, CHRISTIAN SCIENCE MONITOR (November 2023) (print)

Caroline Love, *Can Alleged Domestic Abusers Keep Their Guns? The Supreme Court May Decide the Answer*, KERA NEWS (November 2023) (print and radio)

Marco Poggio, *Justices Skeptical of Keeping Domestic Abusers Armed*, LAW360 (November 2023) (print)

Tom Brune, *Supreme Court Gun Case Could Prompt New Challenges to New York Laws*, NEWSDAY (November 2023) (print)

*Should Domestic Abusers Lose Gun Rights?*, VOX'S TODAY, EXPLAINED (November 2023) (podcast)

Adam Liptak, *Supreme Court's Devotion to Gun Rights Faces a Challenging Test*, N.Y. TIMES (November 2023) (print)

Abbie VanSickle, *Texas Man at Center of Supreme Court Case Says He No Longer Wants Guns*, N.Y. TIMES (November 2023) (print)

Reena Diamante, *Supreme Court to Weigh Constitutionality of Gun Restrictions on Accused Domestic Abusers*, SPECTRUM NEWS (November 2023) (print and television)

Andrew Goudsward and Nate Raymond, *US Supreme Court Ruling May Help Hunter Biden Fight Gun Charge*, REUTERS (October 2023) (print)

Bloomberg Law Podcast with June Grasso, *Supreme Court to Rule on Guns for Domestic Abusers*, BLOOMBERG RADIO (September 2023) (radio and podcast)

Marco Poggio, *Access to Justice Cases to Watch This Term*, LAW360 (September 2023) (print)

*Carbon Capture is Coming to the King Ranch*, TEXAS STANDARD (August 2023) (radio)

App. 0466

ERIC RUBEN                                                         MARCH 2024

Bloomberg Law Podcast with June Grasso, *Landmark Young People's Climate Ruling*, BLOOMBERG RADIO (August 2023) (radio and podcast)

Marco Poggio, *Justices Eye Intersection Of Domestic Violence, Gun Rights*, LAW360 (July 2023) (print)

*Supreme Court Conservatives Could Further Erode Gun Control in Next Term*, THE GUARDIAN (June 2023) (print)

Caroline Love, *Supreme Court Decides to Hear North Texas Case on Guns and Domestic Violence*, KERA NEWS (June 2023) (print)

Avalon Zoppo, *Justices Take Up Gun Case That Puts Landmark 2nd Amendment Ruling to the Test*, NATIONAL LAW JOURNAL (June 30, 2023) (print)

Joseph Stepansky, *How a US Supreme Court Ruling Is Transforming Gun Control*, AL JAZEERA (May 2023) (print)

Terrence T. McDonald, *Ruling on New Jersey Gun Law Shows Democrats Didn't Do Their Homework*, N.J. MONITOR (May 2023) (print)

*The Daniel Perry Case Shows Contradictions of Gun Enthusiasts in Texas*, ECONOMIST (April 2023) (print)

Peter Charalambous', *How Two Decades of Gun Culture Helped Shape America's 'Stand Your Ground' Laws*, ABC NEWS (April 2023) (print)

Caroline Love, *More Domestic Abusers Can Keep Guns After 5th Circuit Court Ruling — Risking Deadly Consequences*, KERA NEWS (April 2023) (print and radio)

Alex Swoyer, *Chaos in the Courts After Justices' Ruling that Firearm Regs Must Align with Nation's Founding*, WASHINGTON TIMES (April 2023) (print)

*Is That Really Legal*, with Eric Ruben (April 2023) (podcast)

Michael Macagnone, *Senate Hears About Legal Fallout from Supreme Court Gun Decision*, ROLL CALL (March 2023) (print)

*Senators Seek Solutions to Address Gun Violence in the Country Due to Supreme Court Decision*, FOX 2 (March 2023) (television and print)

Wisconsin Public Radio, *How Court Ruling on Domestic Violence Restraining Orders Shapes U.S. Gun Law*, NPR WISCONSIN (February 2023) (radio)

Briana Vannozzi, *Legal Challenges Delay Murphy's Gun Control Laws*, NJ SPOTLIGHT NEWS (February 2023) (television)

Scott Reeder, *Choosing Which Laws to Enforce*, ILLINOIS TIMES (January 2023) (print)

The John Howell Show, *Questions Surrounding the Assault-Style Weapons Ban: Will it Hold Up in Court?*, WLS CHICAGO (January 2023) (radio)

**App. 0467**

ERIC RUBEN                                                                    MARCH 2024

Peter Charalambous, *At Least 74 Illinois Sheriff's Departments Vow to Defy State Assault Weapons Ban*, ABC NEWS (January 2023) (print)

June Grasso, *Jackson Joins Supreme Court's Million Dollar Book Club*, BLOOMBERG LAW SHOW (January 2023) (radio and podcast)

Frank Main and Tina Sfondeles, *Why Illinois' New Assault Weapons Ban Might Not Hold Up in Court*, CHICAGO SUN TIMES (January 2023) (print)

Douglass Dowty, *Can You Bring a Gun to the Zoo? On a Bus? Syracuse Judge Eagerly Rewrites NY Firearms Law*, SYRACUSE POST STANDARD (December 2022) (print)

William Melhado, *Texas Judge Rules that Disarming Those Under Protective Orders Violates Their Second Amendment Rights*, TEXAS TRIBUNE (November 2022) (print)

Debra Cassens Weiss, *In "Scorching" Opinion, Federal Judge Considers Appointing Historian to Help Him in Gun Case*, ABA JOURNAL (November 2022) (print)

Avalon Zoppo, *Judge May Appoint Historian After Justices' Turn to New Test in Gun Rights Cases*, NAT'L L. J. (November 2022) (print)

Keegan Hamilton, *Ghost Guns Are Causing Chaos in American Courts*, VICE NEWS (October 2022) (print)

Michael Waldman, *Guns Don't Belong at Polling Locations*, BRENNAN CTR. FOR JUST. (October 2022) (print)

Dana Difilippo, *New York Court Rulings Signal Trouble for New Jersey's Fresh Attempt to Regulate Guns*, N.J. MONITOR (October 2022) (print)

S.P. Sullivan, *N.J. Is Seeking Tough Restrictions for Carrying Guns in Public. Will They Hold up in Court?*, STAR-LEDGER/NJ.COM (October 2022) (print)

Kery Murakami, *Court Fights Begin Over Gun Bans in Places Like Subways and Bars*, ROUTE FIFTY (October 2022) (print)

Jonah E. Bromwich, *Court Gives New York State More Time to Argue for Its Gun Law*, N.Y. TIMES (October 2022) (print)

*Second Amendment Expert Discusses NY Gun Law Court Challenge*, SPECTRUM NEWS N.Y. 1 (October 2022) (television)

Jonah E. Bromwich, *Federal Judge Blocks N.Y. Gun Law, Finding Much of It Unconstitutional*, N.Y. TIMES (October 2022) (print)

Scott Neuman, *The 'Gun Dude' and a Supreme Court Case that Changed Who Can Own Firearms in the U.S.*, NPR (August 2022) (print)

Brandon Tensley & Eva McKend, *The Fight to Curb Gun Violence Without Inflaming Racial Biases*, CNN (July 2022) (print)

*What Can We Do About Gun Control?*, LAW DISRUPTED (July 2022) (podcast)

**App. 0468**

ERIC RUBEN                                                                      MARCH 2024

Chip Brownlee, *The Real Significance of the Supreme Court's Gun Decision*, THE TRACE (July 2022) (print)

Nusaiba Mizan, *Fact-check: Can Texans 'Too Dangerous to Carry a Loaded Gun in Public' Now Carry?*, AUSTIN AMERICAN-STATESMAN (July 2022) (print)

Marco Poggio, *How Bruen Ruling Will Change Gun Restrictions Scrutiny*, LAW 360 (July 2022) (print)

Naheed Rajwani-Dharsi, *How the New Federal Gun Law Will - and Won't - Affect Texas*, AXIOS DALLAS (June 2022) (print)

Wisconsin Public Radio, *What the Supreme Court's Ruling on a New York Gun Law Means for How We Apply the Second Amendment*, NPR WISCONSIN (June 2022) (radio)

Studio Tulsa, *Interview regarding Bruen*, NPR TULSA (June 2022) (radio)

Roque Planas, *Bombshell Supreme Court Gun Ruling Opens Up New State Battles*, HUFF POST (June 2022) (print)

Eric Lipton et al., *States Rush to Revamp Laws After Supreme Court's Gun Ruling*, NEW YORK TIMES (June 2022) (print)

Mark Weiner, *What Supreme Court Ruling Means for New Yorkers and Handgun Owners*, SYRACUSE POST-STANDARD (June 2022) (print)

Kaila Philo, *The Supreme Court Just Made It a Whole Lot Easier to Conceal-Carry a Gun*, GRID (June 2022) (print)

Chip Brownlee & Tom Kutsch, *What You Need to Know About the Senate Gun Reform Bill*, THE TRACE (June 2022) (print)

TV and Radio Interviews Regarding *Bruen*, June 23-24, 2022
    WPIX 11 NEW YORK (television)
    *Good Morning America*, ABC (television)
    *Morning Edition*, NPR (radio)
    *ABC News Prime*, ABC (television)
    *Balance of Power*, BLOOMBERG RADIO (radio)
    *All Things Considered*, NPR (radio)
    CBS RADIO (radio)
    CNN (television)

Michael Macagnone, *Supreme Court Bolsters Right to Carry Handgun in Public*, Roll Call (June 2022) (print)

Nicole Narea, *Blue States' Gun Control Efforts Hinge on the Supreme Court*, VOX (June 2022) (print)

John Fritze, *Should Guns Be Banned in Bars, Hospitals? Supreme Court Could Spur New 2nd Amendment Fight*, USA TODAY (June 2022) (print)

Brian Pascus, *Adams' Team Braces for Landmark Supreme Court Ruling on Guns*, CRAIN'S NEW YORK (June 2022) (print)

10

**App. 0469**

ERIC RUBEN                                                MARCH 2024

Timothy L. O'Brien, *An Executive Order That Might Actually Stop Gun Violence*, BLOOMBERG
NEWS & WASHINGTON POST (June 2022) (print)

Ellen Ioanes, *What's in the Bipartisan Plan for Gun Control*, VOX (June 2022) (print)

Nusaiba Mizan, *Fact-check: How many mass shootings have occurred since Uvalde tragedy?*, AUSTIN
AMERICAN-STATESMAN (June 2022) (print)

Kery Murakami, *Supreme Court Could Make it Harder For States and Localities to Keep Guns Off
Streets*, ROUTE FIFTY (June 2022) (print)

Alex Thomas, *Gun Companies Are More Vulnerable to Lawsuits Than You Think*, NEW REPUBLIC (June
2022) (print)

Ellen Ioanes, *What Does the Second Amendment Mean in 2022?*, VOX (June 2022) (print)

*NBC News Now with Joshua Johnson*, NBC NEWS (June 2022) (television)

Josh Clancy, *America and Guns—Did It Have to Be This Way?*, THE TIMES (May 2022) (print, England)

*Velshi on MSNBC*, MSNBC (May 2022) (television)

Jess Bidgood, *From Concealed Carry to Eliminating Permits, Gun Restrictions Have Loosened Since
Sandy Hook*, BOSTON GLOBE (May 2022) (print)

Sherryn Groch & Billie Eder, *Why Can't America Fix Its Gun Crisis?*, SYDNEY MORNING HERALD (May
2022) (print)

Emilie Burditt, *Gun Laws, Reform Following School Shooting in Uvalde, Texas*, WISCONSIN PUBLIC
RADIO (May 2022) (radio)

*Trump urges mental health initiatives at NRA event*, NEWSNATION PRIME (May 2022) (television)

*Interview Regarding Uvalde Shooting* FRANCE 24 (May 2022) (television, France)

Timothy L. O'Brien, *Uvalde Families Should Take Gunmakers to Court*, WASHINGTON
POST and BLOOMBERG NEWS (May 2022) (print)

*Debate por el control de armas: el callejón sin salidaal que EE.UU. vuelve tras la matanza en Texas*, EL
MERCURIO (May 2022) (print, Chile)

Kevin T. Dugan, *The NRA won after Sandy Hook, but today the gun lobby is in disarray and gun safety is
slowly making gains in states*, NEW YORK MAGAZINE (INTELLIGENCER) (May 2022) (print)

Tyler Kingkade, *Uvalde shooting renews push for 'red flag' laws — 4 years after Texas Republicans
blocked one*, NBC NEWS (May 2022) (print)

*NBC News Now with Joshua Johnson*, NBC News (May 2022) (television)

Annie McDonough, *SCOTUS could soon overturn New York's gun law. Here how the state could
respond*, CITY AND STATE (May 2022) (print)

**App. 0470**

ERIC RUBEN                                                                    MARCH 2024

*Interview Regarding the Uvalde Shooting*, TIMES RADIO (May 2022) (radio, England)

*Coverage of the Uvalde Shooting*, CTV NEWS, (May 2022) (television, Canada)

Lindsay Whitehurst, Michael Tarm, & James Anderson, *Buffalo shooter's previous threat raises red-flag questions*, AP News (May 2022) (print)

Kevin McCoy, *Gun Rights Groups' Wave of Lawsuits Could Change America's Relationship With Firearms*, USA TODAY (February 2022) (print)

Brandan Pierson, *Manslaughter Charges Against Michigan Shooter's Parents Break New Legal Ground*, REUTERS (December 2021) (print)

*Kyle Rittenhouse and the "Self-Defense" Defense*, VOX'S TODAY, EXPLAINED (November 2021) (podcast)

*The Supreme Court, Concealed Carry, and How Your Laws Might Change*, NEW BOOKS NETWORK (November 2021) (podcast)

Kiara Alfonseca, *Arbery, Rittenhouse Cases Spotlight Self-Defense and Vigilantism*, ABC NEWS (November 2021) (print)

Marc Fisher & Mark Berman, *After Rittenhouse: Will Deadly Clashes Multiply as the Right to Self-Defense Expands?*, WASH. POST (November 2021) (print)

Willy Lowry, *Rittenhouse and Arbery Cases Expose Deep Rifts on Gun Rights and Vigilantism in US*, THE NATIONAL (November 2021) (print)

*The Claim of Self-Defense Raising Concerns in Recent Court Cases*, KCBS SAN FRANCISCO (November 2021) (radio)

Shaila Dewan, *Can Self-Defense Laws Stand Up to a Country Awash in Guns?*, N.Y. TIMES (November 2021) (print)

Interview, NYC's WPIX 11 TV (November 2021) (television)

Jonah E. Bromwich & Ashley Southall, *What Happens if the Supreme Court Strikes Down New York's Gun Law?*, N.Y. TIMES (November 2021) (print)

Bob Ortega, *Fears of Unlikely Federal Gun-Control Measures Lead to Raft of State Laws*, CNN.COM (November 2021) (print)

*U.S. Supreme Court Firearms Case Could Reshape Gun Control in America*, NPR DETROIT (WDET) (November 2021) (radio)

Interview, Houston's ABC 13 KTRK TV (November 2021) (television)

Noah Goldberg, *Supreme Court Appears Likely to Shoot Down New York Gun Law*, N.Y. DAILY NEWS (November 2021) (print)

ERIC RUBEN                                                        MARCH 2024

*La Cour Supreme des États-Unis Examine un Dossier Majeur sur les Armes à Feu*, LE FIGARO (November 2021) (print)

Noah Goldberg, *Supreme Court Could Nix New York Gun Law that Limits Right to Carry Guns in Public*, N.Y. DAILY NEWS (November 2021) (print)

Amelia Thomson-DeVeaux, *How the Supreme Court Could Make It Easier to Carry Guns in Public*, FIVETHIRTYEIGHT (November 2021) (print)

Devin Dwyer, *Gun Owners Ask Supreme Court to Back Concealed Carry for Self-Defense*, ABC NEWS LIVE (November 2021) (television and print)

*US Supreme Court to Hear High-Stakes Gun Rights Case*, VOICE OF AMERICA (November 2021) (print)

Tiana Headley, *New York Is America's Latest Battleground Over Gun Rights*, THE RIVER (November 2021) (print)

Robert Gavin, *Law Beat: Supreme Court Ready for Possible Landmark Gun Case from Rensselaer County*, ALB. T. UNION (October 2021) (print)

Marcia Coyle, *'Originalists' Gorsuch, Kavanaugh, Barrett Under Microscope in 2nd Amendment Case*, NAT'L L.J. (October 2021) (print)

*The Attitude With Arnie Arneson*, WNHN (October 2021) (radio)

*SCOTUS Returns for Blockbuster Term*, ABC NEWS LIVE (October 2021) (television)

*This Week with George Stephanopoulos*, ABC NEWS (October 2021) (television)

Dan Frosch and Elizabeth Findell, *Air Force Found Largely Responsible for Texas Church Shooting*, WALL STREET JOURNAL (July 2021) (print)

Yanqi Xu, *Fourth Circuit Ruling: Federal Laws Banning Handgun Sales to Young Adults Violate Second Amendment*, NC POLICY WATCH (July 2021) (print)

Erik Larson, *California Gun Laws Reviled by NRA Face Pivotal Court Test*, BLOOMBERG NEWS (June 2021) (print)

*Agenda Svijet*, HRT (May 2021) (television)

Jennifer Mascia, *The Supreme Court's Next Big Gun Case, Explained*, THE TRACE (May 2021) (print)

*"The Week" with Joshua Johnson*, NBC PEACOCK TV (April 2021) (television)

*Open Carry Laws, Public Safety, and* Young v. Hawaii, LAWYER 2 LAWYER (April 2021) (podcast)

