**No. 24-2121**

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

Samuel Ortega and Rebecca Scott,
Plaintiffs-Appellants,

v.

Michelle Lujan Grisham, in her official capacity as Governor of the State of New Mexico and Raul Torrez, in his official capacity as Attorney General of the State of New Mexico,
Defendants-Appellees.

On Appeal from the United States District Court for the District of New Mexico
No. 24-CV-00471-JB-SCY James O. Browning

**APPELLANT'S APPENDIX VOLUME III**

| | |
|---|---|
| Michael D. McCoy | Paul D. Clement |
| Sean D. Nation | Erin E. Murphy |
| Robert Welsh | *Counsel of Record* |
| MOUNTAIN STATES LEGAL FOUNDATION | MATTHEW D. ROWEN KEVIN |
| 2596 South Lewis Way | WYNOSKY CLEMENT & MURPHY, |
| Lakewood, Colorado 80227 | PLLC |
| (303) 292-2021 | 706 Duke Street Alexandria, VA |
| mmccoy@mslegal.org | 22314 (202) 742-8900 |
| | |
| Joseph G.S. Greenlee | Carter B. Harrison IV |
| Erin M. Erhardt | Attorney and Partner |
| NATIONAL RIFLE ASSOCIATION OF AMERICA | HARRISON & HART, LLC |
| 11250 Waples Mill Road | 924 Park Ave SW, Suite E |
| Fairfax, VA 22030 | Albuquerque, NM 87102 |
| (703) 267-1161 | (505) 303-1835 |
| jgreenlee@nrahq.org | carter@harrisonhartlaw.com |

*Attorneys for Plaintiffs-Appellants*

# APPENDIX INDEX

*Samuel Ortega and Rebecca Scott v. Michelle Lujan Grisham, in her official capacity as Governor of the State of New Mexico and Raul Torrez, in his official capacity as Attorney General of the State of New Mexico*

*No. 24-2121*

Reply in Support of Motion for Temporary Restraining Order and Preliminary Injunction
(ECF No. 21)........................................................................ App. 0518

Exhibit A Expert Report and Declaration of Professor F. Lee Francis
(ECF No. 21-1) ...................................................................... App. 0534

Exhibit B Curriculum Vitae of Professor F. Lee Francis
(ECF No. 21-2) ...................................................................... App. 0557

Plaintiffs' Expert Disclosure
(ECF No. 23).......................................................................... App. 0561

Governor Lujan Grisham's Unopposed Motion for Supplemental Briefing
(ECF No. 25).......................................................................... App. 0564

Clerk's Minutes for Hearing on Motion for Temporary Restraining Order and/or Motion for Preliminary Injunction
(ECF No. 28).......................................................................... App. 0567

Order Granting Governor Lujan Grisham's Unopposed Motion for Supplemental Briefing
(ECF No. 30).......................................................................... App. 0572

Defendants' Joint Supplemental Brief
(ECF No. 31).......................................................................... App. 0574

Plaintiffs' Supplemental Brief
(ECF No. 32).......................................................................... App. 0591

Notice of Certification that Associated Attorney Licensed Outside of the District is an Attorney in Good Standing
(ECF No. 33).......................................................................... App. 0613

Notice of Certification that Associated Attorney Licensed Outside of the District is an Attorney in Good Standing
(ECF No. 34)............................................................................. App. 0615

Defendants' Joint Response to Plaintiffs' Supplemental Brief
(ECF No. 35)............................................................................. App. 0617

Plaintiffs' Response to Defendants' Supplemental Brief
(ECF No. 36)............................................................................. App. 0635

Governor Lujan Grisham's Notice of Supplemental Authority
(ECF No. 38)............................................................................. App. 0647

Exhibit to Governor Lujan Grisham's Notice of Supplemental Authority
(ECF No. 38-1) ......................................................................... App. 0650

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| SAMUEL ORTEGA and REBECCA SCOTT, <br><br> Plaintiffs, <br><br> v. <br><br> MICHELLE LUJAN GRISHAM, in her official capacity as Governor of the State of New Mexico, and RAÚL TORREZ, in his official capacity as Attorney General of the State of New Mexico, <br><br> Defendants. | No. 24-CV-0471-JB/SCY |

## REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS......................................................................................... i

TABLE OF AUTHORITIES .................................................................................. ii

I. INTRODUCTION ..................................................................... 1

II. LEGAL STANDARD ................................................................ 1

III. AN INJUNCTION IS NOT DISFAVORED IN THIS CONTEXT ........................... 2

IV. PLAINTIFFS SATISFY BRUEN'S STEP ONE ....................................... 7

    A. The Plain Text of the Second Amendment Covers Plaintiffs' Conduct................3

    B. The Defendants Mis-Frame the Right at Issue as the "Immediate" Access to Firearms. ................................................................................ 4

V. THE WAITING PERIOD ACT IS NOT A PRESUMPTIVELY LAWFUL COMMERCIAL REGULATION ...................................................... 4

VI. THE WAITING PERIOD ACT IS NOT IN LINE WITH THE HISTORY AND TRADITION OF FIREARMS REGULATIONS ...................................... 5

    A. Intoxication Laws are a Poor Analogy to the Waiting Period Act ....................... 5

    B. Licensing Regimes are not a Historical Analogue to the Waiting Period Act....... 6

    C. Firearms Were Common at the Founding, Yet There Were No Waiting Period Laws................................................................................. 7

    D. If the Court Finds the Historical Record to be Indeterminate, the Plaintiffs have Demonstrated a Likelihood of Success on the Merits .......................................... 8

VII. PLAINTIFFS ARE SUFFERING IRREPARABLE HARM, AND THE BALANCE OF HARMS AND PUBLIC INTEREST FACTORS SUPPORT ENTRY OF INJUNCTIVE RELIEF .............................................................. 9

    A. Plaintiffs are Suffering Irreparable Harm Due to the Waiting Period Act.................. 9

    B. The Balance of Harms and Public Interest Factors Support of Entry of Injunctive Relief ................................................................................ 11

VIII. CONCLUSION...................................................................... 12

**App. 0519**

## TABLE OF AUTHORITIES

**Case**                                                                    **Page(s)**

*Antonyuk v. Chiumento,*
  89 F.4th 271 (2d. Cir. 2023)............................................................5

*Baird v. Bonta,*
  81 F.4th 1036 (9th Cir. 2023)........................................................11

*Bevis v. City of Naperville, Ill.,*
  657 F. Supp. 3d 1052 (N.D. Ill. 2023) ...........................................9

*D.C. v. Heller,*
  554 U.S. 570 (2008) .......................................................................3

*Elrod v. Burns,*
  427 U.S. 347 (1976) .....................................................................10

*Ezell v. City of Chi.,*
  651 F.3d 684 (7th Cir. 2011).........................................................10

*Gen. Motors Corp. v. Urban Gorilla*, LLC,
  500 F.3d 1222 (10th Cir. 2007)......................................................1

*Hill v. Colorado,*
  530 U.S. 703 (2000) .......................................................................4

*Duarte v. United States,*
  2024 WL 2068016 (9th Cir. 2024)..................................................6

In *Chamber of Com. of U.S. v. Edmondson,*
  594 F.3d 742 (10th Cir. 2010).......................................................11

*League of Women Voters of North Carolina v. North Carolina,*
  769 F.3d 224 (4th Cir. 2014)..........................................................2

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) .....................................................................10

*McRorey v. Garland,*
  2023 WL 5200670 (N.D. Tex., 2023) ............................................4

*Miller v. Bonta,*
  2023 WL 6929336 (S.D. Cal. Oct. 19, 2023)................................8

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
  597 U.S. 1 (2022) ...........................................................1, 3, 8, 11

*Rocky Mountain Gun Owners v. Polis,*
  2023 WL 5017257 (D. Colo. Aug. 7, 2023) ..................................9

**App. 0520**

*SCFC ILC, Inc. v. VISA USA, Inc.*,
   936 F.2d 1096 (10th Cir.1991) ........................................................................ 2

*Schrier v. University of Colorado*,
   427 F.3d 1253 (10th Cir. 2005) ..................................................................... 2

*Teixeira v. Cnty. of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ...................................................................... 10

*United States v. Marique*,
   647 F.Supp.3d 382 (D. Md. 2022) ................................................................ 5

*United States v. Price*,
   635 F.Supp.3d 455 (S.D. W.V. 2023) ......................................................... 5

*Utah Licensed Beverage Ass'n v. Leavitt*,
   256 F.3d 1061 (10th Cir. 2001) ................................................................. 11

**<u>Statutes</u>**

Colorado House Bill 23-1219 ............................................................................ 5

New Mexico House Bill 129 .............................................................................. 9

**App. 0521**

## I.      INTRODUCTION

Simply put, because there is no historical analogue to the New Mexico Waiting Period Act either at the Founding or for 150 years after the Founding, Plaintiffs are likely to prevail on the merits. *See New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 19 ("[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."). Defendants primarily rely on the argument that a waiting period law will save some number of lives. But no amount of policy debate on the supposed wisdom of the Waiting Period Act can change the constitutional analysis.

Defendants' efforts to use means-ends scrutiny as a way of getting around the Second Amendment was expressly rejected in *Bruen*. *Id.* at 17 ("[T]he Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny. Today, we decline to adopt that two-part approach."). To the extent that Defendants or their experts attempt to introduce such evidence, the Court should disregard it as irrelevant.

At the end of the day, the government either meets or fails its burden under *Bruen*. Defendants have not presented anything that would indicate they have met their burden to find a historical analogue for the 7-day waiting period that is consistent with the nation's historical tradition of firearms regulation. Plaintiffs are constitutionally and irreparably harmed by the Waiting Period Act, and the balance of equities tips in their favor. Therefore, this court should grant a preliminary injunction.

## II.      LEGAL STANDARD

To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *See Gen. Motors Corp.*

**App. 0522**

*v. Urban Gorilla*, LLC, 500 F.3d 1222, 1226 (10th Cir. 2007).  All four of the requirements for a preliminary injunction order weigh in favor of such relief here.

### III.        AN INJUNCTION IS NOT DISFAVORED IN THIS CONTEXT.

Contrary to Defendants' assertions, an injunction based on a constitutional challenge to a law, sought on the effective date of the law, does not truly disrupt the status quo.  In fact, if there was a disruption to the status quo, that disorder occurred when the Waiting Period Act went into effect and altered the longstanding practice of how law-abiding residents of New Mexico acquire a firearm.  Rather than disrupting the status quo, the injunction requested in this case would reestablish it and preserve the relative positions of the parties until a decision on the merits could be reached.

In support of their argument that an injunction is disfavored in this case, the Defendants cite *Schrier v. University of Colorado*, 427 F.3d 1253 (10th Cir. 2005), but that case dealt with a mandatory rather than a prohibitory injunction.  The Tenth Circuit has long characterized an injunction as mandatory, rather than prohibitory, "if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'"  *Id.* at 1266 (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1099 (10th Cir.1991)).  That is not the case here.  Restoring the status quo does not require Defendants to take any affirmative steps or act in a particular way that would require supervision by the Court.  An injunction would simply prevent Defendants from continuing to enforce an arbitrary waiting period that did not even exist until last month.  Thus, while obtaining a preliminary injunction certainly requires that Plaintiffs establish the relevant elements outlined above, their request in the instant matter is not disfavored. *Cf. League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (where a group filed a challenge "on the very same day" that same-

**App. 0523**

day voter registration was eliminated, the court held that "[w]ithout doubt, this is the language and stuff of a prohibitory injunction seeking to maintain the status quo").

In their response, Defendants also rely on a series of First Amendment related cases for the proposition that facial challenges generally are disfavored. Response Br. at 6.  In addition to offering no analysis as to how these cases apply in the context of a motion for a preliminary injunction—particularly against a law that applies uniformly to almost all firearm transfers in New Mexico—the cases are intuitively inapposite. Plaintiffs seek to enjoin the Waiting Period Act so that they can exercise their own, personal constitutional rights under the Second Amendment. Their challenge is no more disfavored than those in *District of Columbia v. Heller*, 554 U.S. 570 (2008), or *Bruen* itself. *Accord Heller*, 554 U.S. at 581 ("We start . . . with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans.").

The Court should thus approach this dispute without any "disfavoring" of the preservation of Plaintiffs' constitutional rights through injunctive relief.  Maintaining the status quo while Plaintiffs challenge the Waiting Period Act is important and will ensure that otherwise law-abiding citizens are not caught in the dragnet of this law which impermissibly burdens their Second Amendment rights.

## IV.       PLAINTIFFS SATISFY *BRUEN*'S STEP ONE.

### A.    The Plain Text of the Second Amendment Covers the Plaintiffs' Conduct

The right to "keep" arms necessarily implies the right to obtain arms. After all, "keep" means to possess or "have weapons." *Heller*, 554 U.S. at 582. By the Waiting Period Act's very terms, it prevents individuals from taking "possession" of their firearms. Therefore, because the Second Amendment's plain text covers Plaintiffs' conduct—*i.e.*, possessing bearable arms—"the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. Plaintiffs have met their burden under *Bruen*, and the Waiting Period Act is presumptively unconstitutional.

3

**App. 0524**

**B.      Defendants Mis-Frame the Right at Issue as the "Immediate" Access to Firearms**

Defendants argue that the Waiting Period Act does not take away someone's ability to keep and bear arms—it simply delays it, and for that reason, the Second Amendment is not even implicated.  But this sort of logic would never withstand scrutiny in the context of any other fundamental right.  For example, imagine a mandatory 7-day delay on offering a political stump speech—to prevent a candidate from engaging in impulsive rhetoric. Even though this law would not "take away" anyone's right to speak—only delay it—it would still clearly implicate the First Amendment. *Cf. Hill v. Colorado*, 530 U.S. 703, 745 (2000) (Scalia, J., dissenting) ("The strictures of the First Amendment cannot be avoided by regulating the act of moving one's lips; and they cannot be avoided by regulating the act of extending one's arm to deliver a handbill, or peacefully approaching in order to speak.").

The Defendants mis-frame the right at issue as one of "immediate acquisition." Not so. Plaintiffs do not challenge the time it takes for a Federal Firearms Licensee to conduct a background check to ensure that a purchaser is not a prohibited possessor.  *See McRorey v. Garland*, 23-cv-00047-O, 2023 WL 5200670, at *5 (N.D. Tex., 2023) (A waiting period associated with a background check is consistent with the nation's historical tradition of firearms regulation). Plaintiffs instead challenge the imposition of an arbitrary delay in exercising their Second Amendment rights that continues *even after successfully completing a background check*. At a minimum, that delay burdens Plaintiffs' Second Amendment rights, and implicates the Second Amendment's plain text.

## V.      THE WAITING PERIOD ACT IS NOT A PRESUMPTIVELY LAWFUL COMMERCIAL REGULATION

The Defendants argue the Waiting Period Act is a "commercial regulation" that is presumptively lawful.  It is not.  Its very purpose is to impose a burden on the exercise of the individual right to keep and bear arms, and the Court should reject the effort as trickery by the

**App. 0525**

Defendants. *Cf. United States v. Price*, 635 F.Supp.3d 455, 460 (S.D. W.V. 2023) ("[A] blatant prohibition on possession" of a firearm is not a commercial regulation.); *United States v. Marique*, 647 F.Supp.3d 382, 385 (D. Md. 2022) (commercial regulations are those that do not intrinsically "implicate an individual's right of possession").  Though the Waiting Period Act may impose criminal penalties on sellers for noncompliance, it also imposes the same penalties on the buyer. Moreover, its terms apply equally to both private and commercial transfers.  But, most importantly for our analysis here, it imposes a clear burden on the buyer's right of armed self-defense. Even a "commercial regulation" is not presumptively constitutional if it is merely a pretext for burdening an individual right to keep and bear arms.  *Antonyuk v. Chiumento*, 89 F.4th 271, 316 (2d. Cir. 2023).

## VI.      THE WAITING PERIOD ACT IS NOT IN LINE WITH THE HISTORY AND TRADITION OF FIREARMS REGULATIONS

Defendants argue that even if the Court reaches *Bruen*'s Step Two, the Waiting Period Act is in line with the historical tradition of the nation's firearms regulation. It is not. As outlined in the Plaintiffs' Opening Brief, the first waiting period enacted in the United States was not until 1923. *See* Professor David B. Kopel's Written Testimony on Colorado House Bill 23-1219, *To Delay the Acquisition of Firearms.* In an attempt to overcome the clear lack of a historical tradition of imposing arbitrary waiting periods, Defendants turn to ill-fitting analogies.  These arguments fail.

### A. Intoxication Laws are a Poor Analogy to the Waiting Period Act.

Defendants rely on pre-Founding and Founding-era laws regulating firearm usage by intoxicated persons.  Response Br. at 16.  Those laws are particularly poor analogies because they did not, as the Waiting Period Act does, assume that everyone is always intoxicated, and require them to wait seven days after passing a background check to sober up.[1]  In fact, the intoxicated

---

[1] Expert Report and Declaration of Professor F. Lee Francis. *See* Exhibit A ¶¶ 19-37.

**App. 0526**

individual could acquire the firearm as soon as they sobered up.

In the case of intoxication laws from the Founding era, there were undoubtedly numerous reasons "why" public officials would have wanted to prevent intoxicated individuals from obtaining firearms—the likelihood of careless and negligent discharge, the suspicious nature of anyone becoming intoxicated and only then seeking to purchase a gun, and of course, that people often make bad decisions while intoxicated.

The intoxication laws Defendants reference in their Response Brief applied to individuals, not to the *entire* population of the colony or state that enforced them.  And they did not impose 7-day delays.

**B.  Licensing Regimes are not a Historical Analogue to the Waiting Period Act**

Similarly, licensing requirements do not provide a historical analogue to the Waiting Period Act. The first licensing regime in the United States was the 1911 Sullivan Act in New York, which is entirely too late to be an appropriate analogue. Moreover, the Sullivan Act only required licensing for concealed carry. The first federal licensing was enacted in 1938, the National Firearms Act, which required sellers of firearms to receive a federal license.

While Defendants rely on a compilation of laws gathered by Professor Robert Spitzer, it is clear that the "licensing" laws Professor Spitzer collected are of a different kind than at issue here. For one, they were not universal licensing regimes. Instead, they were most often regimes rooted in racism and bias regarding disfavored racial groups. *Duarte v. United States*, 2024 WL 2068016, at *20-26 (9th Cir. 2024) (rejecting race and religious-based licensing as a proper analogue). Nearly every true licensing system came into being in the twentieth century. As such, they are too distant from the Founding to be relevant to the analysis. Moreover, and as Professor Lee notes in his Report:

> [N]one of the [licensing regimes cited by Professor Spitzer] actually required one
> to postpone taking possession of a firearm. Even when a permit or license [was]

**App. 0527**

required to hunt, Spitzer has shown no evidence that the individual would be required to wait for any period of time before taking possession of his firearm....

Exhibit A ¶ 63.

### C. Firearms Were Common at the Founding, Yet There Were No Waiting Period Laws

Defendants simply err by asserting that firearms – the obtaining or use of them – were not part of general American society at the time of the Founding. They were.[2]  Firearms were freely available for purchase at shops. Indeed, virtually every able-bodied male during the Colonial and Founding eras were *required* to acquire arms. *See* Backgrounds of Selective Service: Military obligation: the American tradition, a compilation of the enactments of compulsion from the earliest settlements of the original thirteen colonies in 1607 though the Articles of Confederation, 1789, Parts 2–14 (Arthur Vollmer ed., 1947) (providing hundreds of militia laws requiring all able-bodied males to acquire and possess arms). The federal Uniform Militia Act of 1792 required every "free able-bodied white male citizen" to be enrolled in the state militia. Those militiamen were required to acquire a firearm:

> That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball: or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear, so armed, accoutred [sic] and provided, when called out to exercise, or into service, except, that when called out on company days to exercise only, he may appear without a knapsack.

Public Acts of the Second Congress, 1st Session, Chapter 33.

It cannot be true that nearly every adult male for roughly 200 years was required to possess firearms, and *at the same time* firearms were rare in that same place.

It is important to understand the historical context that led to the Uniform Militia Act of 1792.  The Founders had just come out of the American Revolution, where famously the

---

[2] *See* Exhibit A ¶¶ 8-12.

**App. 0528**

Minutemen had used their own firearms to engage in combat with the British Army. Even after

the ultimate defeat of the British Empire, concern over maintaining a standing army led to the

disbandment of most of the Continental Army in 1783.  In its place, the founding generation relied

on militias for collective defense – as they always had.  Imposing an arbitrary waiting period for

those seeking to acquire firearms so that they could defend themselves, their states, and their

country would have been seen as anathema to the Founders.

Early America saw several armed rebellions: Shay's Rebellion, the Whiskey Rebellion,

Fries's Rebellion, the 1838 Mormon War, Bleeding Kansas, Dorr's Rebellion, John Brown's

Revolt, the Utah War, and multiple armed confrontations with Native Americans. All of these

events occurred between the Founding and the ratification of the Fourteenth Amendment. The

Founders knew and understood that firearms could be used for violent purposes, yet they imposed

no waiting period to acquire a firearm.

**D. If the Court Finds the Historical Record to be Indeterminate, the Plaintiffs have Demonstrated a Likelihood of Success on the Merits**

"The constitutional imperative is on the government to not infringe the right to keep and

bear arms. The correct starting orientation is that no arm may be prohibited." *Miller v. Bonta*, —

F. Supp. 3d —, 2023 WL 6929336, *36 (S.D. Cal. Oct. 19, 2023) (quotation marks omitted). In

other words, the fact that history may be contradictory or indeterminate leads to a clear doctrinal

result—the constitutional challenge succeeds. *See Bruen*, 597 U.S. at 26 ("The Second

Amendment is the very product of an interest balancing by the people and it surely elevates above

all other interests the right of law-abiding, responsible citizens to use arms for self-defense. It is

this balance—struck by the traditions of the American people—that demands our unqualified

deference.") (emphasis added and cleaned up); *id*. at 34 ("[T]he burden falls on respondents to

show that New York's proper-cause requirement is consistent with this Nation's historical

**App. 0529**

tradition of firearm regulation.").

The Second Amendment context is no different than other areas of law where constitutional rights are squarely at issue—unless the government can persuade the Court that it has met its burden, which it hasn't here. *Accord Bevis v. City of Naperville, Ill.*, 657 F. Supp. 3d 1052, 1066 n.6 (N.D. Ill. 2023) ("*Bruen* indicates that judges, not party elected experts, will assess the Second Amendment's history."). Thus, to the extent that the Court is unsure as to whether Defendant has satisfied its onerous burden under *Bruen* Step Two, the appropriate next step is to find that Plaintiffs are likely to succeed on the merits, because the government has in fact failed to meet its heavy burden.

### VII.   PLAINTIFFS ARE SUFFERING IRREPARABLE HARM, AND THE BALANCE OF HARMS AND PUBLIC INTEREST FACTORS SUPPORT ENTRY OF INJUNCTIVE RELIEF.

**A.  Plaintiffs are Suffering Irreparable Harm Due to the Waiting Period Act**

In their Response Brief, Defendants assert that because Plaintiffs delayed seeking a preliminary injunction for "months . . . despite being aware of the passage of House Bill 129", Plaintiffs claim of irreparable harm is undermined. Response Br. 17. But this is an odd assertion for Defendants to make, especially considering their knowledge of and affinity for the "other" waiting period case out of Colorado—*Rocky Mountain Gun Owners v. Polis* (a case Defendants cite 17 times in their brief). The plaintiffs in *Rocky Mountain Gun Owners v. Polis* filed a motion for a pre-enforcement preliminary injunction of Colorado's three-day waiting period act.  That motion was subsequently denied after the district court determined that the plaintiffs lacked standing to move to enjoin the waiting period act <u>before it was enforced</u>. *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01076-PAB-NRN, 2023 WL 5017257, at *5 (D. Colo. Aug. 7, 2023). Mindful of this recent decision in a neighboring state and wishing to avoid a quick dismissal based on lack of standing, Plaintiffs in the current case waited until the Waiting Period Act went into

**App. 0530**

effect on May 15th before bringing this action.

Plaintiffs have demonstrated that they have suffered an "injury in fact," that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992). As outlined in Plaintiffs' declarations, on May 15, 2024, Plaintiff Ortega (a retired law enforcement officer) and Plaintiff Scott, both of whom are law-abiding adult residents of New Mexico, attempted to purchase firearms for their own self-defense and the defense of their families. Both cleared their federal instant background checks authorizing them to acquire these firearms, but when they attempted to take possession of the firearms so that they could transport them back to their residences, they were told that due to the Waiting Period Act, their firearms had to remain in the custody of the respective gun stores for the next seven days.

It is indisputable that the right to possess arms cannot be exercised unless individuals have the right to obtain them. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) ("The core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms.") (quoting *Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011). Any time that Plaintiffs or any other law-abiding resident of New Mexico attempts to purchase a firearm while the Waiting Period Act remains in effect, they will be denied possession of those firearms for a minimum of seven days, even if they have cleared a background check and rendered full payment.  It is irrelevant to the discussion of harm that the denial of this basic Constitutional right is temporary or that the Plaintiffs in this case were ultimately able to take possession of the firearms they attempted to acquire on May 15th.  As discussed in the Opening Brief, even a brief violation of constitutional rights constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (loss of constitutional freedom "for even minimal periods of time" unquestionably constitutes irreparable injury).

**App. 0531**

**B. The Balance of Harms and Public Interest Factors Support Entry of Injunctive Relief**

It is not only Plaintiffs' Second Amendment rights that have been violated by the Waiting Period Act, but also those of all law-abiding New Mexicans seeking to purchase a firearm. Because of that, the balance of equities in this case weighs in favor of granting a preliminary injunction. "[P]ublic interest concerns are implicated when a constitutional right has been violated, [and] all citizens have a stake in upholding the Constitution." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (internal citation and quotation marks omitted; cleaned up).  In *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010), the Tenth Circuit held that when applying these factors, courts must be mindful that even if a state is pursuing a legitimate goal (in that case, deterring illegal immigration), it has no interest in doing so by unconstitutional means, because a state "does not have an interest in enforcing a law that is likely constitutionally infirm." *Id*. "Moreover, the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law." *Id*. (internal quotation marks and citation omitted). *See also Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001) (public interest favors preliminarily enjoining state statutes likely to be held unconstitutional).

In the present case, Defendants argue that because there is an important government interest advanced by the Waiting Period Act (namely, reducing impulsive gun suicides and homicides), the balance of harm tips in the Defendants' favor. But in making this argument, Defendants are asking the Court to employ the type of backdoor means-end test that has been rejected by *Bruen*. *See Bruen,* 597 U.S. at 24-25. "[T]he government may not simply posit that the regulation promotes an important interest [such as public safety]" *Id*. at 17.  Even if true, that potential outcome is irrelevant to the constitutionality of the Waiting Period Act.  And it is easy to see why the Supreme Court in *Bruen* explicitly forbade consideration of the proposed outcome of laws that implicate the Second Amendment. The state could just as easily enact a law that the delayed release

**App. 0532**

of news critical of the state would save lives and find an expert to opine on the result; or delaying the right to an attorney; or to peaceably assemble, and on, and on until the right itself was watered down to nonexistence.

**VIII.     CONCLUSION**

The Waiting Period Act is an unconstitutional burden on the exercise of law-abiding New Mexicans' Second Amendment rights. Plaintiffs brought this case to prevent the infringement on the right of all New Mexicans to keep and bear arms. It would be troubling to let these violations continue to occur until final judgment can be entered in the case. For this reason, the Plaintiffs respectfully request that this Court issue a preliminary injunction.

DATED: June 18, 2024

Respectfully submitted,
 */s Carter B. Harrison IV*
Carter B. Harrison IV
Attorney and Partner
**Harrison & Hart, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102
(505) 303-1835
carter@harrisonhartlaw.com

Michael D. McCoy
Sean D. Nation
Robert Welsh
**Mountain States Legal Foundation**
2596 South Lewis Way
Lakewood, Colorado 80227
Phone: (303) 292-2021
mmccoy@mslegal.org

Joseph G.S. Greenlee
Erin M. Erhardt
**National Rifle Association of America**
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org

*Attorneys for Plaintiff*

**App. 0533**

# Exhibit A

**Expert Report and Declaration**

**of Professor F. Lee Francis**

**App. 0534**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **SAMUEL ORTEGA and** | ) | |
| **REBECCA SCOTT** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **No. 1:24-cv-00471-JB-SCY** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MICHELLE LUJAN GRISHAM, in her** | ) | |
| **Official capacity as Governor of the State** | ) | |
| **Of New Mexico, and RAUL TORREZ,** | ) | |
| **in his official capacity Attorney General** | ) | |
| **of the State of New Mexico,** | ) | |

**Defendants.**

### EXPERT REPORT AND DECLARATION
### OF PROFESSOR F. LEE FRANCIS

I, F. Lee Francis, declare that the following is true and correct:

1.      I have been asked to provide an expert opinion on the history of firearms waiting periods, their effectiveness, and to address the Declarations of Professors Robert Spitzer and Randolph Roth. My report below explores these issues in detail.

2.      This declaration is based on my own knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

### BACKGROUND AND QUALIFICATIONS

**App. 0535**

3.      Beginning July 1, 2024, I will join the faculty of Widener University Commonwealth Law School as an Assistant Professor of Law. Most recently, I was an Assistant Professor of Law at Mississippi College School of Law in Jackson, Mississippi. I have a master's degree in English from the University of North Carolina at Greensboro, and a Juris Doctorate from the Maurice A. Deane School of Law at Hofstra University. At Widener University, my course load will include teaching courses in Constitutional Law, Criminal Procedure, and Evidence. Prior to my appointment as a professor, I served as a Special Assistant United States Attorney in the Eastern District of North Carolina where I prosecuted firearms related offenses. A copy of my complete curriculum vitae (CV) is attached to this declaration as Exhibit A.

4.      My scholarship on the Second Amendment and the history of firearms regulation has been cited by a federal court.[1] I have published multiple articles on this topic that have appeared in leading law reviews.[2]

5.      I have been invited to present lectures, papers at faculty workshops, and participated in conferences on the Second Amendment and the history of

---

[1] For a complete list of court citations, see my CV attached as Exhibit A to this report.
[2] Particularly relevant publications include F. Lee Francis, *The Addiction Restriction: Addiction and the Right to Bear Arms,* WEST VIRGINIA LAW REVIEW *(Forthcoming 2025)*; F. Lee Francis, *Defining Dangerousness: When Disarmament is Appropriate*, TEXAS TECH LAW REVIEW (Forthcoming 2024). A full list of relevant publications is also included in my CV.

**App. 0536**

firearms regulation at Duke University Law School, Southern Methodist University Dedman School of Law, and Mississippi College School of Law.

## RETENTION AND COMPENSATION

6.      I have been retained to render expert opinions in this case. I am being compensated for services performed in the above-entitled case at an hourly rate of $400 for reviewing materials, participating in meetings, and preparing reports, $400 for depositions and court appearances, and compensation for travel expenses. My compensation is not in any way dependent on the outcome of this or any related proceeding, or on the substance of my opinion.

## BASIS FOR OPINION AND MATERIALS CONSIDERED

7.      Counsel for Plaintiffs provided me with the operative Complaint, Answer, Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, Defendants' Response to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, and Statement Respecting Plaintiffs' Request for Temporary Restraining Order. Otherwise, my report is based on my independent research. In my report, I cite to a variety of scholarly articles, laws, cases, popular and learned constitutional commentaries, and various other related materials on which I based my opinions. The materials cited in this report are a subset of the relevant materials I have consulted to understand the contours of American constitutional history that are relevant to understanding the historical issues posed

**App. 0537**

by this case.

## I.   FIREARM WAITING PERIODS

8.      I agree with the proponents of the law when they confirm that waiting periods, as they are understood today, did not exist during the Founding Era. They are a wholly modern development and do not comport with the history and tradition standard established by the Supreme Court.

9.      During the colonial period, firearms were an essential part of daily life. They were primarily used for hunting and for defending one's home or community.[3]

10.      Spitzer emphasizes the large number of firearms dealers currently in the U.S. While I do not question the estimation, I am skeptical of the implication. For instance, in 1790, the U.S. population was just shy of 4 million people.[4] During the early colonial and early Republic periods, it would not be uncommon for individuals to make their own firearms.[5]

11.      The U.S. population today is more than 335 million people.[6] That is

---

[3] Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35 (2023) ("Since the earliest colonial days, Americans have been busily manufacturing and repairing arms. In the colonies, the ability to defend one's home and community, hunt, fight wars, and ultimately win American independence depended largely on the ability to produce arms. For the newly independent nation, arms production was critical to repel invasions and insurrections, and eventually, to western expansion. The skill was always valued and in demand, and many Americans made their own arms rather than depend on others.").
[4] US Census data, https://www.census.gov/history/www/through_the_decades/fast_facts/1790_fast_facts.html
[5] *See supra note* 3.
[6] US Commerce Dept., https://www.commerce.gov/news/blog/2024/01/census-bureau-projects-

**App. 0538**

more than 80 times the population of 1790. Thus, it is not surprising that there are so many firearms dealers today. Rather than assume that the absence of historical waiting periods is due to a lack of demand or availability, a more plausible explanation is that at the time many citizens possessed skill that did not always require them to seek out retailers. Many citizens would make their own clothing, hunt for their own meat, and raise their own cattle.

12.      While many did make their own firearms, this should not be understood to assert that firearms were not commonly available to the public. Historical sources including advertisement and state probate records clearly support the notion that firearms were generally available for purchase during the Founding period.

### A.    FIREARM AVAILABILITY DURING THE COLONIAL ERA

13.      Spitzer's declaration concedes the fact that waiting periods "did not exist early in the country's history." However, to justify the waiting period in this case, he contends that such was not necessary because there was no "Guns-R-Us" retailers during the Founding Era:

> First, in the modern era, gun and ammunition purchases can be made easily and rapidly from tens of thousands of licensed gun dealers, private sales, gun shows, and through internet sales. This modern sales system was key to the enactment of waiting periods. No "Guns-R-Us" outlets existed in the 1600s, 1700s, or most of the 1800s. Rapid, convenient gun sales processes did not exist in the U.S. until

us-and-world-populations-new-years-day

**App. 0539**

the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get.

14.    This point is misleading and not a complete depiction of the history. For example, probate records indicate that in more densely populated areas, firearm ownership was considerably high:

> Guns are found in 50- 73% of the male estates in each of the eight databases and in 6-38% of the female estates in each of the first four databases. Gun ownership is particularly high compared to other common items. For example, in 813 itemized male inventories from the 1774 Jones national database, guns are listed in 54% of estates, compared to only 30% of estates listing any cash, 14% listing swords or edged weapons, 25% listing Bibles, 62% listing any book, and 79% listing any clothes.[7]

15.    While it may be difficult to accurately ascertain the number of gunsmiths and gun makers that existed during the Founding Era until the early nineteenth century, there are a large number of historical newspaper advertisements indicating that firearm sales were common and accessible.

16.    During a search of historical newspaper advertisements in the *Pennsylvania Gazette* from 1728 through 1800, I found a great number of ads for firearms. One such ad was that of a merchant named Peter Turner who, in 1741, was liquidating his property before setting sail to London. Of the property he sought to

---

[7] James Lindgren and Justin L. Heather, *Counting Guns in Early America*, 43 WILLIAM AND MARY L. REV. 1777, 1778 (2002).

**App. 0540**

relieve himself of items included "Rifle barrel Guns,… with several sorts of fowling Pieces [akin to a shotgun]…."[8]

17.     Indeed, even large quantities of firearms were available for purchase. For example, in 1745, a gentleman named Commissary Dart sold 300 muskets and bayonets out of his home.[9] Similarly, in 1748, "12 fine carriage guns, "12 swivels [akin to small cannons], a parcel [of] fine blunderbusses, muskets, [and] pistols" were auctioned during a sale in Pennsylvania.[10] Another ad in the 1748 newspaper offered for sale "a parcel of small arms, pistols, cutlasses, 16 fine cannon . . . swivel guns, grenadoes, and other warlike stores" and a notice of an upcoming auction where "10 carriage guns, and 6 swivel guns" would be sold.[11] A Connecticut newspaper featured an ad by a local store selling 26 Horsemen's Pistols [52 handguns].[12]

18.     The common thread central to each of these examples is that while firearms were generally accessible and available to the public both in small individual sales and in bulk quantities, neither required a waiting period. There are numerous other similar ads, as well as many ads offering muskets, pistols, and gunpowder for sale, as well as parts for making guns.[13]

_____

[8] *Pennsylvania Gazette*, July 30, 1741.
[9] *South Carolina Gazette*, June 1, 1745, at 2.
[10] *Pennsylvania Gazette*, Sep. 15, 1748.
[11] *Pennsylvania Gazette*, Mar. 29, 1748.
[12] *Connecticut Courant*, Mar. 7, 1797.
[13] *JUST imported from London*, PENNSYLVANIA GAZETTE, November 1, 1744, 4; Id., September 26, 1745.

**App. 0541**

### B.    FIREARMS AND INTOXICATION LAWS

19.    Spitzer's report seemingly equates historical state laws regulating firearm use and intoxication laws with modern waiting period restrictions:

> An interesting, instructive, and analogous historical parallel to waiting periods is gun laws pertaining to alcohol use and intoxication. These measures mimicked waiting periods because, for the most part, they prevented gun acquisition or use only for the period of time of actual intoxication (leaving aside those individuals for which chronic intoxication was a more-or-less permanent condition). When a person became sober, the intoxication barrier disappeared.[14]

20.    I contend that this is not the most natural or apt comparison for the following reasons.

21.    A waiting period prevents someone from *obtaining* a firearm. None of the historical statutes from the Founding Era cited in Spitzer's report indicate a similar intrusion on the right to bear arms. To put it another way, merely being intoxicated during the Founding Era would not have prohibited an individual from obtaining a firearm. This is a separate consideration from those of *use* of a firearm while intoxicated. Of the few laws that did regulate drinking while shooting, the impact was de minimis at best:

> A trio of laws passed between 1761 and 1775 in New York and New Jersey restricted the discharge of firearms on certain occasions. These laws, however, did not prevent the carrying while intoxicated, nor was intoxication an element of the offense. What is more, the New York ordinance clearly permitted the use of a firearm while drinking, save for only two days out of the year. Therefore, there was a strong tradition

---

[14] Spitzer's Declaration p. 7.

of permitting drinking while shooting.[15]

22.     It is true that excessive alcohol consumption and drunkenness was pervasive during the colonial period.[16] In the seventeenth and eighteenth centuries, it was commonplace:

> During the seventeenth and eighteenth centuries, habitual drunkenness was commonplace.[17] It is not unreasonable to think that individuals drank due to some hardship or other difficulties of the time, rather people drank simply because they wanted to, not out of necessity.[18]

23.     Moreover, drinking did not occur silently in the privacy of one's home or during an occasional gathering at the local tavern. quite the contrary, people drank everywhere:

> [Alcohol] flowed freely at weddings, christenings and funerals, at the building of churches, the installation of pews and the ordination of

---

[15] F. Lee Francis, *Armed and Under the Influence: The Second Amendment and the Intoxicant Rule After Bruen*, 107 Marq. L. Rev. 803 (2024).