Jolana Humpalova, *To Limit or Not to Limit? Weapons Divide America, It Has the Most in the World*, SEZNAM ZPRÁVY (April 2021)

Matt Reynolds, *Lawyers Involved in the Gun Debate Are Primed for the Supreme Court to Take the Next Big Case*, ABA JOURNAL (December 2020) (print)

13

**App. 0472**

ERIC RUBEN                                                    MARCH 2024

Stephen Gutowski, *Gun Lawsuits Flood in After Barrett Supreme Court Confirmation*, WASHINGTON FREE BEACON (December 2020) (print)

Olivia Li, *On Guns, Barrett's Philosophy Leaves Little Room for Public Safety*, THE TRACE (September 2020) (print)

Greg Stohr, *Gun Cases Could Prompt Supreme Court to Bolster Second Amendment*, BLOOMBERG NEWS (June 2020) (print)

Annie McDonough, *What Does SCOTUS' Second Amendment Case Mean for New York?*, CITY & STATE NEW YORK (April 2020) (print)

*U.S. Supreme Court Leaves Bump Stock Ban in Place*, CT PUBLIC RADIO (March 2020) (radio)

*Virginia Assault Weapon Bill Shot Down by Senate Committee*, KCBS (February 2020) (radio)

Kaley Johnson, *White Settlement Church Shooter Had a Long Criminal History. So How Did He Get a Gun?*, FORT WORTH STAR-TELEGRAM (January 2020) (print)

*2020 Will Be a Big Year for the Gun Issue*, THE TRACE (January 2020) (print)

Adam Liptak, *After Long Gap, Supreme Court Poised to Break Silence on Gun Rights*, N.Y. TIMES (December 2019) (print)

*Supreme Court Watchers See Chief Justice as Possible Fifth Vote to Dismiss Major Gun Case*, THE TRACE (December 2019) (print)

Richard Wolf, *Supreme Court May Expand Second Amendment Rights Despite Repeal of Disputed Gun Restrictions*, U.S.A. TODAY (December 2019) (print)

John Kruzel, *Supreme Court Poised to Hear First Major Gun Case in a Decade*, THE HILL (December 2019) (print)

Matt Cohen, *Gun Violence Costs Americans Billions Every Year. A California Mayor Has a Plan to Make Gun Owners Pay for It*, MOTHERJONES.COM (August 2019) (print)

Jennifer Mascia, *What to Know About the Supreme Court's First Gun Case in 9 Years*, THE TRACE (April 2019) (print)

*A Historic Ruling on Guns, Ten Years Later*, 1A, NPR (June 2018) (radio)

Jon Schuppe, *Low-Crime Village Bans Military-Style Guns, Citing Parkland and Other Mass Shootings*, NBCNEWS.COM (April 2018) (print)

Andrew Wong, *Why the US Is So Different From the UK and Australia When It Comes to Gun Control*, CNBC.COM (March 2018) (print)

Kiran Alvi, *US: Most Mass Shootings Not Committed by Mentally Ill*, ALJAZEERA.COM (November 2017) (print)

Jared Keller, *Is The End of the Assault Rifle Nigh?*, PACIFIC STANDARD (February 2017) (print)

**App. 0473**

ERIC RUBEN                                                                                        MARCH 2024

*Does the Second Amendment Leave Any Room for Gun Control Laws?*, TAKE TWO, KPCC (Southern California Public Radio) (June 2016) (radio)

*Guns in the Spotlight: Do Americans Really Need an Assault Weapon to Protect Themselves?*, Paul Henry Show, TV3 (New Zealand) (June 2016) (television)

## OTHER LEGAL EXPERIENCE

**Morvillo Abramowitz Grand Iason & Anello, P.C.**, New York, NY
  *Litigation Associate*, November 2008-November 2014

**U.S. Department of State, Office of the Legal Advisor**, Washington, D.C.
  *Summer Intern*, May-June 2007

**Davis Polk & Wardwell LLP**, New York, NY and Madrid, Spain
  *Summer Law Clerk*, May-August 2006 (offer extended)

**Civil Association for Equality and Justice (ACIJ)**, Buenos Aires, Argentina
  *Legal Intern*, May-August 2005

## UNIVERSITY SERVICE

Appointments Committee, SMU Dedman School of Law (2023-present)
Academic Standards Committee, SMU Dedman School of Law (2022-2023)
Admissions/Financial Aid Committee, SMU Dedman School of Law (2022-2023)
SMU Law Hooder (2022, 2023) (selected by vote of graduating 3Ls)
SMU Law AALS Representative (2020, 2021, 2022, and 2023)
Curriculum/Academic Standards Committee, SMU Dedman School of Law (2020-2022)
Teaching Committee, SMU Dedman School of Law (2020-2022)
Faculty Advisor, 1L Inn of Court, SMU Dedman School of Law (2020-2021)
Faculty Advisory Board, Deason Criminal Justice Reform Center (2019-present)
Endowed Lectures and Faculty Forum Committee, SMU Dedman School of Law (2019-2020)
Faculty Secretary, SMU Dedman School of Law (2019-2020)

## REFEREE ACTIVITY

YALE LAW JOURNAL
STANFORD LAW REVIEW

## BRIEFS AND OTHER ADVOCACY

Brief of Second Amendment Law Scholars as Amici Curiae in Support of Petitioner, United States v. Rahimi, No. 22-915 (U.S.) (August 21, 2023)

Brief of Second Amendment Law Professors as Amici Curiae in Support of Neither Party, New York State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S.) (July 20, 2021)
  • cited in dissenting opinion

Statement of Professors of Constitutional Law to Senate Judiciary Committee: The Right to Keep and Bear Arms and the Constitutionality of Expanded Background Checks (March 22, 2021)

Brief of Second Amendment Law Professors as Amici Curiae in Support of Defendant-Appellee, Wade v. The Board of Regents of the University of Michigan, MSC No. 156150 (Mich. Sup. Ct.) (March 1, 2021)

App. 0474

ERIC RUBEN                                                                    MARCH 2024

Brief of Second Amendment Law Professors as Amici Curiae in Support of Neither Party, New York State Rifle & Pistol Ass'n v. City of New York, No. 18-280 (U.S.) (May 14, 2019)
- cited in dissenting opinion

**App. 0475**

**EXHIBIT B**

1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   PAUL STEIN
3  Supervising Deputy Attorneys General
   KEVIN KELLY
4  SEBASTIAN BRADY
   Deputy Attorneys General
5  ROBERT L. MEYERHOFF
   Deputy Attorney General
6  State Bar No. 298196
    300 South Spring Street, Suite 1702
7   Los Angeles, CA  90013-1230
    Telephone:  (213) 269-6177
8   Fax:  (916) 731-2144
    E-mail:  Robert.Meyerhoff@doj.ca.gov
9  *Attorneys for Defendant Rob Bonta in his*
   *official capacity as Attorney General of the*
10 *State of California and Defendant Allison*
   *Mendoza in her official capacity as Director*
11 *of the Bureau of Firearms*

12                 IN THE UNITED STATES DISTRICT COURT

13              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

14

15

16
   **CLAIRE RICHARDS, ET AL.,**            Case No. 3:23-CV-00793
17
                            Plaintiffs,    **EXPERT REPORT AND**
18                                         **DECLARATION OF PROFESSOR**
          **v.**                           **CHRISTOPHER POLIQUIN**
19
20 **ROB BONTA, IN HIS OFFICIAL CAPACITY**
   **AS ATTORNEY GENERAL OF**
21 **CALIFORNIA, ET AL.,**

22                            Defendants.
23

24

25

26

27

28
                                    1

<div align="center">

**EXPERT REPORT AND DECLARATION OF**
**PROFESSOR CHRISTOPHER POLIQUIN**

</div>

I, Professor Christopher Poliquin, declare under the penalty of perjury that the following is true and correct:

The California Department of Justice has asked me to provide an expert opinion pertaining to firearms waiting periods and related restrictions in the United States in the above-captioned matter. This expert report and declaration ("Declaration") provides that opinion and is based on my own personal knowledge and experience; if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Declaration.

<div align="center">

**BACKGROUND AND QUALIFICATIONS**

</div>

1. I am a scholar whose work spans the fields of public policy, with a focus on gun policy and its impact on violence; organizational design and strategy; and technology.

2. Since 2018, I have served as an Assistant Professor at the UCLA Anderson School of Management.  I joined UCLA's faculty after obtaining my Doctor of Business Administration from Harvard Business School and my bachelor's degree from the University of Pennsylvania.  A true and correct copy of my curriculum vitae is attached as **Exhibit 1** to this declaration.

3. In addition to my other academic work, I have published multiple peer-reviewed papers on firearms policy and violence.  These include *Handgun Waiting Periods Reduce Gun Deaths*, published in the Proceedings of the National Academy of Sciences in 2017 and attached as **Exhibit 2**, and *The Impact of Mass Shootings on Gun Policy*, published in the Journal of Public Economics in 2020.

4. I have previously provided expert testimony on similar issues at a preliminary injunction hearing in *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-02563-JLK (D. Colo.).

<div align="center">

**RETENTION AND COMPENSATION**

</div>

5.    I have been retained by the California Department of Justice to render expert opinions in this case. I am being compensated at a rate of $250 an hour for my work on this matter. My compensation is not contingent on the results of my expert analysis or the substance of my opinions or testimony in this matter.

**BASIS FOR OPINION AND MATERIALS CONSIDERED**

6.    I have been retained by the California Department of Justice to provide my expert opinion on the impact of firearm waiting periods on firearm deaths and violence more broadly.

7.    Counsel for Defendants provided me with the operative Complaint in this matter and copies of the relevant statutes being challenged.  Apart from these documents, my report is based on my independent research.

**OPINIONS**

8.    Based on my extensive review and analysis of the relevant evidence, it is my professional opinion that:

- Waiting period laws that delay the purchase of firearms reduce firearm-related homicides.
- Waiting period laws reduce firearm-related suicides, especially among young people.
- Reductions in gun homicides from waiting period laws are not offset by a concomitant increase in non-gun violence.

**I.    STUDY OF WAITING PERIOD LAWS**

9.    In 2017, my co-authors at Harvard Business School and I published a peer-reviewed study—attached as **Exhibit 2**—titled *Handgun Waiting Periods Reduce Gun Deaths* in the Proceedings of the National Academy of Sciences. This study examines 45 years of data between 1970 and 2014 on injury-related death and waiting period laws across all 50 states and the District of Columbia (DC). During this time, 44 states (including DC) had an effective waiting period for purchasing a handgun for at least some years.

3

Expert Report and Declaration of Professor Christopher Poliquin
(Case No. 3:23-CV-00793)
**App. 0479**

10. Variation in waiting period laws across states and over time allows my co-authors and I to use modern, quasi-experimental statistical methods to estimate how waiting period laws affect violence. These estimates—which compare how violence changes within states that adopted or were forced to adopt waiting period laws to changes in other states—have a causal interpretation. In other words, our study design allows us to determine if waiting periods cause changes in violence and estimate the magnitude of any effects.

## II. THE IMPACT OF FIREARM WAITING PERIOD LAWS ON HOMICIDES

11. According to my study, waiting period laws cause large and statistically significant reductions in firearm-related homicides. Implementation of a handgun waiting period causes an approximately 17 percent reduction in gun homicides (Table 1, **Exhibit 2**). For California, this estimate suggests that the state avoids about 260 gun homicides per year due to its waiting period policy.

12. This estimate for the effect of waiting periods on gun homicides holds across several statistical models and time periods. It is insensitive to whether the statistical model includes a state-specific time trend or controls for alcohol consumption, poverty, income, urbanization, black population, population in seven age groups, and several other gun policies that may have been enacted coincident with laws that delayed the purchase of a handgun.[1] The estimate is also similar for both the full study period—1970 through 2014—and for the "Brady interim period," a period from November 1993 to November 1998 in which federal law created a new, 5-day waiting period in 19 states to allow for the completion of a background check before firearm sales by federally licensed firearm dealers (Table 2, **Exhibit 2**).[2]

---

[1] Several of these additional analyses appear in an appendix to the article *Handgun Waiting Periods Reduce Gun Deaths*. The appendix, titled "Supporting Information," is attached as **Exhibit 3**.
[2] Brady Handgun Violence Prevention Act, Pub. L. No. 103-159 (1993).

4

13. Reductions in gun homicides from the implementation of handgun waiting periods are not offset by increases in non-gun homicide. My estimates for the effect of waiting periods on non-gun homicide are close to zero and not statistically significant, which suggests waiting periods have little, if any, effect on rates of non-gun homicide (Tables 1–2, **Exhibit 2**).

14. Recent research has supported these findings. A study of handgun purchases during a spike in gun sales and subsequent homicides found that purchasing delays of various forms decreased handgun homicides, and that this decrease was driven by a decrease in "domestic violence and other heat-of-the-moment murders."[3]

15. All of these results are consistent with research indicating that certain forms of interpersonal violence—especially domestic violence—are impulsive. In 2011, for example, researchers found statistically significant increases in police reports of family violence in particular locations immediately after the home professional football team suffered an upset loss.[4]

### III. THE IMPACT OF FIREARM WAITING PERIOD LAWS ON SUICIDES

16. Waiting period laws likely reduce firearm-related suicides. According to some analyses, the implementation of a waiting period causes a statistically significant reduction in gun suicide of 7–11 percent (Table 1, **Exhibit 2**). For California, a 7 percent reduction is equivalent to about 110 fewer gun suicides per year. During the "Brady interim period," my co-authors and I estimate that waiting periods caused a 5–6 percent reduction in gun suicide (Table 2, **Exhibit 2**).

17. My estimates of the effect of waiting periods on gun suicides and total suicides (gun and non-gun) are more sensitive to the inclusion of control variables

---

[3] Christoph Koenig & David Schindler; *Impulse Purchases, Gun Ownership, and Homicides: Evidence from a Firearm Demand Shock*. The Review of Economics and Statistics 2023; 105 (5): 1271–1286.

[4] David Card and Gordon B. Dahl, *Family Violence and Football: The Effect of Unexpected Emotional Cues on Violent Behavior*, The Quarterly Journal of Economics 126, no. 1 (2011): 103–143.

5

and the years examined than the estimates for homicide. While analyses of total suicides for the period 1970–2014 suggest that waiting periods reduce all suicides by a statistically significant 2–7 percent, estimates for the "Brady interim period" suggest reductions of 2–3.5 percent and are less precisely estimated (Tables 1–2, **Exhibit 2**).

18.     Recent research—attached as **Exhibit 4**—has expanded on my 2017 paper *Handgun Waiting Periods Reduce Gun Deaths* by examining the effects of waiting period laws on suicide for different age groups and by using newer statistical methods developed after my own study.[5] The authors note that impulsivity differs by age and that waiting period laws, which arguably disrupt impulsive suicide, may therefore have different effects on different age groups. Their analyses show that handgun waiting periods reduce gun suicide in the total adult population by 3.3 percent, and reduce gun suicide among young adults, which they define as people between the ages of 21 and 34, by 6.1 percent. The authors' estimates for older adults suggest no statistically significant effect of waiting periods on gun suicide. They report no effect of waiting periods on non-gun suicide.

19.     These results are consistent with other studies indicating that suicide is often an impulsive act. Research has found that there is often limited time between the formation of the intent and the completion of the attempt.[6] One study based on interviews with those who have survived a suicide attempt, for example, found that less than 10% of interviewees waited for more than 7 days after deciding to commit suicide before taking the suicidal act.[7] And other research has found that suicidal

---

[5] Donohue, John J., Samuel V. Cai, and Arjun Ravi. *Age and Suicide Impulsivity: Evidence from Handgun Purchase Delay Laws*. National Bureau of Economic Research (2023). (Attached as **Exhibit 4**.)

[6] *See, e.g.*, Megan Spokas, *et al.*, *Characteristics of Individuals Who Make Impulsive Suicide Attempts*, J. Affective Disorders, 2021 Feb; 136(3): 1121-1125.
[7] Elizabeth A. Deisenhammer, *et al.*, *The Duration of the Suicidal Process: How Much Time Is Left for Intervention Between Consideration and*

6

1   impulses are unlikely to recur: those who survive an initial suicide attempt, for

2   example, usually do not die by suicide later in life.[8]

3       20.    My professional opinion, based on my own and other scholars'

4   research, is that waiting period laws significantly reduce firearm-related homicides

5   and likely reduce gun suicides as well, especially among young people, but that

6   there is mixed evidence regarding the extent to which these reductions are offset by

7   increases in non-gun suicides.

8

9   **DECLARATION UNDER PENALTY OF PERJURY PURSUANT TO 28**

10   **U.S.C. § 1746**

11       I declare under penalty of perjury that the foregoing is true and correct, and if

12   called as a witness would testify competently to the above.

13

14       Executed in Los Angeles, California on March  11 , 2024.

15

16   _____

17               Christopher Poliquin

18

19

20

21

22

23

24

25

26   _____

27   *Accomplishment of a Suicide Attempt?*, J. Clinical Psychiatry, 2009 Jan; 70(1):19-24.