[16] H.G. Levine, *The Discovery of Addiction Changing Conceptions of Habitual Drunkenness in America*, 39 Journal of Studies on Alcohol 143 (1978) ("Seventeenth century and especially eighteenth century America was notable for the amount of alcoholic beverages consumed, the universality of their use and the high esteem they were accorded. Liquor was food, medicine and social lubricant, and even such a Puritan divine as Cotton Mather called it the "good creature of God.").

[17] H.G. Levine, *The Discovery of Addiction Changing Conceptions of Habitual Drunkenness in America*, 39 Journal of Studies on Alcohol 143 (1978) ("Seventeenth century and especially eighteenth century America was notable for the amount of alcoholic beverages consumed, the universality of their use and the high esteem they were accorded. Liquor was food, medicine and social lubricant, and even such a Puritan divine as Cotton Mather called it the "good creature of God.").

[18] F. Lee Francis, *The Addiction Restriction: Addiction and the Right to Bear Arms*, WEST VIRGINIA LAW REVIEW (Forthcoming 2025); *see also* H.G. Levine, *The Discovery of Addiction Changing Conceptions of Habitual Drunkenness in America*, 39 Journal of Studies on Alcohol 143 (1978) ("Seventeenth century and especially eighteenth century America was notable for the amount of alcoholic beverages consumed, the universality of their use and the high esteem they were accorded. Liquor was food, medicine and social lubricant, and even such a Puritan divine as Cotton Mather called it the "good creature of God.").

**App. 0543**

ministers. For example, in 1678 at the funeral of a Boston minister's wife, mourners consumed 51 1/2 gallons of wine; at the ordination of Reverend Edwin Jackson of Woburn, Massachusetts, the guests drank 6 1/2 barrels of cider, along with 25 gallons of wine, 2 gallons of brandy and 4 gallons of rum. Heavy drinking was also part of special occasions like corn huskings, barn raisings, court and meeting days, and especially militia training days. Workers received a daily allotment of rum, and certain days were set aside for drunken bouts; in some cases, employers paid for the liquor.[19]

24.     In the nineteenth century, drinking to excess continued, and age was no discriminator:

White males were taught to drink as children, even as babies. As soon as a toddler was old enough to drink from a cup, he was coaxed to consume the sugary residue at the bottom of an adult's nearly empty glass of spirits. Adolescents perceived drinking at a public house to be a mark of manhood. Men encouraged this youthful drinking.[20]

25.     Thus, when people drank, it was to get drunk.[21]

26.     Our Founders were brilliant men. They knew the world and enjoyed many of its vices, including alcohol. Drunkenness was not foreign to them, nor did it elude them. When the Second Amendment was drafted and ratified, they simply did not consider alcohol or drunkenness to be a reason to deprive one of their rights to keep and bear arms.

27.     However, as Spitzer notes, such was not a basis for prohibiting an

---

[19] H.G. Levine, *The Discovery of Addiction Changing Conceptions of Habitual Drunkenness in America*, 39 Journal of Studies on Alcohol 143 (1978).
[20] W.J. RORABAUGH, THE ALCOHOLIC REPUBLIC: AN AMERICAN TRADITION (1979).
[21] *Id*. ("Americans drank wine, beer, cider and distilled spirits, especially rum. They drank at home, at work and while traveling; they drank morning, noon and night. And they got drunk.").

**App. 0544**

individual from obtaining a firearm until the late nineteenth century, more than 100 years after the Founding.[22]

28.     What is more, implicit in Spitzer's analysis of intoxicant laws is the fact that those laws did not prohibit an individual from simply carrying or possessing firearms.[23]

29.     Further still, many, if not all, of the laws regulating firearm use or possession while intoxicated fall outside the relevant time period as explained by the Supreme Court in *Bruen*.[24]

30.     What is more, many of the precedent surrounding these laws were decided before *Bruen* and many of those courts applied the now defunct two-step intermediate scrutiny approach rejected by the *Bruen* majority.[25]

31.     These pre-*Bruen* precedents are ripe for challenge, and under the history and tradition standard articulated by the High Court, these laws likely won't

---

[22] See Spitzer Declaration at 11. ("In 1878, 1880, and 1908, Mississippi enacted laws that made it illegal "to sell to any minor or person intoxicated" any pistol or other named weapon.").

[23] State v. Christen, 2021 WI 39 (2021) (R.G. Bradley, J., dissenting) ("From before the enactment of the Second Amendment through the late-18th and early-19th centuries, legislatures did not limit the individual right to bear arms while under the influence of an intoxicant. Indeed, few colonial-era laws even regulated the use of firearms while consuming alcohol, and none dealt with carrying while intoxicated."); *see also* F. Lee Francis, *The Addiction Restriction: Addiction and the Right to Bear Arms*, WEST VIRGINIA LAW REVIEW (Forthcoming 2025).

[24] New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. ___ (2022) ("As we suggested in Heller, however, late-19th [and 20th] centur[ies] evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence.").

[25] *See* People v. Wilder, 861 N.W.2d 645 (Mich. Ct. App. 2014); *see also* State v. Christen, 2021 WI 39.

**App. 0545**

pass constitutional muster.[26]

32.    To test the point further, much like alcohol regulations, laws restricting drug use were not enacted until 1875.[27] Notably, this ordinance did not restrict an individual's right to keep and bear nor did it prevent individuals from obtaining firearms while under the influence. Such laws did not exist until the twentieth century.[28]

33.    The 1655 Virginia statute referenced in Spitzer's report fails to provide the necessary context to the law. The law had a practical purpose, to prevent the false alarm of an Indian attack:

> [P]rior to the formation of the Republic, British colonies, such as those in Pennsylvania, Virginia, and Massachusetts, appear to have been predominantly concerned with what they perceived as defending themselves against unjustified attacks by Indians. Virginia, for instance, passed a statute in 1655–56 that outlawed the 'shoot[ing] of any gunns at drinkeing (marriages and ffuneralls onely excepted) [sic].' The reason for the law was that 'gunshots were the common alarm of Indian attack,' 'of which no certainty

---

[26] See F. Lee Francis, *Armed and Under the Influence: The Second Amendment and the Intoxicant Rule After Bruen*, 107 Marq. L. Rev. 803 (2024) (arguing that laws restricting the right to keep and bear arms due to intoxication are unconstitutional.).

[27] *See Order No*. 1254, S.F. EXAMINER, Nov. 24, 1875, at 2; see also James Baumohl, *The Dope Fiend's Paradise' Revisited: Notes from Research in Progress on Drug Law Enforcement in San Francisco*, 1875-1915, 24 THE SURVEYOR 3 (1992) ("[To] keep or maintain, or become an inmate of, or visit, or … in any way contribute to the support of any place, house or room, where opium is smoked, or where persons assemble for the purpose of moking opium, or inhaling the fumes of opium[.]").

[28] F. Lee Francis, *The Addiction Restriction: Addiction and the Right to Bear Arms*, WEST VIRGINIA LAW REVIEW (Forthcoming 2025) ("However, it would take Congress until the early twentieth century to pass significant legislation regulating the use of drugs. True, these laws were keen on regulating the use and distribution of drugs, but nowhere was a restriction on an individual's right to bear arms contemplated. Indeed, a prohibition of this sort did not become law until 1993.").

**App. 0546**

can be had in respect of the frequent shooting of guns in drinking.'[29]

34.     On page 11 of Spitzer's declaration, he quotes the 1636 Rhode Island

statute:

> "In 1636 Rhode Island enacted a measure to punish any who would
> engage in 'shooting out any gun . . . drinking in any tavern alehouse . .
> . on the first day of the week more than necessity requireth.'"

35.     The full text of the statute reads as follows:

> And bee it further enacted by the authority aforesaid, That any person
> or persons shall presume to sport, game or play at any manner of
> game or games, *or shooting on the first day of the weeke* as aforesaid,
> or shall sit tippling and drinking in any tavern, ale-house, ordinary or
> victualling house on the first day of the weeke, more than necessity
> requireth [emphasis added].[30]

36.     This was likely a statute intending to preserve the Sabbath. In fact, it

forbade all varieties of sport as well as drinking on the Sabbath. It did not, however,

prohibit one from being armed while intoxicated.

37.     The statutes referenced in Spitzer's report enacted between 1623-1750

clearly did not prohibit an individual from obtaining a firearm while intoxicated. The

---

[29] Ann E. Tweedy, "*Hostile Indian Tribes . . . Outlaws, Wolves, . . . Bears . . . Grizzlies and Things Like That?" How the Second Amendment and Supreme Court Precedent Target Tribal Self-Defense*, 13 U. PA. J. CONST. L. 687, 698 (2011).
[30] 3 RECORDS OF THE COLONY OF RHODE ISLAND, AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 31 (1858).
https://books.google.com/books?id=ehxPAQAAMAAJ&newbks=1&newbks_redir=0&dq=%22 That%20any%20person%20or%20persons%20shall%20presume%20to%20sport%2C%20game %20or%20play%20at%20any%20manner%20of%20game%20or%20games%22&pg=PA31#v= onepage&q=%22That%20any%20person%20or%20persons%20shall%20presume%20to%20spo rt,%20game%20or%20play%20at%20any%20manner%20of%20game%20or%20games%22&f= false.

**App. 0547**

earliest statute that is even remotely supportive of the proponent's view was not enacted until 1878 and falls outside of the relevant historical period under *Bruen*. Furthermore, restrictions on alcohol consumption are no justification for firearm waiting periods. Limiting where one may choose to imbibe is not tantamount to preventing one from obtaining a firearm.

## II.    THE PURPOSE OF WAITING PERIODS

38.    Spitzer explains in his report that the purpose of waiting periods:

> "By its nature, a gun waiting period simply delays an otherwise lawful purchase for sound [sic] two reasons: to complete a proper background check to ensure that the individual is not among those not qualified to have a gun; and to provide a cooling off period for those who seek to obtain a gun impulsively for homicidal or suicidal reasons."

39.    Notwithstanding the national background check system currently in place, the New Mexico statute seemingly imposes a waiting period irrespective of whether the background check yields a clean result before the mandatory seven-day period: "The firearm shall remain in the custody of the seller or the federal firearms licensee performing the federal instant background check during the entirety of the waiting period."[31]

40.    If the purpose of the statute is to provide a "cooling off" period, then such is an unconstitutional end-means approach expressly rejected by *Bruen*:

In the years since, the Courts of Appeals have coalesced around a "two-

---

[31] § 30-7-7.3, Unlawful Sale of a Firearm Before Required Waiting Period Ends.

**App. 0548**

step" framework for analyzing Second Amendment challenges that combines history with means-end scrutiny. Today, we decline to adopt that two-part approach. In keeping with Heller, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[32]

41.     The government's policy concerns may be reasonable, but without a

plausible showing that this regulatory scheme is consistent with our Nation's history

and tradition, the law should be struck down under the *Bruen* Framework.

## III.   ROTH'S HOMICIDE RATES

42.     Roth's homicide rates should not be confused with *murder* rates.

Though, it seems the two are conflated in Spitzer's report:

> Third, as Randall Roth reports, homicide rates in the colonies and early Federal era were generally low, and when homicides occurred, guns were seldom used because of the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy. More specifically, muzzle loading firearms were problematic as implements for murder: they did not lend themselves to impulsive use unless already loaded (and it was generally unwise to leave them loaded for extended periods because their firing reliability degraded over time). Nearly all firearms at the time were single shot weapons, meaning that reloading time rendered them all but useless if a second shot was needed in an interpersonal conflict.

---

[32] *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022).

**App. 0549**

43.     Roth explains that he is focused on *homicide* rates that include "assaults that were legally justified or not meant to cause death." This catch-all category does not truly capture the data Spitzer implies.

44.     If we are to consider today's murder rates, the essential question to be addressed is whether law-abiding individuals, subject to the waiting periods, who legally purchase firearms are likely to commit such violence.

45.     Spitzer implies that a waiting period helps to reduce gun violence because it gives the individual time for "cooling off." However, the data suggests that law-abiding citizens subject to a waiting period are less likely to engage in intentional and unprovoked gun violence.

46.     In fact, leading research studies suggest that "different types of access to firearms may have divergent effects on rates of violent crime, suggesting that all gun availability may not have the same effect on crime rates."[33]

47.     Furthermore, scientists believe that legally acquired firearms are more likely to be used in a defensive situation, as in a justifiable homicide context, rather than used in a criminally offensive manner.[34] Most importantly, the data indicates that there is likely "no relationship to criminal violence" when firearms are obtained

---

[33] Daniel C. Semenza, et al., *Firearm Availability, Homicide, and the Context of Structural Disadvantage,* 27 Homicide Studies 2 (2021); see also Philip J. Cook, *The Effect of Gun Availability on Robbery and Robbery Murder: A Cross-Section Study of Fifty* Cities (1979).
[34] *Id.* ("More specifically, illegally obtained guns may be more likely to be used during the course of a violent crime, whereas legally obtained weapons may be more salient in a defensive context or have no relationship to criminal violence at all.").

**App. 0550**

through legal means.[35]

48.     Scientists agree, as the data show, "that the availability of illegal guns influences violent crime rates" more than guns obtained legally.[36] In a study examining how guns come into police possession, experts found that 79 percent of perpetrators apprehended by police were carrying stolen firearms:

> Most cases involve a single perpetrator. Traffic stop and street patrol accounted for 31% of method of recovery. Most perpetrators (79%) were carrying a gun that did not belong to them.[37]

49.     To be clear, this data is widely accepted across the political spectrum. Even progressive gun control groups such as Everytown for Gun Safety Support Fund agree that "the majority of homicides and assaults involve stolen or illegal guns."[38]

## IV.  SUICIDE RATES

50.     It is true that suicide has plagued our society since the Colonial Era. Still today, the subject continues to perplex and elude experts in our advanced

---

[35] *Id. See also* Lisa Stolzenberg and Stewart J. D'Alessio, *Gun Availability and Violent Crime: New Evidence from the National Incident-Based Reporting System*, SOCIAL FORCES, Volume 78, Issue 4, June 2000, Pages 1461–1482, https://doi.org/10.1093/sf/78.4.1461

[36] *Id.* See also

[37] Anthony Fabio, et al., *Gaps continue in firearm surveillance: Evidence from a large U.S. City Bureau of Police, Social Medicine*, Volume 10, Number 1, July 2016 ("Given that 79% of perpetrators are connected to firearms for which they are not the legal owner, it is highly likely that a significant amount of theft or trafficking is the source of perpetrators' firearms."), https://socialmedicine.info/index.php/socialmedicine/article/view/852/1649

[38] Jay Szkola, et al., "Gun Thefts from Cars: The Largest Source of Stolen Guns," Everytown Research and Policy, 5/9/2024, https://everytownresearch.org/report/gun-thefts-from-cars-the-largest-source-of-stolen-guns-2/

**App. 0551**

society. It is also true that firearms are one of the leading means of suicide today.

51.    However, the data surrounding firearm related suicides are not as plain and clear as the proponents and its experts contend.

52.    Like the data addressing homicide and murder statistics, the narrow question requiring redress in the context of firearm related suicide is whether those who lawfully obtain firearms are the primary victims of suicide. Upon further examination, the data seemingly indicates that the answer is no.

53.    A recent study found that "The association between firearm ownership and suicide was approximately 2 times stronger among adolescents relative to adults."[39] Many states as well as federal firearms licensees prohibit individuals under the age of 21 from purchasing handgun. A waiting period simply does not reach those with an increased risk for suicide. This proves that the typical law-abiding citizen seeking to purchase firearms are not in the class of individuals who would use a firearm for self-harm. If the purpose of waiting periods is to reduce suicide rates, then such an aim is clearly overbroad.

54.    The proponents of the waiting period system note on several occasions that the plan would provide a cooling off period which would limit "those who seek

---

[39] Kivisto AJ, Kivisto KL, Gurnell E, et al.. *Adolescent suicide, household firearm ownership, and the effects of child access prevention laws*. J AM ACAD CHILD ADOLESC PSYCHIATRY 2020 ("There were 37,652 suicides among adolescents aged 14 to 18 years during the study period (1991−2017), for an overall rate of 6.9 per 100,000. Slightly more than half of all adolescent suicides (51.5%, n = 19,402) were with a firearm, for a rate of 3.6 per 100,000. For comparison, 53.9% of adult suicides used a firearm during the same time period.").

**App. 0552**

to obtain a gun impulsively for homicidal or suicidal reasons."[40] They also claim that the "purpose of a modern gun purchase waiting period is to provide a 'cooling off' period for the prospective purchaser—very much like a "sobering up" period for someone who is intoxicated."[41]

55.     Again, the data does not support these claims. For example, more than 76 percent of suicide attempters "did not attempt impulsively."[42] This is also true within the adolescent population where "less than 10% of the adolescents who had attempted suicide in their sample had done so impulsively. Again, these findings are consistent with the idea that suicide attempts "on a whim" are quite rare."[43]

56.     Thus, because most individuals who intend to commit suicide plan well in advance of the act itself, a waiting period would likely not impede their decision. As such, its utility has significantly less value than the proponents of the law claim. Therefore, this general prohibition on the right to keep and bear arms is again overbroad.

## V.    HISTORICAL LICENSING LAWS

57.     Spitzer references several laws that he claims to be analogues to modern waiting period laws. This presumption is seriously flawed for two reasons.

---

[40] Spitzer Declaration at 6.
[41] Spitzer Declaration at 7.
[42] April R. Smith, et al., *Revisiting impulsivity in suicide: implications for civil liability of third parties*. 26 BEHAV SCI LAW 779 (2008),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2597102/.
[43] *Id*.

**App. 0553**

58.     First, nearly all of the statutes cited by Spitzer fall outside the relevant period determined by the *Bruen* majority.[44]

59.     True, in a concurring opinion Justice Barrett inquired as to whether laws enacted around 1868 would be relevant for understanding the scope of the right to keep and bear arms following the passage of the Fourteenth Amendment:

> Second and relatedly, the Court avoids another "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868" or when the Bill of Rights was ratified in 1791.[45]

60.     However, the statute at issue in *Bruen*, the New Mexico waiting period and the licensing laws referenced by Spitzer fail regardless of whether the proper period is the Founding Era or Reconstruction.

61.     The New York statute required an applicant to prove "proper cause exists" in order to carry a firearm in public. The Supreme Court struck down the 1913 statute finding that the law prevented an individual from exercising their constitutional right to keep and bear arms:

> Throughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms. But apart from a handful of late19th-century jurisdictions, the historical record compiled by respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used

---

[44] *See Supra* note 24.

[45] *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022) (Barrett, J., concurring).

**App. 0554**

firearms for self-defense. Nor is there any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense. We conclude that respondents have failed to meet their burden to identify an American tradition justifying New York's proper cause requirement. Under Heller's text-and-history standard, the proper-cause requirement is therefore unconstitutional.[46]

62.     The proponents rightly concede that there is no historical tradition of requiring individuals to wait before acquiring firearms. Like the statute at issue in *Bruen*, requiring an individual to wait a period of time is tantamount to prohibiting an individual from exercising their constitutional right. Thus, because there is no historical tradition of requiring an individual to wait prior to taking possession of a firearm, the New Mexico waiting period fails regardless of whether the relevant time period is 1791 or 1868.

63.     Second, of the Founding Era statutes Spitzer cites none of them actually require one to postpone taking possession of a firearm. Even when a permit or license is required to hunt, Spitzer has shown no evidence that the individual would be required to wait for any period of time before taking possession of his firearm regardless of whether he'd be permitted to hunt. There is simply no historical basis to support this statute.

---

[46] *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 29-30 (2022)

**App. 0555**

I declare under penalty of perjury under the laws of the State of New Mexico that the foregoing is true and correct.


Executed on June 17, 2024

_____  F. Lee Francis

App. 0556

# <u>Exhibit B</u>

**Curriculum Vitae**

**of Professor F. Lee Francis**

# F. LEE FRANCIS

Assistant Professor of Law
Widener University Commonwealth Law School
lfrancis@widener.edu

## ACADEMIC APPOINTMENTS

**Widener University Commonwealth Law School**
*Assistant Professor of Law*, July 2024
- <u>Courses</u>: Constitutional Law, Criminal Procedure, Evidence

**Mississippi College School of Law**
*Assistant Professor of Law*, August 2023 – June 2024
- <u>Courses</u>: Civil Procedure, Administrative Law
*Director, Center for Litigation and Alternative Dispute Resolution*

## LEGAL EXPERIENCE

**Special Assistant U. S. Attorney, EDNC, 2022-2023**
- Prosecuted criminal cases in the US Court of Appeals for the Fourth Circuit.
- Prosecuted misdemeanors and felonies in the Eastern District of North Carolina.

**Judge Advocate General Corps, US Army, 2021-2023**
- Advised on employment and dozens of sexual harassment cases.
- Advised senior leaders on matter relating to employment law, ethics, and federal regulations.

## ARTICLES

*The Mutability of Dangerousness: Restoring the Second Amendment Rights of the Dangerous,* SOUTHERN METHODIST UNIVERSITY LAW REVIEW (Forthcoming 2025) (Invited).

*The Addiction Restriction: Addiction and the Right to Bear Arms*, WEST VIRGINIA LAW REVIEW (Forthcoming 2025).

*Defining Dangerousness: When Disarmament is Appropriate*, TEXAS TECH LAW REVIEW (Forthcoming 2024).

*Of the Rights of Parents: Parental Authority and the Common Law*, TEXAS REVIEW OF LAW AND POLITICS (2024) (Invited).

*Armed and Under the Influence: The Second Amendment and the Intoxicant Rule After Bruen,* MARQUETTE LAW REVIEW (Forthcoming 2024).

- Cited in SUPPLEMENT FOR FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY. Ed. Johnson, et al, 2023. (Casebook)

*The History of Policing and the Impact on Minority Communities,* MISSISSIPPI COLLEGE LAW REVIEW (Forthcoming 2024).

*In Loco Parentis and the Fourth Amendment Rights of Minors in Public Schools,* SOUTHERN UNIVERSITY LAW REVIEW (2022).

*Who Decides: What the Constitution Says About Parental Authority and the Rights of Minor Children to Seek Gender Transition Treatment,* SOUTHERN ILLINOIS UNIVERSITY LAW JOURNAL (2022).

- Mentioned on HealthLawProf Blog.
- Cited in the Journal of the American Academy of Matrimonial Lawyers (2022).
- Cited in *Kanuszewski v. Shah* (Eastern District of Michigan, 2023).

*Remembering Congress and the Separation-of-Powers: The Case Against 'Judicial Updating' of Title VII of the Civil Rights Act of 1964* 12 JOURNAL OF RACE, GENDER, & POVERTY (2021).

- Mentioned on Legal Theory Blog.

*In Memoriam: The Republican Form and the Separation-of-Powers Among the Four Branches of Government* Brazilian Journal of Public Policy (2020) (Peer-reviewed).

## BOOK CHAPTERS

"A Sartorial Tapestry: The Rhetorical Shifts of Hillary Rodham Clinton." HILLARY RODHAM CLINTON AND THE 2016 ELECTION: HER POLITICAL AND SOCIAL DISCOURSE. Ed. Michele Lockhart and Kathleen Mollick. Lexington Books, 2015. (with Rochelle Gregory).

- Cited in THE DYNAMICS OF POLITICAL COMMUNICATION: MEDIA AND POLITICS IN A DIGITAL AGE (2017).

"Pardoning Marijuana Possession While Using Marijuana to Criminalize Firearm Ownership." SUPPLEMENT FOR FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY. Ed. Johnson, et al, 2023. (Casebook)

## BOOK REVIEWS

RADICAL MOVES: CARIBBEAN MIGRANTS AND THE POLITICS OF RACE IN THE JAZZ AGE (Chapel Hill: The University of North Carolina Press, 2013. Pp. 336), 540-542.
CULTIVATION AND CATASTROPHE: THE LYRIC ECOLOGY OF MODERN BLACK LITERATURE (Baltimore, MD: Johns Hopkins University Press, 2017. Pp. 304), 719-721.

## AMICUS BRIEFS

Brief of Amicus Curiae Scholars of Second Amendment Law and The Independence Institute in Support of Defendant-Appellant, *U.S. v. Daniels*, U.S. Court of Appeals for the Fifth Circuit (2023) (principal author of brief addressing the constitutionality of 18 U.S.C. §922(g)(3)).

- Cited in *United States v. Daniels* (US Court of Appeals for the Fifth Circuit, 2023).

## PRESENTATIONS

*The Addiction Restriction: Addiction and the Right to Bear Arms* – Duke University (2024)

"Litigating the Second Amendment" – Miss. State Public Defenders Conf. (2023)

## ADMISSIONS

State of New Jersey – Bar No. 387292021
United States District Court – Eastern District of North Carolina
United States District Court – Western District of Wisconsin
United States Court of Appeals – Fourth Circuit

## EDUCATION

**Maurice A. Deane School of Law at Hofstra University**, J.D., 2020
- Associate Editor, Journal of Labor and Employment Law

**University of North Carolina at Greensboro**, M.A. (Rhetoric and Composition) 2015
Advanced Graduate Certificates (African American Studies, 2017, and Women and Gender Studies, 2014)

**Campbell University,** B.S., Social Science (Political Science and Humanities) 2013

**App. 0560**

IN THE UNITED STATES DISCTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**SAMUEL ORTEGA, and**
**REBECCA SCOTT,**

      **Plaintiffs,**

**vs.**                                          No. 1:24-cv-00471-JB-SCY

**MICHELLE LUJAN GRISHAM,**
**in her official capacity as**
**Governor of the State of New**
**Mexico, and RAÚL TORREZ, in**
**his official capacity as Attorney**
**General of the State of New**
**Mexico,**

      **Defendants.**

<u>**PLAINTIFFS' EXPERT DISCLOSURE**</u>

    Samuel Ortega and Rebecca Scott (collectively, "Plaintiffs") hereby disclose their

retained expert pursuant to the Court's Scheduling Order [Doc. 10]:

    **F. Lee Francis**
    Assistant Professor of Law
    Mississippi College School of Law
    Jackson, MS 39201
    917-280-2694
    leefrancis12@gmail.com

    **Scope of opinion:** In his Expert Report and Declaration, attached as Exhibit A to

Plaintiff's Reply in Support of Motion for Temporary Restraining Order and Preliminary

Injunction [Doc. 21], Assistant Professor F. Lee Francis opines on the history surrounding

firearms regulations in the United States, corresponding statistics, as well as the relevance and

applicability of these regulations to the law at issue in the present case. His analysis, which spans

the breadth of American history beginning with the colonial era and extending into modern

times, addresses the inability of NMSA 1978, § 30-7-7.3 (2024) (the "Waiting Period Act") to

**App. 0561**

meet the history and tradition standard test established under *New York State Rifle & Pistol Association, Inc. v. Bruen* (597 U.S. 1 (2022)).  Plaintiffs intend to call Assistant Professor F. Lee Francis as a witness at the upcoming preliminary injunction hearing to testify as to the analysis and findings contained in his Expert Report and Declaration, as well as to respond to the declaration of Defendants' experts, Professor Robert J. Spitzer and Professor Randolph Roth.

Plaintiffs reserve the right to retain additional /alternative experts as the case proceeds.

DATED: June 21, 2024

Respectfully submitted,

*/s Carter B. Harrison IV*
Carter B. Harrison IV
Attorney and Partner
**Harrison & Hart, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102
(505) 303-1835
carter@harrisonhartlaw.com

Michael D. McCoy
Sean D. Nation
Robert Welsh
**Mountain States Legal Foundation**
2596 South Lewis Way
Lakewood, Colorado 80227
Phone: (303) 292-2021
mmccoy@mslegal.org

Joseph G.S.
Greenlee Erin M.
Erhardt
**National Rifle Association of America**
11250 Waples Mill
Road Fairfax, VA
22030
(703) 267-1161
jgreenlee@nrahq.org

*Attorneys for Plaintiff*

**App. 0562**

**CERTIFICATE OF SERVICE**

I hereby certify that on June 21, 2024, I filed the foregoing via the CM/ECF filing system, which caused all counsel of record to be served by electronic means.

/s/ Michael D. McCoy
Michael D. McCoy

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SAMUEL ORTEGA, and**
**REBECCA SCOTT,**

     **Plaintiffs,**

**vs.**                     **No. 1:24-cv-00471-JB-SCY**

**MICHELLE LUJAN GRISHAM, in her**
**official capacity as Governor of the State of**
**New Mexico, and RAÚL TORREZ, in his**
**official capacity as Attorney General of the**
**State of New Mexico,**

     **Defendants.**

### GOVERNOR LUJAN GRISHAM'S UNOPPOSED
### MOTION FOR SUPPLEMENTAL BRIEFING

Defendant Governor Michelle Lujan Grisham, by and through her counsel of record, hereby moves for this Court to allow the parties to submit supplemental briefs addressing the Supreme Court's June 21, 2024, decision in *United States v. Rahimi*, 602 U.S. __, 2024 WL 3074728 (U.S. June 21, 2024). In support thereof, the Governor states as follows:

1.      On May 15, 2024, Plaintiffs filed the instant action against challenging New Mexico's newly enacted waiting period law, NMSA 1978, § 30-7-7.3 (2024), on the basis that it allegedly violates the Second Amendment. [Doc. 1]

2.      In addition to seeking declaratory and permanent injunctive relief, Plaintiffs moved for a temporary restraining order and preliminary injunction. [Doc. 2]

3.      Defendants filed their response to Plaintiffs' motion on June 4, 2024. [Doc. 15]

4.      Plaintiffs filed their reply on June 18, 2024. [Doc. 21]

**App. 0564**

5.      Three days later, the Supreme Court issued *Rahimi*, 2024 WL 3074728, a 103-page opinion upholding the constitutionality of 18 U.S.C. § 922(g)(8) in which it addresses lower courts' "misunderst[anding of] the methodology of [the Court's] recent Second Amendment cases[.]" *Rahimi*, 2024 WL 3074728, at *6.

6.      Although the parties will have the opportunity to present argument on the motion at a hearing set for June 27 and 28, the Governor believes the Court will benefit from supplemental briefing from the parties on *Rahimi*'s impact on this Court's Second Amendment analysis. [Doc. 10]

7.      Supplemental briefing will not significantly delay the Court's ability to decide Plaintiffs' motion for a preliminary injunction.

8.      The parties do not oppose this motion.

WHEREFORE, for the foregoing reasons, the Governor respectfully requests that the Court allow the parties to submit supplemental briefs of no more than fifteen pages addressing *Rahimi*'s impact on the Court's Second Amendment analysis on or before July 1 and response briefs of no more than ten pages on or before July 8, or any other timeline that is acceptable to the Court.

Respectfully submitted,

*/s/ Holly Agajanian*
**HOLLY AGAJANIAN**
*Chief General Counsel to Governor Michelle Lujan Grisham*
**KYLE P. DUFFY**
*Deputy General Counsel to Governor Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2200
Holly.Agajanian@exec.nm.gov
Kyle.duffy@exec.nm.gov

**App. 0565**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 25, 2024, I filed the foregoing via the CM/ECF filing system, which caused all counsel of record to be served by electronic means.

Respectfully submitted,

*/s/ Holly Agajanian*
Holly Agajanian

**App. 0566**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

### Clerk's Minutes
### Before the Honorable James O. Browning

**CASE NO.**   CIV 24-0471 JB/SCY         **DATE:**   6/27/2024

**TITLE:**   *Ortega, et al. v. Lujan Grisham, et al.*

**COURTROOM CLERK:** L. Rotonda      **COURT REPORTER:**   J. Bean

**COURT IN SESSION:**   8:55 AM      **TOTAL TIME:**   6:05

**TYPE OF PROCEEDING:** MOTION HEARING

**COURT RULING/DISPOSITION:**
1. PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (DOC. 2) – TAKEN UNDER ADVISEMENT.

**ATTORNEYS PRESENT FOR PLAINTIFF(S):**      **ATTORNEYS PRESENT FOR DEFENDANT(S):**

Mike McCoy                      Holly Agajanian
Robert Welsh                    Kyle Duffy
Sean Nation                     Mark Allen
Carter Harrison

**PROCEEDINGS:**

**COURT IN SESSION: 8:55 AM**

**COURT:**   CALLS CASE, COUNSEL ENTER APPEARANCES.

QUERIES COUNSEL AS TO WHETHER EITHER PARTY WISHES TO INVOKE RULE, COUNSEL FOR DEFENDANTS CONFIRMS DOES WISH TO INVOKE SAME.  DIRECTS COUNSEL TO ADDRESS COURT AND CLARIFY WHICH WITNESSES SHOULD BE ADMITTED.

ADDRESSES COUNSEL AT OUTSET OF HEARING REGARDING COURT'S VIEW OF RELEVANT LEGAL LANDSCAPE, AREAS WHERE COURT PERCEIVES AMBIGUITIES.

**MR. HARRISON:**   DELIVERS OPENING STATEMENT ON BEHALF OF PLAINTIFFS.

**COURT:**   QUERIES MR. HARRISON REGARDING PRESUMPTIVELY CONSTITUTIONAL THEORY AND RELEVANT HOLDINGS IN SCOTUS CASES, HISTORICAL ANALOGUES, COMMERCIAL SALE

**App. 0567**

RESTRICTIONS.

**MR. HARRISON:** RESPONDS TO COURT'S QUERIES.

**MR. DUFFY:** DELIVERS OPENING STATEMENT ON BEHALF OF DEFENDANTS.

**COURT:** QUERIES MR. DUFFY REGARDING REGULATORY FRAMEWORK OUTLINED BY COURT,

HISTORICAL ANALOGUE ISSUES.

**MR. DUFFY:** RESPONDS TO COURT'S QUERIES, RESUMES OPENING STATEMENT.

**MR. MCCOY:** PLAINTIFF CALLS REBECCA SCOTT (SWORN), QUESTIONS ON DIRECT EXAMINATION.

MOVES FOR ADMISSION OF PLAINTIFFS' EX. NOS. 1, 2.

**MS. AGAJANIAN:** NO OBJECTIONS.

**COURT:** WILL ADMIT PLAINTIFFS' EX. NOS. 1, 2.

**MS. AGAJANIAN:** QUESTIONS MS. SCOTT ON CROSS EXAMINATION.

**MR. MCCOY:** QUESTIONS MS. SCOTT ON REDIRECT EXAMINATION.

**MS. AGAJANIAN:** QUESTIONS MS. SCOTT ON RECROSS EXAMINATION.

**COURT:** EXCUSES MS. SCOTT FROM PROCEEDINGS.

**MR. MCCOY:** PLAINTIFFS CALL PAUL ORTEGA (SWORN), QUESTIONS ON DIRECT EXAMINATION.

**COURT IN RECESS: 10:31 AM**

**COURT IN SESSION: 10:48 AM**

**MR. MCCOY:** RESUMES QUESTIONING MR. ORTEGA ON DIRECT EXAMINATION.

**MS. AGAJANIAN:** QUESTIONS MR. ORTEGA ON CROSS EXAMINATION.

**COURT:** EXCUSES MR. ORTEGA FROM PROCEEDINGS.

**MR. WALSH:** PLAINTIFF CALLS ROBERT POHL (SWORN), QUESTIONS ON DIRECT EXAMINATION.

**MS. AGAJANIAN:** QUESTIONS MR. POHL ON CROSS EXAMINATION.

**COURT:** EXCUSES MR. POHL FROM PROCEEDINGS.

**MR. HARRISON:** PLAINTIFFS CALL PROFESSOR F. LEE FRANCIS (SWORN – APPEARING REMOTELY),

**App. 0568**

QUESTIONS ON CROSS EXAMINATION.

MOVES FOR ADMISSION OF PLAINTIFFS' EX. NOS. 3, 4, 5, 6.

MS. AGAJANIAN:  NO OBJECTIONS.

COURT:  WILL ADMIT PLAINTIFFS' EX. NOS. 3, 4, 5, 6.

MR. HARRISON:  RESUMES QUESTIONING PROFESSOR FRANCIS ON DIRECT EXAMINATION.

MOVES TO RECOGNIZE PROFESSOR FRANCIS AS EXPERT WITNESS.

MR. ALLEN:  NO OBJECTION, RESERVES RIGHT TO *VOIR DIRE* WITNESS IF NECESSARY.

COURT:  WILL PERMIT PROFESSOR FRANCIS TO PROVIDE EXPERT WITNESS TESTIMONY.

MR. HARRISON:  RESUMES QUESTIONING PROFESSOR FRANCIS ON DIRECT EXAMINATION.

MR. ALLEN:  QUESTIONS PROFESSOR FRANCIS ON CROSS EXAMINATION.

**COURT IN RECESS: 12:00 PM**

**COURT IN SESSION: 1:02 PM**

MR. ALLEN:  RESUMES QUESTIONING PROFESSOR FRANCIS ON CROSS EXAMINATION.

COURT:  EXCUSES PROFESSOR FRANCIS FROM PROCEEDINGS.

MR. HARRISON:  INDICATES PLAINTIFFS HAVE NO FURTHER WITNESSES OR EVIDENCE.

MR. DUFFY:  DEFENDANTS CALL PROFESSOR RANDOLPH ROTH (SWORN – APPEARING REMOTELY),

QUESTIONS ON DIRECT EXAMINATION.

MOVES TO HAVE PROFESSOR ROTH RECOGNIZED AS AN EXPERT WITNESSES.

MR. NATION:  OBJECTS ON BASIS OF RELEVANCY.

COURT:  WILL PERMIT WITNESS TO PROVIDE EXPERT WITNESS TESTIMONY, WILL DETERMINE

RELEVANCY AT LATER POINT.

MR. DUFFY:  RESUMES QUESTIONING PROFESSOR ROTH ON DIRECT EXAMINATION.

MR. NATION:  QUESTIONS PROFESSOR ROTH ON CROSS EXAMINATION.