28      [8] *See, e.g.*, Owens, *et al.*, *Fatal and Non-Fatal Repetition of Self-Harm: Systematic Review.*  British Journal of Psychiatry.  2002; 181(3): 193-199;

# Christopher W. Poliquin

UCLA Anderson School of Management, 110 Westwood Plaza, Cornell Hall D-512, Los Angeles, CA 90095
310-206-6553 • chris.poliquin@anderson.ucla.edu • https://www.poliquin.xyz/

## Academic Employment

July 2018 —    UCLA Anderson School of Management
               Assistant Professor

## Education

May 2018       Harvard Business School
               Doctor of Business Administration

May 2009       University of Pennsylvania
               B.A. Philosophy, Politics, and Economics

## Research

*Peer Reviewed Journal Articles*

- Chauvin, Jasmina and Christopher Poliquin. 2023. Supply-side inducements and resource redeployment in multi-unit firms. *Accepted at Strategic Management Journal.*
- Lawrence, Megan and Christopher Poliquin. 2023. The growth of hierarchy in organizations: Managing knowledge scope. *Strategic Management Journal.* 44(13): 3155–3184.
- Hou, Young and Christopher Poliquin. 2023. The effects of CEO activism: Partisan consumer behavior and its duration. *Strategic Management Journal.* 44(3): 672–703.
- Luca, Michael, Deepak Malhotra, and Christopher Poliquin. 2020. The impact of mass shootings on gun policy. *Journal of Public Economics.* 181(January 2020).
- Licht, Amir, Christopher Poliquin, Jordan I. Siegel, and Xi Li. 2018. What makes the bonding stick? A natural experiment testing the legal bonding hypothesis. *Journal of Financial Economics.* 129(2) (August): 329–356.
- Luca, Michael, Deepak Malhotra, and Christopher Poliquin. 2017. Handgun waiting periods reduce gun deaths. *Proceedings of the National Academy of Sciences.* 114(46): 12162–12165.

*Journal Articles Submitted*

- Chauvin, Jasmina, Carlos Inoue, and Christopher Poliquin. 2023. Resource redeployment as an entry advantage in resource poor settings. *Minor Revision at Strategic Management Journal.*
- Poliquin, Christopher. 2020. The wage and inequality impacts of broadband internet. *Revise and Resubmit at Management Science.*
- Poliquin, Christopher and Young Hou. 2023. Policymaker responses to CEO activism. *Revise and Resubmit at Organization Science.*
- Poliquin, Christopher, Megan Lawrence, and Samina Karim. 2023. Hierarchy expansion in young firms: The impact of internal versus external hiring on performance. *Revise and Resubmit at Management Science.*
- Hou, Young and Christopher Poliquin. 2024.  Political consumerism: Ideology or signaling?

*Working Papers*

- Hou, Young and Christopher Poliquin. 2023. CEO activism and public mobilization.
- Poliquin, Christopher and Young Hou. 2022. The value of corporate political donations: Evidence from the capitol riot.

*Chapters in Books*

- Baron, Jonathan, William T. McEnroe, and Christopher Poliquin. 2012. Citizens' perceptions and the disconnect between economics and regulatory policy. In *Regulatory Breakdown: The Crisis of Confidence in U.S. Regulation*. Ed. Cary Coglianese. Philadelphia, PA: University of Pennsylvania Press. 143–162.

**App. 0484**

*Published Conference Proceedings*

- Poliquin, Christopher and Young Hou. 2022. The value of corporate political donations: Evidence from the capitol riot. *Academy of Management Proceedings*. Vol. 1.
- Chauvin et al. 2021. Unpacking internal mobility: Drivers and consequences of employee redeployment inside organizations. *Academy of Management Proceedings*. Vol. 1.
- Chauvin, Jasmina and Christopher Poliquin. 2019. Knowledge sharing and intra-organizational worker mobility. *Academy of Management Proceedings*. Vol. 1.
- Lawrence, Megan Lynn and Christopher Poliquin. 2019. Prior experience and the emergence of hierarchy in young firms. *Academy of Management Proceedings*. Vol. 1.

*Non-Peer Reviewed Publications*

- Poliquin, Christopher and Young Hou. 2023. How policymakers respond to CEO activism. *Blue Sky Blog*. Columbia Law School. 11 December.
- Poliquin, Christopher. 2022. After mass shootings like Uvalde, national gun control fails — but states often loosen gun laws. *The Conversation*. 25 May.
- Poliquin, Christopher and Young Hou. 2022. Corporate political donations and firm value following the Capitol riot. *The FinReg Blog*. Duke University School of Law. 10 February.
- Poliquin, Christopher. 2021. Gun control fails quickly in Congress after each mass shooting, but states often act — including to loosen gun laws. *The Conversation*. 22 March.
- Luca, Michael, Deepak Malhotra, and Christopher Poliquin. 2018. The case for handgun waiting periods. *Behavioral Scientist*. 12 December.

## Grants

2019         Morrison Family Center for Marketing Studies and Data Analytics (with Young Hou)
             UCLA Anderson School of Management

2015         Pellegrini Summer International Economics Research Grant (with Jasmina Chauvin)
             Harvard Economics Department

## Teaching

Winter 2024    Full-time MBA Program, UCLA Anderson
               Business Strategy (MGMT 420-1/2/3/4)

Winter 2023    Full-time MBA Program, UCLA Anderson
               Business Strategy (MGMT 420-1/2/3/4/5)

Winter 2022    Full-time MBA Program, UCLA Anderson
               Business Strategy (MGMT 420-1/2/3/4/5)

Winter 2021    Full-time MBA Program, UCLA Anderson
               Business Strategy (MGMT 420-1/2/3/4/5)

Winter 2020    Full-time MBA Program, UCLA Anderson
               Business Strategy (MGMT 420-1/2/5)

Fall 2018      Fully Employed MBA Program, UCLA Anderson
               Business Strategy (MGMT 420-3/4)

Spring 2015    Harvard John F. Kennedy School of Government
               Teaching Fellow, Economic Analysis of Public Policy

## Case Studies and Course Materials

- Unilever's New Recipe for Growth (with Jordan Siegel and Barbara Zepp Larson)

Poliquin CV

- Yum! Brands (with Jordan Siegel)
- Baxter's Asia Pacific "Talent Edge" Initiative (with Jordan Siegel and Mimi Xi)

## Conferences, Consortia, and Invited Talks

| | |
|---|---|
| 2023 | Non-Market Strategy Research Community Brown Bag Seminar<br>*CEO Activism and Public Mobilization* |
| 2023 | University of Michigan<br>*CEO Activism and Public Policy* |
| 2023 | Insper Institute of Education and Research<br>*Resource Redeployment as an Entry Advantage in Resource-Poor Settings* |
| 2023 | Academy of Management Annual Meeting<br>*Resource Redeployment as an Entry Advantage in Resource-Poor Settings* |
| 2023 | Academy of Management Annual Meeting<br>*Corporate Engagement in the Aftermath of the Capitol Riot* |
| 2023 | DRUID<br>*Resource Redeployment as an Entry Advantage in Resource-Poor Settings* |
| 2023 | So-Cal Strategy and OT Workshop<br>USC Marshall School of Business<br>*CEO Activism and Political Participation: Experimental Evidence on Abortion Rights* |
| 2022 | Academy of Management Annual Meeting<br>*The Value of Corporate Political Donations: Evidence from the Capitol Riot* |
| 2022 | Non-Market Strategy Research Community Brown Bag Seminar<br>*The Value of Corporate Political Donations: Evidence from the Capitol Riot* |
| 2021 | Sumantra Ghoshal Strategy Conference<br>London Business School<br>*CEO Activism, Consumer Polarization, and Firm Performance* |
| 2021 | CCC Corporate Dynamics Brown Bag Seminar<br>*CEO Activism, Consumer Polarization, and Firm Performance* |
| 2021 | Allied Social Science Association<br>*The Impact of Mass Shootings on Gun Policy* |
| 2019 | APPAM Fall Research Conference<br>*The Impact of Mass Shootings on Gun Policy* |
| 2019 | 12th Annual People & Organizations Conference<br>Wharton, University of Pennsylvania<br>*Worker Redeployment in Multi-Business Firms: An Empirical Examination* |
| 2019 | Georgetown University<br>*The Impact of Mass Shootings on Gun Policy* |
| 2019 | University of Utah / BYU Winter Strategy Conference<br>*Knowledge Sharing and Intra-Organizational Worker Mobility* |
| 2018 | SMS São Paulo, Brazil<br>*The Effect of the Internet on Wages* |

Poliquin CV

| | |
|---|---|
| 2018 | Tufts University<br>*The Impact of Mass Shootings on Gun Policy* |
| 2017 | American Society of Criminology Annual Meeting<br>*The Impact of Mass Shootings on Gun Policy* |
| 2017 | Conference on Empirical Legal Studies<br>Cornell Law School<br>*The Impact of Mass Shootings on Gun Policy* |
| 2017 | TIM Doctoral Consortium<br>Academy of Management Annual Meeting |
| 2017 | Consortium for Cooperation and Competition<br>Wharton, University of Pennsylvania<br>*The Effect of the Internet on Wages* |
| 2017 | Economics Experiments in the Tech Industry<br>Stanford Institute for Economic Policy Research<br>*The Effect of the Internet on Wages* (poster session) |
| 2016 | International Association for Conflict Management Annual Meeting<br>*The Impact of Mass Shootings on Gun Policy* |
| 2014 | EDEN Doctoral Seminar on Advanced Strategic Management<br>IESE Business School, Barcelona |
| 2014 | Strategic Research Initiative PhD Bootcamp<br>IESE Business School, New York |

## Work Experience

| | |
|---|---|
| 2010 − 2012 | Harvard Business School, Boston, MA<br>Research Associate for Jordan Siegel |
| 2009 − 2010 | Guaruma: Jóvenes Hondureños por el Desarrollo Educativo, La Ceiba, Honduras<br>Assistant Director |
| 2009 | University of Pennsylvania, Philadelphia, PA<br>Research Assistant for Jonathan Baron |

# Handgun waiting periods reduce gun deaths

Michael Luca[a,1], Deepak Malhotra[a], and Christopher Poliquin[a]

[a]Harvard Business School, Boston, MA 02163

Edited by Philip J. Cook, Duke University, Durham, NC, and accepted by Editorial Board Member Kenneth W. Wachter September 21, 2017 (received for review December 3, 2016)

Handgun waiting periods are laws that impose a delay between the initiation of a purchase and final acquisition of a firearm. We show that waiting periods, which create a "cooling off" period among buyers, significantly reduce the incidence of gun violence. We estimate the impact of waiting periods on gun deaths, exploiting all changes to state-level policies in the Unites States since 1970. We find that waiting periods reduce gun homicides by roughly 17%. We provide further support for the causal impact of waiting periods on homicides by exploiting a natural experiment resulting from a federal law in 1994 that imposed a temporary waiting period on a subset of states.

gun policy | gun violence | waiting period | injury prevention

More than 33,000 people die in gun-related incidents each year in the United States, accounting for as many deaths as motor vehicle accidents (1). This is concerning both in absolute terms and in comparison to other developed countries, all of which have lower rates of gun violence (2). For example, if the United States could lower its firearm death rate to that of Finland (the high-income country with the second highest rate), roughly 20,000 fewer people would die from guns every year. However, there has been no meaningful reduction in the US firearm-related death rate for more than a decade. Moreover, evidence about which policies would be effective at reducing violence remains limited (3), and the types of bills that are enacted depend on the political party in power (4).

One avenue for reducing gun deaths is to draw on insights from behavioral economics and psychology, which suggest that delaying gun purchases, even for a short time, might be an effective policy tool. Visceral factors, such as anger or suicidal impulses, can spur people to inflict harm on others or themselves, but tend to be transitory states (5, 6). For example, Card and Dahl (7) find that there is a 10% increase in domestic violence following an upset loss of the local National Football League team. Moreover, behaviors triggered by such visceral states can be contrary to longer term self-interest (5, 6).

Delaying a gun purchase could create a "cooling off" period that reduces violence by postponing firearm acquisitions until after a visceral state has passed. Increasing the time it takes to acquire a gun might also close the window of opportunity for would-be perpetrators of violence to use their weapons. Finally, a mandatory delay has the potential to deter purchases among people who have malevolent, but temporary, motivations for owning a firearm.

This article explores the impact of "waiting period" laws on firearm-related homicides and suicides using 45 y of data on law changes and mortality at the state level in the United States. A waiting period is a mandatory delay between the purchase and delivery of a gun; it requires purchasers to wait, typically between 2 and 7 d, before receiving their weapons. We exploit plausibly exogenous temporal and geographic variation in waiting period laws to implement a difference-in-differences approach that identifies the causal impact of waiting periods on homicides and suicides.

We find that waiting periods cause large and statistically significant reductions in homicides. Point estimates using our full 45-y sample and all waiting period changes imply a 17% reduction in gun homicides. We provide further evidence of a causal relationship between waiting periods and lower homicide rates based on a natural experiment in which federal law imposed waiting periods on a subset of states. Estimates from this analysis

also suggest that waiting periods reduce gun homicides by 17%. The results of both analyses confirm a large and robust effect of waiting periods on homicides. We also find a negative effect of waiting periods on suicides, but the magnitude and statistical significance of the suicide effect vary across model specification.

## Data and Research Design

We construct a panel of every change to waiting period laws in the United States between 1970 and 2014, which we obtained from state statutes and session laws. We combine these changes with annual data on firearm-related deaths from the Centers for Disease Control and Prevention. Fig. 1 shows the number of states with waiting periods over time. Overall, 44 states (including the District of Columbia) have had a waiting period for at least some time between 1970 and 2014. Exploiting the significant geographic and temporal variation in the adoption of waiting periods, we implement a difference-in-differences framework to estimate the causal impact of waiting periods on gun deaths. Essentially, we compare changes in firearm-related deaths within states that adopted waiting periods with changes in firearm-related deaths in other states. We control for changing economic and demographic factors that may be correlated with higher levels of gun violence or with the decision of lawmakers to adopt policies that delay gun purchases.

To support our causal interpretation, we then restrict the analysis to the period from 1990 to 1998, during which federal policy forced many states to implement waiting periods. The Brady Handgun Violence Prevention Act (hereinafter "Brady Act"), which went into effect in February 1994, required background checks on handgun purchases from licensed firearm dealers and created a 5-d waiting period to allow sufficient time for the check. Although it was a federal policy, the Brady Act only created new waiting periods for 19 states, since some states already required a background check and waiting period, and some implemented an "instant check" system that allowed for nearly immediate background checks (thereby obviating the need for a waiting period). We provide further details regarding the Brady Act and affected states in *Identifying Policy Changes* and *Materials and Methods*.

### Significance

Waiting period laws that delay the purchase of firearms by a few days reduce gun homicides by roughly 17%. Our results imply that the 17 states (including the District of Columbia) with waiting periods avoid roughly 750 gun homicides per year as a result of this policy. Expanding the waiting period policy to all other US states would prevent an additional 910 gun homicides per year without imposing any restrictions on who can own a gun.

Author contributions: M.L., D.M., and C.P. designed research, performed research, analyzed data, and wrote the paper.

The authors declare no conflict of interest.

This article is a PNAS Direct Submission. P.J.C. is a guest editor invited by the Editorial Board.

This is an open access article distributed under the PNAS license.

See Commentary on page 12097.

[1]To whom correspondence should be addressed. Email: mluca@hbs.edu.

This article contains supporting information online at www.pnas.org/lookup/suppl/doi:10.1073/pnas.1619896114/-/DCSupplemental.

Downloaded from https://www.pnas.org by UC Los Angeles on February 28, 2024 from IP address 169.232.243.48.

App. 0488

SEE COMMENTARY



**Fig. 1.**  States with handgun waiting periods and background checks on dealer sales from 1970 to 2015. Many states were required to implement these policies during the Brady interim period between February 1994 and November 1998 (shaded gray). Following prior research (8), Alabama and Ohio are coded as not requiring background checks after the Supreme Court's decision in *Printz v. United States*. Not all states had waiting periods during the Brady interim period because they implemented or already had an instant background check system that obviated the need for a waiting period to investigate gun buyers.

ECONOMIC SCIENCES

## Results

We begin by examining the effect of waiting periods across the full sample period from 1970 to 2014. The results of Table 1 show that waiting periods are associated with a ~17% reduction in gun homicides. This effect is equivalent to ~36 fewer gun homicides per year for a state with an average number of gun deaths. Waiting periods also lead to a 7–11% reduction in gun suicides (depending on the control variables used in the specification), which is equivalent to 22–35 fewer gun suicides per year for the average state. The results in Table 1 use a log-linear specification; we

**Table 1.  Effects of handgun waiting periods and background checks on violence, 1970–2014**

| Type of violence | 1970–2014 | | 1977–2014 |
|---|---|---|---|
| | (1) | (2) | (3) |
| **All homicide** | | | |
| Waiting period | −0.127 (0.059)** | −0.137 (0.059)** | −0.132 (0.050)** |
| Background check | | 0.049 (0.082) | 0.025 (0.081) |
| **Gun homicide** | | | |
| Waiting period | −0.188 (0.077)** | −0.187 (0.086)** | −0.186 (0.071)** |
| Background check | | −0.004 (0.103) | 0.022 (0.107) |
| **Non-gun homicide** | | | |
| Waiting period | −0.016 (0.051) | −0.048 (0.060) | −0.035 (0.037) |
| Background check | | 0.153 (0.076)** | 0.036 (0.057) |
| **All suicide** | | | |
| Waiting period | −0.047 (0.021)** | −0.070 (0.023)*** | −0.024 (0.011)** |
| Background check | | 0.113 (0.061)* | 0.023 (0.020) |
| **Gun suicide** | | | |
| Waiting period | −0.097 (0.034)*** | −0.120 (0.031)*** | −0.074 (0.017)*** |
| Background check | | 0.111 (0.073) | 0.029 (0.028) |
| **Non-gun suicide** | | | |
| Waiting period | −0.017 (0.038) | −0.058 (0.059) | −0.006 (0.033) |
| Background check | | 0.199 (0.072)*** | 0.084 (0.031)** |

Coefficients represent the effects of waiting periods and background checks on the natural logarithm of deaths per 100,000 adult residents. All models include state and year fixed effects. Models 1–2 include only the policy variables shown. Model 3 follows the specification of Ludwig and Cook (8) and includes alcohol consumption, poverty, income, urbanization, black population, and seven age groups. Model 3 uses fewer years of data due to missing control variables in earlier years. Summary statistics for all variables are included in Table S1. The 1970–2014 period includes 2,295 state-year observations; the model for gun homicides omits three state-years, and the model for non-gun homicides omits two state years because the death count was zero and the model is specified with a logged dependent variable. Similarly, the 1977–2014 period includes 1,938 state-years, but omits two state-years for gun homicides and one state-year for non-gun homicides. SEs, shown in parentheses, are clustered by state. Alternative model specifications presented in Tables S7 and S8 are not logged and include all state-years. *P < 0.10; **P < 0.05; ***P < 0.01.