**COURT IN RECESS:  2:32 PM**

App. 0569

**COURT IN SESSION: 2:54 PM**

**MR. NATION:** RESUMES QUESTIONING PROFESSOR ROTH ON CROSS EXAMINATION.

**COURT:** EXCUSES PROFESSOR ROTH FROM PROCEEDING.

**MR. DUFFY:** INDICATES DEFENDANTS HAVE NO FURTHER EVIDENCE OR WITNESSES.

**MR. MCCOY:** INDICATES PLAINTIFFS DO NOT WISH TO PRESENT REBUTTAL EVIDENCE.

DELIVERS CLOSING STATEMENT ON BEHALF OF PLAINTIFFS, ARGUES IN SUPPORT OF PLAINTIFFS'

MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (DOC. 2).

**COURT:** QUERIES MR. MCCOY.

**MR. MCCOY:** RESPONDS TO COURT'S QUERIES, RESUMES ARGUMENT.

**MR. DUFFY:** DELIVERS CLOSING STATEMENT ON BEHALF OF DEFENDANTS, ARGUES IN OPPOSITION

TO MOTION.

**COURT:** QUERIES MR. DUFFY.

**MR. DUFFY:** RESPONDS TO COURT'S QUERIES, RESUMES ARGUMENT.

**MR. MCCOY:** ARGUES IN REBUTTAL AS TO MOTION.

**MR. HARRISON:** ADDRESSES COURT REGARDING SUPPLEMENTAL BRIEFING PARTIES WISH TO FILE,

ORALLY MOVES COURT TO EXPAND PAGE LIMITS.

**COURT:** QUERIES COUNSEL REGARDING TIMEFRAME WITHIN WHICH PARTIES WOULD LIKE FOR

COURT TO ISSUE OPINION.

**MR. HARRISON:** REQUESTS THAT OPINION BE ISSUED WITHIN 2 WEEKS OF PARTIES'

SUPPLEMENTAL BRIEFING.

**COURT:** CONFIRMS WILL FILE BY CLOSE OF BUSINESS ON JULY 22, 2024.

PROVIDES COURT'S INCLINATION AS IT LEAVES BENCH, SHOULD COUNSEL WISH TO ADDRESS THESE

POINTS IN BRIEFING.

**MR. NATION:** PROVIDES CITES TO CASES REFERENCED.

**COURT:** THANKS COUNSEL FOR PRESENTATIONS.

**COURT IN RECESS: 4:41 PM**

**App. 0571**

**FILED**

IN THE UNITED STATES DISTRICT COURT   UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

FOR THE DISTRICT OF NEW MEXICO

JUL **3** 2024

SAMUEL ORTEGA, and
REBECCA SCOTT,

MITCHELL R. ELFERS
CLERK

      Plaintiffs,

vs.                                                      No. 1:24-cv-00471-JB-SCY

MICHELLE LUJAN GRISHAM, in her
official capacity as Governor of the State of
New Mexico, and RAÚL TORREZ, in his
official capacity as Attorney General of the
State of New Mexico,

      Defendants.

## ORDER GRANTING GOVERNOR LUJAN GRISHAM'S
## UNOPPOSED MOTION FOR SUPPLEMENTAL BRIEFING

THIS COURT, having reviewed Governor Michelle Lujan Grisham's Unopposed Motion

for Supplemental Briefing [Doc. 25], FINDS the motion is well taken and should be GRANTED.

IT IS THERFORE ORDERED that the parties shall be permitted to file supplemental briefs

of no more than fifteen pages addressing the impact of *United States v. Rahimi*, 602 U.S. __, 2024

WL 3074728 (U.S. June 21, 2024), on the Court's Second Amendment analysis on or before July

1, 2024, and response briefs of no more than ten pages on or before July 8, 2024.

The Honorable James O. Browning
United States District Court Judge

1

**App. 0572**

Submitted by:

*/s/ Holly Agajanian*
**HOLLY AGAJANIAN**
*Chief General Counsel to Governor Michelle Lujan Grisham*
**KYLE P. DUFFY**
*Deputy General Counsel to Governor Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2200
Holly.Agajanian@exec.nm.gov
Kyle.Duffy@exec.nm.gov


Approved by:

*/s/ electronically approved via email June 26, 2024*
Carter B. Harrison IV
**Attorney and Partner**
Harrison & Hart, LLC
924 Park Ave. SW, Suite E
Albuquerque, NM 87102
Email: carter@harrisonhartlaw.com

*Attorney for Plaintiff*

*/s/ electronically approved via email June 26, 2024*
Mark W. Allen
Assistant Attorney General
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
505.490.4825
mallen@nmdoj.gov

*Attorney for Raúl Torrez*

**App. 0573**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SAMUEL ORTEGA, and**
**REBECCA SCOTT,**

      **Plaintiffs,**

**vs.**                      **No. 1:24-cv-00471-JB-SCY**

**MICHELLE LUJAN GRISHAM, in her**
**official capacity as Governor of the State of**
**New Mexico, and RAÚL TORREZ, in his**
**official capacity as Attorney General of the**
**State of New Mexico,**

      **Defendants.**

## <u>DEFENDANTS' JOINT SUPPLEMENTAL BRIEF</u>

Governor Michelle Lujan Grisham and Attorney General Raúl Torrez (collectively, "Defendants"), by and through their respective counsel of record, hereby submit their supplemental brief pursuant to the Court's leave granted orally at the June 27, 2024, preliminary injunction hearing.

## INTRODUCTION

On June 21, 2024, the United States Supreme Court issued its opinion in *United States v. Rahimi*, 602 U.S. __, 2024 WL 3074728 (U.S. June 21, 2024), its first Second Amendment decision following *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). At the outset, it is important to note what *Rahimi* did *not* do. Contrary to the Court's initial concerns expressed at last week's preliminary injunction hearing, *Rahimi* did not abandon *Bruen*'s first step in which courts must consider whether the regulated conduct is protected by Second Amendment's plain text. Nor did it abrogate *Heller*'s list of "presumptively lawful" measures, such as "laws imposing conditions

**App. 0574**

and qualifications on the commercial sale of arms." *D.C. v. Heller*, 554 U.S. 570, 626-27 &. n.26 (2008). Thus, this Court need not doubt its preliminary conclusion that Plaintiffs are unlikely to succeed because (1) the Second Amendment's plain text does not cover the right to immediately acquire a newly purchased firearm and (2) the challenged waiting period is a presumptively lawful commercial regulation.

While *Rahimi* did not shed much, if any, light on *Bruen*'s first step, it *did* provide much needed clarification to lower courts applying the second step of the *Bruen* test and addressing facial challenges to firearm regulations. Regarding *Bruen*'s second step, *Rahimi* clarified that (1) courts should apply *Bruen*'s "more nuanced" approach to identifying historical analogs even if a modern law is addressing general societal issues that existed at the time of the founding; (2) courts may rely on historical laws to justify a modern regulation even though those laws addressed different societal issues so long as the modern regulation is consistent with the principles underlying the historical laws; and (3) *Bruen* allows for modern regulations that address longstanding or evolving societal issues through different means. Applying these clarifications to the instant case, it is clear waiting periods are consistent with the principles underlying historical regulations like intoxication laws and licensing regimes because they only impose a brief delay on an individual's ability to use a firearm to help ensure the deadly weapon is not misused. And regarding facial challenges, *Rahimi* confirmed that individuals bringing such a challenge to a firearm regulation—as Plaintiffs do here—must "establish *that no set of circumstances* exists under which the [challenged law] would be valid." *Rahimi*, 2024 WL 3074728, at *6 (cleaned up) (emphasis added). Because Plaintiffs obviously fail to meet this demanding standard, this Court should flatly reject their request for a preliminary injunction.

**App. 0575**

At bottom, while Defendants are confident the challenged waiting period in this case would have been upheld prior to the Supreme Court's latest decision, *Rahimi* solidifies that conclusion.

## BACKGROUND

On May 15, 2024, Plaintiffs filed the instant action against challenging New Mexico's newly enacted waiting period law, NMSA 1978, § 30-7-7.3 (2024), on the basis that it allegedly violates the Second Amendment. [Doc. 1] In addition to seeking declaratory and permanent injunctive relief, Plaintiffs moved for a temporary restraining order and preliminary injunction. [Doc. 2] Defendants filed their response to Plaintiffs' motion on June 4, 2024. [Doc. 15] Plaintiffs filed their reply on June 18, 2024. [Doc. 21] Three days later, the Supreme Court issued *Rahimi*, 2024 WL 3074728, a 103-page opinion upholding the constitutionality of 18 U.S.C. § 922(g)(8) in which it addresses lower courts' "misunderst[anding of] the methodology of [the Court's] recent Second Amendment cases[.]" *Rahimi*, 2024 WL 3074728, at *6. Given the significance of *Rahimi* on this Court's analysis of Plaintiffs' Second Amendment challenge, the Governor requested leave to file a supplemental brief on the issue. [Doc. 25] The Court also permitted the parties to address other issues raised by the Court at the June 27, 2024, preliminary injunction hearing—including the Court's concerns that *Rahimi* may have transformed *Bruen*'s two-part test into a single history and tradition inquiry for all firearm regulations regardless of whether they regulate conduct unprotected by the Second Amendment's plain text or are presumptively lawful.

## DISCUSSION

### I.   *United States v. Rahimi*

In *Rahimi*, the Supreme Court addressed whether 18 U.S.C. § 922(g)(8), a federal law prohibiting persons subject to certain domestic violence restraining orders from possessing a firearm, violated the Second Amendment. The Court began its analysis by observing that "the right

**App. 0576**

secured by the Second Amendment is not unlimited" and "was never thought to sweep indiscriminately." 2024 WL 3074728, at *5 (cleaned up). Thus, the Court noted, "the bearing of arms was subject to regulations ranging from rules about firearm storage to restrictions on gun use by drunken New Year's Eve revelers" since the founding. *Id.*

The Court then went on to summarize its holding in *D.C. v. Heller*, 554 U.S. 570 (2008), and *Bruen*, 597 U.S. 1, and the historical inquiry it directed courts to undertake in Second Amendment challenges. *Rahimi*, 2024 WL 3074728, at *6. However, the Court noted, "some courts have misunderstood the methodology of our recent Second Amendment cases." *Id.* The Court clarified:

> *These precedents were not meant to suggest a law trapped in amber*. As we explained in *Heller*, for example, the reach of the Second Amendment is not limited only to those arms that were in existence at the founding. Rather, it extends, prima facie, to all instruments that constitute bearable arms, even those that were not yet in existence. *By that same logic, the Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.*

*Rahimi*, 2024 WL 3074728, at *6 (cleaned up) (emphases added).

Therefore, the Court explained, "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition[,]" and "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *Id.* (cleaned up) (emphasis added). The Court reaffirmed *Bruen*'s direction that "[w]hy and how the regulation burdens the right are central to this inquiry." *Rahimi*, 2024 WL 3074728, at *6. Significantly, though, the Court observed:

> For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. . .

**App. 0577**

> . And when a challenged regulation does not precisely match its historical
> precursors, it still may be analogous enough to pass constitutional muster. The law
> must comport with the *principles* underlying the Second Amendment, but it need
> not be a "dead ringer" or a "historical twin."

*Rahimi*, 2024 WL 3074728, at \*6 (cleaned up) (emphasis added).[1]

With these clarified principles in mind, the Court turned to the challenged regulation, §

922(g)(8). The Court began by observing that "[f]rom the earliest days of the common law, firearm

regulations have included provisions barring people from misusing weapons to harm or menace

others." *Rahimi*, 2024 WL 3074728, at \*7. The Court focused on "two distinct legal regimes" that

had developed by the 1700s and early 1800s: surety laws and going armed laws. *Id.* at \*\*7-9. The

former category of laws was a form of preventative justice in which a magistrate could jail

"individuals suspected of future misbehavior" unless they posted a bond, which they would forfeit

should they later break the peace. *Id.* at \*8. And the latter category of laws, derived from the

common-law prohibition on "affrays," broadly proscribed "riding or going armed, with dangerous

or unusual weapons, [to] terrify[ ] the good people of the land." *Id.* at \*9 (quoting 4 Blackstone

149).

"Taken together," the Court concluded, "the surety and going armed laws confirm what

common sense suggests: When an individual poses a clear threat of physical violence to another,

the threatening individual may be disarmed." *Id.* at \*9. This was true even though § 922(g)(8) "is

by no means identical to these founding era regimes." *Rahimi*, 2024 WL 3074728, at \*9. The Court

found that § 922(g)(8) was still "relevantly similar" to the surety and going armed laws because it

---

[1] The Court again recognized the "ongoing scholarly debate on whether courts should primarily
rely on the prevailing understanding of an individual right when the Fourteenth Amendment was
ratified in 1868 when defining its scope (as well as the scope of the right against the Federal
Government)." *Id.* at \*6 n.1 (quoting *Bruen*, 597 U.S., at 37). And the Court again declined to
resolve this debate. *Id.*

**App. 0578**

"applies to individuals found to threaten the physical safety of another" and "restricts gun use to mitigate demonstrated threats of physical violence." *Rahimi*, 2024 WL 3074728, at *9. Section 922(g)(8) was also relevantly similar in the sense that its prohibition is of limited duration and its penalty (i.e., temporary disarmament) was less severe than the punishment provided for under the going armed laws (i.e., imprisonment). *Rahimi*, 2024 WL 3074728, at *10. Thus, the Court concluded the federal law was constitutional on its face and as-applied to the challenger. *Id.* at *11.

## II.    *Rahimi* did not alter or abandon the first step of the *Bruen* test or *Heller*'s list of presumptively lawful measures

As an initial matter, it is important to note what *Rahami* did *not* do. This Court raised concerns at the beginning of last week's preliminary injunction hearing that *Rahimi* may have turned *Bruen*'s two-step test into a single inquiry in which the government must justify its regulations by showing they are consistent with history and tradition, even if they fall within one of *Heller*'s categories of presumptively lawful measures, because the Supreme Court did not perform any analysis of *Bruen*'s first step in determining the constitutionality of § 922(g)(8). However, as discussed at the hearing, the Supreme Court did not need to address *Bruen*'s first step because § 922(g)(8) indisputably imposed on the defendant's right to "keep" and "bear" firearms. *See Rahimi*, 2024 WL 3074728, at *35 (Thomas, J., dissenting) ("It is undisputed that § 922(g)(8) targets conduct encompassed by the Second Amendment's plain text."). And so there is no reason to believe that the Supreme Court transformed *Bruen*'s two-step inquiry into a single history and tradition test simply because it did not address an obvious proposition.

Rather than read *Rahimi* as implicitly discarding *Bruen*'s first step—which would be a major change in Second Amendment jurisprudence—based on what the Court did *not* say, this Court should rely on what the Supreme Court *has* clearly said:

**App. 0579**

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Bruen*, 597 U.S. at 24; *see generally Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*."); *cf. Vincent v. Garland*, 80 F.4th 1197, 1200 (10th Cir. 2023) (stating that district courts and the Tenth Circuit are obligated to apply Tenth Circuit precedent unless the Supreme Court "indisputably and pellucidly" abrogated it).

For this same reason, this Court should not read *Rahimi* as abrogating *Heller*'s list of "presumptively lawful" measures, including "laws imposing conditions and qualifications on the commercial sale of arms." *D.C. v. Heller*, 554 U.S. 570, 626-27 &. n.26 (2008); *see also Rocky Mountain Gun Owners v. Polis*, 2023 WL 8446495, at *2 (D. Colo. Nov. 13, 2023) (noting that "three of the justices from the majority indicated that the decision was not disturbing what was stated in *Heller* regarding presumptively lawful regulatory measures"). The Court did not need to address this category of presumptively lawful laws because no one argued that § 922(g)(8) qualified as one. *See generally Rahimi*, 2024 WL 3074728. If anything, *Rahimi* reaffirmed the ongoing viability of these presumptively lawful measures by citing this discussion with apparent approval. *See id.* at *9 (stating that "the Court does not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse" (citing *Heller*, 554 U.S., at 626); *id.* at *10 ("But *Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home. In fact, our opinion stated that many such prohibitions, like

**App. 0580**

those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" (quoting *Heller*, 554 U.S. at 626, 627, n.26)).

In sum, this Court need not be concerned that *Rahimi* drastically transformed *Bruen*'s two-step test and abolished *Heller*'s category of presumptively lawful measures. If the Court intended to enact such a sea change in Second Amendment law, it would have done so clearly—as it did in *Bruen*. *See Shalala*, 529 U.S. at 18. Concluding otherwise would be a dangerous mistake. And, as explained previously, the plain text of the Second Amendment does not protect the right to immediately acquire a newly purchased firearm, and Section 30-7-7.3 qualifies as a presumptively lawful regulation imposing conditions and qualifications on the commercial sale of arms. [Doc. 15 at 8-14] Therefore, the Court has no reason to doubt its preliminary conclusion that Plaintiffs are unlikely to succeed on the merits of their challenge.

## III.  Intoxication laws and licensing regimes are sufficient to justify Section 30-7-7.3 under *Bruen*'s second step, as clarified by *Rahimi*

Given the foregoing, this Court need not analyze whether Section 30-7-7.3 is consistent with history and tradition under *Bruen*'s second step. *See* 597 U.S. at 24. However, should the Court decide to proceed to this step, it should conclude that waiting periods like the one imposed by Section 30-7-7.3 are consistent with the principles embodied in intoxication laws and licensing regimes because it simply briefly delays a person's ability to use a firearm to help ensure they will not misuse it.

### A.  *Rahimi*'s impact on *Bruen*'s second step

The Supreme Court's decision in *Rahimi* provides several key clarifications to the second step of the *Bruen* test in which the government must show that a firearm regulation is consistent with history and tradition. First, *Rahimi* makes clear that the government need not show "unprecedented societal concerns" or "dramatic technological changes" that were "unimaginable

**App. 0581**

at the founding" to gain the benefit of *Bruen*'s "more nuanced approach" to finding historical analogs—as some have argued. *Bruen*, 597 U.S. 1, 27-28; *see, e.g.*, *Rocky Mountain Gun Owners*, 2023 WL 8446495, at *13 (addressing argument that a challenge to Colorado's waiting period law "is a straightforward case like *Heller* and *Bruen* since the problem of impulsive gun violence dates from the invention of guns" and "the complete absence of similar Founding-era regulations addressing a problem that was familiar to the Founders means the Act is inconsistent with the Second Amendment" (cleaned up)); *cf. Rahimi*, 2024 WL 3074728, at *43 (Thomas J., dissenting) (arguing that "[s]urety laws demonstrate that this case should have been a 'straightforward' inquiry" because the risk of interpersonal violence persisted since the 18th century). If this were not the case, the federal government could not have relied on surety and going armed laws to justify a "by no means identical" law addressing an issue that existed at the time of the founding (i.e., domestic violence). *Rahimi*, 2024 WL 3074728, at *9; *see id.* at *36 (Thomas, J., dissenting) ("The Government's failure is unsurprising given that § 922(g)(8) addresses a societal problem— the risk of interpersonal violence—that has persisted since the 18th century, yet was addressed through the materially different means of surety laws." (cleaned up)).

Second, *Rahimi* clarifies that courts may rely on historical laws to justify a modern regulation even though those laws addressed different societal issues so long as the modern regulation is consistent with the *principles* underlying the historical laws. *See Rahimi*, 2024 WL 3074728, at *6; *see also id.* at * 12 (Sotomayor, J. concurring) ("The Court's opinion also clarifies an important methodological point that bears repeating: Rather than asking whether a present-day gun regulation has a precise historical analogue, courts applying *Bruen* should consider whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." (cleaned up)); *id.* at *30 (Barrett, J., concurring) (similar); *id.* at *31 (Jackson, J., concurring)

(similar). Accordingly, the federal government was able to rely on going armed laws to justify a law addressing domestic violence even though going armed laws were aimed at a different societal problem (i.e., threatening *public* peace) because they shared the same underlying principle of protecting against individuals who posed a threat to others. *Compare id.* at **8-11, *with id.* at *44 (Thomas J., dissenting).

Third, and relatedly, *Rahimi* reinforces that *Bruen*'s test is not a "regulatory straightjacket" and allows for modern regulations that address longstanding or evolving societal issues through different—or even stricter—ways. *See id.* at *6 ("These precedents were not meant to suggest a law trapped in amber. . . . [T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791."). As Justice Barrett explains more fully in her concurrence:

> Courts have struggled with this use of history in the wake of *Bruen*. One difficulty is a level of generality problem: Must the government produce a founding-era relative of the challenged regulation—if not a twin, a cousin? Or do founding-era gun regulations yield concrete principles that mark the borders of the right?
>
> Many courts, including the Fifth Circuit, have understood *Bruen* to require the former, narrower approach. But *Bruen* emphasized that 'analogical reasoning' is not a 'regulatory straightjacket.' To be consistent with historical limits, a challenged regulation need not be an updated model of a historical counterpart. Besides, imposing a test that demands overly specific analogues has serious problems. To name two: It forces 21st-century regulations to follow late-18th-century policy choices, giving us 'a law trapped in amber.' And it assumes that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority. Such assumptions are flawed, and originalism does not require them.

*Rahimi*, 2024 WL 3074728, at *30 (Barrett, J., concurring) (cleaned up). And so, the federal government is permitted to prophylactically disarm those subject to certain domestic violence restraining orders (and punish those who disobey with imprisonment) even though the founding era laws that addressed this issue only required a surety bond. *Compare id*. at **7-9, *with id.* at

**App. 0583**

\*40 (Thomas, J., dissenting) ("[T]he Founders responded to the societal problem of interpersonal violence through a less burdensome regime: surety laws.").

**B.    Section 30-7-7.3 is consistent with the principles underlying intoxication laws and licensing regimes, as demonstrated by *Rahimi***

Applying the foregoing principles to the instant case, it is clear Section 30-7-7.3 does not violate the Second Amendment. First, this Court should have no trouble using *Bruen*'s more "nuanced approach" to identifying historical analogues to Section 30-7-7.3, such as intoxication laws and licensing regimes. Plaintiffs ask that this Court require Defendants produce a historical twin to Section 30-7-7.3 because "[t]he Founders knew and understood that firearms could be used for violent purposes, yet they imposed no waiting period to acquire a firearm." [Doc. 21 at 8] But the same could have been said of interpersonal violence during the founding. Yet the Supreme Court accepted surety laws and going armed laws as sufficient to justify § 922(g)(8), which was "by no means identical." *Rahimi*, 2024 WL 3074728, at \*9; *see id.* at \*36 (Thomas, J., dissenting). This Court should, therefore, apply *Bruen*'s more nuanced approach regardless of whether it finds that Section 30-7-7.3 addresses a general issue that existed at the time of the founding.

Second, the Court should accept intoxication laws and licensing regimes as relevantly similar historical analogs that justify Section 30-7-7.3 even though they may have addressed different societal issues because they stand for the principle that the government may impose temporary measures that briefly delay a person's ability to use a firearm to ensure that they do not misuse the deadly weapons. *Rahimi* makes clear that Section 30-7-7.3 is constitutional so long as it is consistent with the *principles* underlying historical laws like intoxication laws and licensing regimes. *See Rahimi*, 2024 WL 3074728, at \*6; *id.* at \* 12 (Sotomayor, J. concurring); *id.* at \*30 (Barrett, J., concurring); *id.* at \*31 (Jackson, J., concurring). These two categories of historical laws stand for the principle that the government may impose brief delays on someone's ability to

**App. 0584**

use a firearm to help ensure that they use it properly. *See Rocky Mountain Gun Owners*, 2023 WL 8446495, at **18-20 (explaining the purpose of intoxication laws and licensing regimes). And, like those laws, Section 30-7-7.3 only imposes a short, 7-day delay on an individual's ability to possess a newly purchased firearm in order to help ensure that they do not use it impulsively to hurt themselves or others.[2] [Doc. 15 at 3-4, 19-20; Doc. 20-1; Doc. 20-2]

Lastly, the Court should accept intoxication laws as sufficient to justify Section 30-7-7.3 even though they used different means to ensure people responsibly used their firearms. Plaintiffs argue that intoxication laws "are poor analogies" because they did not "assume that everyone is always intoxicated" and did not impose an additional delay on the ability to possess a firearm after the person sobered up. [Doc. 21 at 5-6][3] Yet these laws *did* assume that every intoxicated person with a firearm presented a potential danger (regardless of whether they actually did), similar to Section 30-7-7.3.[4] And the fact that Section 30-7-7.3 applies a bit more broadly in the sense that it

---

[2] Section 30-7-7.3 also helps ensure that individuals do not take possession of a firearm without first completing a background check. [Doc. 15 at 4] In this sense, it is not materially different than the shall-issue licensing regimes tacitly approved by the Supreme Court in *Bruen*. 597 U.S. at 39 n.9; *cf. McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024) (rejecting challenge to law providing for enhanced background checks for firearm purchasers under 21, which can create a waiting period of up to 10 days before delivering a firearm).

[3] Notably, Plaintiffs did not argue in their briefing that licensing regimes are not relevantly similar to Section 30-7-7.3; they merely argue that universal licensing regimes did not become popular until the early twentieth century, which Plaintiffs assert is "entirely too late to be an appropriate analogue." [Doc. 21 at 6] However, this ignores the fact that the Supreme Court in *Bruen* suggested that these were constitutional and "indicated that there is a sufficient historical basis for 'shall-issue' licensing regimes." *Rocky Mountain Gun Owners*, 2023 WL 8446495, at **10, 19 (citing *Bruen*, 597 U.S. 1, 39 n.9); *see also Antonyuk v. Chiumento*, 89 F.4th 271, 320 n.32 (2d Cir. 2023) (noting that twentieth century laws "are not weightless" and remain probative as to the existence of an American tradition of regulation" when they "reflect previously settled practices and assumptions").

[4] Plaintiffs fault 30-7-7.3 for making this "assumption." But what other way could the government realistically protect against impulsive firearm violence? Background checks alone are by no means perfect, and it is impossible to read a purchaser's mind and predict whether they plan to kill

**App. 0585**

applies to everyone who purchases a new firearm and imposes a few additional days of delay on a

purchaser's ability to take possession of their firearm does not require this Court to reject it as a

proper analogue. *See Rocky Mountain Gun Owners*, 2023 WL 8446495, at \**18-19; *cf. Rahimi*,

2024 WL 3074728 (finding surety laws relevantly similar to § 922(g)(8) even though they only

required an individual to post a small bond).

At bottom, Section 30-7-7.3 satisfies *Bruen*'s second step, as clarified by *Rahimi*, because

it simply imposes a brief delay on an individual's ability to use a firearm to help ensure that they

safely and responsibly use it.[5] A contrary conclusion would result in a "law trapped in amber."

*Rahimi*, 2024 WL 3074728, at \*6; *id.* at \*30 (Barrett, J., concurring).

**IV.    Plaintiffs fail to show that Section 30-7-7.3 is unconstitutional in all its applications, as required by *Rahimi***

In addition to clarifying the analysis under *Bruen*'s second step, *Rahimi* confirms

Defendants' position that Plaintiffs must "establish *that no set of circumstances* exists under which

the [challenged law] would be valid" and, conversely, "the Government need only demonstrate

that [the challenged law] is constitutional in *some* of its applications." 2024 WL 3074728, at \*6

(cleaned up) (emphases added); [Doc. 15 at 6-7]. Here, Plaintiffs requested that the Court issue "a

preliminary injunction of the Waiting Period Act" (i.e., Section 30-7-7.3). To gain this sort of

---

themselves or others with a newly purchased firearm. *See, e.g.*, Reese Oxner, *Uvalde gunman legally bought AR rifles days before shooting, law enforcement says*, Texas Tribune (May 25, 2022), https://www.texastribune.org/2022/05/25/uvalde-shooter-bought-gun-legally/ (reporting that the Uvalde gunman legally purchased the assault rifles he used to massacre 19 children and two adults days before the tragedy).

[5] In their reply, Plaintiffs argue that the Court should issue a preliminary injunction if it finds the present historical record "indeterminate." [Doc. 21 at 8] This argument flies in the face of the Tenth Circuit's repeated admonitions that plaintiffs must show a "clear and unequivocal" right to the "extraordinary remedy" of a preliminary injunction. *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 (10th Cir. 2006); *see, e.g.*, *We the Patriots, Inc. v. Lujan Grisham*, 2023 WL 6622042, at \*9 (D.N.M. Oct. 11, 2023).

unqualified preliminary injunctive relief, Plaintiffs must show a likelihood of success on their facial challenge to Section 30-7-7.3. *See Voter Reference Found., LLC v. Balderas*, 616 F. Supp. 3d 1132, 1257, 75 (D.N.M. 2022) (Browning, J.) (concluding that the plaintiffs were not likely to succeed on their facial challenge and only granting a preliminary injunction prohibiting the defendants from prosecuting the plaintiffs on the basis of their as-applied challenge).

Notably, when the Governor pointed out that the requested preliminary injunction depended on the likelihood of Plaintiffs mounting a successful facial challenge, [Doc. 15 at 6-7] Plaintiffs did not deny it. [Doc. 21 at 3] Rather, Plaintiffs simply faulted the Governor for not offering any analysis as to how facial challenges apply in the context of preliminary injunctions and Second Amendment law. *See id.* But the caselaw already makes clear that a plaintiff seeking to preliminarily enjoin a law in all of its applications must meet this demanding standard. *See Moody v. NetChoice, LLC*, __ U.S. __, 2024 WL 3237685, at *7 (U.S. July 1, 2024) (holding that a party seeking a preliminary injunction barring enforcement of a law in its entirety must show they are likely to succeed on their facial challenge); *Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1150 (10th Cir. 2020); *Antonyuk*, 89 F.4th at 313; *Voter Reference Found.*, 616 F. Supp. 3d at 1257. And now the Supreme Court has confirmed this demanding standard applies to Second Amendment challenges. *See Rahimi*, 2024 WL 3074728, at *6. Thus, the Court must find that Section 30-7-7.3 is likely unconstitutional in *all* of its applications before it grants Plaintiffs' request to universally enjoin the law.[6]

---

[6] It is unclear if Plaintiffs now claim they only seek a preliminary injunction based on an as-applied challenge to Section 30-7-7.3. [Doc. 21 at 3] If so, it bears emphasizing that this is not the relief requested in Plaintiffs' motion, and therefore, the Court should not analyze an as-applied challenge's likelihood of success. *See Genesee Cnty. Employees' Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*, 825 F. Supp. 2d 1082, 1225 n.39 (D.N.M. 2011) (Browning, J.). Plus, as discussed at the preliminary injunction hearing, there is no need to issue an injunction protecting Plaintiffs because they have no definitive plans to purchase additional firearms in the immediate future. *See*

**App. 0587**

Plaintiffs fail to meet this demanding burden. For example, while it is true Section 30-7-7.3 imposes a 7-day waiting period regardless of whether the firearm purchaser has received notification that they have passed the required federal background check, it is indisputably constitutional to the extent it applies to individuals who do *not* receive such a notification. *See McRorey*, 99 F.4th 831; [Doc. 21 at 4 ("Plaintiffs do not challenge the time it takes for a Federal Firearms Licensee to conduct a background check to ensure a purchaser is not a prohibited possessor.")]. And while most federal firearm background checks come back within minutes, a non-insignificant amount take longer than three days—which can lead to firearms being transferred to prohibited persons.[7] Section 30-7-7.3, therefore, "is constitutional in *some* of its applications," *Rahimi*, 2024 WL 3074728, at *6 (cleaned up), and Plaintiffs cannot obtain their requested preliminary injunction to enjoin it in all of its applications.[8]

---

*Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) ("To constitute irreparable harm, an injury must be certain, great, actual and not theoretical. . . . The party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." (cleaned up)).

[7] *See, e.g.*, *The Effects of Waiting Periods*, RAND (Jan. 10, 2023), https://www.rand.org/research/gun-policy/analysis/waiting-periods.html ("In 2021, for instance, 5,203 firearms were confirmed to be transferred from federally licensed firearm dealers to prohibited persons because of delays in NICS background checks that exceeded three business days."); *see generally* 18 U.S.C. 922(t)(1)(B)(ii) (allowing a licensee to transfer a firearm to a purchaser if "3 business days . . . have elapsed since the licensee contacted the system, and the system has not notified the licensee that the receipt of a firearm by such other person would violate subsection (g) or (n) of this section, or State, local, or Tribal law").

[8] Even if Plaintiffs *could* show a likelihood of success on a facial or as-applied challenge, the Court should only issue a preliminary injunction protecting the parties themselves. *See Labrador v. Poe by & through Poe*, 144 S. Ct. 921, 927-28 (2024) (Gorsuch, J., concurring, joined by Thomas and Alito, JJ.) (advising lower courts to "take heed" and retire universal injunctions that protect nonparties); *id.* at 928-29 (J. Kavanaugh, concurring, joined by Barrett, J.) (stating that the state's application seeking "a stay primarily because of the scope of the injunction" "is itself certworthy" and "has a likelihood of success"); *see generally* Hon. Trevor N. McFadden and Vetan Kapoor, *The Precedential Effects of the Supreme Court's Emergency Stays*, 44 HARV. J. L. & PUB. POL'Y 827, 832-35, 882 (2021) ("When the full Supreme Court grants a stay application, lower

**App. 0588**

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' request for a preliminary injunction.

Respectfully submitted,

*/s/ Holly Agajanian*
**HOLLY AGAJANIAN**
*Chief General Counsel to Governor Michelle Lujan Grisham*
**KYLE P. DUFFY**
*Deputy General Counsel to Governor Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2200
Holly.Agajanian@exec.nm.gov
Kyle.duffy@exec.nm.gov

*/s/ Mark W. Allen*
Mark W. Allen
*Assistant Attorney General*
Billy J. Jimenez
*Assistant Attorney General*
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
505.490.4825
mallen@nmdoj.gov
bjimenez@nmdoj.gov

*Attorneys for Raúl Torrez*

---

courts should accord that decision great weight, unless there is compelling reason not to do so."); *Legacy Church, Inc. v. Kunkel*, 472 F. Supp. 3d 926, 1046 (D.N.M. 2020) (Browning, J.) (deferring to concurring opinion in Supreme Court denial of a stay).

App. 0589

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 3, 2024, I filed the foregoing via the CM/ECF filing system,

which caused all counsel of record to be served by electronic means.


Respectfully submitted,


*/s/ Holly Agajanian*
Holly Agajanian

**App. 0590**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| SAMUEL ORTEGA and REBECCA SCOTT,<br><br>Plaintiffs,<br><br>v.<br><br>MICHELLE LUJAN GRISHAM, in her official capacity as Governor of the State of New Mexico, and RAÚL TORREZ, in his official capacity as Attorney General of the State of New Mexico,<br><br>Defendants. | No. 24-CV-0471 |

## PLAINTIFFS' SUPPLEMENTAL BRIEF

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

I.    The Second Amendment's plain text covers the right to obtain possession of firearms ......... 1

  A.    The Second Amendment's plain text protects Plaintiffs' right to possess arms .................. 2

  B.    The waiting period law burdens Plaintiffs' right to possess arms ..................................... 2

  C.    The right to possess arms includes the right to acquire arms. ........................................... 3

  D.    The right to acquire arms is a necessary concomitant of the right to keep and
        bear arms. .................................................................................................................... 4

II.    All firearms regulations must be justified by historical tradition, including the
       regulations that *Heller* deemed "presumptively lawful." ................................................ 8

III.    The waiting period law is neither longstanding nor a commercial regulation. .................. 12

IV.    *Rahimi* makes clear that narrow laws, such as intoxication laws, cannot be
       analogs for laws that broadly restrict arms use by the public generally, such
       as the waiting period law ............................................................................................ 15

CONCLUSION ......................................................................................................... 16

App. 0592

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State*,
  50 Tenn. 165 (1871).................................................................................. 6

*Antonyuk v. Chiumento*,
  89 F.4th 271 (2d. Cir. 2023).................................................................... 19

*Atkinson v. Garland*,
  70 F.4th 1018 (7th Cir. 2023).................................................................. 15

*Brown v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  No. 1:22-CV-80, 2023 WL 8361745 (N.D.W. Va. Dec. 1, 2023) ........................ 7, 8

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)................................................... 1-4, 6, 10, 12, 16, 18

*Drummond v. Robinson Twp.*,
  9 F.4th 217 (3d Cir. 2021) ........................................................................ 7

*Illinois Ass'n of Firearms Retailers v. City of Chicago*,
  961 F. Supp. 2d 928 (N.D. Ill. 2014) .................................................. 9, 18

*Jackson v. City & Cnty. of San Francisco*,
  746 F.3d 953 (9th Cir. 2014) .................................................................... 6

*Kole v. Vill. of Norridge*,
  No. 11-cv-3871, 2017 WL 5128989 (N.D. Ill. Nov. 6, 2017) ..................... 9

*Luis v. United States*,
  578 U.S. 5 (2016).......................................................................................... 6

*McConnell v. Federal Election Com'n*,
  540 U.S. 93 (2003).................................................................................... 10

*McCulloch v. Maryland*,
  17 U.S. 316 (1819)............................................................................... 5, 19

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010).................................................................................. 10

*Miller v. Bonta*,
  No. 19-CV-01537, 2023 WL 6929336 (S.D. Cal. Oct. 19, 2023)................ 8

*Minneapolis Star and Tribune Co. v. Minn. Comm'r of Revenue*,
  460 U.S. 575 (1983)............................................................................. 9, 10

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022)........................................... 1-4, 11-12, 14-17, 19-20

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York*,
  140 S. Ct. 1525 (2020)............................................................................ 5, 6

**App. 0593**

*Oakland Tactical Supply, LLC v. Howell Twp., Michigan*,
    103 F.4th 1186 (6th Cir. 2024) ................................................................6-7, 9-10

*Range v. Att'y Gen. United States of Am.*,
    69 F.4th 96 (3d Cir. 2023) (en banc) ............................................................. 13

*Renna v. Bonta*,
    667 F. Supp. 3d 1048 (S.D. Cal. 2023) ....................................................... 8, 17

*Richmond Newspapers v. Virginia*,
    448 U.S. 555 (1980) .......................................................................................... 5

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) (en banc) .......................................................... 7

*United States v. Alston*,
    No. 5:23-CR-021-FL-1, 2023 WL 7003235 (E.D.N.C. Oct. 24, 2023) ................... 8

*United States v. Bena*,
    664 F.3d 1180 (8th Cir. 2011) ...................................................................... 14

*United States v. Duarte*,
    101 F.4th 657 (9th Cir. 2024) ............................................................... 12-13, 15

*United States v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) ........................................................................ 6, 19

*United States v. McNulty*,
    684 F. Supp. 3d 14 (D. Mass. 2023) ............................................................ 7-8

*United States v. Perez-Garcia*,
    96 F.4th 1166 (9th Cir. 2024) ....................................................................... 15

*United States v. Quiroz*,
    629 F. Supp. 3d 511 (W.D. Tex. 2022) ........................................................ 4-6

*United States v. Rahimi*,
    No. 22-915, 602 U.S. __, 2024 WL 3074728 (June 21, 2024) ........................ 2-3, 14-15, 20-21

*Vigil v. City of Espanola*,
    No. CIV 08–0980 JB/RLP, 2009 WL 1300746 (D. N.M. Feb. 18, 2009) ................. 18

## Constitutional Provisions

U.S. Const. amend. I ....................................................................................... 1, 9

U.S. Const. amend. II ......................................................................................... 1

## Statutes and Regulations

18 U.S.C. § 922(g)(3) ........................................................................................ 8

18 U.S.C. § 922(g)(8) .................................................................................. 14, 20

App. 0594

1923 Cal. Stat. 701 ................................................................................................ 16-17

N.M. Stats. § 30-7-7.3(D) ...................................................................................... 19

**Other Authorities**

Johnson, Samuel, DICTIONARY OF THE ENGLISH LANGUAGE, vol. 1 (4th ed. 1773) ...................... 4

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1996) ................................................. 4

THE AMERICAN HERITAGE COLLEGE DICTIONARY (3d ed. 1993) ................................................. 4

Webster, Noah, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE, vol. 1 (1828) ................... 4

App. 0595

## PLAINTIFFS' SUPPLEMENTAL BRIEF

The Court held a hearing on Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction on June 27, 2024. [ECF 28]. The Court invited the parties to file simultaneous supplemental briefing by July 3, 2024, with response briefs due by July 8, 2024. [*Id.* at 4]. Plaintiffs hereby submit initial supplemental briefing on the topics of: (1) whether a waiting period law that prevents Americans from possessing their firearms implicates the Second Amendment's plain text; (2) whether "presumptively lawful" firearms regulations must be justified by historical tradition; (3) whether the waiting period law is either longstanding or a commercial regulation; and (4) whether the Supreme Court's decision in *United States v. Rahimi* alters the historical analysis required by *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*.