Downloaded from https://www.pnas.org by UC Los Angeles on February 28, 2024 from IP address 169.232.243.48.

**App. 0489**

Downloaded from https://www.pnas.org by UC Los Angeles on February 28, 2024 from IP address 169.232.243.48.

present models with state-specific trends, models linear in the rate of violence, and Poisson models as part of Tables S3 and S5. The conclusion that waiting periods reduce gun homicides is robust across all specifications. The conclusion regarding suicides is robust to all specifications except those that include state-specific, linear trends (Table S3). Both conclusions are robust across models with and without controls for state-level economic and demographic changes. We also investigate the robustness of the results to the exclusion of individual states in Fig. S1.

To further support the hypothesis that waiting periods lead to a reduction in gun homicides, we then focus on a natural experiment created by the Brady Act, a federal law that forced some states to adopt new waiting period and background check policies between 1994 and 1998. Ludwig and Cook (8) also use the Brady Act to study whether background checks and waiting periods affect violence. They compare "Brady states" that were subject to the Brady Act with "Brady-exempt states" that were not. However, some states that were classified as Brady states already had waiting periods and background checks before the Brady Act, and other states chose to implement an "instant" background check system instead of requiring a waiting period. As a result, the coding of Brady states in the study by Ludwig and Cook (8) fails to capture all states that had preexisting waiting periods. In contrast, we precisely code which states had waiting periods (before 1994) and which implemented waiting periods only because of the Brady Act. In total, our coding differs from theirs for 16 states. This additional accuracy allows us to assess the causal impact of waiting periods resulting from the Brady Act. The full list of differences between our coding and prior research, along with supporting citations, can be found in Table S4.

We find that waiting periods led to large and statistically significant reductions in gun violence (Table 2) during the Brady interim period. Specifically, the results of column 3 of Table 2 show that waiting periods implemented during the Brady interim years resulted in a 17% reduction in gun homicides. This is equivalent to roughly 39 fewer homicides per year for the average state. There was also a 6% reduction in gun suicides (i.e.,

17 fewer suicides per year for the average state). Both results are robust across models with and without controls for state-level economic and demographic changes. Notably, exploiting the Brady Act as a natural experiment produces similar estimates as the longer sample period from 1970 to 2014.

Tables 1 and 2 also show that waiting periods have no significant effect on non-gun homicides, suggesting that people subject to waiting period laws do not substitute other means of committing homicide. This is consistent with other research (9) finding no increase in non-gun homicides in response to policies restricting access to firearms. Results for non-gun suicides, however, are less clear; some specifications suggest partial substitution toward non-gun methods of suicide in response to handgun waiting periods.

## Discussion

Our results show that waiting periods reduce gun homicides. Waiting periods for gun purchases are supported not only by the American Medical Association but also by a majority of Americans and a majority of gun owners (10, 11). Our point estimates, based on 45 y of data, suggest that the 17 states (including the District of Columbia) with waiting periods as of 2014 avoid ∼750 gun homicides. Expanding the waiting period policy to states that do not currently have it would prevent an additional 910 gun homicides per year. Waiting periods would therefore reduce gun violence without imposing any restrictions on who can own a gun.

## Materials and Methods

Our main specifications are of the form:

$$r_{it} = \alpha_i + \lambda_t + \beta W_{it} + \gamma B_{it} + \delta' X_{it} + \epsilon_{it},$$

where $r_{it}$ is the natural logarithm of the rate of violence (homicides or suicides) per 100,000 adult residents, $W_{it}$ is an indicator for handgun waiting periods and $B_{it}$ is an indicator for whether background checks are required for dealer handgun sales. We include an indicator variable for background checks on handgun purchases from licensed firearm dealers because a major source of policy variation in our dataset (the Brady Act) also affected

### Table 2. Effects of handgun waiting periods and background checks on violence, 1990–1998

| Type of violence | Brady period, 1990–1998 | | |
| --- | --- | --- | --- |
| | (1) | (2) | (3) |
| All homicide | | | |
|   Waiting period | −0.073 (0.084) | −0.130 (0.077)* | −0.145 (0.060)** |
|   Background check | | 0.091 (0.064) | 0.010 (0.053) |
| Gun homicide | | | |
|   Waiting period | −0.103 (0.093) | −0.179 (0.087)** | −0.181 (0.068)** |
|   Background check | | 0.120 (0.080) | 0.033 (0.065) |
| Non-gun homicide | | | |
|   Waiting period | −0.019 (0.068) | −0.035 (0.064) | −0.072 (0.050) |
|   Background check | | 0.025 (0.044) | −0.043 (0.039) |
| All suicide | | | |
|   Waiting period | −0.016 (0.021) | −0.022 (0.023) | −0.036 (0.020)* |
|   Background check | | 0.009 (0.022) | −0.007 (0.019) |
| Gun suicide | | | |
|   Waiting period | −0.039 (0.024) | −0.053 (0.028)* | −0.066 (0.021)*** |
|   Background check | | 0.023 (0.028) | −0.003 (0.024) |
| Non-gun suicide | | | |
|   Waiting period | 0.050 (0.021)** | 0.035 (0.022) | 0.018 (0.022) |
|   Background check | | 0.024 (0.023) | 0.009 (0.018) |

Coefficients represent the effects of waiting periods and background checks on the natural logarithm of deaths per 100,000 adult residents. All models include state and year fixed effects. Models 1–2 include only the policy variables shown. Model 3 follows the specification of Ludwig and Cook (8) and includes alcohol consumption, poverty, income, urbanization, black population, and seven age groups. Summary statistics for all variables are included in Table S2. The sample includes 459 state-year observations for all models. SEs, shown in parentheses, are clustered by state. *P < 0.10; **P < 0.05; ***P < 0.01.

App. 0490

SEE COMMENTARY

background check policies. As seen in Tables 1 and 2, the estimated impact of background checks depends on model specification. We also incorporate time-varying state-level control variables that may influence rates of gun violence (8), $X_{it}$, including alcohol consumption, poverty, income, urbanization, black population, and seven age groups. Summary statistics for these variables are included in Tables S1 and S2. The $\alpha_i$ and $\lambda_t$ parameters represent state and year fixed effects. These fixed effects control for stable, state-specific factors affecting violence and time-varying factors that affect all states identically. It is impossible to control for all time-varying, state-specific factors that affect gun violence. For example, policing tactics, drug use, and environmental factors such as lead exposure might not have changed uniformly across states over time and may also affect violence. However, the consistency between our estimates during the short (Brady interim) period and the longer period (including all waiting period changes since 1970) supports our interpretation of the results. The model parameters are estimated via least squares weighted by state population. We then calculate the percentage effect of waiting periods on violence using the estimator described by Kennedy (12).

We code a state as having a waiting period if it imposes any mandatory delay on the purchase of a handgun or has a permitting system for dealer and private sales. (In Table S5, we estimate models with a separate control variable for handgun permit systems and show that the effect of waiting periods is not limited to states with permitting systems.) Currently, 10 states and the District of Columbia impose an explicit waiting period on handgun

sales, and an additional five states have permitting systems for private and dealer sales that result in a delay of firearm purchases. Forty-four states have had a handgun waiting period at some point since 1970, although 19 implemented the policy only due to the Brady Act's interim provisions, in effect from February 1994 to November 1998. These provisions required local law enforcement agencies to conduct background checks on handgun purchases from licensed firearm dealers and required a 5-d waiting period to conduct the check. Some states already required background checks and/or waiting periods before the Brady Act, and were therefore not affected by the new law, but other states were forced to adopt a new waiting period due to the federal policy change. When the permanent provisions of the Brady Act took effect on November 30, 1998, the federal waiting period requirement was replaced with an instant background check system [the National Instant Criminal Background Check System (NICS)]. As a result, many states discarded their waiting periods after 1998 because the NICS eliminated the need for a waiting period to investigate purchasers' backgrounds. We use the subset of waiting period changes that resulted from the Brady Act as a natural experiment to provide further support for our analysis of the full sample period from 1970 to 2014.

Although nine states have also had a waiting period on long-guns (i.e., rifles and shotguns) sometime since 1970, we focus on handgun waiting periods because handguns account for 70–80% of firearm homicides (13) and because a major source of variation in our data, the Brady Act's interim period, only affected handgun sales.

1. National Center for Health Statistics, Centers for Disease Control and Prevention (2015) About Compressed Mortality, 1999-2014. CDC WONDER Online Database. Available at wonder.cdc.gov/cmf-icd10.html. Accessed August 5, 2016.
2. Grinshteyn E, Hemenway D (2016) Violent death rates: The US compared with other high-income OECD countries, 2010. *Am J Med* 129:266–273.
3. Sacks CA (2015) In memory of Daniel–Reviving research to prevent gun violence. *N Engl J Med* 372:800–801.
4. Luca M, Malhotra D, Poliquin C (2017) The impact of mass shootings on gun policy. Harvard Business School NOM Unit Working Paper No. 16-126. Available at dx.doi.org/10.2139/ssrn.2776657. Accessed October 1, 2016.
5. Loewenstein G (1996) Out of control: Visceral influences on behavior. *Organ Behav Hum Decis Process* 65:272–292.
6. Loewenstein G, Lerner JS (2002) The role of affect in decision making. *Handbook of Affective Sciences*, eds Davidson RJ, Scherer KR, Goldsmith HH (Oxford Univ Press, Oxford), pp 619–642.
7. Card D, Dahl GB (2011) Family violence and football: The effect of unexpected emotional cues on violent behavior. *Q J Econ* 126:103–143.
8. Ludwig J, Cook PJ (2000) Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. *JAMA* 284:585–591.
9. Raissian KM (2016) Hold your fire: Did the 1996 Federal Gun Control Act expansion reduce domestic homicides? *J Policy Anal Manage* 35:67–93.
10. American Medical Association (2016) AMA Expands Policy on Background Checks, Waiting Periods for Gun Buyers. Available at https://perma.cc/CNE4-FEQ9. Accessed October 28, 2016.
11. Sides J (December 23, 2012) Gun owners vs. the NRA: What the polling shows. Washington Post, Wonkblog. Available at https://perma.cc/HCC9-4DY5. Accessed October 28, 2016.
12. Kennedy P (1981) Estimation with correctly interpreted dummy variables in semilogarithmic equations. *Am Econ Rev* 71:801.
13. Planty M, Truman J (2013) Firearm Violence, 1993-2011 (US Department of Justice, Washington, DC), NCJ 241730. Available at https://www.bjs.gov/index.cfm?iid=4616&ty=pbdetail. Accessed October 18, 2016.
14. Wolfers J (2006) Did unilateral divorce laws raise divorce rates? A reconciliation and new results. *Am Econ Rev* 96:1802–1820.
15. Webster D, Crifasi CK, Vernick JS (2014) Effects of the repeal of Missouri's handgun purchaser licensing law on homicides. *J Urban Health* 91:293–302.
16. Rudolph KE, Stuart EA, Vernick JS, Webster DW (2015) Association between Connecticut's permit-to-purchase handgun law and homicides. *Am J Public Health* 105: e49–e54.
17. Lott JR, Jr, Mustard DB (1997) Crime, deterrence, and right-to-carry concealed handguns. *J Legal Stud* 26:1–68.
18. Ludwig J (1998) Concealed-gun-carrying laws and violent crime: Evidence from state panel data. *Int Rev Law Econ* 18:239–254.
19. Ayres I, Donohue JJ, III (2002) Shooting down the 'more guns, less crime' hypothesis. *Stanford Law Rev* 55:1193–1312.
20. Manski CF, Pepper JV (2017) How do right-to-carry laws affect crime rates? Coping with ambiguity using bounded-variation assumptions. *Rev Econ Stat*, 10.1162/REST_a_00689.
21. Solon G, Haider SJ, Wooldridge JM (2015) What are we weighting for? *J Hum Resour* 50:301–316.
22. Federal Register 59 (1994). Available at https://www.gpo.gov/fdsys/pkg/FR-1994-07-22/html/94-17819.htm. Accessed June 29, 2016.
23. Manson DA, Gilliard DK, Lauver G (1999) Presale Handgun Checks, the Brady Interim Period, 1994-98 (US Department of Justice Bureau of Justice Statistics Bulletin, Washington, DC), NCJ 175034. Available at https://www.bjs.gov/content/pub/pdf/phc98.pdf. Accessed June 29, 2016.
24. Vernick J, Hepburn L (2003) State and federal gun laws. *Evaluating Gun Policy: Effects on Crime and Violence*, eds Ludwig J, Cook PJ (The Brookings Institution, Washington, DC), pp 345–402.
25. U.S. Department of Justice Bureau of Justice Statistics (1996) Survey of State Procedures Related to Firearm Sales (US Department of Justice Bureau of Justice Statistics Bulletin, Washington, DC), NCJ 160763. Available at https://www.bjs.gov/index.cfm?ty=pbdetail&iid=1067. Accessed August 2, 2014.
26. Carroll CA, Jr (January 27, 1994) South Carolina Executive order no. 94-03. Available at hdl.handle.net/10827/1350. Accessed June 14, 2017.

ECONOMIC SCIENCES

Downloaded from https://www.pnas.org by UC Los Angeles on February 28, 2024 from IP address 169.232.243.48.

**App. 0491**

# Supporting Information

## Luca et al. 10.1073/pnas.1619896114

### Summary Statistics

Tables S1 and S2 provide summary statistics for variables used in the main analyses. Table S1 shows summary statistics for variables used for analyses presented in Table 1, covering the full 1970–2014 sample period. Table S2 shows summary statistics for variables used for the analysis of the Brady interim period in Table 2, covering 1990–1998.

### Identifying Policy Changes

In our first set of analyses, covering 1970–2014, we extend prior coding of policy changes by including an additional 36 y of data with 25 changes in waiting period policies. Our approach to identifying changes in waiting period policies also improves on Ludwig and Cook's (8) classification of states affected by the Brady Handgun Violence Prevention Act. Prior research coded all states subject to the Brady Act's interim provisions as treatment states, but some of these states already had background checks and/or waiting periods before the interim period. Table S4 details the differences between our coding and that of Ludwig and Cook (8). In total, our coding differs for 16 states; the table footnotes provide supporting citations for each difference. We find that these improvements more accurately measure the effects of waiting periods on homicides, which we now find to be robust and statistically significant at conventional levels, even when we restrict the sample to the same years examined in prior research.

### Robustness: State-Specific Trends

If states that do and do not adopt waiting periods have different trends in violence before the implementation of the waiting period, then one might be concerned that our results reflect these different trends rather than the impact of the waiting period policy. To allow for the possibility of differential secular trends, Table S3 estimates a log-linear model with linear trends that vary by state for the 1970–2014 time period [We do not estimate models with state-specific trends for the analysis of the Brady interim period (1990–1998) because there is too little pretreatment data to identify preexisting, state-specific trends in gun violence (14)]. This model produces similar estimates for the effect of waiting periods on homicides, suggesting that differential trends are not the main driver of the results and providing further support for our interpretation. The results for suicides, however, differ across specification and are not robust to the inclusion of control variables and state-specific trends in suicide. The model without trends in column 3 of Table 1 suggests that waiting periods reduce gun suicides by 7%, while the model in column 3 of Table S3 suggests no reduction. The results of Table S3 also suggest that any decrease in gun suicides due to waiting periods is offset by an increase in non-gun suicides.

### Robustness: Falsification Exercise and Dynamic Effects

To shed further light on the dynamics of the effects shown in Table 1, Table S6 reestimates the model in column 3 of Table 1, but includes leads and lags of the policy change, specifically including indicator variables for the years before and after implementation of a waiting period. We find that the impact of waiting periods does not appear until the waiting period has been adopted, providing further support for our causal interpretation. Violence appears to fall soon after implementation, although the single-year estimates are imprecise.

### Robustness: Other Changes in Gun Policy

While the results overall point to the causal effect of waiting periods, one might be concerned that other gun policy changes are correlated with the timing of waiting period changes. To address this concern, we provide evidence that the effects reported in Table 1 are robust to the inclusion of controls for other gun policies in a state. Specifically, in Table S5, we reestimate the models of columns 2 and 3 in Table 1, but include additional variables for handgun permit and concealed carry policies to account for potential correlation between the implementation of these policies and waiting periods. The results in Table S5 show that the inclusion of other gun policies in the model does not change our conclusion that waiting periods reduce gun homicides and suicides. Our study uses a natural experiment embedded in the Brady Act to identify the impact of waiting periods; estimating the causal impact of exogenous changes to other gun policies is beyond the scope of this study. Other research focuses on the impact of handgun permits (15, 16) and concealed carry laws (17–20).