## I.     The Second Amendment's plain text covers the right to obtain possession of firearms.

In a Second Amendment challenge, the initial inquiry is whether "the Second Amendment's plain text covers" the plaintiffs' desired conduct.[1] *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022). Here, "Plaintiffs desire to obtain possession of firearms that they have purchased for lawful purposes." Compl. ¶ 13.

The Supreme Court conducted the plain text analysis in *District of Columbia v. Heller*, 554 U.S. 570, 576–600 (2008). The Court's analysis makes clear that the plain text covers Plaintiffs' possession of their purchased firearms. And even if the waiting period law is characterized as a restriction on acquisition rather than possession, Supreme Court precedent makes clear that the right to acquire arms is inherent to the right to keep and bear arms.

---

[1] The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

1

**App. 0596**

**A.      The Second Amendment's plain text protects Plaintiffs' right to possess arms.**

The *Heller* Court's plain text analysis makes clear that the Second Amendment's plain text covers Plaintiffs' possession of their purchased firearms.

The *Heller* Court held that the Second Amendment's "textual elements": (1) "guarantee the individual right to *possess* and carry weapons," *id.* at 592 (emphasis added); (2) protect the rights of "all Americans," *id.* at 580; and (3) "extend[] prima facie, to all instruments that constitute bearable arms," *id.* at 582. Plaintiffs in this case are "Americans" who desire to "possess" their "bearable arms." Under *Heller*, therefore, their conduct is covered by the plain text.

Notably, in *United States v. Rahimi*, No. 22-915, 602 U.S. __, 2024 WL 3074728 (June 21, 2024), the Court did not address the plain text analysis. There was no need. The Court's precedents clearly established that the possession of a firearm by an American is covered by the Second Amendment's plain text. *Heller*, 554 U.S. at 592; *Bruen*, 597 U.S. at 32. *Rahimi* did not eliminate the plain text inquiry, but instead demonstrated that the plain text inquiry was never intended to be a significant obstacle for challengers to overcome. Rather, the inquiry simply indicates when the government's burden to justify a regulation with historical tradition is triggered.

Here, as in *Rahimi*, it is clear that Plaintiffs' possession of firearms is covered by the plain text.[2]

**B.      The waiting period law burdens Plaintiffs' right to possess arms.**

New Mexico's waiting period law directly burdens Plaintiffs' right to possess arms: but for the law, Plaintiffs could possess their firearms during the week after purchasing them.

---

[2] *Rahimi*, in fact, referred broadly to conduct that relates to "arms-bearing." *See* No. 22-915, 2024 WL 3074728, at *6 ("[W]hen the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" (quoting *Bruen*, 597 U.S. at 24)).

**App. 0597**

Because "the Second Amendment's plain text covers" Plaintiffs' possession of their purchased firearms, the Court should require the government to "justify its regulation" that deprives Plaintiffs of their right to possess their firearms for one week "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

**C.    The right to possess arms includes the right to acquire arms.**

Characterizing the waiting period law as a restriction on firearms acquisition rather than possession does not alter the plain text analysis. The right to acquire arms is inherent to the right to possess arms.

The *Heller* Court consulted Samuel Johnson's and Noah Webster's dictionaries in its plain text analysis to conclude that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" 554 U.S. at 582. To "have" something—both historically and today—has always included its acquisition. Johnson's dictionary defined "have" as "5. To obtain" and "6. To take; to receive." 1 Samuel Johnson, DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773) (unpaginated).[3] Webster's defined "have" as "9. To gain; to procure; to receive; to obtain; to purchase." 1 Noah Webster, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (unpaginated).[4] Today, *Merriam Webster's* defines "have" as "4 a: to acquire or get possession of: OBTAIN" and to "b: RECEIVE." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 533 (10th ed. 1996). *American Heritage* defines "have" as "6.a. To come into possession of; acquire. b. To receive; get. c. To accept; take." THE AMERICAN HERITAGE COLLEGE DICTIONARY 622 (3d ed. 1993).

---

[3] *Heller* relied on Johnson to define "arms," 554 U.S. at 581, "keep," *id.* at 582, "bear," *id.* at 584, and "well-regulated," *id.* at 597.

[4] *Heller* relied on Webster to define "arms," *id.* at 581, "keep," *id.* at 582, "bear," *id.* at 584, and "militia," *id.* at 595.

**App. 0598**

Because "the plain meaning of the verbs 'have' or 'possess' include the act of receipt," "'to have weapons'" must encompass the "receipt" and "possession of those weapons." *United States v. Quiroz*, 629 F. Supp. 3d 511, 516 (W.D. Tex. 2022).

> **D.** **The right to acquire arms is a necessary concomitant of the right to keep and bear arms.**

At a minimum, the right to acquire arms is a necessary concomitant of the right to possess arms.

"A constitution. . . . requires, that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects, be deduced from the nature of the objects themselves." *McCulloch v. Maryland*, 17 U.S. 316, 407 (1819). Thus, "the [Supreme] Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579 (1980). And "fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Id.* at 580.

In the Second Amendment context, four Supreme Court Justices determined—and none disagreed—that "a necessary concomitant" of "the right to keep a handgun in the home for self-defense" is the right "to take a gun to a range in order to gain and maintain the skill necessary to use it responsibly." *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1541 (2020) (Alito, J., joined by Gorsuch and Thomas, J.J., dissenting); *id.* at 1527 (Kavanaugh, J., concurring) (expressing "agree[ment] with Justice Alito's general analysis of *Heller*"); *see also Oakland Tactical Supply, LLC v. Howell Twp., Michigan*, 103 F.4th 1186, 1192 (6th Cir. 2024) ("at least some [firearms] training is protected . . . because it is a necessary corollary to the right defined in *Heller*. Four Justices seemingly endorsed this view"). Another "necessary concomitant" of the right to keep and bear arms is the right to acquire arms:

**App. 0599**

> Constitutional rights thus implicitly protect those closely related acts necessary to their exercise. . . . The right to keep and bear arms, for example, "implies a corresponding right to obtain the bullets necessary to use them," *Jackson* v. *City and County of San Francisco*, 746 F. 3d 953, 967 (CA9 2014) (internal quotation marks omitted). . . . Without protection for th[is] closely related right[], the Second Amendment would be toothless.

*Luis v. United States*, 578 U.S. 5, 26–27 (2016) (Thomas, J., concurring).

In a case *Heller* cited thrice approvingly, 554 U.S. at 608, 614, 629, the Tennessee Supreme Court held that "[t]he right to keep arms, necessarily involves the right to purchase them," *Andrews v. State*, 50 Tenn. 165, 178 (1871). More recently, the Third Circuit held that the Second Amendment protects the right to purchase firearms, *Drummond v. Robinson Twp.*, 9 F.4th 217, 226–29 (3d Cir. 2021), and the Ninth Circuit reasoned that "[c]ommerce in firearms is a necessary prerequisite to keeping and possessing arms for self-defense," *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc). The Seventh Circuit has likewise held that "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use," *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (Sykes, J.), and the Eleventh Circuit, noting that all its "sister circuits have found that the right to keep and bear arms includes the right to acquire them," assumed the truth of that proposition without formally deciding it, *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1325 (11th Cir. 2023). The Fourth Circuit has gone so far as to declare that a waiting-period law, specifically, violates the plain text of the Second Amendment — meaning that even if the defense's overly constrained view that the right implicated here is the timely/fast acquisition of a firearm, that right is covered by the amendment's plain text. *See Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1044-45 (4th Cir. 2023) ("[T]he law's waiting period could well be the critical time in which the applicant expects to face danger. So the temporary deprivation that Plaintiffs allege is a facially plausible Second Amendment

**App. 0600**

violation.   Accordingly, Maryland's law regulates conduct that falls within the Second Amendment's plain text.").

Numerous district courts have also recognized the right to acquire arms. *See, e.g.*, *Brown v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 1:22-CV-80, 2023 WL 8361745, at *10 (N.D.W. Va. Dec. 1, 2023) ("the act of purchasing a handgun is within the bounds of the Second Amendment"); *Miller v. Bonta*, No. 19-CV-01537, 2023 WL 6929336, at *6 (S.D. Cal. Oct. 19, 2023) (recognizing "a citizen's constitutional right to acquire these firearms for self-defense"); *United States v. McNulty*, 684 F. Supp. 3d 14, 20 (D. Mass. 2023) ("The text of the Second Amendment itself also suggests that the right to 'keep' firearms necessarily includes an ability to purchase" firearms); *United States v. Alston*, No. 5:23-CR-021-FL-1, 2023 WL 7003235, at *4 (E.D.N.C. Oct. 24, 2023) ("The court has little difficulty concluding that [18 U.S.C.] § 922(g)(3), which prohibits the receipt of firearms, burdens conduct within the ambit of the Second Amendment.") (quotation marks omitted); *Renna v. Bonta*, 667 F. Supp. 3d 1048, 1065 (S.D. Cal. 2023) ("Plaintiffs' desire to purchase the arms in question on the retail market falls within the plain text of the Second Amendment"); *United States v. Hicks*, 649 F. Supp. 3d 357, 359 (W.D. Tex. 2023) ("[E]xcluding 'receipt' from 'keep and bear' lacks foundation in plain language because the verbs 'have' or 'possess' include the act of receipt.   For example, 'to have' means 'to be in possession of . . . something received.'   Therefore, 'to have weapons' would encompass the past receipt and the current possession of those weapons."   (footnotes omitted)); *Kole v. Vill. of Norridge*, No. 11-cv-3871, 2017 WL 5128989, at *9 (N.D. Ill. Nov. 6, 2017) ("the Second Amendment right . . . to acquire a firearm . . . is implicated by . . . laws directly or functionally banning firearm sales"); *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) ("the right to keep and bear arms for self-defense. . . . must also include

**App. 0601**

the right to *acquire* a firearm"). Some of these decisions have been appealed, but they nevertheless represent the widespread consensus that the Second Amendment protects the right to acquire arms.

Similarly, "[t]he First Amendment guarantee of a free press . . . implies a right to buy the inks and paper necessary for printing newspapers." *Oakland Tactical Supply, LLC*, 103 F.4th at 1201 (Kethledge, J., dissenting) (citing *Minneapolis Star and Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582–83 (1983)). And "the First Amendment 'right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise.'" *Id.* (quoting *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 252 (2003) (Scalia, J., concurring in part)). The Second Amendment—which is not a "second-class right" to be "singled out for special—and specially unfavorable—treatment," *McDonald v. City of Chicago*, 561 U.S. 742, 778–79, 780 (2010)—contains implicit rights just like the First Amendment. Indeed, "self-defense" is not among the 27 words of the Second Amendment's text, yet *Heller* identified it as a "core protection" of the Second Amendment. 554 U.S. at 634.

Indeed, if a one-week waiting period does not implicate the plain text, no waiting period does. The plain text analysis considers only whether the conduct is covered; limitations on covered conduct are considered in the historical analysis. At the plain text stage, the question is the same for a one-week and one-year waiting period—*i.e.*, is the right to obtain possession of purchased firearms protected? The government bears the burden of justifying the wait it imposes at the historical stage of the analysis.

Because the right to acquire arms is inherent to the right to possess arms—or at least a necessary concomitant of that right—even if the waiting period law is characterized as an acquisition restriction, "the Constitution presumptively protects" Plaintiffs' conduct, and the State

**App. 0602**

must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

## II.  All firearms regulations must be justified by historical tradition, including the regulations that *Heller* deemed "presumptively lawful."

The Supreme Court set forth "*the standard* for applying the Second Amendment" in *Bruen*:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *Only then* may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

597 U.S. at 24 (emphasis added). The Court reiterated twice that the "*only*" way the government can justify a firearms regulation is with historical tradition. *Id.* at 17 ("*Only if* a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.") (quotation marks omitted and emphasis added); *Id.* at 34 ("*Only if* respondents carry that burden can they show that the pre-existing right codified in the Second Amendment . . . does not protect petitioners' proposed course of conduct.") (emphasis added).

The *Bruen* Court made it unmistakably clear that this historical test applies to the "presumptively lawful" regulations it identified in *Heller*. *Heller* deemed three categories of "longstanding" laws "presumptively lawful": "prohibitions on the possession of firearms by felons and the mentally ill"; "laws imposing conditions and qualifications on the commercial sale of arms"; and "laws forbidding the carrying of firearms in sensitive places." *Id.* at 626–27 & n.26. In *Bruen*, the government "attempt[ed] to characterize New York's proper-cause requirement as a 'sensitive-place' law." 597 U.S. at 30. The Court consulted the historical record to conclude that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police

Department." *Id.* at 30–31. *Bruen* thus held the alleged "sensitive place" restriction to the same historical standard—"*the standard* for applying the Second Amendment," 597 U.S. at 24 (emphasis added)—that applies to all firearms regulations. "Had the Court in *Bruen* endorsed simply deferring to *Heller*'s 'presumptively lawful' footnote, the outcome of that case would have been much different." *United States v. Duarte*, 101 F.4th 657, 669 (9th Cir. 2024). Instead, "[a]s with any other firearm regulation challenged under the Second Amendment, *Bruen* clarified, courts must now analyze 'sensitive place' laws by analogizing them to a sufficiently comparable historical counterpart." *Id.* Thus, "[i]t would be fundamentally inconsistent with *Bruen*'s analytical framework to treat" commercial regulations "any differently, as nothing in the majority opinion implies that we can jettison *Bruen*'s test for one 'presumptively lawful' category of firearm regulations but not others (e.g., sensitive place regulations)." *Id.* (quotation marks omitted).

*Bruen*'s treatment of the "presumptively lawful" sensitive-place regulation is consistent with *Heller*, which conveyed that those regulations must be historically justified. The *Heller* Court acknowledged that it did "not provid[e] extensive historical justification for those regulations" but asserted that "there will be time enough to expound upon *the historical justifications* for" the regulations in a later case. 554 U.S. at 635 (emphasis added). Thus, any restriction on the commercial sale of arms must have "historical justifications," just like any other firearms regulation.

Both *Heller* and *Bruen* make clear that *Heller*'s "presumptively lawful" language has no doctrinal significance. Consequently, the Ninth Circuit recently held that "[s]imply repeating *Heller*'s language about the 'presumptive lawfulness' of felon firearm bans will no longer do after *Bruen*." *Duarte*, 101 F.4th at 668 (cleaned up). And the en banc Third Circuit declined to rely on *Heller*'s "presumptively lawful" language when holding the federal firearms ban for felons

**App. 0604**

unconstitutional as applied to a nonviolent felon and instead applied the historical analysis. *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023) (en banc), *cert. granted*, *judgment vacated sub nom. Garland, Atty Gen. v. Range, Bryan D.*, No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024);[5] *see also Nguyen v. Bonta*, 2024 WL 1057241, at *6 (S.D. Cal. Mar. 11, 2024) (publication in F. Supp. 3d forthcoming) ("*Bruen* suggests that the proper question in evaluating whether a regulation falls within the commercial sales category is not the extent of interference with the Second Amendment right, but instead whether the regulation historically would have been tolerated. In the wake of *Bruen*, several Courts of Appeals have conducted the full text-and-history analysis when confronted with a regulation that falls within one of *Heller*'s enumerated categories." (citations omitted)).

In *Rahimi*, the Supreme Court confirmed that *all* laws must be historically justified, emphasizing that:

> the appropriate [Second Amendment] analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. [*Bruen*,] 597 U.S., at 26–31, 142 S.Ct. 2111. A court must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit, "apply[ing] faithfully the balance struck by the founding generation to modern circumstances." *Id.*, at 29, and n. 7, 142 S.Ct. 2111.

No. 22-915, 2024 WL 3074728, at *6; *see also id.* ("In *Bruen*, we directed courts to examine our 'historical tradition of firearm regulation' to help delineate the contours of the right." (quoting *Bruen*, 597 U.S. at 17)).

Prior to *Bruen*, some courts upheld the law at issue in *Rahimi*, 18 U.S.C. § 922(g)(8), by reasoning that it is analogous to the "presumptively lawful" prohibitions for felons and the

---

[5] The Supreme Court granted, vacated, and remanded *Range* for further consideration in light of its decision in *Rahimi*, but it is not apparent that anything in *Rahimi* would alter the en banc court's decision.

**App. 0605**

mentally ill. *See, e.g.*, *United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011) ("this statute—like prohibitions on the possession of firearms by violent felons and the mentally ill—is focused on a threat presented by a specific category of presumptively dangerous individuals."). The *Rahimi* Court, significantly, did not take that approach. Instead, the Court analyzed Section 922(g)(8) the same way it analyzed the handgun ban in *Heller*, the carry restriction in *Bruen*, and the sensitive place argument in *Bruen*—by "considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." No. 22-915, 2024 WL 3074728, at *6.

The Supreme Court has clearly and repeatedly defined its Second Amendment test. *See Bruen*, 597 U.S. at 17, 24; *Rahimi*, No. 22-915, 2024 WL 3074728, at *6. Never once has the Court articulated an exception for the regulations it deemed "presumptively lawful" in *Heller*. Rather, the Court has expressly stated that "a court [may] conclude that the individual's conduct falls outside the Second Amendment's" scope "*[o]nly if* a firearm regulation is consistent with this Nation's historical tradition." *Bruen*, 597 U.S. at 17 (emphasis added).

As the Ninth Circuit explained in holding that the "presumptively lawful" language has no doctrinal significance, "*Bruen* expressly 'requires courts to assess whether' . . . '*any* regulation infringing on Second Amendment rights, is consistent with this nation's historical tradition of firearm regulation.'" *Duarte*, 101 F.4th at 668 (quoting *United States v. Perez-Garcia*, 96 F.4th 1166, 1175 (9th Cir. 2024)) (brackets omitted). "It would pay lip service to this mandate if we continued to defer . . . to *Heller*'s ['presumptively lawful'] footnote." *Id.* "Nothing allows us to sidestep *Bruen* in this way." *Id.* at 669 (quoting *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023)) (brackets omitted).

**App. 0606**

**III.    The waiting period law is neither longstanding nor a commercial regulation.**

Because *Heller*'s "presumptively lawful" language does not alter *Bruen*'s analysis, neither does the "longstanding" qualifier that describes the "presumptively lawful" regulations. *See* 554 U.S. at 627 n.26.

In any event, the only allegedly longstanding waiting period law produced in this case is California's 1923 law prohibiting the transfer of a handgun from a licensed dealer to a purchaser on the same day as the purchase. 1923 Cal. Stat. 701, ch. 339 §§ 10, 11.[6] California's law cannot qualify New Mexico's seven-day waiting period law as "longstanding" for several reasons.

First, the law held unconstitutional in *Bruen* was enacted in 1911. 597 U.S. at 11. And the Court acknowledged that New York had started requiring a license to carry in 1905. *Id.* The *Bruen* Court did not consider that 1911 law "longstanding," so California's 1923 law cannot be "longstanding" either.

Second, California's law forbade only the transfer of a handgun on the same business day that the purchase was made, meaning that the transfer could occur in less than 24 hours—for example, if the purchase was made in the evening, the purchaser could acquire the handgun the following morning. 1923 Cal. Stat. 701, ch. 339 § 10. Because New Mexico's waiting period is more than seven times longer than California's, the burden is more than seven times as severe.

---

[6] Notably, California's 1923 waiting period law—the first in the United States—was not produced in this case by Defendants; rather, it was produced by Plaintiffs. *See* Compl. ¶ 19. Defendants offered only intoxication laws and licensing laws as proposed historical analogs, *see* Response Br., ECF No. 15, at 16–17, suggesting that Defendants recognize that all waiting period laws in the United States come too late in time to pass muster under *Bruen*'s historical tradition standard.

**App. 0607**

Third, California's law applied only to handguns. *Id.* New Mexico's applies to all firearms. California's law, therefore, still allowed long guns to be immediately possessed, while New Mexico's entirely deprives citizens of their Second Amendment rights for one week.

Fourth, California's law applied only to sales by licensed dealers. *Id.* A seller who was not licensed could transfer a firearm to anyone "personally known to the vendor" without any wait. *Id.* New Mexico's law applies to sales by licensed *and* non-licensed sellers. Thus, under California's law—unlike New Mexico's—handguns could still be possessed immediately through private sales.

Fifth, *Bruen* makes clear that a restriction that appears for the first time in the 20th century cannot establish a tradition. The *Bruen* Court first discounted "late-19th-century evidence" due to its "temporal distance from the founding," 597 U.S. at 66, and accordingly refused to "stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption," *id.* at 67–68. The Court then dismissed 20th-century evidence entirely: "[a]s with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 66 n.28.

With respect to Defendants' argument that the law is a commercial regulation, this Court should avoid opening that Pandora's box. A law that directly burdens an individual right to self-defense by strategically regulating a business is not a true commercial regulation. Otherwise, by Defendants' logic, an indefinite ban on firearms purchases is merely a commercial regulation; and a complete prohibition on the ordinary sale of ammunition is merely a commercial regulation. *Renna*, 667 F. Supp. 3d at 1065 ("If the commercial sales limitation identified in *Heller* were interpreted as broadly as the State suggests, the exception would swallow the Second Amendment."). It is implausible that the Supreme Court, when it decided *Bruen*, meant that such

**App. 0608**

laws would be presumptively constitutional, and that it would be a plaintiff's burden—*contra Bruen*—to establish that these laws are unconstitutional. *See Vigil v. City of Espanola*, No. CIV 08–0980 JB/RLP, 2009 WL 1300746, *9 (D. N.M. Feb. 18, 2009) (Browning, J.) (rejecting "elevat[ing] form over substance"); *Illinois Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 930–31 (rejecting Chicago's argument that a ban on firearms sales and transfers within city limits was a commercial regulation).

What is more, New Mexico's waiting period applies to *all* sales—including both ordinary business and *private* sales between non-commercial entities. So even if Defendants could viably assert that every law that limits or imposes conditions on a commercial purchase is presumptively constitutional, this law is not merely a restriction on "commercial sale[s]," and thus far exceeds the scope of the regulations that *Heller* referred to. 554 U.S. at 627. Had *Heller* intended to carve out literally all sales from the protection of the Second Amendment, it would not have used the word "commercial."

The New Mexico law's purpose also has nothing to do with commercial sales: the law is designed exclusively to prevent certain impulsive uses of the firearm *by the buyer*, versus being a law that "primarily impact[s] manufacturers, sellers, or transferers". *United States v. James*, 677 F. Supp. 3d 329, 343 (D.V.I. 2023). The New Mexico law even imposes criminal penalties *on the buyer*, further underscoring this point. *See* NMSA 1978, § 30-7-7.3(D) ("Each party to an unlawful sale of a firearm before the required waiting period ends is in violation of this section and may be separately charged for the same sale.").

Finally, even commercial regulations are unconstitutional if they are "abusive." And a law that constitutes a pretextual smokescreen for a burden on the right to keep and bear arms is abusive. *Cf. Antonyuk v. Chiumento*, 89 F.4th 271, 316 (2d. Cir. 2023), *cert. granted, judgment vacated sub*

14

**App. 0609**

*nom. Antonyuk, Ivan, et al. v. James, Steven G., et al.*, No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024) ("[A] licensing decision that uses 'good moral character' as a smokescreen to deny licenses for impermissible reasons untethered to dangerousness, such as the applicant's lifestyle or political preferences, would violate the Constitution by relying on a ground for disarmament for which there is no historical basis."); *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010), *abrogated on other grounds by Bruen*, 597 U.S. at 19 ("In order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition. If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*."). Here, New Mexico's law imposes just as much liability on a purchaser as it does the seller. *See* N.M. Stats. § 30-7-7.3(D). Such a provision clearly evidences whom the law targets— individuals who want to keep and bear arms.

**IV.**   ***Rahimi* makes clear that narrow laws, such as intoxication laws, cannot be analogs for laws that broadly restrict arms use by the public generally, such as the waiting period law.**

It is clear under *Bruen* that the waiting period law contradicts our nation's tradition of firearm regulation. *Rahimi* confirms it.

*Bruen* emphasizes that the historical "inquiry will be fairly straightforward" in cases where "a challenged regulation addresses a general societal problem that has persisted since the 18th century" and there is a "lack of a distinctly similar historical regulation addressing that problem." 597 U.S. at 26. That is precisely the case here. Impulsive firearms use has persisted since the colonial era—indeed, since the invention of firearms centuries prior—yet no waiting period regulation was enacted during the 17th, 18th, or 19th centuries. Prelim. Inj. Hr'g Tr. 190:13-18,

**App. 0610**

193:5-9. *Bruen*'s test can be straightforwardly applied, therefore, to invalidate the waiting period law.

*Rahimi* provides additional support for invalidating the waiting period law. *Rahimi* made clear that "narrow" laws, such as the intoxication laws that the State offers as analogs, are distinctly dissimilar from laws that "broadly restrict arms use by the public generally," such as the waiting period law. No. 22-915, 2024 WL 3074728, at *9. That is because "our Nation's tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not." *Id.* at *10. So while surety laws were "an appropriate analogue" for Section 922(g)(8)'s "narrow" restriction that applies to particular individuals, they were "not a historical analogue for a broad prohibitory regime like New York's" licensing regime at issue in *Bruen* that applied to the public generally. *Id.* at *10. For the same reason, intoxication laws—which were narrow and applied only to intoxicated individuals—cannot justify the waiting period law—which "broadly restrict[s] arms use by the public generally." *Id.* at *9.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a temporary restraining order and a preliminary injunction of the Waiting Period Act.

Dated: July 3, 2024

Respectfully submitted,

*/s/ Carter B. Harrison IV*
Carter B. Harrison IV
Attorney and Partner
**Harrison & Hart, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102
(505) 303-1835
carter@harrisonhartlaw.com

Michael D. McCoy
Sean D. Nation
**Mountain States Legal Foundation**

**App. 0611**

2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
mmccoy@mslegal.org

Joseph G.S. Greenlee
Erin M. Erhardt
**National Rifle Association of America**
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org
eerhardt@nrahq.org
***Attorneys for Plaintiffs***

**App. 0612**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| SAMUEL ORTEGA and REBECCA SCOTT, <br><br> Plaintiffs, <br><br> v. <br><br> MICHELLE LUJAN GRISHAM, in her official capacity as Governor of the State of New Mexico, and RAÚL TORREZ, in his official capacity as Attorney General of the State of New Mexico, <br><br> Defendants. | Case:  1:24-cv-00471-JB-SCY |

### NOTICE OF CERTIFICATION THAT ASSOCIATED ATTORNEY LICENSED OUTSIDE OF THE DISTRICT IS AN ATTORNEY IN GOOD STANDING

The undersigned counsel Carter B. Harrison IV, and pursuant to Local Rule 83.3, submits this certification following the submission of Association of Attorney Licensed Outside the District by Joseph G.S. Greenlee.  *See Doc. 29*.  Carter B. Harrison IV certifies that Joseph G. S. Greenlee is currently a licensed attorney in good standing admitted to practice by the State of Idaho, Idaho Bar Number 10491, the First Circuit Court of Appeals, Bar Number 1185211; Second Circuit Court of Appeals; Third Circuit Court of Appeals; Fourth Circuit Court of Appeals; Fifth Circuit Court of Appeals; Sixth Circuit Court of Appeals; Seventh Circuit Court of Appeals; Ninth Circuit Court of Appeals; Tenth Circuit Court of Appeals; Eleventh Circuit Court of Appeals; and the United States Supreme Court.  Mr. Greenlee's contact information is as follows:

Joseph G.S. Greenlee
P.O. Box 4061
McCall, ID 83638
Telephone:  (703) 267-1161
jgreenlee@nrahq.org

**App. 0613**

DATED: July 5, 2024

Respectfully submitted,

*/s Carter B. Harrison IV*
Carter B. Harrison IV
Attorney and Partner
**Harrison & Hart, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102
Email: Carter@harrisonhartlaw.com

***Attorney for Plaintiff***

## CERTIFICATE OF SERVICE

I certify that this Notice of Certification That Associated Attorney Licensed Outside of the District is an Attorney in Attorney in Good Standing, was filed with the United States Court for the District of New Mexico's CM/ECF e-filing system on July 5, 2024, which caused service upon all parties through counsel of record as more fully reflected on the Notice of Electronic Filing.

*/s/ Carter B. Harrison IV*

3

**App. 0614**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| SAMUEL ORTEGA and<br>REBECCA SCOTT,<br><br>Plaintiffs,<br><br>v.<br><br>MICHELLE LUJAN GRISHAM, in her<br>official capacity as Governor of the State of<br>New Mexico, and RAÚL TORREZ, in his<br>official capacity as Attorney General of the<br>State of New Mexico,<br><br>Defendants. | Case:  1:24-cv-00471-JB-SCY |

## NOTICE OF CERTIFICATION THAT ASSOCIATED ATTORNEY LICENSED OUTSIDE OF THE DISTRICT IS AN ATTORNEY IN GOOD STANDING

Plaintiffs Samuel Ortega and Rebecca Scott, submit this certification following the submission of Association of Attorney Licensed Outside the District by Joseph G.S. Greenlee. *See Doc. 29.* Plaintiffs certify that Joseph G. S. Greenlee is currently a licensed attorney in good standing admitted to practice by the State of Idaho, Idaho Bar Number 10491, the First Circuit Court of Appeals, Bar Number 1185211; Second Circuit Court of Appeals; Third Circuit Court of Appeals; Fourth Circuit Court of Appeals; Fifth Circuit Court of Appeals; Sixth Circuit Court of Appeals; Seventh Circuit Court of Appeals; Ninth Circuit Court of Appeals; Tenth Circuit Court of Appeals; Eleventh Circuit Court of Appeals; and the United States Supreme Court.  Mr. Greenlee's contact information is as follows:

Joseph G.S. Greenlee
P.O. Box 4061
McCall, ID 83638
Telephone:  (703) 267-1161
jgreenlee@nrahq.org

**App. 0615**

DATED: July 5, 2024

Respectfully submitted,

 /s Carter B. Harrison IV
Carter B. Harrison IV
Attorney and Partner
**Harrison & Hart, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102
Email: Carter@harrisonhartlaw.com

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that this Notice of Certification That Associated Attorney Licensed Outside of the District is an Attorney in Attorney in Good Standing, was filed with the United States Court for the District of New Mexico's CM/ECF e-filing system on July 5, 2024, which caused service upon all parties through counsel of record as more fully reflected on the Notice of Electronic Filing.

/s/ Carter B. Harrison IV

3

**App. 0616**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SAMUEL ORTEGA, and**
**REBECCA SCOTT,**

      **Plaintiffs,**

**vs.**                               **No. 1:24-cv-00471-JB-SCY**

**MICHELLE LUJAN GRISHAM, in her**
**official capacity as Governor of the State of**
**New Mexico, and RAÚL TORREZ, in his**
**official capacity as Attorney General of the**
**State of New Mexico,**

      **Defendants.**

### DEFENDANTS' JOINT RESPONSE TO PLAINTIFFS' SUPPLEMENTAL BRIEF

Governor Michelle Lujan Grisham and Attorney General Raúl Torrez (collectively, "Defendants"), by and through their respective counsel of record, hereby submit their supplemental response brief pursuant to the Court's leave granted orally at the June 27, 2024, preliminary injunction hearing.

### INTRODUCTION

"A preliminary injunction is an extraordinary remedy, and thus the right to relief must be clear and unequivocal." *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 (10th Cir. 2006) (cleaned up). Plaintiffs' right to totally enjoin New Mexico's newly enacted waiting law, NMSA 1978, § 30-7-7.3 (2024), is neither clear nor unequivocal. As explained in Defendants' Joint Supplemental Brief, *United States v. Rahimi*, 602 U.S. __, 2024 WL 3074728 (U.S. June 21, 2024), all but dooms any likelihood of success Plaintiffs might have had in their post-*Bruen* challenge. This Court should reject Plaintiffs arguments to the contrary—many of which have been raised for the first time now even though they could have (and should have) been raised earlier. First, Section

**App. 0617**

30-7-7.3 does not infringe upon the plain text of the Second Amendment because the right to "keep" and "bear" arms does not encompass an unqualified right to immediately acquire newly purchased firearms. Second, neither *Bruen* nor *Rahimi* require that "presumptively lawful" commercial regulations be subject to the same historical analysis applicable to presumptively unconstitutional measures under *Bruen*'s second step. Third, waiting periods like Section 30-7-7.3 qualify as presumptively lawful regulations "imposing conditions and qualifications on the commercial sale of arms" because they apply only to those buying and selling firearms. And lastly, *Rahimi* supports (rather than undermines) Defendants' position that historical analogues like intoxication laws and licensing regimes are sufficient to justify Section 30-7-7.3 as consistent with history and tradition under *Bruen*'s second step.

## DISCUSSION

**I.      Section 30-7-7.3 does not infringe upon the plain text of the Second Amendment**

It is undisputed that Section 30-7-7.3 does not prevent anyone from "keeping" or "bearing" their arms that they already possess. Nor does it prohibit anyone from purchasing any firearm. Rather, it merely imposes a brief delay on the transfer of a newly purchased firearm to a buyer. So, the question is whether the plain text of the Second Amendment covers the right to *immediately acquire* a newly purchased firearm. *See United States v. Reyna*, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022) ("For Step One to have any meaning, the regulated conduct must be defined specifically enough that it can meaningfully compare to the Second Amendment's plain text — a plain text that is more complex than mere possession."); *United States v. Dangleben*, 2023 WL 6441977, at *4 (D.V.I. Oct. 3, 2023) ("[B]ecause the Second Amendment is specific as to the conduct it covers, the regulated conduct must be defined in a similarly precise fashion."). It does not.

**App. 0618**

As explained previously, Section 30-7-7.3 does not plausibly infringe on Plaintiffs' right to "bear Arms" because that phrase "has a meaning that refers to carrying for a particular purpose—confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 584 (2008). Nor does it infringe on Plaintiffs' right to "keep Arms." The Supreme Court in *Heller* explained that the phrase "'[k]eep arms' was simply a common way of referring to possessing arms[.]" *Id.* at 583. And the natural and plain meaning of the word "keep" is to "*retain* possession of" and "not to lose." *See Rocky Mountain Gun Owners v. Polis*, 2023 WL 8446495, at \*7 (D. Colo. Nov. 13, 2023) ("As the Court explained, the 1773 edition of Samuel Johnson's Dictionary of the English Language "defined 'keep' as, most relevantly, '[t]o retain; not to lose,' and '[t]o have in custody.'" (citing *Heller*, 554 U.S. at 582)); *see also The American Heritage Dictionary* 459 (3d ed.1994) (defining "keep" as "[t]o retain possession of"); Thomas Sheridan, *A Complete Dictionary of the English Language* (6th ed.1796) (defining "to keep" as "[t]o retain; to have in custody"); Samuel Johnson, *A Dictionary of the English Language* (7th ed.1785) (defining "to keep" as "to retain; not to lose" and also "[t]o have in custody").[1] In other words, the right to "keep Arms" is a right to *continue* to keep in one's possession something already possessed. Accordingly, this Court should reach the same conclusion as Judge Kane in *Rocky Mountain Gun Owners* and hold that "it is clear the relevant conduct impacted by the waiting period—the receipt of a paid-for firearm without delay—

---

[1] Plaintiffs would have this Court re-write the Second Amendment as: "A well regulated Militia, being necessary to the security of a free State, the right of the people to *have* and bear Arms, shall not be infringed." [Doc. 31 a 3] The Court should flatly reject this argument that departs from the plain language of the Second Amendment, especially since it was made for the first time in Plaintiffs' supplemental brief and there was no reason why Plaintiffs could not have made it earlier. *See Genesee Cnty. Employees' Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*, 825 F. Supp. 2d 1082, 1225 (D.N.M. 2011) (Browning, J.) ("[A]rguments raised for the first time in a reply brief are generally deemed waived." (cleaned up)).

**App. 0619**

is not covered." 2023 WL 8446495, at *8; *see also McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024) ("[O]n its face 'keep and bear' does not include purchase").

Of course, this is not to say that *no* regulation impacting a person's ability to acquire a firearm can be found to infringe on the right to "keep Arms." The Ninth Circuit's recent analysis in *B & L Productions, Inc. v. Newsom*, 104 F.4th 108, 2024 WL 2927734 (9th Cir. 2024), is particularly instructive on this point. There, the court addressed the constitutionality of a law barring the sale of firearms on state property. In analyzing whether this infringed upon the Second Amendment's plain text, the court acknowledged that "unless the right to *acquire* firearms receives some Second Amendment protection, the right to keep and bear firearms would be meaningless." *Id.* at *7. However, the court observed that "[t]he Supreme Court itself has suggested that the ancillary right at issue in these cases—the right to acquire firearms—only implicates the Second Amendment in limited circumstances" and "explicitly framed 'laws imposing conditions and qualifications on the commercial sale of arms' as '*presumptively lawful* regulatory measures.'" *Id.* at *8 (quoting *Heller*, 554 U.S. at 626-27 & n.26, and citing *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring, joined by Roberts, C.J.)). The court then noted that "[f]or any law to be 'presumptively lawful,' it necessarily must not implicate the plain text of the Second Amendment. Otherwise, *Bruen* makes clear that the Constitution would "*presumptively protect*[ ] that conduct," and the government would bear the burden of identifying a historical tradition of similar regulation." *Id.* (quoting *Heller*, 554 U.S. at 17). Thus, the Ninth Circuit concluded, "[t]he most reasonable interpretation of that passage is that commercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the *Bruen* test" and "[w]hile the [Supreme] Court did not specify what is required to overcome that presumption, requiring that

**App. 0620**

a regulation 'meaningfully constrain' the right to keep and bear arms for the purpose of self-defense faithfully tracks the Second Amendment's plain text." *Id.* (cleaned up).