### Alternative Model Specifications

Alternative specifications for the effect of waiting periods on homicides and suicides produce similar point estimates (Tables S7 and S8). The estimates in Table S7 are based on models linear in the rate of violence. The results in columns 2 and 3 imply that waiting periods reduce gun homicides by roughly 18% and gun suicides by 5–9% for a state with an average rate of violence. Results for the Poisson model (Table S8) imply reductions of 18–20% and 7–11.6% for gun homicides and suicides, respectively, while estimates based on the log-linear model presented in the main text and Table 1 imply 17% and 7–11% reductions.

Additionally, we examine unweighted, least-squares estimates (Tables S9 and S10). The coefficient estimates on the waiting period dummy from the unweighted regressions are attenuated relative to the weighted results. This suggests that the effect of waiting period policies is heterogeneous, with larger states experiencing greater reductions in violence than smaller states (21). To ensure our results are not driven by outlier states, we reestimate the model of gun homicide and suicide rates (column 3 of Table 1), but exclude one state at a time. Fig. S1 shows the 51 resulting coefficients (one from excluding each state and the District of Columbia) for homicides and suicides. The coefficient estimates are consistently negative. As expected from the difference between the weighted and unweighted estimates, large states like Pennsylvania and Florida seem to exert downward pressure on the coefficient.

### Complete Coefficient Estimates

Table S11 presents coefficient estimates for all variables included in model 3 of Table 1. This model uses the same control variables as prior research by Ludwig and Cook (8).

App. 0492



**Fig. S1.** Estimates of the effect of waiting periods on gun homicides and suicides, dropping each state individually from the analysis and reestimating model 3 of Table 1. Bars are 1.96 ± SE of the waiting period coefficient. Solid lines mark the full sample estimates, and dashed lines are 1.96 ± full sample SE.

**Table S1.   State-level summary statistics: 1970–2014 (Table 1)**

| Variable | Mean | SD | p5 | p10 | p50 | p90 | p95 |
|---|---|---|---|---|---|---|---|
| **Years 1970–2014** | | | | | | | |
| Gun homicide rate | 5.7 | 4.9 | 1.0 | 1.4 | 4.4 | 11.1 | 14.4 |
| Homicide rate | 8.5 | 6.7 | 2.1 | 2.6 | 6.8 | 15.6 | 19.4 |
| Gun suicide rate | 10.2 | 4.2 | 3.1 | 4.0 | 10.2 | 15.0 | 17.1 |
| Suicide rate | 17.3 | 4.7 | 10.2 | 11.9 | 16.7 | 23.7 | 26.0 |
| Handgun waiting period | 0.45 | 0.49 | 0 | 0 | 0 | 1 | 1 |
| Background checks | 0.64 | 0.48 | 0 | 0 | 1 | 1 | 1 |
| **Years 1977–2014 (Control variables for model 3)** | | | | | | | |
| Alcohol consumption | 2.9 | 0.8 | 2.0 | 2.1 | 2.7 | 3.8 | 4.3 |
| Income per capita | 25.4 | 5.8 | 17.2 | 18.6 | 24.8 | 32.6 | 35.7 |
| Demographics, % | | | | | | | |
| Poverty | 13.1 | 4.0 | 7.9 | 8.7 | 12.5 | 18.5 | 20.9 |
| Urban areas | 64.2 | 20.1 | 29.5 | 35.5 | 64.9 | 89.0 | 91.9 |
| Black | 11.2 | 11.8 | 0.4 | 0.7 | 7.4 | 27.5 | 32.1 |
| Ages 0–14 y | 21.4 | 2.4 | 17.9 | 18.7 | 21.3 | 24.3 | 25.8 |
| Ages 15–17 y | 4.5 | 0.6 | 3.7 | 3.9 | 4.4 | 5.5 | 5.8 |
| Ages 18–24 y | 10.9 | 1.6 | 8.9 | 9.2 | 10.3 | 13.4 | 13.8 |
| Ages 25–34 y | 15.1 | 2.2 | 12.0 | 12.5 | 15.0 | 17.9 | 18.7 |
| Ages 35–44 y | 14.0 | 1.9 | 10.8 | 11.3 | 14.1 | 16.3 | 16.9 |
| Ages 45–54 y | 12.0 | 2.2 | 9.0 | 9.3 | 12.0 | 14.9 | 15.4 |
| Ages 55–64 y | 9.7 | 1.7 | 7.6 | 7.9 | 9.2 | 12.3 | 12.9 |

Homicide and suicide rates are adult (21+) deaths per 100,000 adult residents. Alcohol consumption is measured in gallons of ethanol per capita, and income is measured in thousands of 1998 dollars. Demographic control variables are percentages of total state population. Columns beginning with "p" represent percentiles of the distribution; for example, "p10" means the 10th percentile.

**App. 0493**

**Table S2.   State-level summary statistics: 1990–1998 (Table 2)**

| Variable | Mean | SD | p5 | p10 | p50 | p90 | p95 |
|---|---|---|---|---|---|---|---|
| Gun homicide rate | 5.9 | 6.1 | 1.0 | 1.4 | 4.6 | 10.4 | 12.3 |
| Homicide rate | 8.8 | 8.0 | 2.1 | 2.7 | 7.0 | 14.7 | 18.3 |
| Gun suicide rate | 10.2 | 4.0 | 3.2 | 4.0 | 10.6 | 15.0 | 17.3 |
| Suicide rate | 16.6 | 4.5 | 9.6 | 11.4 | 16.1 | 22.7 | 24.9 |
| Handgun waiting period | 0.63 | 0.47 | 0 | 0 | 1 | 1 | 1 |
| Background checks | 0.74 | 0.43 | 0 | 0 | 1 | 1 | 1 |
| Alcohol consumption | 2.6 | 0.6 | 2.0 | 2.1 | 2.6 | 3.1 | 4.1 |
| Income per capita | 24.3 | 3.8 | 19.1 | 19.9 | 23.9 | 29.1 | 31.7 |
| Demographics, % | | | | | | | |
| Poverty | 13.3 | 4.0 | 8.2 | 8.9 | 12.5 | 19.0 | 21.1 |
| Urban areas | 63.5 | 19.9 | 29.0 | 35.1 | 63.9 | 87.5 | 91.1 |
| Black | 11.1 | 12.0 | 0.4 | 0.5 | 7.3 | 27.5 | 31.9 |
| Ages 0–14 y | 21.9 | 1.9 | 19.4 | 20.0 | 21.6 | 24.1 | 25.2 |
| Ages 15–17 y | 4.3 | 0.5 | 3.5 | 3.7 | 4.2 | 4.9 | 5.1 |
| Ages 18–24 y | 9.9 | 0.9 | 8.4 | 8.9 | 9.9 | 11.0 | 11.6 |
| Ages 25–34 y | 15.7 | 1.6 | 13.1 | 13.7 | 15.6 | 17.7 | 18.4 |
| Ages 35–44 y | 16.0 | 1.0 | 14.4 | 14.8 | 15.9 | 17.1 | 17.7 |
| Ages 45–54 y | 11.5 | 1.2 | 9.7 | 10.0 | 11.5 | 13.1 | 13.5 |
| Ages 55–64 y | 8.2 | 0.7 | 7.1 | 7.5 | 8.2 | 8.9 | 9.1 |

Homicide and suicide rates are adult (21+) deaths per 100,000 adult residents. Alcohol consumption is measured in gallons of ethanol per capita; income is thousands of 1998 dollars. Demographic control variables are percentages of total state population. Columns beginning with "p" represent percentiles of the distribution; for example, "p10" means the 10th percentile.

App. 0494

**Table S3.  States that implemented background checks and waiting periods during the Brady Act's interim period from February 1994 through November 1998, according to Ludwig and Cook (8) and this study**

| State | Ludwig and Cook (8) | | New coding (this study) | |
| --- | --- | --- | --- | --- |
| | Background check | Waiting period | Background check | Waiting period |
| **Alabama*** | ■ | ■ | ■ | ■ |
| Alaska | | | | |
| **Arizona†** | □ | | | ■ Feb–Oct 1994 |
| Arkansas | □ | | □ Feb 1994–June 1997 | □ Feb 1994–June 1997 |
| California | | | ■ | |
| Colorado | | | ■ | |
| Connecticut | | | | |
| Delaware | | | | |
| District of Columbia | | | | |
| Florida | | | | |
| **Georgia‡** | ■ | | ■ | □ Feb 1994–Dec 1995 |
| Hawaii | ■ | | ■ | ■ |
| **Idaho§** | ■ | | | □ Feb–May 1994 |
| Illinois | ■ | ■ | ■ | ■ |
| Indiana | ■ | ■ | ■ | ■ |
| Iowa | ■ | ■ | ■ | ■ |
| Kansas | ■ | ■ | ■ | ■ |
| Kentucky | ■ | ■ | ■ | ■ |
| Louisiana | ■ | ■ | ■ | ■ |
| Maine | ■ | ■ | ■ | ■ |
| Maryland | | | | |
| Massachusetts | | | | |
| Michigan | | | | |
| **Minnesota¶** | ■ | | | |
| Mississippi | ■ | | ■ | ■ |
| Missouri | | | | |
| Montana | ■ | ■ | ■ | ■ |
| **Nebraska#** | ■ | | | |
| **Nevada‖** | ■ | ■ | ■ | ■ |
| **New Hampshire**** | ■ | | ■ | □ Feb–Dec 1994 |
| New Jersey | | | | |
| New Mexico | ■ | ■ | ■ | ■ |
| New York | ■ | ■ | ■ | ■ |
| **North Carolina††** | ■ | | ■ | |
| North Dakota | ■ | ■ | ■ | ■ |
| **Ohio‡‡** | □ | □ | □ Feb 1994–June 1997 | ■ |
| Oklahoma | ■ | ■ | ■ | ■ |
| Oregon | | | | |
| **Pennsylvania§§** | ■ | | ■ | |
| **Rhode Island¶¶** | ■ | | ■ | |
| **South Carolina##** | ■ | ■ | ■ | ■ |
| **South Dakota‖‖** | ■ | | ■ | |
| **Tennessee**** | ■ | ■ | ■ | ■ |
| Texas | ■ | ■ | ■ | ■ |
| Utah | ■ | ■ | ■ | ■ |
| Vermont | ■ | ■ | ■ | ■ |
| Virginia | ■ | | ■ | |
| **Washington†††** | ■ | | ■ | |
| West Virginia | | | | |
| Wisconsin | ■ | | ■ | |
| Wyoming | ■ | | ■ | |

The coding of states in boldface differs; an explanation of differences is provided in table footnotes. Dates are noted for cases in which policies changed during the interim period. ■, state got policy for full interim period; □, state got policy for part of interim period.

*Alabama had a 2-d waiting period on handgun purchases before implementation of the Brady Act (Code of Ala. § 13A-11-77).

†Arizona created an instant check background system in October 1994, and therefore had effectively no waiting period for most of the Brady Act's interim period (Ariz. Rev. Stat. Ann. § 13–3114).

‡Georgia implemented an instant check system in January 1996 (Ga. Code Ann. § 16-11-170).

§Idaho implemented an instant check system in June 1994 (Ida. Code § 19-5403).

¶Minnesota created a permit system in 1977 that required background checks and a 7-d waiting period for handgun purchases (Minn. Stat. § 624.7131 et seq.).

#Nebraska was exempt from the Brady Act (22, 23). Furthermore, it created a handgun permit system with a background check and 2-d waiting period in 1991 (Neb. Rev. Stat. § 69-2404 et seq.).

‖Ludwig and Cook (8) say Nevada was classified as a control state because it's pre-Brady Act laws were strict enough to warrant an exemption even though it was subject to the Brady Act. We cannot find evidence of this; Nevada had neither a background check nor waiting period requirement before implementation of the Brady Act (24) and was subject to the act's provisions (23). We classify the state as not having a waiting period because the state implemented an instant check system (25).

**New Hampshire implemented an instant check system in January 1995 (N.H. Rev. Stat Ann. § 159-C).

††We classify North Carolina as a control state because it implemented a handgun permit system in 1919 (N.C. Gen. Stat. § 14-402 et seq.). An explicit background check requirement was not added to the statutes until 1995, but the law previously required superior court clerks to certify that handgun permit applicants were of "good moral character" and included felonies, indictments, fugitive status, and mentally ill persons among those not of such character (N.C. Gen. Stat. § 14-404).

‡‡Ohio was subject to the Brady Act's interim provisions (22, 23) but had instant background checks (25), and is therefore coded as not implementing a waiting period. Like Ludwig and Cook (8), we code Ohio as stopping background checks after the Supreme Court's decision in *Printz v. United States* in June of 1997. We cannot find a statute or executive order for Ohio, and therefore rely exclusively on federal government reports (22, 23, 25).

§§Pennsylvania already had a 2-d waiting period before implementation of the Brady Act (24). We therefore code the state as only implementing the Brady Act's background check provisions. The state abandoned its waiting period in 1998 when instant checks became available (text and legislative history of 18 Pa.C.S.A. § 6111).

¶¶Rhode Island was subject to the Brady Act despite requiring both a background check and waiting period as part of its handgun permit process before 1994 (24). It therefore did not newly implement background checks or waiting periods as a result of the Brady Act (R.I. Gen. Laws § 11-47-35 et seq.).

##South Carolina's Law Enforcement Division ran an instant check system at the time the Brady Act was implemented (22, 25, 26), and is therefore coded as not implementing a waiting period. South Carolina's governor created the instant check system by executive order (26).

‖‖South Dakota had a 2-d waiting period before implementation of the Brady Act (since at least 1935) that was not repealed until 2009 (S.D. Codified Laws § 23-7-9).

***Tennessee was subject to the Brady Act even though it already required a background check and 15-d waiting period (24) (Tenn. Code Ann. § 39-17-1316). It is therefore coded as not newly implementing these laws due to the Brady Act's interim provisions.

†††Washington conducted background checks before the Brady Act but was not Brady-exempt because it did not require that law enforcement officer in the area where the purchaser lived to conduct the check (Wash. Rev. Code Ann. § 9.41.090).

**Table S4.    Effects of handgun waiting periods and background checks on violence, including state-specific trends, 1970–2014**

| Type of violence | 1970–2014 | | 1977–2014 |
|---|---|---|---|
| | (1) | (2) | (3) |
| All homicide | | | |
|   Waiting period | −0.118 (0.049)** | −0.129 (0.049)** | −0.086 (0.045)* |
|   Background check | | 0.033 (0.057) | 0.001 (0.047) |
| Gun homicide | | | |
|   Waiting period | −0.181 (0.066)*** | −0.195 (0.071)*** | −0.124 (0.050)** |
|   Background check | | 0.043 (0.077) | 0.014 (0.068) |
| Non-gun homicide | | | |
|   Waiting period | −0.011 (0.039) | −0.014 (0.038) | −0.030 (0.047) |
|   Background check | | 0.011 (0.051) | −0.015 (0.035) |
| All suicide | | | |
|   Waiting period | 0.015 (0.013) | 0.017 (0.013) | 0.022 (0.016) |
|   Background check | | −0.005 (0.017) | −0.006 (0.015) |
| Gun suicide | | | |
|   Waiting period | −0.044 (0.017)** | −0.045 (0.020)** | −0.012 (0.016) |
|   Background check | | 0.002 (0.018) | −0.017 (0.017) |
| Non-gun suicide | | | |
|   Waiting period | 0.056 (0.019)*** | 0.050 (0.020)** | 0.048 (0.024)* |
|   Background check | | 0.020 (0.022) | 0.019 (0.024) |

Coefficients represent the effects of waiting periods and background checks on the natural logarithm of deaths per 100,000 adult residents. Models mirror Table 1, but include a state-specific, linear trend in addition to state and year fixed effects. Models 1–2 include only the policy variables shown. Model 3 follows the specification of Ludwig and Cook (8) and uses fewer years of data due to missing control variables in earlier years. SEs, shown in parentheses, are clustered by state. *$P < 0.10$; **$P < 0.05$; ***$P < 0.01$.

**Table S5.    Effect of handgun waiting periods relative to adoption year, 1977–2013**

| | Homicides | | | Suicides | | |
|---|---|---|---|---|---|---|
| | All | Gun | Non-gun | All | Gun | Non-gun |
| Time relative to waiting period | (1) | (2) | (3) | (4) | (5) | (6) |
| 2 y before | −0.024 (0.047) | −0.038 (0.056) | 0.004 (0.060) | 0.015 (0.021) | 0.001 (0.024) | 0.045 (0.031) |
| 1 y before | −0.053 (0.051) | −0.076 (0.060) | −0.014 (0.052) | 0.025 (0.017) | 0.003 (0.018) | 0.046 (0.029) |
| Adoption year | −0.087 (0.054) | −0.106 (0.077) | −0.063 (0.051) | 0.008 (0.021) | −0.014 (0.026) | 0.006 (0.034) |
| 1 y after | −0.147 (0.060)** | −0.178 (0.080)** | −0.11 (0.065)* | −0.032 (0.022) | −0.082 (0.026)*** | −0.016 (0.032) |
| 2 y after | −0.147 (0.058)** | −0.176 (0.082)** | −0.086 (0.043)* | −0.004 (0.016) | −0.061 (0.023)*** | 0.039 (0.030) |
| 3 y after | −0.145 (0.060)** | −0.198 (0.083)** | −0.048 (0.053) | −0.007 (0.017) | −0.063 (0.022)*** | 0.04 (0.034) |
| 4+ y after | −0.129 (0.053)** | −0.188 (0.072)** | −0.021 (0.041) | −0.022 (0.012)* | −0.071 (0.016)*** | −0.006 (0.037) |

Models mirror column 3 of Table 1, but include an indicator variable for years before and after implementation of the waiting period *$P < 0.10$; **$P < 0.05$; ***$P < 0.01$.