Following the Ninth Circuit's logic, a regulation impacting someone's ability to acquire a new firearm *may* infringe on conduct protected by the Second Amendment's plain text if it "meaningfully constrains" their right to keep firearms for self-defense. Section 30-7-7.3's short, seven-day waiting period does no such thing. As the Supreme Court has strongly indicated, shall-issue licensing regimes that "often require applicants to undergo a background check or pass a firearms safety course"—things which can often take well over seven days to complete—do not ordinarily violate the Second Amendment. *Bruen*, 597 U.S. at 39 n.9. Indeed, Chief Justice Roberts and Justice Kavanaugh—two justices necessary for the majority in *Bruen*—acknowledged that these shall-issue regimes "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements" and expressly stated that *Bruen* "does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense" or "affect the existing licensing regimes—known as 'shall-issue' regimes—that are employed in 43 States." *Id.* at 79-80 (Kavanaugh, J., concurring, joined by Roberts, C.J.). In other words, a majority of the Supreme Court has expressly stated that the government may impose measures temporarily delaying an individual's right to obtain or use a firearm without infringing on the right to "keep or bear Arms."

While this does not mean that these measures are *always* constitutional, it is safe to say a seven-day delay does not meaningfully constrain anyone's right to bear arms for self-defense. *Cf. Bruen*, 597 U.S. 39 n.9 (observing that shall-issue licensing regimes "do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry"

App. 0621

(cleaned up)); *McRorey*, 99 F.4th at 840 ("[T]here is some point at which a background check becomes so lengthy that it is 'put towards abusive ends' or subject to *Bruen*'s historical framework as a de facto prohibition on possession. But a period of 10 days does not qualify."). But even if it did as a general matter, Plaintiffs *here* cannot show that Section 30-7-7.3 meaningfully constrains their right to keep arms for self-defense when they already had multiple firearms before the law went into effect. *Cf. Rocky Mountain Gun Owners*, 2023 WL 8446495, at *20 (finding no irreparable harm when the plaintiffs "have alleged no harm associated with the right of self-defense"); [Doc. 2-2; Doc. 2-3].

This Court should reject Plaintiffs' arguments to the contrary. Plaintiffs argue that "the right to acquire arms is a necessary concomitant of the right to keep and bear arms." [Doc. 32 at 4] This may be true to some extent. *See B & L Productions, Inc.*, 104 F.4th 108. But that does not mean that the right to acquire newly purchased firearms *immediately* is a necessary concomitant of this right. Indeed, Plaintiffs fail to cite a single case holding that the Second Amendment's plain text covers the right to *immediately* take possession of a newly purchased firearm. [Doc. 32 at 4-7][2] Plaintiffs' reliance on First Amendment law is similarly misplaced. [Doc. 32 at 7] As Chief Judge Thomas has observed, "[t]he Supreme Court has permitted waiting periods of varying duration in several other constitutional contexts, including before obtaining a marriage license, and permits for gathering to protest or parade." *Silvester v. Harris*, 843 F.3d 816, 832 (9th Cir.

---

[2] The only case that comes close to this conclusion, *Maryland Shall Issue, Inc. v. Moore*, has been vacated by the Fourth Circuit—which Plaintiffs failed to mention. 86 F.4th 1038 (4th Cir. 2023), *reh'g en banc granted*, 2024 WL 124290 (4th Cir. Jan. 11, 2024). Plus, *Maryland Shall Issue, Inc.* is distinguishable because it dealt with a licensing regime that can take thirty days—*over four times longer* than Section 30-7-7.3's waiting period. *See id.* at 1045.

**App. 0622**

2016) (Thomas, C.J., concurring), *abrogated on other grounds by Bruen*, 597 U.S. 1 (2022).[3] Thus, allowing for a short waiting period does not render the Second Amendment a "second class right."

Lastly, the Court should not fall for Plaintiffs' hyperbolic conclusion "if a one-week waiting period does not implicate the plain text, no waiting period does." [Doc. 32 at 7]. As the Supreme Court has explained, objective laws temporarily delaying a person's ability to possess a firearm to help ensure those bearing arms "are, in fact, law-abiding, responsible citizens" may be challenged on an as-applied basis if they are "put to abusive ends." *Bruen*, 597 U.S. at 39 n.9; *see McRorey*, 99 F.4th at 837; *B & L Productions, Inc.*, 104 F.4th 108. That is no less true here. But, as the Fifth Circuit recently observed, even "a period of 10 days does not qualify [as abusive]." *McRorey*, 99 F.4th at 840. Plaintiffs give this Court no reason to reach a contrary conclusion.

## II. Presumptively lawful commercial regulations are not subject to *Bruen*'s second step

Plaintiffs now argue for the first time that "[a]ll firearms regulations must be justified by historical tradition, including the regulations that *Heller* deemed 'presumptively lawful.'" [Doc. 32 at 8-11] The Court should reject this argument for several reasons. For starters, Plaintiffs failed to raise it earlier and should not be allowed to belatedly backdoor in a new argument under the guise of addressing *Rahimi*—which did not deal with a law falling within this "presumptively lawful" category. *See Genesee Cnty. Employees' Ret. Sys.*, 825 F. Supp. 2d at 1225; [Doc. 21 (only arguing that Section 30-7-7.3 is not a presumptively lawful regulation)].[4]

---

[3] While *Silvester* was decided pre-*Bruen*, it is still good law to the extent its analysis focused on history and tradition. *See Bruen*, 597 U.S. at 19 (stating that the first step of the pre-Bruen framework "is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history").

[4] Although the Court raised this issue *sua sponte* at the beginning of the preliminary injunction hearing, it should not address it in light of Plaintiffs' failure to raise the issue. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (noting that in "our adversarial system of adjudication,

**App. 0623**

But even if the Court *did* consider this newly raised argument, it should reject it. The Fifth Circuit recently addressed a nearly identical argument in rejecting a challenge to a federal law providing for enhanced background checks for firearm purchasers under 21, which can create a waiting period of up to 10 days before delivering a firearm. *McRorey*, 99 F.4th 831. There, the challengers cleaved to the same language in *Bruen* that Plaintiffs do now elucidating the two-step test for Second Amendment claims, and they argued this language meant "that the government must show 'a broad and enduring historical tradition' analogous to the challenged provisions in this case." *McRorey*, 99 F.4th at 836. While the Fifth Circuit acknowledged this argument was "tenable" when *Bruen*'s language was taken out of context, the court declined to "read that language in a vacuum." *McRorey*, 99 F.4th at 836. The court properly recognized that *Heller* described "'conditions and qualifications on the commercial sale of arms' as 'presumptively lawful,'" and "*Bruen* did nothing to disturb that part of *Heller*." *McRorey*, 99 F.4th at 836 (quoting *Heller*, 554 U.S. at 626-27 & n.26).[5] Instead, the Fifth Circuit concluded, "*Bruen* continued to distinguish the treatment of prohibitions on "keep[ing] and bear[ing]"—such as the law at issue in *Bruen*—and other ancillary firearm regulations such as background checks preceding sale[.]" *McRorey*, 99 F.4th at 836-37 (citing *Bruen*, 597 U.S. at 38 n.9, and *id.* at 80 (Kavanaugh, J., concurring, joined by Roberts, C.J.)).

Notably, the Fifth Circuit also considered *and rejected* Plaintiffs' argument that *Bruen*'s discussion of sensitive places demonstrates that *Heller*'s "presumptively lawful" regulations must be justified under *Bruen*'s second step, observing:

---

we follow the principle of party presentation" and courts should "normally decide only questions presented by the parties").

[5] The Fifth Circuit also noted that "[i]t is quite possible that *Bruen* disturbed no part of *Heller*." *McRorey*, 99 F.4th at 836 n.11 (citing *Bruen*, 597 U.S. at 39, and *id.* at 72 (Alito, J., concurring)).

**App. 0624**

First, sensitive-place laws are likely captured by the plain text of the Second Amendment—they directly impact the right to bear. Therefore, they are likely subject to *Bruen*'s historical analysis. Second, though *Heller* notes sensitive-place laws are presumptively lawful, *Bruen*'s footnote 9 omits them. Third, even if sensitive-place laws are presumptively lawful, declaring all of Manhattan as a "sensitive place," seems like the quintessential example of putting a presumptively constitutional regulation "toward abusive ends." *Bruen*, 597 U.S. at 38 n.9.

*McRorey*, 99 F.4th at 838 (footnote omitted).[6] Ultimately, the Fifth circuit concluded:

The right to "keep and bear" can implicate the right to purchase. That is why the Court prohibits shoehorning restrictions on purchase into functional prohibitions on keeping. But such an implication is not the same thing as being covered by the plain text of the amendment. The law at issue in *Bruen* underscores this distinction. That statute prohibited public carry—conduct readily within the plain meaning of "keep and bear"—without demonstrated cause. The challenged regulation here is entirely dissimilar. Background checks such as those in the challenged provisions are presumptively lawful.

*McRorey*, 99 F.4th at 838-39 (citations and footnotes omitted). Many other courts have reached a similar conclusion that laws imposing conditions and qualifications on the commercial sale of firearms do not regulate conduct protected by the plain text of the Second Amendment, and therefore, are not subject to *Bruen*'s second step. *See, e.g.*, *B & L Productions*, 104 F.4th 108; *Rocky Mountain Gun Owners*, 2023 WL 8446495, at *10.

Plaintiffs give this Court no reason to reach another conclusion. Plaintiffs primarily rely on two divided appellate cases that reached a different result in the context of addressing the federal felon-in-possession ban, *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024), and *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023) (en banc), *cert. granted, judgment vacated*

---

[6] Defendants would add that *Bruen* only considered whether New York's licensing regime could be justified as a sensitive place regulation. *See* 597 U.S. at 30-31. This is consistent with the analysis other courts have applied to waiting period laws—which is to determine whether Section 30-7-7.3 qualifies as a presumptively lawful regulation "imposing conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626-27 & n.26, and if so, whether Plaintiffs overcome this presumption of constitutionality. *See Rocky Mountain Gun Owners*, 2023 WL 8446495, at *11.

**App. 0625**

*sub nom. Garland, Atty Gen. v. Range, Bryan D.*, No. 23-374, 2024 WL 3259661 (U.S. July 2,

2024). [Doc. 32 at 8-10] However, these cases are on shaky grounds following *Rahimi*, which went

out of its way to note that the Supreme Court did "not suggest that the Second Amendment

prohibits the enactment of laws banning the possession of guns by categories of persons thought

by a legislature to present a special danger of misuse," and repeated *Heller*'s observation that

"many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,'

are 'presumptively lawful.'" 2024 WL 3074728, at \*\*9-10 (citing and quoting *Heller*, 554 U.S. at

626-27 & n.26). Indeed, the Supreme Court subsequently vacated *Range* and remanded for further

consideration in light of *Rahimi*. These cases also are directly contrary to the Tenth Circuit's

decision in *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023), *cert. granted, judgment vacated*,

2024 WL 3259668 (U.S. July 2, 2024).[7] And the lone district court case cited by plaintiffs, *Nguyen*

*v. Bonta*, 2024 WL 1057241 (S.D. Cal. Mar. 11, 2024), was decided before *B & L Productions*,

104 F.4th 108, and has been stayed by the Ninth Circuit pending appeal because the government

is likely to succeed. *See Nguyen v. Bonta*, No. 24-2036 (9th Cir. Apr. 24, 2024) ("Appellants have

established a sufficient likelihood of success on the merits of this appeal and made a sufficient

showing on the relative equities to justify a stay pending appeal.").[8]

_____

[7] Although the Supreme Court granted certiorari, vacated, and remanded *Vincent* for further
consideration in light of its decision in *Rahimi* along with virtually every other pending Second
Amendment appeal, it is not apparent that anything in *Rahimi* would alter the Tenth Circuit's
decision.

[8] *Nguyen* is also distinguishable on its facts, as the challenged law there prohibited individuals
from purchasing more than one firearm in any third-day period. *See Nguyen*, 2024 WL 1057241,
at \*1. Such a broad limitation is arguably a "meaningful constraint" on the right to "keep and bear
Arms" such that it would be subject to justification under *Bruen*'s second step. *See B & L
Productions*, 104 F.4th 108. In contrast, Section 30-7-7.3 does not impose any purchase limit.

**App. 0626**

Nor does *Rahimi* change any of the Fifth Circuit's analysis in cases such as *McRorey* given that no one claimed the law at issue in *Rahimi* fell within this "presumptively lawful" category. *See generally Rahimi*, 2024 WL 3074728; [Doc. 31 at 6-8]. Plaintiffs make much of the fact that the *Rahimi* Court did not analogize 18 U.S.C. § 922(g)(8) to *Heller*'s presumptively lawful prohibition on the possession of firearms by felons. [Doc. 32 at 10-11] However, it is unclear if the parties even argued this point. *See generally Rahimi*, 2024 WL 3074728. Moreover, as noted above, the Supreme Court went out of its way to acknowledge and reaffirm *Heller*'s language that "many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Rahimi*, 2024 WL 3074728, at **9-10 (quoting *Heller*, 554 U.S., at 626-27 & n.26). Therefore, there is no reason to believe *Rahimi* now requires that laws falling within *Heller*'s list of "presumptively lawful" regulations—such as laws imposing "conditions and qualifications on the commercial sale of arms"—are now presumptively unlawful and must be justified under *Bruen*'s second step.

III.   **Waiting periods are presumptively lawful commercial regulations**

Plaintiffs next argue that Section 30-7-7.3 is not presumptively lawful because it is "neither longstanding nor a commercial regulation." [Doc. 32 at 12] These arguments fail for several reasons. First, Plaintiffs did not raise the argument that a commercial regulation must be "longstanding" to qualify as a presumptively lawful regulation, and the Court should not permit them to raise it now under the guise of addressing *Rahimi*, which did not involve a "presumptively lawful" regulation. *See Genesee Cnty. Employees' Ret. Sys.*, 825 F. Supp. 2d at 1225; [Doc. 21 (only arguing that Section 30-7-7.3 is not a presumptively lawful regulation)]. Second, commercial regulations do not need to be justified as "longstanding" to qualify as presumptively lawful. The Supreme Court in *Heller* stated:

**App. 0627**

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions
> on the possession of firearms by felons and the mentally ill, or laws forbidding the
> carrying of firearms in sensitive places such as schools and government buildings,
> or laws imposing conditions and qualifications on the commercial sale of arms.

554 U.S. at 626-27. The word "longstanding" refers only to the first category of laws mentioned

(i.e., prohibitions on the possession of firearms by felons and the mentally ill) given the syntax and

punctuation of this sentence. *See Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 707

n.275 (Del. 2017), *abrogated on other grounds by Bruen*, 597 U.S. 1 ("In *Heller*, the word

"longstanding" only qualified one set of restrictions, and not those involving sensitive places."

(citing *Heller*, 554 U.S. at 626-27 & n.26)). Alternatively, "longstanding" is simply an adjective

that *describes* (rather than conditions) these categories of presumptively lawful regulations. *See*

*Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1320 (11th Cir. 2023), *reh'g en banc granted, opinion*

*vacated*, 72 F.4th 1346 (11th Cir. 2023) (noting that the Supreme Court has described the category

of "'laws imposing conditions and qualifications on the commercial sale of firearms' as

'longstanding' and therefore 'presumptively lawful' firearm regulations" (quoting *Heller*, 554

U.S. at 626-27 & n.26)). Either way, Plaintiffs' "longstanding" argument is unpersuasive.

But even if Plaintiffs *were* correct that every commercial regulation must be

"longstanding" to qualify as presumptively lawful, this Court may readily conclude that Section

30-7-7.3 is sufficiently analogous to "longstanding" commercial regulations like "shall-issue"

licensing regimes and early twentieth century waiting period laws such as California's 1923

waiting period. Contrary to Plaintiffs' arguments, it is of no moment that these laws arose in the

early twentieth century. As the Fifth Circuit observed, "*Heller* demonstrates that a regulation can

be deemed 'longstanding' even if it cannot boast a precise founding-era analogue. . . . After all,

*Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet

the current versions of these bans are of mid-20th century vintage." *Nat'l Rifle Ass'n of Am., Inc.*

**App. 0628**

*v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012), *abrogated on other grounds by Bruen*, 597 U.S. 1 (cleaned up); *see also United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (same). And, as explained earlier, neither *Bruen* nor *Rahimi* abrogated this language in *Heller*.[9] Thus, waiting period laws such as Section 30-7-7.3 qualify as "longstanding." *See Silvester*, 843 F.3d at 829-32 (Thomas, C.J., concurring) (noting that "waiting-period statutes have existed in several states since the 1920s" and concluding that California's ten-day waiting period qualified as "longstanding" as a result).

Plaintiffs also argue that early twentieth century waiting periods like California's and "shall-issue" licensing regimes cannot justify Section 30-7-7.3 as "longstanding" because they are not identical. [Doc. 32 at 12-13] But this runs contrary to the logic underpinning *Rahimi*'s instruction that courts should not require a "historical twin" or create a "law trapped in amber." [Doc. 31 at 4-5, 10] Rather, if anything, this Court should look to the *principles* embodied in these laws and consider whether Section 30-7-7.3 is consistent with those principles. [Doc. 31 at 8-13] As previously explained, these sorts of laws stand for the principle that the government may briefly delay a person's ability to use a firearm to help ensure that they "are, in fact, law-abiding, responsible citizens." *Bruen*, 597 U.S. at 39 n.9; [Doc. 31 at 11-13]. And Section 30-7.7.3 is consistent with this principle because it imposes a brief 7-day delay to help ensure that a firearm purchaser does not use it impulsively to hurt themselves or others. [Doc. 31 at 11-13]

Indeed, Section 30-7.7.3 is substantially *less* burdensome than many longstanding "shall-issue" licensing regimes, regimes that "require a license applicant to undergo fingerprinting, a

---

[9] True, the Supreme Court rejected New York's 1911 licensing law as failing to satisfy *Bruen*'s second step. However, as Chief Justice Roberts and Justice Kavanaugh noted, it only did so because New York's law was "unusual[ly] discretionary" and an "outlier." *Bruen*, 597 U.S. at 79-80 (Kavanaugh, J., concurring, joined by Roberts, C.J.)). Plaintiffs cannot claim the same for Section 30-7-7.3, which imposes a purely objective condition on the sale of firearms.

**App. 0629**

background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Bruen*, 597 U.S. at 79-80 (Kavanaugh, J., concurring, joined by Roberts, C.J.). Rather than require purchasers to take the time and effort to satisfy these prerequisites and pay related fees, New Mexico has opted to simply have purchasers wait seven days to take possession of a newly purchased firearm. If a majority of the Supreme Court approves of the former, more burdensome regime, surely a *less* burdensome measure passes constitutional muster as well.

The Court should also reject Plaintiffs' argument that Section 30-7-7.3 is not a commercial regulation simply because it applies to "private" (i.e., non-licensed) sales, as well as buyers and sellers alike. The Supreme Court approved as presumptively constitutional "laws imposing conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626-27 & n.26; it did not restrict this presumptively lawful category to "laws imposing conditions and qualifications on the federally licensed firearms dealers that sell arms." Section 30-7-7.3 plainly qualifies as a law imposing a "condition . . . on the commercial sale of arms," *Heller*, 554 U.S. at 626-27 & n.26, as it only applies to individuals *buying* and *selling* firearms. *See Commercial*, Black's Law Dictionary (defining "commercial" as "[o]f, relating to, or involving the buying and selling of goods"); *Bondi*, 61 F.4th at 1320 (concluding that Florida's law "imposing a minimum age as a qualification for buying firearms" imposes a condition and qualification on the commercial sale of firearms); *Silvester*, 843 F.3d at 830 (Thomas, C.J., concurring) ("California's waiting period law is a condition or qualification on the sale of guns: It imposes a brief delay—to permit compliance with background check requirements and provide a 'cooling off' period—as a prerequisite to acquiring a gun."). But even if Section 30-7-7.3 did not qualify as a presumptively lawful commercial regulation to the extent it applies to "private" sales or buyers, the Court should

**App. 0630**

still find it presumptively constitutional to the extent it applies to commercial businesses selling firearms—which would result in the same outcome for Plaintiffs' facial challenge. *See Rahimi*, 2024 WL 3074728, at *6.[10]

As a last resort, Plaintiffs now claim that Section 30-7-7.3's waiting period is "abusive" and therefore subject to challenge on an as-applied basis. Again, the Court should not address this belated argument when Plaintiffs had the opportunity and obligation to raise it earlier. *See Genesee Cnty. Employees' Ret. Sys.*, 825 F. Supp. 2d at 1225; [Doc. 15 at 10 (noting that Plaintiffs did not make this argument); Doc. 21 (not addressing Defendants' observation)]. But even if it did, the Court may readily conclude that a period of seven days "does not qualify [as abusive]." *McRorey*, 99 F.4th at 840.[11]

## IV.  *Rahimi* supports finding intoxication laws and licensing regimes as proper analogues to waiting periods

Lastly, Plaintiffs argue that *Rahimi* "confirms" their position that this case involves a "straightforward" inquiry in which this Court should require a historical twin under *Bruen*'s second

---

[10] Defendants further note that Plaintiffs do not have standing to challenge Section 30-7-7.3 to the extent it applies to "private" sales because they purchased their firearms from licensed dealers and do not allege they intend to purchase a firearm from a non-licensed individual in the future. *See Whitmore v. Arkansas*, 495 U.S. 149, 155-56 (1990) ("A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing."); *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973) ("[A] person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court."); *Skoien*, 614 F.3d at 645 (same) [Doc. 1; Doc. 2-2; Doc. 2-3].

[11] Plaintiffs argue that *any* "law that constitutes a pretextual smokescreen for a burden on the right to keep and bear arms is abusive." [Doc. 32 at 14] However, this runs contrary to the Supreme Court's facial approval of "shall-issue" licensing regimes that can "require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements," *Bruen*, 597 U.S. at 79-80 (Kavanaugh, J., concurring, joined by Roberts, C.J.), which only become "abusive" when they involve, "for example, lengthy wait times in processing license applications or exorbitant fees." *Id.* at 38 n.9.

**App. 0631**

step because "[i]mpulsive firearms use has persisted since the colonial era . . . yet no waiting period

regulation was enacted during the 17th, 18th, or 19th centuries." [Doc. 32 at 15-16] This is a

curious argument given that the same was said of the issue of interpersonal violence in *Rahimi*,

yet the Supreme Court did not require an identical law from those periods to justify 18 U.S.C. §

922(g)(8). [Doc. 31 at 8-9] Indeed, as Justice Barrett explained in her concurrence:

> [I]mposing a test that demands overly specific analogues has serious problems. To
> name two: It forces 21st-century regulations to follow late-18th-century policy
> choices, giving us 'a law trapped in amber.' And it assumes that founding-era
> legislatures maximally exercised their power to regulate, thereby adopting a 'use it
> or lose it' view of legislative authority. Such assumptions are flawed, and
> originalism does not require them.

*Rahimi*, 2024 WL 3074728, at *30 (Barrett, J., concurring) (cleaned up). Accordingly, this Court

should reject Plaintiffs' calls for a historical twin and apply a more nuanced approach to analogical

reasoning should it reach *Bruen*'s second step. *Rahimi*, 2024 WL 3074728, at *6.

Plaintiffs also argue that "*Rahimi* made clear that 'narrow' laws, such as the intoxication

laws that the State offers as analogs, are distinctly dissimilar from laws that 'broadly restrict arms

use by the public generally,' such as the waiting period law." [Doc. 32 at 16 (quoting *Rahimi*, 2024

WL 3074728, at *9)] In so arguing, Plaintiffs attempt to paint Section 30-7-7.3 as "'a broad

prohibitory regime like New York's' licensing regime at issue in *Bruen*." [Doc. 32 at 16 (quoting

*Rahimi*, 2024 WL 3074728, at *10)] The Court should reject this mischaracterization. Section 30-

7-7.3 is much more akin to—and indeed much less burdensome than—the "shall-issue" licensing

regimes that a majority of the Supreme Court approved as facially permissible than New York's

"unusual[ly] discretionary" regime that "grant[ed] open-ended discretion to licensing officials and

authorizes licenses only for those applicants who can show some special need apart from self-

defense." *Bruen*, 597 U.S. at 79-80 (Kavanaugh, J., concurring, joined by Roberts, C.J.)). As

previously explained, while intoxications laws may have applied a bit more narrowly than Section

**App. 0632**

30-7-7.3, *Rahimi* demonstrates that this Court may rely on these historical analogues since Section 30-7-7.3 is consistent with the *principles* for which they stand: the government may impose a brief delay on an individual's ability to use or possess a firearm to make sure that they will not misuse it. [Doc. 31 at 8-13]

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' request for a preliminary injunction.

Respectfully submitted,

*/s/ Holly Agajanian*
**HOLLY AGAJANIAN**
*Chief General Counsel to Governor Michelle Lujan Grisham*
**KYLE P. DUFFY**
*Deputy General Counsel to Governor Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2200
Holly.Agajanian@exec.nm.gov
Kyle.duffy@exec.nm.gov

*/s/ Mark W. Allen*
Mark W. Allen
*Assistant Attorney General*
Billy J. Jimenez
*Assistant Attorney General*
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
505.490.4825
mallen@nmdoj.gov
bjimenez@nmdoj.gov

*Attorneys for Raúl Torrez*

**App. 0633**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 8, 2024, I filed the foregoing via the CM/ECF filing system,

which caused all counsel of record to be served by electronic means.


Respectfully submitted,

<u>/s/ Holly Agajanian</u>
Holly Agajanian

**App. 0634**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| SAMUEL ORTEGA and REBECCA SCOTT, <br><br> Plaintiffs, <br><br> v. <br><br> MICHELLE LUJAN GRISHAM, in her official capacity as Governor of the State of New Mexico, and RAÚL TORREZ, in his official capacity as Attorney General of the State of New Mexico, <br><br> Defendants. | No. 24-CV-0471 |

**PLAINTIFFS' RESPONSE TO DEFENDANTS SUPPLEMENTAL BRIEF**

App. 0635

**TABLE OF CONTENTS**

TABLE OF CONTENTS .............................................................. i

TABLE OF AUTHORITIES........................................................ ii

I.    The plain text issue is whether the text covers the right to possess arms; any limitation
      must be considered in the historical analysis. ................................................. 1

II.   The waiting period law is not a commercial regulation, and there is nothing
      "presumptive" about its lawfulness. ................................................. 3

III.  The intoxication laws and licensing regimes Defendants proffer as historical analogues
      are not "relevantly similar" to the waiting period law. ................................. 5

IV.   The waiting period law is unconstitutional both on its face and as applied. . 7

CONCLUSION.................................................................. 8

**App. 0636**

## TABLE OF AUTHORITIES

**<u>Case</u>**                                                                              **<u>Page(s)</u>**

*Curtis v. University of Houston,*
  940 F. Supp. 1070 (S.D. Tex. 1996) .......................................................... 1

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) .................................................................... 1, 2, 4, 7

*Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives,*
  5 F.4th 407 (4th Cir. 2021) ....................................................................... 4

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ................................................................................. 7

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  597 U.S. 1 (2022) ............................................................................... 1, 3, 5-7

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York,*
  140 S. Ct. 1525 (2020) ............................................................................. 2

*United States v. Rahimi,*
  602 U.S. __, 2024 WL 3074728 (2024) ................................................... 1

**<u>Statutes</u>**

  18 U.S.C. § 922(g) .................................................................................... 1

**App. 0637**

I.      **The plain text issue is whether the text covers the right to possess arms; any limitation must be considered in the historical analysis.**

Defendants concede that the waiting period law burdens the right to possess arms. They admit that the law "imposes" a "7-day delay on an individual's ability to possess a newly purchased firearm." Defs.' Suppl. Br. 12; *see also id.* at 13 (the law "imposes" a "delay on a purchaser's ability to take possession of their firearm"). And Defendants do not deny that the Second Amendment's "textual elements . . . guarantee the individual right to *possess* and carry weapons." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) (emphasis added). Nothing more is required at the plain text stage. Defendants must justify the waiting period law by "demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022); *cf. Curtis v. University of Houston*, 940 F. Supp. 1070, 1073 (S.D. Tex. 1996) ("plain text" of the First Amendment had no implied limit that would carve out public employees).

In *Rahimi*, it was "undisputed that §922(g)(8) targets conduct encompassed by the Second Amendment's plain text" by "prohibiting covered individuals from 'possessing' or 'receiving any firearm.'" *United States v. Rahimi*, 602 U.S. __, No. 22-915, 2024 WL 3074728, at *35 (June 21, 2024) (Thomas, J., dissenting) (quoting 18 U.S.C. § 922(g)) (brackets omitted). New Mexico's waiting period functions in a similar manner, by preventing individuals from possessing or receiving their firearms.

To dodge this conclusion, Defendants attempt to insert a limitation into the plain text analysis. They argue that the plain text "does not cover the right to *immediately* acquire a newly purchased firearm." Defs.' Suppl. Br. 2 (emphasis added). But that is an argument about the merits of Plaintiffs' claims, to be considered in the historical analysis. Here, the parties are simply debating whether *Bruen*'s historical analysis applies, at all, to the waiting period. And because the

1

**App. 0638**

Second Amendment protects the act of possessing arms, that is the end of the plain text analysis. Otherwise, defendants could chip away at *Bruen* by always narrowly characterizing the right at issue.

This logic is born out again and again by case law. In *Heller*, for instance, the Court explained that it would "begin our textual analysis," 554 U.S. at 578, "*[b]efore turning to limitations* upon the individual right," *id.* at 595 (emphasis added). It was thus only after the Court concluded that the "textual elements" cover the "right to possess and carry weapons," *id.* at 592, that the Court considered whether the limitations imposed by the regulations—*i.e.*, the ban on "handgun possession in the home" and the "require[ment] that any lawful firearm in the home be disassembled or bound by a trigger lock," *id.* at 628—were historically justified.

Justices Alito, Thomas, Gorsuch, and Kavanaugh followed this approach in *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525 (2020). *City of New York* involved a challenge to New York City's prohibition on the transportation of firearms to shooting ranges outside the city. The majority held that the case had been mooted by a later-enacted State law. Justice Alito, joined by Justices Gorsuch and Thomas, dissented, arguing that the case was not moot and reaching the merits. Justice Kavanaugh, while joining the majority, expressed that he "agree[d] with Justice Alito's general analysis of *Heller.*" 140 S. Ct. at 1527 (Kavanaugh, J., concurring). So, four members of the Court—all members of the *Bruen* majority—agreed with Justice Alito's treatment of *Heller*, and not one disagreed.

Justice Alito began by positing that "a necessary concomitant" of "the right to keep a handgun in the home for self-defense" is the right "to take a gun to a range in order to gain and maintain the skill necessary to use it responsibly." *Id.* at 1541 (Alito, J., dissenting). And because range training was protected by the plain text, it became "incumbent on the City to justify the

2

**App. 0639**

restrictions" on training outside of the City with "evidence of laws in force around the time of the adoption of the Second Amendment." *Id.* Significantly, Justice Alito did not question whether training at a range *outside the City* is protected by the plain text—but rather, whether training in general is protected. The limitation on training outside the City would be considered in the historical analysis, where the government would need to justify it with tradition.

In *Bruen*, the Court moved quickly through the plain text analysis. It determined that the petitioners, as "two ordinary, law-abiding, adult citizens—are part of 'the people,'" 597 U.S. at 31, that handguns are protected arms, *id.* at 32, and that the "definition of 'bear' naturally encompasses public carry," *id.* The Court then "turn[ed] to respondents' historical evidence" to consider limitations on that right—there it found that "the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms," but no "tradition of broadly prohibiting the public carry of commonly used firearms for self-defense." *Id.* at 38. Thus, as in *Heller* and the *New York City* dissent, the plain text analysis merely questioned whether the conduct was covered, and the limitation on that conduct was considered only in the historical analysis.

The Supreme Court's precedents require that this Court consider in the plain text analysis only whether the text covers the possession of bearable arms by law-abiding citizens. Any limitation on that conduct—including a law prohibiting that conduct for one week—must be justified with historical tradition in the historical analysis.

## II. The waiting period law is not a commercial regulation, and there is nothing "presumptive" about its lawfulness.

The defendants rely on dicta in *Heller* to support their contention that the waiting period law is presumptively lawful because it merely "impos[es] conditions and qualifications on the

commercial sale of firearms." *Heller*, 554 U.S. at 626–27. But the waiting period law is not truly part of any commercial transaction. It is not a "condition" on whether a firearms dealer may sell a firearm. It has nothing to do with the "qualifications" of a firearms dealer to sell firearms. It serves no commercial purpose. The Act merely targets the "transfer" of a firearm to a customer after a purchase, not the underlying sale of that firearm.  As previously noted, Defendants emphasize that the benefit of the waiting period law is to reduce impulsive gun violence by the purchaser—not a need for merchants to have more time to conduct background checks or engage in other relevant commercial activity.

For this reason, the waiting period is nothing more than an overly broad and constitutionally infirm law that Defendants are attempting to pass off as a commercial regulation. But what <u>commercial purpose</u> does it serve to force a gun dealer to wait 7 days to transfer a firearm to an individual who has already passed a background check and paid for the gun? None. Instead, this law is simply an effort to make an end-run around the Second Amendment.

In 2021, the Fourth Circuit rejected a similar effort by the federal government to portray prohibitions on the sale of handguns to 18–20-year-olds as being presumptively lawful conditions on commercial sales. "A condition or qualification on the sale of arms [by sellers] is a hoop someone must jump through to sell a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records." *See Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 416 (4th Cir. 2021) (vacated as moot, 34 F.4th 14 F.4th 322). By contrast, restrictions that operate as a flat bar on a purchaser's right to obtain a gun are not "conditions and qualifications on the sale of arms." This Court ought to reach the same conclusion here.

4

**App. 0641**

But even if the waiting period law is determined to be a commercial regulation, it still must survive the *Bruen* analysis—Defendants still must establish that the law is consistent with this Nation's historical tradition. *See Bruen*, 597 U.S. at 17, 24; *Rahimi*, No. 22-915, 2024 WL 3074728, at *6. As previously noted, the Supreme Court has never articulated an exception to the requirement that a historical analogue be established for those regulations deemed "presumptively lawful" in *Heller*. Instead, the Court has expressly stated that "a court [may] conclude that the individual's conduct falls outside the Second Amendment's" scope "[o]nly if a firearm regulation is consistent with this Nation's historical tradition." *Bruen*, 597 U.S. at 17. This was reaffirmed in *Rahimi* without any categorical exceptions being listed. *Rahimi*, No. 22-915, 2024 WL 3074728, at *6.

In sum, the waiting period law is not a presumptively lawful commercial regulation like maintaining purchase records or requiring certain storage facilities for gun dealers. Instead, it is an arbitrary limitation on New Mexicans' right to keep and bear arms. Even if it were presumptively constitutional, however, that presumption has been rebutted because the regulation, to the extent it regulates anything "commercial," operates solely as an impermissible restriction on an individual's right to keep and bear arms without a viable historical analogue to support it. As such, it runs afoul of the Second Amendment, and should be enjoined.

**III.   The intoxication laws and licensing regimes Defendants proffer as historical analogues are not "relevantly similar" to the waiting period law.**

There is no historical tradition—either at the time of the Founding or Reconstruction—consistent with firearms being regulated in this manner. Despite Defendants' best efforts to fit the square peg of intoxication laws and licensing regimes into the round hole of the waiting period law, the simple fact is that they are not analogous in any way. *They do not need to be a "historical twin,"* the defense tirelessly points out in their supplemental briefing. Defs.' Suppl. Br. 11. True,

**App. 0642**

but they still need to be "relevantly similar." "A court must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi,* No. 22-915, 2024 WL 3074728, at *6 (quoting *Bruen*, 597 U.S. at 29).

In their supplemental briefing, Defendants ask this court to accept Founding era intoxication laws as relevantly similar historical analogues despite acknowledging that they "addressed different societal issues." Defs.' Suppl. Br. 11. But in making this request, Defendants fail to acknowledge the condition precedent that had to be in place before these intoxication laws went into effect—namely, the would-be purchaser had to be drunk. And when that condition arose, the law was applied specifically and limitedly to that individual until his "condition" cleared itself up. Once sober, the formerly intoxicated individual could acquire a firearm—there was no additional delay or waiting period imposed.

Defendants assert that just like the intoxication laws "assume[d] that every intoxicated person with a firearm presented a potential danger (regardless of whether they actually did)," the waiting period law similarly assumes that everyone seeking to acquire a firearm presents a potential danger of impulsive gun violence—regardless of whether they actually do. Defs.' Suppl. Br. 12. But, once again, Defendants are comparing apples to oranges. The intoxication laws applied only to those who were drunk, and only for as long as they were under the influence of alcohol. And the reasoning behind the intoxication laws was much more than impulsivity—even the most cautious of purchasers should not handle a deadly weapon with their senses dulled. The waiting period law, however, applies to everyone—even though there is no common condition that they all share that would make them any more prone to acting impulsively than anyone else. There is

**App. 0643**

simply nothing "relevantly similar" about these laws, the individuals impacted by them, or the underlying conduct they are intended to control.

The fact that the waiting period "imposes a few additional days of delay" than the intoxication laws is equally disqualifying. Defs.' Suppl. Br. 13. As *Bruen* explains, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '"*central*"' considerations when engaging in an analogical inquiry." 597 U.S. at 29 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599)); *see also Rahimi*, 2024 WL 3074728, at *6. And as *Rahimi* added, "[e]ven when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding." 2024 WL 3074728, at *6. There was *no* government-imposed wait for a firearm at the founding. And even under the intoxication laws, the wait was a matter of hours rather than days until the intoxicated person sobered up. Under New Mexico's waiting period law, the wait is an entire week for the entire public, including individuals who have never been intoxicated. A law that is anywhere from 7 to 21 times as burdensome as a historical law and applies to the entire population rather than specific individuals does not "impose a comparable burden." *Bruen*, 597 U.S. at 29. Rather, the waiting period law regulates arms possession "to an extent" far "beyond what was done at the founding."