App. 0496

**Table S6.   Estimates of the waiting period effect, controlling for other gun policies**

| Type of violence | 1970–2014 | 1977–2014 |
|---|---|---|
| | (1) | (2) |
| **All homicide** | | |
| Waiting period | −0.141 (0.061)** | −0.137 (0.051)** |
| Background check | 0.054 (0.065) | 0.019 (0.068) |
| Handgun permit | 0.021 (0.089) | 0.051 (0.091) |
| Shall-issue CCW | 0.002 (0.104) | 0.056 (0.095) |
| May-issue CCW | 0.006 (0.118) | 0.062 (0.097) |
| **Gun homicide** | | |
| Waiting period | −0.201 (0.086)** | −0.194 (0.074)** |
| Background check | 0.010 (0.084) | 0.007 (0.090) |
| Handgun permit | 0.075 (0.093) | 0.084 (0.125) |
| Shall-issue CCW | −0.019 (0.119) | 0.078 (0.118) |
| May-issue CCW | −0.035 (0.137) | 0.046 (0.118) |
| **Non-gun homicide** | | |
| Waiting period | −0.033 (0.055) | −0.035 (0.033) |
| Background check | 0.135 (0.055)** | 0.042 (0.053) |
| Handgun permit | −0.077 (0.100) | 0.006 (0.054) |
| Shall-issue CCW | 0.063 (0.083) | 0.045 (0.062) |
| May-issue CCW | 0.110 (0.096) | 0.118 (0.073) |
| **All Suicide** | | |
| Waiting period | −0.037 (0.023) | −0.016 (0.011) |
| Background check | 0.066 (0.029)** | 0.012 (0.017) |
| Handgun Permit | −0.167 (0.070)** | −0.092 (0.036)** |
| Shall-issue CCW | 0.044 (0.040) | 0.013 (0.026) |
| May-issue CCW | 0.025 (0.046) | 0.014 (0.026) |
| **Gun suicide** | | |
| Waiting period | −0.083 (0.031)*** | −0.066 (0.019)*** |
| Background check | 0.064 (0.034)* | 0.015 (0.023) |
| Handgun permit | −0.196 (0.078)** | −0.101 (0.037)*** |
| Shall-issue CCW | 0.007 (0.048) | 0.008 (0.031) |
| May-issue CCW | −0.029 (0.063) | −0.012 (0.039) |
| **Non-gun suicide** | | |
| Waiting period | −0.021 (0.047) | −0.001 (0.030) |
| Background check | 0.119 (0.050)** | 0.062 (0.030)** |
| Handgun permit | −0.156 (0.062)** | −0.059 (0.040) |
| Shall-issue CCW | 0.176 (0.049)*** | 0.085 (0.028)*** |
| May-issue CCW | 0.152 (0.054)*** | 0.093 (0.027)*** |

Coefficients estimate the effect of waiting periods and background checks on the number of deaths per 100,000 adult residents. Models mirror those of Table 1. Model 1 includes only the policy variables shown. Model 2 follows the specification of Ludwig and Cook (8) and uses fewer years of data due to missing control variables in earlier years. SEs, shown in parentheses, are clustered by state. $*P < 0.10$; $**P < 0.05$; $***P < 0.01$. CCW, carrying of a concealed weapon.

**App. 0497**

**Table S7.  Alternative specifications for the effect of handgun waiting periods and background checks on violence from 1970 to 2014: Linear rate**

| Type of violence | 1970–2014 | 1977–2014 | |
|---|---|---|---|
| | (1) | (2) | (3) |
| **All homicide** | | | |
| Waiting period | −1.372 (0.772)* | −1.332 (0.790)* | −1.138 (0.477)** |
| Background check | | −0.190 (1.046) | −0.412 (0.960) |
| **Gun homicide** | | | |
| Waiting period | −1.185 (0.627)* | −1.054 (0.686) | −1.010 (0.412)** |
| Background check | | −0.627 (0.806) | −0.398 (0.791) |
| **Non-gun homicide** | | | |
| Waiting period | −0.187 (0.186) | −0.278 (0.191) | −0.129 (0.131) |
| Background check | | 0.436 (0.324) | −0.014 (0.219) |
| **All suicide** | | | |
| Waiting period | −0.906 (0.325)*** | −1.238 (0.391)*** | −0.459 (0.167)*** |
| Background check | | 1.600 (1.157) | 0.070 (0.328) |
| **Gun suicide** | | | |
| Waiting period | −0.882 (0.277)*** | −0.912 (0.327)*** | −0.533 (0.203)** |
| Background check | | 0.143 (0.669) | −0.453 (0.338) |
| **Non-gun suicide** | | | |
| Waiting period | −0.024 (0.222) | −0.326 (0.357) | 0.073 (0.174) |
| Background check | | 1.458 (0.615)** | 0.524 (0.189)*** |

Coefficients estimate the effect of waiting periods and background checks on the number of deaths per 100,000 adult residents. All models include state and year fixed effects and mirror those of Table 1. Model 3 uses fewer years of data due to missing control variables in earlier years. The analysis covering 1970–2014 includes 2,295 state-years; the analysis with control variables covering 1977–2014 includes 1,938 state-years. SEs, shown in parentheses, are clustered by state. *$P < 0.10$; **$P < 0.05$; ***$P < 0.01$.

**Table S8.  Alternative specifications for the effect of handgun waiting periods and background checks on violence from 1970 to 2014: Poisson**

| Type of violence | 1970–2014 | | 1977–2014 |
|---|---|---|---|
| | (1) | (2) | (3) |
| **All homicide** | | | |
| Waiting period | −0.153 (0.049)*** | −0.155 (0.050)*** | −0.125 (0.051)** |
| Background check | | 0.007 (0.076) | −0.002 (0.084) |
| **Gun homicide** | | | |
| Waiting period | −0.209 (0.064)*** | −0.198 (0.072)*** | −0.177 (0.074)** |
| Background check | | −0.039 (0.094) | −0.007 (0.112) |
| **Non-gun homicide** | | | |
| Waiting period | −0.031 (0.046) | −0.060 (0.050) | −0.012 (0.036) |
| Background check | | 0.100 (0.072) | 0.001 (0.055) |
| **All suicide** | | | |
| Waiting period | −0.047 (0.019)** | −0.076 (0.023)*** | −0.032 (0.010)*** |
| Background check | | 0.127 (0.070)* | 0.032 (0.021) |
| **Gun suicide** | | | |
| Waiting period | −0.089 (0.026)*** | −0.116 (0.030)*** | −0.075 (0.017)*** |
| Background check | | 0.111 (0.075) | 0.032 (0.030) |
| **Non-gun suicide** | | | |
| Waiting period | −0.010 (0.031) | −0.053 (0.053) | 0.001 (0.032) |
| Background check | | 0.207 (0.078)*** | 0.088 (0.031)*** |

Coefficients are based on a Poisson model for the count of deaths using adult population as the exposure variable. All models include state and year fixed effects and mirror those of Table 1. Model 3 uses fewer years of data due to missing control variables in earlier years. The analysis covering 1970–2014 includes 2,295 state-years; the analysis with control variables covering 1977–2014 includes 1,938 state-years. SEs, shown in parentheses, are clustered by state. *$P < 0.10$; **$P < 0.05$; ***$P < 0.01$.

App. 0498

**Table S9.** Unweighted estimates of the effects of handgun waiting periods and background checks on violence: Full sample period

| Type of violence | 1970–2014 | | 1977–2014 |
| --- | --- | --- | --- |
| | (1) | (2) | (3) |
| All homicide | | | |
| Waiting period | −0.007 (0.050) | −0.012 (0.052) | −0.047 (0.051) |
| Background check | | 0.018 (0.047) | 0.022 (0.050) |
| Gun homicide | | | |
| Waiting period | −0.042 (0.060) | −0.029 (0.066) | −0.067 (0.066) |
| Background check | | −0.049 (0.068) | 0.011 (0.068) |
| Non-gun homicide | | | |
| Waiting period | 0.055 (0.049) | 0.020 (0.053) | −0.003 (0.044) |
| Background check | | 0.134 (0.049)*** | 0.039 (0.047) |
| All suicide | | | |
| Waiting period | −0.020 (0.017) | −0.045 (0.017)** | −0.028 (0.012)** |
| Background check | | 0.097 (0.029)*** | 0.032 (0.018)* |
| Gun suicide | | | |
| Waiting period | −0.044 (0.023)* | −0.070 (0.021)*** | −0.063 (0.018)*** |
| Background check | | 0.098 (0.032)*** | 0.051 (0.023)** |
| Non-gun suicide | | | |
| Waiting period | −0.016 (0.034) | −0.064 (0.041) | −0.029 (0.029) |
| Background check | | 0.186 (0.044)*** | 0.087 (0.032)*** |

This table mirrors Table 1, but models are not population-weighted. *$P < 0.10$; **$P < 0.05$; ***$P < 0.01$.

**Table S10.** Unweighted estimates of the effects of handgun waiting periods and background checks on violence: Brady period

| Type of violence | Brady period, 1990–1998 | | |
| --- | --- | --- | --- |
| | (1) | (2) | (3) |
| All homicide | | | |
| Waiting period | −0.047 (0.033) | −0.048 (0.035) | −0.012 (0.040) |
| Background check | | 0.003 (0.035) | −0.019 (0.043) |
| Gun homicide | | | |
| Waiting period | −0.081 (0.044)* | −0.070 (0.048) | −0.015 (0.051) |
| Background check | | −0.032 (0.053) | −0.045 (0.065) |
| Non-gun homicide | | | |
| Waiting period | 0.005 (0.034) | −0.006 (0.039) | 0.009 (0.039) |
| Background check | | 0.033 (0.037) | −0.012 (0.038) |
| All suicide | | | |
| Waiting period | 0.018 (0.016) | 0.023 (0.017) | 0.008 (0.017) |
| Background check | | −0.014 (0.022) | 0.000 (0.014) |
| Gun suicide | | | |
| Waiting period | −0.019 (0.019) | −0.019 (0.023) | −0.010 (0.019) |
| Background check | | −0.000 (0.026) | −0.017 (0.017) |
| Non-gun suicide | | | |
| Waiting period | 0.040 (0.019)** | 0.035 (0.020)* | 0.015 (0.022) |
| Background check | | 0.013 (0.024) | 0.036 (0.023) |

This table mirrors Table 1, but models are not population-weighted. *$P < 0.10$; **$P < 0.05$.

**App. 0499**

**Table S11.   Effects of handgun waiting periods on violence, 1970–2014**

| | Homicides | | | Suicides | | |
|---|---|---|---|---|---|---|
| | All | Gun | Non-gun | All | Gun | Non-gun |
| Variable | (1) | (2) | (3) | (4) | (5) | (6) |
| Waiting period | −0.132** | −0.186** | −0.035 | −0.024** | −0.074*** | −0.006 |
| | (0.050) | (0.071) | (0.037) | (0.011) | (0.017) | (0.033) |
| Background check | 0.025 | 0.022 | 0.036 | 0.023 | 0.029 | 0.084** |
| | (0.081) | (0.107) | (0.057) | (0.020) | (0.028) | (0.031) |
| Alcohol consumption | 0.155** | 0.142* | 0.198*** | 0.144*** | 0.147*** | 0.128*** |
| | (0.065) | (0.075) | (0.071) | (0.039) | (0.045) | (0.045) |
| Poverty | −0.004 | −0.006 | −0.003 | 0.001 | 0.002 | −0.005 |
| | (0.006) | (0.007) | (0.005) | (0.002) | (0.002) | (0.004) |
| Income | −0.002 | 0.003 | −0.003 | −0.009*** | −0.011** | −0.021*** |
| | (0.011) | (0.013) | (0.011) | (0.003) | (0.004) | (0.005) |
| Urban | 0.002 | 0.001 | 0.003 | 0.003 | 0.002 | 0.009** |
| | (0.006) | (0.007) | (0.006) | (0.003) | (0.003) | (0.004) |
| Black | 0.035* | 0.040* | 0.022 | 0.004 | 0.024* | −0.011 |
| | (0.020) | (0.023) | (0.016) | (0.009) | (0.012) | (0.010) |
| Age under 14 y | 0.033 | 0.057 | 0.005 | −0.003 | 0.002 | 0.013 |
| | (0.038) | (0.055) | (0.027) | (0.015) | (0.017) | (0.021) |
| Age 15–17 y | −0.136** | −0.106 | −0.145* | −0.084** | −0.171*** | −0.068 |
| | (0.062) | (0.077) | (0.073) | (0.035) | (0.040) | (0.052) |
| Age 18–24 y | 0.015 | 0.017 | 0.014 | 0.002 | 0.037* | 0.010 |
| | (0.046) | (0.061) | (0.047) | (0.020) | (0.021) | (0.025) |
| Age 25–34 y | −0.035 | −0.038 | −0.015 | 0.016 | 0.013 | 0.041 |
| | (0.034) | (0.045) | (0.029) | (0.019) | (0.022) | (0.026) |
| Age 35–44 y | −0.008 | −0.038 | 0.044 | −0.009 | 0.005 | 0.024 |
| | (0.051) | (0.063) | (0.047) | (0.017) | (0.023) | (0.023) |
| Age 45–54 y | 0.056 | 0.107** | 0.009 | 0.037** | 0.027 | 0.016 |
| | (0.034) | (0.046) | (0.029) | (0.016) | (0.020) | (0.028) |
| Age 55–64 y | 0.029 | −0.025 | 0.126*** | 0.020 | 0.022 | 0.090** |
| | (0.061) | (0.085) | (0.044) | (0.022) | (0.033) | (0.036) |
| Observations | 1,938 | 1,936 | 1,937 | 1,938 | 1,938 | 1,938 |
| Adjusted $R^2$ | 0.91 | 0.90 | 0.85 | 0.92 | 0.97 | 0.84 |

This table reports coefficients for all variables included in model 3 of Table 1. The dependent variable is the natural logarithm of adult deaths (21+) per 100,000 adult residents. The observation count for gun homicides is two less than the full sample count because North Dakota had no adult gun homicides in 2008 and Vermont had no adult gun homicides in 2009. The observation count for non-gun homicides is one less than the full sample count because North Dakota had no adult non-gun homicides in 2003. All models include state and year fixed effects. SEs, shown in parentheses, are clustered by state. $*P < 0.10$; $**P < 0.05$; $***P < 0.01$.

**App. 0500**

NBER WORKING PAPER SERIES

AGE AND SUICIDE IMPULSIVITY:
EVIDENCE FROM HANDGUN PURCHASE DELAY LAWS

John J. Donohue
Samuel V. Cai
Arjun Ravi

Working Paper 31917
http://www.nber.org/papers/w31917

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
November 2023

John Donohue has at various times served as an expert witness in litigation involving firearm regulation. The views expressed herein are those of the authors and do not necessarily reflect the views of the National Bureau of Economic Research.

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2023 by John J. Donohue, Samuel V. Cai, and Arjun Ravi. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

Age and Suicide Impulsivity: Evidence from Handgun Purchase Delay Laws
John J. Donohue, Samuel V. Cai, and Arjun Ravi
NBER Working Paper No. 31917
November 2023
JEL No. H0,I0,I18,K0,K32

## **ABSTRACT**

We provide the first quasi-experimental estimates of variation in suicide impulsivity by age by examining the impact of firearm purchase delay laws by age. Prior studies of firearm purchase delay laws use traditional two-way-fixed-effects estimation, but we demonstrate that bias due to heterogenous treatment effects may have inflated previous estimates relative to our stacked-regression approach. We also develop a triple-difference stacked-regression estimator to confirm the robustness of our results. We find that purchase delay laws reduce firearm suicide for the overall adult population, but this effect is largely driven by a 6.1 percent reduction in firearm suicides for young adults ages 21-34. We demonstrate that the relationship between purchase delay laws and firearm suicide reduction weakens with age and is not driven by gun ownership rates. We argue that this is due to the impulsiveness of young adults in committing suicide, indicating that removing firearm access for young adults may provide a critical deterrent to suicide.

John J. Donohue
Stanford Law School
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305
and NBER
donohue@law.stanford.edu

Samuel V. Cai
Yale Law School
sam.cai@yale.edu

Arjun Ravi
University of Oxford
arjun.ravi@stx.ox.ac.uk

# Age and Suicide Impulsivity: Evidence from Handgun Purchase Delay Laws

John Donohue, Samuel Cai, and Arjun Ravi   *

## 1   Introduction

In 2021, about 12.3 million American adults had serious suicidal ideation, and 48,000 people died by suicide (CDC, 2023). Given the gravity and prevalence of deaths by suicide, preventing suicide is an increasingly important policy priority and research interest. 988, the Department of Health and Human Services's new Suicide and Crisis Lifeline launched in 2022, has received nearly a billion dollars in federal funding alone (HHS, 2023). Economists have identified important predictors of suicide, such as social cohesion (Becker and Woessman, 2018), income inequality (Daly, Wilson and Johnson, 2013), and unemployment (Breuer, 2014), highlighting the impact of economic and social policy on suicidality. Moreover, economic research has directly measured the beneficial effects of particular policies on suicide rates, such as cash transfers (Christian, Hensel and Roth, 2019), unilateral divorce (Stevenson and Wolfers, 2006), and required mental health benefits as part of health insurance coverage (Lang, 2013). One significant challenge in translating these research findings to policy, however, lies in the fact that much of the economic research studies the effects of socio-economic phenomena and policies on a large and diverse group of adults. As such, the overall findings in these studies may mask substantial heterogeneous effects within different subpopulations. In particular, descriptive evidence indicates that patterns and circumstances of suicide vary substantially across age, suggesting that the effect sizes of various suicide prevention policies may also vary by age (McLone et al., 2016).