**IV.     The waiting period law is unconstitutional both on its face and as applied.**

Plaintiffs challenge the waiting period law both on its face and as applied. Complaint (ECF No. 1 at 28). With respect to the facial challenge, Defendants allege that Plaintiffs are unable to show that the waiting period law is unconstitutional in *all* of its applications. In support of this assertion, Defendants note that the regulation is "indisputably constitutional" as it applies to

**App. 0644**

individuals who do not receive notification that they have passed their background check within 7 days of attempting to purchase their firearms. They contend that these individuals would have to wait that same period (if not more) to receive the firearm anyway.  Defs.' Suppl. Br. 15.

Defendants once again compare apples and oranges.  As a facial matter, the 7-day waiting period imposed by the law is completely untethered to the length of time that a background check process takes. A delay associated with a background check experienced by relatively few individuals exists independently of the arbitrary 7-day delay imposed on all purchasers by the waiting period law. Those purchasers who do not receive notification of their background check in a "timely manner" would be delayed in acquiring their firearms, regardless of whether the waiting period law existed or not.

The Plaintiffs' facial challenge and challenge as applied remains.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a temporary restraining order and a preliminary injunction of the Waiting Period Act.

Dated: July 8, 2024

Respectfully submitted,

*/s/ Carter B. Harrison IV*
Carter B. Harrison IV
Attorney and Partner
**Harrison & Hart, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102
(505) 303-1835
carter@harrisonhartlaw.com

Michael D. McCoy
Sean D. Nation
**Mountain States Legal Foundation**
2596 South Lewis Way Lakewood,
Colorado 80227
(303) 292-2021
mmccoy@mslegal.org

**App. 0645**

Joseph G.S. Greenlee
Erin M. Erhardt
**National Rifle Association of America**
11250 Waples Mill Road Fairfax, VA
22030
(703) 267-1161
jgreenlee@nrahq.org
eerhardt@nrahq.org

*Attorneys for Plaintiffs*

**App. 0646**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SAMUEL ORTEGA, and**
**REBECCA SCOTT,**

       **Plaintiffs,**

**vs.**                               **No. 1:24-cv-00471-JB-SCY**

**MICHELLE LUJAN GRISHAM, in her**
**official capacity as Governor of the State of**
**New Mexico, and RAÚL TORREZ, in his**
**official capacity as Attorney General of the**
**State of New Mexico,**

       **Defendants.**

### GOVERNOR LUJAN GRISHAM'S NOTICE OF SUPPLEMENTAL AUTHORITY

Governor Michelle Lujan Grisham hereby alerts the Court to pertinent and significant authorities central to the issues of this case pursuant to D.N.M.LR-Civ 7.8. Specifically, the Governor attaches *Vermont Fed'n of Sportsmen's Clubs v. Birmingham*, No. 2:23-cv-720, 2024 WL _____ (D. Vt. July 18, 2024), in which the Honorable William K. Sessions denied a motion for a preliminary injunction against Vermont's waiting period law, which is very similar to the law challenged in the instant suit. The court found that the plaintiffs were unlikely to succeed because the plain text of the Second Amendment does not prohibit short waiting periods. *See id.* at 65-72. The court additionally held that the nation's history and tradition of gun regulation justifies waiting periods. *Id.* at 72-83. In reaching this conclusion, the court agreed that the same intoxication laws submitted to this Court serve as "an apt historical analogue" because they both "work[] to ensure that individuals in temporarily impulsive states will not make reckless decisions with a firearm." *Id.* at 75-76. The court also agreed that the same licensing laws submitted to this Court are proper

**App. 0647**

historical analogs because they "[b]oth allow for background checks and mandate delay so the government can ensure that the individuals acquiring firearms are, in fact, law-abiding and responsible citizens." *Id.* at 77. In addition to rejecting the plaintiffs' claims of irreparable harm, the court found that the balance of the equities and the public interest favor the government. *Id.* at 83-87. Accordingly, the court denied the requested preliminary injunction.

Respectfully submitted,

*/s/ Holly Agajanian*
**HOLLY AGAJANIAN**
*Chief General Counsel to Governor*
*Michelle Lujan Grisham*
**KYLE P. DUFFY**
*Deputy General Counsel to Governor*
*Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2200
holly.agajanian@exec.nm.gov
kyle.duffy@exec.nm.gov

**App. 0648**

**CERTIFICATE OF SERVICE**

I hereby certify that on July 18, 2024, I filed the foregoing via the CM/ECF filing system, which caused all counsel of record to be served by electronic means.

/s/ Holly Agajanian
Holly Agajanian

**App. 0649**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

VERMONT FEDERATION OF SPORTSMEN'S    :
CLUBS, ET AL.,                       :
                                     :
         Plaintiffs,                 :
                                     :
v.                                   :    Case No. 2:23-cv-710
                                     :
MATTHEW BIRMINGHAM, ET AL.,          :
                                     :
         Defendants.                 :

**OPINION AND ORDER**

**INTRODUCTION**

Plaintiffs Vermont Federation of Sportsmen's Clubs ("VFSC"), two for-profit gun sports organizations, and two Vermont residents bring this action against Defendants Matthew Birmingham, Charity Clark, and Sarah George, high-level officials in Vermont state and local government. Plaintiffs allege that 13 V.S.A. § 4021, which prohibits possession and sale of "large capacity ammunition feeding device[s]" ("large capacity magazines" or "LCMs"), and 13 V.S.A. § 4019a, which prohibits transfer of firearms without a designated waiting period, are unconstitutional under the Second Amendment. ECF No. 1 at 12, 25. On December 20, 2023, Plaintiffs moved for a preliminary injunction against enforcement of the Vermont laws. ECF No. 2. Pursuant to the textual and historical inquiry laid out by the Supreme Court in *New York State Rifle & Pistol Ass'n,*

*Inc. v. Bruen*, 597 U.S. 1 (2022), and refined in *United States
v. Rahimi*, 602 U.S. __ (2024), the Court must consider whether
the Second Amendment's plain text covers the restricted conduct,
and if so, whether the challenged restriction "is consistent
with the Nation's historical tradition of firearm regulation."
*Bruen*, 597 U.S. at 24. For the reasons outlined in this opinion,
Plaintiffs' motion for a preliminary injunction is denied.

## BACKGROUND

### I.    The Parties

Plaintiff VFSC is a Vermont nonprofit association composed
of organizations interested in gun-related sports. Plaintiffs
Powderhorn Outdoor Sports Center, Inc. and JPM, Inc. (d/b/a
Black Dog Shooting Supplies) are federally licensed Vermont
firearms retailers that assert standing on behalf of themselves
and their customers. Plaintiffs Paul Dame and Marsha Thompson
are Vermont citizens. Thompson is a firearms instructor. Both
Dame and Thompson state that they seek to acquire prohibited
magazines and firearms without having to wait at least 72 hours.
ECF No. 2-1 at 4 (collectively "Plaintiffs" or "VFSC").
Defendants are Vermont officials with authority to enforce
Vermont gun laws ("Defendants" or "Vermont" or "the State").

### II.  The Challenged Statutes

Concern over the threat of mass shootings motivated the
Vermont legislature to revise state laws governing gun

**App. 0651**

ownership. *See State v. Misch*, 2021 VT 10, ¶¶ 69-71 ("[T]he purpose of [one of the challenged laws] is to reduce the number of people who would be killed or injured in a mass shooting in Vermont. . . . The Legislature's aim was to prevent catastrophic harm to the people of Vermont."). It recently enacted the two provisions challenged in this lawsuit.

### A. Large-Capacity Magazines

The first statute deals with "large capacity ammunition feeding device[s]." 13 V.S.A. § 4021(a). The term "large capacity ammunition feeding device" is defined to mean "a magazine, belt, drum, feed strip, or similar device that has a capacity of" more than 10 rounds of ammunition for a long gun or more than 15 rounds of ammunition for a handgun. *Id.* § 4021(e)(1). The statute states that a person shall not "manufacture, possess, transfer, offer for sale, purchase, or receive or import" an LCM into Vermont. *Id.* § 4021(a). The penalty for violating the statute is imprisonment for up to a year and a fine not to exceed $500. *Id.*

The statute contains a long list of exceptions to the general ban on LCMs. Most notably, it does not apply to LCMs lawfully possessed prior to July 1, 2022, the statute's effective date. *Id.* at § 4021 (c)(1). It also does not apply to LCMs lawfully possessed by a licensed dealer prior to April 11, 2018 and transferred by that dealer prior to October 1, 2018.

**App. 0652**

*Id.* at § 4021(c)(2). The law does not prohibit certain entities from owning LCMs, including state and federal governments, law enforcement officers, licensed manufacturers, and organized competitors. *Id.* § 4021(d)(1).[1]

Some background on magazines helps understand how they interact with firearms themselves. At the hearing on this motion, Plaintiffs called Christopher Bradley, the president and executive director of the Vermont Federation of Sportsmen's Clubs. Bradley testified that "[a] magazine is a mechanical device designed to hold cartridges and present those cartridges to the chamber for firing." ECF No. 59 at 10. He explained that magazines are made up of four components: a "body," which is essentially a rectangular box holding cartridges; a floor plate, which is a metal piece at the bottom of the body; a spring, which "provid[es] tension under the cartridges to" present them to the top of the magazine; and the "magazine follower," which ensures that the "bullets are properly aligned." *Id.* at 10-11. The magazine's body holds bullets, which are pressed down against the compressed spring and follower. After a round is fired, the spring pushes the next round into the chamber to facilitate rapid shooting. The size of the magazine impacts how

---

[1] The statute exempts several other categories of individuals from the LCM ban. *See* 13 V.S.A. § 4021(c), (d). Those exemptions are not relevant to this action.

4

**App. 0653**

many bullets can be rapidly loaded and therefore shot in a short period of time.

**B. Waiting Periods**

The second challenged statute is 13 V.S.A. § 4019a, which prohibits transfer of a firearm without waiting period. The statute provides that a person "shall not transfer a firearm to another person until 72 hours after the licensed dealer facilitating the transfer is provided with a unique identification number for the transfer by the National Instant Criminal Background Check system (NICS) or seven business days have elapsed since the dealer contacted NICS to initiate the background check, whichever occurs first." *Id.* Violation of the statute is punishable by imprisonment for up to a year and a fine of up to $500. *Id.* at § 4019(b).

The statute does not apply to firearm transfers that are exempt from background check requirements under federal law, 18 U.S.C. § 922(t), or state law, 13 V.S.A. § 4019. It also exempted firearm transfers at gun shows, defined as functions sponsored by "national, state, or local organization[s] devoted to the collection, competitive use, or other sporting use of firearms," or organizations that "sponsor[] functions devoted to the collection, competitive use, or other sporting use of firearms." 13 V.S.A. § 4019a(e)(2). The gun show exception expired on July 1, 2024.

5

**App. 0654**

### III. Procedural History

Plaintiffs filed their complaint on December 18, 2023. ECF No. 1. They moved for a preliminary injunction two days later. ECF No. 2. On January 17, 2024, the State filed a motion requesting that the Court consolidate resolution of Plaintiffs' preliminary injunction motion with a merits determination and otherwise set deadlines consistent with an expedited trial schedule. ECF No. 14. The Court denied that motion and granted Defendants until February 21, 2024 to respond to Plaintiffs' preliminary injunction motion.

On February 28, 2024, Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March For Our Lives (collectively "Amici") – non-profits dedicated to gun violence prevention – moved for leave to appear as amici curiae. ECF No. 26. The Court granted that motion, ECF No. 27, and Amici filed a brief in opposition to the preliminary injunction on February 29, 2024. ECF No. 28. The Court later denied Plaintiffs' motion to exclude several of the State's experts based upon Federal Rule of Evidence 702. ECF No. 44.

The Court held a hearing on the preliminary injunction motion on May 23rd and June 3rd. ECF No. 59 (transcript from the May 23rd hearing); ECF No. 62 (transcript from the June 3rd hearing). It took the matter under advisement. This opinion follows.

## DISCUSSION

### I.    Legal Standard

A party seeking a preliminary injunction must show that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The Second Circuit has explained that when the government is a party to the suit, "the final two factors merge." *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 59 (2d Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). In cases alleging constitutional injury, a "strong showing of a constitutional deprivation" ordinarily warrants a finding of irreparable harm. As a result, VFSC's likelihood of success on the merits is the "dominant" factor in evaluating Plaintiffs' motion for a preliminary injunction. *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021).

The Second Circuit has counseled that when plaintiffs seek a preliminary injunction that "will alter the status quo," they must "demonstrate a 'substantial' likelihood of success on the merits." *Pharaohs GC, Inc. v. United States Small Bus. Admin.*, 990 F.3d 217, 225 (2d Cir. 2021) (citing *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013)). Preliminary

7

**App. 0656**

injunction determinations adopt burdens of proof from the underlying legal frameworks. So while Plaintiffs bear the burden of proof on most issues, the State must meet its evidentiary obligations on the relevant constitutional question in order to prevail. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

## II.  Analysis

### A. Likelihood of Success on the Merits

1. Substantive Legal Standard

The Second Amendment states "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. It is well-established that "[t]he right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.'" *Rahimi*, 602 U.S. at 5 (quoting *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778 (2010)).

The Supreme Court has interpreted the Second Amendment to protect "the right of an ordinary, law-abiding citizen[] to possess a handgun" both inside and outside of the home. *Bruen*, 597 U.S. at 10-11 (citing *D.C. v. Heller*, 554 U.S. 570, 626 (2008)). It recently explained that the "standard for applying the Second Amendment" involves two steps: first, a court must determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24. If it does, the government must (second) justify its regulation "by demonstrating that [the

8

**App. 0657**

regulation] is consistent with the Nation's historical tradition of firearm regulation." *Id.* The First, Second, Fifth, Eighth, and Eleventh Circuits have explained that in this two-step framework, "the first step [is] based on text and the second step [is] based on history." *Antonyuk v. Chiumento*, 89 F.4th 271, 298 (2d Cir. 2023) *cert. granted, judgment vacated sub nom. Antonyuk v. James*, No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024) (agreeing with the Fifth, Eighth, and Eleventh Circuits); *see also Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 43 (1st Cir. 2024).

The Supreme Court's *Bruen* decision built upon several earlier Supreme Court cases.[2] The most significant of these is *District of Columbia v. Heller*, which outlined the analytical framework for determining whether a firearm is presumptively protected by the Second Amendment. *See Bruen*, 597 U.S. at 21 (citing *Heller*, 554 U.S. at 626). *Heller* explained that "the right [to bear arms] was not a right to keep and carry any weapon whatsoever." *Id.* (quoting *Heller*, 554 U.S. at 626). Instead, the term "arms" historically applied only to weapons "that were not specifically designed for military use and were not employed in a military capacity." *Heller*, 554 U.S. at 581.

---

[2] In *McDonald*, the Court held that the Due Process Clause of the Fourteenth Amendment incorporated the Second Amendment right recognized in *Heller* against the states. 561 U.S. at 791.

The *Heller* Court held that it is "fairly supported by the
historical tradition of prohibiting the carrying of 'dangerous
and unusual weapons'" that the Second Amendment protects only
the possession and use of weapons that are "in common use at the
time." *Id.* at 627 (citing *United States v. Miller*, 307 U.S. 174,
179 (1939)).

2. Common Use

The first issue is whether and how the question of a
weapon's "common use" factors into the analysis. There is
significant dispute over this issue. *See, e.g.*, *Capen v.
Campbell*, No. CV 22-11431-FDS, 2023 WL 8851005, at *7 (D. Mass.
Dec. 21, 2023) (explaining that the Supreme Court's emphasis on
the common use inquiry "has led to considerable confusion among
courts and commentators."). The Court concludes that weapons "in
common use for self-defense" are presumptively protected by the
Second Amendment, but that they may nonetheless be regulated by
analogy to historical regulations.

Plaintiffs argue that the Supreme Court's guidance in
*Heller* and *Bruen* requires courts to ask first whether the
restricted item is a firearm, and second whether it is in common
use. In other words, they argue that the only way in which a ban
of a firearm can fall within this nation's "historical tradition
of firearm regulation," *Bruen*, 597 U.S. at 24, is if the weapon
is not "in common use at the time." ECF No. 2-1 at 9-10

**App. 0659**

(asserting that governments may enact and enforce bans "only if the banned arms are not 'the sorts of weapons in common use at the time.'") (quoting *Heller*, 554 U.S. at 627).[3] This is because, according to Plaintiffs, the only relevant historical inquiry is whether the firearm may be regulated by virtue of the historical tradition of regulating "dangerous and unusual weapons." *Id.*

This argument is disproven by the Supreme Court's recent decision in *Rahimi*, which upheld a federal statute prohibiting individuals subject to domestic violence restraining orders from possessing firearms. *Rahimi*, 602 U.S. at 1. First, *Rahimi* involved a restriction on handgun ownership, a weapon which *Heller* and *Bruen* found to be "central" and "in common use." *See Heller*, 554 U.S. at 628 (noting that handguns are

---

[3] Courts have vigorously criticized this application of the "common use" framework. In *Bevis v. City of Naperville, Illinois*, for instance, the Seventh Circuit cautioned against such "circular reasoning:"

> Machine guns aren't commonly owned for lawful purposes today because they are illegal; semi-automatic weapons with large-capacity magazines are owned more commonly because, until recently (in some jurisdictions), they have been legal. Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity.

85 F.4th 1175, 1190 (7th Cir. 2023) (quoting *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 409 (7th Cir. 2015)); *see also Nat'l Ass'n for Gun Rts. v. Lamont* ("*Lamont*"), 685 F. Supp. 3d 63, 86 (D. Conn. 2023) (same). Another court noted that this approach would mean that "the constitutionality of the regulation of different firearms would ebb and flow with their sales receipts." *Capen*, 2023 WL 8851005, at *8.

"overwhelmingly" chosen by Americans for self-defense); *Bruen*,
597 U.S. at 32 (same). To be sure, *Rahimi* involved a restriction
on the category of individuals that could own handguns – not a
flat ban of those weapons – but the decision still reveals that
weapons in common use for self-defense may be constitutionally
regulated. Second, and perhaps more importantly, *Rahimi* upheld
the government's restriction on handgun ownership with reference
to historical analogues other than the tradition of regulating
"dangerous and unusual weapons," showing that more comprehensive
review of this country's historical firearm regulations is
appropriate, even when the restricted item is in common use for
self-defense. *See Rahimi*, 602 U.S. at 13 (noting that "surety"
and "going armed" laws justified the regulation at issue in that
case).

The State argues that the "common use" inquiry is relevant
to the initial determination of whether conduct is entitled to
presumptive Second Amendment protection. ECF No. 24 at 15-19.
Courts have adopted this approach in two ways. Some courts hold
that if a weapon is not in "common use," it is not an arm and is
therefore altogether unprotected by the Second Amendment. *See,
e.g.*, *Bevis*, 85 F.4th at 1193 ("[T]he definition of 'bearable
Arms' extends only to weapons in common use for a lawful
purpose."); *Oregon Firearms Fed'n, Inc. v. Brown* ("*Brown*"), 644
F. Supp. 3d 782, 799 (D. Or. 2022) (same). Other courts decide

12

**App. 0661**

whether a weapon is an arm based on evaluation of the Second Amendment's plain text, but subsequently ask whether it is in "common use" to determine whether it is presumptively protected. *See, e.g.*, *Nat'l Ass'n for Gun Rts. v. Lamont* ("*Lamont*"), 685 F. Supp. 3d 63, 84-91 (D. Conn. 2023); *Capen*, 2023 WL 8851005, at *7. The State submits that this is the correct approach. ECF No. 24 at 17.

The Court agrees that the "common use" inquiry is relevant to the determination of whether firearms are presumptively protected. If a court concludes that the restricted weapons are not in common use, they do not gain "presumptively protected" status, *Bruen*, 597 U.S. at 17, because of the clear historical tradition of regulating dangerous and unusual weapons. *See id.* at 19 (stating that *Heller* "demands a test rooted in the Second Amendment's text, as informed by history"). In this sense, the first step of the *Bruen* analysis is imbued with the threshold historical inquiry of whether the restricted arm may be regulated as dangerous and unusual. *See Heller*, 554 U.S. at 581 ("The term ["arms"] was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity."). If the weapons *are* in common use, they are presumptively protected; however, the government's regulation may still be justified with reference to a different

13

and more specific analogous historical tradition of regulation.
*Cf. Rahimi*, 602 U.S. at 13.

This understanding of the common use analysis finds support
in the Supreme Court's analysis in *Bruen* itself. In that case,
the Court discussed the "common use" issue as part of its
consideration of whether handguns were presumptively protected
by the Second Amendment. *See Bruen*, 597 U.S. at 32. In fact, the
Court asked the "common use" question before even getting to
whether the plain text of the Second Amendment protects
"carrying handguns publicly for self-defense." *Id*. While the
Court did later juxtapose contemporary "common use" with the
historical "dangerous and unusual" inquiry in its discussion of
*Heller*, that analysis focused on whether the State had carried
its responsive burden of showing that the regulation was
justified by reference to history. *Id.* at 47. Because the *Bruen*
Court had already concluded that handguns were "in common use"
and therefore presumptively protected, the government's
"historical analogy" to regulations restricting dangerous and
unusual weapons failed to persuade. *Id.*

In sum, according to *Bruen*, a plaintiff must prove that the
regulated weapons are in common use in order to qualify for
presumptive protection under the Second Amendment. Once a
plaintiff has done that, the State may justify its regulation by

**App. 0663**

demonstrating that the regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

The next issue is whether Plaintiffs must show that weapons are in common use for "lawful purposes," "self-defense," or whether mere common ownership is enough to satisfy "common use." The logic underlying the initial adoption of the Second Amendment sheds some light on this question. As the Supreme Court explained in *Heller*, the "right was codified" to "prevent elimination of the militia." *Heller*, 554 U.S. at 599. Because the "traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense," those are the weapons that the Second Amendment protects. *Id.* at 624 (citing *Miller*, 307 U.S. at 179). Indeed, the Supreme Court has repeatedly reiterated that the Second Amendment "secures for Americans a means of self-defense." *Rahimi*, 602 U.S. at 5 (citing *Bruen*, 597 U.S. at 17); *Heller*, 554 U.S. at 599 (calling self-defense the "central component" of the right to bear arms). This historical tradition, along with the Supreme Court's guidance, makes clear that to presumptively qualify for Second Amendment protection, the relevant weapons must be commonly used for self-defense. [4] *See Bevis*, 85 F.4th at

---

[4] Nearly all the parties' briefing goes to the self-defense issue. Even if the Court were to conclude that weapons in common use for purposes other than self-defense qualify for presumptive

**App. 0664**

1192 ("[T]he Arms the Second Amendment is talking about are weapons in common use for self-defense.").

### 3. Facial vs. As Applied Challenge

The parties dispute whether this case involves a facial or as-applied challenge to the two Vermont gun regulations. In facial challenges, "the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). In as-applied challenges, Plaintiffs must simply prove that the statute is unconstitutional as applied to the litigant's actual conduct. *Copeland v. Vance*, 893 F.3d 101, 113 (2d Cir. 2018). Plaintiffs here have failed to allege that the statute is unconstitutional as applied to their specific conduct, so the Court need not resolve whether Plaintiffs' challenge is facial or as-applied. *Rahimi*, 602 U.S. at 8 ("[H]ere the provision is constitutional as applied to the facts of Rahimi's own case.").

### 4. LCMs

a. The plain text of the Second Amendment does not protect LCMs.

The first question under *Bruen* is whether the restricted activity falls under the plain text of the Second Amendment. *Bruen*, 597 U.S. at 23-24. *Bruen* offers some guidance on how to

---

Second Amendment protection, it would be unable to determine whether the restricted magazines are in such common use.

assess this question. It first asked whether petitioners were "part of 'the people' whom the Second Amendment protects," *Bruen*, 597 U.S. at 31-32, before assessing whether handguns were "weapons 'in common use for self-defense.'" *Id.* at 32. *Bruen* then proceeded to analyze whether the plain text of the Second Amendment protected petitioners' "proposed course of conduct." *Id.*

Like the Supreme Court in *Bruen*, this Court has "little difficulty" concluding that Plaintiffs are part of "the people" whom the Second Amendment protects. The harder question is the next one: whether large capacity magazines are weapons "in common use" for self-defense.[5] *Id.*

---

[5] Plaintiffs submit that the Second Circuit resolved this issue in *Cuomo*, 804 F.3d at 255. ECF No. 2-1 at 9. The Court disagrees. "*Cuomo* interpreted the 'common use' analysis as a purely statistical inquiry into ownership," an understanding that has changed post-*Bruen*. *Lamont*, 685 F. Supp. 3d at 86 (noting, like this Court, that *Bruen* framed "the relevant inquiry as being whether the weapons are 'in common use today for self-defense'") (cleaned up). The *Bruen* Court focused on common use for self-defense, not mere ownership. Additionally, the ownership approach is analytically problematic for the reasons articulated in *Bevis*, 85 F.4th at 1190, and *Capen*, 2023 WL 8851005, at *8. *See supra* footnote 3. Finally, *Cuomo* ultimately concluded that it had insufficient evidence to evaluate whether "large-capacity magazines are 'typically possessed by law-abiding citizens for lawful purposes,'" highlighting that it does not even purport resolve the issue in this case. *Cuomo*, 804 F.3d at 256-57 (quoting *Heller*, 554 U.S. at 625). Plaintiffs also cite *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) for the principle that common ownership is sufficient to show common use, but fail to indicate that their citation goes to a non-controlling concurrence. ECF No. 2-1 at 11.

App. 0666

Some courts have concluded that magazines are not arms –
and are therefore not entitled to the full protection of the
Second Amendment – because they are not "[w]eapons of offence,
or armour of defence," or "any thing that a man wears for his
defence, or takes into his hands, or useth in wrath to cast at
or strike another." *Heller*, 554 U.S. at 581 (citations omitted);
*see also Bevis*, 85 F.4th at 1197 (concluding that LCMs are not
"arms" and can be "lawfully reserved for military use"); *Capen*,
2023 WL 8851005, at *16 ("No magazine, regardless of capacity,
is itself an 'arm' within the plain meaning of that term.");
*Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368,
388 (D.R.I. 2022) ("[P]laintiffs have failed to meet their
burden of establishing that LCMs are "Arms" within the textual
meaning of the Second Amendment."). The Court need not answer
this threshold question because – even assuming magazines *are*
arms entitled to the full protection of the Second Amendment[6] –

---

[6] This conclusion is not a given. While there is little question
that bullets – essential to the firing of a firearm – are
protected by the Second Amendment, the precise scope of that
protection is unclear. Neither the Supreme Court nor the Second
Circuit has directly addressed this question, but the Supreme
Court has stated that the right to bear arms implies taking
actions to "keep them ready for their efficient use." *Heller*,
554 U.S. at 617-18.  The Ninth Circuit has directly ruled that
the Second Amendment protects "ancillary rights" such as the
ownership of bullets, without which "the right to bear arms
would be meaningless." *Brown*, 644 F. Supp. 3d at 798-99 (citing
*Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953, 967
(9th Cir. 2014)). However, these courts have also explained that
these "ancillary rights" only cover items (and conduct) that are

**App. 0667**

LCMs, a narrow subset of magazines, are not in common use for
self-defense – which they must be in order to qualify for
presumptive Second Amendment protection.[7] *See Oregon Firearms
Fed'n v. Kotek* ("*Kotek*"), 682 F. Supp. 3d 874, 912 (D. Or. 2023)
(holding that LCMs are a "subset of magazines," and "while
magazines may often be necessary to render a firearm operable,
LCMs are not."); *Ocean State Tactical,* 646 F. Supp. 3d at 390
("[T]he plaintiffs have failed to establish . . . that LCMs are
weapons of self-defense.").

Because Plaintiffs bear the burden of showing that their
conduct is presumptively protected by the Second Amendment,
*Bruen*, 597 U.S. at 24; *Lamont*, 685 F. Supp. 3d at 89
("Plaintiffs must bear the burden of producing evidence that the
specific firearms they seek to use and possess are in common use
for self-defense."), the Court will begin by assessing their
evidence on the issue.

Plaintiffs first submit evidence indicating that weapons
capable of firing multiple rounds are commonly used by

---

"necessary to render certain firearms operable for self-defense
and other lawful purposes." *Id.*

[7] In so doing, it keeps with several other courts – including the
District of Connecticut – in concluding that even assuming that
magazines are entitled to full Second Amendment protection, LCMs
are not protected. *See Lamont*, 685 F. Supp. 3d at 94; 103
(concluding that magazines are "arms" but later finding that
they are not in common use for self-defense); *Hanson v. D.C.*,
671 F. Supp. 3d 1, 10; 16 (D.D.C. 2023) (same).

Americans. ECF No. 2-1 at 11. They argue that the AR-15 is
America's "most popular semi-automatic rifle," ECF No. 2-1 at 11
(citing *Heller v. D.C.*, 670 F.3d 1244, 1287 (D.C. Cir. 2011)
(Kavanaugh, J., dissenting)), and that over 24 million AR-15s
(and comparable assault rifles) are currently in circulation.
*Id.* Plaintiffs also note that these "popular rifles come
standard with 20- or 30-round ammunition magazines," and submit
consumer reports indicating that "52% of recently acquired AR-
style and other modern sporting rifles came equipped with 30-
round magazines." *Id.* These statistics were bolstered by
testimony from Plaintiffs' witnesses at the hearing on this
motion. *See, e.g.*, ECF No. 59 at 11-12 (Bradley testifying that
his Glock pistol came standard with a 17-round magazine); 17
(the same pistol is "the most popular firearm out there as far
as pistols go"); 23 ("The AR-15 is the most popular long gun in
America."); 29 (stating that the AR-15 is sold with a 20- or 30-
round magazine); 56-57 (Bradley has never seen smaller than a
10-round magazine for a Glock 17 pistol); 64 (Plaintiffs'
witness William Cleary stating that gun purchasers want LCMs for
self-defense).

   The Court finds that this category of evidence, which deals
with the popularity of weapons capable of using (or which
normally use) LCMs, is not directly relevant to the central
issue in this case which is whether LCMs are in common use for

**App. 0669**

self-defense. Vermont has not regulated the firearms themselves. Therefore, the various benefits of these firearms – which range from physical comfort, ECF No. 59 at 23, to accuracy, *id.* at 69, and rapidity of firing, *id.* at 24 – are not impeded by Vermont's regulation. Additionally, while these guns may be very popular (and commonly used for self-defense), that does not bear on the question of whether LCMs are similarly in common use for self-defense.

Plaintiffs' witnesses acknowledge that these popular firearms function with smaller-capacity magazines. As Bradley noted in his hearing testimony, "manufacturers can make magazines for [] a 17-round [gun] that are restricted for how many cartridges they can hold . . . it really has a great deal of flexibility." ECF No. 59 at 13. While guns like the AR-15 and Glock-17 may come "standard" with higher-capacity magazines, there is no design constraint that makes those popular weapons incapable of firing with a smaller magazine. *Id.* at 48; 51.

Both of Plaintiffs' witnesses testified specifically to the Glock-17, a very popular pistol. *Id.* at 17. It serves as a useful example for this point. According to Bradley, the Glock-17 comes standard with a "full-capacity" 17-round magazine. ECF No. 59 at 12. Plaintiffs' witness William Cleary, owner of the Powderhorn Outdoor Sports Center, also testified that his gun shop used to commonly sell the Glock 17 with a 17-round

magazine, but that the shop can now "only sell it with 10-round mags." *Id.* at 66. Cleary went on to explain that Glock does not typically manufacture pistols with default or standard 15-round magazines, because only Vermont and Colorado have "a 15-round law on pistols." *Id.* Nonetheless, he testified that after Vermont's LCM ban, his shop was able to sell Glock pistols with compliant 10-round magazines. He also testified that while "you can't order [a Glock] with three 15-round magazines . . . you can as an after-market product through Glock purchase 15-round mags, and they do cost about 29 bucks." *Id.* at 66. The upshot of this discussion is that the weapons designated by Plaintiffs as especially popular still come with standard compliant magazines. And gun enthusiasts can access magazines that hold as many rounds as the law permits for just $29 – less than the cost of entry to some gun shows. U.S. DEP'T OF JUSTICE, OFFICE OF THE INSPECTOR GEN., EVALUATION AND INSPECTIONS DIVISION, I-2007-007, THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES' INVESTIGATIVE OPERATIONS AT GUN SHOWS (2007) ("Public admittance fees for the shows range from $5 to $50."). Plaintiffs' concern that Vermont has effectively banned popular firearms is unfounded.

Plaintiffs nonetheless argue that LCMs are commonly owned and are therefore presumptively protected. Their evidence on this point consists primarily of a 2021 national firearms survey authored by Professor William English which found that Americans

own as many as 542 million rifle and handgun magazines "capable of holding more than 10 rounds" and 382 million magazines that hold more than 15 rounds. ECF No. 2-1 at 12 (citing ECF No. 2-7 at 23-25). That survey also concluded that roughly 39 million Americans own magazines that hold more than 10 rounds, and those individuals own an average of between 4.5 handgun magazines and 5.4 rifle magazines with capacity of more than 15 rounds. ECF No. 2-8 at 7, 16; *see also* ECF No. 2-1 at 12 (citing another study stating that 80 million 30+ round magazines are in circulation today). The 2021 survey also found that roughly 66% of gun owners reported that recreational target shooting was their reason for owning an assault rifle, followed by home defense (61.9%) and hunting (50.5%). ECF No. 2-7 at 33-34.

English's survey reports that roughly 1/3 of adults in the United States report owning a gun, *id.* at 7, and that roughly 1/3 of those individuals report having used a gun in self-defense. *Id.* at 9. This, extrapolated, means that 25.3 million adult Americans have used a gun in self-defense. *Id.* But English also notes that in 81.9% of those cases, the gun was not fired. *Id.* at 11. Additionally, English's study does not precisely reflect the number of shots typically fired in defensive situations. He nonetheless concludes that "[i]n 67.8% of these cases in which a gun was fired in self defense, multiple rounds were fired." *Id.* at 26. But again, according to English, shots

23

were fired in only 18.1% of defensive gun uses[8] – meaning that multiple rounds were fired in only 12.27% of all defensive gun uses (67.8% of 18.1%). English's study does not further deconstruct the number of shots fired in self-defense, leaving a reader with no way of knowing what "multiple rounds" means. Ultimately, this data is largely consistent with the State's expert's conclusion that large numbers of rounds are rarely fired in self-defense situations (described in greater detail below).[9]

In sum, most of Plaintiffs' evidence goes to the common ownership of guns and LCMs. But "common ownership" is different from "common use for self-defense," which is what *Bruen* mandates. *Bruen*, 597 U.S. at 32.

---

[8] The fact that Plaintiffs' declaration employs the undefined phrase "used a gun in self-defense" substantially detracts from their objection to the State's expert's use of the phrase "defensive gun use." *See* ECF No. 67 at 2. It highlights that the only way to measure how guns are used in self-defense is to select a category of incidents in which guns are "used," which is necessarily imprecise.

[9] English later departs from percentages to note that 550 respondents stated that they had been in situations in which "it would have been useful for defensive purposes to have a firearm with a magazine capacity in excess of 10 rounds." ECF No. 2-7 at 26-28. This is not helpful for two reasons: first, it does not show that those individuals actually used LCMs for self-defense (and therefore does not bear on the question of whether LCMs are "in common use for self-defense"). Second, these individuals comprise only 3.5% of survey respondents – a small enough figure to conclude that gun-owning individuals rarely *desire* magazine capacities of greater than 10 rounds for self-defense, much less use them. *See* ECF No. 2-7 at 4 (noting that 15,450 respondents completed the survey).

24

There is substantial evidence in the record indicating that LCMs are not commonly used for self-defense. Central to that conclusion is the written and oral testimony of the State's expert, Dr. Lucy P. Allen. Allen holds a bachelor's degree from Stanford, three graduate degrees from Yale (M.B.A., M.A., and M.Phil.), and is currently the Senior Managing Director of an economic consulting group. ECF No. 24-2 at 3. In order to assess how often guns are discharged in self-defense, Allen conducted three separate analyses using three different data sources. ECF No. 59 at 98. The first came from a National Rifle Association ("NRA") database; the second from a random sample of news stories from the aggregator Factiva; and the third from police data on shootings in Portland, Oregon. *Id.* at 98-99.

Allen first analyzed a "database of defensive gun use put together by the [NRA]." *Id.* at 99. This database aggregates stories "describing private citizens who have successfully defended themselves, or others, using a firearm." ECF No. 24-2 at 5. She assessed all of the incidents in the NRA database from January, 2011 until May, 2017 – a data set totaling 736 incidents. *Id.* 18% of those events involved no shots fired; roughly 80% involved between one and five; and roughly 2% involved between six and ten. Allen's research found only two incidents in the NRA database involving more than 10 shots fired. *Id.* On average, each incident involved 2.2 shots fired.

25

**App. 0674**

That trend was supported by Allen's second dataset, a collection of news stories aggregated from nearly 33,000 different sources by a platform called Factiva. ECF No. 59 at 102. Her search, which focused on specific keywords related to home invasion, used the same temporal parameters as the NRA survey and revealed approximately 4,800 relevant news stories. Allen reviewed a random sample of 200 of those news stories and catalogued the number of shots fired in each incident. She concluded that the average number of shots fired in each incident was 2.34. ECF No. 24-2 at 10.

Finally, Allen analyzed publicly available data from the Portland, Oregon Police Bureau to "identify any incidents of self-defense with a firearm where more than 10 rounds were fired by the defender." *Id.* at 13. Out of 2,632 shootings associated with a criminal offense between 2019 and 2022, she found only 398 in which the police encountered more than ten casings, ECF No. 59 at 107 – meaning that there were fewer than 400 incidents in which the aggressor and defender *combined* fired more than 10 shots. Allen then looked more closely at the reports from each of those 398 incidents and found just one incident involving a "potential situation of self-defense with a firearm." ECF No. 24-2 at 14. News stories covering that event revealed that the defender fired "only four or five shots." *Id.*

26

The thrust of Allen's research on the use of firearms on self-defense is that it is exceedingly rare for individuals to fire more than ten shots in self-defense, and that when guns *are* fired in self-defense, an average of between two and three shots are discharged. This leads to the conclusion that LCMs – which allow users to fire upwards of 10 rounds per magazine – are not "in common use for self-defense."