One key difference in risk for suicide between younger and older adults is the difference in impulsivity[1] between these two groups. Psychologists and public health researchers have posited several linkages between impulsive tendencies and suicidal behavior, with some attributing suicide

*Donohue: Stanford Law School and NBER (email: jjd@law.stanford.edu). Cai: Yale Law School (email: sam.cai@yale.edu). Ravi: University of Oxford (email: arjun.ravi@stx.ox.ac.uk). We are grateful to Matthew Bondy, Henry Manley, Richard Sweeney, and Dustin Swonder for comments on the paper. Amy Zhang provided outstanding research assistance.

[1]While there exist many measures of impulsivity (Mccullumsmith et al., 2014), we define an impulsive suicide as one that could be prevented by a delay in access to a chosen suicide mechanism, namely firearms. This definition of impulsive suicide follows naturally from our study context, and it is a reasonable definition of impulsive suicide for policymakers and public health officials. Additionally, given that elevated states of suicidal thinking typically only last on average a few hours, the interventions we study that delay firearm purchase by several days will encapsulate most short-term episodes of elevated suicidal thinking (Coppersmith et al., 2023).

App. 0503

outcomes directly to elevated impulsivity compared to nonsuicidal mental patients and healthy controls (Anestis et al., 2014; Conner et al., 2004; Dumais et al., 2005). Additionally, McGirr et al. (2008) finds that the impulsivity-suicidality relationship weakens with age. However, there is an absence of quasi-experimental evidence quantifying this relationship. Motivated by this gap in estimating the relationship between age and suicide impulsivity, we use handgun purchase delay laws as an avenue to investigate how disruptions in impulsive firearm[2] suicide plans may have heterogeneous impacts by age. Leveraging differential timing in the adoption and repeal of purchase delay laws, our difference-in-differences estimates suggest that impulsivity directly increases suicide risk through the sudden ideation of suicide plans that could be disrupted by a "cooling off" period and that suicidal impulsivity in adults wanes with age.

Beginning with Cook and Ludwig (2000), which studied the effect of the waiting period provision of the 1994 Brady Handgun Violence Prevention Act, economists have long identified the beneficial effects of adopting firearm purchase delay laws. The Brady Act instituted a five-day waiting period on handgun purchases from federally licensed firearm dealers between February 1994 and November 1998. While Cook and Ludwig (2000) find an imprecisely estimated negative effect of the Brady Act on firearm suicides, more recent studies leveraging longer panels and more treatment variation (beyond Brady) find evidence of statistically significant declines in firearm suicide as a result of handgun purchase delay laws (Edwards et al., 2017; Luca, Malhotra and Poliquin, 2017). We confirm the direction of these prior findings on firearm suicide across all adults, and demonstrate that the "cooling-off" effect of state-mandated delays in handgun purchase leads to a larger decline in firearm suicides for young adults than for older adults.

Beyond providing the first evidence on the differential impacts of purchase delay laws' ability to disrupt suicidal plans by age group, our paper brings superior data to bear on this issue while making a key methodological contribution to the literature. First, previous research on the effect of purchase delay laws on suicide, as well as the broader economic literature on firearms and suicide, has primarily relied on state-year panel data (Depew and Swensen, 2022; Lang, 2012). Instead, we obtained restricted access CDC mortality files that enabled us to use county-year as the unit of observation in our panel data, thereby generating more precisely estimated effect sizes than models using comparable state-year panels.[3]

Second, we develop and implement estimators that are robust to heterogeneous treatment effects. In recent years, researchers have developed new approaches to difference-in-differences estimators (Roth et al., 2023) that are not biased by differential treatment effects across groups in staggered treatment adoption settings. We use a stacked regression approach popularized by Cengiz et al. (2019), which, like the local projection difference-in-differences approach (Dube et al., 2023), is flexible to non-absorbing treatments and specifications with interaction terms as a variable treatment.[4] Additionally, we introduce a novel stacked triple-differences estimator to confirm the robustness of our main findings.

The remainder of this paper proceeds as follows. Section 2 describes the data used to complete

---

[2]Our paper specifically looks at firearm suicide, and we do not suggest that our results on suicide impulsivity are generalizable to non-firearm suicides, although they may be.

[3]We show results from comparable state-year panels in the Appendix.

[4]We do not use interaction terms in our main specification but some of our robustness checks do include them.

App. 0504

our empirical analysis. Section 3 presents our methodology. Section 4 presents and discusses our empirical estimates. Section 5 concludes.

## 2   Data

Our county-level data spans all states from 1987-2019, with our sample limited to counties included in the American Community Survey (ACS) in 2019. Our outcome of interest is firearm suicide among adults subdivided into three different age groups, which we measure by aggregating individual-level CDC mortality data to the county-year level. We also create a cause-of-death category for non-firearm suicide. We use the RAND Corporation's state firearm law database (Cherney et al., 2022) to identify changes in handgun waiting period laws (state-mandated delay in receiving a handgun after the initial intent to purchase), handgun permit-to-purchase laws, and background check laws for firearms purchased from federally licensed dealers. Consistent with the prior literature on handgun purchase delay laws, we consider a state to have a purchase delay regime if it has either an active waiting period law or a permit-to-purchase law.[5] In practice, permit-to-purchase laws always lead to nonzero administrative turnaround time to purchase a handgun. Between the late 1920s and the early 1990s, 21 states introduced handgun waiting period laws, with a minimum of 2 days and a maximum of 15 days, and often accompanied by a background check. In 1994, under the federal Brady Handgun Violence Prevention Act, the remaining 29 states adopted a 5-day waiting period and background check. The Brady waiting period requirement was sunsetted after five years and replaced by the National Instant Criminal Background Check System (NICS) in November 1998. Sixteen states stopped enforcing handgun waiting periods at seven points spanning 1996 through 2015.

Our specifications also include socioeconomic and demographic controls associated with suicide. We collected information on state-year level ethanol consumption from The National Institute on Alcohol Abuse and Alcoholism (Kaplan, 2021a). For our primary regressions, we obtain county-year level covariates (population density, household income, percent in poverty, percent Black, percent 21-34, and percent 35-54) from US Census data via Social Explorer (Census, 2023). Data was linearly interpolated in non-Census years. Our dataset contains approximately the largest quarter of US counties by population and 85 percent of the total US population in 2019.

In supplemental results, we study the impact of household gun ownership on the effect of handgun purchase delay laws, constructing a state-age group estimate of household gun ownership using data from the University of Chicago's General Social Survey (Smith and Son, 2015) and estimates from the RAND Corporation (Schell et al., 2020) from 1987-2018. For this state-level analysis, we obtain state-age-year-level (household income, percent in poverty, percent Black, percent living in a metropolitan statistical area) covariates from the US Census via IPUMS (Ruggles et al., 2023). More details on our household gun ownership proxy and other data sources can be found in the Data Appendix.

---

[5]We round the date of adoption or repeal of these laws to the nearest year.

**App. 0505**

# 3   Methods

Our approach leverages differential timing in the adoption and repeal of handgun purchase delay laws across US states using a difference-in-differences design. As described by Goodman-Bacon (2021), estimates recovered from staggered-adoption difference-in-difference analyses are a weighted average of individual 2x2 difference-in-difference comparisons. Some of these comparisons, such as using an earlier-treated group as a control for a later-treated group, yield biased estimates if there are heterogeneous treatment effects across treated groups. To overcome this issue in our analysis, our main results use a stacked-regression approach that is robust to heterogeneous treatment effects (Baker, 2022).

For the estimation of our main results, we first construct a dataset specific to each treatment event, $h$, defined as the adoption or repeal of a purchase delay law in a particular year. Each event $h$-specific dataset includes all counties whose treatment status was affected by event $h$ and all clean control countries across a 10-year panel by event time, from $t = (-5, \ldots, 4)$. Our preferred approach for control groups is to use only never adopters or always adopters, depending on whether the treatment event is the adoption or the repeal of a purchase delay law. We select the control group that matches the treatment status of the county prior to event $h$.[6]

We stack all event $h$-specific datasets together to calculate an average effect of purchase delay laws across all events (Cengiz et al., 2019). We employ a Poisson regression model, since a count model is most appropriate for our empirical context. We prefer a Poisson fixed effects model over a negative binomial model because the negative binomial fixed effect approach does not properly account for time-constant variables (Wooldridge, 1999). Our main specification takes the following form:

$$Y_{it} = \alpha + \beta PurchaseDelay_{it} + \sum_{j \in M} \gamma_h^{'} \chi_{it} I(h = j) + \delta_{ih} + \lambda_{th} + \epsilon_{ith}$$

where $Y_{it}$ represents the number of firearm suicides in county $i$ in year $t$, and $X_{it}$ represents a set of covariates, and $M$ represents the set of all stacks $h$.[7] The coefficient represents the average estimated treatment effect of adopting a purchase delay law on firearm suicides with stack-specific county and year fixed effects. Standard errors are clustered at the state-stack level, since all purchase delay laws in our sample are changed at the state level, and thus the state is the level at which "random assignment" occurs. In all specifications, we use population as an exposure variable.[8]

---

[6]In other words, the control group for adopter treatment-stacks would be the never-treated group. The control group for the repealer stacks would be the always-adopter group.

[7]For our regressions analyzing the impact of purchase delay laws on firearm suicides across all adults aged 21 and over, the covariates are ethanol consumption (measured at the state-year level), the presence of a required background check for firearm purchase from a federally licensed dealer (which applies nationally after 1994, but was in place earlier for 21 states), population density, median household income, percent of people living below the poverty line, percent of people who are Black, the percentages of people within the age groups 21-34, 35-54, and 55 and over, and population as an exposure variable. For our analyses of firearm suicides for a subset of adults, we use all the same covariates, except we do not include the percentages of people within various age groups as controls.

[8]When using count data as an outcome variable, the incidence of the event of interest in an observed group is affected by the size of the group and length of observation; in our context, the larger of two counties with the same suicide rate will see more individual suicides. We choose to include population as an exposure variable simply to constrain its coefficient to less than 1, reflecting our expectation that a one-person increase in population will not lead to a one-incident increase in suicides. In practice, including population as a regular explanatory variable minimally

We estimate the average effect of purchase delay laws on firearm suicides across different age groups using the static model presented above and then provide event-study analyses that allow us to assess the conditional parallel trends assumption. Our event study regresses firearm suicides on a set of yearly dummies for each of the 5 years prior and 4 years after a change in purchase delay laws, omitting the dummy for one year prior to adoption. The following equation shows the regression model underlying the event study analyses, where $\psi_h$ is equal to the year of the relevant event for stack $h$ and $\theta_h$ is equal to 1 if the stack $h$ pertains to an adoption event and -1 if the stack $h$ pertains to a repeal event:

$$Y_{it} = \alpha + \sum_{k \in (-5,-4,\ldots,3,4)/(-1)} \beta_k I[t = \psi_h + k]\theta_h + \gamma' X_{it} \sum_{j \in M} I(h = j) + \delta_{ih} + \lambda_{th} + \epsilon_{ith}$$

The stacked-regression approach relies on a dataset constructed of many treatment event-specific datasets that include only the treated groups and "clean" control groups. Among many new estimators that are robust to heterogeneous treatment effects, the stacked-regression estimator has many attractive properties that make it suitable for our empirical setting. First, the stacked-regression estimator is flexible to the non-absorbing treatment setting and allows us to select the control groups that would be expected to most closely predict the counterfactual path of the treatment group. The estimator is also easily adaptable to include interaction terms to study the treatment's effectiveness conditional on a second variable. Additionally, the stacked-regression estimator, like many new robust estimators, relies on weaker assumptions in the inclusion of covariates than traditional two-way fixed effects estimators. In particular, the stacked-regression restricts covariate estimation to only the time period of each stack, rather than assuming a uniform estimate of impact of a selected covariate across all group-time observations in the data. Lastly, while the other new estimators that correct for bias in TWFE are restricted to OLS models, the stacked estimator allows for Poisson regression as well.

## 4   Results

### 4.1   Main Specification

We begin by estimating the effect of purchase delay laws on the firearm suicide rate of the entire adult population as well as within three age groups: the young (21-34), middle-aged (35-54), and old (55+) age groups. Table 1 presents these results from both our preferred stacked estimation approach as well as results using a traditional (non-stacked) TWFE estimation approach.[9] The estimates presented in Table 1 and throughout the paper (unless otherwise noted) use incident-rate-ratios (IRRs) for ease of interpretation.

---

changes our results.

[9]The non-stacked TWFE estimation follows a specification similar to stacked estimates. The general regression equation for the non-stacked estimation is: $Y_{it} = \alpha + \beta PurchaseDelay_{it} + \chi'_{it} + \delta_i + \lambda_t + \epsilon_{it}$.

App. 0507

**Table 1:** Purchase Delay Laws Effect on Firearm Suicide by Age Group, 1987-2019

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| **Stacked Results** | | | | |
| Handgun Purchase Delay | 0.967* | 0.939** | 0.973 | 0.976 |
|  | (0.013) | (0.019) | (0.019) | (0.018) |
| Age | All Adults 21+ | Young | Middle Aged | Old |
| N | 25580 | 25580 | 25580 | 25560 |
|  | (1) | (2) | (3) | (4) |
| **Non-Stacked TWFE Results** | | | | |
| Handgun Purchase Delay | 0.930*** | 0.905*** | 0.897*** | 0.943** |
|  | (0.014) | (0.020) | (0.020) | (0.017) |
| Age | All Adults 21+ | Young | Middle Aged | Old |
| N | 24849 | 24849 | 24849 | 24849 |

$^{***}p < 0.01$, $^{**}p < 0.05$, $^{*}p < 0.1$

Note: County-level Poisson panel data estimates with state and year fixed effects, 1987-2019. Cluster-robust standard errors with clustering at the state level shown in parentheses. All models include covariates as described in Section II. All regressions use population as an exposure variable.

Because our research design exploits the staggered adoption and repeal of purchase delay laws, a traditional non-stacked TWFE estimator is vulnerable to bias for the reasons stated in Section III. Although the bias can theoretically favor any direction, Table 1 reveals that using a non-stacked estimator substantially overstates the beneficial impact of purchase delay laws on reducing firearm suicides. While our non-stacked results are not directly comparable to those of previous papers studying the impact of purchase delay laws because of our county-level data, Poisson regression specification, and slightly different time period and covariates, our results provide suggestive evidence that prior research on purchase delay laws may have yielded biased estimates due to invalid comparisons embedded within the TWFE estimator.

Given the flaws in the non-stacked TWFE estimator, for the remainder of the paper, we only discuss results from our preferred stacked estimator. For the overall adult population, we find that the presence of a purchase delay decreases the incidence of firearm suicide by a modest yet statistically significant 3.3% (IRR=.967). This overall estimate, however, masks heterogeneity of effect size by age, as shown by columns (2) through (4). The overall effect on adults is driven largely by the young age group, whose estimate is almost two times as large as the overall population: adults aged 21-34 experience a 6.1% (IRR=.939) drop in firearm suicide.[10] For middle-aged and

---

[10] A two sample t-test confirms that the drop in firearm suicides due to handgun purchase delay laws is statistically

6

older adults, we estimate weaker, non-statistically significant effects. In the Appendix, we show that purchase delay laws have a null effect on non-firearm suicide, providing evidence that there are minimal spillover effects of handgun purchase delays into non-firearm suicides. That is, individuals are not resorting to other means to commit suicide, and the reduction in suicides by purchase delay laws is an absolute decrease in total suicides.

In Figure 1, we also present event plots corresponding to the analyses in Table 1.[11] We find no evidence of non-parallel pre-trends across age groups.[12]

**Figure 1:** Purchase Delay Laws Effect on Firearm Suicide by Age Group, 1987-2019, Poisson Stacked Event Plot



Note: 95 percent confidence intervals with cluster-robust standard errors displayed.

## 4.2   Triple-Difference Estimation

To confirm that our results are not driven by trends in risky behaviors like suicide relative to adoption or repeal of handgun purchase delay laws, we introduce a novel triple-difference stacked regression approach. Our triple-difference analysis compares the effect of handgun purchase delay laws on trends in firearm suicides and arrests made for driving under the influence (DUI). We argue that DUI arrests reflect a risky behavior that may proxy for the underlying level of the self-endangering "acquired capability" for suicide that is described in Joiner (2007). We prefer to use

---

larger for young adults than it is for middle aged or older adults at the p<.01 level.

[11]To clarify the figure visually, we run event study analyses for young adults and all other adults rather than having four different event study analyses corresponding to the four columns of Table 1. The event studies directly corresponding to each column of Table 1 are qualitatively similar and are available upon request.

[12]The p-value on the F-test of pre-passage dummies is p=0.60 and p=0.62 for the young adults and all other adults respectively.

7

DUI arrests because they do not vary significantly over time, unlike many other lower-level arrests.[13] Our triple-difference specification assumes that the rate of firearm suicides would have evolved in parallel with the rate of DUI arrests in a county, were it not for the adoption or repeal of a purchase delay. This design flexibly absorbs state-year shocks unrelated to purchasing law changes such as economic conditions or national changes in suicidality.

We aggregate age-specific arrest data from the FBI's Uniform Crime Reporting (UCR) Program (Kaplan, 2021$b$) from the agency-level up to the county-level, following a conservative imputation procedure for missing months and dropping agencies that do not report all sample years, as outlined in the Appendix. We estimate the triple-difference using the following equation:

$$Y_{itd} = \alpha + \beta \cdot PurchaseDelay_{it} \cdot I\{d = FS\} + \delta_{ihd} + \lambda_{ith} + \sigma_{dth} + \epsilon_{ithd}$$

where $d$ represents whether the outcome being observed is firearm suicides (FS) or DUIs.