Plaintiffs take issue with several points of Allen's testimony. They note that Judge Benitez, in the Southern District of California, has criticized Allen's testimony in two opinions on similar issues. *Duncan v. Bonta*, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at *12 (S.D. Cal. Sept. 22, 2023); *Miller v. Bonta*, No. 19CV01537BENJLB, 2023 WL 6929336, at *33 (S.D. Cal. Oct. 19, 2023), appeal held in abeyance, No. 23-2979, 2024 WL 1929016 (9th Cir. Jan. 26, 2024).[10] Because the Court

---

[10] *Miller* evaluated the constitutionality of California laws that "ma[d]e it a crime to acquire and possess many common modern semiautomatic firearms." *Miller*, 2023 WL 6929336, at *1. Allen testified in that case – but because the issues were different, her declaration and oral testimony were also different. Plaintiffs' counsel in this case seeks to impute Judge Benitez' critiques in *Miller* onto Allen's testimony in this case, but misses the mark. For instance, at oral argument, Plaintiffs' counsel asked Allen about the *Miller* court's description of her "misleading" charts which – apparently – suggested that "rifles were used in just 2 to 4 percent of defensive gun uses." ECF No. 59 at 127. This might be relevant to a case involving laws restricting *rifles*, but is irrelevant here, as is most of the *Miller* court's discussion of Allen's testimony. Plaintiffs' counsel also asked Allen whether she had updated her testimony post-*Miller*, which (understandably) confused her because the two

27

**App. 0676**

finds that Allen's testimony is relevant, credible, and methodologically sound, it will address each of those concerns in turn.

Plaintiffs, echoing Judge Benitez, first criticize Allen's data source for the NRA study. Plaintiffs' counsel suggested that the source is a "column of individual stories" rather than a "database." ECF No. 59 at 115-116; *see also Duncan*, 2023 WL 6180472, at *14 ("A database of news articles lacks the usual indicia of accuracy and reliability of admissible evidence."). Allen explains that she chose to analyze the NRA's Armed Citizens Database for three separate reasons: first, because it "was the largest collection of accounts of citizen self-defense compiled by others that [she] was able to find;" second, because the NRA compiled the listed incidents because they all describe "the use of firearms by law-abiding citizens for self-defense;" and third, because the database is "compiled by an entity that actively opposes restrictions on magazine capacity and [firearms

---

cases involve different issues. *Id.* at 127-29. And finally, Plaintiffs' counsel asked Allen about data collected from the Heritage Foundation. *Id.* at 130. Allen presented evidence from the Heritage Foundation in *Miller*, *see* 2023 WL 6929336, at *33, but did not do so here. *See generally* ECF No. 24-2 (mentioning the Heritage Foundation only to note that it keeps a separate database of defensive gun uses); see also ECF No. 59 at 130 (MR. HARDIN: That's what it says in the [*Miller*] opinion is that she testified as to the results of a database maintained by The Heritage Foundation. THE COURT: Okay. MS. ALLEN: I just don't recall that. I don't -- that's not something I've used here.").

in general]," leading her to believe that "any selection bias would be in favor of stories that put use of guns in self-defense the best possible light." ECF No. 24-2 at 6. Allen's rationale thoroughly justifies her analysis of the Database. It is a repository of effective uses of guns in self-defense, reported by an organization that supports the use of guns, allowing for the reasonable inference that the reported incidents will paint defensive gun use in a positive light. *See Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 781 (D. Md. 2014) ("[T]he database which Allen studied is maintained by the NRA, suggesting, if anything, that her study may have a bias in favor of finding more instances of the defensive use of firearms.").

Judge Benitez also distrusts Allen's research because it is based on "anecdotal statements, often from bystanders, reported in news media." *Duncan*, 2023 WL 6180472, at *13; *see also* ECF No. 59 at 134. Allen has explained that the lack of reliable data on the use of firearms in self-defense necessitates turning to secondhand accounts of those incidents for research purposes. ECF No. 24-2 at 5 (stating that there is no source that systematically categorizes the number of gunshots fired in self-defense, necessitating analysis of secondhand accounts). Judge Benitez's methodological critique would hold more weight if there was contrary empirical evidence relating to whether LCMs are "in common use for self-defense." As discussed above, there

29

**App. 0678**

is no such evidence – and, in fact, Plaintiffs' declarations are largely consistent with Allen's findings. "[I]n light of the apparent dearth of other evidence demonstrating that the firearms at issue here are used for self-defense, Allen's use of the NRA database [and other supporting data] is appropriate and acceptable." *Kolbe*, 42 F. Supp. 3d at 781.

Judge Benitez expresses concern that "Allen does not list the 736 stories" analyzed in the NRA study. *Duncan*, 2023 WL 6180472 at *13. First, Allen does provide a link to the NRA Armed Citizen Database. *See* ECF No. 24-2 at 3 n.4. And second, to the extent that Judge Benitez' concern is that the analysis is non-confirmable, any other expert could conduct a comparable review of the same news stories on the same website. Indeed, in a similar case, plaintiffs were forced to backtrack after being confronted with evidence that their witness had conducted a similar study of the NRA database and reached a similar conclusion to Allen. *See Hanson*, 671 F. Supp. 3d at 14 (explaining that plaintiffs' expert in that case, a former U.S. army officer with experience in sport shooting, conducted a similar study and reached the same conclusion, and noting that several other appellate courts have relied on that study).

Plaintiffs and Judge Benitez also criticize Allen for "including situations in which no shots were fired" in her analysis. *Duncan,* 2023 WL 6180472, at *13; ECF No. 59 at 119.

This, they argue, drags the average number of shots fired in self-defense down. *Id.* First, brandishing a gun in self-defense could qualify as using that gun for self-defense. Therefore, inclusion of those incidents is important to the ultimate inquiry: how frequently LCMs are used when guns are involved in self-defense. Second, Allen's analysis of the NRA's database includes all of the NRA's reported incidents involving "law-abiding gun owners in America using their Second Amendment rights to defend self, home and family." ECF No. 24-2 at 5. As noted above, using the NRA's definition of defensive gun use comes with a potential pro-plaintiff bias. Finally, and most importantly, contrary to Plaintiffs' (and Judge Benitez') arguments, Allen actually does provide a data point for the number of shots fired excluding situations in which no shots were fired. *See* ECF No. 24-2 at 7 n.11 ("If one calculates the average excluding incidents of self-defense with a gun without firing shots, the average is still low, 2.6 shots when at least one shot is fired."). This number, 2.6 shots, is still well below Vermont's magazine limits of 10 or 15 rounds.[11]

---

[11] Plaintiffs point out that Allen has not updated her analysis of the NRA or Factiva datasets since 2022. ECF No. 24-2 at 123. They do not offer any reason why the Court should expect more recent results to be any different from Allen's designated time period.

App. 0680

Plaintiffs later criticize Allen for failing to include in her analysis situations in which "someone chooses not to break into a house because that house has a firearm in it." ECF No. 24-2 at 121. Plaintiffs seem to argue that this deterrent effect should be considered a defensive gun use. *Id.* Plaintiffs have put themselves in a catch-22: if Allen's study were to include situations in which intruders decide not to break into homes due to the threat of a gun, the average number of shots fired would be infinitesimally small – showing with even greater force that LCMs are not in common use for self-defense. If, on the other hand, Allen were to analyze only incidents in which shots were fired, the "average number of shots fired" would go up, but – as Plaintiffs argue – that analysis might not encompass the full "defensive" effect of guns, which includes both deterrence and active use. And, as noted above, excluding situations in which guns were not fired only raises the average number of shots fired to 2.6. Either way, the evidence reveals that LCMs are not commonly used in self-defense.

Judge Benitez next notes that Allen interposed figures when the analyzed Factiva and NRA news stories did not specify the number of shots fired. ECF No. 59 at 138; *Duncan*, 2023 WL 6180472, at 13-14. A complete reproduction of Allen's explanation of this practice aids understanding:

**App. 0681**

> When the exact number of shots fired was not specified, we
> used the average for the most relevant incidents with known
> number of shots. For example, if the story stated that
> "shots were fired" this would indicate that at least two
> shots were fired and thus we used the average number of
> shots fired in all incidents in which two or more shots
> were fired and the number of shots was specified.

ECF No. 24-2 at 6; 10. This method – while necessarily imprecise

– allows for a greater sample. And contrary to Judge Benitez'

conclusion, this practice does not "tend[] to bring the overall

average of shots fired down towards 2.2." *Duncan*, 2023 WL

6180472, at *14. The 2.2 average figure includes incidents in

which no shots were fired. ECF No. 24-2 at 11-12. Allen's

imputed value for non-specified situations in which "shots were

fired" used the "average number of shots fired in all incidents

in which two or more shots were fired," which excludes incidents

involving either zero or one shot fired. This assigned number

will therefore be greater than the overall average, and will

accordingly drag the overall average number of shots fired

*upwards* rather than downwards.[12] Therefore, Allen's insertion of

---

[12] To spell this out in greater detail, imagine a set of 100
incidents in which 15 involved zero shots; 20 involved one shot;
30 involved two shots; 20 involved three shots; 10 involved four
shots; and 5 involved 10 shots. This would create an average of
2.3 shots fired per incident (and would roughly map onto the
percentages correlation outlined by Allen's declaration, but
with substantially more incidents involving 10+ shots. *See* ECF
No. 24-2 at 6-7). If the 35 incidents involving zero or one shot
are removed from the sample set, the average number of shots
fired in the remaining 65 incidents goes up to 3.23. If that
3.23 figure were to be inserted for incidents in which "shots

a revised average for incidents in which the precise number of shots fired is not specified actually benefits Plaintiffs.

Judge Benitez moves on to criticize Allen's Factiva analysis. He states that the studied news stories are unavailable, and that Factiva is unreliable because it is behind a paywall. *Duncan*, 2023 WL 6180472, at *14. While the Court agrees that open accessibility of data would be helpful for analytical purposes, neither Judge Benitez nor Plaintiffs have offered any particular reason to doubt the results of Allen's research – especially given that the Factiva results are consistent with the NRA study's results, and the results of a prior study on the same subject. The Court is also conscious that Plaintiffs have not provided any evidence to the contrary (nor have they provided testimony from Dr. English or the data set for his study). Additionally, the fact that an expert's study is based on a dataset which requires payment to access is innocuous; data aggregation is time-consuming and expensive, warranting a fee.

The Court finds Allen's methodology for the Factiva study quite comprehensible. *Duncan*, 2023 WL 6180472, at *14 ("Allen's methodology for the Factiva study is incomprehensible."). She conducted a search for news stories from 2011 to 2017 reporting

---

were fired" but a number was not specified, the overall average would go up.

on "the use of firearms for self-defense" by seeking to identify stories containing words relating to guns, break-ins, and burglars.[13] This returned 35,000 stories. ECF No. 24-2 at 9. She randomly selected 200 stories from each of the seven years, leading to a total sample of 1,400 stories. *Id.* Allen then reviewed those 1,400 stories to find only the stories describing "incidents of self-defense with a firearm in or near the home," *id.*, which led to 200 stories. This is a simple filtering process, using keyword searching and random sampling to alleviate the burden of reviewing 35,000 stories. After developing her 200-story set, Allen then analyzed each source for the number of shots described. ECF No. 24-2 at 10. She also recognized that each incident may result in multiple news stories, and accordingly reached two results: an average of 2.61 shots fired per story, and an average of 2.34 shots fired per incident. ECF No. 24-2 at 10-11. This discrepancy reflects the (logical) principle that events involving more gunshots will lead to more news coverage. *Id.* The Court does not find it difficult to understand Allen's methodology, finds the results credible, and notes that the conclusions are consistent with the findings of the NRA analysis.

---

[13] Allen explains that the study focused specifically on self-defense in the home, which was the type of self-defense at issue in *Heller*.

**App. 0684**

Allen's study does not compare the number of shots fired in defense with the number of shots fired by criminals. Judge Benitez (and Plaintiffs) take issue with that. ECF No. 59 at 137-38; *Duncan*, 2023 WL 6180472, at 13. The Court does not see this as a problem, given that the relevant question is whether LCMs are "in common use for self-defense," not whether they are in common use for crime.

Judge Benitez also does not understand why Allen selected limited time periods for research. ECF No. 59 at 135; *Duncan*, 2023 WL 6180472, at 13. The NRA study analyzes reports from 2011 to 2017; the Factiva study focuses on the same time period; and the police data covers events from 2019 to 2022. Meanwhile, Allen's analysis of mass shootings extends from 1982 until the present. The Court does not find this troubling. First, Plaintiffs have not offered a reason why data sets from different periods of time would be misrepresentative of general trends. Second, it is logical that an analysis of mass shooting events would require a larger temporal frame because of the relative infrequency of those events. It would be otherwise impossible to get a statistically significant sample size. ECF No. 24-2 at 20 (analyzing 179 mass shootings between 1982 and 2022). And because the Factiva analysis is essentially a control for the NRA analysis, it makes sense to use the same timeframe. These temporal differences are not methodological flaws.

36

**App. 0685**

Plaintiffs make several other points. They argue that Allen does not clearly define "defensive gun use" so as to determine the parameters of her dataset. ECF No. 67 at 2-3. But Allen's declaration uses "defensive gun use" as a shorthand for the events that were the subject of the various studies: that is, reported incidents of individuals using guns to actively ward off attacks, invasions, or other crimes. Plaintiffs highlight the difficulty of defining "defensive gun use" when they point out that any time a person decides not to break into a house could be considered a "defensive gun use;" the best an analyst can do is evaluate situations in which a gun is actively used to repel opponents, and the upshot of Allen's research is that those situations involve an average of 2.2 shots and very rarely more than 10.[14]

On a related note, Plaintiffs criticize Allen's analysis of the Portland, Oregon police data on shootings. They begin by emphasizing that this data is flawed because it only represents incidents in which there actually were shootings, and therefore fails to capture the "deterrent" manner in which LCMs are "used" for self-defense. ECF No. 59 at 124. The District Court for the District of Columbia recently issued a lucid analysis of the

---

[14] Allen's declaration cites another study (referenced above), from 1997 to 2001, which *also* concluded that the average number of shots fired in self-defense is 2.2. *Id.* at 8 n.13; *see Hanson*, 671 F. Supp. 3d at 14 (referencing the same study).

word "use," explaining why the deterrent effect does not qualify as a "use." *Hanson*, 671 F. Supp. 3d at 15-16. But more importantly, it is a conceptual mistake to think that civilians "use" LCMs for self-defense because "the added benefit of a large-capacity magazine — being able to fire more than ten bullets in rapid succession — has [virtually n]ever been realized in self-defense." *Duncan v. Bonta*, 19 F.4th 1087, 1105 (9th Cir. 2021) (en banc); *see also ANJRPC*, 910 F.3d at 118 ("The record here demonstrates that LCMs are not well-suited for self-defense."); *Kolbe v. Hogan*, 849 F.3d 114, 138 (4th Cir. 2017) (noting "scant evidence" indicating that LCMs are used in self-defense). The data presented in this case uniformly supports this conclusion. *See* ECF No. 24-2 at 6-7; 12; 14 (finding, in each of the three studies, that individuals using guns in self-defense fire more than 10 shots less than 1% of the time).

There is additional evidence in the record indicating that LCMs are not used in self-defense. This includes a statement by the D.C. Chief of Police that "magazines holding over 10 rounds are more about firepower than self-defense," ECF No. 28 at 35 (cleaned up), and quotes from Rhode Island and Maryland law enforcement officials stating that they lacked knowledge of any self-defense incident in which it was "necessary to fire as many as 10 rounds in self-defense." *Id.* Finally, several gun

**App. 0687**

retailers and training officers also explained that most self-defense episodes do not require high numbers of shots fired. ECF No. 28 at 36.

The expected number of shots required for self-defense is easily allowed by Vermont's LCM limit, and it is exceedingly rare for an individual to need to use more than 10 rounds. Accordingly, pursuant to *Heller* and *Bruen*, Plaintiffs have not carried their burden in showing that LCMs are presumptively protected under the Second Amendment.[15]

---

[15] In so ruling, this Court joins with essentially every other court to have considered the issue. *See, e.g., Misch*, 2021 VT 10, ¶ 82 ("Section 4021 does not prevent Vermonters from buying or using the gun of their choice — it restricts only the capacity to shoot more than ten or fifteen rounds at a time, and thus places minimal restriction on their ability to bear arms in self-defense."); *Capen*, 2023 WL 8851005, at *20 ("[T]he limit on magazine capacity imposes virtually no burden on self-defense."); *Kotek*, 682 F. Supp. 3d at 897 ("[T]his Court finds that the features unique to LCMs — the ability to shoot more than ten bullets without reloading — are not 'commonly used for self-defense.'") (citations omitted) (cleaned up); *Ocean State Tactical*, 646 F. Supp. 3d at 388 ("There is simply no credible evidence in the record to support the plaintiffs' assertion that LCMs are weapons of self-defense and there is ample evidence put forth by the State that they are not."); *Hanson*, 671 F. Supp. 3d at 16 ("LCMs fall outside of the Second Amendment's scope because they are most useful in military service and because they are not in fact commonly used for self-defense."); *Lamont*, 685 F. Supp. 3d at 98 (finding no persuasive evidence that LCMs "are commonly used or are particularly suitable for self-defense.").

b. This nation's history and tradition of gun regulation

   justifies Vermont's regulation.

Because Plaintiffs have failed to carry their burden on

step one of the *Bruen* test, their likelihood of success on the

merits is low. However, some courts have declined to resolve the

threshold question of whether LCMs are presumptively protected

by the Second Amendment and instead proceeded directly to the

history and tradition inquiry. *See, e.g., Ocean State Tactical*,

95 F.4th at 43. Others have concluded that LCMs are not entitled

to presumptive protection, but nonetheless proceeded to the

historical inquiry to "round out the analysis." *Hanson*, 671 F.

Supp. 3d at 16. This Court, like those, will assess the

country's history and tradition of gun regulation as an

analytical backstop.[16]

---

[16] As the Supreme Court noted in *Bruen*, and *Rahimi* "there is an
ongoing scholarly debate on whether courts should primarily rely
on the prevailing understanding of an individual right when the
Fourteenth Amendment was ratified in 1868 when defining its
scope" for purposes of constitutional analysis. *Bruen*, 597 U.S.
at 37; *Rahimi*, 602 U.S. at 8. Plaintiffs argue that the "key
period" for "understanding the Second Amendment is ratification
– 1791 – and go on to argue that "[t]he fact that there was not
any general ban on arms in common use until" 1927 ends the
analysis. ECF No. 2-1 at 16. This Court agrees that regulatory
history from the era of ratification is directly relevant to
constitutional understanding but is also mindful of the Supreme
Court's admonition that "the appropriate analysis involves
considering whether the challenged regulation is consistent with
the principles that underpin our regulatory tradition." *Rahimi*,
602 U.S. at 7. Statutory history from periods other than
ratification can also help reveal the "principles that underpin
our regulatory tradition." *Id.* The appropriate question is

Here, the State bears the burden of showing that its regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. The *Bruen* Court offered some guidance on how courts should evaluate consistency with historical tradition:

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.

*Id.* at 26–27. Some cases require "a more nuanced approach." *Id.* at 27. Cases involving "modern regulations that were unimaginable at the founding" will require "a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 29 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). At least two metrics are significant: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.*; *see also Rahimi*, 602 U.S. at 7 ("Why and how the regulation burdens the right are central to this inquiry."). The Court expounded upon this guidance in *Rahimi*, explaining that "the Second Amendment permits more than just those regulations identical to ones that could be found in

---

whether the analogous historical restrictions reveal useful constitutional principles, not necessarily when they are from.

**App. 0690**

1791. . . . As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.*

Plaintiffs state that "at the time of the Founding and for many decades thereafter, no State or jurisdiction enacted any general ban on any arm in common use." ECF No. 2-1 at 15. Plaintiffs' argument amounts to an assertion that if a weapon is owned by an undefined threshold percentage of the population, it may not be regulated. ECF No. 2-1 at 15. This is precisely the type of "regulatory straitjacket" that the Supreme Court intended to avoid in *Bruen*, 597 U.S. at 30. As explained above, the common use inquiry is relevant to step one, determining whether the arm is entitled to presumptive Second Amendment protection. If it is, the government may still regulate it if it shows that the regulation is consistent with the nation's historical tradition of firearm regulation.

i.   *How*

When assessing how a regulation burdens the right of armed self-defense, courts consider "the extent to which LCMs are actually used by civilians in self-defense." *Ocean State Tactical*, 95 F.4th at 45. As noted above, the Court concludes that LCMs are very rarely used in self-defense. Accordingly, "it

**App. 0691**

reasonably follows that banning them imposes no meaningful burden on the ability of [citizens] to defend themselves." *Id.*

The Court will evaluate whether the "how" underlying Vermont's regulation has a reasonable historical analogue. But first, a matter of framing: Plaintiffs construe Vermont's regulation as an "absolute ban on certain firearms." ECF No. 2-1 at 15. Any regulation can be construed as an "absolute ban." *Rahimi* could be considered an "absolute ban" on possession of firearms by individuals subject to domestic violence restraining owners. *Rahimi*, 602 U.S. at 5 (concluding that individuals who pose a credible threat to the physical safety of an intimate partner may "be banned from possessing firearms."). Restrictions on modifications of firearms – including sawed-off shotguns and silencers – could be considered "absolute bans" on those modified firearms. *See United States v. Comeaux*, No. 6:23-CR-00183, 2024 WL 115929, at *3 (W.D. La. Jan. 10, 2024) (upholding a federal statute restricting silencers and short-barreled shotguns). Like both of these examples, Vermont's restriction on LCMs is best considered a limitation on the ways in which firearms may be used, rather than as a flat ban. *See* ECF No. 66 at 2.

The way in which that limitation operates – that is, the "how" of the regulation – finds precedent in the annals of this country's history of firearm regulation. The State has shown

43

that founding-era legislatures were concerned with episodes of mass violence (such as explosions from consolidated gunpowder and public knifing) and imposed restrictions accordingly.

First, the State submits that founding-era legislatures were concerned with technologies that had the capacity to cause mass devastation and accordingly limited how those weapons could be used. Specifically, Bowie knives – long knives with a cross guard and clipped point – proliferated in the early 1830s and caused an increase in homicide rates. ECF No. 24-10 at 50-51. This led to a wave of state regulation throughout the nineteenth century. *Id.* at 56. The State's expert, Professor Robert Spitzer,[17] states that knives, clubs, and pistols "were considered so dangerous and inimical to public safety that [they were] subject to anti-carry laws and bundled together in

---

[17] At the hearing on this motion the Court took Plaintiffs' renewed *Daubert* objection to Professor Spitzer's testimony under advisement. ECF No. 62 at 3. For the reasons outlined in its prior Order on the *Daubert* issue, ECF No. 44 at 16-18, Plaintiffs' renewed objection is denied. Spitzer is a professional historian and Plaintiffs have not argued that the historical gun regulations which he presented to the Court were illegitimate. Their point that Spitzer's declaration inaccurately represented certain local ordinances as coming from state governments is noted and addressed below. Additionally, Spitzer's inability to testify to the specifics of Vermont's waiting period detracts from the credibility of his testimony on the comparability of historical regulations. ECF No. 62 at 85. However, whether the historical laws are "relevantly similar" to the modern law is a legal determination to be made by the Court, *Bruen*, 597 U.S. at 29, and Spitzer's submission of allegedly comparable statutes is nonetheless helpful because it provides the Court with materials on which to base its decision.

legislative enactments." *Id.* at 58. He also cites several court cases from the early nineteenth century upholding convictions of individuals for possessing these weapons designated by legislatures as "dangerous to the peace and safety of the citizens." ECF No. 24-10 at 52 (citing *Aymette v. State*, 21 Tenn. 152, 157 (1840)).

Plaintiffs make essentially three arguments in response to the State's analogy to Bowie knives. None are persuasive. First, Plaintiffs point out that many of the states that regulated Bowie knives had not been granted statehood when the laws were passed. ECF No. 62 at 47-50. They therefore argue that these laws have no bearing on this country's tradition of firearm regulation. *Id.; see also Bruen*, 597 U.S. at 66-70 (holding that carry regulations in Western Territories did not "justify New York's proper-cause requirement"). But the territorial carry regulations at issue in *Bruen* were largely limited to the Western Territories. *Bruen*, 597 U.S. at 66 ("The vast majority of the statutes that respondents invoke come from the Western Territories."). The restrictions set forth by the State in this case were part of a broad national pattern of knife regulation in response to a public safety threat. *See* ECF No. 24-19 (noting nineteenth-century Bowie knife restrictions in eastern states such as Maryland, New Jersey, Pennsylvania, Rhode Island, and Vermont). Plaintiffs here have not submitted any of the other

**App. 0694**

criticisms levied against the territorial restrictions in *Bruen,* which involved judicial review and repeal of statutes, and the Court has no reason to think that they would apply here. *See Bruen*, 597 U.S. at 66-70.

Second, Plaintiffs suggest that Spitzer miscategorizes several restrictions as "no carry" laws when they are better considered "no concealed carry" or "sensitive places" laws. ECF No. 42 at 39; s*ee also, e.g.*, ECF No. 62 at 51; 62. They argue that historical prohibitions on carrying such knives in public places served to protect the public, not regulate private conduct. *Id.* at 41. This is a specious distinction. Like historical carry restrictions limiting how and where Bowie knives could be used, Vermont's law protects the public by limiting how citizens may use firearms. Just as Bowie knife restrictions did not ban knives altogether, Vermont does not ban firearms altogether. Both regulatory schemes limit how the dangerous weapons may be used. Also like these historical restrictions, Vermont's law imposes limits on weapons correlated with an increase in public violence. *See* ECF No. 24-10 at 56 ("The ubiquity of the concern about the criminological consequences of carrying Bowie knives and other, similar long-bladed knives is seen in the widespread adoption of laws barring or restricting these weapons."); c*f. Rahimi*, 602 U.S. at 7-8 ("The law must comport with the principles underlying the Second

46

**App. 0695**

Amendment, but it need not be a 'dead ringer' or a 'historical twin.'").

Finally, Plaintiffs state that many of Spitzer's example regulations are municipal regulations rather than state laws. *See, e.g.*, ECF No. 62 at 53. As the Court noted at argument on this motion, Spitzer simply suggests that "there are laws in that particular state which restrict carrying." ECF No. 62 at 59-60. And regardless, municipalities operate as state actors for constitutional purposes. *United Bldg. & Const. Trades Council of Camden Caty. & Vicinity v. Mayor & Council of City of Camden*, 465 U.S. 208, 215 (1984) ("[A] municipality is merely a political subdivision of the State from which its authority derives. . . . [W]hat would be unconstitutional if done directly by the State can no more readily be accomplished by a city deriving its authority from the State."). The Court sees no reason why these local regulations should not be considered part of this Nation's history and tradition of arm regulation for purposes of the *Bruen* analysis. If anything, the fact that localities exercised this power indicates that historical federalism practices militate towards allowing local actors to resolve public health crises arising from proliferation of unsafe weapons by regulating how those weapons may be used.

The point of Spitzer's analysis is that while states dealt with the public health problem of Bowie knives in different

App. 0696

ways, *see* ECF No. 24-19, there is no constitutional history prohibiting such restrictions. The Court further finds that the burden on self-defense of a law prohibiting the carry of knives in public is substantial, and greater than the minimal burden imposed by a law prohibiting the possession of an LCM (which does not restrict the carry of a firearm at all).

Spitzer also notes that "every state in the country enacted one or more gunpowder laws from the seventeenth century through the start of the twentieth century." ECF No. 24-10 at 92. These laws regulated the transportation and storage of gunpowder, which was unstable and "could lead to explosions and fires if stored improperly." *Kotek*, 682 F. Supp. 3d at 903. Gunpowder laws "did not severely restrict the right to armed self-defense because an individual could still purchase gunpowder," albeit only in amounts that would not "place the public at risk by leading to a catastrophic explosive event." *Id.* at 929.

Plaintiffs respond that these laws are poor historical analogues because they did not deal with the "discharge" of a firearm." ECF No. 42 at 44. They construe gunpowder laws as "fire prevention laws." *Id.* The Court finds that historical gunpowder laws burden the right to armed self-defense in a way substantially comparable to Vermont's LCM regulation. Gunpowder, like modern magazines, was necessary for the discharge of a firearm. Accumulation of a massive amount of gunpowder was not

App. 0697

necessary for the discharge of a firearm, just like storage of many rounds in an LCM is not necessary for the discharge of a firearm. Both regulations impose modest restrictions on a citizen's ability to possess unlimited materials associated with self-defense, and negligible restrictions on the ability to discharge that weapon in self-defense. Both also mitigate the possibility of mass death: in the case of gunpowder laws stemming from accidental explosions, and in the case of LCMs stemming from misuse for insidious purposes. *See Kotek*, 682 F. Supp. 3d at 929 ("The gunpowder laws did not severely restrict the right to armed self-defense because an individual could still purchase gunpowder but could not store that gunpowder in amounts that would place the public at risk by leading to a catastrophic explosive event. . . . Similarly, [an LCM statute] restricts the ability of an individual to amass a level of firepower deemed to be a threat to public safety.").

Plaintiffs note that the Supreme Court declined to adopt gunpowder laws as a comparator for the handgun ban at issue in *Heller,* 554 U.S. at 632. In that case, the Supreme Court explained that restrictions on storage of excess gunpowder did not "burden the right of self-defense as much as an absolute ban on handguns." *Id.* The Court agrees: an absolute ban on handguns certainly imposes a greater burden on the right of self-defense than a regulation on storage of gunpowder. But for the reasons

49

**App. 0698**

detailed above, Vermont's LCM law does not impose anywhere near
as substantial a burden on self-defense as a ban on handguns,
and accordingly, the laws regulating gunpowder storage are much
more comparable here. Both adopt a gradated approach to
ammunition regulation – allowing gunpowder, but not too much
gunpowder at one time; or bullets in magazines, but not too many
bullets in a magazine at any one time – which supports the LCM
regulation.

Amici submit several other historical regulations that
match the "how" underlying Vermont's law: specifically, laws
that restricted the manner in which firearms could be used so as
to limit the risk of catastrophic injury to the public. First,
they argue that the LCM regulation is justified by the history
of gun regulation in sensitive places. ECF No. 28 at 25. They
note that "[c]olonial Philadelphia, New York, and Boston
prohibited the discharge of firearms within their cities," ECF
No. 28 at 25, that courts have long allowed legislatures to
regulate weapons that "will naturally cause a terror to the
people," *id.* at 26 (citing *State v. Langford*, 10 N.C. 381, 383-
84 (1824)), and cite historical laws regulating the concealed
carry of firearms.[18] *Id.* The Court finds that the sensitive

---

[18] Plaintiffs respond that the Court should not consider these
laws and the rationale underlying them because to do so would be
to "engage in independent means-end scrutiny under the guise of
an analogical inquiry." ECF No. 42 at 35. The Court is conscious

places regulations pose an inexact analogue to the LCM restriction because they focus on location rather than method of use or carry. But for the reasons outlined above, carry regulations and restrictions on weapons that cause "terror to the people" provide evidence that legislatures in this country have long restricted the ways in which individuals can use arms in order to protect the public. While Plaintiffs are correct that gun violence is an historical issue that early legislatures did not address by banning firearms, they did attempt to limit damage by imposing restrictions like the ones submitted by the State and Amici.

    *ii.  Why*

    The next issue is "why the regulation[] burden[s] a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. Assessing the rationale underlying the challenged regulation requires first discerning the legislative intent of the law. Here, the purpose is clear: "the purpose of [the LCM restriction] is to reduce the number of people who would be killed or injured in a mass shooting in Vermont." *Misch*, 2021 VT, ¶ 71. As the Vermont Supreme Court noted, the statute was enacted in the "wake of a threatened mass shooting in Fair

---

of its obligation to avoid means-end scrutiny, but also must follow the Supreme Court's mandate to consider "how and why" modern regulations burden self-defense.

Haven, Vermont," where police received a report about an
eighteen-year-old suspect threatening to commit a mass shooting
at a high school. *Id* ¶ 69. The individual told police that "he
wanted to exceed the body count from the Virginia Tech shooting
and that he had chosen his ammunition accordingly." *Id.* (quoting
*State v. Sawyer*, 2018 VT 43, ¶ 5). Pursuant to this factual
record, the Court finds that the reason – or answer to the "why"
question – for Vermont's LCM regulation is to regulate highly
dangerous repeating rifles that did not exist at the founding
and which are commonly used to commit mass shootings, causing
unthinkable loss of life. The Court will place this rationale in
historical context below, concluding that founding-era
legislatures had little reason to issue similar regulations –
militating in favor of the statute's constitutionality.

First, repeating firearms are relatively new. The State and
Amici both submit evidence indicating that "the lethality of
semi-automatic firearms equipped with LCMs did not exist until
the 20th century." ECF No. 24 at 23. Spitzer's declaration states
that single shot weapons were the "ubiquitous firearm" until
after the Civil War. ECF No. 24-10 at 21.

The evidence submitted in this case indicates that early
repeater weapons were "experimental, fraught with problems, and
proven unfeasible." ECF No. 24 at 23 (cleaned up) (citing ECF
No. 24-10 at 10-20). Spitzer describes one "repeating" firearm

52

**App. 0701**

from the 1500s detailed in a book called *Firearms Curiosa* which superimposed bullets vertically and fired when gunpowder exploded "like lighting the fuse of a string of firecrackers." ECF No. 24-10 at 11. Unsurprisingly, Spitzer adds that this method had "potentially catastrophic results should a charge go off before it was supposed to." ECF No. 24-10 at 12.[19]

The *Curiosa* firearm is representative of the type of repeating firearm available in the early years of American government. At the time, it was "not possible to manufacture with precision and in any quantity firearms with closely fitting parts that could contain the destructive potential associated with the use of" gunpowder. ECF No. 24-10 at 13. This meant that many firearms – including the Lorenzoni, an early repeater mentioned in Plaintiffs' Complaint, ECF No. 1 at 14 – ran the risk of flame leaking back and "explod[ing] the black powder stored in the gun's butt." ECF No. 24-10 at 12-13. Other repeating weapons faced similar problems. *See* ECF No. 24-10 at 14 ("[T]he flintlock mechanisms that ignited the cartridges [of the Puckle gun] were unreliable."); *id.* at 15 (the Belton

---

[19] Plaintiffs submit that this firearm proves that repeating firearms existed, were unregulated, and indicate that restrictions on such repeating weapons are unconstitutional. ECF No. 42 at 27 (citing *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020)). The Court finds that this weapon was not sophisticated or mainstream enough to warrant regulation, and the absence of regulation holds no significance.

flintlock relied on discredited "superposed loads" technology);
16 (the Jennings multi-shot flintlock rifle used "fatally
defective" superposed firing); 19 (the 1854 Volcanic repeating
pistol was noted to have "radical defects"); 20 (the Pepperbox
pistol frequently discharged "all [its] barrels at once,"
creating a risk that the shooter might hit "two or three
innocent bystanders, as well as his intended victim").

The State and Amici explain that other early repeating
weapons were similarly impractical, unreliable, and used only
occasionally in military contexts. ECF No. 24-10 at 10 (early
repeating weapons did not "actually circulate in civil
society."). The Girandoni air rifle is a useful example. It was
fueled by a water pump, which meant that "[l]eather gaskets
needed to be constantly maintained and swelled with water to
sustain pressure." ECF No. 24-10 at 18. Soldiers either had to
manually re-pump the gaskets or bring a wagon with a pump to
resupply. *Id.* Amici add that the reliance on water pressure made
the rifle well-suited to the Lewis and Clark expedition but
poorly suited to ordinary self-defense. ECF No. 42 at 28
(Plaintiffs arguing that the Girandoni rifle's use on the Lewis
and Clark expedition shows that repeater firearms were available
in the early 19th century); ECF No. 28 at 28-29 (explaining its
limitations). The Girandoni never became common in military use
for these reasons, as well as the fact that it was "delicate"

**App. 0703**

and broke easily. *Id.; see also id.* at 14 (the Puckle gun was
"an experimental weapon designed for military use" that was
"likely never even manufactured beyond perhaps a prototype").

Amici further support this discussion. They outline the
evolution of various firearms capable of firing repeatedly
without reloading, ECF No. 28 at 28, and state that none were
safe, effective, and available until the late nineteenth
century. Plaintiffs also reference the pepperbox pistol, the
Volcanic Arms lever-action rifle, the Henry Rifle, and the
Winchester Model 66, all of which became available to the public
between 1855 and 1867. ECF No. 42 at 27-28. Amici articulate
reasons why none of these weapons were wieldy, reliable, or
accessible. *See* ECF No. 28 at 29 (pepperbox pistol typically
fired just five or six rounds, could fire up to 24 but was
"monstrously unwieldy," inaccurate beyond the width of a poker
table, limited in power, and frequently at risk of firing all of
its barrels simultaneously); 31 (volcanic rifle had design
defects such as gas discharge around the breech, misfires, was
grossly underpowered, and without sufficient force to be a "man
stopper"); 31 (Henry Rifle was underpowered for a military
firearm, frequently jammed, suffered from broken firing pins,
and was sparsely used in the Civil War); 32 (Winchester
repeating rifle frequently jammed, was inaccurate, and did not

achieve mass-market success until after the ratification of the Fourteenth Amendment).

Multishot weapons like the Colt revolver achieved limited military success during the Civil War. For instance, the Winchester 1873 repeating rifle[20] (which could fire up to fifteen rounds without reloading) was "designed for sale to the government as a military arm." ECF No. 24-10 at 23. It then expanded to the civilian community in a limited capacity (mostly in Western territories) shortly after the war. ECF No. 24-10 at 25-26. But these firearms also came with associated crime problems and were commonly regulated. *Id* at 26 ("By the end of the nineteenth century, virtually every state in the country prohibited or severely restricted concealed gun and other weapons carrying.").

As multi-shot technology continued to evolve and expand, so too did regulation. In the post-World War I era, "multi-shot semi-automatic and fully automatic long guns began to circulate appreciably in society." *Id.* at 26. But they also came to be associated with criminal use, making them a "regulatory and public policy concern." *Id.* This led "to the enactment of anti-machine gun laws in at least 32 states, [with] between eight and

---

[20] Spitzer notes that the Winchester "was not a semi-automatic firearm." It was a lever-action rifle that required manual reloading, "one round at a time." ECF No. 24-10 at 24.

eleven state laws restricting semi-automatic firearms, and the first significant national gun regulatory law in 1934."[21] *Id.* at 26-27. As the District Court for the District of Columbia explained, the prohibition era came with criminal organizations using LCMs to facilitate their enterprises. "In response, numerous states enacted sweeping bans on high-capacity semi-automatic and automatic weapons during this era that applied to all individuals, not just a certain subset of the population such as gangsters or criminals." *Hanson*, 671 F. Supp. 3d at 22.