Results from our stacked-regression approach are displayed in Table 2. The event-study plot is shown in the Appendix. We find that our triple-difference results are consistent with and buttress the findings from our main stacked specification in Table 1. Young adults aged 21-34 see a large, significant drop in firearm suicides of roughly 10% while the depressing effect of purchase delay laws on suicides for older adults is far more muted and not statistically significant.

**Table 2:** Purchase Delay Laws Effect on Firearm Suicide, 1987-2019, Triple Difference Stacked Estimates

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Handgun Purchase Delay | 0.953 | 0.897*** | 0.960 | 0.972 |
|  | (0.034) | (0.038) | (0.038) | (0.043) |
| Age | All Adults 21+ | Young | Middle Aged | Old |
| N | 31520 | 31320 | 31480 | 31200 |

***$p < 0.01$, **$p < 0.05$, *$p < 0.1$

Note: County-level Poisson panel data estimates with state and year fixed effects, 1987-2019. Cluster-robust standard errors with clustering at the state-level shown in parentheses. Due to lack of DUI observations for treated groups, we do not include the 2001 or 2009 treatment events in our triple difference analysis.

---

[13]Other potential control groups could have been non-firearm suicides, drug overdoses, or deaths due to alcoholic liver disease. Case and Deaton (2020) have considered suicides, drug overdoses, and deaths due to alcoholic liver disease collectively to be "deaths of despair'," making these other categories of deaths seem like viable control groups. However, using non-firearm suicides in our triple-difference specification would be problematic due to potential spillover effects that would bias results away from zero (although we find no evidence of substantial spillover). Additionally, deaths by alcoholic liver disease are not a practical outcome given our interest in age-specific suicide risk because young people very rarely die of cirrhosis or other alcoholic liver diseases, making this an inappropriate comparison given our interest in age-specific suicide risk. Finally, drug overdoses display significant trends over our study period due to the crack and opioid epidemics. Thus, we opt not to rely on any of the categories traditionally classified as deaths of despair.

### 4.3   Single Age Estimation

The age groups presented in our Table 1 and Table 2 analyses were based on data availability in our *county*-level population data. However, we now show that our results showing the increased effectiveness of purchase delay laws on reducing firearm suicide in young adults are not simply an artifact of these age cutoffs. To do this, we run our preferred specification for each individual age at the *state*-level.[14] In Figure 2, we plot coefficients of purchase delay laws for every age between 21-85 using a state-year panel. The resulting regression line shows that purchase delay laws dampen suicides for the youngest adults by about 9 percent but the effect falls to zero by around age 75.[15] The figure provides compelling evidence of the relationship between impulsive suicide and age. The suicide-dampening effect of purchase delay laws subsides as age increases, demonstrating that however we set age group cutoffs, the effect is most prominent for young people.

**Figure 2:** Purchase Delay Laws Effect on Firearm Suicide by Single Age at State Level, 1987-2019



Note: State-level panel data Poisson estimates with state and year fixed effects, 1987-2019. Cluster-robust standard errors with clustering at the state level shown in parentheses. All models include covariates as described in Section II, with coefficients reported per single age. All regressions use population as an exposure variable.

---

[14]We use the same model as we used for our county-level results shown in Table 1. While we still control for socioeconomic and demographic conditions, we use slightly different covariates due to data availability. In the state level regressions, we control for: the presence of a required background check for firearm purchase from a federally licensed dealer, ethanol consumption, percent of individuals living in metropolitan statistical areas, household income per capita, percent of individuals who are Black, and population as an exposure variable. We perform this analysis at the state-level to increase the average population of our geographic unit of analysis since studying single ages will dramatically reduce the population represented by each observation.

[15]The slope of the fitted line is .001 with a p-value of .001.

## 4.4  Gun Ownership and Effect Size

For purchase delay laws to work, we assume that individuals do not already have a firearm accessible to them and must purchase a new firearm. One possible omitted variable that we are not able to control for in the county-level results is a measure of gun prevalence. It could be that young people are mechanically most impacted by purchase delays because they have a lower level of pre-existing household gun ownership. However, we now show that our results hold at the state-level when we for gun ownership.[16] We consider how the effectiveness of purchase delay laws vary by *both age and household gun ownership.* We use a dataset at the state-age group-year observation level[17] and run the following interaction models shown in columns 1 and 2 of Table 3, respectively:

$$Y_{stk} = \alpha + \beta_1 x_1 + \beta_2 x_2 + \beta_3 x_1 x_2 + \beta_4 x_1 o + \beta_5 x_1 m + \sum_{j \in M} \gamma_h' \chi_{it} I(h = j) + \delta_{skh} + \lambda_{tkh} + \epsilon_{stkh}$$

$$Y_{stk} = \alpha + \beta_1 x_1 + \beta_2 x_2 + \beta_3 x_1 x_2 + + \beta_4 x_1 p + \sum_{j \in M} \gamma_h' \chi_{st} I(h = j) + \delta_{skh} + \lambda_{tkh} + \epsilon_{stkh}$$

where $Y_{stk}$ represents the logged firearm suicide rate in state $s$ in year $t$ in age-group $k$, $x_1$ is equal to $PurchaseDelay_{st}$ as shown in previous equations; $x_2$ is equal to household gun ownership at time $t$ for age group $k$ in state $s$; $o$ represents a dummy variable equal to 1 for the old age group and 0 for all other groups; $m$ represents a dummy variable equal to 1 for the middle age group and 0 for all other groups; and $p$ is a dummy variable equal to 0 for the young adult age group, 1 for the middle-aged group, and 2 for the old age group. The second model assumes an equal gap between the young, middle-aged, and older adults, as is implied by Figure 2, whereas model 1 uses a more flexible approach. Because the unit of analysis is at the state-age bucket level rather than the county-age bucket level, we opt to use a OLS regression instead of a Poisson estimation. We weight our regression by population.

---

[16]We note that throughout the 1980s and 1990s, which includes the time period of the Brady Act waiting period that contributes a substantial part of the treatment variation in our data, household gun ownership rates were not meaningfully different for young adults and elderly adults.

[17]Reliable and nationally representative measures of gun ownership are only available at the state level, requiring us to move to the state level rather than the county level. For reference, when weighted by state population, the mean gun ownership in our sample is 37% with a standard deviation of 3.5%.

**Table 3:** Purchase Delay Laws Effect on Firearm Suicide by Age Group and Gun Ownership at State Level, 1987-2019, OLS Stacked Estimates

|  | (1) | (2) |
|---|---|---|
| Handgun Purchase Delay | -0.158*** | -0.161*** |
|  | (0.043) | (0.043) |
| Gun Ownership | -0.002* | -0.002* |
|  | (0.001) | (0.001) |
| Middle Effect (Relative to Young) | 0.019 |  |
|  | (0.037) |  |
| Old Effect (Relative to Young) | 0.054 |  |
|  | (0.038) |  |
| Gun Ownership x Handgun Purchase Delay | 0.002** | 0.002** |
|  | (0.001) | (0.001) |
| Effect As Age Bucket Increases |  | 0.028 |
|  |  | (0.019) |
| Observations | 4050 | 4050 |

*** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$

Note: State-age group level panel data estimates, 1987-2019. Cluster-robust standard errors with clustering at the state level shown in parentheses. Gun ownership is not controlled for separately for each individual stack, but rather a single variable across all stacks, for purposes of presentation. When we control for gun ownership separately by stack, we find similar results on each coefficient. Note that the estimates shown here are not IRRs.

These results suggest that even controlling for gun ownership, purchase delay laws have a strong negative effect on suicides. The results also support the conclusion that the effect weakens as age increases, although using our state-level panel makes it more difficult to precisely measure these effects. Overall, the findings provide evidence consistent with the public health and medical literatures suggesting suicide is an impulsive act for young people and access to a firearm eases barriers for them to commit suicide.

## 4.5   Further Robustness

In addition to providing evidence supporting the conclusion that our main results are robust to underlying trends in firearm suicides (relative to handgun purchase delay law adoption or repeal), varied age cutoffs, and variation in household gun ownership rates, we perform a battery of further robustness checks to confirm the validity of our findings in the Appendix. We use alternate covariates and clustering variables and find qualitatively similar results. We also show that the effects we

**App. 0513**

identify are not driven by a few large counties that may be outliers. Further, we show that other demographic variables such as race and gender are relatively stable across young, middle aged, and older adult suicides, indicating that the heterogenous effects we identify by age are likely not due to confounding by another demographic variable. Moreover, our paper, like all prior studies of handgun purchase delay laws, combines the study of both the adoption and repeal of purchase delay laws. In the Appendix, we provide evidence that these effects are roughly reciprocal and can be studied simultaneously. Lastly, we show that our results hold at the state-level.

## 5   Conclusion

Our paper makes three significant contributions to the economics literature on the effect of handgun purchase delay laws on firearm suicide and impulsivity in firearm suicide. First, it adds to the mounting literature documenting bias in estimates from two-way-fixed-effects models and uses a stacked regression approach to address this issue. Our analysis found that this bias was fairly substantial. Specifically, we find that two-way fixed effects models estimate larger effect sizes than those using a stacked regression approach, which suggests that prior literature on the topic may have inflated the magnitude of the benefits of handgun purchase delay laws as a policy intervention in reducing firearm suicide. Second, we use triple-difference stacked estimation to demonstrate the robustness of our main findings, the first paper that we know of to use this technique. Our stacked triple-difference estimator can be flexibly deployed across many empirical settings and overcomes a separate threat to identification that cannot be addressed simply by using a stacked regression difference-in-differences approach. Third, by breaking down the traditional analysis of purchase delay laws and suicide into age groups within our stacked approach, we were able to identify substantial heterogeneity by age group – establishing that the primary benefit of purchase delay laws is to significantly reduce suicides by young adults. In doing so, we are the first study to quasi-experimentally identify and estimate the relationship between age and suicide impulsivity, confirming many hypotheses of the relationship with estimates.

Our paper adds support to the idea, so far understudied by economists, that young people are impulsive in their decision to commit suicide. Our empirical approach also indicates that more research on suicide should test for heterogenous treatment effects by age group. Doing so may provide additional clarity and robustness to researchers as well as important information to policymakers. There are also rich opportunities for further research. For example, to confirm the suicide-impulsivity hypothesis beyond firearm suicide, researchers may look at policies associated with non-firearm suicide by age. Ultimately, further research into understanding how different populations are affected by suicide prevention policies will help policymakers carefully tailor their approach to suicide prevention and more effectively fight this public health crisis.

**App. 0514**

# References

**Anestis, Michael, Kelly Soberay, Peter Gutierrez, Theresa Hernández, and Thomas Joiner.** 2014. "Reconsidering the Link Between Impulsivity and Suicidal Behavior." *Personality and Social Psychology Review*, 18(4).

**Baker, Andrew.** 2022. "How much should we trust staggered difference-in-differences estimates?" *Journal of Financial Economics*, 144(2): 370–395.

**Becker, Sascha, and Ludger Woessman.** 2018. "Social Cohesion, Religious Beliefs, and the Effect of Protestantism on Suicide." *Review of Economics and Statistics*, 100(3): 377–391.

**Breuer, Christian.** 2014. "Unemployment and Suicide Mortality: Evidence from Regional Panel Data in Europe." *Health Economics*, 24(8): 936–950.

**Case, Anne, and Angus Deaton.** 2020. *Deaths of Despair and the Future of Capitalism.* Princeton University Press.

**CDC.** 2023. *Facts About Suicide.* CDC.

**Cengiz, Doruk, Arindrajit Dube, Attila Lindner, and Ben Zipperer.** 2019. "The Effect of Minimum Wages on Low-Wage Jobs." *The Quarterly Journal of Economics*, 134(3): 1405–1454.

**Census.** 2023. "Census Data." *Social Explorer.*

**Cherney, Samatha, Andrew Morral, Terry Schell, Sierra Smucker, and Emily Hoch.** 2022. "Development of the RAND State Firearm Law Database and Supporting Materials." *RAND.*

**Christian, Cornelius, Lukas Hensel, and Christopher Roth.** 2019. "Income Shocks and Suicides: Causal Evidence From Indonesia." *The Review of Economics and Statistics*, 101(5): 905–920.

**Conner, Kenneth, Sean Meldrum, William Wieczorek, Paul Duberstein, and John Welte.** 2004. "The Association of Irritability and Impulsivity with Suicidal Ideation Among 15- to 20-Year-Old Males." *Suicide and Life-Threatening Behavior*, 4(34): 337–349.

**Cook, Philip J, and Jens Ludwig.** 2000. "Homicide and Suicide Rates Associated With Implementation of the Brady Handgun Violence Prevention Act." *JAMA*, 284(5): 585–591.

**Coppersmith, Daniel, Oisín Ryan, Rebecca Fortgang, Alexander Milner, Evan Kleiman, and Matthew Nock.** 2023. *Mapping the timescale of suicidal thinking.* Vol. 120, PNAS.

**Daly, Mary, Daniel Wilson, and Norman Johnson.** 2013. "Relative Status and Well-Being: Evidence from U.S. Suicide Deaths." *The Review of Economics and Statistics*, 95(5): 1480–1500.

13

**Depew, Briggs, and Isaac Swensen.** 2022. "The Effect of Concealed-Carry and Handgun Restrictions on Gun-Related Deaths: Evidence from the Sullivan Act of 1911." *The Economic Journal*, 132(646): 2118–2140.

**Dube, Arindrajit, Daniele Girardi, Òscar Jordá, and Alan Taylor.** 2023. "A Local Projections Approach to Difference-in-Differences Event Studies." *NBER*.

**Dumais, A., A.D. Lessage, M. Alda, G. Rouleau, M. Dumont, N. Chawky, M. Roy, J.J. Mann, C. Benkelfat, and Gustavo Turecki.** 2005. "Suicide Impulsivity and Age: Evidence from Handgun Purchase Delay Laws." *The American Journal of Psychiatry*, 162(11): 2116–2124.

**Edwards, Griffin, Erik Nesson, Joshua Robinson, and Frederick Vars.** 2017. "Looking Down the Barrel of a Loaded Gun: The Effect of Mandatory Handgun Purchase Delays on Homicide and Suicide." *TheEconomic Journal*, 128(616): 3117–3140.

**Goodman-Bacon, Andrew.** 2021. "Difference-in-differences with variation in treatment timing." *Journal of Econometrics*, 225(2): 254–277.

**HHS.** 2023. "988 Suicide and Crisis Lifeline Adds Spanish Text and Chat Service Ahead of One-Year Anniversary."

**Joiner, Thomas.** 2007. *Why People Die by Suicide.* Harvard University Press.

**Kaplan, Jacob.** 2021*a*. "Apparent Per Capita Alcohol Consumption: National, State, and Regional Trends 1977-2018." *Data Set. Inter-University Consortium for Political and Social Research.*

**Kaplan, Jacob.** 2021*b*. "Jacob Kaplan's Concatenated Files: Uniform Crime Reporting Program Data: Offenses Known and Clearances by Arrest, 1960-2019." *Data Set. Inter-University Consortium for Political and Social Research.*

**Lang, Matthew.** 2012. "Firearm Background Checks and Suicide." *The Economic Journal*, 123(573): 1085–1099.

**Lang, Matthew.** 2013. "The impact of mental health insurance laws on state suicide rates." *Health Economics*, 22(1): 73–88.

**Luca, Michael, Deepak Malhotra, and Christopher Poliquin.** 2017. "Handgun waiting periods reduce gun deaths." *PNAS*, 114(46): 12162–12165.

**Mccullumsmith, Cheryl, David Williamson, Roberta May, Emily Bruer, David Sheehan, and Larry Alphs.** 2014. "Simple Measures of Hopelessness and Impulsivity are Associated with Acute Suicidal Ideation and Attempts in Patients in Psychiatric Crisis." *Innovations in Clinical Neuroscience*, 11(9-10): 47–53.

**McGirr, A, AJ Renaud, A Bureau, M Seguin, A Lesage, and G Turecki.** 2008. "Impulsive-aggressive behaviours and completed suicide across the life cycle: a predisposition for younger age of suicide." *Psychological Medicine*, 38(3): 407–417.

**App. 0516**

**McLone, Suzanne, Anagha Loharikar, Karen Sheehan, and Maryann Mason.** 2016. "Suicide in Illinois, 2005-2010: A reflection of patterns and risks by age groups and opportunities for targeted prevention." *Journal of Trauma and Acute Care Surgery*, 81(4): S30–5.

**Roth, Jonathan, Pedro H.C. Sant'Anna, Alyssa Bilinski, and John Poe.** 2023. "What's trending in difference-in-differences? A synthesis of the recent econometrics literature." *Journal of Econometrics*, 325(2): 2218–2244.

**Ruggles, Steven, Sarah Flood, Matthew Sobek, Danika Brockman, Grace Cooper, Stephanie Richards, and Megan Schouweiler.** 2023. "IPUMS: USA: Version 13.0 [dataset]." *IPUMS*.

**Schell, Terry, Samuel Peterson, Brian Vegetabile, Adam Scherling, Rossana Smart, and Andrew Morral.** 2020. "State-Level Estimates of Household Firearm Ownership." *RAND*.

**Smith, Tom, and Jaesok Son.** 2015. "Trends in Gun Ownership in the United States, 1972-2014." *General Social Survey Final Report*.

**Stevenson, Betsey, and Justin Wolfers.** 2006. "Bargaining in the Shadow of the Law: Divorce Laws and Family Distress." *Quarterly Journal of Economics*, 121(1): 267–288.

**Wooldridge, Jefferey.** 1999. "Distribution-free estimation of some nonlinear panel data models." *Journal of Econometrics*, 90(1): 77–97.

**App. 0517**