This regulatory tradition is reflected in Vermont law. Amici point out that in 1923, Vermont banned hunters from using a "machine gun . . . or an automatic rifle of military type with a magazine capacity of over six cartridges." *Id.* at 27 (citing 1923 Vt. Acts and Resolves 130). Similarly, in 1912, it banned gun silencers. *Id.* (citing 1912 Vt. Acts and Resolves No. 237); *see also* 13 V.S.A. § 4010).[22] This regulatory evolution reveals

---

[21] Plaintiffs state that there is no direct history of restriction on weapons based on firing capacity and state that "speculative explanations for why legislative action did not occur cannot justify Vermont's restriction." ECF No. 42 at 29. There is no history of restriction of weapons based on firing capacity only before weapons capable of firing multiple shots were commonly available to the public. As this discussion shows, public availability of repeating firearms came with rapid regulation.

[22] These regulations – specifically the repeating firearms restriction – align with the State's expert's testimony that repeating firearms did not become widely available after World War I.

that the Vermont Legislature has a tradition of addressing firearm developments that pose threats to public safety (specifically including multi-shot weapon restrictions).

Plaintiffs argue that early military-readiness statutes prove the statute's unconstitutionality. ECF No. 42 at 55. They note that certain founding-era laws required citizens to "acquire a firearm and be equipped to fire at least 20 to 24 shots." *Id.* at 44 (citing 1 Stat. 271, 2 Cong. Ch. 33). However, "a duty to possess guns in a militia or National Guard setting is distinguishable from a right to bear arms unconnected to such service." *Lara v. Comm'r Pennsylvania State Police*, 91 F.4th 122, 137 (3d Cir. 2024). If anything, these laws show that the only reason why individuals would possess large amounts of ammunition would be for military purposes. As noted above, the Second Amendment only protects weapons in common use for self-defense, not weapons typically reserved for the military. *Heller*, 554 U.S. at 581-82 ("The term was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity.").

The Court agrees with the State that the absence of LCMs at the founding explains the lack of contemporaneous regulation. ECF No. 24 at 24 ("Late 1700s legislators had no reason to pass laws governing multishot weapons that were very rare, experimental, and barely functional."). It is impossible to

regulate something that is incomprehensible. As the State notes, most early firearms were single-shot weapons that were kept unloaded to prevent risk of "corrosion or misfire." ECF No. 24 (citing ECF No. 24-8 at 16). The Framers "could not have conceived of the weaponry and firepower that allowed . . . a single shooter to kill 59 people and injure hundreds more in Las Vegas in 2017." *Id.* (citing ECF No. 24-8 at 10-11). Today's legislators can, all too well.

This segues to the second point. While Vermont's modern regulation finds backing in the historical absence of multi-shot, repeating firearms, the prevalence of those firearms has come with a dramatic increase in serious violence and mass shooting events – warranting regulatory advances designed to curb such loss of life.

The specific problem presented by LCMs is mass shootings, not gun violence. The State's expert on the issue, Dr. Allen, defines an event as a mass shooting if "four or more people were killed in a public place in one incident," excluding incidents involving other criminal activity. ECF No. 24-2 at 18. Four other entities that keep mass shooting data define the term similarly. *Id.* So does the FBI. ECF No. 24-8 at 40.

This definition is important because, as Plaintiffs note, "firearm violence" is far from new. ECF No. 42 at 26. Plaintiffs state that the "peacetime murder rate for adult colonists ranged

59

**App. 0708**

from . . . ten to fifty times the rate in the United States in 2009," ECF No. 42 at 26 (cleaned up) (citing Randolph A. Roth, American Homicide 209 (2009)). This may be true, but homicide rates are substantially different from mass killing sprees (which are the target of Vermont's regulation). *See Capen*, 2023 WL 8851005, at *12 (explaining that during the founding era "as a practical matter individuals could not go on killing sprees."). Plaintiffs argue that mass public killings were a familiar social problem at the founding, and point to Indian raids as evidence. *Id.* But territorial conflict in the farmland of colonial New England[23] is substantially different from a single individual using eight

_____

[23] Plaintiffs do not provide the death tolls related to these events, which makes it difficult to evaluate the magnitude of the problem. ECF No. 42 at 26-27. Additionally, even if these Indian raids created comparable injuries (which the Court doubts), modern mass shootings are different in kind. Plaintiffs describe war, essentially: rival groups sparring over territory. Today's mass shootings typically involve individuals or small groups inflicting incredible and senseless violence upon their own communities. Additionally, the speed of commission and harm inflicted by these contemporary events is unparalleled by historical comparators. *See Lamont*, 685 F. Supp. 3d at 105 ("The only way to kill a large number of people was to . . . go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons that were certainly lethal but did not provide individuals or small groups of people the means to inflict mass casualties on their own."). The Court finds that Indian raids did not pose the same regulatory problem (and are really not in the same ballpark) as events like the Parkland or Sandy Hook massacres. *See Ocean State Tactical*, 95 F.4th at 44 ("[W]e find in the record no direct precedent for the contemporary and growing societal concern that such weapons have become the preferred tool for murderous individuals intent on killing as many people as possible, as quickly as possible.").

LCMs to murder 17 people in Parkland, Florida, or marching into
Sandy Hook Elementary School to kill 20 children. ECF No. 28 at
41.

Neither party has submitted evidence on the prevalence of
mass shootings at the founding. But other courts have found that
"between 1776 and 1949, or for about 70 percent of American
history, there was no example of a mass shooting event that
resulted in double digit fatalities. The first known mass
shooting involving more than ten fatalities, not including the
perpetrator, occurred in 1949." *Kotek*, 682 F. Supp. 3d at 897
(record citations omitted); *see also Ocean state Tactical*, 95
F.4th at 44. And the State submits an expert declaration
asserting that "mass shootings carried out by individuals are 'a
criminological problem that did not exist in the Founding era,
nor during the first century of the nation's existence.'" ECF
No. 24 at 26 (citing ECF No. 24-8 at 43).

The evidence also shows that mass shootings are a modern
problem that has worsened in recent years. As the *Kotek* court
concluded, "[t]he annual incidence of high-fatality mass
shootings has increased along a linear trend line from 1990 to
2022. The number of fatalities in mass shooting events has also
increased along a linear trend line from 1990 to 2022." *Id.* at
899 (record citations omitted). Evidence presented in this case
supports the same conclusion. Allen explains that the

**App. 0710**

Congressional Research Service reported an average of 2.7 public mass shooting events per year in the 1980s, increasing to 4.5 from 2010 to 2013. ECF No. 24-6 at 9. She also notes that mass shootings *and* mass shootings committed with LCMs have increased in a relatively linear fashion from 1982 to 2020. ECF No. 24-2 at 23-26.

The Court finds that high-fatality mass shooting violence is "on the rise" and poses a "significant—and growing—threat to American public safety." *Lamont*, 685 F. Supp. 3d at 106. Allen's research found that, of the mass shootings with known magazine capacity, 63% used magazines with a capacity to hold more than 10 rounds of ammunition. ECF No. 24-2 at 20; *see also* ECF No. 24-8 at 39 (finding that "with extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, 185 percent more than semiautomatic rifles without extended magazines."). She also found that "casualties were higher in the mass shootings that involved weapons with [LCMs]" than in those that did not: specifically, the average number of casualties (deaths and injuries) was 25 in shootings with LCMs and 9 in shootings without. *Id.* As of July 2020, LCMs "were used in the ten deadliest mass shootings of the prior decade." ECF No. 24 at 33.[24]

---

[24] Allen notes that these conclusions "are consistent with those of other studies that have analyzed mass shootings," including

**App. 0711**

The reason why LCMs contribute to mass shootings – and mass death – is intuitive: "[T]he use of [LCMs] leads to more bullet wounds for victims (thereby substantially increasing the death toll of those who are shot), results in more shots fired (thus increasing the number of individuals who are shot) and reduces the capacity of potential victims to flee to safety or take effective defensive action." ECF No. 24-6 at 51. As the First Circuit explained, "[s]emiautomatic firearms fitted with LCMs are highly effective weapons of mass slaughter. They are designed to shoot multiple human targets very rapidly, and to allow the shooter to spray-fire from the hip position." *Ocean State Tactical*, 95 F.4th at 46 (quotations omitted). The data backs this up. The federal assault weapons ban – which also included a ban on large-capacity magazines – expired in 2004, and research reveals that mass shooting incidents and average fatality numbers "fell during the decade in which the [ban] was in place and then rebounded when the ban was lifted." *Id.* at 21. Because the federal law banned both LCMs and assault weapons, it is difficult to assess the "independent benefit" from each ban. ECF No. 24-6 at 28. But other research has revealed that mass

---

one that found an average of "11.8 [fatalities] per mass shooting with a large-capacity magazine versus 7.3 for those without." ECF No. 24-1 at 21. Another study found "21 average fatalities or injuries in mass shootings involving large-capacity magazines versus 8 for those without." *Id.*

shootings involving LCMs "resulted in a 62% higher mean average death toll," suggesting that the independent benefit from regulating LCMs is substantial. ECF No. 24-6 at 30.[25]

In sum, "mass shootings carried out with assault weapons and LCMs that result in mass fatalities are a modern societal problem; the development of semiautomatic fire has led to a level of casualties and injuries from firearm violence previously unseen in American history and has been spurred by factors and advances in technology that would have been unimaginable to the Founding Fathers." *Lamont*, 685 F. Supp. 3d at 107. Because Vermont's LCM regulation was implemented in response to a modern problem without an historical analogue (yet is nonetheless consistent with historical regulatory principles), the Court concludes that it is justified by America's history and tradition of firearm regulation.

---

[25] This conclusion is bolstered by data analyzed by other courts. *See, e.g.*, *Duncan*, 19 F.4th at 1096 ("In the past half-century, large-capacity magazines have been used in about three-quarters of gun massacres with 10 or more deaths and in 100 percent of gun massacres with 20 or more deaths, and more than twice as many people have been killed or injured in mass shootings that involved a large-capacity magazine as compared with mass shootings that involved a smaller-capacity magazine.").

5. Waiting Periods

    a. The plain text of the Second Amendment does not prohibit short waiting periods.

As noted above, the first question under *Bruen* is whether the restricted activity falls under the plain text of the Second Amendment. *Bruen*, 597 U.S. at 23-24. The Court concludes that the "right of the people to keep and bear Arms," U.S. Const. Amend. II, does not facially include a right to immediately obtain a firearm through a commercial sale.

The Supreme Court interpreted the relevant verbs – "keep and bear" – in *Heller*. That case expounded upon the "normal and ordinary" meaning of the Second Amendment. *Heller*, 554 U.S. at 576. The Court explained that founding-era dictionaries defined the word "keep" as "to retain; not to lose," and "to have in custody;" in short, "to have weapons." *Id.* at 582. The word "bear" meant "to carry," but in the context of arms, specifically "carrying for a particular purpose – confrontation." *Id.* at 584. Putting the pieces of the textual puzzle together, the *Heller* Court concluded that the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

Notably absent from the Supreme Court's guidance in *Heller* is any discussion of an ancillary, non-textual right to acquire firearms. To be sure, rights exist that are not directly

**App. 0714**

enumerated in the Constitution's text. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 345-46 (2022) (Kavanaugh, J., concurring) (stating that "[o]verruling *Roe* does not mean the overruling of [precedents on contraception and marriage], and does not threaten or cast doubt on those precedents" and that "a State [may not] bar a resident of that State from traveling to another State to obtain an abortion" because of "the constitutional right to interstate travel."). But absent textual enumeration, courts like this one must determine the parameters of the right.

As Plaintiffs note, the Second Circuit offered guidance on this question in *Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023) (per curiam).[26] In that decision, the Second Circuit held that gun vendors may bring Second Amendment claims on behalf of firearm purchasers. *Id.* at 194. In reaching that conclusion, it noted that while states may impose conditions and qualifications on the commercial sale of arms, they may not outright ban "the sale or transfer of common-use weapons and necessary ammunition." *Id.* at 195. The court overtly declined to "set out

---

[26] The State represents that *Gazzola* and related law governing commercial transfer of firearms is not part of the *Bruen* analysis. ECF No. 66 at 3-4. The Court disagrees, because the question is whether the plain text of the Second Amendment protects a right to acquire firearms. Accordingly, it will discuss *Gazzola* and related cases as part of its analysis of the Second Amendment's presumptive coverage.

specific guidance as to how a trial court must assess evidence that a commercial regulation is stifling the individual right of access to firearms." *Id.* at 196 n.6. However, it noted that the law at issue in that case – which, among other things, required gun dealers to secure firearms in a vault outside of business hours, install security alarms, provide employees with State Police-developed training, and prohibit minors from entering without a parent or guardian – did not "restrict protections conferred by the Second Amendment." *Id.* at 197. It also reiterated that gun buyers "have no right to have a gun store in a particular location," nor a right to proximity to a convenient gun store. *Id.*

The Second Circuit's *Gazzola* decision is consistent with dicta from *Bruen* itself. In *Bruen*, the Supreme Court struck down New York's "may issue" permitting system, which allowed magistrates to issue firearm licenses only if the applicant had "good moral character and proper cause." 597 U.S. at 12 (cleaned up). The Court explained that the permitting system was unconstitutional because it required plaintiffs to justify their exercise of a constitutional right. *Id.* at 46. However, it noted that its decision should not be "interpreted to suggest the unconstitutionality of" shall-issue licensing regimes, under which "a general desire for self-defense is sufficient to obtain a permit." *Id.* at 38 n.9 (cleaned up) (citing *Drake v. Filko*,

724 F.3d 426, 442 (3d Cir. 2013) (Hardiman, J., dissenting)).
The Court explained that these licensing schemes, "which often
require applicants to undergo a background check or pass a
firearms safety course, are designed to ensure only that those
bearing arms in the jurisdiction are, in fact, 'law-abiding,
responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635).
They also contain "narrow, objective, and definite standards"
guiding licensing officials. *Id.* (quoting *Shuttlesworth v.
Birmingham*, 394 U.S. 147, 151 (1969)). While the Court noted
that "lengthy wait times" or "exorbitant fees" may make a shall-
issue licensing scheme unconstitutional, it acknowledged that
objective licensing criteria which may delay acquisition of a
firearm (or firearm permit) survive constitutional scrutiny.

One other case warrants discussion: *Antonyuk v. Chiumento*,
89 F.4th 271, 312 (2d Cir. 2023).[27] There, the Second Circuit

_____

[27] The Supreme Court vacated this decision for further
consideration in light of *Rahimi*. *Antonyuk v. James*, No. 23-910,
2024 WL 3259671 (U.S. July 2, 2024). It is settled that vacated
decisions are not "technically binding." *Brown v. Kelly*, 609
F.3d 467, 476 (2d Cir. 2010) (citing *O'Connor v. Donaldson*, 422
U.S. 563, 577 n. 12 (1975) ("Of necessity our decision vacating
the judgment of the Court of Appeals deprives that court's
opinion of precedential effect, leaving this Court's opinion and
judgment as the sole law of the case.")). However, courts may
still treat vacated decisions as persuasive authority. *See,
e.g.*, *id.* (treating a prior appellate ruling as "persuasive
authority" despite vacatur). *Antonyuk* serves as persuasive
authority for its discussion of shall-issue licensing regimes
and the constitutionality of waiting periods because *Rahimi* –
which caused the vacatur – did not address those subjects. *See
generally Rahimi*, 602 U.S. at 5-18.

App. 0717

explained that New York's "shall-issue" licensing regime, which
denies firearms licenses to individuals who are "not law-abiding
and responsible," survives Second Amendment scrutiny. *Id.* at
314-15. In a footnote of that discussion, the court expressed
disapproval of a Fourth Circuit decision striking down a thirty-
day review period. *Id.* at 315 n.4. ("We find it especially
difficult to square the [Fourth Circuit's] conclusion that a
thirty-day review period is per se an unconstitutional temporary
deprivation of Second Amendment rights with *Bruen*'s contrasting
statements that '*lengthy* wait times ... [would] deny ordinary
citizens their right to public carry.'" *Id.* at 315 (quoting
*Bruen*, 597 U.S. at 38 n.9) (emphasis added by the Second
Circuit) (citing *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th
1038, 1044 (4th Cir. 2023), *reh'g en banc granted*, No. 21-2017
(L), 2024 WL 124290 (4th Cir. Jan. 11, 2024)). By contrasting a
thirty-day review period with a "lengthy" waiting period, the
Second Circuit implied that – in its view – thirty-day waiting
periods are not unconstitutionally long.

In sum, *Bruen* and *Gazzola* stand for the principle that a
state may impose "objective standards" on commercial firearm
transactions that delay the acquisition of a firearm without
violating the Second Amendment. And *Antonyuk* suggests that even
a thirty-day waiting period is constitutionally acceptable.

The Court finds that the relevant conduct – acquiring a
firearm through a commercial transaction on-demand – is not
covered by the plain text of the Second Amendment. Plaintiffs
may keep and bear arms without immediately acquiring them. The
objective nature of Vermont's law, combined with its relatively
short period of delay, reveals that it does not unduly burden
the protected right, pursuant to *Bruen*, *Gazzola*, and *Antonyuk*.

Plaintiffs seek to differentiate both *Bruen* and *Antonyuk*,
arguing that both condone waiting periods for the limited
purpose of "ascertaining whether the prospective weapon carrier
is a 'law-abiding, responsible citizen.'" ECF No. 42 at 48
(quoting *Heller*, 554 U.S. at 635). They argue that the Vermont
law, on the other hand, delays acquisition of firearms without
serving any "governmental function."[28] *Id.* But neither *Bruen* nor

---

[28] This is the type of "judge-empowering 'interest balancing
inquiry' that 'asks whether the statute burdens a protected
interest in a way or to an extent that is out of proportion to
the statue's salutary effects upon other governmental
interests'" that the Supreme Court declared unconstitutional in
*Bruen*. 597 U.S. at 23 (citing *Heller*, 554 U.S. at 634); *see also*
ECF No. 42 at 50 (reminding the Court that it may not consider
"public policy arguments"). This Court is not tasked with
evaluating whether Vermont's waiting period law is a good fit
for its intended purpose of preventing impulsive violence.
However, if it were to undertake this inquiry, the Court would
find that the State's waiting period does facilitate review for
whether the purchaser is law-abiding. The statute imposes a 72-
hour waiting period on firearm acquisition after the dealer is
provided with a unique identification number by the National
Instant Criminal Background Check System (NICS). Regardless of
whether the transfer has been approved, the statute allows the
transaction to proceed no more than seven days after the dealer

**App. 0719**

*Antonyuk* focused on governmental function. *Bruen* disavowed of
regulatory discretion and condoned short waiting periods for
objective determinations. *See Bruen*, 597 U.S. at 38 n.9. And as
mentioned above, *Antonyuk* disapproved of the Fourth Circuit's
decision in *Maryland Shall Issue, Inc. v. Moore*, which struck
down a Maryland law requiring a wait of "up to thirty for
approval" for a "handgun qualification license." 86 F.4th at
1040. The Fourth Circuit's decision in that case focused on the
fact that the licensing process "can take thirty days," not on
the rationale underlying that delay period. *Id.* at 1045. The
Second Circuit's disagreement with that decision serves as
further persuasive authority supporting the constitutionality of
short, non-discretionary waiting periods.

Plaintiffs specifically argue that the waiting period
infringes on their ability to "possess and carry weapons in case
of confrontation." ECF No. 2-1 at 19. They state that because
the law requires gun sellers to wait 72 hours after the seller
is provided with a background check identification number to
complete the sale, buyers cannot immediately acquire firearms if
they need them for self-defense. ECF No. 42 at 49. The Court

---

"contacted NICS to initiate the background check." 13 V.S.A. §
4019a(a). The statute can be understood as imposing a backstop,
preventing rapid acquisition of a gun without NICS approval,
along with a short waiting period even if NICS approval happens
quickly.

disagrees that Plaintiffs have an absolute, unfettered right to immediately acquire firearms for self-defense based on the Supreme Court's guidance in *Bruen*, which – as noted above – expressed approval for shall-issue licensing regimes which inevitably include some delay. *See Bruen*, 597 U.S. at 38 n.9 (approving of licensing regimes which contain "narrow, objective and definite standards" guiding licensing officials) (quoting *Shuttlesworth*, 394 U.S. at 151 (1969)). Indeed, Vermont's law is perhaps the best version of a shall-issue licensing regime post-*Bruen* because it imposes *no* administrative discretion. Further, Vermont's law does not impede Plaintiffs' abilities to "possess and carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, because they can bear weapons in their possession without limitation.[29]

b. This nation's history and tradition of gun regulation justifies Vermont's waiting period.

As with the LCM regulation, Plaintiffs have failed to carry their burden on step one of the *Bruen* test, and their likelihood of success on the merits is accordingly low. Again, though, the Court will proceed to the history and tradition inquiry for

---

[29] The State and Amici also argue that there is no historical right to "immediate acquisition of a firearm without any delay." ECF No. 24 at 32 (citing *Rocky Mountain Gun Owners*, 2023 WL 8446495, at *8-9); ECF No. 28 at 18. This argument is better considered under the "history and tradition" prong.

purposes of analytical thoroughness. Here, the question is whether the waiting period "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 10.

Plaintiffs argue that there is no tradition of firearm regulation that supports delaying acquisition of firearms. ECF No. 2-1 at 19. They note that permit-to-purchase schemes, which effectively impose waiting periods, are creatures of the twentieth century. *Id.* at 21. The State does not contest this history, but contends that immediate availability of firearms is a modern development that requires modern regulation. *See generally* ECF No. 24 at 32-39. As explained below, the Court agrees; and due to this substantial evolution in firearm availability, it must undertake a "nuanced approach" to the historical analysis, asking "how and why the regulation[] burden[s] a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29.

   *i. How*

First, the Court will assess how Vermont's waiting period burdens the right of law-abiding citizens to "possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. As a threshold matter, as noted above, the law's burden on the right is relatively small because the law does not prohibit individuals from purchasing and keeping firearms for the

**App. 0722**

unlikely event that they need to bear them in self-defense. *See, e.g.*, ECF No. 59 at 40 (Plaintiffs' witness stating "I already have lethal means."). Additionally, background checks required under federal law can take up to seven days, so the marginal added burden imposed by Vermont's law is small. *Id.* at 51-52. While Vermont's waiting period may require individuals to wait up to three days when they otherwise would be approved rapidly under the NICS system, there is no guarantee that NICS will instantaneously approve any individual buyer – meaning that any purchaser could find him or herself waiting longer than the time required by Vermont's waiting period.

Vermont analogizes its regulation to ostensibly comparable historical statutes that restrict the carry or use of firearms by intoxicated people, as well as the distribution of alcohol in settings "where firearms were present." ECF No. 24 at 35. The State cites a 1655 Virginia statute making it illegal to "shoot guns at drinking," with an exception for "marriages and funerals," i*d.* (quoting 1655 Va. Acts 401, Acts of March 10, 1655, Act XII), and a similar Pennsylvania law which imposed fines on innkeepers that sold alcoholic beverages to "any such persons so assembled on pretense of . . . shooting matches." *Id.* (quoting 1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries, §

II). Spitzer's declaration attests that "[f]rom the 1600s through the early 1900s, at least 30 states regulated, restricted, and punished inebriation in connection with the ownership or use of weapons. These regulations included at least 20 states that criminalized the carrying or use of firearms when intoxicated." *See* ECF No. 24-10 at 71; *see also Rocky Mountain Gun Owners v. Polis*, No. 23-CV-02563-JLK, 2023 WL 8446495, at *17-*18 (D. Colo. Nov. 13, 2023) (listing the relevant states and their laws in greater detail). The State submits that these restrictions are comparable because – like the Vermont statute – "they imposed temporary intervals during which a person was not allowed to use or carry a firearm." ECF No. 24 at 37.

These restrictions on firearm use associated with alcohol are an apt historical analogue for Vermont's waiting period. In both cases, the relevant legislature identifies a period during which it believes that firearms pose an extreme risk to public safety. It then mandates that individuals refrain from carrying or using firearms until those people can exercise their Second Amendment rights safely and effectively. Vermont's statute operates in a manner that finds precedence in our nation's history and tradition of gun regulation.

App. 0724

Plaintiffs respond that the alcohol-related restrictions are insufficiently related because they "disarmed the populace[30] only while intoxicated or while at a tavern," ECF No. 42 at 50, making it so that an individual could avoid the restriction – and thereby maintain his right to use a firearm – by avoiding alcohol. Plaintiffs argue that there is no way to opt-out of Vermont's restriction. This conclusion is not quite right: the easiest way to "opt out" of the waiting period is to purchase a firearm before the instant in which it is needed. Like alcohol restrictions which disarmed the populace "only while intoxicated or while at a tavern," the waiting period restricts the right to purchase a firearm only while purchasers are potentially primed to make impulsive decisions. This is a minimal inhibition on the right to armed self-defense.

Relatedly, Plaintiffs argue that intoxication law ensured that people carrying firearms were unimpaired, which Vermont's law does not do. ECF No. 42 at 47. This is not true; like past intoxication-related laws, the waiting period works to ensure that individuals in temporarily impulsive states will not make reckless decisions with a firearm. The only difference between

---

[30] Notably, the waiting period does not "disarm the populace" because it does not impact an individual's right to use a previously-purchased firearm. In this sense, the intoxication laws are *more* restrictive than Vermont's waiting period because they eliminated an individual's right to use *any* firearm.

the two laws is the reason why the individual might make a reckless decision: one based upon alcohol, and one based upon inflamed passions or fears.

The State's second proposed historical analogue comes in the form of weapons licensing laws. ECF No. 24 at 37. As noted above, the *Bruen* Court condoned shall-issue licensing regimes. *Bruen*, 597 U.S. at 38 n.9. It explained that under those frameworks, citizens seeking to exercise their right to self-defense can receive firearm permits after undergoing a "background check or firearms safety course." *Id.* Because the Supreme Court has already expressed that these restrictions – which, by their nature, impose a modest waiting period on the acquisition of firearms for self-defense – satisfy Second Amendment scrutiny, the Court need not thoroughly detail the history of these regulations.[31] It concludes that the "how" of those regulations also matches the "how" of Vermont's waiting period. Both allow for background checks and mandate delay so the government can ensure that the individuals acquiring firearms are, in fact, law-abiding and responsible citizens.

---

[31] Spitzer's declaration provides a thorough history of historical weapons licensing laws. *See* ECF No. 24-10 at 78-92. Amici similarly submit that colonial governments "substantially controlled" commercial firearms transactions. ECF No. 28 at 20 (quoting *Teixeira v. Cnty. Of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017)).

App. 0726

*ii.  Why*

At the "why" stage of the analysis the Court makes two findings. First, it finds that the specific problem addressed by Vermont's law – immediate acquisition of highly lethal firearms – was not present at the founding. Second, it concludes that the rationale underlying Vermont's law nonetheless maps onto the reasoning behind comparable historical regulations.

First, the State and Amici argue that an historical understanding of the Second Amendment does not include a right to acquire a firearm immediately. ECF No. 24 at 32. They note that "[w]aiting for delivery of goods, including firearms, was an accepted part of American life in the 18th and 19th century," and cite literature explaining how long travel took during the founding era. ECF No. 28 at 18-19. They also contend that the founders would not have expected "instant, widespread availability" of a large menu of firearms. ECF No. 28 at 19 (quoting *Rocky Mountain Gun Owners*, 2023 WL 8446495, at *8).

The Court agrees. There is substantial evidence in the record highlighting that instant availability of a wide variety of guns would not have been anticipated at the founding. The State cites expert declarations from professors Roth, Spitzer, and Donohue to this effect. ECF No. 24 at 34-35. Roth and Spitzer emphasize that rash and impulsive decisions to buy firearms and shoot others or the self were not a problem at the

78

**App. 0727**

founding for two reasons: first, because guns were infrequently
used for violence (and when they were, the muzzle-loading nature
of the weapons made it difficult to use them impulsively), ECF
No. 24 at 34; and second, because there were no "Guns-R-Us"
outlets in early American history. ECF No. 24 at 33-35 (quoting
*Rocky Mountain Gun Owners*, 2023 WL 8446495, at *9). In
particular, Spitzer's declaration explains that rapid,
convenient gun-sale processes were not available until the end
of the nineteenth century. ECF No. 24-10 at 66.

This leads to several subsequent points. First, it
undergirds the Court's above conclusion that the rapid
availability of guns presents an "unprecedented social concern"
that requires a "more nuanced approach" to historical analogy.
*Bruen*, 597 U.S. at 28. The Vermont legislature seeks to address
a problem that the founders could not anticipate; accordingly,
this Court must use analogous history – such as that of
intoxication laws and licensing regimes – to "guide [its]
consideration of modern regulations that were unimaginable at
the founding." *Id.*

Plaintiffs urge that consideration of the relative
availability of firearms at the founding versus today is
inappropriate because "there is no law to analyze." ECF No. 42
at 51. This argument is analytically off-target. The point is
not to directly analogize Vermont's regulation to founding-era

79

factual circumstances or argue that the regulation is acceptable because it regresses our country's system of firearm regulation to that present at the founding. Instead, the State's (and, indeed, the Legislature's) point is that there are features of the modern gun market that are substantially novel. Vermont must be able to respond accordingly.

Modern technology has facilitated speedy and unprecedented exercise of many constitutional rights, including (for instance) instantaneous distribution of protected speech on the internet. ECF No. 42 at 51. Plaintiffs suggest that the novel rapidity of speech publication does not justify waiting periods on Facebook posts, so the comparable modern rapidity of firearm acquisition should not justify waiting periods in this case. But this Court's mandate – to consider the country's history of gun regulation – does not require it to find a modern law to be an exact replica of a founding-era statute in order for that regulation to be constitutional. *See Rahimi*, 602 U.S. at 7 (clarifying that the Court's precedents "were not meant to suggest a law trapped in amber. . . . [T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791."). Technological changes warrant regulatory innovations, just like (to borrow Plaintiffs' example) ease of access to the internet may require regulation unimaginable at the founding, such as mandating that certain

80

App. 0729

websites verify the age of their viewers or provide certain
health warnings. *Cf. Free Speech Coal., Inc. v. Paxton*, 95 F.4th
263, 268 (5th Cir. 2024).

Finally, as noted above, the rationale for Vermont's law is
to prevent impulsive violence to the self and to the community.
Plaintiffs state that suicide and community violence "have been
around since the beginning of humanity," so Vermont's law does
not address a novel problem and is therefore an unconstitutional
legislative innovation. *Id.* at 22. Plaintiffs are right that
violence is an age-old problem. But disarming individuals when
they are primed to make potentially unsafe decisions is an age-
old solution. As the Court also noted above, intoxication laws
and licensing restrictions historically limited the right to
self-defense in circumstances in which citizens might take
illegal or unsafe actions.

Evidence submitted to the Court requires the conclusion
that Vermont's law does the same. Amici cite a study indicating
that "waiting period laws may reduce firearm suicide rates by 7-
11" percent. ECF No. 28 at 23-24 (citing Michael Luca et al.,
*Handgun Waiting Periods Reduce Gun Deaths*, 114 PROCEEDINGS OF THE
NATIONAL ACADEMY OF SCIENCES no. 46, 12162-12165 (2017). That same
study concluded that waiting periods reduce gun suicides but
have no impact on non-gun suicides. ECF No. 24-6 at 49. Another
study – cited by the Vermont legislature in support of this

81

measure – found that waiting periods may reduce "gun homicides by roughly 17 percent." ECF No. 28 at 24 (citing 2023 Vt. Acts & Resolves No. 45, General Assembly findings). Several additional pieces of academic research have reached the same conclusion. *Id.* at 50. Professor Donohue's own research estimates that "waiting period laws reduce suicides by 21-34 year-olds by 6.1 percent." ECF No. 24-6 at 49-50. Amici further support this point, adding psychological literature suggesting that many suicide attempts are impulsive, singular acts. ECF No. 28 at 23. Plaintiffs have submitted no empirical evidence speaking to the impact of waiting periods on impulsive firearm use.[32]

The Court concludes that modern developments impacting firearm acquisition render Vermont's waiting period law, 13 V.S.A. § 4019a, a novel solution to a novel problem. The Court also concludes, however, that the principle underlying the law – that individuals who might be likely to make rash decisions with a firearm should be disarmed – has precedent in this country's history of firearm regulation. *See Rocky Mountain Gun Owners,* 2023 WL 8446495, at *18 ([T]he Waiting-Period Act and the intoxication laws both work to prevent individuals in a

---

[32] This is not a "means-end" analysis; it is simply an assessment of whether the State's method of regulation saves lives in the same way as the relevant historical analogue.

temporary impulsive state from irresponsibly using a firearm."). Accordingly, Plaintiffs are unlikely to succeed on the merits of their challenge to Vermont's waiting period law.

## B. Irreparable Harm

Because Plaintiffs are unlikely to succeed on the merits, they are also unlikely to suffer irreparable harm from violation of their constitutional rights. *French*, 985 F.3d 165 at 176 (in constitutional cases, likelihood of success is a harbinger for irreparable harm). Several courts evaluating similar issues have held that if a plaintiff is unlikely to succeed on the merits, the rest of the preliminary injunction analysis is unnecessary. *Lamont*, 685 F. Supp. 3d at 113 ("Plaintiffs have failed to show their likelihood of success on the merits, and so the Court need not reach the remaining preliminary injunction factors."); *Capen*, 2023 WL 8851005, at *20. However, individual plaintiffs also assert specific harms, and the Court will proceed to address those.

Plaintiffs state that the waiting period "may force [Plaintiff Dame] to buy a firearm before a threat has arisen so he can ensure his ability to defend himself and his family against an immediate threat," which comes with harms such as "unnecessary purchase" and the cost associated with "the need to responsibly store the firearms in a house with young children." ECF No. 2-1 at 23 (citing 13 V.S.A. § 4024). First, this harm is

speculative – Dame does not state with certainty that he wishes to buy a firearm for self-defense. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (showing of irreparable injury "cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged.").

Further, Dame may purchase a firearm whenever he wants, to later use in self-defense. Costs associated with safe-storage laws do not constitute irreparable harm for two reasons. First, these minor financial costs are clearly reparable. Second, compliance with legitimate regulatory standards (such as protecting children from loose firearms) is part of responsible gun ownership and is not traceable to the challenged statute.

Plaintiffs next argue that Plaintiff Thompson can no longer buy firearms in their "most popular and common configuration, cannot purchase replacements for her grandfathered magazines, and must wait at least 72 hours before obtaining new firearms." ECF No. 2-1 at 24. This also does not state a claim for irreparable harm. The law does not ban repairing grandfathered magazines, and Thompson may continue to possess LCMs that she had prior to the statute's effective date. Thompson also does not state why she is harmed by the 72-hour waiting period, especially given that she already owns several firearms.

The for-profit plaintiffs state that they are prevented from selling some of the most common firearms in America, and

are accordingly forced to forego sales. First, they have not stated with specificity how much business they will lose due to the LCM ban. Further, as the State notes, monetary harm generally does not constitute irreparable harm. ECF No. 24 at 41 (citing *Ocean State Tactical*, 646 F. Supp. 3d at 400). VFSC also asserts that it will lose revenue when it can no longer offer firearms to winners of raffles at gun shows. ECF No. 2-1 at 24. It states that this restriction will reduce the incentive for individuals to attend the gun shows. But Plaintiffs have presented no evidence on this point. While they may, at trial, show that their inability to raffle will substantially impact their business, the conclusory nature of this assertation is difficult to credit at this stage of the litigation.

Finally, pursuant to the evidence described above, the Court concludes that Plaintiffs' right to engage in self-defense is not burdened by the LCM regulation. They are still capable of using firearms and 10- or 15-round magazines in self-defense, which is empirically adequate.

## C. Balance of Equities and Public Interest

The Second Circuit has explained that when the government is a party to the suit, the "balance of the equities" and "public interest" factors of the preliminary injunction analysis merge. *New York v. United States Dep't of Homeland Sec.*, 969

App. 0734

F.3d 42, 59 (2d Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418,
435 (2009)).

Plaintiffs argue that the public interest is best served by
injunction of unconstitutional laws. For the reasons outlined
above, Plaintiffs are unlikely to succeed on the merits, and
this argument therefore holds little weight. Additionally, the
Supreme Court has noted that "[a]ny time a State is enjoined by
a court from effectuating statutes enacted by representatives of
its people, it suffers a form of irreparable injury." *Maryland
v. King*, 567 U.S. 1301, 1303 (2012).

The State will be harmed by injunction of the two statutes.
It has a legitimate interest in (1) preventing mass shootings,
which motivated the LCM ban, and (2) reducing impulse-based
violence both to the self and to others. *Rocky Mountain Gun
Owners*, 2023 WL 8446495, at *22 (considering "statistically
rigorous studies" on the effect of waiting periods and
concluding that "saving approximately one hundred people in
Colorado this year outweighs the aggregate harm of minimal
expenditures of time and sacrificed business opportunities.").

For the reasons outlined above, the harm to plaintiffs
(including, most importantly, the burden on their rights to
self-defense) is minimal.[33] The State's interest in enforcing the

---

[33] Plaintiffs state that this analysis constitutes "forbidden
interest balancing." ECF No. 42 at 53. This is difficult to

**App. 0735**

laws is substantial. The balance of equities and public interest favors the State.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction (ECF No. 2) against enforcement of Vermont's LCM ban, 13 V.S.A. § 4021, and waiting period, 13 V.S.A. § 4019a, is **denied**. Plaintiffs have failed to show a likelihood of success on the merits with regard to LCMs because those magazines are not in common use for self-defense. But regardless of whether LCMs are in common use for self-defense, the State's restriction is justified by the nation's history of regulating mass threats to public safety. Plaintiffs are also unlikely to succeed on the merits of their challenge to the waiting period because the plain text of the Second Amendment does not protect a right to immediately acquire a firearm. Additionally, the State's law imposes a reasonable commercial restriction on firearm sales to ensure that gun purchasers use the firearms for law-abiding purposes, an approach deemed acceptable by the Supreme Court. Finally, Plaintiffs have not demonstrated that they will be irreparably harmed by enforcement

---

square with the Court's explicit mandate to consider the "balance of the equities" and the "public interest." *Winter*, 555 U.S. at 24. Interest balancing may be forbidden when considering the merits of Plaintiffs' Second Amendment claim, but it is required at this stage of the preliminary injunction analysis.

of the law, or that the balance of equities or public interest favors an injunction.

Plaintiffs' renewed *Daubert* motion as to Professor Spitzer's testimony (ECF No. 30) is also **denied.**

DATED at Burlington, in the District of Vermont, this 18th day of July, 2024.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge