No. 24-2121

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

Samuel Ortega and Rebecca Scott,
Plaintiffs-Appellants,

v.

Michelle Lujan Grisham, in her official capacity as Governor of the State of New
Mexico and Raul Torrez, in his official capacity as Attorney General of the State of
New Mexico,
Defendants-Appellees.

On Appeal from the United States District Court for the District of New Mexico
No. 24-CV-00471-JB-SCY James O. Browning

**APPELLANT'S APPENDIX VOLUME IV**

Michael D. McCoy
Sean D. Nation
Robert Welsh
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
mmccoy@mslegal.org

Joseph G.S. Greenlee
Erin M. Erhardt
NATIONAL RIFLE ASSOCIATION OF AMERICA
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org

Paul D. Clement
Erin E. Murphy
*Counsel of Record*
MATTHEW D. ROWEN KEVIN
WYNOSKY CLEMENT & MURPHY,
PLLC
706 Duke Street Alexandria, VA
22314 (202) 742-8900

Carter B. Harrison IV
Attorney and Partner
HARRISON & HART, LLC
924 Park Ave SW, Suite E
Albuquerque, NM 87102
(505) 303-1835
carter@harrisonhartlaw.com

*Attorneys for Plaintiffs-Appellants*

# APPENDIX INDEX

*Samuel Ortega and Rebecca Scott v. Michelle Lujan Grisham, in her official capacity as Governor of the State of New Mexico and Raul Torrez, in his official capacity as Attorney General of the State of New Mexico*

*No. 24-2121*

Transcript of Motion Proceedings
(ECF No. 37)............................................................................. App. 0738

Case 1:24-cv-00471-JB-SCY   Document 37   Filed 07/15/24   Page 1 of 286
Appellate Case: 24-2121   Document: 31-4   Date Filed: 11/08/2024   Page: 3

1

1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEW MEXICO

3

4    SAMUEL ORTEGA, et al.,

5            Plaintiffs,

6            VS.                    NO. CV 24-0471 JB

7    MICHELLE LUJAN GRISHAM, et al.,

8            Defendants.

9

10

11           Transcript of Motion Proceedings before The
     Honorable James O. Browning, United States District
12   Judge, Albuquerque, Bernalillo County, New Mexico,
     commencing on June 27, 2024.

13

14   For the Plaintiffs:  Mr. Carter Harrison; Mr. Sean
     Nation; Mr. Robert Welsh; Mr. Mike McCoy

15
     For the Defendants:  Ms. Holly Agajanian; Mr. Kyle
16   Duffy; Mr. Mark Allen

17

18

19

20

21           Jennifer Bean, FAPR, RDR, RMR, CCR
                 United States Court Reporter
22               Certified Realtime Reporter
                  333 Lomas, Northwest
23               Albuquerque, NM  87102
                  Phone:  (505) 348-2283
24           Email:  Jbean@litsupport.com

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: info@litsupport.com

App. 0738

```
 1              THE COURT:  All right.  Good morning

 2   everyone.  I appreciate everybody making themselves

 3   available to me this morning.  The Court will call

 4   Samuel Ortega, et al., versus Michelle Lujan

 5   Grisham, et al., Civil Matter Number 24-CV-0471 JB.

 6              If counsel will enter their appearances

 7   for the plaintiffs.

 8              MR. HARRISON:  Your Honor, Carter Harrison

 9   for the plaintiffs.  And I'll allow my co-counsel

10   here to introduce themselves as well.

11              MR. NATION:  Sean Nation, Mountain States

12   Legal Foundation.

13              THE COURT:  Mr. Harrison, Mr. Nation, good

14   morning to you.

15              MR. WELSH:  Robert Welsh, Mountain States

16   Legal Foundation.

17              THE COURT:  Mr. Welsh, good morning to

18   you.

19              MR. McCOY:  Good morning, Your Honor.

20   Mike McCoy Mountain States Legal Foundation.

21              THE COURT:  Mr. McCoy, good morning to

22   you.

23              And for the defendant.

24              MR. DUFFY:  Good morning, Your Honor.

25   Kyle Duffy, Deputy General Counsel on behalf of the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0739

```
 1   Governor.  And with me is Chief General Counsel

 2   Holly Agajanian on behalf of the Governor.  I'll

 3   allow my esteemed colleague to introduce himself.

 4             MR. ALLEN:  Good morning, Your Honor.

 5   Mark Allen, New Mexico Department of Justice, here

 6   on behalf of AG Torrez.

 7             THE COURT:  All right.  Mr. Duffy, Ms.

 8   Agajanian, Mr. Allen, morning to you.

 9             There is a motion that y'all filed that's

10   unopposed.  This  is the Governor's unopposed motion

11   for supplemental briefing.  It was filed by the

12   Governor, but I assume it is unopposed.  Okay.

13   Somebody needs to give me an order.  So if y'all

14   will give me an order, I'll get that signed.

15             MR. DUFFY:  Your Honor, I believe we did

16   send one yesterday.

17             THE COURT:  All right.  Are there

18   witnesses waiting?  In the waiting room?

19             MR. McCOY:  There are two witnesses here

20   who are waiting in the waiting room outside.  We

21   also have one witness who will be joining us via

22   Zoom.

23             THE COURT:  Let me ask y'all, does anybody

24   care about invoking the rule, or is everybody

25   comfortable with just everybody hearing everything?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

**BEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE

```
 1           MS. AGAJANIAN:  Judge, we'd like to invoke
 2 the rule.
 3           THE COURT:  Let me know who to let in, and
 4 I'll try to keep off the Zoom the people that are
 5 not supposed to be in the room.
 6           MR. McCOY:  Okay.
 7           MS. AGAJANIAN:  Your Honor, one thing I
 8 would note, when the plaintiffs' expert -- my
 9 understanding is that the plaintiffs will be
10 testifying first with fact witnesses, and then their
11 expert.  Our expert Dr. Roth, who is appearing via
12 Zoom, will want to start listening in about the time
13 that their expert starts.  So just so your staff is
14 aware of Dr. Roth knocking on the Zoom door.  I
15 believe it's okay for him to be listening to expert
16 testimony.
17           THE COURT:  All right.  Do you got that,
18 Ms. Rotonda?  So the experts can listen to
19 everything.  But I guess lay witnesses, they'll
20 need -- are the lay witnesses here?  Are they
21 waiting out there?
22           MR. McCOY:  They're waiting in the waiting
23 room, Your Honor.
24           MR. HARRISON:  I just want to clarify the
25 operation.  So the experts are going to be fine to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

email@beansupport.com

App. 0741

 1  listen to anything they want.  We'll keep the fact

 2  witnesses in the anteroom until they testify.

 3          THE COURT:  Is that y'all's understanding

 4  as well?

 5          THE CLERK:  Should I admit Tyler Bradshaw

 6  or Erin Erhardt?

 7          THE COURT:  Tyler Bradshaw, we can let in

 8  now?

 9          MR. NATION:  Judge, he's a summer.  He

10  finished his first year at Wyoming Law.  Erin

11  Erhardt is our co-counsel with the National Rifle

12  Association.

13          THE COURT:  So these are both people that

14  are associated with you as counsel in the case?

15          MR. NATION:  Yes, Your Honor.

16          THE COURT:  All right.  We'll let them in

17  as well.

18          THE CLERK:  Joseph Greenlee?

19          MR. NATION:  He's also with the NRA.

20          THE COURT:  So don't feel like you have to

21  stand for me today.  But you do have to speak into a

22  mic for these people to hear on the screen.  So

23  either grab a mic at the table or come up to the

24  podium.  If you don't speak into a mic, people on

25  the Zoom are not going to be able to hear you.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1           All right.  Let me talk, let me ramble a
2   little bit about where I am in my work on this.  I
3   thought I was pretty clear until the Supreme Court
4   case came out this week, and now I'm having to maybe
5   rethink some things.  But I'll give you where I was
6   before the Supreme Court case came down, Rahimi, and
7   tell you where I think I may need some help trying
8   to figure out whether the outline I'm about to give
9   you is still intact or whether if it's changed some.
10          So to me, there are two sort of
11  precondition categories you have to run legislation
12  through before you get to the Bruen Test.  The first
13  one is whether the plain text of the Second
14  Amendment covers the legislation.  I think that
15  that's a separate category of legislation.  And I
16  would think that a waiting period would not be
17  covered by the plain text of the Second Amendment.
18  And I think in those areas what the test is is that
19  certainly a waiting period of considerable length
20  could undermine the Second Amendment.  And so
21  legislation in this category is presumptively
22  constitutional.  But there is this check that it
23  can't be of such a length or -- that you end up
24  undermining all Second Amendment protection.
25          Now, I know that some courts -- I think

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                                      Albuquerque, NM 87102
(505) 989-4949                                                                    (505) 843-9494
FAX (505) 843-9492                                                        FAX (505) 843-9492
                                                                                  1-800-669-9492
                                                                        email@litsupport.com



**App. 0743**

1   the courts in Denver, the district courts, have just

2   said:  Well, it's not covered by the plain text,

3   therefore all waiting periods are legal.  I'm not

4   sure I agree with that analysis.  I do think that a

5   waiting period could be of a length that it would

6   undermine the Second Amendment right.  I'm not

7   convinced the seven days is of that length.

8            Then there is a second category before you

9   get to the Bruen rights, or Bruen analysis, and the

10  historical analysis, and that is these categories

11  that the Supreme Court listed out in Heller,

12  indicating that they were constitutional.  And so I

13  thought that there -- those categories that are

14  presumptively constitutional, as long as they are

15  long-standing.  I don't think that -- I know some

16  courts, the Eleventh Circuit struggled with this.

17  But I don't think long-standing means there has to

18  be an historical analog that predates the Second

19  Amendment.  I think it means something like things

20  that were passed in the 20th century, maybe early in

21  the 20th century, but certainly post Second

22  Amendment.  So this category has to be similar to

23  the ones that are listed in the categories of

24  Heller.  But they don't have to be run through the

25  rigorous historical analog of Bruen.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@bapsupport.com

App. 0744

```
 1              And then, if a statute clearly is covered
 2  by the Second Amendment's plain text and doesn't fit
 3  one of these categories that Heller mentioned and is
 4  long-standing, such as a commercial regulation, then
 5  you have to look for the historical analog that the
 6  Bruen analysis requires.
 7              On that first thing that you have to go
 8  through, as far as the plain text and not covered,
 9  I'm not prepared to say that the Second Amendment
10  implicitly covers things like waiting periods.  I do
11  think there is a check.  But I don't think the plain
12  language really allows coverage of waiting periods
13  and commercial regulations and those things.  I
14  don't think it implicitly covers.  But I do think
15  there is a check at some point that would undermine
16  the Second Amendment right.
17              So under that analysis, I think the
18  waiting period certainly survives the first gate of
19  the Second Amendment not covering this.  I think it
20  also fits the long-standing requirement for
21  commercial regulation and those things that are
22  categorically similar to the exceptions in Heller.
23  And I'm not convinced that it needs a historical
24  analog.
25              I'm not sure -- I felt pretty confident
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492





BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0745

1   that that was the test, and that this waiting period

2   is constitutional until Rahimi came out.  And now

3   I'm trying to figure out if an historical analog is

4   needed for everything.  And that's what I'm

5   struggling with is whether it changed the framework

6   that I just laid out, that I thought was the

7   framework, or whether it now requires a historical

8   analog to everything.  Anyway, those were my

9   thoughts coming in, and as I'm working.

10          One thing -- Mr. Harrison probably knows

11   this, and defendants know it as well -- I'll be

12   looking to you, Mr. Harrison, at the end of the day,

13   or whenever this hearing ends, for you to tell me --

14   I want to be a good judge and get you an opinion

15   out.  Y'all have been very patient on the TRO and

16   PI.  But y'all be thinking throughout the day, tell

17   me when you want to give me a drop-dead date as to

18   when -- date or time -- it can be today, if you need

19   it -- as to when you need a ruling on this.  But,

20   obviously, I'm trying to decipher and digest Rahimi,

21   because I'm a little bit concerned it may upset the

22   framework that I just gave you.

23          All right.  Mr. Harrison, it's your motion

24   for preliminary injunction.  If you wish to speak on

25   behalf of it.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreport.com

App. 0746

```
 1           MR. HARRISON:  Certainly.  So by having
 2   this hearing set when it was, Your Honor, we do have
 3   the benefit of being able to talk a little about the
 4   Rahimi decision, which came out pretty recently.
 5   We'll be having more fulsome briefing on that, and
 6   on some of the Court's concerns that you've just
 7   expressed, coming from Your Honor.
 8           That having been said, a lot of what Your
 9   Honor is going to hear today in terms of evidence,
10   we contend is going to be irrelevant, by which I
11   mean, the State -- for a variety of reasons, some
12   core legal, some less -- you know, more practical --
13   is going to talk about whether effectively policy
14   justifications for the waiting period, that's going
15   to be a decent amount of the expert testimony and a
16   decent amount of the expert declarations have
17   focused on.
18           The reality is that waiting periods might
19   fare well under a lot of other conceivable
20   standards.  But they do not fare well under the
21   Bruen Test.  Waiting periods are a fairly specific,
22   discrete, and distinctive form of regulation on the
23   right to bear arms, which we contend means:  Once
24   you purchase your arms, you have the right to have
25   them and bear them.  And they date back to all of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@litsupport.com

App. 0747

```
 1    1923.  So they're a purely 20th century innovation.

 2            The defense has effectively conceded that

 3    to the extent that we get to the historical analog

 4    step of the analysis, that waiting periods

 5    themselves are not within the relevant historical

 6    time period.  There is still, even after Rahimi -- I

 7    don't know if the Court noticed -- but they repeated

 8    in a footnote what they already said in Bruen, which

 9    is it remains unclear whether The Founding or the

10    Fourteenth Amendment Reconstruction remains the

11    relevant time period.  So to some extent, people are

12    using kind of that general space of time that would

13    cover both.

14            Now, it should be noted, in Bruen, they

15    focused on Founding Era restrictions.  And so we

16    think that's going to be the way things pan out.

17    For our purposes today, though, it doesn't really

18    make a whole lot of difference.  And I'm not aware

19    that anybody has pointed to anything individual, you

20    know, any particular restriction that would clearly

21    fall within a Reconstruction timeframe, but not a

22    Founding timeframe.  We have waiting periods which

23    date back clearly only to the early 20th century,

24    1923, which is clearly not far enough for the Bruen

25    historical analog test.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@bean-report.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

**App. 0748**

1           And then we have some of these, you know,

2    intoxication laws, you know, which obviously date

3    back -- we would consider largely within the

4    relevant time period.  We just don't think that

5    they're historical analogs.  And Rahimi is useful in

6    refining Bruen's historical analog analysis.

7           So like I said, what the State has is

8    again kind of a viscerally compelling argument,

9    well, this is a time limited deprivation.  It

10   applies evenly to everybody.  It ends automatically.

11   And I think it's easy for judges -- many of whom

12   still viscerally view the Second Amendment as a

13   second class right, because that's what most judges

14   have been doing for most of their careers, to sort

15   of ask:  What's the big deal?  Why do you need to

16   have your firearm immediately versus after a waiting

17   period?  Those questions, of course, wouldn't be

18   asked of any other right, aside from the Second

19   Amendment.  And they're wholly irrelevant to the

20   Bruen analysis.

21           Similarly, as Justice Thomas wrote in

22   Bruen, "Judicial deference to legislative interest

23   balancing is understandable and elsewhere

24   appropriate, but it is not deference that the

25   Constitution demands in the Second Amendment

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0749

```
 1   context."
 2            So the Bruen analysis, of course, is a
 3   two-step analysis.  We contend to answer, I guess,
 4   the first thing that Your Honor brought up -- we
 5   contend that those categories that were mentioned in
 6   Heller, including commercial sales regulations, have
 7   now effectively been folded into the master Bruen
 8   analysis.
 9            Again, the recognition of those categories
10   predated Bruen.  Bruen is now the gold standard, the
11   seminal case on what the substance of the Second
12   Amendment right is.
13            I'll point the Court to a case that I'm
14   not sure if we cited, Nguyen v. Bonta, 2024 WL
15   1057241.  That says basically this:  The court is
16   analyzing a claim that a firearm restriction is a
17   commercial sales -- commercial sales restriction.
18   And the court says, "As an initial matter, it is
19   readily apparent that the Supreme Court in Heller
20   could not have meant that anything that could be
21   characterized as a condition and qualification on
22   the commercial sale of firearms is immune from more
23   searching Second Amendment scrutiny.  And there
24   they're quoting Judge Bybee from a Ninth Circuit
25   case.  If there was somehow a categorical exception
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreporting.com



App. 0750

1    for all regulations that could be characterized as a
2    condition and qualification on the commercial sale
3    of firearms, it would follow that there would be no
4    constitutional defect in prohibiting the commercial
5    sales of firearms entirely, which is an untenable
6    result.
7             One approach taken by the Fourth Circuit
8    prior the Bruen is to treat a commercial regulation
9    as presumptively lawful if it does not act as a,
10   quote, "functional prohibition on buyers."  In
11   determining whether a commercial regulation amounts
12   to a functional ban, the Hirschfield (phonetic)
13   case, which is a Fourth Circuit case, instructs
14   courts to consider the severity of their restriction
15   and whether it substantially burdens a group's
16   rights.  However, this approach is inconsistent with
17   Bruen, which repudiated any consideration of, quote,
18   "how close the law comes to the core of the Second
19   Amendment right, and severity of the law's burden on
20   that right."  Bruen suggests that the proper
21   question evaluating whether a regulation falls
22   within the commercial sales category is not the
23   extent of interference with the Second Amendment
24   right, but instead, whether the regulation
25   historically would have been tolerated.  In the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
email@beansupport.com

**App. 0751**

```
 1   light of Bruen several courts of appeals have
 2   conducted the full text and history analysis when
 3   confronted with the regulation that falls within one
 4   of Heller's enumerated categories.
 5            And then, of course, obviously there are
 6   the cases that this district court is citing for
 7   that proposition.  That is the correct way to
 8   analyze the list of things that the Heller court had
 9   mentioned.
10            Our position is those no longer have any
11   sort of distinctive separate analysis that applies
12   to them.  Let's see if it fits within the category
13   of a commercial sales regulation.  These days, you
14   know, it hasn't been brought up again.  Every
15   indication is that Bruen has now collapsed that
16   analysis.  They have to be justified, the way
17   anything else.  There were a list of examples of the
18   types of things that the court did not want to be
19   misunderstood in Heller as striking down.  But
20   they're not subject to any type of separate special
21   analysis.
22            And in particular, again, with respect,
23   the courts viewed that well at some point they
24   become problematic, maybe not seven days, maybe not
25   14, but 30, 60, a year.  They start to now move
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreporting.com

**BEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE

**App. 0752**

```
 1   within the plain text of the Second Amendment.  You
 2   know, we would say that has no basis -- well, we'd
 3   say that has no basis in law.  And we'd also say
 4   that that is at significant tension with the
 5   prohibition of -- with Bruen's prohibition on what
 6   many courts of appeals were doing at the time, which
 7   is a review of whether a restriction entrenches on
 8   the quote/unquote core of the Second Amendment.
 9   Those types of analyses are pretty well dead and
10   gone at this point.
11           Now, the plain text analysis, obviously --
12   so part of what the defense has done is to define
13   the quote/unquote right at issue here at such a
14   narrow level of abstraction, a specific level of
15   abstraction, as basically being the absence of the
16   instant restriction itself.
17           So here, they're defining the right as the
18   instantaneous receipt of a purchased firearm.  Now,
19   again, if that general methodology is accepted, what
20   that basically is is historical burden shifting,
21   burden shifting on step two, in the sense it asks
22   the plaintiffs to come in and point to a place where
23   there was a restriction that was struck, you know,
24   at The Founding; that it's similar to the current
25   restriction and was struck down.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@litsupport.com

App. 0753

```
 1              Of course, that's not the analysis.  The
 2   analysis is the State has to come in and show that
 3   there was a restriction that was, of course, not
 4   struck down and was tolerated during the relevant
 5   timeframe.
 6              More generally, factually, it relies
 7   largely on what we'll call the Guns R Us argument,
 8   after, what one of the defense's arguments -- the
 9   terminology favored by one of the defense experts,
10   which is, as a practical matter, at The Founding,
11   when you bought a gun, you didn't get it
12   immediately, because they largely had to be made to
13   order.  The Founding predated the widespread
14   availability of mass manufactured firearms.
15              Now, the problem with that is that one way
16   the firearms were the same at The Founding as they
17   are now, is they're durable goods.  There was a
18   robust and is a robust resale market for secondhand
19   firearms, which of course, would be acquired
20   instantaneously.
21              We have -- you know, our expert will
22   testify to this, you know, with very historical
23   samples of the estates' sales of massive numbers of
24   preowned firearms, et cetera.  But the point
25   remains, and is fairly obvious that, while it's true
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beansupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0754

```
 1   that to get a new firearm, that was necessarily a
 2   longer process at The Founding than it is today,
 3   where they're premanufactured, it is by no means the
 4   case there wasn't, again, a robust market where you
 5   could get a firearm instantaneously and it remains
 6   true today, of course.  There are some firearms that
 7   you have to wait for.
 8              Beyond -- on the plain text prong of the
 9   analysis, what we can say is that this part of the
10   analysis did exist prior to Bruen.  And it does not
11   appear to me that many courts analyzing waiting
12   periods, in fact, made the decision that Your Honor
13   had alluded to.  Obviously, there is the Garcia
14   case, this is the Mountain States Gun Owners versus
15   Polis case up in Colorado, which is probably the
16   most similar district court case in the Tenth
17   Circuit right now, where Judge Kane basically
18   decided on all fronts in favor of the state,
19   including plain text.  And he didn't have any
20   supporting precedent for his view accepting the Guns
21   R Us argument, and stating that these waiting
22   periods fall outside and do not impinge upon the
23   plain text of the analysis.  In fact, the way that
24   he distinguished the line of cases relied upon by
25   the challengers to the statute there, well, those
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreporting.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0755

 1  decisions predate Bruen.  And while it's certainly

 2  true that Second Amendment cases that predate Bruen

 3  are of very limited value in this day and age, it's

 4  probably the only suggestion I've ever seen in a

 5  case, or really written on paper in general, that

 6  Bruen may have softened some portion of the

 7  analysis.  There is no reason to think that the

 8  plain text analysis has gotten more state favorable,

 9  more restriction favorable post Bruen than it was

10  pre Bruen.  So we invite the Court to look at those

11  cases.

12          Moving to the historical analog prong of

13  Bruen, which, of course, is going to be the bulk of

14  what the Court hears about today.  And of course, I

15  would expect the Court to do this anyway, but,

16  obviously, we do get some utility out of the Court

17  making specific findings on every aspect of this

18  versus, say, avoiding a second prong, if the Court

19  finds that it could technically do so through the

20  first prong.

21          Obviously, the Court is a district court.

22  It doesn't have to worry about making precedent that

23  is, you know, insufficiently well thought out.  And

24  upon appellate review, again, we get some benefit

25  from the Court telling us what it thinks on plain

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreport.com

App. 0756

 1  text, and then also what it thinks on historical

 2  analog.

 3          So the Rahimi case we actually like quite

 4  a bit in its illustration of how the historical

 5  analog test works.  So first off, the Chief Justice

 6  twice clarified -- the Chief Justice's opinion was

 7  relatively succinct -- but twice clarified that,

 8  "Unlike the regulations struck down in Bruen,

 9  Section 922(g)(8) does not broadly restrict arms

10  used by the public generally."  Then he said later,

11  "Our nation's tradition of firearm regulation

12  distinguishes citizens who have been found to pose a

13  credible threat to the physical safety of others

14  from those who have not."

15          And then it goes through what I'll call

16  the relevantly similar analysis, or the why and how

17  analysis, comparing two Founding Era sets of laws,

18  surety laws and going armed laws, to 922(g)(8),

19  which of course restricts basically anybody subject

20  to a domestic violation restraining order, who has

21  had, you know, basic due process followed, you know,

22  has notice of the restraining order, from possessing

23  any gun.

24          And frankly, at least as characterized by

25  the Supreme Court -- and that's what matters.  I

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                     201 Third NW, Suite 1630
Santa Fe, NM 87501                              Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                              FAX (505) 843-9492
                                                   1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

email@bean-reporting.com

App. 0757

```
 1   have no doubt that in the coming years a lot of ink
 2   will be spilled saying the Supreme Court got its
 3   history wrong, that Chief Justice Roberts
 4   characterized surety laws at The Founding in a way
 5   that makes them closer to 922(g)(8) than they
 6   actually are.
 7            But that really doesn't matter to the
 8   Court.  What matters to the Court is what the
 9   Supreme Court says history is.  And so the Court
10   should look at how the Rahimi court characterized
11   the surety laws.  And frankly, they're pretty close
12   to modern day 922(g)(8).
13            Now, the court starts the history buff's
14   opinion, and the court starts with some kind of
15   discursive discussion of these frankpledge systems,
16   and how they evolved into surety laws.  But the laws
17   that existed as of the time of The Founding, the
18   true historical analogs, are quite similar.
19            So, again, once the Court gets through the
20   discussion of how the sureties evolved, it says,
21   "Importantly for this case, surety laws also
22   targeted the misuse of firearms.  In 1795, for
23   example, Massachusetts enacted a law authorizing
24   justices of the peace to arrest" --
25            THE COURT:  What are you reading?  Rahimi?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

email@beanreport.com

App. 0758

```
 1              MR. HARRISON:  This is Rahimi, yes.

 2              -- "all who go on defensively and require

 3    the offender to find sureties for keeping the

 4    peace."

 5              Later, Massachusetts amended its surety

 6    law to be even more specific, authorizing the

 7    imposition of bonds from individuals who, when armed

 8    with dirk, dagger, sword, pistol, or other offensive

 9    and dangerous weapon, now have the jurisdiction to

10    do the same.  These laws often offer the accused

11    significant procedural protections.  The accused

12    could be compelled to post a bond for going armed, a

13    complaint having been made to a judge, justice of

14    the peace, that any person having a reasonable cause

15    to fear the accused would do them harm or breach the

16    peace.  Will take evidence, and if you determine the

17    cause existed for the charge, summon the accused to

18    respond to the allegations.  Bonds could not be

19    required for more than six months at a time.  And an

20    individual could obtain an exception, if he needed

21    his arms for self-defense or some other legitimate

22    reason.

23              And then earlier, and during the Court's

24    kind of discussion of the most specific subset of

25    surety laws, the court discussed that these were
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0759

```
 1  used in the DV context specifically, invoking the
 2  historical example of a judge, whose wife basically
 3  made what we would today recognize as a DV claim
 4  against the judge and obtained a surety against the
 5  judge.
 6          So these are, frankly, pretty close to --
 7  they're a pretty good model of analog to modern day
 8  DV restraining orders, particularly given the DV --
 9  you know, 922(g)(8) is a single statute that you
10  can, you know, very clearly define the outer
11  perimeter of.
12          But the actual antecedent or the actual
13  antecedent TROs that make one subject to 922(g)(8),
14  of course, vary.  You know, presumably, there are 50
15  different kinds for the 50 different states and the
16  District of Columbia.
17          And so that's the kind of fit, again, that
18  the Supreme Court appears to be looking for.  And
19  they defined it, I think, probably the best
20  definition they give is the why and how test, quote,
21  Why and how the regulation burdens the right are
22  central to this inquiry.  For example, if laws at
23  The Founding regulated firearm use to address
24  particular problems, that would be a strong
25  indicator that contemporary laws imposing similar
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@litsupport.com

App. 0760

1  restrictions for similar reasons fall within a

2  permissible category of regulations.  Even when a

3  law regulates arms bearing for a permissible reason,

4  though, it may not be compatible with the right, if

5  it does so to an extent that was beyond what was

6  done at The Founding.

7        So what we have, again, here is the why of

8  these waiting periods is effectively to provide a

9  cooling-off period for homicides and suicides.  So I

10  guess, before I do that, there is a reasonable delay

11  attendant to any firearm sales, to run a background

12  check.  Those, these days, are instantaneous.  And

13  there is no suggestion that you need seven days to

14  run that.

15        The real reason for these -- and it's been

16  recognized many times -- for these waiting periods

17  is the idea of a cooling-off period; someone who

18  desires to purchase a firearm to harm another person

19  or themselves, and maybe would be dissuaded from

20  doing so, given a forced period of time without a

21  gun, to reconsider his actions.

22        Now, again the Court is going to hear some

23  evidence that these waiting periods are, in fact, in

24  no way effective at doing this.  It's also going to

25  hear evidence that they are both over and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



PROFESSIONAL COURT
REPORTING SERVICE

App. 0761

1  underinclusive in how they effectuate this goal.
2  For example, there is no reason for some of the
3  exemptions for things like CCP holders, if that's
4  the goal.  And then they're overinclusive, because,
5  for example, they apply to people who already have a
6  gun.  If I desire to commit suicide, and already own
7  a gun, there is no way that a cooling-off period on
8  my purchase of a subsequent firearm would in any way
9  deter me from committing suicide or committing a
10  homicide.  Similarly, for suicides -- well, suicides
11  and homicides are done overwhelming with handguns.
12  The waiting period here applies, of course, to all
13  forms of guns, including long guns.
14          Again, this gets into the policy balancing
15  that has nothing to do with the Bruen Test.  The
16  Bruen Test really is -- just doesn't involve looking
17  at that.  It involves, again, determining whether
18  this bears on the right to bear arms.  And we would
19  contend that it rather clearly does.  And then
20  whether there is a historical -- a relevant and
21  similar historical analog in place.
22          So for reasons that we are going to
23  present today:  The Court's going to hear first from
24  the two plaintiffs, then from the employee of
25  Calibers who effectuated the sales to the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreport.com

App. 0762

1   plaintiffs, and then from our expert, Lee Francis, a

2   law professor who is specializing in Second

3   Amendment issues, including his historical research

4   relevant for the Bruen analysis, to make the case

5   that, again, this is a restriction that has no

6   historical analog anywhere within the potentially

7   relevant field extending from The Founding to

8   Reconstruction.

9          Beyond the substantial likelihood of

10   success prong, which we expect to drive this

11   analysis, of course, there are three other prongs.

12   It's been confirmed again that these prongs largely

13   collapse in a constitutional case like this one.  So

14   I'm going to quote quickly from Barrett v. Bonta,

15   which is a Ninth Circuit case, Judge VanDyke.  And

16   this is a Bruen case, a post Bruen Second Amendment

17   challenge reversing a district court who declined to

18   grant a preliminary injunction on the other prongs

19   of the analysis, and said, "The likelihood of

20   success on the merits is a particularly important

21   consideration in a preliminary injunction analysis

22   of a constitutional claim because a finding that the

23   plaintiff is likely to succeed on the merits of such

24   a claim sharply tilts in the plaintiff's favor, both

25   the irreparable harm factor and the merged public

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email info@litsupport.com

App. 0763

```
 1   interest and balance or harms factors.
 2          "Consequently, a plaintiff who can show
 3   that a statute likely violates the Constitution,
 4   will also usually show that both the public
 5   interests and the balance of equities favor a
 6   preliminary injunction."
 7          We contend that such a preliminary
 8   injunction is necessitated by the waiting period
 9   law.  And we're happy to address any questions the
10   Court has here at the end of our presentation today
11   when we give our closing argument.
12          Thank you, Your Honor.
13          THE COURT:  Let me ask you a few
14   questions, though, now, so I can be thinking about
15   it.
16          What's your justification for saying that
17   the presumptively constitutional category is folded
18   into the Bruen analysis?  I know you cited Judge
19   Bybee's case.  But is there anything in the Supreme
20   Court cases that mandate that result?
21          MR. HARRISON:  In terms of what the
22   Supreme Court has come back to is, obviously, Bruen
23   and Rahimi.  And again, never suggested in any way
24   that these are outside of the framework that they
25   laid out in Bruen.  And again, I think --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
email@beanreport.com

App. 0764

 1          THE COURT:  But don't the concurring

 2    opinions in Bruen explain that the categories

 3    survive?

 4          MR. HARRISON:  Well -- so the Court is --

 5    again, we're going to more fulsomely brief -- Bruen

 6    or Rahimi?

 7          THE COURT:  Well, I'm talking about Bruen.

 8    The concurring opinions in Bruen explain that these

 9    categories survive.  Do I really have a good basis

10    for adopting your analysis that these presumptively

11    constitutional categories have been folded into the

12    Bruen analysis, given that the concurring opinion

13    seemed to think these categories survive?

14          MR. HARRISON:  Well, again, as examples of

15    the types of laws that will often be upheld, they

16    quote/unquote survive, and that that will continue

17    to be the case.  And that is true today, as it was

18    in Heller.  The idea that they are subject to some

19    type of independent analysis, the safe harbor

20    analysis, there is just no basis for that.

21          Now, what exactly is being said in a

22    concurring opinion?  Obviously, the Court knows that

23    all types of opportunistic stuff gets said in

24    concurring opinions in an effort to shape the view

25    of the majority opinion.  The majority opinion is

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

email@beanreport.com

App. 0765

 1  what's going to be binding on this Court.

 2          Again, probably the best address of this

 3  that I've seen was the Nguyen case that we cited,

 4  which again, kind of goes down this rabbit hole a

 5  little bit and says:  Well, this ultimately brings

 6  us back to the master Bruen analysis, which is, is

 7  this restriction, you know, of a type that has an

 8  historical analog under the Bruen analysis?

 9          There is just no reason to think anything

10  else.  We have a list of -- an illustrative list of

11  the types of laws that the Heller court didn't want

12  to be misunderstood as casting down upon.  Again,

13  back in Heller.  And then we have, again, just a

14  wholly new master analysis for Second Amendment

15  claims in Bruen several years later, wherein they

16  didn't return -- the majority did not return to this

17  idea of certain categories of laws that fall outside

18  of the Bruen analysis.

19          Obviously, if the Court -- if that's the

20  direction the Court wants to go, we would hope that

21  the Court clearly says it.  But we just don't think

22  that's correct.

23          The reality is, if a restriction -- and

24  this seems arguendo our argument -- but if a

25  restriction does impinge upon the plain text of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beansupport.com

App. 0766

```
 1  Second Amendment and does not have an historical

 2  analog, saying, well, but it's a commercial sales

 3  restriction or commercial sales regulation, is not

 4  going to save it today.

 5          THE COURT:  Well, let me approach it from

 6  a different angle.  If, presumptively,

 7  constitutional -- and I'm going to quote, then,

 8  Heller, "conditions and qualifications on commercial

 9  sales," close quote, have been folded into the Bruen

10  Test, how do those survive Bruen's historical

11  tradition test?

12          MR. HARRISON:  They will on a case-by-case

13  basis, or they won't.  I mean --

14          THE COURT:  Well --

15          MR. HARRISON:  Again, the view is that

16  everything that could be called a commercial sales

17  regulation, which then means the State will seek to

18  cast everything as a commercial sales regulation,

19  you know, is now just outside the Bruen Test, that

20  will be self-defeating, and is clearly not what the

21  Supreme Court meant.  It's not the direction the

22  Supreme Court has been going in Bruen, and now

23  Rahimi.

24          THE COURT:  Let me break that down.  You

25  would agree with me that Heller concluded that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beansupport.com

App. 0767

```
 1   commercial firearm sale restrictions are

 2   presumptively constitutional?

 3           MR. HARRISON:  No.  I don't know that I

 4   necessarily would.  I think they were given an

 5   illustrative list that then -- kind of by the

 6   circuit court was given a life of its own -- but I

 7   think that life was largely distinguished by Bruen.

 8           THE COURT:  Let's assume I, when I read

 9   that language in the Supreme Court, I think they are

10   saying, in Heller, that those -- that commercial

11   firearm sale restrictions are presumptively

12   constitutional.  Do you think Bruen overrules that?

13   If we didn't have Bruen and we just had that

14   language in Heller --

15           MR. HARRISON:  So the language is

16   nothing --

17           THE COURT:  And the courts did what I

18   think we both agree they have done with that

19   listing, that language, would you come back and say

20   that -- would you say that Bruen overruled it?  How

21   would you get rid of that?

22           MR. HARRISON:  Of course, we wouldn't say

23   that Bruen overruled it.

24           But the actual line is this:  Nothing, in

25   our opinion, should be taken to cast doubt on
```

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492
                                                                      1-800-669-9492




App. 0768

1    long-standing prohibitions on the possession of

2    firearms by felons and the mentally ill, or laws

3    forbidding the carrying of firearms in sensitive

4    places, such as schools or government buildings,

5    along with imposing conditions and qualifications on

6    the commercial sale of arms.

7              Now, I guess I should have mentioned this

8    before.  But there is nothing -- frankly, even if

9    this is viewed as a discrete category, the waiting

10   period act doesn't fit within -- it applies

11   individual to individual sales.  There is exemptions

12   for immediate family members, but not for what would

13   not count as anyone's view of a commercial sale.

14   Right?  This isn't something that just applies when

15   I go to buy a gun at Calibers; it would apply if I

16   sold a gun to Mr. Nation here in a private

17   person-to-person sale.

18             So first off, whether it even fits within

19   this category, we contend that the category today,

20   post Bruen, especially, doesn't exist as a

21   meaningful category; that the Court has to conduct

22   an analysis to see whether it falls within the

23   quote/unquote commercial sales of arms.  If that

24   analysis existed -- which it doesn't -- it wouldn't

25   make any sense to say that the waiting period is, in

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0769

1    fact, a regulation on the quote/unquote commercial

2    sale of arms.

3            Because, unless the Court's view is they

4    said commercial, but that means nothing, we should

5    read that out, I think all sales are commercial.

6    Okay, then, why does it cover individual sales, you

7    know, and other transfers?

8            So I guess it's kind of a two-pronged

9    argument that we're making.  A, this is not a

10   discrete category or a meaningful category that,

11   again, shields a Second Amendment regulation or

12   restriction from the normal scrutiny that is

13   applicable under the Second Amendment, as stated in

14   Bruen, as described in Bruen, and as repeated in

15   Rahimi.

16           What you have here is a statement in

17   Heller, a pre Bruen case just like any other pre

18   Bruen case; i.e., minimally, helpful in a post Bruen

19   Second Amendment analysis listing off a set of

20   examples that, quote, should not be taken to cast

21   doubt -- where the Heller opinion should not be

22   taken to cast doubt on, you know.  What this is is a

23   list of examples of things to, again, try to, I

24   guess, head off the view that such restrictions are

25   immediately suspect under Heller.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0770

```
 1              But, again, the Supreme Court has not

 2    returned to this to say:  Well, a commercial sale

 3    regulation is this.  It requires -- you know, this

 4    is what makes something commercial.  And if you fall

 5    within that category, here's what you get.  You

 6    don't have to find historical analog.  You can -- I

 7    don't know if the Court's view is that anything that

 8    gets within that tent is now immune from any type of

 9    analysis?  If the Court's view is that, well, there

10    is still a pre Bruen means-end analysis that would

11    apply to commercial sales regulation.  But none of

12    this has any support in the case law, Your Honor.

13    And in particular, I guess, the Court's view that

14    quote/unquote long-standing in this throw-away line

15    in Heller goes beyond what Bruen and Rahimi have now

16    very clearly said the Court needs to look to in

17    finding historical analogs, which is probably The

18    Founding, maybe up to Reconstruction, but not the

19    20th century -- I mean, Justice Thomas and Bruen

20    itself stated -- and I don't have the quote in front

21    of me -- that late 19th century and 20th century

22    regulations are of minimal use in this analysis.

23              I mean, on that front -- on the front that

24    long-standing in this throw-away line in Heller,

25    what does that mean?  I think the Court would be
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
email@beansupport.com

**App. 0771**

1   very much against the clear mandates, the direct

2   mandates of Bruen and Rahimi.  Those cases only

3   stand for the proposition -- they describe a text

4   where you need to find a historical analog from the

5   relevant time period, which again is The Founding up

6   to -- potentially up to Reconstruction, and not

7   including anything afterward.

8            So again, we would say that,

9   quote/unquote, conditions and qualifications on the

10  commercial sale of arms -- again, not a meaningful

11  analytical category subject to a separate

12  extra-Bruen analysis at all -- to the extent that it

13  is, A, long-standing just cannot be.

14           And again, I'll point the Court to the

15  core holdings of both Bruen and Rahimi for support

16  for the proposition that long-standing can't be

17  interpreted to encompass something from 1923.

18           And then, B, if the Court were going to

19  make up a way to add content to this category of

20  commercial sales of arms restrictions, there would

21  be no reason to say that the waiting period falls

22  within it.  Because, again, it covers -- you know,

23  it has too many exemptions to be said to be a

24  restriction on the commercial sale of arms, and it

25  applies to people who are not commercial arms

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreportsupport.com

App. 0772

 1  sellers, by any definition of the term.

 2          So I guess that would be the way that we'd

 3  answer Your Honor's question on the commercial sales

 4  front.

 5          But if the Court has any more questions,

 6  I'm happy to take them.  Otherwise, we can begin

 7  our --

 8          THE COURT:  Why don't I let the defendants

 9  make an opening statement.  And then I'll let you

10  start presenting evidence.  Thank you, Mr. Harrison.

11          Mr. Duffy, are you going to take the lead?

12          MR. DUFFY:  Yes, Your Honor.

13          THE COURT:  Mr. Harrison didn't think much

14  of my framework that I gave at the beginning.

15          MR. DUFFY:  I'd say I'm a bigger fan.

16          THE COURT:  Are you as critical of it?

17          MR. DUFFY:  No, Your Honor.

18          THE COURT:  Tell me, since it was more

19  favorable to you than it was to Mr. Harrison's

20  position and request, what is it that you agreed

21  with as far as my analytical framework, and what did

22  you disagree with?

23          MR. DUFFY:  Well, the short answer is I

24  believe I agreed with pretty much everything.  To

25  get into it in a little bit more detail, to first

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreporting.com

App. 0773

1   address the elephant in the room, which is Rahimi,

2   we actually feel that Rahimi helps the defense case

3   quite a bit.

4           As Your Honor observed earlier, to work

5   our way --

6           THE COURT:  What about my nagging fear

7   that Rahimi does require a historical analog for

8   everything now, and that these careful categories

9   that I thought were the pre Bruen hurdles, the

10  waiting period, seemed to survive those, and we

11  didn't really have to get to the Bruen historical

12  analog.  But now I'm concerned that they are looking

13  for historical analog everywhere.

14          MR. DUFFY:  Well, I think it's helpful

15  to -- I will address your question, but I'm going to

16  work my way briefly through Heller and Bruen first,

17  and explain why Rahimi doesn't upset any of that.

18          So, in Heller, the court observed that

19  these sorts of, you know, commercial regulations are

20  presumptively lawful.  And then, in Bruen, as the

21  Tenth Circuit acknowledged in Vinson, six out of the

22  nine justices said nothing in Bruen should be read

23  to cast doubt upon anything we said in Heller.

24          In Bruen, they also said, you know, if a

25  law infringes upon the plain text of the Second

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
email: info@litsupport.com

App. 0774

1   Amendment, it is presumptively unconstitutional, and

2   the government has the burden.  Well, something

3   cannot be both presumptively constitutional and

4   presumptively unconstitutional.  So, if the Bruen

5   Court did not disturb anything that the Heller court

6   said -- which they said it was presumptively

7   constitutional -- I think it's a sound inference,

8   and other courts have come to the same conclusion,

9   that these laws remain in that first category or in

10  that plain text analysis.

11          Now, going to Rahimi.  Rahimi simply

12  didn't upset any of that analysis, because it didn't

13  involve a regulation upon the commercial sale of

14  firearms.  That doesn't mention that category, I

15  believe in the 103 pages -- I might have missed

16  it -- but I don't believe it addressed any of that

17  presumptively lawful language, because it simply

18  wasn't addressing that.

19          THE COURT:  Well, but that's what concerns

20  me, is that it seems to have kind of disappeared in

21  Rahimi.  You're saying it survives.  But the thrust

22  of the Chief Justice's opinion is he's looking for

23  historical analog.

24          MR. DUFFY:  I think it's useful -- the old

25  saying, you know:  Cases aren't propositions, or

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0775

```
 1   don't stand for conclusions that they weren't

 2   considered.

 3          THE COURT:  Yeah, but I guess the way

 4   they're doing this -- and of course, it's a changing

 5   court from Heller -- people are, I think, thinking

 6   this through.  And we don't have that sort of

 7   sentence in Bruen that we had about Heller's

 8   categories surviving.  You don't have that sort of

 9   reassurance after we read the Chief Justice opinion

10   in Rahimi.

11          MR. DUFFY:  That is true, Your Honor.

12   However, I wouldn't read too much into that silence.

13   It would be one thing if they did address that.  But

14   simply, that they didn't have the need to.  So I

15   just wouldn't read too much into the fact that they

16   don't address it, because they simply didn't need

17   to.  It would have just been extra dicta to stick in

18   there.

19          THE COURT:  It sure would have been

20   helpful to have that extra dicta.

21          MR. DUFFY:  I agree.  Unfortunately, some

22   of the Supreme Court opinions aren't models of

23   clarity.  And it would be nice if we could have a

24   Justice Browning up there, maybe, who could provide

25   us a little bit more clarity on some of these minute
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreport.com

App. 0776

 1  details.  But, unfortunately, you know, we don't

 2  have that.  What we have is silence.  And what we

 3  have is a case that didn't address this category.

 4  And so we look to the most recent case that did

 5  address it.  Which, I mean, you have Heller saying

 6  it's presumptively lawful, and you have six out of

 7  the nine justices in Bruen saying:  Nothing in Bruen

 8  disturbs anything we said in Heller.

 9             So I think it's better to go with what the

10  Supreme Court has said than what the Supreme Court

11  has not said.

12             So I think, unless Your Honor has another

13  question on that part, I'd like --

14             THE COURT:  Go ahead.

15             MR. DUFFY:  I think it's useful to come

16  back to the standard for why we're here today.

17  We're here on a motion for a preliminary injunction,

18  which, as Your Honor knows, is an extraordinary

19  remedy, and requires that the plaintiff prove a

20  clear, non-equivocal right to relief.

21             Not only is this motion for a preliminary

22  injunction, this is a disfavored preliminary

23  injunction.  And that's for two reasons.  First and

24  foremost, it upsets the status quo.  Because the day

25  that plaintiffs filed this, you know, the law was

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



1    already in effect.  This law was signed by the

2    Governor months ago.  And plaintiffs, you know,

3    waited.  They explained in their reply that they

4    waited because in the first Rocky Mountain Gun

5    Owners case with Judge Brimmer, he dismissed that

6    case for lack of standing to bring a pre-enforcement

7    challenge.

8            But the key difference is in the Colorado

9    law that only applied to sellers.  And the plaintiff

10   there was a buyer.  So Judge Brimmer said:  Hey, you

11   know, you don't have any fear of prosecution here

12   because you're a buyer -- this law -- you can't be

13   prosecuted under this.

14           The New Mexico law clearly says, in

15   subsection D, that this applies to both buyers and

16   sellers.  So I think it was pretty clear from the

17   get-go that plaintiff, these buyers, could have

18   brought a pre-enforcement claim.  So their mistaken

19   legal conclusion shouldn't, you know, excuse or

20   allow them a more favorable burden than they are

21   entitled to.

22           Secondly, it's also disfavored because it

23   would supply plaintiffs with virtually all the

24   relief that they could seek to gain at the end of

25   the day.  And that's the same conclusion that this

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0778

```
 1   Court came to in Legacy Church.  You know, the
 2   primary motivation behind this lawsuit is an
 3   injunction against this law.  And that's what
 4   plaintiffs will get when they -- if they were to
 5   win.  So for those reasons, the plaintiffs must make
 6   a strong showing on both the likelihood of success
 7   and the balance of the equities.
 8            Also, something that Rahimi did
 9   significantly clarify -- and actually that makes
10   this case -- or at least this motion today very easy
11   for the Court -- is that this is a facial challenge.
12   This is a preliminary injunction seeking to enjoin
13   this law in all of its respects.  If you look at the
14   motion, plaintiffs don't say just, you know,
15   protecting plaintiffs; they don't say just
16   protecting those who pass a background check
17   immediately.  At the end, they ask for total
18   injunction against this law.  So this is a
19   preliminary injunction request based on a facial
20   challenge.  And as Rahimi shows, that means that the
21   plaintiffs must show that this law is
22   unconstitutional in every application.  And
23   plaintiffs have already -- I believe they conceded
24   in their reply that they don't challenge the
25   constitutionality of this law to the extent a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0779

1  background check doesn't come back instantly.  So

2  there are occasions where the background checks

3  don't come back instantly.  And so this waiting

4  period, part of reason for it is to allow the

5  government the time to, you know, run that

6  background check.  Because under the current federal

7  law now, if three business days pass, the firearm

8  can be transferred, whether or not the background

9  check has been completed.  So, I mean, that alone

10  defeats any facial challenge to this law.

11          And the fact that plaintiffs haven't

12  requested a more as-applied challenge, I mean, that

13  is kind of the end of the analysis here.  It could

14  be a short, two-page opinion.  But I understand

15  there are many other issues the Court may want to

16  address.  But I think that is important that Rahimi

17  did acknowledge that this sort of facial challenge

18  standard does, in fact, apply to Second Amendment

19  cases.

20          Now, just briefly, I'll go through --

21  because I do agree with the plaintiffs that the

22  likelihood of success is probably the most important

23  factor here because all the other factors live or

24  die, for the most part, on that.

25          As Your Honor recognized earlier, you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beansupport.com

App. 0780

```
 1  know, Bruen has its two-step test.  First step is
 2  whether the plain language of the Second Amendment
 3  covers the proposed course of conduct.  Here, that
 4  proposed course of conduct is not merely just to
 5  obtain a firearm; it is to obtain a firearm
 6  instantly.  And other courts have recognized that
 7  when defining this proposed course of conduct, you
 8  have to do so in relative detail in order for the
 9  plain text analysis to have any meaning.  And so I
10  think one defined in that light, and showing that
11  historical -- you know, understanding the historical
12  context -- excuse me, the plain language of the
13  Second Amendment, it clearly doesn't impact the
14  right to bear arms, because that is -- you know, as
15  the Heller court explained, that has a meaning that
16  refers to carrying for a particular purpose, which
17  is confrontation.  And it doesn't infringe on the
18  right to keep arms because that plain meaning
19  implies that the person already has those arms.
20          And I agree, though, that perhaps there
21  comes a point where, you know, a waiting period or
22  one of these commercial regulations is so lengthy,
23  as other courts have recognized, that it does
24  meaningfully infringe on the right to keep arms.
25  But plaintiffs haven't shown that a seven-day
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
email@beansupport.com

App. 0781

1   waiting period meaningfully really infringes upon

2   that plain language.

3          And I also believe that Bruen supports

4   that there is no right to immediately obtain

5   firearms, because they say, you know, nothing in our

6   opinion should be read to cast doubt upon the Shall

7   Issue regimes, which these licensing regimes, and

8   they mention, come with requirements like background

9   checks and safety courses, which obviously take time

10   to complete.  You have to schedule those.  I mean,

11   you have to take them, submit the paperwork.  So I

12   think it's pretty clearly, but implicitly mentioned

13   in Bruen that this would not satisfy a plain text

14   analysis.  And that's the same conclusion that Judge

15   Kane reached in the Colorado case.

16          But even if this was -- and, you know,

17   this analysis is kind of -- you know, they're melded

18   together, the plain text and the presumptively

19   lawful commercial regulation.  As I mentioned

20   earlier, I don't believe Rahimi disturbs any of the

21   rulings in Heller and Bruen about this presumptively

22   lawful category.

23          One of the arguments plaintiffs put

24   forward is that this is not a commercial regulation,

25   because it also regulates buyers and not sellers.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email info@beansupport.com

1    Well, I haven't found any authority for that.  But I

2    would note that, you know, Black's Law defines

3    "commercial" as "of or relating to or involving the

4    buying and selling of goods."  I mean, this is a

5    commercial regulation.  It only applies to purchases

6    and sales of firearms.  So I think that's a red

7    herring, that argument, that because this applies to

8    buyers, it cannot be a commercial regulation.

9           I also would point out that, if the Court

10   believed that were true and thought, you know, to

11   the extent this applies to buyers, it's not

12   presumptively lawful commercial regulation, and it

13   moves on to this historical analysis, and it

14   concludes there is no such historical tradition of

15   similar regulation, that doesn't mean it should

16   strike down the law, or it should enjoin --

17   preliminarily enjoin the law in full, it would only

18   preliminarily enjoin the law as it applied to

19   buyers, leaving the same prohibition on sellers,

20   which would leave us essentially in the same place.

21   I don't know of any firearms seller who would say,

22   well, you're not going to get in trouble for this,

23   so I'll sell you the gun.  I mean, there is really

24   no meaningful difference in that argument.

25           Now, you know, we do mention the Rocky

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                         FAX (505) 843-9492
                                                                  1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE

App. 0783

1    Mountain Gun Owners case in Colorado that came to

2    that same conclusion that this was a valid

3    commercial regulation.  I will note that the Ninth

4    Circuit in Silvester v. Harris came to that same

5    conclusion.  That is admittedly a pre Bruen case.

6    However, Bruen also said these circuit courts have

7    this two-step analysis before, but that first step,

8    which was focusing on history and tradition, is

9    broadly consistent with our -- the ruling in Bruen.

10   And Silvester v. Harris focused mainly on that

11   history and tradition, especially the concurrence by

12   the Chief Judge that we cite.

13            Now, if the Court, you know, is not

14   satisfied with all of that, and the Court would like

15   to get to the history and tradition, we believe

16   there is a sufficient tradition in this country of

17   similar firearm regulation.  Initially, the Court

18   should reject any argument that it should require an

19   historical twin.  Essentially, that's what

20   plaintiffs are arguing here today.  They say:  Hey,

21   look, there hasn't been a waiting period law until

22   the perhaps early 20th century, so that's it, this

23   is a straightforward case.

24            Rahimi makes it clear that:  Wait, that's

25   not exactly the case.  Because if it was, in Rahimi,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0784

 1   you know, if we had the same societal problem,

 2   domestic violence, that existed back then, I think

 3   it's very useful when analyzing Rahimi to compare

 4   and contrast Justice Thomas' dissent with the

 5   majority opinion.  Justice Thomas recognized:  Hey,

 6   this was a problem that existed -- persisted since

 7   the 18th century, yet the majority opinion in Rahimi

 8   looked to historical analogs, and did not require a

 9   historical twin.  They looked to these surety laws

10   and going armed laws, and they said:  These are, by

11   no means, identical laws.

12          So the Court should not be persuaded by

13   the argument that it needs the historical twin.  And

14   it should use Bruen's more nuanced approach, after

15   Rahimi has clarified that.  And under that approach,

16   I believe we have met our burden.  But two laws that

17   we point to are, you know, these intoxication laws

18   and licensing regimes.  And those are long-standing.

19   I understand one of the arguments that plaintiffs

20   make is that the universal licensing regimes didn't

21   really emerge, broadly speaking, under the 20th

22   century.  But if I remember correctly, the Court

23   observed earlier that these sorts of laws could

24   still qualify as long-standing.  And I agree with

25   that.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@littoncourtreport.com

App. 0785

```
 1              And I also would point out the Antonyuk --
 2  I'm probably pronouncing that case incorrectly --
 3  but that Second Circuit case cited in our brief is
 4  very helpful in explaining some of the post Bruen
 5  methodology, and looking for this history and
 6  tradition, and how long long-standing laws need to
 7  be in explaining Bruen.
 8              I also believe that the intoxication laws
 9  are also a good analogy for this law, because, you
10  know, it's not a perfect fit.  As Rahimi said:
11  These laws are, by no means, identical.  We admit
12  that.  But these laws, the licensing regimes and the
13  intoxication laws stand for the principle that the
14  government may briefly postpone a person's ability
15  to use a firearm in order to help ensure that they
16  use it responsibly.  That's what they do in
17  intoxication laws to make sure, you know, maybe not
18  every intoxicated person would irresponsibly use a
19  firearm.  There is plenty of people who probably
20  have a few beers and don't go out shooting their
21  guns.  But it remains that these laws apply broadly
22  to everyone who is intoxicated.
23              And that's the same with the waiting
24  period.  We understand there are many buyers who
25  would not go out and impulsively use their firearms.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@litsupport.com

App. 0786

```
 1  But, as the studies have shown, there is not an
 2  insignificant amount of people who do go out and
 3  impulsively use it to either kill themselves or kill
 4  other people.  So these waiting period laws fall
 5  within that principle that is set up by these
 6  intoxication laws and these licensing regimes.
 7          Now, briefly moving through the remaining
 8  factors:  Irreparable --
 9          THE COURT:  I've been critical of this,
10  but if we take the Supreme Court at its word that
11  the core function of the Second Amendment is to
12  protect an individual right to self-protection, how
13  do you justify any waiting period?  Because you've
14  got an instantaneous background check that shows
15  that this person is law-abiding, and you're telling
16  them that -- they may be in danger from neighbors or
17  gangs or an abusive partner, you're telling them
18  they don't get a gun now.  So it seems to me it rubs
19  up against what the Supreme Court has said is the
20  central tenet of the Second Amendment.  I'm not -- I
21  don't agree with that, but that is what they say.
22          MR. DUFFY:  Yes, Your Honor, it is true
23  that they say, you know, the core part of this
24  amendment is the right to self-defense.  However,
25  what they also say is, you know, that these laws --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreport.com




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0787

```
 1   these licensing regimes that require things that
 2   take time, background checks, and which can take
 3   time --
 4            THE COURT:  They don't take time now.
 5   There was a time when they did.  But the reality is
 6   that, for the most part, they don't.
 7            MR. DUFFY:  Well, for the most part, yes,
 8   but not in every case.  They do take longer than
 9   that, you know, instant 20-minute period.  But the
10   Supreme Court also mentioned that these licensing
11   regimes can require things like safety courses.
12   Now, that is not instant.  You have to go; you have
13   to sign up for one.  Some states can require you to
14   attend one in person.  I mean, those take time.  So
15   that -- I think those two statements they do rub up
16   against each other.  But the Supreme Court has also
17   said, you know, the Second Amendment is not
18   unlimited.  So yes, you can acknowledge that the
19   right to self-defense is the core part of that
20   right.  But the right is not unlimited at the same
21   time, and these sorts of Shall Issue regimes that
22   include requirements that take time are
23   presumptively constitutional.
24            I would also note that that's not the case
25   here for this preliminary injunction.  The two
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0788

 1   plaintiffs here in their declarations, if I'm

 2   remembering correctly, say they already own

 3   firearms.

 4          So that kind of goes into my next point

 5   about the irreparable injury, which I believe Judge

 6   Kane mentioned in the Colorado case, that, you know,

 7   plaintiffs haven't alleged a meaningful infringement

 8   upon their right of self-defense.  I imagine we'll

 9   hear from the plaintiffs later this morning, and you

10   know, confirm that they do have other firearms.

11          So as far as the Court is concerned today,

12   for a preliminary injunction, there is really no

13   irreparable harm.  And I would also, you know,

14   repeat that plaintiffs waited to bring this case,

15   which substantially cuts against any argument of

16   irreparable harm.  I mean, I understand maybe it

17   was, perhaps, under a mistaken legal conclusion.

18   But it's still -- you know, if these rights were so

19   important to plaintiffs, it was incumbent upon them

20   to make sure that they understood Judge Brimmer's

21   ruling in the Rocky Mountain case, and how that

22   ruling would apply to a law in another state.

23          Lastly, the public interest and the

24   balancing of the equities.  Those weigh

25   substantially in favor of defendants.  These factors

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0789

1   merge when the government is defending the

2   preliminary injunction.  Plaintiffs say that, you

3   know, the Court shouldn't consider this, the

4   interest balancing, because Bruen said, you know,

5   this is inappropriate.  But I believe that's, you

6   know, a red herring, because Bruen did not consider

7   a preliminary injunction, so it had no opportunity

8   to pass upon the factors established by that Court

9   in Winters.  And most courts I believe, post Bruen,

10  have recognized this and said, you know, it's true,

11  interest balancing is inappropriate when weighing

12  the likelihood of success on the merits.  But we're

13  here in an equitable manner today.  And so we need

14  to analyze these equitable factors that the Supreme

15  Court has required us to.

16          And so in terms of that balance,

17  plaintiffs here, the harm that they have is waiting

18  seven days to obtain additional firearms that they

19  want to buy.  In contrast, they want to enjoin the

20  entire waiting period.  And, as studies have shown,

21  that we have mentioned in our brief and submitted

22  supplemental authority on, there is significant

23  research showing that these waiting periods do, in

24  fact, save numerous lives every year.  And, you

25  know, applying those calculations to New Mexico,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

**App. 0790**

1  that came out in my calculation to nearly 100 New

2  Mexicans every year, if we're using that one study

3  that said it reduced 17 percent of gun homicides.

4  You know, admittedly, lawyers are not great at math,

5  so you might want to double-check that.  But it

6  shows that the government and the public have a

7  substantial interest in having this waiting period

8  enforced during the pendency of this lawsuit.  As

9  Judge Kane observed in Rocky Mountain Gun Owners,

10  this factor is not even close.

11          So, in conclusion, Your Honor, we believe

12  plaintiffs have met none of the factors required for

13  a preliminary injunction.  So we would ask that the

14  Court deny it.  Unless Your Honor has any questions,

15  I will be done with my presentation.

16          THE COURT:  All right.  Thank you, Mr.

17  Duffy.

18          Mr. Allen, do you have anything you want

19  to say on this?

20          MR. ALLEN:  No, Your Honor.

21          THE COURT:  All right.  Mr. Harrison, if

22  you want to -- all right.

23          MR. McCOY:  Yes, Your Honor.  We're

24  calling our first witness, who is plaintiff Rebecca

25  Scott.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

email@bcrsupport.com

App. 0791

1            THE COURT:  Ms. Scott, if you'll come up

2  and stand next to the witness box on my left, your

3  right.  Before you're seated, my courtroom deputy

4  Ms. Rotonda will swear you in.

5                      REBECCA SCOTT,

6       after having been first duly sworn under oath,

7       was questioned and testified as follows:

8                   DIRECT EXAMINATION

9            THE CLERK:  Please be seated.  And please

10  state your name for the record.

11  BY MR. McCOY:

12       Q    Go ahead and state your name for the

13  record.

14       A    Rebecca Scott.

15            THE COURT:  Ms. Scott.  Mr. McCoy.

16            MR. McCOY:  Thank you, Your Honor.

17       Q    Are you a resident of the State of New

18  Mexico?

19       A    Yes.

20       Q    And how long have you been a resident of

21  the state?

22       A    My whole life.

23       Q    And do you intend to remain a resident of

24  the State of New Mexico for the foreseeable future?

25       A    Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email bean@beansupport.com

App. 0792

Appellate Case: 24-2121   Document: 31-4   Date Filed: 11/08/2024   Page: 58

```
 1        Q     Without providing your street address,
 2   will you let the Court know the city or area where
 3   you live in the state?
 4        A     Farmington, New Mexico.
 5        Q     And were you living in Farmington, New
 6   Mexico in May of this year?
 7        A     Yes.
 8        Q     And what do you do for a living,
 9   Ms. Scott?
10        A     I'm an office manager.
11        Q     For what type of business?
12        A     A motorcycle shop.
13        Q     Do you now or have you ever owned a
14   firearm?
15        A     Yes.
16        Q     And why do you own these firearms?
17        A     For my personal protection.
18        Q     Are you a federal firearms licensee?
19        A     No.
20        Q     Do you currently hold a New Mexico
21   concealed handgun license?
22        A     No, sir.
23        Q     Now, prior to the firearm you acquired in
24   May, which I'll ask you some questions about here in
25   a moment, I wanted to ask you if you've ever
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



PROFESSIONAL COURT
REPORTING SERVICE

App. 0793

```
 1   purchased a firearm in the State of New Mexico

 2   before?

 3        A    Yes.

 4        Q    And approximately how long ago did you

 5   purchase that firearm?

 6        A    Seven, eight years ago.

 7        Q    Do you recall what type of firearm it was?

 8        A    It was a Sky 9 millimeter.

 9        Q    And do you still have that in your

10   possession?

11        A    Yes.

12        Q    Do you recall where you purchased that

13   firearm from?

14        A    Yes, Big R in Farmington.

15        Q    That's a store in Farmington?

16        A    Yes, sir.

17        Q    If you could, explain to the Court the

18   process of purchasing that firearm, the Sky 9

19   millimeter handgun that you purchased six or seven

20   years ago.  How did you go about purchasing that

21   firearm?

22        A    I went in, handed them my driver's

23   license -- after I picked out the firearm, handed

24   them my driver's license to go ahead and do the

25   background check.  Did the background check.  About
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



App. 0794

```
 1   30 minutes later background check was done,

 2   purchased the firearm, paid for it.  Manager walked

 3   out with the gun with me, and I was good to go.

 4        Q     So in total, how long did that process

 5   take?

 6        A     Probably about 30 minutes, 45 minutes

 7   total.

 8        Q     And you were able to leave the Big R store

 9   in Farmington that day with the Sky --

10             THE COURT:  Ms. Scott, could I get you to

11   pull your seat up closer to the microphone?

12             THE WITNESS:  Is that better?

13             THE COURT:  Maybe lift it up a little bit.

14   Let's see if that's a little better.

15             THE WITNESS:  That's better.

16             MR. McCOY:  Thank you, Your Honor.

17        Q     So you were able to leave the Big R store

18   in Farmington that day with the firearm in your

19   possession?

20        A     Yes.

21        Q     Now, you said there was a background check

22   performed when you purchased this firearm; is that

23   correct?

24        A     Yes.

25        Q     Have you had other background checks
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0795

1    performed in the past when purchasing other

2    firearms?

3         A    One prior.

4         Q    And on that prior occasion and on this

5    occasion, did you pass the background check?

6         A    Yes.

7         Q    Have you ever been notified that you did

8    not pass a background check?

9         A    No.

10        Q    What I'd like to do now, Ms. Scott is

11   actually focus your attention on this most recent

12   gun purchase you made in May of this year; so May

13   15, 2024, specifically.  On that day did you attempt

14   to acquire a firearm?

15        A    Yes.

16        Q    And where did you attempt to acquire the

17   firearm?

18        A    Big R in Farmington, the same store.

19        Q    Same store as the last purchase; is that

20   correct?

21        A    Yes.

22        Q    What type of firearm were you trying to

23   purchase?

24        A    It was a Smith & Wesson M&P 380 handgun.

25        Q    And what was your primary motivation for

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                  Albuquerque, NM 87102
(505) 989-4949                                                                      (505) 843-9494
FAX (505) 843-9492                                                                  FAX (505) 843-9492
                                                                                    1-800-669-9492



1  acquiring this firearm?

2       A    Self-defense.

3       Q    Was your intent to bring the firearm home

4  with you that day?

5       A    Yes.

6       Q    If you could, describe to the Court the

7  process that day -- this is May 15th, now -- going

8  in and attempting to purchase this M&P EZ Shield 380

9  handgun?

10      A    I went in; picked out the gun that I

11 wanted, which was the M&P.  And the gentleman -- I

12 told him; he got it out; gave him my driver's

13 license.  We did the background check.  I passed the

14 background check.  And I said, Okay, I'll go ahead

15 and pay for it.  And he said:  No, you can't take

16 it, pay for it, because the seven-day waiting

17 period.

18           And I said:  Excuse me?

19           And he said:  There is a seven-day waiting

20 period now.  You cannot take it.

21           And I said:  Oh, okay.

22      Q    So you purchased -- you picked out the

23 firearm, you attempted to actually pay the purchase

24 price for the firearm; is that correct?

25      A    Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
email@beansupport.com

App. 0797

```
 1        Q     But the store employee told you he
 2   couldn't accept money?
 3        A     Exactly.
 4        Q     Did he tell you what he was going to do
 5   with the firearm that you had selected?
 6        A     No.
 7        Q     Did he say if the firearm would be held in
 8   layaway or some other status?
 9        A     No.
10        Q     Did you confirm that the firearm that you
11   picked out would be there waiting for you in seven
12   days?
13        A     Yes.  He said it would be there in seven
14   days.
15        Q     But you'd have to wait that period of
16   time; is that correct?
17        A     Yes.
18        Q     Was it your desire, though, to take
19   possession of the firearm that very day?
20        A     Yes.
21        Q     So what did you do after you attempted to
22   purchase the firearm and he told you that you
23   couldn't do that?  What did you do next?
24        A     Went back to work because I couldn't do
25   anything.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0798

1      Q     In total, how long was that process, that

2  first day, on May 15th?

3      A     The first day on May 15th was about 30 to

4  45 minutes.

5      Q     Did you have to take time off of work to

6  go to do that?

7      A     Yes.

8      Q     So seven days later, did you go back to

9  the Big R store in Farmington to purchase the

10  firearm?

11     A     Yes.

12     Q     What happened when you went back that day?

13     A     I went to pick up the firearm, and they

14  told me I could not take it because they said it

15  hadn't been seven days.

16     Q     Can I stop you there, and say what day was

17  it, if you recall?

18     A     Sorry.  It was May 22nd.

19     Q     And you had initially gone into the store

20  on May 15th; is that correct?

21     A     Yes.

22     Q     So May 22nd, you go back in, which was by

23  your calculation seven days later, to complete the

24  transaction; is that correct?

25     A     Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0799

1      Q    And when you arrived at the store, what
2  did the employee tell you?
3      A    That it hadn't been seven days.
4      Q    So what happened next?
5      A    A big fiasco.  There was managers up
6  there, the store employee.  They told me that I
7  needed to come back whenever there was another
8  manager there.  So I had to come back at noon to
9  pick up the firearm.  It was a mess.
10     Q    So you made a third trip, then, to the
11 store to get the firearm?
12     A    Yes.
13     Q    When you went back that third time, were
14 you able to actually pay the purchase price for the
15 firearm?
16     A    Yes.
17          MR. McCOY:  May I may have a minute, Your
18 Honor?
19          THE COURT:  You may.
20          MR. McCOY:  May I approach the witness,
21 Your Honor?
22          THE COURT:  You may.
23 BY MR. McCOY:
24     Q    Ms. Scott, I'm showing you what's been
25 marked for identification as Plaintiffs' Exhibits 1

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                     1-800-669-9492



PROFESSIONAL COURT
REPORTING SERVICE

App. 0800

1   and 2.  If you could, could you take a moment to

2   look at both 1 and 2.  And when you've had a chance

3   to review them, let me know.

4        A    Okay.

5        Q    And what are those?  Let's start with

6   Number 1, Plaintiffs' Exhibit 1.  What is that?

7        A    This is my receipt of whenever I purchased

8   the firearm.

9        Q    And how did you purchase the firearm?

10  With cash or credit card or some other form?

11       A    I used my debit card.

12       Q    And this is the receipt that you received

13  after using your debit card to purchase the firearm?

14       A    Yes.

15       Q    And what about Plaintiffs' Exhibit 2?

16       A    This is the invoice of the purchase of the

17  firearm, that says what it is, and all that stuff.

18       Q    Okay.  Did that include the date that you

19  purchased the firearm on?

20       A    Yes.

21       Q    And what is that date?

22       A    5/22.

23            MR. McCOY:  Your Honor, we'd move to admit

24  Plaintiffs' Exhibits 1 and 2 into evidence.

25            THE COURT:  Any objection, Ms. Agajanian?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

**App. 0801**

```
 1              MS. AGAJANIAN:  No.

 2              THE COURT:  All right.  Plaintiffs'

 3   Exhibit 2 will be admitted into evidence.

 4              MR. McCOY:  And 1, Your Honor?

 5              THE COURT:  And 1.

 6              MR. McCOY:  May I approach, Your Honor?

 7              THE COURT:  You may.

 8              MS. AGAJANIAN:  Your Honor, may I just

 9   clarify, which one is 1 and which is 2?

10              MR. McCOY:  Sorry, the receipt is 1.

11              MS. AGAJANIAN:  Okay.

12   BY MR. McCOY:

13       Q    Ms. Scott, do you have any plans to

14   purchase additional firearms in the State of New

15   Mexico in the future?

16       A    Yes.

17       Q    And are they specific plans or just

18   general plans at this point?

19       A    Just in general, nothing specific.

20       Q    In addition to the testimony you've

21   already provided, is there anything that you want

22   the Court to know or tell the Court about this

23   seven-day waiting period and how it's impacted you?

24       A    So I am a domestic violence survivor from

25   two different domestic violence situations that I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0802

```
 1  was in.  This seven-day waiting period is putting a
 2  lot of people's lives in jeopardy that are in
 3  situations like that.  And it's a scary situation
 4  when you're not able to protect yourself.
 5            MR. McCOY:  May I have a moment, Your
 6  Honor?
 7            THE COURT:  You may.
 8            MR. McCOY:  Those are all my questions for
 9  now.  Thank you.
10            THE COURT:  Thank you, Mr. McCoy.
11            Ms. Agajanian, do you have
12  cross-examination of Ms. Scott?
13            MS. AGAJANIAN:  Yes, sir, Your Honor.
14            THE COURT:  Ms. Agajanian.
15                 CROSS-EXAMINATION
16  BY MS. AGAJANIAN:
17       Q    Good morning, Ms. Scott.
18       A    Good morning.
19       Q    My name is Holly Agajanian, and I'm going
20  to ask you a few questions.  Okay?
21       A    Okay.
22       Q    Great.  Just out of curiosity, what time
23  of day did you go to that Big R on May 15th?
24       A    8:00 in the morning.
25       Q    Right when they opened?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0803

```
 1        A    Yes, ma'am.

 2        Q    And you already knew on May 15, at 8:00

 3   a.m., that the waiting period law was in effect,

 4   didn't you?

 5        A    I don't recall.

 6        Q    Okay.  You knew when you went in to Big R,

 7   at 8:00 a.m. on May 15th, that you were filing a

 8   lawsuit; right?

 9        A    Possibly.

10        Q    Possibly.  You know the lawsuit was filed

11   on May 15; right?

12        A    No, I don't know when it was filed.

13        Q    Okay.  And let me be clear.  I'm going to

14   ask you some questions, and I'm not asking you

15   anything at all that you've discussed with your

16   attorneys.

17        A    No, you're fine.

18        Q    Just to be really clear.

19        A    You're fine.

20        Q    Okay.  So you went into Big R, and you

21   knew that you wanted to buy a firearm on May 15th;

22   right?

23        A    Yes, ma'am.

24        Q    Okay.  And I believe what you said on

25   direct was that it was your intent to bring the
```

SANTA FE OFFICE                                                           MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                     FAX (505) 843-9492
                                                                       1-800-669-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0804

1   firearm home that day?

2        A    Yes, ma'am.

3        Q    And then later on, when your counsel was

4   asking you questions, you sort of clarified, and you

5   said it was your desire to bring your firearm home

6   that day.  Do you remember that?

7        A    Intent, desire, it all kind of means the

8   same thing.

9        Q    This is why people don't like lawyers.

10       A    No, you're fine.

11       Q    And again, I guess my question to you is,

12  as you sit here today, did you know that you were

13  going to have to wait seven days to take that

14  firearm home when you went into the store on May

15  15th at 8 a.m.?

16       A    I knew there was a possibility.

17       Q    Okay.  Did you know that the law had been

18  signed a couple months earlier by Governor Lujan

19  Grisham?

20       A    No, ma'am.

21       Q    But you did know that the law was going to

22  be in effect as of May 15th?

23       A    I knew it was going to be going into

24  effect.  But I wasn't exactly sure, I guess, how it

25  was going to be put into effect.  Does that make



SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                                      Albuquerque, NM 87102
(505) 989-4949                                                                (505) 843-9494
FAX (505) 843-9492                                                      FAX (505) 843-9492
                                                                            1-800-669-9492

**BEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE

**App. 0805**

1    sense?

2       Q    No.  Do you want to explain that to me a

3    little bit?

4       A    Like, I knew it was going to be put into

5    effect.  But I didn't know the process of how it was

6    going to be.

7       Q    Okay, understood.  Thank you for that

8    clarification.

9       A    Um-hum.

10      Q    You also testified on direct that when you

11   bought your previous firearm -- and I'm sorry, let

12   me withdraw that and just ask you:  Before May 15th,

13   how many firearms did you own?

14      A    Two.

15      Q    And you bought one on May 15th?

16      A    Yes -- well, I didn't buy it on May 15th.

17      Q    You started the process on May 15th?

18      A    Yes, I did a background check.

19      Q    Great.  And have you purchased any

20   firearms since then?

21      A    No.

22      Q    So you own the three right now?

23      A    Yes.

24      Q    All right.  You spoke about the process

25   from Big R seven or eight years ago, and you said it

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



PROFESSIONAL COURT
REPORTING SERVICE

BEAN & ASSOCIATES, Inc.

App. 0806

```
 1  took 30 to 45 minutes; right?

 2       A    Yes, for the background check.

 3       Q    And I'm not being facetious or glib when I

 4  ask you this, I promise, but how long does it take

 5  you to do a load of laundry?

 6       A    I don't know, like, 25 minutes.

 7       Q    Is that washing and drying?

 8       A    Drying takes about 30 minutes.

 9       Q    So about 55 minutes total washing and

10  drying to do a load of laundry?

11       A    Yes.

12       Q    So you bought a gun faster than that seven

13  or eight years ago; right?

14       A    No, because normally when I do laundry, I

15  just throw it in and go to work.

16       Q    Fair enough.  Okay.

17            And then again, on 5/22 -- well, let me

18  ask you another question as well.  When you went in

19  at Big R on the 15th, and you said -- no, we don't

20  need to do that.  We'll just keep moving.  It's no

21  problem.

22            All right.  So your intent was to pay

23  Calibers -- I'm sorry, was to pay Big R for the gun;

24  correct?

25       A    Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



PROFESSIONAL COURT
REPORTING SERVICE

App. 0807

Appellate Case: 24-2121   Document: 31-4   Date Filed: 11/08/2024   Page: 73

1    Q    And eventually you did pay Big R for the
2  gun; correct?
3    A    Yeah.
4    Q    You agree this was a commercial
5  transaction, a buyer and seller?
6    A    Oh, yeah, a buyer and seller.
7    Q    Big R didn't give you a gun.  We saw your
8  receipt.  You paid about $476 for it?
9    A    Yeah, somewhere right around there.
10   Q    Something around there, fair enough.
11        And what's -- this is really just out of
12 curiosity.  What time of day did you return to Big R
13 to pick up that gun on the 22nd?
14   A    So I arrived there at 8:00 in the morning.
15   Q    Right at 8:00.  And you don't contend,
16 Ms. Scott, that that snafu was any part -- was the
17 Governor's fault or anything like that?
18   A    Oh, it absolutely was.
19   Q    The snafu was the Governor's fault?
20   A    Yeah.
21   Q    Oh.  Okay.  Thank you very much.  I
22 appreciate it.
23   A    You're very welcome.
24        THE COURT:  Thank you, Ms. Agajanian.
25        Mr. McCoy, do you have redirect of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0808

```
 1   Ms. Scott?

 2            MR. McCOY:  Just briefly.

 3            THE COURT:  Mr. McCoy.

 4                  REDIRECT EXAMINATION

 5   BY MR. MCCOY:

 6        Q    Ms. Scott, defense counsel asked you how

 7   long it takes to do a load of laundry and to compare

 8   and contrast the length of time it took for this

 9   firearm purchase.  But this firearm purchase wasn't

10   a matter of hours; correct?

11        A    No, it was days.

12        Q    How many days did you have to wait to

13   purchase the firearm?

14        A    Altogether, it was seven days.

15            MR. McCOY:  Those are all my questions,

16   Your Honor.

17            THE COURT:  Thank you, Mr. McCoy.

18            Anything further, Ms. Agajanian?

19            MS. AGAJANIAN:  Just a few, Your Honor.

20                  RECROSS-EXAMINATION

21   BY MS. AGAJANIAN:

22        Q    Ms. Scott, just to clarify -- and I think

23   you know what I meant, when I was talking about the

24   load of laundry and the purchase of the firearm, I

25   was talking about the first purchase of your
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: bean@beanreporting.com



App. 0809

```
 1   firearm; correct?  Do you remember that?

 2       A    The first time I purchased my firearm.

 3       Q    That was 30 to 45 minutes?

 4       A    Yes.

 5            MS. AGAJANIAN:  That's all.  Thank you.

 6            THE COURT:  Thank you, Ms. Agajanian.

 7            Mr. McCoy, anything further?

 8            MR. McCOY:  No.  Thank you, Your Honor.

 9            THE COURT:  Any reason Ms. Scott cannot be

10   accused from the proceedings, Mr. McCoy?

11            MR. McCOY:  Not from the plaintiffs' side.

12            THE COURT:  Can she be excused from the

13   proceedings?

14            MS. AGAJANIAN:  Yes, Your Honor.

15            THE COURT:  Thank you for your testimony.

16   You're excused from the proceedings.  Mr. McCoy, do

17   you have your next witness or evidence?

18            MR. McCOY:  Yes, Your Honor, Paul Ortega.

19            THE COURT:  Mr. Ortega, if you'll come up

20   and stand next to the witness box on my right, your

21   left.  Before you're seated, Ms. Rotonda, my

22   courtroom deputy, will swear you in.

23

24

25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



App. 0810

```
 1                      PAUL SAMMY ORTEGA,

 2        after having been first duly sworn under oath,

 3        was questioned and testified as follows:

 4                      DIRECT EXAMINATION

 5             THE CLERK:  Please be seated and please

 6   state your name for the record.

 7             THE WITNESS:  Paul Sammy Ortega.

 8             THE COURT:  Mr. Ortega.  Mr. McCoy.

 9             MR. McCOY:  Thank you, Your Honor.

10   BY MR. McCOY:

11        Q    Good morning, Mr. Ortega.

12        A    Good morning.

13        Q    How are you?

14        A    Doing well.

15        Q    Good.  Are you a resident of the State of

16   New Mexico?

17        A    Yes, I am.

18        Q    And how long have you been a resident of

19   this state?

20        A    Life.

21        Q    And is it your plans or intent to at least

22   remain a resident of this state for the foreseeable

23   future?

24        A    Yes, sir.

25        Q    Without providing your address, would you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

**App. 0811**

```
 1   let the Court know which city or area of the state

 2   you live in?

 3        A    Northeast Heights.

 4        Q    Is that a suburb of Albuquerque?

 5        A    Yes.

 6        Q    What do you do for a living, Mr. Ortega?

 7        A    I'm medically retired from law

 8   enforcement.

 9        Q    Sorry.  Say that again?

10        A    Medically retired from law enforcement.

11        Q    And which agency did you work with or for?

12        A    I worked for APD and Corrections.

13        Q    And what was total length of time that you

14   worked in law enforcement?

15        A    Twelve years.

16        Q    But you're not currently a law enforcement

17   officer; correct?

18        A    No, sir.

19        Q    And you weren't a law enforcement officer

20   in May of this year, of 2024?

21        A    No, sir.

22        Q    Do you own or -- do you now or have you

23   ever owned a firearm?

24        A    Yes, sir.

25        Q    And approximately how many firearms do you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email beanreport@beanreport.com

App. 0812

1   own?

2        A     I own six including rifles.

3        Q     These are both handguns and long guns?

4        A     Yes, sir.

5        Q     And what's the primary reason that you

6   have these firearms?

7        A     Protection, hunting.

8        Q     Are you a federal firearms licensee?

9        A     No, sir.

10       Q     And do you currently hold a New Mexico

11  concealed handgun license?

12       A     No, sir.

13       Q     Now, prior to the firearm you acquired in

14  May, which I'll ask you some questions about here in

15  a moment, when was the last time, prior to that May

16  purchase, that you purchased a firearm?

17       A     That would be two years.

18       Q     Do you recall what type of firearm you

19  purchased two years ago?

20       A     It was a Glock 26.

21       Q     Do you recall where you purchased it from?

22       A     Yeah.  A gun shop up on Juan Tabo and

23  Montgomery.

24       Q     Somewhere here in Albuquerque?

25       A     Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: beanassociatessupport.com

App. 0813

```
 1        Q     And do you recall the process of going in
 2   that day to that gun shop and purchasing the
 3   firearm?
 4        A     Yes.
 5        Q     And if you could, explain to the Court how
 6   that transpired, how that process went through?
 7        A     Walked into the gun shop, looked around.
 8   Asked them about some guns I was looking for, see
 9   what they had.  And they showed me what I wanted.
10   Looked at it.  Gave them my license, did a
11   background check on me.  Once my background check
12   was cleared, paid them, put it in a box, and walked
13   out the store.
14        Q     I would imagine, as a former law
15   enforcement officer, as well as an owner of six
16   firearms, you've had a few background checks
17   performed on you?
18        A     Yes, sir.
19        Q     Have you ever had a background check come
20   back as a "not proceed" or with a negative result?
21        A     No, sir.
22        Q     And you said that the background check --
23   well, when you were purchasing this particular
24   firearm -- I'm sorry, did you say what type of
25   firearm it was?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreporting.com

```
 1        A      Which one?

 2        Q      That you purchased two years ago?

 3        A      A Glock 26.

 4        Q      Yeah.  When you had the background check

 5   performed on that Glock 26, did that come back

 6   clean?

 7        A      Yes, sir.

 8        Q      And proceed.  Did you issue or did you

 9   provide the store at that point in time the purchase

10   price or the cost or money for the firearm?

11        A      Yes, sir.

12        Q      And were you able to leave the store that

13   day with the firearm in hand?

14        A      Yes, sir.

15        Q      What I'd like to do now is focus your

16   attention on May 15th.  On that day, did you attempt

17   to acquire a firearm?

18        A      Yes, sir.

19        Q      And where did you go to purchase it from?

20        A      Calibers.

21        Q      And that's their store here in

22   Albuquerque?

23        A      Yes, sir.

24        Q      And what type of firearm did you wish to

25   purchase there at Calibers?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

email@beanreport.com

App. 0815

```
 1        A    A Glock 21, or .45 caliber.

 2        Q    And were you able to locate that type of

 3   firearm at Calibers that day?

 4        A    Yes, sir.

 5        Q    And what was your primary motivation for

 6   acquiring this firearm?

 7        A    I wanted a new gun.  Also for protection

 8   and take camping.

 9        Q    So if you could, just like you did with

10   the last firearms purchase, if you could walk us

11   through, walk the Court through the process of

12   attempting to purchase or purchasing this firearm

13   that day, on May 15th.

14        A    I went in, looked around for a couple

15   guns, see what they had.  And they showed me a

16   couple of guns.  They had some 9 millimeters, but I

17   wanted a .45.  And he showed me the Glock 21 he had.

18   Looked at it, liked it, told him I'd take it.  He

19   asked me for my license; run a background check.  It

20   was clean.  So he goes:  Do you want it?  Purchased

21   it, gave him the money.  And he told me I had to

22   wait seven days.

23             And I asked him:  I can't take it now?

24             He goes:  No, there is a new law that I

25   had to wait seven days before I could walk out with
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0816

```
 1   it.  And be goes, we can hold it in the gun shop in
 2   their safe until the seven days were up and I could
 3   come back and pick it up.
 4        Q    But Calibers did accept payment at that
 5   time, on the 15th, for the firearm?
 6        A    Yes, sir.
 7             THE COURT:  Mr. McCoy, we've been going
 8   for about an hour and a half.  I need to give
 9   Ms. Bean a little bit of a break.  Can we maybe take
10   a 15-minute break now?
11             MR. McCOY:  We can, Your Honor.  I have
12   maybe just a minute or two with this witness left,
13   if you want.
14             THE COURT:  Why don't we go ahead and take
15   our break.  So you can take your time, so I won't
16   rush you.
17             All right.  We'll be in recess for about
18   15 minutes.
19             MR. McCOY:  Thank you, Your Honor.
20             (The Court stood in recess.)
21             THE COURT:  All right.  Mr. Ortega, I'll
22   remind that you're still under oath.
23             THE WITNESS:  Yes, sir.
24             THE COURT:  Mr. McCoy, if you wish to
25   continue your direct examination of Mr. Ortega, you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beansupport.com

App. 0817

```
 1    may do so at this time.

 2    BY MR. McCOY:

 3        Q    Mr. Ortega, just to recap, you had gone

 4    into Calibers on the 15th, selected a firearm.  I

 5    believe it was a Glock; correct?

 6        A    Yes, sir.

 7        Q    What type of Glock?

 8        A    Glock 21, .45 caliber.

 9        Q    You'd selected the firearm.  And did you

10    actually provide Calibers with the payment for that

11    firearm?

12        A    Yes, sir.

13             MR. McCOY:  May I approach the witness,

14    Your Honor?

15             THE COURT:  You may.

16             MR. McCOY:  And defense counsel has also

17    received copies of these as well.

18        Q    I'm showing you what's been marked for

19    identification as Plaintiffs' Exhibits 3 and 4.  If

20    you could take a look at each of them.  And when

21    you're finished, look up.

22             Okay.  Let me start with Plaintiffs'

23    Exhibit 3.  Do you recognize what that document is?

24        A    Yes, sir.

25        Q    And what is that?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0818

```
 1        A     Bill of sale.

 2        Q     And a bill of sale for what?

 3        A     My weapon I bought, my pistol.

 4        Q     And that's the firearm, the Glock that you

 5   purchased from Calibers on May 15, 2024?

 6        A     Yes, sir.

 7        Q     And if you could look at Plaintiffs'

 8   Exhibit 4.

 9        A     Yes, sir.

10        Q     What is that?

11        A     That's a receipt.

12        Q     Receipt of what?

13        A     Receipt for the pistol I bought.

14        Q     And that's showing that you rendered

15   payment for that firearm on that day, on May 15th?

16        A     Yes, sir.

17        Q     And how did you render payment?  Was it

18   through credit card?  Cash?

19        A     Cash.

20        Q     So you provide Calibers with the money,

21   you've selected a gun obviously, and you did pass

22   your background check; correct?

23        A     Yes, sir.

24        Q     Were you able to leave Calibers that day

25   with the firearm in your possession?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0819

Appellate Case: 24-2121   Document: 31-4   Date Filed: 11/08/2024   Page: 85

```
 1        A    No, sir.

 2        Q    Had it been your goal, when you walked

 3   into the store that day, to leave Calibers with that

 4   firearm in your possession?

 5        A    Yes, sir.

 6        Q    Did you ask Calibers why you could not

 7   leave the store with the firearm?

 8        A    Yes, sir.

 9        Q    And what were you told?

10        A    They said they passed a law where we had

11   to wait seven days.

12        Q    Did they tell you what they would do with

13   the firearm during that period of time, while you

14   were waiting?

15        A    Yes, sir.  They said that they would put

16   it in their safe room, and hold it there until seven

17   days was up.

18        Q    And then you could come back seven days

19   later and acquire the firearm?

20        A    Yes, sir.

21        Q    Or take possession of it?

22        A    Yes, sir.

23        Q    Did you, in fact, do that?

24        A    Yes, sir.

25        Q    What day did you go back to get the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

**App. 0820**

```
 1  firearm?

 2       A    We actually waited eight days.  We picked

 3  it up on a Friday, we were able to pick it up on

 4  Thursday, picked it up on a Friday.

 5       Q    So eight days after you purchased?

 6       A    Yes, sir.

 7       Q    That would have been May 23rd?

 8       A    Yes, sir.

 9       Q    Do you have any additional plans to

10  purchase firearms in the future here in the State of

11  New Mexico?

12       A    Yes, sir.

13       Q    Anything specific?

14       A    I was looking to get a Desert Eagle, if I

15  can.

16       Q    And what is your goal on when you'd like

17  to purchase that firearm?

18       A    Once I save up enough money to get it.

19       Q    Fair enough.  In addition to the testimony

20  you've already provided here today, is there

21  anything you'd like the Court to know in regards to

22  the impact of the seven-day waiting period on you

23  personally?

24       A    Yeah, it's a hassle.  I mean, I expect to

25  go in and purchase a weapon, to take home, to enjoy,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

email @ beansupport.com

App. 0821

```
 1   to go practice with it, or whatever, and have it at

 2   my house for protection or when I go camping, so I

 3   could have it with me when I need it.  Instead of

 4   having to wait seven days and not have it with me if

 5   I need it.

 6             MR. McCOY:  May I have a moment, Your

 7   Honor?

 8             THE COURT:  You may.

 9             MR. McCOY:  Those are all my questions for

10   right now.

11             THE COURT:  Thank you, Mr. McCoy.

12             Ms. Agajanian, do you have

13   cross-examination of Mr. Ortega?

14             MS. AGAJANIAN:  Yes, Your Honor.

15             THE COURT:  Ms. Agajanian.

16                  CROSS-EXAMINATION

17   BY MR. AGAJANIAN:

18        Q    Hello, Mr. Ortega.

19        A    Hello.

20        Q    When you went into Calibers on May 15th,

21   sir, what time of day did you go?

22        A    It was in the afternoon.

23        Q    After lunch?

24        A    Yeah.

25        Q    Were you alone?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0822

```
 1        A    No, I was with my girlfriend.

 2        Q    Were you with anyone else?

 3        A    No.

 4        Q    Had you told anyone else you were going to

 5   Calibers that day?

 6        A    No.

 7        Q    Mr. Ortega, when you went in to Calibers

 8   on May 15th to purchase that firearm, you knew you

 9   were going to be filing a lawsuit; right?

10        A    Yes.

11        Q    So you were going to leave, having tried

12   to purchase a firearm that day; right?

13        A    Yes.

14        Q    And you wanted that Glock .45, but ended

15   up with a 21?

16        A    No, that was what I wanted.  I wanted a

17   .45 caliber, which is the Glock 21.

18        Q    Okay, understood.  When did you become

19   aware that the seven-day waiting period had been

20   signed into law?

21        A    That day.

22        Q    The day the Governor signed it, meaning?

23        A    Um-hum.

24        Q    Is that a yes, just for the court

25   reporter?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE

App. 0823

1          A     Yes.

2          Q     So in about the end of March of 2024?

3          A     Yes.

4          Q     Okay.  But you waited until May 15th to

5     file that lawsuit; right?

6          A     Yes.

7          Q     I believe you testified on direct, sir,

8     that you already owned -- you owned five firearms

9     before May 15th; is that right?

10         A     Yes.

11         Q     You own six now?

12         A     Yeah, six now.

13         Q     Have you purchased any firearms since May

14    15th, sir?

15         A     No.

16         Q     I believe you also testified on direct

17    that your current set of firearms is a mix of

18    handguns and long guns?

19         A     Yes.

20         Q     Would you just run through for me what

21    guns you currently have?

22         A     I have a rifle, which is a .30-06; a rifle

23    that's a Glock 26; a Glock 17; a .357, a .22, and a

24    Glock 21.

25         Q     And the Glock 21.  All right.  When you



SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                         1-800-669-9492
PROFESSIONAL COURT                        email@beansupport.com
REPORTING SERVICE                          App. 0824

1  bought that -- you said two years talk bought a

2  Glock.  Do you remember talking about that earlier?

3      A    Glock 26.

4      Q    From about the time you walked up to the

5  counter, knowing which gun you wanted to purchase,

6  to the time you walked out the door that day two

7  years ago, how long do you think it took?

8      A    The background check, and had to pick out

9  the gun, maybe 10 minutes.

10     Q    Maybe 10 minutes.  Okay.

11          You would agree with me, Mr. Ortega, that

12  the purchase of that firearm at Calibers on May 15th

13  was a commercial transaction, wouldn't you?  I can

14  say it differently, I can say it better.

15     A    What do you mean?

16     Q    You're the buyer, they were the seller?

17     A    Yes.

18     Q    And you didn't get your gun until seven

19  days later; right?

20     A    Yes.

21     Q    And when you got the gun, you'd already

22  paid for it, I think you said; correct?

23     A    Yes.

24          MS. AGAJANIAN:  Nothing further, sir.

25  Thank you.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0825

```
 1                 THE COURT:  Thank you, Ms. Agajanian.

 2                 Mr. McCoy, do you have redirect for Mr.

 3      Ortega?

 4                 MR. McCOY:  No.  Thank you, Your Honor.

 5                 THE COURT:  All right.  Mr. Ortega, you

 6      may step down.  Is there any reason, Mr. McCoy, that

 7      Mr. Ortega cannot be excused from the proceedings?

 8                 MR. McCOY:  Not from plaintiffs, Your

 9      Honor.

10                 THE COURT:  May he be excused,

11      Ms. Agajanian?

12                 MS. AGAJANIAN:  Yes, Your Honor.

13                 THE COURT:  All right.  You're excused

14      from the proceedings.  Thank you for your testimony.

15                 MR. McCOY:  Your Honor, would it be okay

16      if he remains in court?

17                 THE COURT:  Yes, that's the purpose of me

18      asking if he can be excused.

19                 All right.  Do plaintiffs have their next

20      witness or evidence?

21                 MR. WELSH:  Yes, Your Honor.  We're

22      calling Robert Pohl from Calibers.

23                 THE COURT:  Mr. Pohl, if you'll come up

24      and stand next to the witness box on my right, your

25      left.  Before you're seated, my courtroom deputy,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0826

```
 1   Ms. Rotonda, will swear you in.

 2                     ROBERT POHL,

 3      after having been first duly sworn under oath,

 4      was questioned and testified as follows:

 5                  DIRECT EXAMINATION

 6            THE CLERK:  Please be seated, and please

 7   state your name for the record.

 8            THE WITNESS:  My name is Robert Pohl.

 9            THE COURT:  Mr. Pohl.  Mr. Welsh.

10            MR. WELSH:  Thank you, Your Honor.

11   BY MR. WELSH:

12      Q    Mr. Pohl, where do you currently reside?

13   We don't need your address, just the area or city

14   and state.

15      A    Rio Rancho, New Mexico.

16      Q    And where do you work?

17      A    Calibers.

18      Q    How long have you worked at Calibers?

19      A    About 12 years.

20      Q    And what's your current position there?

21      A    I'm the director of operations and

22   inventory.

23      Q    Were you at that same position on May

24   15th?

25      A    Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0827

```
 1        Q     And for this position, what are your
 2   duties?
 3        A     General inventory.  So I'm out on the
 4   floor, kind of checking to make sure that we have
 5   stock, different things like that; making sure that
 6   our operations are being followed.  Pretty much
 7   anything that needs doing.
 8        Q     Okay.  And is this the only Calibers that
 9   is around?
10        A     There are three locations in New Mexico.
11        Q     And which location do you work at?
12        A     I'm based out of the 4340, Albuquerque.
13        Q     That's the east side location?
14        A     Correct.
15        Q     Were you working at that location on May
16   15th?
17        A     I was.
18        Q     Is Calibers an FFL dealer?
19        A     Yes.
20        Q     And other than selling firearms, what
21   other services does Calibers provide?
22        A     We offer a range; we also have training,
23   memberships, and other retail items.
24        Q     I'd like to focus your attention on May
25   15th, specifically, of this year.  Do you recall
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: beanreporting@support.com

App. 0828

```
 1   selling a firearm that day to an individual named

 2   Paul Ortega, also sometimes goes by Sam?

 3        A    Yes.

 4        Q    And what type of firearm did Mr. Ortega

 5   ultimately decide to purchase that day?

 6        A    It was a Glock 21.

 7        Q    And that's a .45 caliber; correct?

 8        A    .45 caliber handgun.

 9        Q    Would you please walk us through the

10   process of what happens, generally, when a person

11   comes into a store and decides that they want to

12   purchase a firearm?

13        A    So generally speaking, a customer will

14   come through the doors.  They'll kind of look

15   through the different firearms that we have.  An

16   associate will be there with them.  Once they decide

17   on a specific firearm they intend to purchase, we'll

18   collect their credentials, such as their driver's

19   license, and we'll walk them over to the 4473 kiosk,

20   at which point we'll initiate that.  We'll have them

21   complete the 4473, and we'll submit that to the NICS

22   system, and wait for an approval, or wait for a

23   status, rather.  Once we get a status, we'll shore

24   up the transaction at the registers.

25        Q    And what exactly is a 4473?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



App. 0829

1    A    A 4473 is an ATF document that we're

2  required to use to submit background checks to the

3  FBI NICS system.

4    Q    And what is NICS?

5    A    NICS is National Instant Criminal

6  Background Check System.

7    Q    And that's the federal background check?

8    A    Yes, that's a federal background check

9  done through the FBI.

10    Q    Okay.  And with these results that you

11  received, do you -- excuse me, let me back step a

12  little bit.  Did you follow a similar process in

13  regard to the sale with Mr. Ortega?

14    A    Yes.

15    Q    And about how long did it take to get that

16  result back on the background check?

17    A    For his status, generally, I believe it

18  was around anywhere from two to seven minutes.

19    Q    Two to seven minutes.  And what was -- do

20  you recall the results on the background check?

21    A    He was given a proceed status.

22    Q    And generally, what does that mean?

23    A    A proceed status, which is going to be

24  you're cleared through the federal government to

25  take that firearm.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0830

```
 1        Q     And once you receive this proceed status,
 2   what happened with Mr. Ortega?
 3        A     Once I received the proceed status, I took
 4   Mr. Ortega over to the register, wrote up his
 5   paperwork for his sales receipts, and I rang him
 6   out.  I then explained to him, you know, the amount
 7   owed.  We rang everything up in the register.  I
 8   pulled the firearm and set it aside, and told him
 9   when he could pick it up.  I explained to him that
10   he wasn't able to get it that day.
11        Q     Was not able to get it that day?
12        A     Correct.
13        Q     And, as for the reason behind why he
14   wasn't able to pick it up, what was that reason?
15        A     The reason was due to the new state law,
16   the seven-day wait.
17        Q     The waiting period?
18        A     Correct.
19        Q     And that was the waiting period that went
20   into effect on May 15th?
21        A     Correct.
22        Q     And so prior to May 15th, what would the
23   process have looked like in comparison?
24        A     It would have been the aforementioned
25   process, with the exception of, you know, once we
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0831

```
 1  rang him up through the register, Mr. Ortega would
 2  have been normally able to just walk out the door
 3  with his firearm, since he was given an instant
 4  proceed through the NICS system.
 5      Q    So it would have been ultimately similar,
 6  as far as the background check was concerned, he
 7  still would have gone through that?
 8      A    Correct.
 9      Q    And he would have received his firearm
10  that day?
11      A    Correct.
12      Q    And so what happened to the firearm after
13  Mr. Ortega left or had rung up with you?
14      A    What I did was I put his name on there
15  with the receipt and everything, and I walked it
16  back to our firearms vault and placed it in there.
17      Q    And your firearms vault is there at
18  Calibers?
19      A    Um-hum.
20      Q    And to your knowledge, was Mr. Ortega
21  eventually allowed to take possession of his
22  firearm?
23      A    Yes.
24      Q    Do you happen to recall when that might
25  have occurred?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0832

Appellate Case: 24-2121   Document: 31-4   Date Filed: 11/08/2024   Page: 98

```
 1        A    I believe it was the 24th.

 2        Q    As far as the policy surrounding this

 3   waiting period for Calibers, is it specific to

 4   Calibers?

 5        A    It is specific -- the way that we wrote it

 6   is specific to Calibers, just our general

 7   operations.

 8        Q    And who wrote that policy?

 9        A    I did.

10        Q    You wrote it.  And can you walk me through

11   what the policy entails?

12        A    Yes.  So, essentially, we -- you know,

13   once we find a customer that's interested in buying

14   a firearm, we go through the standard transaction

15   process of making sure that they're federally able

16   to with their documentation, so ID and stuff.  Once

17   we get that all set up, we run them through the 4473

18   kiosk, get them through the NICS system.  And then

19   we -- once they're given a status, if they're given

20   a proceed status, we explain to them the seven-day

21   policy, which is they can either pay the firearm off

22   in full, which secures that firearm for them, so

23   they don't have to worry about somebody else buying

24   it.  And then we put it to the back, and then seven

25   days after that, they can come in, re-sign the 4473,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



PROFESSIONAL COURT
REPORTING SERVICE



**App. 0833**

1  and pick it up and go on about their business.

2          If they are delayed, we explain basically

3  the same process.  They can pay for it up front, or

4  put it on layaway.  And with the delay status under

5  the current law, if they're not able to get an

6  updated status within that seven days, you cannot

7  release the firearm to them until you either get an

8  updated status or the additional 20 days.

9      Q    And was there any outside guidance

10 provided to you on creating this policy when you

11 wrote it?

12     A    No.

13          MR. WELSH:  May I have a moment, Your

14 Honor?

15          THE COURT:  You may.

16     Q    And with regard to the outside guidance

17 that I previously asked, do you recall who it was

18 that provided -- or sorry, that you asked for

19 guidance?

20     A    I mean, to our knowledge, the DPS has the

21 law, or is in charge of enforcing.  You know,

22 reaching out to them is -- you know, there is no

23 real portal for FFL dealers.  I mean, we weren't

24 sent the law.  I mean, I was a little -- just being

25 extra cautious and followed this law, and saw you

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                     201 Third NW, Suite 1630
Santa Fe, NM 87501                             Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                              FAX (505) 843-9492



                                                        1-800-669-9492
                                                email@beanreporting.com

 1   know, okay, it's finalized for this date.  So I just

 2   kind of had to go off of what was on the final law.

 3        Q    So when you asked, you received no

 4   response?  Was there a response?  Anything like

 5   that?

 6        A    Yes.  I mean, I didn't -- nobody knows,

 7   from my understanding, in the State who is in charge

 8   of the law specifically.  And there is no guidance.

 9   I know a lot of FFLs have been frustrated because

10   you reach out to the State, and they don't know who

11   to send you to.

12        Q    Right.

13             MR. WELSH:  Thank you.  I have no further

14   questions, Your Honor.

15             THE COURT:  Thank you, Mr. Welsh.

16             Ms. Agajanian, do you have

17   cross-examination of Mr. Pohl?

18                  CROSS-EXAMINATION

19   BY MS. AGAJANIAN:

20        Q    Good morning.  My name is Holly Agajanian.

21   I'm going to ask you a few questions.  Okay?

22        A    Okay.

23        Q    I believe you testified that your job is

24   the director of operations at Calibers; is that

25   correct?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: beansupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0835

```
 1        A    Yes.

 2        Q    Is it just that you're the director at

 3   that store, or is it over all of them?

 4        A    It's -- for the inventory, it's over all

 5   of them.

 6        Q    Over all of them.  And you testified that

 7   you remembered selling a gun to Mr. Ortega; right?

 8        A    Yes.

 9        Q    Who else did you sell a gun to that day?

10        A    I didn't sell a gun to anybody else that

11   day.

12        Q    Why not?

13        A    So, with my job, I go out on the sales

14   floor probably about three or four times a day, and

15   so just kind of checking up on different things and

16   stuff like that.  So it's typically -- in the

17   mornings is when I'm usually most out there.  At

18   that point, it was a pretty slow day.  From that day

19   forward, it was actually kind of slow.  But, yeah,

20   that was the only reason.

21        Q    Would it surprise you to learn that Mr.

22   Ortega bought that gun at 1:43 p.m.?

23        A    No.

24        Q    So it was in the afternoon, not the

25   morning, when you're normally on the floor?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@litsupport.com

App. 0836

1      A      Um-hum.

2      Q      Is that a yes?

3      A      Yes.   Like I said, three or four times a

4   day, usually.

5      Q      Did you know Mr. Ortega prior to your

6   encounter with him that afternoon?

7      A      Did I know him as far as like a regular

8   customer?

9      Q      Had you ever met him?

10     A      No.

11     Q      Had you ever spoken to him?

12     A      He and I had been in contact.

13     Q      About this lawsuit?

14     A      Not about the lawsuit.

15     Q      What had you been in contact about?

16     A      Just inquiring about different types of

17   firearms we had.

18     Q      Okay.  Sir, Mr. Pohl, you're not a party

19   to this lawsuit; right?

20     A      No.

21     Q      And Calibers is not a plaintiff in this

22   lawsuit; correct?

23     A      Correct.

24     Q      When did you first speak to somebody,

25   either one of these attorneys or somebody who works

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                          1-800-669-9492



PROFESSIONAL COURT
REPORTING SERVICE

App. 0837

1   with them or Mr. Ortega or somebody else, about the

2   fact that there was going to be this lawsuit?

3        A    I first spoke to Mr. Ortega, I think,

4   maybe a day or so before.

5        Q    A day or so before May 15th?

6        A    Correct.

7        Q    And tell me about that conversation, as it

8   relates to this lawsuit?

9        A    He just asked me if I had a Glock 21 in

10  stock.

11       Q    Did he say anything about the fact that he

12  was going to file a lawsuit, sir?

13       A    No.

14       Q    Okay.  Then how do you remember this

15  particular transaction?  That's just what I'm trying

16  to get at.  If you didn't know that you were going

17  to be testifying or if you didn't know that this was

18  going to be part of a lawsuit, it was a month and a

19  half or two months ago, and you're a busy guy.  I'm

20  trying to figure out how you remembered this?

21       A    The amount of transactions that I run

22  personally are very limited.  I've also been in that

23  company for 12 years.  And I remember a lot of the

24  customers that I deal with on a day-to-day basis.

25  That's just one way I've built a good customer

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0838

1  service line.

2       Q    Do you remember who you sold a gun to on

3  May 14th?

4       A    I don't believe I sold any guns on the

5  14th.

6       Q    What about the 16th?

7       A    The 16th, I don't believe so.

8       Q    You testified on direct that the

9  background check takes three to four minutes -- in

10 this particular case it took three to four minutes;

11 right?

12      A    To get the status.

13      Q    Unpack that for me a little bit, if you

14 wouldn't mind?

15      A    So the transaction generally -- you know,

16 when you start on the 4473 kiosk, that could take

17 anywhere from, you know, five, 10, 15 minutes,

18 depending on just general awareness of the system,

19 people using it, and whatnot.  And then inputting

20 that information into the NICS system.  And then

21 once you submit that, the status could be generally

22 two to seven minutes, in that instance.

23      Q    Okay.  So estimate for me, ballpark, how

24 long did that take in this particular circumstance?

25      A    From Mr. Ortega being on the 4473 kiosk or

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0839

 1   the entire transaction from when I started talking
 2   with Mr. Ortega?
 3        Q    I'm not interested when you were talking
 4   to him about which guns you had in stock or anything
 5   else.
 6        A    I mean, from, like, when he came in that
 7   day.
 8        Q    No.  From when he said:  I want to buy
 9   this gun, to when the time -- to the time that he
10   paid for the gun and you gave him the receipt, how
11   long was that?
12        A    Potentially, 45 minutes.
13        Q    Okay.  Potentially, like give or take
14   around 10 or 15 minutes?
15        A    Correct, yeah, and to my knowledge.
16        Q    Okay.  And you did talk as well, I
17   believe, about the background check component of it.
18   I think that's the part that you said was just the
19   three or four minutes, where you got to the proceed?
20        A    Yes, from the time we submit to the time
21   that the FBI gave us his status.
22        Q    And sometimes you don't get a proceed.
23   Sometimes you get -- I'm going to abbreviate it this
24   way, because I'm -- it's just easier for me.  But
25   let's say we can do it a green, yellow, red; would

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

1   that be a fair categorization?

2       A    That's actually exactly how it comes

3   through.

4       Q    There you go.  Even a broken clock is

5   right twice a day sometimes, Mr. Pohl.  So sometimes

6   you get the green; that's the proceed, right?

7       A    Correct.

8       Q    Sometimes you get a yellow.  What does

9   that mean?

10      A    A yellow is a delay status.

11      Q    What does delay status mean?

12      A    A delayed status means that the FBI needs

13  a little bit more time to check that out.

14      Q    And in your experience in the 12 years of

15  doing this, again ballpark, what can a yellow light

16  mean, or what is a yellow status, how long could

17  that take, conceivably, to get the results?

18      A    It could take anywhere from two hours, in

19  my experience.  I've seen it about -- you know,

20  where it changed as soon as the customer left to

21  indefinite.  Sometimes it never changes the status.

22      Q    Sometimes it never comes back, does it?

23      A    Correct.

24      Q    And in the event that the yellow never

25  comes back, what does Calibers do with the purchase?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail DA@support.com

App. 0841

```
 1        A    At that point, we explain to the customer
 2   what the status was, that they were delayed.  A lot
 3   of times they ask why.  It doesn't tell us why.  So
 4   we explain, yes, you were put on a delay.
 5   Essentially, you have until the FBI reaches back out
 6   to us with an updated status, or we wait seven days
 7   if they do not give us a status.
 8        Q    So if you don't get anything back on the
 9   background check from the FBI in seven days, you
10   still sell that weapon, don't you?
11        A    After seven days.
12        Q    Yes.
13        A    Per federal Brady Bill Law.
14        Q    Understood.  Thank you.
15             MS. AGAJANIAN:  Nothing further.  Thank
16   you, sir.
17             THE COURT:  Thank you, Ms. Agajanian.
18             Mr. Welsh, do you have redirect of Mr.
19   Pohl?
20             MR. WELSH:  I do not, Your Honor.
21             THE COURT:  All right.  Mr. Pohl, you may
22   step down.
23             Is there any reason that Mr. Pohl cannot
24   be excused from the proceedings, Mr. Welsh?
25             MR. WELSH:  No, Your Honor.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0842

 1            THE COURT:  Can he be excused,

 2   Ms. Agajanian?

 3            MS. AGAJANIAN:  Yes, Your Honor.

 4            THE COURT:  All right.  You're excused

 5   from the proceedings.  Thank you for your testimony.

 6            All right.  Do the plaintiffs have their

 7   next witness or evidence?

 8            MR. HARRISON:  Yes, Your Honor.  We're

 9   going to be calling Professor Lee Francis.  And he

10   is going to be testifying via Zoom.

11            THE COURT:  All right.  Mr. Francis, if

12   you will stand and raise your right hand.

13   Ms. Rotonda, my courtroom deputy, will swear you in,

14   and we'll take your testimony under oath.

15                 FARRIS LEE FRANCIS,

16       after having been first duly sworn under oath,

17       was questioned and testified as follows:

18                 DIRECT EXAMINATION

19            THE CLERK:  You may be seated.  Please

20   state your name for the record.

21            THE WITNESS:  Thank you.  My name is

22   Farris Lee Francis.

23            THE COURT:  Mr. Francis.  Mr. Harrison.

24   BY MR. HARRISON:

25       Q    Professor, I want to make sure.  Can you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail@bean-support.com

App. 0843

1    hear me well?

2         A    I can.

3         Q    Excellent.

4              All right.  So to start off with, I

5    referred to you as "Professor."  Can you explain

6    what academic appointments you currently have, and

7    what appointments you may have had in the past?

8         A    Yes.  I am currently an Assistant

9    Professor of Law at Widener Commonwealth Law School

10   in Harrisburg, Pennsylvania.  Previously, I was an

11   Assistant Professor of Law at Mississippi College

12   School of Law in Jackson, Mississippi.

13        Q    Okay.  And what is your education?

14        A    I have a bachelor's of science from

15   Campbell University in social science.  I have a

16   master's of arts degree from the University of North

17   Carolina in Greensboro, and two advanced graduate

18   certificates in African-American studies and in

19   women and gender studies, and a law degree from

20   Hofstra University.

21        Q    Okay.  Have you ever published in the

22   field of the Second Amendment?

23        A    Yes.  I've published several Law Review

24   articles; namely, in the West Virginia Law Review,

25   the Marquette Law Review; Texas Tech Law Review,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: bean@beanreport.com

App. 0844

1   specifically on Second Amendment related topics.

2        Q    And some of those publications

3   specifically involve historical research under the

4   Bruen framework?

5        A    Yes, they do; yes, they all do.

6        Q    And have you ever been cited by a U.S.

7   court?

8        A    Yes, I've been cited -- I've had a paper

9   cited in the Eastern District of Michigan.  I was

10  also cited in the Fifth Circuit Court of Appeals,

11  where I filed an appellate brief with another

12  professor who specialized in Second Amendment law.

13       Q    Okay.  And other than the universities

14  where you've worked, have you ever been invited to

15  speak on Second Amendment subjects?

16       A    Yes.  I've been invited to speak at Duke

17  University for their firearms work in progress

18  conference.  I've been invited to speak at the

19  Deadman School of Law, Southern Methodist

20  University, in Dallas, Texas.  And I've also been

21  invited to speak at the University of Virginia, all

22  on Second Amendment related talks.

23       Q    Have you had the opportunity to review the

24  document that's been filed in this case as docket

25  number 21-2?  It has your F. Lee Francis at the top

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0845

```
 1   of it, and it certainly appears to be a curriculum

 2   vitae.

 3        A    Yes, I am.

 4        Q    And is that your CV?

 5        A    It is, yes.

 6             MR. HARRISON:  Your Honor, for

 7   convenience, we'd move in Professor Francis' CV into

 8   evidence.

 9             THE COURT:  Any objection, Mr. Allen?

10             MR. ALLEN:  No objection, Your Honor.

11             THE COURT:  All right.  Plaintiffs'

12   Exhibit is that number 3?  Did you want to do

13   anything with 3 and 4?

14             MR. McCOY:  We would move them into

15   evidence, Your Honor.

16             THE COURT:  Any objection, to those,

17   Ms. Agajanian?

18             MS. AGAJANIAN:  No, Your Honor.

19             THE COURT:  All right.  Plaintiffs'

20   Exhibits 3, 4, and 5 will be admitted into evidence.

21   BY MR. HARRISON:

22        Q    So Professor Francis, could you describe

23   your methodology in preparing for your testimony

24   today here?

25        A    Yes.  So I examined a range of primary
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@bean-report.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0846

1   sources; for example, newspaper clippings, laws from

2   the relevant period, particularly The Founding Era,

3   a number of secondary sources, including Law Review

4   articles, monographs, historical books on, typically

5   firearm related, and then crime, American crime as

6   well.

7        Q    And did you review the declarations

8   prepared by Mr. Spitzer and Roth for the defendants?

9        A    Yes, I have.

10       Q    Okay.  And did you prepare your own

11   declaration in this case?

12       A    I did, yes.

13       Q    Okay.  I have in front of me a document

14   that's file stamped and is filed in this case as

15   21-1, and it's titled, "Expert Report and

16   Declaration of Professor F. Lee Francis."  Are you

17   familiar with that document?

18       A    I am, yes.

19       Q    Is that the declaration you prepared in

20   this case?

21       A    It is.

22            MR. HARRISON:  Okay.  And then with the

23   defendants' permission, Your Honor, and for the

24   convenience of the Court, we would also move the

25   declaration into evidence.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0847

1             THE COURT:  Any objection, Mr. Allen?

2             MR. ALLEN:  No, Your Honor.

3             THE COURT:  All right.  Plaintiffs'

4    Exhibit 6 will be admitted into evidence.

5             MR. HARRISON:  And, Your Honor, at this

6    point we would proffer Professor Francis as an

7    expert on the historical analysis underlying the

8    Second Amendment.

9             THE COURT:  Any objection, Mr. Allen?

10            MR. ALLEN:  No, Your Honor, with the

11   reservation of the right to voir dire Mr. Francis on

12   the nature of his qualifications.

13            THE COURT:  All right.  Mr. Francis will

14   be allowed to offer opinion testimony in the area of

15   the Second Amendment.  Mr. Harrison.

16        Q    So Professor Francis, a few more

17   background questions before you get into your

18   opinions.  First, are you being compensated for your

19   work in this case?

20        A    I am, yes.

21        Q    Okay.  What is the financial arrangement

22   that we have with you?

23        A     It's $400 an hour.

24        Q    Okay.  And are you currently working as an

25   expert in any other Second Amendment related case?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



App. 0848

 1       A    Yes, one other case out of the Delaware
 2   state court.  I'm working as an expert there in that
 3   case.
 4       Q    So you're an academic.  Is any of your
 5   research funded by the gun industry?
 6       A    No, not at all.
 7       Q    Okay.  And do you make any income in
 8   general from the gun industry or gun lobby groups?
 9       A    None at all.
10       Q    Okay.  So the moving on to your opinions
11   in this case.  I want to start with some of the
12   plain text related things that the defense has put
13   forward.
14            Can you tell me about how common gun
15   ownership and gun carrying and gun sales were around
16   the time of The Founding?
17       A    Well, gun ownership was quite common,
18   particularly when we think of in terms of the
19   militia context.  We didn't have a standing army in
20   the traditional sense that we have now.  So a lot of
21   the states required that there is an eligible age
22   period, or age for citizens to serve in militias.
23   And this would be men between the ages of -- as
24   young as 16, through adulthood, through middle age.
25   There were some exceptions for those, ministers and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0849

1  things like that.  But within those militia

2  statutes, each individual male was required to own a

3  firearm.  In fact, they had to provide firearms for

4  themselves.

5       There wasn't really a robust means of

6  government to provide firearms to individuals.  And

7  that was true in some cases where the government did

8  for those who just didn't have the income to buy

9  their own, or the skills to make their own.  The

10 firearms were very, very present, arguably in 50

11 percent of the population, based on these statutes

12 were required to possess firearms and bring them for

13 militia purposes.

14      Q    So if, in fact, significant portions of

15 the population were at various points required to

16 own firearms, does that imply that, in practice,

17 they were also required to purchase them somehow?

18      A    They would have been required to purchase

19 them absolutely.  And they would have been

20 available.  There are several newspaper articles

21 that I cite from the Pennsylvania Gazette, the South

22 Carolina Gazette, a number of sources where you

23 would have, for example, advertisements in the

24 newspaper offering certain types of firearms.  And

25 this would be pistols that would come in pairs, or



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0850

1   long guns, that these would be available to

2   individuals to purchase.  And again, the individuals

3   were able to make their own, those who had the skill

4   set, were able to make their own firearms as well.

5        Q    Okay.  And so it sounds like you suggested

6   that there was a market for guns that were already

7   made, either that were preowned or that were not

8   necessarily made to order after the input of an

9   order?

10       A    That's correct.

11       Q    Then, to be clear, was this a niche

12  market, a small market, or was this a relatively

13  well-established marked?

14       A    This is definitely well established.  And

15  this is kind of indicative of the dates of the

16  advertisements from different places across the

17  country.  And I think the history here is important,

18  because we're coming out of an issue where under the

19  crowds of people wanting to defend themselves in the

20  same way.  So the right to both possess and obtain

21  firearms was particularly high on the minds of our

22  Founders.  And so it was quite available for an

23  individual to purchase and to obtain generally as

24  well.

25       Q    Okay.  Let me transition over to waiting

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beansupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0851

1   periods.  So, obviously, the defense in this case is

2   mostly pointing to things that aren't waiting

3   periods, but they say are historical analogs to

4   waiting periods.  But what is the actual history of

5   true waiting periods?

6       A    So the earliest waiting period comes from

7   1923 out of California.  And this clearly -- if

8   we're looking at the Bruen standard -- is the

9   relevant time period, this is the 20th century law.

10  Bruen really seems to put a lot of focus on The

11  Founding, the law.  They say that law is going too

12  far.  Before The Founding may have less of an

13  influence on the understanding at the time of the

14  Founding.  And the same is true for those that go

15  too far beyond The Founding.  And this could be laws

16  that are enacted in the late 19th century, which

17  would be removed from the understanding that the

18  Founders would have had.

19          And so clearly, at least from Bruen

20  analysis, those in the 20th century would be

21  excluded as well.  And so the 1923 law from

22  California would be an example of that.

23          Then we start to see waiting periods come

24  about more from the Brady legislation, the attempted

25  assassination of Reagan in the '80s, and things



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0852

1   start to spill over into the '90s, where the federal

2   government initiates a five-day waiting period,

3   which expires once the background check system kind

4   of gets a little bit more developed.

5          So these are all very, very new, very

6   modern types of legislation.  This is not to say

7   that if we're talking about individuals having to

8   wait for a firearm to be produced in The founding

9   Era, that's a different consideration there, because

10  it was a question of supply and demand, rather a

11  question of government regulation.  This was just a

12  gunsmith needed time to produce a firearm.  But this

13  was not an effort of any government organization or

14  the state to restrict an individual in that sense.

15     Q    Okay.  So I'm going to, kind of in line

16  with Rahimi, you know, why, how analysis, I'm going

17  to first ask you why do waiting periods exist?

18     A    The waiting periods exist, from everything

19  that I've kind of seen, to provide what's considered

20  a cooling off period.  I think the idea here is to

21  prevent impulsive behavior, impulsive criminal

22  conduct with a firearm.  And that could include

23  homicide, that could include suicide.  And I think

24  the idea here is to prevent that kind of violence

25  from happening to an individual or to others in

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



App. 0853

1  society.

2       Q    Okay.  So I'm going to address homicides

3  first before suicides.  Is there a large amount of

4  impulsive -- or are there a large number of

5  impulsive homicides committed after a lawful gun

6  purchase?

7       A    This is one of the topics that came up as

8  I was conducting my research for this declaration,

9  where a lot of the leading public health journals

10 and social science journals indicated that the idea

11 of impulsive homicides and suicides, as it relates

12 to those who lawfully process firearms are quite,

13 quite rare.  This is in reference, as I note in the

14 declaration, by the Everytown Organization.  I would

15 say that the vast majority of firearms death,

16 firearm related homicides are really done by those

17 who are not the lawful owners, not the legal owners.

18 So this would include stolen firearms.  And there is

19 a lot of research that goes into how these firearms

20 are obtained; people breaking into people's cars or

21 homes, or even the black-market.  So these are not,

22 in the vast majority of cases, individuals who are

23 legally producing firearms that are then going on to

24 commit homicide.

25           One of the things that I do think is

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: info@litsupport.com




App. 0854

1   important to note -- and this comes up in Professor

2   Roth's declaration -- is this idea of combining

3   justified homicide with what would otherwise be an

4   intentional homicide, or a murder.  And so I think

5   it is important to distinguish that when someone

6   uses their firearm justifiably, that that should not

7   then be lumped in with those who intend to commit a

8   murder, because the data indicates that those are

9   separate; that lawful owners are not the ones

10  intentionally committing homicides.  But they may

11  very well be those defending themselves against

12  those violent acts.

13       Q    All right.  So let's switch to suicides

14  which, you know, are more commonly done by

15  law-abiding gun owners.  Are most suicides

16  impulsive?

17       A    So, again, going back to the public health

18  data here, the social science data, it really

19  indicates that there is a 20 to 25 percent impulsive

20  rate for suicide conduct, as it relates to firearms.

21  So the vast majority, in fact, the overwhelming

22  majority of suicides are not impulsive, and there is

23  a degree of planning that goes into this kind of

24  act.

25            And the other thing, I think, to note

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreporting.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0855

1   about suicides is that the rate for adolescent

2   suicide are double what they are for adults.  Why is

3   that significant?  Well, it's significant because

4   adolescents aren't able to purchase firearms.  Lots

5   of laws, either state or federal laws, require an

6   individual to, one, to purchase a handguns.

7   Handguns are most likely to be used for suicide

8   attempts, as opposed to long guns and rifles.  But

9   the data indicates that those who legally possess

10  firearms, adults primarily here, are not the one

11  committing suicide at a rate that is concerning when

12  we look at the numbers compared to adolescents that

13  are double what the rates are for adults.

14       Q    I see.  And adolescents are already

15  legally barred from purchasing handguns?

16       A    That's correct.

17       Q    Then I think you may have already said

18  this, but in terms of handguns versus long guns, is

19  one more typically used than the other for homicides

20  and/or suicides?

21       A    Yes.  For suicides, we're looking

22  primarily at handguns.  For homicides, I do think

23  that there is data going on either side of that.

24  But for suicides, particularly pistols, handguns are

25  the most common.  And this is true even

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

App. 0856

1  historically.  I mean, Bruen talks about, you know,

2  is there a historical problem that persists?  And

3  suicide is clearly one of them.  There are several

4  newspaper articles, again, where they'll actually

5  pose a suicide incident.  There is one, in

6  particular, where there is an individual who gets

7  into a lot of gambling debts.  He goes into a gun

8  store -- and this is in the late 1700s -- he goes

9  into a gun store.  He purchased two pistols.  He

10  goes behind the store, and he commits suicide right

11  there in the store.

12        There is another newspaper article where

13  there is a father who kills his family; then he

14  commits suicide using a firearm, using a pistol,

15  using a handgun.

16        It would have been pretty difficult to try

17  to use a long gun during that particular time the

18  pistols were used and were available.  Very much the

19  same is true in today's circumstance.

20        Q    Okay.  So it sounds like, from some of the

21  things you've related, that gun homicides and gun

22  suicides were a thing that existed in The Founding

23  Era; is that fair to say?

24        A    Absolutely.  And I think what's also

25  important, there is a book that's called, I believe



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email bean@beansupport.com

PROFESSIONAL COURT
REPORTING SERVICE

App. 0857

1   American Homicide by Professor Roth.  Actually, in

2   his declaration, he focuses on the 1688-1689 period.

3   But what's fascinating in this is book, he goes into

4   a great deal of emphasis on the history of American

5   crime, history of homicide.  And what's interesting

6   is that in the first chapter of his book he says

7   that the 17th century was likely the worst period of

8   time for homicides in the Early American Colonial

9   society.  In fact, he says that the rates in the

10  1600s, comparable today, are three to five times

11  worse back then than they are today.

12          So this idea that crime was not common

13  during the Colonial Era, or even just before the

14  American Colonial Era, Professor Roth clearly

15  indicates that crime was not only common, but in

16  some cases worse than some of the crime that we saw

17  in the peak of the 20th century.  And I think that's

18  pretty significant.

19      Q    Interesting.  And now, is it true -- I

20  think you mentioned the idea of sets of pistols.

21  Were there, in fact, gun sets that were purpose

22  built for dueling?

23      A    Absolutely.  And dueling has a history

24  within both the European culture and the Early

25  American period.  The classic duel between Alexander

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



App. 0858

```
 1   Hamilton and Aaron Burr.  This is not to say that
 2   there weren't restrictions on dueling within the
 3   states.  There were some.  And, obviously, when
 4   Aaron Burr and Alexander Hamilton are signing up to
 5   complete their duel, they go to New Jersey to do it.
 6          But what's interesting here is that there
 7   would not have been any restrictions, as far as if
 8   we're talking about a waiting period that existed.
 9   The Founders hated the idea of dueling.  Thomas
10   Jefferson hated dueling.  Abraham Lincoln was once
11   challenged to a duel.  Imagine how that would have
12   turned out, if he had died in a duel?  So dueling
13   was quite common.  It was not something that was
14   widely accepted throughout our Founders.  I think
15   Benjamin Franklin called it "a murderous activity."
16   And yet, it prevailed, and there was the purpose of
17   obtaining these firearms for dueling.
18      Q    So if I'm understanding you correctly,
19   it's not that governments at the time liked dueling;
20   they, in fact, very much frowned on the practice,
21   and yet, no one ever proposed the idea, or no one
22   ever passed waiting periods in order to prevent the
23   sale of purpose-made dueling weapons?
24      A    That's absolutely right.  The Founding
25   Fathers really despised the idea.  George Washington
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE

App. 0859

1   tried to convince his young soldiers not to do it,

2   mostly because he needed the men to fight a war that

3   was not going in favor for quite some time.  But by

4   no means was our Founding Fathers, at least the

5   majority of them really thought of dueling as a

6   wonderful bit of culture.

7        Q    Certainly.  And I'm going to transition

8   now to the how, of how these things burden the --

9   but I guess before I do, so there has been a

10  suggestion that this is a commercial sales

11  restriction.  In terms of the purpose for waiting

12  periods, is every bit of that purpose oriented

13  toward things that a buyer might potentially do with

14  a gun?

15       A    Yes.  I mean, the idea of the cooling-off

16  period really is targeting the individual who wishes

17  to obtain a firearm.  And that is not commercial in

18  the sense of you have a seller or someone with a

19  license to sell a firearm.  Here, we're looking at

20  individuals and how they would use a firearm and

21  that is not commercial in that sense.

22       Q    So moving now to the how.  So obviously,

23  the New Mexico waiting period, they settled on seven

24  calendar days.  I know it was initially as

25  introduced in the legislature 14 business days.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



App. 0860

1  Other states have a three-day waiting period.  Are

2  you aware of any evidence supporting three versus

3  seven, versus 14, any particular number?

4      A    No, definitely no number.  I mean,

5  historically, the idea would have been, if something

6  is available, you just go and pick it up.  There

7  could be an estate sale, there could be a local

8  shop, for example, in Connecticut puts an ad in the

9  newspaper and says:  Hey, we've got 300 long gun

10 rifles.  If you can come get them, their yours.

11         So this would apply to both individuals'

12 weapons, whether it's a rifle or 300 of them.  So

13 both quantities would have been available for

14 immediate possession as well.  And that, again, is

15 separate from those needing to be made.

16         No different here, if you -- for example,

17 if you use -- I like Volvos.  So I want to have a

18 Volvo custom built, I can't go pick up that Volvo,

19 I've got to wait for it to come in.  But there is no

20 requirement that I do so.

21     Q    Sure.  And so last, I want to compare, I

22 guess, why and how of the waiting periods with

23 intoxication laws and licensing regimes.  So first,

24 let's do intoxication laws first.  And I guess the

25 subzero of this analysis, were these laws around at



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beansupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0861

1   The Founding?

2       A    You know, the way that we think of

3   intoxication laws today, particularly those that

4   came about in the late 19th century were definitely

5   not around during The Founding.  There were laws,

6   for example, in the late 1600s, the 1650s out of

7   Virginia, out of New Amsterdam, New York, which

8   would have regulated the use of firearms.  For

9   example, one could not expel unnecessary fire during

10  the day.  Why is that?  That doesn't necessarily

11  have anything to do with one being intoxicated.  It

12  has to do with, at that particular time inscending

13  firearms, or shooting into the air, as we would

14  think of it, would be a way to signal an Indian

15  attack, a Native American attack.

16          So the society there used firearms fire as

17  a way to alert the town that there was an attack;

18  brace yourselves, defend yourselves.  So that

19  particular law is not necessarily to those that are

20  intoxicated, but those who would cause unnecessary

21  panic.

22          Another example is there are laws that

23  would have existed to prevent an individual from

24  using firearms on the Sabbath day, to keep that day

25  holy, as it were.  There are other instances, again,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email info@beanreport.com



**App. 0862**

1   that would limit an individual who was drinking from

2   using a firearm, for example, on May Day, on New

3   Year's.  Again, the idea here is not to target those

4   who are intoxicated.  In fact, intoxication was not

5   even an element of the offense for these

6   individual -- these laws.  It was really to prevent

7   public panic, and any issues that relate to

8   unnecessary anxiety to the public.

9           So I kind of hesitate to call those

10  intoxication laws; namely, because one didn't

11  necessarily need to be intoxicated under those laws.

12  There was no element of intoxication as the offense.

13          On the other side of that, if we look at

14  laws from the 19th century -- and these here are

15  closer to intoxication laws today, for example, not

16  selling a firearm to someone who is clearly under

17  the influence.  Well, those laws would not have

18  existed during The Founding.  It would not have

19  existed, for example, if when someone is using

20  opium.  That would have not been something under the

21  influence of a drug, not something that would have

22  prohibited one from using and possessing a firearm.

23      Q    Okay.  So it sounds like -- and I guess to

24  put that into my why/how framework, it sounds like,

25  in terms of why these intoxication laws exist, it's

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: bean@beanreport.com


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0863

1    not necessarily -- I'm sorry, Professor, I'm

2    producing a little feedback here.

3              It sounds like --

4              THE COURT:  Let me just remind everybody

5    that is on the Zoom.  If you're not Mr. Francis

6    right now, make sure you've muted your phone.  We're

7    getting some feedback somewhere.

8         Q    So it sounds like you mentioned things

9    like gunshots were used to sound the alarm for

10   attacks by native tribes; that some of these laws

11   were really more designed toward keeping the Sabbath

12   holy.  But these so-called intoxication laws were

13   not necessarily oriented toward the preemption of

14   impulsive suicides or homicides; is that correct?

15        A    That's right.  And it's not to say that

16   suicides didn't exist.  I mean, there is clearly

17   evidence to confirm that that was the case.  But

18   these laws were not intended to prevent those acts

19   at that time.

20        Q    And then moving on to licensing regimes.

21   And that's, obviously, more of a broad term.  People

22   can disagree about what is and isn't a licensing

23   regime.  But were licensing regimes common at The

24   Founding or around Reconstruction?

25        A    Some of them were, yes.  The licensing

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                    1-800-669-9492



App. 0864

1  regime that we think of today, for example, like the

2  one in Bruen, well, no, those clearly were not --

3  the Bruen law was in 1913.  There were licensing

4  laws that had more of an invidious purpose to them,

5  not necessarily to apply generally to all

6  individuals.

7       Q    Okay.  So let me develop that, I guess.

8  So, to the extent that there were laws that existed

9  in, say, the Reconstruction Period, that could be

10 characterized as incipient portions of a licensing

11 regime, did those laws tend to apply equally to all

12 Americans?

13      A    They did not.  And this is also noted in,

14 I believe, Professor Spitzer's report, where he

15 indicates that there were restrictions on slaves,

16 Free Men, Native Americans.  You know, the idea

17 here -- and I'm a guy that grew up in the South --

18 so the idea here was not to prevent general -- was

19 not a general licensing regime; whereas, a white man

20 would have had to deal with the same.  These were

21 specifically targeted to slaves, because there was a

22 fear of revolt, a history of turning into revolt by

23 Native Americans.

24           So this idea was not something -- this

25 kind of discriminatory purpose, really, when it

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0865

1   comes down to this type of licensing regime, is not

2   something that the Supreme Court had said should be

3   upheld because of the discriminatory elements.  But

4   these were not generally applicable, as if we're

5   talking about everyone in society.  They were

6   narrowly focused; they were racist on their face,

7   and definitely should not be used to justify any

8   licensing or waiting period.

9        Q    Sure.  And then just to clarify that point

10  a little bit:  Obviously, there are plenty of areas

11  of law during the Reconstruction Period, and before,

12  where African-Americans weren't given equal

13  treatment, the law wasn't administered fairly;

14  perhaps there was a de jure element.

15           What we're talking about here, though, are

16  laws that specifically only exist to say that

17  African-Americans, or Freedmen, or at the time just

18  slaves, could not own guns?

19       A    That's absolutely right.  That's right.

20           MR. HARRISON:  May I have just a moment?

21           THE COURT:  You may.

22           MR. HARRISON:  Thank you, Professor.  I'm

23  going to pass you off for the defense to cross.

24           THE COURT:  Thank you, Mr. Harrison.  Mr.

25  Allen, do you have cross-examination of Mr. Francis?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                         FAX (505) 843-9492
                                                                    1-800-669-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0866

```
 1                MR. ALLEN:  Yes, Your Honor.
 2                THE COURT:  Mr. Allen.
 3                     CROSS-EXAMINATION
 4    BY MR. ALLEN:
 5        Q    Good morning, Mr. Francis, or Professor
 6    Francis.
 7        A    It's still new to me as well.
 8        Q    I see you have a little unpacking to do
 9    there.
10             So you're starting as an Assistant
11    Professor at Widener University this fall?
12        A    That's correct.
13        Q    And this is a tenure track position?
14        A    It is, yes.
15        Q    You have not been granted tenure yet?
16        A    Not full tenure, no.
17        Q    Your career as an academic began in 2022;
18    is that accurate?
19        A    Let's see, I believe the fall of 2023.  So
20    I've got one year as a professor, 2023, and then I
21    was a prosecutor before that.
22        Q    And how many articles have you published
23    on the topic of constitutional limits on gun
24    regulation?
25        A    Oh, I would say maybe five or six
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email...support.com

App. 0867

1   articles.  I also have an essay in a casebook.  I've

2   got several smaller articles that aren't the typical

3   40-page articles.  But five or six, I believe.

4          Q    And other than your academic work on the

5   Second Amendment, you have no specialized training

6   or experience in history?

7          A    In history -- I mean, I think everyone --

8   law professors kind of have to know history; that's

9   kind of what our job is with looking at old

10  opinions.

11              I do have a bachelor of African-American

12  history.  That's one of my graduate areas.  And the

13  same is true for women and gender studies.  That

14  would have included history as well.

15         Q    And you have no background or training in

16  psychology?

17         A    I do have a degree in social science; that

18  was a bachelor's of science degree, so that would

19  have included psychology courses and things like

20  that.  Am I psychologist?  No, I'm not a

21  psychologist.

22         Q    So other than your undergraduate course

23  work, you have no training or experience in

24  psychology?

25         A    Not in psychology, no.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0868

1      Q     Or public health?

2      A     My focus in women and gender studies would

3  have included public health discussions.  I did

4  write a paper on public health related issues, for

5  example, including transgender research.  So I do

6  have some -- at least research interests in public

7  health.

8            I was a history teacher as well.

9      Q     I want to talk a little bit about your

10  testimony here today, and your declaration regarding

11  the availability of guns during The Founding period.

12            You make three claims that I identified

13  for the widespread availability of firearms during

14  The Founding Period.  Some guns were self-made;

15  there are probate records indicate that guns were

16  widely owned; and there were newspaper clippings

17  advertising guns for sale.

18            I'll start with the issue with self-made

19  guns.  You raise an objection to Mr. Spitzer's

20  declaration regarding the widespread availability of

21  guns via retail these days, by positing, in part,

22  that this discrepancy is explained by people making

23  guns for themselves at home.  Is that accurate?

24      A     I do say that self-made firearms were part

25  of the American tradition, absolutely.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0869

1          Q     Okay.  In your declaration you don't

2     quantify that number; correct?

3          A     I don't believe I do.

4          Q     And you rely on your declaration, you rely

5     for your declaration on an article written by

6     Mr. Joseph Greenlee -- who is now --

7          A     Now -- sorry.

8          Q     Who is now representing the plaintiffs in

9     this case; is that correct?

10         A     I think that's one of the things that I

11    looked at.  I also look at the militia laws.  Again,

12    I serve as an expert in a case in Delaware, which

13    looks at whether 18 to 20 year olds can obtain

14    firearms.  And that really required that I looked at

15    militias; what laws were on the books at the time

16    that would have included those individuals.  So the

17    article by Joseph Greenlee, would have been one of

18    the central resources I looked to, yes.

19         Q     And Mr. Greenlee performs a pretty

20    thorough survey of the history of self-made guns?

21         A     He does in the article, yes.

22         Q     He does not quantify the number of

23    self-made guns that would have been available at the

24    time of The Founding, does he?

25         A     I don't believe so.  But I do think it

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0870

1    would be -- even today, for example, trying to

2    pinpoint an exact number of firearms would be

3    difficult to do, and I have no problem saying that.

4    But I do think the evidence, both in the articles

5    that I cite and in my own declaration, make clear

6    that they were available.  I don't know that the

7    number, specifically -- if I were to say:  There

8    were 1.6 million guns available -- we do know that

9    each male, as young as 16, were required to have

10   firearms.  So, by definition, they would have needed

11   to be available for 50 percent of the population.

12       Q    Okay.  So that's a no, as to the quantity

13   of self-made guns available at the time of The

14   Founding?

15       A    Correct.

16       Q    And you acknowledged during your testimony

17   that, oftentimes the acquisition of firearms would

18   be delayed by the need to manufacture them to order?

19       A    The supply and demand issue, absolutely.

20   This would be common, to the extent that firearms

21   were -- for example, in the articles referenced

22   local stores having firearms.  "We've got them, come

23   get them."  But there would be instances where a

24   gunsmith might take two weeks to make the firearm,

25   yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email @ bastsupport.com

App. 0871

1       Q    I want to talk a little bit about the

2   probate records, just briefly.  The probate records

3   you cite in your declaration, these are statistics

4   derived from probate inventories; correct?

5       A    That's right.

6       Q    So the inventories don't indicate how the

7   firearms were disposed from the estate?

8       A    They -- what these probate records kind of

9   indicate is that, you know, the estate has firearms.

10  So the way that I think they're useful is that these

11  were firearms that were in possession, that

12  individuals were in possession during the course and

13  at the end of their lives.  So that's kind of a way

14  to indicate the commonality of firearms possession.

15      Q    So there is no indication from these

16  inventories how they were disposed of in

17  administering the probated estate?

18      A    Some will vary.  So, for example -- in a

19  lot of the newspaper clippings, if there is a death,

20  they would be sold at an auction, so that would be

21  one mechanism to do that.

22           But to your point, I think that there are

23  some evidence that would suggest that we don't know

24  what happened to every one of those firearms, yes.

25      Q    Yes.  It's certainly likely that some were

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: info@beanreport.com



**App. 0872**

1    sold at an estate sale?

2        A    Absolutely, yes.

3        Q    And that some were distributed to heirs?

4        A    I think that's probably true.  You know,

5    there would be -- to the extent that those documents

6    are available, it would be very common to leave a

7    firearm in a will to an heir, absolutely.

8        Q    I want to talk a little bit about the

9    newspaper ads you referenced in your declaration.

10   The ones you cite appear to be for, I would say, the

11   bulk sales of arms; is this a fair characterization?

12       A    I cite bulk sales, then I also cite some

13   individual stores as well.  There is one from a

14   local store in Connecticut.  And the idea here is to

15   just show that individual arms -- there is

16   Mr. Turner, who is leaving, going overseas.  If you

17   wanted an individual firearm, you can get that.  But

18   it's also extended out to large bulk.  If you wanted

19   300 firearms, or if you wanted a pair of dueling

20   pistols, those would be available as well.  So that

21   really is an indication that this would have applied

22   to individual firearms or to large bulk sales.

23           THE COURT:  Mr. Allen, why don't we take

24   our lunch break now.  We'll come back and resume

25   about 1:00.

---

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreport.com

App. 0873

```
 1              MR. ALLEN:  Okay.  Thank you, Your Honor.

 2              THE COURT:  Everybody finish their

 3  sandwich.  Nobody is going to start without anybody.

 4  We'll shoot for 1:00.

 5              All right.  We'll be in recess for about

 6  an hour.

 7              (The Court stood in lunch recess.)

 8              THE COURT:  All right.  Mr. Francis, I'll

 9  remind you that you're still under oath.

10              Mr. Allen, if you wish to continue your

11  cross-examination of Mr. Francis, you may do so at

12  this time.

13              MR. ALLEN:  Thank you, Your Honor.

14              THE COURT:  Mr. Allen.

15  BY MR. ALLEN:

16     Q    Mr.  Francis, I want to talk a little bit

17  about your discussion regarding suicides and

18  impulsivity.  You mentioned during your direct

19  examination this was a matter you've researched in

20  preparation for making your declaration in this

21  case?

22     A    That's correct.

23     Q    And you've never published on this topic

24  before?

25     A    No, I have not.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

email@bean.support.com

App. 0874

1      Q     And outside of your undergraduate studies,
2  and the subsequent certificates you mentioned, you
3  don't have any experience conducting social science
4  research?
5      A     In graduate school I did have what we
6  called an assignment, where we would go in and kind
7  of take data from individuals.  But outside of that,
8  no.
9      Q     And you mentioned that the research that
10 you performed indicated that impulsivity played a
11 role in suicide in 25 percent of cases?
12     A     I think what would be kind of termed in
13 academia as a literature review, I looked at a
14 series of articles on the topic.  A lot of these
15 were social science; some of these were from medical
16 journals.  And they seemed to indicate that
17 impulsivity, as it relates to suicide occurred in
18 from nearly 20 to 25 percent of the studies they
19 examined.  A lot of these studies were also
20 referenced in subsequent papers.  So this wasn't
21 just a one-off that no one really does, but these
22 were things that were developed across the
23 scholarship in the literature.
24     Q     In preparation for your testimony here
25 today, did you review the declaration of Eric Rubin,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@bean-reporting.com

App. 0875

1    which was filed in this case as document number

2    20-1?

3        A    I have reviewed that, yes.

4        Q    It's fair to say that there are differing

5    opinions in the social science literature as to the

6    role that impulsivity plays in suicidality?

7        A    I think one of the things that came up,

8    particularly as relates to impulsivity, is kind of

9    the scope of the term.  There has been some

10   discussion within the social science literature of

11   what qualifies impulsivity.  And this could be, for

12   example, someone talking about it, someone taking

13   additional steps.  Does that count as planning?

14            I do think that the question of what does

15   an individual -- what does it mean for an individual

16   to be impulsive?  That does come up in the

17   scholarship.  But like I said, I used, particularly

18   from those that are looking at the social science,

19   that are looking at this that conducted the data, so

20   I relied on their reports.

21       Q    Okay.  So there is a dispute?

22       A    There is a dispute insofar as what does

23   the term "impulsive" mean?  I don't know that there

24   is a dispute within the field of -- social science

25   field as it relates to the impulsivity of suicide

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreport.com

App. 0876

```
 1  itself.
 2          So there is a broader question as it
 3  relates to what exactly -- what are the aspects of
 4  impulsivity.  I mean, that's a separate discussion
 5  from whether or not suicides themselves are
 6  conducted on impulse.
 7      Q   I'm going to need you to unpack that a
 8  little bit.  You're saying there is a debate over
 9  what impulsive means, but that doesn't change the
10  calculus on whether suicide is impulsive or not?
11      A   That's right.  Because, in the social
12  science articles that I referenced, particularly the
13  one that indicated that suicide as a means of death
14  by suicide via firearm, were extremely rare, I think
15  they quoted 25 percent, they were also cited in a
16  subsequent social science journal, which really
17  unpacked what it means to be impulsive.
18          And it really looks at, are people taking
19  affirmative steps -- and that could mean they have
20  cleaned out bank accounts; they have spoken with a
21  therapist as it relates to their conduct.  But I
22  don't know that that changes the scenario of
23  impulsivity, generally, as a social sciences report
24  are still quite, quite rare, as it relates to those
25  that are planned.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beansupport.com

App. 0877

 1       Q    Your earlier testimony, you stated
 2  adolescents were twice as likely to commit suicide
 3  by firearm than adults.  Is that accurate?
 4       A    Yes.  So the rate, at least from those
 5  reports, indicate that adolescents are twice as
 6  likely to commit suicide with a firearm.
 7       Q    Are you basing that finding on the article
 8  by Cavisto (phonetic), et al., regarding adolescent
 9  suicide and access to firearms?
10       A    I believe that you're referencing -- is
11  that A.J. Cavisto?
12       Q    That's correct.
13       A    That's right.  That's one of the articles
14  that I referenced, yes.
15       Q    Now, their finding was not double the rate
16  for adolescents.  Rather the finding was a
17  correlation between gun ownership on a state level
18  and rates of suicidality doubled the effect on
19  adolescents than it did on adults; correct?
20       A    Am I able to read from my declaration?
21  It's footnote 39 in my declaration.  And they look
22  at -- I don't know if I'm able to read from that or
23  not.  I don't want to --
24       Q    That's been admitted as an exhibit, so you
25  are allowed to consult it, if that would refresh

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0878

```
 1   your memory.
 2        A    Okay.  So in this footnote -- and this is
 3   a direct quote from their study -- it says:  There
 4   were 37,652 suicides among adolescents age 14 to 18
 5   years during this particular study during the time
 6   they looked at in the studies, for an overall rate
 7   of 6.9 per 100,000.  Slightly more than half of all
 8   adolescents, who 51.5 percent with firearms with the
 9   rate of 3.6, with comparison for adults 53.9 percent
10   during that same period.
11        Q    Okay.  Wasn't the conclusion of the
12   article that suicidality was correlated to firearm
13   ownership rate on a statewide level to higher rates
14   of suicide, and to double that higher rate of
15   suicide in adolescents?
16        A    That's right.  There is -- the article did
17   address, and this is again quoting from paragraph 53
18   of my declaration -- the association between firearm
19   ownership and suicide.  The reason that this is
20   significant is because adolescents can't obtain --
21   legally can't obtain firearms.  So that's why that's
22   significant.  A 14 year old couldn't go to a store
23   to obtain a firearm.
24        Q    Okay.  But the correlation is still
25   positive for adults as well, the correlation between
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0879

1   increased rates of firearm ownership and suicide?

2        A    Yes.  No, the significant amount of

3   suicides, as it relates to adults, that wasn't the

4   point of that particular piece.  It was essentially

5   saying that adolescents -- and this is quoting from

6   the article, adolescents are more at risk for

7   suicide.

8             MR. ALLEN:  Thank you, Mr. Francis.  I

9   have no further questions.

10            THE COURT:  All right.  Thank you, Mr.

11  Allen.

12            Mr. Welsh, do you have redirect of -- oh,

13  Mr. Harrison?

14            MR. HARRISON:  No redirect, Your Honor.

15            THE COURT:  All right.  You may step down.

16  Thank you for your testimony, Mr. Francis.

17            THE WITNESS:  Thank you, Judge.

18            THE COURT:  All right.  Mr. Harrison, does

19  the plaintiff -- do the plaintiffs have further

20  witnesses or evidence they wish to present?

21            MR. HARRISON:  No, Your Honor.  That's our

22  case for the preliminary injunction.

23            THE COURT:  All right.  Do the defendants

24  have witnesses or evidence they wish to present?

25            MR. DUFFY:  Yes, Your Honor.  At this

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: beanandassocreport.com

App. 0880

1   point, we would like to call our one and only

2   witness, Professor Randolph Roth.

3             THE COURT:  All right.

4             THE WITNESS:  Hello.

5             THE COURT:  Mr. Roth, if you will stand

6   and raise your right hand.  Ms. Rotonda, my

7   courtroom deputy, will swear you in, then we'll take

8   your testimony under oath.

9                     RANDOLPH ROTH,

10       after having been first duly sworn under oath,

11       was questioned and testified as follows:

12                  DIRECT EXAMINATION

13             THE CLERK:  You may be seated.  And please

14   state your name for the record.

15             THE WITNESS:  My name is Randolph Roth,

16   R-OT-H.

17             THE COURT:  Mr. Roth.

18   BY MR. DUFFY:

19       Q    Good afternoon, Dr. Roth.  Can you hear me

20   all right?

21       A    Yes, I can.

22       Q    Great.

23       A    Can you hear me?

24       Q    Yes, I can.

25             And so, as you know, we're speaking via

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492





BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0881

1    Zoom, so I will try my best to pause and let you
2    finish before I start speaking.  If you could do the
3    same, in order to help the court reporter, that
4    would be great.
5              Dr. Roth, what do you do for a living?
6         A    I'm a professor of history and sociology
7    at Ohio State University.
8         Q    Could you tell us a little bit about your
9    educational background?
10        A    I have my undergraduate degree in history
11   from Stanford University.  I have my graduate degree
12   in history from Yale University.  And I took my
13   advanced training in quantitative methods and social
14   science methods in the political science and
15   economics departments at Yale.
16        Q    Can you tell us about the academic posts
17   you've held, starting with the most recent, and
18   working your way backward?
19        A    Yes.  I've been a faculty member at Ohio
20   State for 38 years.  It's been a wonderful job.  And
21   I really love our university, very proud of my
22   department and my school.  I am now college of arts
23   and sciences distinguished professor of history and
24   sociology.
25              Before that, I taught at a wonderful

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0882

 1   liberal arts college, Grinnell College out in Iowa

 2   for seven years, a wonderful school.  If my spouse

 3   had found something to do there with her

 4   professional credentials, we would still be there.

 5           And before that, I was a visiting

 6   assistant instructor at the University of Vermont,

 7   because my original work is on history of religion

 8   in small town rural America, and northern religion.

 9       Q    I believe you already mentioned some of

10   this, but briefly, could you tell us what have been

11   your areas of focus in your academic posts?

12       A    In my academic posts, my specialty has

13   been -- since I completed my first project, I've

14   been studying the history of violent crime and

15   violent death.  So I am interested in all kinds of

16   homicides, murders, homicides, sexual assaults,

17   attempted murders, aggravated assaults, arson,

18   sexual assaults.  Very interested, as my colleagues

19   are, in the history of accidents and suicides,

20   because we find interesting differences and

21   similarities in the causes of those kinds of

22   phenomena over time.  So that is really what I focus

23   on.

24           So my interest in things like firearms, I

25   never conducted any of this research thinking about

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0883

1  would I ever be in a court or ever been important to

2  the Supreme Court.  You know, I just wanted to try

3  to understand how we could deal with the problem

4  that we face, being, by far, the most violent

5  affluent society in the world.  That troubles me.

6  And my current work is not at all on homicides among

7  adults, it's on homicides of children.  And

8  relatively few of those are committed with firearms.

9  The sad fact is that we even beat our children to

10  death at the highest rate in the affluent world.

11          So our problems with violence run deep in

12  our society, and that's really what I've been trying

13  to figure out.

14          And also, professionally, I've been very

15  involved in the community.  I've been involved in,

16  you know, the National Academy of Sciences

17  Roundtable on crime trends.  I was one of the 12

18  scholars that was invited to participate on that,

19  along with judges, police chiefs, and other experts.

20          I have been involved in our Youth Violence

21  Prevention Advisory Board here in Greater Columbus.

22          We're starting a new initiative with the

23  City of Columbus to try and work on those things.  I

24  play a role in that.  I'm an intern at the police

25  department, so I have complete access to all the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: bean@beanreport.com


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0884

1    case files.  And I talk to the officers quite

2    frequently.

3            And I talk to lots of professionals around

4    the country.  They've been very helpful.  I talk to

5    medical examiners, coroners, pathologists, social

6    workers.  So even though my work is academic, I'm

7    very involved in these other issues on the ground,

8    know the people who have been dealing with these

9    difficulties.

10           So yeah, so not narrowly an academic.

11       Q    Thank you, Professor.  Have you authored

12   any books or articles on homicide and violent death

13   in America?

14       A    Yeah.  Yes, I have.  I'm an old guy.  I

15   turned 73 two weeks ago.  So I'm sure that,

16   Professor Francis, you're going to catch up with me

17   quickly and pass me.  But so far, I've got him on

18   age.

19       Q    Well, happy belated birthday.

20       A    Thank you.

21       Q    Have any of your publications been peer-

22   reviewed?

23       A    Yes, virtually all of them.

24       Q    Have you written a book titled, "American

25   Homicide"?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0885

1      A    Yes.

2      Q    Could you briefly tell us about that,

3  about your work in American Homicide?

4      A    Well, I really wanted to understand the

5  history of how and why we became such a violent

6  society.  And it's just fascinating to me how much

7  our homicide rates have changed over time.  It

8  really surprised me.  And my colleagues and I have

9  been working on this.  But I guess I've done the

10  most research of anybody.

11          And Professor Francis is right, we had a

12  very high homicide rate in the early and mid 17th

13  century.  But by the time of the Revolution in the

14  north, we had one of the lowest homicide rates in

15  the world.  And in the mountain south, and after the

16  Revolution, we might have had the lowest homicide

17  rate in the entire world in the north and the

18  mountain south.  So what's gone wrong is a question.

19  The slave south was certainly more violent.  But

20  oddly enough, the violence there was, was really

21  mostly non-lethal in an odd way.  Because no matter

22  what the brutality of slavery was, it was awfully

23  cool.  Murdering your slaves was just not cost

24  effective.  Killing a white person was suicidal in

25  the slave south for African-Americans.  And one of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



**App. 0886**

1   the greatest tragedies is in most of our history

2   African-Americans have been the least homicidal of

3   all Americans, particularly when you consider the

4   circumstances they lived in.

5          How that has changed, especially in the

6   1890s and 1930s is something I've really thought

7   about.  And so what we see today is not what we see

8   in the past.  So I wonder why those rates go up and

9   down so often, and so dramatically, compared to our

10  own history, compared to the rest of the world.

11         So the more I studied, you know, Mr.

12  Duffy, the more complex it's gotten.

13      Q    Yes.  Thank you, Professor.

14         So you're the cofounder of the Historical

15  Violence Database; right?

16      A    Yes, sir.

17      Q    Does that gather data on homicides and

18  suicides in the United States?

19      A    Yes, it does.  And all of the data, every

20  single case -- thousands of cases I've studied --

21  all of the narratives and all of the sources are up

22  there, carefully distinguishing between, you know,

23  cases that are legitimate, justified homicides, the

24  small minority that are, versus those that are

25  criminally sanctioned, murders and voluntary

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0887

 1   manslaughters.

 2          Our spreadsheets are up there.  So all of

 3   that data, all of my work is up there online so

 4   people can kick the tires, help me find any mistakes

 5   I've made, augment it.  Because we're trying to

 6   build for the future, and make sure that the hard

 7   work that my colleagues and I have done is passed on

 8   to the next generation, so they can improve upon it

 9   and understand violence better than we have.

10      Q    Professor, do you have any agenda or

11   preconceived notions about what you want the data to

12   show?

13      A    I can't tell you how many of my theories

14   have died a horrible death in the face of the

15   evidence.  And I've got to say, you know, one thing

16   that I'm fond of telling my students, every time I

17   look at a new set of data, I have one of two

18   responses:  What the heck, or oh, no, because

19   another theory has died.  I did not at all come up

20   with these theories because they were obvious to me.

21   That's why it took me 22 years to write the book

22   because so many theories died.  And I had to -- all

23   my grant applications were testing.  I'd try a new

24   theory, and I'd say:  Well, if my theory is right,

25   this will happen here and this will happen there but

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0888

1    I have to go research it.  And it took years until I

2    found that the answers started coming up, yes, with

3    the theories I now hold.

4            It's just very difficult work.  And right

5    now, I'm working on child murder.  It's a very

6    different periodicity, very different causal

7    structure.  Murders of intimate partners has a very

8    different ups and downs through our history, has

9    very different causes than homicides among unrelated

10   adults.  And I never anticipated that at all.  I had

11   no idea that would be the case, Mr. Duffy.  But that

12   just took me by surprise.

13       Q    So Professor, would you agree that

14   objective accuracy is very important in your work?

15       A    Absolutely.  For those of us in the Social

16   Science History Association, we say very often our

17   job -- and I've said it in print -- our job isn't to

18   be right.  You know, we don't want to be right, we

19   want to get it right.  If that means admitting a

20   mistake, we have to do that.

21           And especially because our work does have

22   implications for public policy.  And the worst thing

23   we could do is do slipshod research or publish

24   prematurely and give our courts, give our

25   legislators, giving our public health people, police

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0889

1    departments, bad advice.  There is just no -- and

2    so, child murder is going to take me two decades to

3    write, too.  It's just painstaking work.  We're down

4    to drudges.  In fact, one of my latest essays is

5    Data Drudges Unite.

6          You know, very few people want to do this

7    kind of work, because you have to go through every

8    scrap of paper in the courthouse.  You know, all the

9    docket books, the case files, the court records, the

10   court orders and requests, the jail records.  You

11   have to read every single issue of the local

12   newspaper, you have to read every local history

13   based on oral traditional testimony.  And the more

14   different sources you have, the better you can

15   reach statistical techniques that estimate the

16   actual number of homicides that probably occurred,

17   knowing that your records are missing some, records

18   are lost, records are incomplete.  And we have

19   mathematical tools we can use, and we do exhaustive

20   research to figure that out.

21          And so, you know, for our contemporary

22   work in Ohio, just to give the judge an idea of

23   this, we found that in the 1970s and '80s, in Ohio,

24   only 60 percent of the homicides that occurred in

25   our rural counties in Ohio were reported to the FBI.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0890

1    And we're building public policy out of data that's

2    that bad.

3              So when you really go back in, it's very

4    important to be thorough.  I'm an outdoorsman, so to

5    make ends meet, I camp out.  I camp out in the

6    winter.  I go to the archives during the day and I

7    camp out in the winter.  I stay in cheap places that

8    I probably shouldn't, and in neighborhoods that I

9    shouldn't.  But, yeah, it's a labor of love for us.

10   And we love our country, and we want to help solve

11   this problem.  So that's why we do this.

12        Q    Thank you, Professor.

13             Have you been recognized as an expert in

14   the fields we're talking about, homicide and violent

15   death, before in federal courts?

16        A    Yes, I have.

17        Q    About how many times would you say?

18        A    Well, right now, as best I can tell, I've

19   been asked to work for 11 states, the District of

20   Columbia.  I haven't got a retention agreement yet

21   with the DOJ, but they are looking towards bringing

22   me in.  And I've been asked to help a number of

23   counties, municipalities.  I've also participated in

24   the amicus brief on the Rahimi case.

25        Q    And, yes, then your brief in Rahimi, was

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



App. 0891

 1   that cited in the decision?

 2        A     Yes, it was.

 3        Q     Do you know where in the decision it was

 4   cited?

 5        A     Well, generally, our historian's brief was

 6   cited, I believe -- again, I'm not the expert on

 7   this, Mr. Duffy, so you're asking me a question that

 8   you know the answer to and I don't -- so please, you

 9   and the judge decide this.  I think we were quoted

10   in all of the majority opinions.  But specifically

11   my work was cited in the concurrence by Justice

12   Sotomayor.  That's the name that appeared, to my

13   knowledge.  But that's just what my friends have

14   told me.  I have no idea, anything else.  I haven't

15   read it.

16        Q     Thank you, Professor.

17              MR. DUFFY:  Your Honor, at this time I'd

18   like to move to have Dr. Roth recognized as an

19   expert in the field of historical and contemporary

20   homicide and violent death.

21              THE COURT:  Any objection?

22              MR. NATION:  The only objection would be

23   as to relevance, Your Honor.  I'm not sure how this

24   is relevant to the inquiry.

25              THE COURT:  Well, we'll determine that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: support.com

App. 0892

 1   later.  But I'm going to take his testimony here

 2   while we're together.  So overruled for the present

 3   time.  And you can argue that in closings or other

 4   briefs.

 5          THE WITNESS:  Judge Browning, if I might

 6   interrupt.  I could not hear why he objected to my

 7   expertise.

 8          THE COURT:  Relevancy.

 9          THE WITNESS:  Oh, yes, he declared

10   everything I have to say irrelevant.  I remember

11   that.  Thank you.

12          THE COURT:  All right.  So Dr. Roth can

13   offer opinion testimony in the areas of historical,

14   and homicide, and violent deaths.

15          MR. DUFFY:  Thank you, Your Honor.

16   BY MR. DUFFY:

17      Q    Okay.  Professor, briefly, let's start

18   with a high level summary of your opinion.  What is

19   your expert opinion on the history of firearm

20   homicide and violent death in the United States?

21      A    Well, for nearly two and a half centuries,

22   every time our citizens and our legislators have

23   faced problems posed by a dangerous new technology,

24   or a dangerous new use of an existing technology

25   that corresponds with a change in the incidents and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0893

1  character of violence, they have acted to regulate

2  that kind of technology that can be used as weapons.

3         I know that the plaintiffs have objected

4  that we shouldn't consider laws against brass

5  knuckles, slingshots, fighting knives, et cetera.

6  But as a historian, when we think of context, that's

7  vitally important to see that we have done that,

8  because it shows that the regulatory legislation has

9  not been aimed specifically at gun owners.  It's

10 been aimed at dangerous technologies, which is why

11 now you can't buy five tons of fertilizer if you are

12 not a farmer.  You can't buy dynamite unless you are

13 in construction or mining.  You can't just walk into

14 the cockpit of a plane today, and make sure that the

15 pilots are doing their job.  We have to respond to

16 these kinds of thing.

17        So, and certainly another thing is I have

18 never claimed, nor have my colleagues claimed, that

19 firearms are the sole reason why we have a high

20 homicide rate.  We would have a high homicide rate

21 anyway, because the fundamental causes of those have

22 to do with feelings and beliefs.  But when you throw

23 dangerous technologies into those situations, it

24 makes the homicide rate much worse.  And that's why

25 one of my essays that I wrote says exactly what I

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: bean@beanreport.com


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0894

1  think, why guns are, and aren't the problem.  They

2  are and they aren't the problem.

3         So that I think is a very fundamental

4  finding of my work.  I would never blame firearms

5  for being the sole -- or any kind of technology --

6  as being the sole reason why we're a violent

7  society.  But when you throw that kind of technology

8  into a violent society, it makes it much worse.  And

9  you can see that because we can't -- even when the

10  fundamentals are good when it comes to politics or

11  feelings and beliefs, we can't get to a low homicide

12  rate, when other societies can, because of that

13  residual violence that comes from all of these

14  dangerous technologies that are available in our

15  society.

16       Q    Thank you, Professor.

17            So Professor Francis points out in his

18  declaration that you include justifiable homicides

19  in your calculations.

20       A    Right.

21       Q    Could you explain why you do this?

22       A    Yes.  My colleagues and I always are

23  encompassing well over 90 percent of the homicides.

24  And the homicide rates that I have reported are

25  willful murders, manslaughters.  So when we talk

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0895

 1  about the ups and downs of the homicide rate, it is
 2  the ups and downs of murdering.  But why do we, as
 3  historians, also include justifiable homicide by
 4  civilians?  Why do we look at homicides by law
 5  enforcement officers, security guards, homicides of
 6  law enforcement and security guards?  Because it's
 7  an empirical question.  We wanted to know do they go
 8  up and down together?  And the fact is that they do.
 9          In other words, everybody gets caught up
10  in when the illegal -- the vast majority, over 90
11  percent of our homicides, which are criminal in
12  nature go up and down -- everybody is caught up in
13  it.  So people are more likely to kill in
14  self-defense.  Law enforcement officers are more
15  likely to be killed, and they're more likely to
16  kill.  And that tells us the police-involved
17  violence is not different from any other kinds of
18  violence.  It's a point we're trying to make to the
19  American people, because right now we're talking
20  about police violence as if it's something
21  different.  You know, when we become more violent,
22  our police officers are victimized, and they very
23  often have no choice but to become violent
24  themselves, use lethal force.
25          So that's really what we're trying to do.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0896

1    We're trying to build a causal map of what kinds of

2    homicide are related to one another?  And, as I

3    said, you know, murders of children under the age of

4    nine don't follow that pattern.  And that's why we

5    studied age differences, why we study intimate

6    partner violence differently.  You know, that went

7    up more during the pandemic than other kinds of

8    homicides.  So we want to know those things.

9            So, again, the other thing -- so it's a

10   difference, it's just a slight misunderstanding of

11   my work on Professor Francis' part.  But we really

12   need to think broadly about these problems.  And

13   that's what we do.

14       Q    Thank you, Professor.

15            I'd like to dive into the history now.

16   Starting with the Colonial Era, immediately before

17   the Revolutionary War, what were the homicide rates

18   generally?

19       A    Well, you know, again, once you achieve

20   political stability after the Glorious Revolution,

21   it's a complicated argument about why you have more

22   faith in government, less political upheaval.  The

23   great revolutionary turmoil, the class and religious

24   antagonisms that were marked in the 17th century

25   subsided considerably at the end of the 17th and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0897

1   early 18th century.  So what we see is that the

2   homicide rate became comparatively low in the United

3   States, or Colonial America outside of the slave

4   south, and homicides were very rarely committed with

5   firearms, because they were very difficult to use at

6   the time on impulse.

7           So when you look at, particularly domestic

8   homicides, household homicides, never more than 10

9   or 15 percent were committed with firearms.  Because

10  those were muzzle-loading black powder weapons; it

11  took considerable time to load them.  And also

12  because black powder is explosive, it was a bad idea

13  to keep them loaded all the time.  That would ruin

14  the mechanism, foul the gun.  So on the frontier,

15  they would try to have it loaded for longer periods.

16  They put it over the fireplace, the hottest, dryest

17  place they could, to try to prolong that.  But even

18  then, they had to regularly keep their guns unloaded

19  and cleaned.  So you'll see for those intimate

20  partner homicides, household homicides, they're

21  never done more than 10, 15 percent with firearms.

22  The rate at which firearms were used among unrelated

23  adults went up and down with the homicide rate.

24  Because when the homicide rate went up, people more

25  often came armed to political and property disputes,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



**BEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE

**App. 0898**

 1  and other disputes, expecting trouble, right?  And

 2  so, it would go up to 40 percent when people --

 3  those hostile, defensive emotions run through

 4  society.

 5          But when the homicide rate is low, as it

 6  was between the 1690s and the mid 1760s, the rate at

 7  which homicides were committed among colonists were

 8  10 to 15 percent.

 9          Now, when you hunt down runaway slaves,

10  they went armed; right?  And so, when runaway slaves

11  are killed, is 90 percent.  When they go out to the

12  frontier, and are afraid of conflict with Native

13  Americans, they go armed.  So when colonists

14  murder -- this is not war, but outside of war --

15  murdered Native Americans, it's over 60, 70 percent.

16          So what you're seeing is that when people

17  are prepared for, or anticipate violence, they load

18  these weapons, they're ready for conflict.  And

19  where you see the impulsive homicides with firearms

20  at this time, it's when people load them for another

21  purpose.  We see impulsive homicides in people are

22  hunting, and they get drunk and they get mad at each

23  other.  We see impulsive homicides on militia

24  training days, because they're drunk, and their guns

25  are loaded.  Otherwise, you just don't see many

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  impulsive homicides in the Colonial Period with

2  firearms.  So it's not a problem that The Founders

3  had, or one they anticipated.

4        And as I noted in my declaration, from my

5  own research, firearm suicide can vary, 10 percent

6  or less.  So yeah, it's a very different era, in

7  part because it was uncommon outside of the slave

8  south, but also because the homicide rates were low,

9  and because these guns were hard to use on impulse.

10       Q    Thank you, Professor.

11            So would you say that firearm suicide and

12  homicide rates were also relatively low during The

13  Founding Era?

14       A    Yes, except in the slave south.  I would

15  never argue that the slave south is a peaceful

16  society.

17       Q    Thank you.

18            So would it be fair to say that firearm

19  suicides, generally, wasn't an issue at that period?

20       A    That would be correct.  As I said in my

21  declaration, people hanged themselves or drowned

22  themselves far more often.

23       Q    And would it be fair to say that firearm

24  homicides, generally, wasn't an issue during that

25  era?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0900

1       A    That would be correct.  Although, again,

2  things changed radically after the Revolution.  They

3  didn't anticipate that.  But it went up in the slave

4  south, went down in the north.

5       Q    Got it.  During The Founding Era, there

6  wouldn't be much need to enact a waiting period like

7  New Mexico's at that time; right?

8       A    No.  It was a problem that they didn't

9  have and they didn't anticipate, they couldn't have

10  anticipated.

11       Q    Thank you, Professor.

12            So I think you've started to get into

13  this, but when did homicide rates begin to rise

14  after The Founding Era?

15       A    Well, the difficulty was that after the

16  Revolution, they went down even farther in the north

17  and the mountain south, they settled north of the

18  mountain south.  They went up, they were still high

19  on contested frontiers, and they went up in the

20  slave south.  And it has to do with the democratic

21  promise of the Revolution as much as anything else.

22  In the north, the democratic promise of our

23  Revolution was realized.  More people could vote.

24  Slavery was slowly, but inexorably dying.  You see,

25  by the time people were in their 30s, 80 percent of

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0901

 1  couples owned their own shop or farm.  You'll see

 2  tremendous pride in the country.  You see the number

 3  of counties that are named after national heroes

 4  peak, that kind of intense patriotism.  So where you

 5  see the promise of the Revolution being realized,

 6  the homicide rate goes down.  But in the slave

 7  south, you're throwing democratic ideals into a

 8  society that is cast and class bound and doesn't

 9  change.

10          And it's a complicated argument.  But, as

11  I put it simply, when you throw democratic ideals

12  into a society that is cast and class bound and

13  won't change, it's like throwing a match in a can of

14  gas.  You change the aspirations and you don't

15  change the reality.  Think of what it's like to be

16  enslaved, and see everybody else in the society not

17  being enslaved.  Think of how threatening it is to

18  the slave owners to see the world turning against

19  them, and to fear revolt like what happened in

20  Haiti.  You'll start to see all of those things

21  destabilize the south, and destabilize the frontier.

22  And that's where you start to see the murder rate go

23  up, and so many of those were committed by concealed

24  weapons.

25      Q    And that's my next point, Professor.  Do

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                              1-800-669-9492



App. 0902

1  you believe, in addition to those issues, the

2  advancements in firearm technology played any role

3  in that rise in homicides?

4      A    Certainly.  You know, the movement more

5  percussion caps helped, because when you use a

6  percussion cap instead of a flint, you can keep that

7  gun loaded and ready longer, because you're not

8  getting air in that way.  But certainly, the pistol

9  technology was not as novel as, say, fighting

10  knives, not as novel as the brass knuckles.  But so

11  it's as much new uses of technologies, the pistol

12  technology, as it is new technologies that you see

13  with the Bowie knives, the dirk knives, the certain

14  kind of shivs that are becoming.  And, of course,

15  it's going to be with the sling-blade knives, which

16  turned into the switch blade, once they can operate

17  it with a switch.  So all of those weapons are

18  concealable.  There is tremendous worry among people

19  in slave south, and in the frontier about how those

20  are being used.  So they cast restrictive laws on

21  the carrying of concealed weapons.  Most generally,

22  they did not restrict at all the open carry.  They

23  restricted the concealed carry.  Because people were

24  ambushing people, essentially.  Or they'd be

25  involved in a fair fight, they'd start to lose, and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0903

1   they'd stab the guy to death, even though that

2   person's unarmed, or they'd shoot them, even though

3   they were unarmed.  So that was a real problem, all

4   of a sudden, that they didn't have in 1791.

5       Q    And now let's talk about suicides.  How

6   did the suicide rates in the early 1800s compare to

7   today's rate?

8       A    As I said in my declaration, there are far

9   more.  You know, it was just not as high.  There is

10  some -- you know, to be frank, we're still copping

11  out all of the drownings.  Because that's the one we

12  have the most trouble with, Mr. Duffy.  You know,

13  how many of those were suicides and how many of

14  those were accidents?  Sometimes it's ambiguous.  So

15  where it's ambiguous, I note that.  And again, I

16  haven't published on this, but I have a lot of cases

17  that I would call uncertain; you know, I'm quoting

18  them as uncertain.  And I want my colleagues to know

19  that where those drownings are concerned, and

20  neighbors are concerned, you know, they may have

21  been suicides.  But even including those, it's lower

22  than it is today, yes, much lower.

23      Q    And what would you say the proportion of

24  suicides at that period were committed with

25  firearms?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0904

```
 1        A    I'm thinking it's still about 10 to 15
 2   percent.  Again, a lot of that stuff I still have to
 3   publish.  It's all in my notes.  So I can't say that
 4   I can refer to a peer-reviewed article on this.  I
 5   have published the data on New Hampshire and
 6   Vermont, though.  So I'm comfortable with telling
 7   you that, which is in my declaration.
 8        Q    Thank you.
 9             So would it be fair to say that firearms
10   suicide and homicide generally wasn't an issue
11   during the early 1800s?
12        A    No -- I mean, yes.  Excuse me, it's not a
13   problem.  I'm sorry.
14        Q    My apologies.  That was an awkwardly
15   worded question.
16        A    No, it was an awkward answer.
17        Q    So let's now move to the Reconstruction
18   Era.  Can you tell us generally what the homicide
19   rates were at that time?
20        A    It really depends on the area.  What you
21   see, it goes up everywhere.  Starting in the Mexican
22   War, right on through the end of Reconstruction, the
23   homicide rates goes up.  But in Amish and Mennonite
24   counties, German County, say Holmes County, it goes
25   up from half a person per 100,000 per year to two
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0905

1    and a half.  It's not like it gets totally out of

2    control.  But in many places it's getting up to, you

3    know, the most violent areas, particularly in the

4    south.  We can actually document just from a single

5    source that the homicide rate of young adults is 65

6    per 100,000 in Texas, 1865 to 1868.  And they're in

7    a panic.  And not just the pro Reconstruction

8    government, the Republican government is in a panic.

9    When the Democrats take over again, the White

10   Supremacist conservative Democrats, they're in a

11   panic, too, which is what, you know, the research

12   that we're seeing from Brennan Rivas is showing.

13   These were just tremendous.  You have counties in

14   Louisiana, thanks to Jules Fandell's (phonetic)

15   work, it's 130 per 100,000.  And where are we today?

16   We're at seven per 100,000, and we see ourselves

17   correctly as a violent society.  So what's happening

18   in that period is our society was more violent than

19   it is today.  That's just the reality.  Thank God.

20        Q    Professor, so understanding it was more

21   violent then, what was the proportion of those

22   homicides committed with firearms?

23        A    Well, what you see is that when this whole

24   crisis started, you have the new cap and ball

25   revolvers.  But most people still had the muzzle-

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0906

1  loaders.  So what you're seeing really is that when

2  this starts in the 1840s and 1850s, the majority of

3  these homicides, even in a place like New York City,

4  are still being committed with knives and other

5  non-firearms weapons.

6          But what you see is, as we get the new

7  breech-loading technologies, the Smith & Wesson

8  revolvers, where you start to get more of your, you

9  know, Sharps and Spencers, carbines.  The Sharps kit

10  is 10 rounds per minute.  The Spencer is 20 rounds

11  per minute.  When you start to see these

12  breech-loading firearms, rimfire, use center pin

13  fire, they can be loaded all the time, because the

14  corrosive powder is encapsulated within the bullet,

15  right?  So you can keep these loaded all the time.

16  And even with something like the Smith & Wesson, it

17  has fairly low muzzle velocity, it has just a .22

18  caliber round.  It's very recent.  But you're going

19  to see the Colts come in by 1873, when that patent

20  expires, you know, they're looking at .45 caliber.

21  And these are very powerful weapons.

22          So what you see is the percentage of

23  homicide committed with firearms goes up and up and

24  up.  And when finally, the breech-loading firearms

25  start, completely replaces the muzzle-loading stock,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0907

1   you'll see by World War I, when that transition is

2   complete.  And at that point, as I show in my

3   declaration, you'll see that -- you know, well over

4   half, usually about two-thirds of all the homicides

5   are committed with firearms.

6           And the most dramatic shift is in intimate

7   partner homicides.  Because those used to always be

8   rare with guns.  And once you have the

9   breech-loaders, it becomes the kind of murder that

10  is committed as often with firearms, as those among

11  unrelated adults.  That had never happened before.

12  Because you can use these weapons on impulse, you

13  can use them to stalk victims.  And they're most

14  often used actually to stalk victims.  That is to

15  say, you hunt down your ex-romantic partner, your

16  ex-wife, and you kill them.  It's the perfect weapon

17  for that, particularly because most of these men are

18  suicidal, and two-thirds of them try to kill

19  themselves immediately, and having the multiple

20  rounds they kill the woman and they try to kill

21  themselves or kill themselves.  So this kind of

22  thing would never be possible in the muzzle-loading

23  era.

24      Q    So did I hear you correctly that today

25  we've reached today's proportion of firearm

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0908

 1  homicides roughly around the time of World War I?

 2      A    That's correct.

 3      Q    And that was in the early 20th century?

 4      A    Right.  Really, our first really good

 5  national statistics would really begin in 1919.

 6  That's when a number of the southern states finally

 7  met the requirements for being in the National Death

 8  Registration area.  You had to prove that at least

 9  90 percent of all deaths in your state ended in --

10  had a death certificate with it.  So, really, we see

11  at that point that, yes, we're at about that, from

12  1919 through to 1933.

13      Q    Now, I'd like to move on, briefly, to mass

14  murders.  Does America have a history with mass

15  murders?

16      A    Sadly, yes.  But, as I said in my

17  declaration, we historians know that in most of our

18  history mass murder was a group activity.  It would

19  be mobs, it would be the Ku Klux Klan, or the White

20  Supremacist groups.  It would be rioters, say, the

21  Orange Riots in New York City, where 70 people died;

22  it was a fight between the Catholics and the

23  Protestants.  You'll see the Draft riots, which took

24  125 lives in New York City in 1863.  Murders of

25  Mormons.  These generally were done by groups of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0909

```
 1   people, because you didn't have the technology that
 2   enabled the loaded individual to kill a massive
 3   number of people.
 4            And you see that change with the invention
 5   of dynamite.  And we can see what the anarchists did
 6   with dynamite, and some labor activists did with
 7   dynamite around the turn of the early 20th century.
 8   And this is one of the reasons why the National
 9   Firearms Act of 1934 really shut down the private
10   sale and ownership and possession and use of
11   dynamite.
12            So what we see is that, as these
13   technologies, dangerous new technologies develop, it
14   enables one or two individuals to kill a massive
15   number of people, voters and their representatives
16   responded.  Our judiciary upheld the
17   constitutionality of these laws.  And our executive
18   branch enforced them.
19       Q    Thank you.  So would it be fair to say
20   that it is much easier today for an individual to
21   kill a mass amount of people than it was in 1791 or
22   1868?
23       A    We're working on that, yes.  You know, and
24   we have eliminated certain technologies.  But they
25   seem to keep coming up with new ones.  I don't want
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                              1-800-669-9492



App. 0910

1   be totally optimistic about the future, Mr. Duffy.

2   It's amazing how malevolent actors will find a new

3   way to use technologies.  But, yes, it is more

4   possible right now with certain technologies to

5   murder a massive number of people.

6        Q    And is one of those technologies firearms?

7        A    Yes, certain classes of firearms.

8        Q    Now, let's switch gears a little and ask

9   you about some of the things Professor Francis

10  testified about.  Did you get a chance to listen to

11  his testimony?

12       A    Yes, I listened to it and I read it.  Let

13  me say this:  I was very impressed.  I think we

14  agree about more than what we disagree, Mr. Duffy.

15  And I look forward to having a chance to read his

16  work.  I'm sure we can learn a lot from one another.

17  But, yes, there are points at which I had some

18  disagreements, and have some disagreements, and I'd

19  like to speak to those.

20       Q    We'll get to those in just a bit.  So did

21  you get an opportunity to listen to his education

22  and qualifications?

23       A    Certainly.

24       Q    Would you have any concern with relying on

25  conclusions about historical trends from someone



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beansupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0911

1    that had the education and qualifications that

2    Professor Francis has?

3              THE WITNESS:  Judge Browning, do I have to

4    answer that?  Can I raise an objection?

5        A    You know, clearly, you know, I disagree

6    with him about specifics, you know.  But I know

7    that -- I'm sure that he's read a lot of history.

8        Q    Let's see, so one of his points was he

9    mentions that you wrote in "American Homicide" that

10   in the 1600s homicide rates were very high.  But did

11   those rates go down shortly after the Revolutionary

12   War, or before that?

13       A    They went down dramatically, beginning

14   with the disastrous Native American wars of 1675,

15   1676, and Bacon's Rebellion and the aftermath of

16   that.  And they went down again after the Glorious

17   Revolution of 1688, 1693.  This is very much a

18   specific historical argument.  But I learned

19   something I didn't want to know.  That's where you

20   really see the class and religious antagonisms that

21   were leading to revolutions and upheavals and

22   constant turmoil in the larger British Empire,

23   dissipated as Whites started to think of themselves

24   as White.  You start to see White solidarity come in

25   and you see them define themselves as White.  You

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail:  bean119@support.com

App. 0912

1   see one of the best predictors of the homicide rate

2   right through the 19th century is the percentage of

3   new counties in any decade that are named after

4   national heroes.  British heroes in the Colonial

5   Era.  American heroes in the American Era.

6          And it's an unconscious way of speaking to

7   our patriotism.  We know that there was a burst of

8   patriotism and pride that came after the Glorious

9   Revolution, the support of constitutional

10   government, the pride in Britain as being the

11   greatest nation on earth.  And with the rise of

12   racial slavery, those disastrous Indian wars, you'll

13   see White people coming together.  It's one of those

14   things I didn't want to learn from history, Mr.

15   Duffy.  That one of the ways to lower the homicide

16   rate is to be on the winning side of a race war.

17   White people stopped killing one another.  It's not

18   altogether benign.  But also that surge in

19   patriotism, patriotic feeling, when that really

20   blossoms, you see it creates a kind of social

21   solidarity, a trust.  And those hostile, defensive,

22   predatory emotions dissipate.

23          One of the things that amazes me is after

24   those changes, you cannot find a native-born Yankee

25   who robs and murders or rapes and murders another

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

**App. 0913**

 1   Yankee, all the way until the Revolutionary crisis,

 2   and things fall apart again.  That's 75 years in

 3   which predatory violence disappears.  It's a

 4   stunning thing.  And it had to do with those big

 5   changes, politically, in terms of race

 6   consciousness, in terms of political patriotism.

 7        Q    Thank you, Professor.

 8             So going back to that time period that

 9   Professor Francis mentioned in the 1600s, when the

10   homicide rates were high, what was the proportion of

11   firearm homicide rates at that time?

12        A    In those eras when the homicide rate was

13   high, it's probably 40 percent.  As soon as the

14   homicide rate went down, it went down to 10 percent,

15   15 percent.  In the Revolution, when things fell

16   apart again, it went up to 40 percent.  After the

17   Revolution ended, in the north it went back down to

18   10 to 15 percent.  It didn't go back down in the

19   slave south, as it became more homicide.

20        Q    Professor Francis also spoke about youth

21   suicides.  I understand you've done some work on

22   that.  Could you tell us about the historical and

23   current trends in youth suicide, particularly as it

24   relates --

25        A    What we know about that -- I sent you a



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

**App. 0914**

1 graphic -- I didn't know this was going to be an

2 issue today, so I apologize to Judge Browning.  What

3 you can see, if you go back to the early data that

4 we have, since right after World War I, Mr. Duffy,

5 older people were far more likely to kill

6 themselves.  It went straight up with age.  Today,

7 what you'll see, beginning in -- we'll see that the

8 rates converge today.  In other words, elderly

9 people, like myself, are less likely to kill

10 themselves than we were at the time of the Great

11 Depression, or just before.  And young people are

12 more likely to kill themselves than they used to.

13            But when we look at the rates -- I just

14 looked last night at the CDC's statistics on

15 suicides, 2018 to 2022, what you can see is that

16 it's not so much adolescent homicides.  When we look

17 at age 10 to 14, the homicide rates say for White

18 males, non-Hispanics, we are the most likely to kill

19 ourselves with guns, people like myself of European

20 ancestry.  If we look at that rate, the homicide,

21 the suicide rate of White non-Hispanic males in this

22 country over the last five years has been 18.4 per

23 100,000 per year.  You have to multiply that by life

24 expectancy to see the risk.  So one out of every 69.

25 If we sustain our suicide rate today, one out of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreport.com





**App. 0915**

1   every 69 White male non-Hispanic children born in

2   our country will end up killing themselves with a

3   firearm.   That's a huge number.

4           And what you see, looking at those rates

5   today, so the average rate is 18.4 for White

6   non-Hispanic males, the rate for ages 10 to 14 with

7   a firearm is only two.   The rates are low through

8   age 17.   It's age 18 where you'll see a jump, age 17

9   to 18.   And you'll see a bigger jump between age 20

10  and 21.   And you'll see that the rate at which

11  firearms are used and the rate at which firearms --

12  White non-Hispanic males die with firearms goes up

13  the older we are.

14          So a person who is most likely to be saved

15  is me; in other words, it's like 35 per 100,000 when

16  you're in your 70s, and it's 42 per 100,000 when

17  you're older than that, older than your early 70s.

18          So, yeah, I think -- you know, I really --

19  the data don't support Professor Francis'

20  conclusions about this.   What you see is that age

21  restrictions on possession of firearms for children

22  under the age of 18 are very effective, essentially,

23  in preventing firearm suicides.   And what you'll see

24  is that we have a tremendous problem with firearm

25  suicides, particularly for Native American men, and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0916

1   for European American men.  And given that the

2   number of us that are going to end up killing

3   ourselves with firearms, these waiting period

4   laws -- you can see why waiting period laws might be

5   effective.

6            Because up until the pandemic, you know,

7   only a third of American households owned a gun.  It

8   went up during the pandemic, of course.  But that's

9   a lot of potentially depressed people who might kill

10  themselves in an impulsive way.

11       Q    Thank you, Professor.

12            I believe you mentioned that you disagreed

13  with Professor Francis on a few points.  Have we hit

14  on all those points?

15       A    Well, one thing, as I said to you, as I

16  said to everybody, please hire a suicidologist, and

17  a public health expert, and a psychologist.  Neither

18  Professor Francis or I are experts in this.

19            And I think we're really talking about

20  apples and oranges with the people who we are

21  talking about, the experts we're talking about.

22  Because, you know, those who talk about impulsivity,

23  who have those high rates, are talking about that

24  critical moment where ideation turns into action.

25  In other words, you know, no one disputes that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0917

1   people who commit suicide are more depressed, on

2   average, than other people; that they've thought

3   about suicide.  Millions of people think about

4   suicide every year.  But who commits suicide and

5   what are the triggers?  And, you know, people who

6   have survived have said:  I made that decision

7   just -- how many of them say:  I made that decision

8   in the short term.  And that's the kind of thing

9   that you're thinking about.

10          So I think that, you know, we may agree

11  more than we disagree.  But think about it.  Even if

12  that as Professor Fisher admits, 25 percent of these

13  are impulsive, think about that, if one out of every

14  69 children born in this country, male, White,

15  non-Hispanic males is going to kill themselves,

16  that's still going to be a significant number of

17  people who are at risk that we might help with a

18  waiting period law.

19          But, again, I am not an expert in

20  psychology.  I'm not an expert in suicidology.  I

21  know a lot about suicide trends because that's a

22  historical part of my research.  So if you ask me

23  what's happened up until now, I'm pretty good at it.

24  What's happening right now, it's over to somebody

25  else.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail@beanreporting.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



App. 0918

1        Q     Thank you, Professor.

2              MR. DUFFY:  One moment, Your Honor?

3              THE COURT:  Certainly.

4              MR. DUFFY:  I am done with my questions,

5   Your Honor.  Thank you.

6              THE COURT:  Thank you, Mr. Duffy.

7              Mr. Nation, do you have cross-examination

8   of Dr. Roth?

9              MR. NATION:  Yes, Your Honor.  Is it

10  usually your practice to take a break every hour and

11  a half?  Would you like to do that now or would you

12  like to proceed?

13             THE COURT:  Let's proceed.  We've only

14  been going an hour and five minutes.

15                   CROSS-EXAMINATION

16  BY MR. NATION:

17       Q     Professor Roth, can you hear me?

18       A     Yes, Mr. Harrison, how are you?  You did a

19  very nice opening presentation. I really am

20  impressed by you and Mr. Duffy and Judge Browning.

21  And, boy, those constitutional questions, I'm

22  leaving those to you.  Please don't ask me to say

23  anything about whether these laws are constitutional

24  or not.  I know I'm out of my wheelhouse.

25       Q     Well, thank you for that.  That was

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreport.com





PROFESSIONAL COURT
REPORTING SERVICE

BEAN & ASSOCIATES, Inc.

App. 0919

 1   actually my colleague, Mr. McCoy, that did the

 2   opening, but I'll take the compliment.

 3          MR. McCOY:  You're both right.

 4   Q     I was actually wrong.  It was my

 5   colleague, Mr. Harrison.

 6          So anyway, Professor, you're here to

 7   testify on behalf of the State; is that correct?

 8   A     Yes, I am.

 9   Q     And it's your opinion that the State

10   should enforce a seven-day waiting period; is that

11   correct?

12   A     What I'm arguing is I think that that

13   would be a wise public policy, and it's certainly

14   one supported by the majority of the American

15   people.

16   Q     And you previously testified in Colorado

17   about their three-day waiting period; is that

18   correct?

19   A     Yes, I did.

20   Q     And do you have an opinion as to what the

21   appropriate waiting period would be?

22   A     That would be something for people who are

23   suicidologists and public health experts.  I don't

24   know who New Mexico relied upon for their advice.  I

25   imagine it might be different than the people who

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0920

 1   the legislature in Colorado relied upon.  And that's

 2   something that I wouldn't have expertise on.

 3        Q     Would there be a point in time in which

 4   you would think a waiting period would be too long?

 5        A     Well, you know, I do know a great deal

 6   about intimate partner homicide; I am an expert in

 7   that.  Would that help if I talk about that?  We

 8   know, if you are threatened by a -- if you have an

 9   angry former partner, you are in grave danger the

10   week after you break up, right?  You're in grave

11   danger.  That is still considerable after the end of

12   the first month, but it's less than the first week.

13   It's less after six months than it is after that

14   first month.  And it's less after a year.  And

15   that's why most of those laws allow a cooling --

16   those Red Flag laws go a year, right?  Because that

17   is about the amount of time it takes for a woman to

18   really reorganize her life, to find safety.  And

19   it's enough time for most, but not all of these

20   domestic abusers, to stop thinking about taking it

21   out violently against the former partner.

22             And I imagine that with any kind of

23   impulsive kind of anger, it may follow that same

24   pattern.  So that first week would be very

25   dangerous, right?  And then the first month is

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0921

```
 1   dangerous, but not as much as the first week.  And
 2   then it goes down from there, right on through.  And
 3   by five years, you know, you're not that much at
 4   risk anymore from a former romantic partner.  It
 5   goes to basically zero.
 6        Q    So Professor Roth, if I understand you
 7   correctly, a woman who has left an abusive partner
 8   is in significant danger for the first seven days?
 9        A    That is right.  And she should -- and what
10   we always say is:  The first thing you need to do is
11   get to a safe place.  The first thing you need to
12   do, and then call law enforcement, call your
13   employer.  Safety is more important than getting the
14   gun right away.  You've got to get out there where
15   they can't find you.  So that is really what
16   shelters are all about.  The first line of defense
17   is the shelter, it is not a firearm, and the most
18   effective protection.
19        Q    But you would understand why a woman in
20   such a position would feel the need to acquire a
21   firearm, I'm sure?
22        A    Absolutely.  It would be maybe the third
23   thing I would do, I would recommend.  And as you
24   know from my testimony in Colorado, I quite
25   understand why people who live in violent
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0922

1  neighborhoods, who have dangerous occupations in

2  dangerous neighborhoods, I quite understand why they

3  want to have a firearm.  I'm not at all saying

4  that -- we live in a violent society so I understand

5  that.  But the advice that any public health

6  professional would give you is to hide, seek

7  shelter.  That's your first thing you have to do.

8      Q    And given that, though, seeking shelter,

9  perhaps if a shelter is unavailable, would you

10  recommend, then -- what would your next

11  recommendation be?  You said getting a firearm would

12  be the third.  What would be the second?

13      A    You have to contact law enforcement

14  because they will protect you.  They will patrol

15  your house.  They will do things like that.

16      Q    Is it your understanding that law

17  enforcement has a duty to protect an individual?

18      A    When there is a clear and present threat,

19  yes.  And I know that personally.  Because of my

20  work, you get threatened.  And certainly everybody

21  got involved all the way to Homeland Security.  It

22  happens.

23      Q    You're not an attorney; is that correct?

24      A    No.  I did real well on the LSAT.

25      Q    I'm absolutely certain you did.  Have you

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                  1-800-669-9492



1    heard of a case called Town of Castle Rock v.

2    Gonzales?

3         A    No, sir.

4         Q    In your report, your only citation to a

5    waiting period is from 1923; is that correct?

6         A    I left all of that to Dr. Spitzer.  You

7    know, he's the expert on those laws.  I am not.

8         Q    And you and Dr. Spitzer frequently write

9    together; is that correct?

10        A    We've never even spoken to one another.

11        Q    I believe you've appeared on amicus briefs

12   together; is that correct?

13        A    Well, we've never spoken to one another.

14   I think I got a nice note from him.  He liked my

15   declaration, I liked his.  That's the extent of it.

16   We work independently.

17        Q    Okay.  And do you have an understanding of

18   why he's not testifying today?

19        A    No, I do not.

20        Q    And do you adopt his opinions as your own,

21   or do you have them stand separately?

22        A    My opinions -- my job as an historian is

23   to help Judge Browning and his colleagues understand

24   our nation's history, you know, with violence, and

25   sort of the reasons why regulations appeared at the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0924

1   time that they did to address real new problems, and

2   new challenges.

3          I don't get into the issue about whether

4   the Bruen decision, whether a particular law is

5   analogous or not analogous to another law.  As we

6   know, all analogies, like all metaphors and similes

7   are at a certain point false, right?  I mean, Mr.

8   Shakespeare, what do you mean a rose -- love is like

9   a rose?  One is an emotion, one is a plant.  You're

10  stupid.  I mean, you can always say.

11         And so the spot tough decision, I think

12  Judge Browning made it very clear, you know, when

13  the Court says analogy, that's a tough question,

14  isn't it?  Is the analogy strong enough or is it too

15  weak, are there too many holes in it?

16         And I am not -- please don't ask me to

17  have an opinion, because that's for you and for

18  Judge Browning to make the decision whether your

19  arguments that the analogies are not sufficient,

20  versus whether Mr. Spitzer's -- Professor Spitzer's

21  are that they are sufficient; that I leave to you.

22     Q    Okay.  Thank you for that.

23         On the last page of your report, page 47,

24  the last real line says, "Public officials today are

25  confronting a criminological problem that did not

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0925

1  exist in The Founding Era, nor during the first

2  century of the nation's existence."  Which

3  criminological problem are you referring to?

4       A    Well, I'm talking about the threats from

5  new kinds of technologies, and the uses of

6  technologies; right?  With suicides, I'm talking

7  about the origins of breech-loading firearms, and

8  I'm talking about the way they facilitate impulsive

9  suicides.  That's what my argument is.

10      Q    So the criminological problem is the

11  change in technology from The Founding to the

12  present; is that correct?

13      A    Right, and the way that they have

14  affected -- they have contributed to changes in

15  suicide rates and homicide rates.  I would never say

16  that they are the sole reasons for those changes.

17  I've never said that.  And these other causes are

18  there, are very important.

19      Q    Again, sir, I'm asking a very specific

20  question.  You're referring to a criminological

21  problem.

22      A    Right.

23      Q    So I want to make sure I understand what

24  that criminological problem is.

25      A    The problem is that we murder one another

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

**BEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE

**App. 0926**

1   at a much higher rate than we did in 1791.

2        Q    Okay.

3        A    And we commit suicide at a much higher

4   rate than we did in 1791.  So why?

5        Q    We humans did kill each other and commit

6   suicide in 1791, and throughout, honestly, since the

7   development of human beings; isn't that correct?

8        A    We're talking about human nature.  We've

9   been doing it since we were actually chimps and de

10  novos, yeah.

11       Q    So it really isn't a new criminological

12  problem.

13       A    To me, it is.  I hate to say it, that

14  sounds argumentative.  Is that the kind of word that

15  you use in a court?  Because, certainly the fact

16  that we are more likely to commit suicide today,

17  that we are more likely to commit homicide today

18  than we did in 1791, is a real problem.  And, again,

19  we kill one another at the highest rate in the

20  affluent world, which we didn't in 1791.  So

21  those --

22            (Simultaneous crosstalk.)

23            THE COURT REPORTER:  I'm sorry, time out.

24            THE COURT:  This is cross-examination,

25  Dr. Roth.  So when you hear Mr. Nation talk, stop,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beansupport.com

App. 0927

1  okay?

2            THE WITNESS:  Okay.  I'm sorry.

3            THE COURT:  I'm going to let him control

4  the cross-examination.  All right.

5            MR. NATION:  Thank you, Your Honor.

6            THE COURT:  Go ahead.

7  BY MR. NATION:

8      Q    And you attribute that change in homicide

9  and suicide rates at least in part to technological

10 advances with firearms; is that correct?

11     A    In part, but not entirely.

12     Q    Okay.  Do you recall your testimony in

13 Colorado, where my colleague showed you various --

14 or discussed the various technological changes

15 between the Revolutionary War and the American Civil

16 War?

17     A    Certainly, I did.

18     Q    And did you -- after that testimony, did

19 you examine any of those firearms or those patents?

20     A    No, because I've always asked that the

21 people who I speak for hire a genuine firearms

22 expert.  Because, for me, the big changes are the

23 big changes to breech-loading, to cap and ball

24 revolvers, to percussion cap.  Those kind of changes

25 are the ones that are really significant.  But the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492




```
 1   particular kinds of weapons, that's really not what
 2   I talk about and not what's really at issue.
 3        Q    So turning to paragraph 23 of your report.
 4   You wrote that, "Smith & Wesson, seven shot .22
 5   caliber breech-loading model 1 rimfire invented in
 6   1857 appeared on the market when the homicide crisis
 7   was already well underway"?
 8        A    Correct.
 9        Q    At any point in 1857, when this homicide
10   crisis, and this breech-loading model 1 revolver was
11   put on the market, was there a waiting period
12   enacted?
13        A    No.
14        Q    You go on to say, in paragraph 24, that
15   "Smith & Wesson had created a near perfect murder
16   weapon; it was lethal, reliable, easy to carry and
17   conceal, capable of multiple shots, and ready to use
18   at any time."  Did I read that correctly?
19        A    They boasted about that themselves.
20        Q    And, again, that was 1857?
21        A    Right.
22        Q    But at no point, until 1923, was there any
23   waiting period in the United States; is that
24   correct?
25        A    You would know better than me.  But, yes,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

**App. 0929**

1    I think that's a question for Dr. Spitzer, not me.

2        Q    Okay.  And stepping back, you've testified

3    as an expert witness in a number of cases; is that

4    correct?

5        A    I've submitted declarations.  But I've

6    only testified in person in Colorado before this.

7        Q    Okay.  So you submitted declarations,

8    then, in a number of cases.  Is one of those Miller

9    v. Bonta?

10       A    Yes.

11       Q    And that involves the certain cosmetic

12   features of semi-automatic firearms; correct?

13       A    That is correct.

14       Q    And you testified again on behalf of the

15   State; is that correct?

16       A    Yes, I did.

17       Q    And in Duncan v. Bonta -- that's a

18   California magazine capacity restriction case;

19   right?

20       A    Correct.

21       Q    And, again, you testified on behalf of the

22   State?

23       A    Yes, I did.

24       Q    And then Rupp v. Bonta, again, with the

25   so-called assault weapons ban, you testified on

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                      (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492
                                                    1-800-669-9492




App. 0930

1    behalf of the State; is that correct?

2         A    I've been invited to, yes.

3         Q    I'm sorry, you submitted a declaration?

4    Yes?

5         A    Yes.

6         Q    Ocean State Tactical v. Rhode Island,

7    regarding magazine capacity restrictions, again, you

8    testified on behalf of the State -- or excuse me,

9    submitted a declaration on behalf of the State?

10        A    Yes.

11        Q    And Hansen versus D.C.; Vermont v. Misch;

12   NAGR v. Campbell; NAGR v. Highland Park, those are

13   all magazine capacity cases where you submitted a

14   declaration on behalf of the State; is that correct?

15        A    Yes, it is.

16        Q    And I see a few other cases listed.  Have

17   you ever submitted a declaration in a firearms case

18   not on behalf of the State?

19        A    I've never been asked.

20        Q    In other words, you've only submitted

21   declarations on behalf of the State?

22        A    I've only been asked to present on behalf

23   of the State, yes.

24        Q    Okay.  And, in general, you're in favor of

25   more restrictive gun laws; is that a fair

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: info@beansupport.com

App. 0931

```
 1   characterization?
 2        A    Yes.  And so are the American people.  I
 3   don't think I support any law that isn't supported
 4   by a considerable portion of the American people.
 5        Q    You haven't done any polling on that
 6   yourself, though, I assume?
 7        A    I've read the polls.
 8        Q    And do you recall which polls you are
 9   referring to?
10        A    Oh, I just know, you know, things like
11   universal background checks, and things like that.
12   I certainly support those.  And again, you know, I
13   do this -- you know, it's my opinion as someone who
14   is a criminologist, that we could save lives.  It's
15   a balance of rights and responsibilities for me.
16   And I certainly don't want to tread on people's
17   rights.  How do you balance rights and
18   responsibilities?
19        Q    Would you characterize the Second
20   Amendment as a balancing of rights and
21   responsibilities as between the people and the
22   government?
23        A    It is best if I don't speak on -- about
24   the Second Amendment, isn't it?  I'm not a
25   constitutional historian.  And I've been advised, I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
E-mail: bean@beansupport.com

App. 0932

1    think, not to speak to that.

2         Q    Okay.  But your area of study is homicide

3    and suicide rates throughout American history; is

4    that correct?

5         A    That is correct.

6         Q    And when you discussed homicide, are you

7    including justifiable homicides within those

8    statistics?

9         A    Yes, because they comprise a small

10   minority of all homicides, and because I discovered

11   empirically that they go up and down with the

12   others, yes.

13        Q    So just so I understand, your testimony or

14   your findings throughout your research are that

15   justifiable homicides trend with offensive

16   homicides?

17        A    Yes, that is what I found.  And I'm quite

18   honest about what I found.

19        Q    Okay.  I'm not suggesting you're not

20   honest, sir.

21             Do you also include accidental or other

22   excusable homicides within your statistics?

23        A    No, those are in separate category, and

24   are separate files, yes.

25        Q    Now, I believe your testimony on direct



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email @beansupport.com

App. 0933

 1  was that the American south, particularly during

 2  slavery and immediately after Reconstruction, had

 3  particularly high rates of violence; is that

 4  correct?

 5       A    That is correct.  And it's not just my

 6  conclusion.  My colleagues agree as well.

 7       Q    As one who grew up in the south, it seems

 8  intuitively correct to me as well.  But that was

 9  also part of the United States at The Founding; was

10  it not?

11       A    Certainly it was.  But their rate was much

12  lower in 1791 than it was going to be by the early

13  19th century, and certainly by Reconstruction.

14       Q    And at that point in time, even in the

15  south, there were no waiting periods, no waiting

16  period laws; right?

17       A    As best I know, no.

18       Q    And, in fact, there were very few, if any,

19  restrictions on free Whites to own firearms in the

20  American south; is that correct?

21       A    Just on concealed carry.

22       Q    And it's your testimony, your expert

23  opinion, that The Founding Generation could not have

24  anticipated higher rates of homicide; is that

25  correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0934

1     A    They didn't experience it, they didn't

2    anticipate it.  That is correct.

3     Q    But they had just fought the American

4    Revolution; right?

5     A    Certainly.  But that's a war.  That's very

6    different from everyday homicides.

7     Q    But there were guerilla bands throughout

8    the American Civil War, were there not?

9     A    I don't understand what you're asking me

10    there.

11    Q    Were there independent guerilla groups,

12    who would engage in violence, either on behalf of

13    the Loyalists or on behalf of the Revolutionaries

14    during the Revolutionary War?

15    A    Yes.  And I do not count those not

16    homicide rates.  But they are part of the violence

17    and it spun over into everyday violence, yes.

18    Q    And so The Founders could, and would have

19    anticipated that, in times of strife, private

20    violence would occur; is that fair?

21    A    They had tremendous hope that that was

22    just a blip and by the 1790s, it was a blip. So, no,

23    they wouldn't -- and the other thing is to think

24    about how much faith they had in their experiment.

25    They believed that the future was going to be better

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0935

1   in every single way if they really followed the laws

2   of nature, if they understood the laws of society,

3   they learned the lessons of history.  So they

4   definitely believed that they were going to have

5   less of a problem in the future.

6          You can even see quotes from northern

7   governors in the 1830s, Governor Crafts of Vermont

8   said:  Look at how much less violent the north is

9   than any other society that's ever existed.  He

10  said:  In time, there will be no crime in America.

11  We have created the best society on earth.  Think

12  about that.  It's unthinkable for a governor to say

13  that today.  But that's how they felt.  So I

14  think --

15      Q    Given that they had been, and were exposed

16  to violence in their immediate past; isn't that

17  correct?

18      A    But mostly wartime violence.

19      Q    Are you familiar with the Militia Act of

20  1792?

21      A    Yes, I am.

22      Q    And did that require every free adult

23  male, with a few exceptions, to own a firearm?

24      A    If I may, I would like to answer that more

25  fully.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0936

1      Q     Sure.

2      A     The Militia Act of 1792, you cited that as

3  evidence that every citizen was required to possess

4  a firearm.  But that law was aspirational, and not a

5  statement of fact.  Yes, somewhere between 50 and 60

6  percent of all households owned a working firearm in

7  the early Republic.  And fewer than half of young

8  men of military age owned a working firearm, because

9  there was a steep gradient in firearm ownership by

10  age and class.  It was mostly wealthy men,

11  particularly those who lived in the south and owned

12  slaves.

13      Q     But it was the aspiration, as you put it,

14  of The Founding Fathers, right, the Second Congress,

15  in 1792, for every adult free man, between the age

16  of 18 and 45 to possess a working musket or rifle;

17  correct?

18      A     That was an aspiration.  Please let me

19  finish.  Vermont, which I know very well, tried to

20  increase gun ownership in the wake of that act, or

21  the borrowing of guns by men of military age.  You

22  could borrow a gun for militia training.  Ages 18 to

23  45, they offered a $3 reduction in the State's 10

24  dollar poll tax to appear at a militia training

25  armed, another $5 off if they came with a horse.

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                     Albuquerque, NM 87102
(505) 989-4949                                                (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                             1-800-669-9492



**BEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE

1   I've read the tax lists of many towns in Windsor and

2   Caledonia Counties of Vermont for my first book,

3   which was on the history of religion and violence.

4   And I copied out all the exemptions for military

5   service, which were for clergy and Quakers, poll tax

6   reductions and poll tax payments to be sure that I

7   assessed each person's wealth correctly.

8           I haven't had time to go back to my notes

9   to check.  But I know that many young men of

10  military age had to pay the $10 tax because they

11  didn't have a gun or a horse when they showed up for

12  training.  And that's a tremendous burden, given

13  that farm laborers only earned $150 a year beyond

14  room and board.  And Kevin Sweeney has shown, only 6

15  percent of households in the decades before The

16  Revolution owned a heavy large caliber musket

17  suitable for military use.  And the percentage

18  wasn't much higher after The Revolution, which is

19  why the federal government created the National

20  Armories at Springfield and Harper's Ferry, and why

21  states were desperately stockpiling military grade

22  weapons in their armories.

23          These are important issues because they

24  show that the government officials were focused on

25  arming the militia, a focus that did not prevent

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0938

 1  them, with the support of the voters who elected

 2  them, from regulating the private use, ownership,

 3  sale and possession of firearms in the Republic,

 4  most notably with the concealed weapons.

 5            So, again, what I wanted to get at there

 6  is that when we look at this issue, we still don't

 7  have in the public's hands the kind of military

 8  grade weapons that they needed.  And many of the

 9  poor people who had to be in the militia couldn't

10  afford a gun, and they couldn't even borrow one from

11  somebody.

12            THE COURT:  Mr. Nation, would this be a

13  good time to us to take our first afternoon break?

14            MR. NATION:  Certainly, Your Honor.

15            THE COURT:  We'll be in recess for about

16  15 minutes.

17            (The Court stood in recess.)

18            THE COURT:  All right.  Dr. Roth, I'll

19  remind you that you're still under oath.

20            Mr. Nation, if you wish to continue your

21  cross-examination of Dr. Roth, you may do so at this

22  time.

23            MR. NATION:  Thank you.

24            THE COURT:  Mr. Nation.

25  BY MR. NATION:

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492





PROFESSIONAL COURT
REPORTING SERVICE

1       Q    Going back, Professor Roth, you are

2  receiving a rate of approximately 250 an hour,

3  thereabouts; is that correct?

4       A    That is correct, yes.  They told me -- I

5  offered to work pro bono.  And the first two states

6  I worked for said:  You don't want to do that amount

7  of work they give you.  And so I'm glad I didn't.

8  It's been a lot of work.

9       Q    Do you know approximately how many hours

10 you've spent as an expert witness, either in

11 preparing reports or testifying?

12      A    Oh, my gosh.  I've got it somewhere on my

13 computer.  I'm sorry.  But it's been -- it's got to

14 be several hundred.  It's not an easy thing to do.

15 And to adapt all these things, even though it's

16 based on my work, takes a lot of thought.  And so,

17 yeah, it's been very time-consuming.  I've never

18 seen anybody so unhappy -- American so unhappy about

19 making 250 an hour.

20      Q    I appreciate that.

21           You submitted a declaration in the Garcia

22 case in Colorado; is that correct?

23      A    I believe so, if it's on the list.  They

24 really run together in my mind.

25      Q    Of course, of course.  You may have also

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492





PROFESSIONAL COURT
REPORTING SERVICE

App. 0940

1   referred to it as the Rocky Mountain Gun Owners,

2   they're both plaintiffs?

3       A    Yes, that's one I remember, yes.

4       Q    And it's reasonably similar to the

5   declaration you submitted here; is that correct?

6       A    It is.

7       Q    In fact, other than the numbering and a

8   few sentences and the three added paragraphs on

9   suicide, it's essentially the same report; right?

10      A    That's what I was asked to do, yeah.

11      Q    Okay.  Sorry, I'm getting to where I am in

12  my outline.

13          Do you know approximately how many murders

14  occur within seven days of a legally purchased

15  firearm?

16      A    You know, that's something that I would

17  really ask Phil Cook and John -- you know, John

18  Donahue and the others who work on that kind of

19  statistical issue contemporarily.  I'm a historian.

20      Q    Are you aware of any statistics regarding

21  the use of a firearm within seven days after

22  purchase?

23      A    No.  That's not my expertise.

24      Q    I understand.  I'm asking if you're aware.

25  Are you aware of any statistics regarding gun

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: support.com

App. 0941

```
 1  control and a reduction -- gun control, generally,

 2  and a reduction in homicides?

 3       A    Yes.  And that's highly contested, and a

 4  lot of it is politicized research.  It's very

 5  difficult.  I would say that, you know, given that,

 6  you know, the people like myself acknowledge that

 7  we're not going to be saving hundreds of lives in

 8  New Mexico next week, next month, or even next year,

 9  it takes really 10 or 20 years of data to really

10  tease out mathematically how effective a particular

11  regulation is.

12       Q    Okay.

13       A    So that's one of the real challenges that

14  we face when we're asked to come up with an

15  immediate answer.  You know, so many things are in

16  play right now changing our homicide rates, that

17  it's really impossible to know how much of the

18  homicide reduction we've seen nationwide would be

19  attributable this past year to New Mexico's new law,

20  because there is so much in play.

21       Q    Just so I understand, your claim is that

22  homicide rates are declining; is that right?

23       A    Well, they have declined this past year,

24  yes.

25       Q    And is there a general trend?  I realize
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanandassociates.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



App. 0942

 1  that, with COVID, it messes up all the data.  But

 2  has it been a general trend over the past, say, 20

 3  years regarding the homicide rates?

 4       A    Yes.  And I just published it as they are

 5  now.

 6       Q    And what is that trend?

 7       A    Well, what you see is that our homicide

 8  rate has been going up steadily since 2015.

 9            And it's not just a COVID thing.  It went

10  up dramatically from 2015 through 2021.  And I was

11  very worried about that, because it really coincides

12  with political instability.  And --

13       Q    Are you aware of any -- you said since

14  2015, the murder rate has increased?

15       A    Yes.

16       Q    And are you aware of any technological

17  changes in firearms, since 2015, that could be

18  attributable to the increase in that homicide rate?

19       A    No.  I never said that guns are the sole

20  problem.  But the fact that we're so heavily armed

21  means that when it goes up for other reasons, the

22  homicide rate amplifies more than it should.

23       Q    Your prior testimony as I understand it,

24  is that suicide rates are increasing for children

25  under 18; is that correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0943

1      A    I did not say that.  What I said was, over

2  time, what we're going to see is a convergence, yes.

3  So if we want to say since -- oh, since the 1920s,

4  yes, I would say that they're up slightly, and those

5  for older Americans are down somewhat.  So there is

6  a more convergence across age categories.  But when

7  we're looking at children still, we see a very low

8  rate, a much lower rate of firearm suicides, with

9  the contemporary data.

10     Q    And just to be clear, you're not offering

11  any expert opinions on firearms technology; correct?

12     A    No.  I think it's best -- well, I see

13  correlations, as I said, with the movement to

14  breech-loaders, I see connections between certain

15  technologies and ability of individuals to commit

16  mass murder.  And I think those are very

17  straightforward.  But if you want to get into the

18  weeds about particular kinds of weapons, particular

19  models of weapons, no, I think we need a firearms

20  expert to really address that.

21     Q    No, I'm not intending to get into the

22  weeds of any particular firearm model, aside from

23  any that you might cite in your declaration.

24          But you're generally aware that firearms

25  technology has improved over the last 250 years?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0944

```
 1        A     Certainly, it has, yes.
 2        Q     And would it be fair to characterize the
 3   improvement as always moving to improve the
 4   lethality and the rate of firearms over the last 250
 5   years?
 6        A     Not when it comes to the creation of
 7   safeties on guns and things like that.
 8        Q     War is certainly an innovator for
 9   firearms; correct?
10        A     Pardon?  Again.
11        Q     War certainly leads to innovations in
12   firearms; is that correct?
13        A     Absolutely.  We can see what the Cold War
14   did with the AK-47 and the M-16, yeah.
15        Q     And during The Revolution, there were
16   improvements in firearms, were there not?
17        A     You know, I'm not an expert on exactly
18   what those improvements were.  I know the biggest
19   change was that the American government really tried
20   to get more military grade muskets, because they
21   didn't have enough.  So it was really getting the
22   right supply, more than the technology changing.
23   They did want more muskets, that's true.
24        Q     And are you aware of early rifles being
25   developed during the American Revolution?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0945

1       A     Certainly.  You know, our Revolutionary

2   Army didn't have very many rifles, muskets, but they

3   were already aware that rifles, muskets would be

4   more effective.  But they really don't come into

5   being dominant until -- in warfare -- until the

6   Crimean and the Civil War.

7       Q     So by the time of the Civil War, we have

8   multi-round firearms and rifle firearms; is that

9   correct?

10      A     That is right.

11      Q     And so it would be fair to say that not

12  only The Founding Generation, but also the

13  generation of the Civil War could see that firearms

14  technology was consistently improving over time?

15      A     Yes.

16      Q     And are you aware of any firearms

17  restrictions that they put on law-abiding citizens

18  at that time, aside from concealment?

19      A     Aside from concealment?  Again, as you

20  know from my declaration, the work of Brennan Rivas

21  and others, they were even starting to outlaw in

22  Texas, and other places, open carry, as well as

23  concealed carry, because the operated gun is so far

24  out of control.

25      Q     Would you characterize that as having a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@bean-support.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0946

```
 1   racial component as well?
 2        A    Those laws were sustained when the White
 3   Supremacists took over again.  And they were very
 4   concerned about homicides among Whites, as well as
 5   interracial homicides.  Certainly, and that's been
 6   established by Dr. Rivas' work.
 7        Q    Turning to today, if you exclude
 8   gang-related shootings from your homicide
 9   statistics, those homicide statistics drop
10   dramatically, don't they?
11        A    You know, there is a real desire to say
12   that our problem is gang related, period.  And --
13        Q    Sir, I'm not suggesting that it drops to
14   zero.  But there is a correlation between gang
15   violence and current homicide rates; correct?
16        A    In the cities, it is.  But if you look
17   at -- and certainly when we look at disadvantaged
18   children of color, their homicide rate increases as
19   the community and the county becomes more urban.
20             But for Americans of European ancestry,
21   like us, the homicide rate goes up higher the more
22   rural the area is.  And that is not about gang
23   related and that is not going to be affected.  So,
24   in other words, yes, we certainly have gang-related
25   violence.  And I know it very well because I'm
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email @bbeansupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



App. 0947

```
 1  working with the Columbus Police on the Atchison and
 2  Proud Boys versus the Milo-Grogan Boys.  When you
 3  talk about gang violence, it's all about women and
 4  it's all about respect.  It's not even about drugs
 5  or anything.  It's about the same old stuff.  And
 6  most of those kids aren't on drugs.  You look at the
 7  drug tests after they're shot dead, they're drunk,
 8  or they're sober.  So, yeah, it's not -- I think we
 9  mischaracterize the homicide problem if we don't
10  look at what's happening in rural America.
11       Q    Okay.  And are you aware of differential
12  homicides rates in rural versus urban America?
13       A    Yes, that's what I just said.
14       Q    I tried to tease out what those actual
15  differences are.
16       A    We know that -- we know that -- well, this
17  is a very complicated question, and I don't know if
18  we have time to get into it properly.  But certainly
19  we see that, you know, in our most troubled,
20  disadvantaged -- wherever we have concentrated
21  poverty, as we do among rural Whites, as we do among
22  people of color in our cities, we have much higher
23  homicide rates than anywhere else.  So that's what
24  we're really looking at.  And, yes, the combination
25  of drugs -- it's not rocket science.  Drugs, plus
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  high levels of gun ownership, plus high levels of

2  concentrated poverty mean homicides.

3          We know, too -- we know, too, that the

4  millennials are the first generation of young people

5  whose parents are in the poorest 50 percent of

6  Americans who are not better off than their parents

7  by the age of -- by their early 30s.  A failure of

8  upward mobility that we haven't had for the last 100

9  years.  And there is a very strong correlation for

10 Whites and for Hispanics and for African-Americans

11 between upward mobility and the homicide rate.  As

12 you go from those counties where young people who

13 are poor are most likely to be upwardly mobile,

14 those were the least upwardly mobile, the homicide

15 rate for each of those groups goes up by three

16 times.  There are so many deep problems that are not

17 firearms related.

18    Q    Have you looked specifically at the State

19 of New Mexico's homicide rate over time?

20    A    I looked at some things there.  It's all

21 on my computer.  I did show you some of those things

22 about New Mexico.  But I had to do those fairly

23 quickly.  I'm not a student of that.  Although my

24 student, Michael Alarid, just published a book about

25 crime and violence in Santa Fe County, New Mexico,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0949

1   during the period of Conquest.

2       Q    Well, sir, are you offering any opinions

3   as to the rate in New Mexico over time?

4       A    Not specifically, no.

5       Q    In your declaration, you refer to mass

6   shootings, both random and targeted; correct?

7       A    Yes, I do.

8       Q    And those are statistically really very

9   rare events; is that correct?

10      A    The ones that are really of most concern

11  to the public are mercifully rare, where an entire

12  school is shot up, an entire night club, or an

13  entire concert.  Fortunately, those are fairly rare.

14  But they're very dependent on technology.

15      Q    And are you aware of -- in any of those

16  mass shootings whether the shooter legally acquired

17  a firearm within seven days of engaging in a mass

18  shooting?

19      A    I've never seen statistics on that.  I

20  just know about their weapons.

21           MR. NATION:  Just a moment, Your Honor.

22           THE COURT:  Certainly.

23           MR. NATION:  Nothing further, Your Honor.

24           THE COURT:  All right.  Thank you, Mr.

25  Nation.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0950

```
 1                Mr. Duffy, do you have redirect of
 2   Dr. Roth?
 3                MR. DUFFY:  We're fine, Your Honor.  No
 4   redirect.
 5                THE COURT:  All right.  Dr. Roth, you may
 6   step down.  Thank you for your testimony.
 7                THE WITNESS:  Thank you, Judge Browning.
 8   It's been sort of a pleasure.
 9                THE COURT:  All right.  Do the State
10   defendants have further witnesses or evidence they
11   wish to present?
12                MR. DUFFY:  No, Your Honor, we are
13   finished.
14                THE COURT:  All right.  Any rebuttal from
15   the plaintiffs?
16                MR. McCOY:  No, Your Honor.
17                THE COURT:  All right.  Who wishes to
18   argue the closing here?
19                MR. McCOY:  I'll be arguing, Your Honor.
20                THE COURT:  All right.  Mr. McCoy.
21                Let me pick up a question that I was sort
22   of asking Mr. Harrison at the very beginning of the
23   day, but if you are correct that you have to have a
24   historical analog for every legislation, gun control
25   legislation, what do you do with the felon in
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0951

1   possession?  I'm getting lots of briefs from the

2   Federal Public Defenders, and I'm sure Mr. Harrison

3   is, too.  They're very good briefs, because they

4   just simply don't have a historical analog.

5            MR. McCOY:  Sure.

6            THE COURT:  But it seems to me that that's

7   the one that Heller, with its exceptions really has

8   made that very difficult for criminal defendants in

9   felon-in-possession cases -- and the Tenth Circuit

10  has a case on it -- to get any relief right now.

11  What do you do with that?  Because there is just

12  really no -- I find it very persuasive, what the

13  Federal Public Defenders are saying, but they're not

14  winning because of what Heller said, and what the

15  Tenth Circuit said as a result.

16           MR. McCOY:  Correct.  And I think if you

17  look at Rahimi, right, and obviously, not every

18  convicted felon was convicted of a crime of

19  violence, or according to Rahimi's language, posed a

20  threat of violence to someone else.  And I bring in

21  Rahimi, because I know that's specific to a

22  restraining order in a domestic violence case, but

23  you can apply that to a person who has been

24  convicted of a crime of violence, and say that that

25  then justifies the prohibition for them owning a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



1   firearm due to that felony.

2           I think the door opens, however, when

3   you're talking about someone who has been convicted

4   of a tax fraud felony, right?  Rahimi doesn't

5   control that.  And if the constitutional analysis

6   was conducted to try to determine if there is some

7   historical analog to whether or not tax cheats, at

8   the time of The Founding Era, were prohibited from

9   possessing firearms, I think you'd have a hard time

10  finding that.

11          THE COURT:  Well, but it's really even

12  broader than that.  I mean, no felons were

13  prohibited from having a firearm.  I mean, you could

14  be a felon and keep your firearm.

15          MR. McCOY:  Correct, except for those

16  felons who had posed a threat, a physical threat to

17  someone else, which Rahimi was able to go back and

18  look and the say, that justifies --

19          THE COURT:  The reason I have -- you may

20  have seen it in my Teston footnotes, the reason I've

21  not been persuaded to draw any distinction between

22  violent and the non-violent felons, is because the

23  Supreme Court keeps using the words "law-abiding

24  citizens" to define who the people are that continue

25  to have rights.  And so, even if -- even if you just

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: bean@beansupport.com

App. 0953

 1   don't need a historical analog here, or even if you

 2   do, I'm skeptical the Supreme Court is going to draw

 3   some distinction that says it has to be violent

 4   crime rather than non-violent, given the language

 5   they use.

 6          MR. McCOY:  I'm skeptical, too.  But I

 7   think applying precedent, they're going to have a

 8   hard time rectifying that, post Rahimi.

 9          THE COURT:  Well, that's what I'm saying.

10   That's the reason I'm casting some doubt on Mr.

11   Harrison's view that you got to have a historical

12   analog for everything, because I just don't think

13   you're going to get one for the felon in possession.

14          MR. McCOY:  Well, correct.  And that's why

15   I think, if a case like that went up, if they were

16   to apply precedent, they would then have to make a

17   distinction between those who have been convicted,

18   those convicted felons who have been convicted of a

19   crime of violence, or some sort of a crime that

20   poses a threat to someone else.  And that can

21   include drug trafficking.  I could see that being

22   easily extrapolated to drug trafficking, even if no

23   gun was involved in that, right, because drugs are

24   inherently dangerous.  It's an inherently dangerous

25   activity that poses a threat to society.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



App. 0954

1        But if that case were to go up, and we're

2    talking about a tax cheat, I think that's a

3    different story.  So I think Mr. Harrison is being

4    consistent, and we're being consistent that if there

5    is no historical analog to support it, then it

6    doesn't stand.

7        The court has said, particularly in

8    Heller, they pointed out, yes, convicted felons

9    should not be allowed to have a firearm.  But the

10   case law has changed dramatically, quite frankly in

11   the last five days.  I don't think Rahimi just

12   reestablishes Bruen.  I think Rahimi takes Bruen

13   even farther, in my opinion.  Because as the Court

14   points out, it leaves a very wide door open.  And I

15   don't know if was an accident by Chief Justice

16   Roberts, or that was intentional.  But there are

17   going to be the additional cases.  And the court

18   even points this out in their opinion, that are

19   going to test this.  It's a typical situation with

20   the Supreme Court, where they issue a significant

21   change in the case law, which was Heller, and

22   McDonald, and then Bruen.  And it usually takes 10

23   to 20 years of cases going up there before they

24   figure out the parameters.

25            THE COURT:  I'm sorry if I'm hung up on



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: bean@beanreporting.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0955

 1   this felon in possession, but it is a fairly large

 2   exception.

 3           MR. McCOY:  Correct.

 4           THE COURT:  So it's not totally

 5   inappropriate to beat this horse a little more, is

 6   that how is it ever going to get to the Supreme

 7   Court?  If Heller said:  We're casting no doubt on

 8   this exception, or whatever what you want to call

 9   it, or category, what district judge or what court

10   of appeals is going to touch that?

11           MR. McCOY:  That's a good question.

12   Except now with Rahimi, I know there is differences

13   in the concurring opinions, but in the majority

14   opinion that Justice Roberts wrote, my understanding

15   is it's silent on that point.

16           THE COURT:  So I guess if it's silent on

17   that point, I think, at least my view would be, as a

18   faithful district court, or an inferior court, I

19   would have to follow that language in Heller.  Until

20   the Supreme Court touches it, it's there.

21           MR. McCOY:  It is there.

22           THE COURT:  I'm skeptical that any

23   district judge or federal court of appeals is going

24   to touch that.

25           MR. McCOY:  It would have to be the right

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



**App. 0956**

```
 1   case, for sure.  You know, we'd have to be talking
 2   about someone who has been convicted -- I'm using a
 3   tax fraud case, just by way of example, because it's
 4   clearly the opposite of a crime of violence.  But it
 5   would have to be the right case and the right
 6   scenario that goes up.  But I just think that the
 7   historical tradition test, they've reaffirmed it now
 8   in Rahimi.  And Heller is from 2008, if I recall.
 9   We're now --
10          THE COURT:  What about Mr. Duffy's point,
11   though?  I mean, you're saying -- you're arguing
12   from the fact that they did not repeat these
13   exceptions in the case, and saying:  We're not
14   touching those in any way, like they did in Bruen as
15   far as Heller's categories.  You're arguing that
16   that says that now we have to find a historical
17   analog to every gun regulation.  What do you do with
18   Mr. Duffy's point that shouldn't we be doing the
19   opposite?  From the silence, we shouldn't be
20   assuming that they've kind of overruled, like you
21   said, drastically expanded Bruen, why go that
22   direction?  Why not go Mr. Duffy's route?
23          MR. McCOY:  Because the court has given
24   zero indication in the majority opinion that that's
25   what they want us to do.  While, yes, they're
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0957

 1  silent, they don't repeat those words again.

 2          THE COURT:  You're arguing that Rahimi

 3  implicitly overrules language in Heller, and

 4  language in Bruen.

 5          MR. McCOY:  Correct.  I'm saying there is

 6  an argument to be made there, yes, Your Honor.

 7          THE COURT:  That's basically your

 8  argument, right?

 9          MR. McCOY:  And there is a case that could

10  go up to test that theory.  But for right now what

11  is clear, and since we're not talking about

12  necessarily, we're not talking about a felon in

13  possession situation here -- although clearly

14  they're prohibited anyways -- is that the historical

15  tradition test that Bruen established is still in

16  place, and it's reaffirmed.  And even though the

17  Supreme Court has received, over the last two or

18  three years, a barrage of criticism from the lower

19  courts, and just from academia and everything else,

20  that that was the wrong decision, they didn't back

21  off of it.  And, in fact, in many ways they opened

22  the door farther.  So that's why I think there is a

23  chance there for a challenge, potentially.

24          THE COURT:  Another thing that Mr.

25  Harrison argued that I've been thinking about all

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email, bean@bean-support.com

App. 0958

1   day, and that is him criticizing Judge Kane's

2   opinion for looking at the plain language of the

3   Second Amendment and saying it doesn't control the

4   acquisition and purchase of firearms.

5          But the more I've thought about it, Mr.

6   Harrison's argument reduces Bruen to a one-step

7   analysis rather than a two.  The first one is it

8   does ask:  Does the second amendment cover this

9   activity.  So how do you give content to step one if

10  you don't do what Judge Kane did?

11         MR. McCOY:  You mean, in regards to

12  determining that the plain text does not apply to

13  the waiting period?

14         THE COURT:  Yeah.  I'm not sure I

15  understand Mr. Harrison's point, like, when does

16  that ever come into play?  What I understood him to

17  say is the Second Amendment covers acquisition of

18  firearms and purchase of firearms.  But I think

19  that's a hard argument to make from a plain language

20  standpoint.

21         MR. McCOY:  No, you're right.  The Second

22  Amendment language is pretty brief.  It's a very

23  small number of words.  But the courts have been

24  clear that the exercise of a constitutional right

25  doesn't just include that right, but rights that are

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



App. 0959

```
 1   incumbent in it, right?  So how can you exercise the
 2   right --
 3           THE COURT:  Well, what is wrong with what
 4   I said initially, that I agree -- maybe we're in
 5   agreement here -- that there is at some point where
 6   the acquisition and purchase are essential to a
 7   Second Amendment right?  If you can't acquire a
 8   firearm, then you'll never -- you could just
 9   eliminate the Second Amendment from the
10   Constitution.  So I agree with you there, if that's
11   what you're saying.
12           But this seven-day waiting period doesn't
13   get close to those constitutional limits.
14           MR. McCOY:  Correct.  But there have been
15   courts that have held, you know, that -- well, in
16   regards to your question about Kane, the issue here
17   is, yeah, is this --
18           THE COURT:  What did Kane do wrong?  It
19   looks to me like Kane did -- Bruen says it's a
20   two-step process.  He did the first step.  He got
21   his answer, and quit.
22           MR. McCOY:  Yeah.
23           THE COURT:  Tell me what was wrong with
24   that.
25           MR. McCOY:  Well, we think that the plain
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail@beanreport.com

App. 0960

1  text does cover the activity.  And that you can't --

2          THE COURT:  So you think bear --

3          MR. McCOY:  Well, Your Honor, apply that

4  kind of logic that Kane used, with three days is

5  not -- you're not interfering with someone's Second

6  Amendment rights by simply delaying their

7  acquisition of a firearm by three days.  Apply that

8  to a First Amendment context, right?  You can speak,

9  but you can't speak for three days, because we're

10  concerned you're going to say something impulsive.

11  Or a Fifth Amendment context.  You can have an

12  attorney, but not for three minutes, so we can try

13  to get an answer out of you.

14          THE COURT:  Well, I understand your

15  argument.  But tell me how -- if Bruen's first

16  requirement is -- the first step is the plain

17  language covers the activity, tell me how the two

18  words of the Second Amendment cover the activity of

19  purchasing and acquiring a firearm.

20          MR. McCOY:  Because you cannot keep or

21  bear a firearm unless you can acquire it first.

22  It's similar.

23          THE COURT:  But that doesn't seem to be a

24  plain language analysis.

25          MR. McCOY:  Well, I think it becomes the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beansupport.com

App. 0961

1  definition what does the Court mean by the plain

2  text?  And I think then you have to look at other

3  decisions from other courts that have said:  Listen,

4  it's not just the right itself, it's the things

5  necessary to acquire the right, achieve the right.

6          THE COURT:  It seems to me your argument

7  can't give any independent content to step one; you

8  just go to step two.

9          MR. McCOY:  No.

10         THE COURT:  You like step two, because

11  you're on much more solid ground on step two.  But

12  you've got to give me some example of where step one

13  would -- you would agree that the text doesn't cover

14  that activity.

15         MR. McCOY:  Well, what does someone need

16  to do in order to be able to exercise that

17  particular right, whatever right it might be, a free

18  exercise right, free speech right, a Second

19  Amendment right.  What do they have to do?  They

20  have to have access to that thing, right.  The

21  church, the newspaper, the podium.  In this case,

22  the gun.  They have to have access to those things.

23  So the plain text -- it doesn't specifically say:

24  You have the right to keep and bear arms that you

25  have previously purchased.  But you cannot keep and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



PROFESSIONAL COURT
REPORTING SERVICE

App. 0962

1  bear an arm, right, without purchasing or acquiring

2  it in some way.  One thing can't happen before the

3  other one does.

4          So if you're restricting people's ability

5  to acquire a firearm, then you are, by that very

6  fact, restricting their ability to keep and bear

7  arms.  Whether you're restricting that for three

8  days, seven days, or six months doesn't matter.

9  It's a restriction on their constitutional rights.

10          THE COURT:  But once again, give me an

11  example where step one would -- you would actually

12  say --

13          MR. McCOY:  Plain text does not cover it?

14          THE COURT:  Yes.

15          MR. McCOY:  Well, that's a good question.

16          THE COURT:  I mean, you're endangering

17  background checks, for example, because they can,

18  under certain circumstances, delay the acquisition

19  of the gun.  And in particular, the old days before

20  you had instantaneous, it was a built-in federal

21  delay.

22          MR. McCOY:  Correct.  But then that gets

23  to other things that justify those delays, right?

24          So in a waiting period we're talking about

25  an arbitrary delay.  It's not based on the status of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beansport.com

**BEAN
&ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

**App. 0963**

1    the person buying the gun.  It's not based on the

2    criminal history.  It's not based on whether or not

3    they're trying to get a CCW.  It's just based on

4    they're getting a gun.  When you look at, for

5    instance, the delay that may occur because of a

6    background check, whether it's they turned yellow,

7    as the testimony was, and there is a potentially

8    seven or more days delay, or because they're red,

9    it's connected to the fact that, for some reason,

10   they're prohibited from having that firearm, either

11   forever, or at that period of time, that the FBI has

12   flagged them.

13           In regards to a CCW, the delay incumbent

14   with that is the fact that you're taking the extra

15   step to be able to carry a firearm --

16           THE COURT:  I think you're more familiar.

17   What were those initials?

18           MR. McCOY:  I'm sorry.  This is a

19   California term.  This is a concealed carry weapons

20   permit.  In New Mexico, I think it's called New

21   Mexico concealed carry, handgun, whatever.

22           But basically, that's an additional

23   license or application that you have to do that does

24   delay, for instance, purchasing the firearm that

25   you're going to be using for that purpose, to carry

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: ...@...support.com



App. 0964

1    around with your CCW card.

2              So there are circumstances, yes, where the

3    plain text does not cover it, or there is an

4    exception that the Supreme Court has said --

5              THE COURT:  So I understand your argument,

6    give me the one where you would concede that it

7    doesn't cover --

8              MR. McCOY:  Background checks.

9              THE COURT:  Okay.

10             MR. McCOY:  Currently felon in possession.

11             THE COURT:  But is your answer that it

12   doesn't cover background checks only because

13   currently federal law is almost instantaneous?

14             MR. McCOY:  No, it's not, and particularly

15   post Rahimi it's not, because the background checks

16   are trying to determine who potentially poses a

17   threat of violence to someone else.  That's why we

18   do it.

19             THE COURT:  But if we went to a background

20   check, for example, that was more rigorous than the

21   current system and there was a built-in delay, like

22   there was in the old days, would you still say that

23   the Second Amendment does not cover that?

24             MR. McCOY:  I might say that.  But I think

25   Rahimi and the historical tradition that Rahimi was

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0965

1    very careful to spell out, I think, justifies that

2    delay, I would have a hard time winning that

3    argument.  I don't think I have a hard time winning

4    the argument that telling a law-abiding citizen, you

5    have to wait seven days to get your gun, even though

6    you're law abiding, clean background check, and you

7    want to pay the money or did pay the money is

8    constitutional.

9              THE COURT:  Would you go so far as to say

10   Rahimi has now eliminated the first step of Bruen?

11             MR. McCOY:  No.

12             THE COURT:  But you can't give me really

13   an example of when that would apply?

14             MR. McCOY:  Well, I give you the example

15   when the first step applies is things like the

16   background check, the delay for the background

17   check.  Yes, it is usually instantaneous, but it

18   could go on for seven days.

19             And while I say that Bruen didn't

20   eliminate step one, I mean, there is --

21             THE COURT:  Why do you give me that?  Why

22   do you say it does cover background, but it doesn't

23   cover waiting period?  Why is the Second Amendment's

24   text, those two words, cover a background check but

25   not a waiting period?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0966

1            MR. McCOY:  Because they're

2   distinguishable, right?  The background check is to

3   ensure that the person doesn't pose a threat of

4   violence or for some reason is a prohibited person.

5   The waiting period, doesn't matter who you are, you

6   could be Mother Teresa, coming back from the dead --

7            THE COURT:  It seems to me like you're

8   dragging back in the means/ends test, and saying:

9   Well, that's good legislation, that's not good

10  legislation, rather than trying to tie it to the two

11  words in the Second Amendment.

12           MR. McCOY:  And perhaps I'm not being

13  clear.  One is trying to ensure that the person that

14  delay is connected to, historical tradition that

15  Rahimi established, and that we've known before

16  this, where people who posed a threat of violence in

17  The Founding Era, as well as around the

18  Reconstruction Era, could have their firearms taken

19  away from them or be prohibited from possessing

20  them.  That's one category.

21           The waiting period is dealing with people

22  who have no indication of violence in their

23  background, that have no criminal history.  It's

24  not:  You have to wait or you cannot have this gun

25  because of what you've done in the past.  It's you

SANTA FE OFFICE                                                        MAIN OFFICE
119 East Marcy, Suite 110                                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                   FAX (505) 843-9492
                                                                              1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: bean@beanreport.com

App. 0967

1  have to wait and cannot have this gun because we say

2  you can't have it.  It's not based on anything.

3          Now, they say that this is a totally

4  different argument, that the reason that we want to

5  do this is to reduce impulsive gun violence.  But

6  that's not the analysis here.  And that's not the

7  analysis that we're dealing with.  We're dealing

8  with the first two parts of Bruen, or the first part

9  of Bruen.  And that first part is:  Does the plain

10 text cover the conduct?  And in this case we believe

11 it does.

12         And again, you apply that kind of thinking

13 to any other right.  Can you exercise that right,

14 but you have to wait seven minutes to do it.  What's

15 the justification for doing that, right?  There are

16 reasons why someone's Fourth or Fifth Amendment

17 rights may be delayed.  But there has to be a

18 legitimate reason.  What's the legitimate reason

19 here?  It not based on any historical tradition.

20 It's not based on anything, whether we're looking at

21 The Founding, whether we're looking at the

22 Reconstruction.

23         In fact, if you want to look at the

24 earliest law we can find that might be analogous to

25 this, it's not until 1923.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail bean@beanreport.com



App. 0968

 1              THE COURT:  But, once again, it seems to
 2   me you're collapsing the two steps, because you're
 3   dragging now the historical analog into step one,
 4   and saying:  The only reason that it's not covered
 5   by the text or is covered by the text, is you've got
 6   to have a historical analog.  So it seems to me that
 7   the position of the plaintiffs right now is that
 8   there is only one step.  You've got to do a
 9   historical analog.  It's overruled Bruen.  Step one
10   is gone.
11              MR. McCOY:  You're asking me, Your Honor,
12   what's an example of something that would happen
13   that we would say the delay was justified, right?
14              THE COURT:  But you justify it by
15   saying --
16              MR. McCOY:  Buy I'm saying the delay is
17   never justified.  In the plain text itself, you have
18   the right to get a firearm, so you can exercise your
19   Second Amendment rights.
20              Now, when it comes to the next step, yes,
21   when you're trying to figure out:  Well, there are
22   delays that the Supreme Court has said are okay,
23   even though the plain text covers it.  The plain
24   text says you have the right to keep and bear arms.
25   In order to exercise that right to keep and bear

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
E-mail: bean@beansupport.com

App. 0969

1   arms, you have to acquire them.  But some people

2   can't acquire them.  And why is that the case?

3   That's, then, you get to justify that delay, yes,

4   you have to then go down the historical analog, and

5   see, does that justify the fact that that person,

6   even though the plain text allows them or should

7   allow them to get that gun right away, does that

8   justify their delay?

9          THE COURT:  Well, walk me through that.

10  Tell me how an acquisition is a keep or bear.  If I

11  just do -- go to the dictionaries, like Justice

12  Scalia, and look at those words, it's hard for me to

13  fit acquisition, purchase, into keep and bear.

14         MR. McCOY:  Well, how, Your Honor, would

15  you be able to keep or bear a firearm without first

16  acquiring it?

17         THE COURT:  Well, you're going to acquire

18  it.  It's just a delay.

19         MR. McCOY:  A delay.  But the fact of the

20  matter is what is the constitutional basis for the

21  delay?  What is the reason why you would have your

22  right delayed?

23         THE COURT:  Well, I think the burden is on

24  you to figure out how, from a plain text -- unless

25  you're prepared to argue that Bruen's first step is

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: info@bean-report.com


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0970

1   gone, you've got to tell me how the plain

2   language -- these are conservative justices that are

3   writing this -- the plain language that the Second

4   Amendment covers keep and bear means anything about

5   acquisition.  I just have a hard time, plain

6   language.  I mean, I'm not sure I agree with Judge

7   Kane in that that just closes the analysis, because

8   I agreed with you at some point it would undermine

9   the Second Amendment if you just said states could

10  do anything they wanted to about acquisition.  But I

11  still am struggling with that first step.  What do

12  they mean when they want a plain language analysis

13  to those two words to an acquisition or purchase?

14          MR. McCOY:  Well, Your Honor, I think --

15          THE COURT:  I think you've got to do it

16  without bringing in the historical analog.

17          MR. McCOY:  Sure.

18          THE COURT:  I don't think you can do it.

19          MR. McCOY:  Well, I mean, here's the point

20  I would make on that, I think when the Court is

21  looking at Rahimi, they're talking about the

22  prohibition of a firearm to somebody who had been

23  issued a criminal protective order in a domestic

24  violence situation.  Now, I've read the decision

25  twice now.  And the analysis that they use -- they

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

email@beansupport.com

App. 0971

```
 1  seem to jump right to analysis regarding historical
 2  tradition.
 3          THE COURT:  So why are you not just saying
 4  step one is gone?
 5          MR. McCOY:  I might be arguing against
 6  myself in that respect.  And maybe step one is gone.
 7  Because, as I think through the decision in
 8  Rahimi -- I don't have it with me -- I don't recall
 9  them going through that Bruen step one.  I recall
10  them jumping right to the historical tradition
11  analog, trying to determine is there some
12  justification for this.
13          And the concurring opinions does that, as
14  does the dissenting opinion.  So while Rahimi
15  affirms Bruen, as I said earlier, it also opens the
16  door, in my opinion, even wider.  And maybe it's
17  opening the door so wide that it takes that first
18  step away.
19          But the court has dealt with the -- and
20  they applied Bruen to Bruen, right?  They applied a
21  similar line of thinking to other gun cases they've
22  received.  And basically, they have determined that
23  we're talking about somebody possessing a firearm,
24  in the case of the Rahimi case, who was prohibited
25  from possessing it.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email bean@beanreporting.com

App. 0972

```
 1              And they didn't stop their analysis there,
 2   right?  I mean, they could have just said:  The
 3   plain text doesn't cover this.  That would be my
 4   argument back to you, why in Rahimi, would the
 5   Supreme Court have gone to step two, if they agreed
 6   that the acquisition of the firearm was not part of
 7   it?  Obviously, he was charged being a prohibited
 8   person in possession of it.  So, sorry, that
 9   argument doesn't hold weight.  But that's my only
10   thought, Your Honor, on the plain text.
11              On this point, Your Honor, as well as
12   on -- I know that you had lots of questions
13   regarding commercial regulations that you were
14   asking Mr. Harrison.  You know, we would like to --
15   and I haven't spoken with defense counsel -- would
16   like to have the opportunity to do an additional
17   briefing, additional written closing argument, to
18   try to address these points.  Because clearly, I'm
19   taking off -- I'm not prepared, as I should be, on
20   answering your questions.  And a deeper dive into
21   the case law might be able to answer those questions
22   for you.
23              THE COURT:  Are you at any point in your
24   argument prepared to assume that those -- that list
25   in Heller still is presumptively constitutional?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@bean-support.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0973

1        MR. McCOY:  When it comes to commercial

2   regulations or anything?

3        THE COURT:  That and the felon in

4   possession, and those that are there, would your

5   analysis ever allow that to be still valid?

6        MR. McCOY:  I believe that everything now

7   is fair game for a challenge.  And I think Rahimi,

8   you know, was challenged.  It went up --

9        THE COURT:  So the answer to that is no?

10       MR. McCOY:  No.  The answer is no, because

11   I think Rahimi actually, again, as I said, makes it

12   all open to a challenge, potentially.  That doesn't

13   mean they don't stand that scrutiny.  And the first

14   test that went up to challenge that withstood it, a

15   constitutional analysis, based on the fact that they

16   could find a historical tradition to support it.

17       THE COURT:  What else, Mr. McCoy?

18       MR. McCOY:  Your Honor, a couple of points

19   that I'd like to make in addition to that.  And,

20   obviously, if what I'm saying is not helpful, then

21   tell me to move on, and I'll go on to the next

22   point.  Because I want to hopefully make this as

23   helpful as possible.  The issue for us is we're

24   talking about not a delay connected to a background

25   check, we're not arguing that.  We're not arguing a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



App. 0974

1    delay related to getting their concealed carry

2    permit.  Right now, what we're arguing is the fact

3    that there is a delay that's imposed on the

4    plaintiffs' rights to exercise their Second

5    Amendment rights.  They're law-abiding citizens.

6    You've got a former law enforcement officer.  You

7    have a single woman in Farmington, who is a domestic

8    violence survivo.  These are people that went in a

9    store and did everything they were supposed to do to

10   exercise their Second Amendment rights, and they

11   were denied.  For what reason, right?  That's how we

12   get into the how and the why, that Rahimi was so

13   careful to basically flush out.  We have to figure

14   that out.

15           Well, the why here, as the government has

16   indicated through their witnesses, and through their

17   opening statement, is that they believe that waiting

18   period laws will reduce impulsive gun violence.  And

19   that that's the reason why we want to do this.  The

20   data, to me, is not particularly clear that that's

21   the case.  This case is likely to go on for a year

22   or more, I'm sure.  I would love to see the stats a

23   year from now in this state, to see if murder and

24   suicide rates have gone down to the degree that they

25   have indicated that they will go down because of

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



1   this.

2          But, you know, regardless of the good

3   intentions, Bruen was clear in saying that this kind

4   of means/end balancing test:   Oh, well, we might be

5   violating someone's constitutional rights, but look

6   at the good things on this side.   Bruen said,

7   Huh-uh, that is not the analysis, right.   The

8   analysis has to be:   Is there historical tradition

9   for this?   Is there some Founding Era connection to

10  it?

11         In regards to those connections, they

12  reach back to intoxication laws, as well as

13  licensing regimes.   And as we've said, or as you've

14  heard from our expert witness, Professor Francis,

15  particularly the intoxication laws are not analogous

16  in any way to a waiting period law.   Those were

17  directed at a specific group of people, a specific

18  person, someone who was intoxicated.   And it wasn't

19  for any arbitrary period of time.   It wasn't for

20  seven days.   They didn't tell the drunk person:

21  Come back and buy your gun seven days from now, when

22  we think you'll be sober.   It was until they sobered

23  up.   But it wasn't a restriction or a regulation

24  that applied to the general public, like this one

25  does.   This applies to everybody, regardless of



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: bean@beanreport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0976

 1   their status at the time.

 2           Rahimi made it clear -- and I think this

 3   is something the defense mentioned in their

 4   opening -- I think they were going to try to hang

 5   their hat on is:  Whoa, whoa, whoa, we don't have to

 6   have an exact twin anymore.  So even if the laws

 7   we're pointing out, the intoxication laws, and the

 8   licensing laws are not directly on point, that's

 9   okay.  Well, Rahimi still said they had to be

10   relevantly similar.  And these intoxication laws may

11   not be an exact twin --

12           THE COURT:  Is that the language that they

13   use?  Is that their language?

14           MR. McCOY:  It is, Your Honor.  I have it

15   in quotation marks.  Rahimi said that the new law

16   does not need to be a quote/unquote "exact twin" to

17   our regulatory tradition, but it is still needed to

18   be quote/unquote "relevantly similar."  The waiting

19   period law is not relevantly similar to the

20   intoxication and licensing laws that the State's put

21   forward.  They're not exact twins.  They're not even

22   distant relatives.  They're just not the same thing,

23   because they're directed at particular people

24   suffering from a particular condition at a

25   particular time.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email bean@beansupport.com

App. 0977

1          The waiting period law is, rather than

2   using a surgical tool to deal with an issue, it's

3   like using a hacksaw to take off the whole leg.  It

4   just applies to the general public, period.  They

5   don't care who you are, how clean your record is, or

6   what you need the gun for.  You can't have it.

7          I mean, Professor Roth testified, and I as

8   a former prosecutor of 20 years can say, and agree

9   with this, domestic violence victims are the most at

10  risk in the week after their accuser is arrested on

11  a charge.  In this day and age, they're arrested, as

12  the Court knows in state court now, just let out the

13  door because of the no bail laws.  They're at most

14  risk at that week.  Well, what if you've got a

15  domestic violence survivor that wants to go into the

16  store.  You can't have this gun for seven days.  You

17  have a clean background, it has nothing to do with

18  that, you just can't have it.  She's been denied the

19  ability to exercise her right, she's been denied the

20  ability to protect herself, if need be.  And that's

21  significant.  What's the reason for it?  Why?

22          The next question is how?  How are you

23  getting to it?  And the how is the problem, right?

24  The how is there is no -- it's applying in a general

25  way without any support of historical tradition or

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0978

1    analog to support it.

2            Regarding the balance of the equities,

3    Your Honor, and the public interest in this case,

4    and this is continuing on from what I just said.  As

5    the Court knows, those factors merge when we're

6    dealing with the situation the government is the

7    opposing party.  And it's not only the plaintiffs'

8    Second Amendment rights which have been violated in

9    this case through the waiting period law, but it's

10   all residents of the State of New Mexico whose

11   Second Amendment rights have been infringed.  When

12   they want to go buy a firearm, they're going to be

13   told they have to wait for seven days.

14           In Chamber of Commerce of U.S. versus

15   Edmundson, the Tenth Circuit held that, "When

16   applying the balance of equities and public interest

17   factors courts must be mindful that, even if a state

18   is pursuing a legitimate goal.  In that case, it was

19   deterring illegal immigration, it has no interest in

20   doing so by unconstitutional means, because the

21   state does not have an interest in enforcing a law

22   that is likely constitutionally infirm."

23           Sorry, Your Honor, I'm trying to find

24   other points I'd like to make.

25           THE COURT:  Take your time.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: bean@beanreport.com

App. 0979

1          MR. McCOY:  And just to focus on a couple

2    other points on Rahimi, since that seems to be the

3    topic of the day, as I've said, and as the Court's

4    aware, it did not alter Bruen's rejection of a court

5    employing the means to end balancing test.  It made

6    that clear that it cannot do that.  The proponent of

7    the law still cannot rely solely on the argument

8    that, well, it infringes on constitutional rights,

9    but who cares, when it's advancing a legitimate

10   government interest.

11          The state may stand up here in a moment

12   and extol all the potential benefits of this Waiting

13   Period Act.  But quite frankly, no matter how good

14   the why is in a case like this, that does not save

15   the law.  Especially, when the how is out of whack

16   with the historical tradition.

17          In Rahimi the Court said, "Even when a law

18   regulates arms bearing for a permissible reason, it

19   still may not be compatible with the right, if it

20   does so to an extent beyond what's done at The

21   Founding.  Not every government effort to save the

22   people from themselves, no matter how well

23   intentioned, is constitutional.

24          The question for the Court is not what

25   this law might do in the future when it comes to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0980

```
 1   impulsive violence, but what it does today to the
 2   Second Amendment rights of the citizens of the
 3   state.  And we believe that the answer to that
 4   question is that the Waiting Period Act is a
 5   violation of their Second Amendment rights.  And
 6   it's happening right now.  It's happened, and will
 7   continue to happen to all residents of the State of
 8   New Mexico who want to buy guns.
 9           And we think for that reason, we think it
10   should be enjoined during the pendency of this case.
11   And we'd ask for preliminary injunction.  Thank you.
12           THE COURT:  Thank you, Mr. McCoy.
13           Are you just shifting in your seat, Mr.
14   Harrison, or did you want to say something?
15           MR. HARRISON:  Not right now, Your Honor.
16           THE COURT:  Not right now.
17           MR. McCOY:  May I make one final comment?
18           THE COURT:  Yeah, sure.
19           MR. McCOY:  Co-counsel had shown this to
20   me.
21           There is a case out of the Ninth Circuit;
22   in fact, it found that non-violent felon bans were
23   unconstitutional.  Third and the Ninth?  So there
24   was an en banc decision out of the Third, as well as
25   a decision out of the Ninth Circuits, these are
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

**BEAN & ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

email@bean-support.com

**App. 0981**

 1  recent cases finding non-violent felon bans

 2  unconstitutional.  So those cases are already

 3  started.  And I can give you the cites, if you want.

 4          THE COURT:  Well, yeah, why don't you give

 5  them to me, because I was unaware anybody had

 6  touched those.

 7          MR. McCOY:  I have the case names.  We'll

 8  get the case cites and provide them to the Court.

 9          THE COURT:  All right.  Mr. Duffy.

10          So I don't forget, let me ask you -- give

11  me your -- give me the State's interpretation of

12  this statute.  We've listened to two plaintiffs

13  here, and the stores apparently interpreted the

14  statute differently.  One of them took the money and

15  kept the gun for seven days.  The other one said:

16  Here's your background check, come back and buy the

17  gun in seven days.  What's the State's position?

18  How does the State envision gun shops operating?

19          MR. DUFFY:  Yes, Your Honor.  Well, I

20  mean --

21          THE COURT:  Is either one of them all

22  right with you?  Or is there one way that it's

23  supposed to operate?

24          MR. DUFFY:  I mean, with the caveat being

25  that the chief law enforcement officer of the State

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492





**App. 0982**

```
 1  is the Attorney General, and not necessarily the
 2  Governor, my interpretation of that statute is that
 3  the sale can occur, and, you know, they can exchange
 4  the money.
 5           THE COURT:  So they can go ahead and take
 6  the money, and just keep it, like layaway for seven
 7  days.
 8           MR. DUFFY:  Yes, yes.  And I mean, I was
 9  is personally helping drafting some of the statute,
10  and that was my intent.  But, you know, plain
11  language wise, I believe it does come through that
12  they can do the exchange of the consideration, and
13  then come back later in seven days.
14           THE COURT:  Okay.  What if they do it the
15  other way?  What if they did it the way -- one of
16  the examples here, where they don't exchange the
17  money, but they just do the background check?  Is
18  that okay?
19           MR. DUFFY:  I mean, I'd hate to give legal
20  advice to the general public in that sense.  But I
21  mean, that seems probably fine.  I don't have the
22  statute in front of me.  But I believe it does refer
23  to seven days after the sale.  So in my mind, you
24  know, the sale is the exchange of consideration of
25  that, so --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0983

 1          THE COURT:  Would you go ding a gun dealer

 2   if they did it where they don't do the sale, but

 3   they just do the background check?

 4          MR. DUFFY:  With the caveat being that I'm

 5   not the law enforcement officer.  But I don't think

 6   so.  They seem to be complying with the spirit of

 7   the law, at the very least; that you're initiating

 8   the transaction to purchase the firearm, and then

 9   you're waiting seven days after that initiation.

10   That falls within the spirit of the law.  So I

11   highly doubt any dealer would get dinged for that.

12          THE COURT:  Let me pick up a little bit on

13   the exchange that I had with Mr. McCoy about whether

14   we're down to just a single step in Bruen, rather

15   than a two-step analysis.

16          One of the things the Chief Justice did

17   that I think gives his argument some force is he

18   doubled back on places that you could exclude to

19   sort of justify some of the place restrictions that

20   have been part of gun regulation for a long time.

21   He seemed to go out of his way to find a historical

22   analog or place restrictions.  He seems to have gone

23   back and did it.  Now, he didn't do it with, like,

24   felons in possession.  He didn't go down that

25   complete list.  But he did seem to go back -- it

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



1    wasn't necessarily to the holding or him writing the

2    opinion, but found that historical analogs were one

3    of those categories from Heller.  Does that not give

4    his argument some force that you've got to find a

5    historical analog for everything?

6             MR. DUFFY:  Excuse me, we're talking about

7    Rahimi; correct?

8             THE COURT:  Correct.

9             MR. DUFFY:  And by place restriction,

10   you're referring to, like, sensitive locations, like

11   courthouses?

12            THE COURT:  Right.  He seemed to have gone

13   out of his way to take one of the examples, and find

14   a historical analog.  He didn't need to do that, but

15   he did.  And I think that lends some force to Mr.

16   McCoy's point, which I think really is that you got

17   to have one for everything.

18            MR. DUFFY:  Yes.  I admit it's not a model

19   of clarity, and it does inject some uncertainty into

20   the analysis.  But it remains that Bruen said there

21   is this two-step:  First plain language, and then

22   history and tradition.

23            Granted, Rahimi doesn't really discuss the

24   first step.  Don't need it.  In that case it was

25   pretty obvious this was a prohibition on somebody's

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0985

1 ability to possess a firearm.  That was a given in

2 that case.  So there was really no need to discuss

3 the first step.

4          And so I think any argument that now we

5 have just pure history and tradition, based on the

6 silence in Rahimi, it is misplaced.  I think the

7 better route is to look at what the Supreme Court

8 has said.

9          And, as I mentioned earlier today, in

10 Heller, they said that these sorts of laws, bans on

11 felons possessing, laws regulating the commercial

12 sales of firearms, et cetera, are presumptively

13 lawful.  And Heller also said, you know, the right

14 is not unlimited.  And you go to Bruen.  And they

15 say:  Nothing in our analysis should be read to cast

16 doubt on anything we said in Bruen.  And six out of

17 the nine justices, I believe, also mention that

18 presumptively lawful category.

19          Now, it's true Rahimi didn't --

20          THE COURT:  Bruen said -- you said cast

21 doubt on anything said in Bruen.  But you meant --

22          MR. DUFFY:  Sorry.

23          THE COURT:  Bruen said we're not casting

24 any doubt on what was said in Heller?

25          MR. DUFFY:  Yes, thank you, Your Honor.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0986

1   That's correct.

2          And I did have a chance to review part of

3   Rahimi again after your questioning earlier.  And it

4   is true, you know, that they don't in-depth discuss

5   that category of presumptively lawful measures.  But

6   there are two places in the majority opinion, pages

7   14 through 15, where they do reference it.  One on

8   page 14, they mention -- they say, "While we do not

9   suggest that the Second Amendment prohibits the

10  enactment of laws banning the possession of guns by

11  categories of persons thought by a legislature to

12  present a pressure danger, misuse."  Then they cite

13  Heller, 554 U.S. at 626, which that's discussing the

14  presumptively lawful categories banning felons in

15  possession, all of that.  So they do mention it

16  there.  And then they mention it on the next page,

17  when Rahimi is arguing that Heller requires them to

18  affirm, because Heller said you cannot restrain an

19  individual from having firearms in the home.  And

20  they say:  But Heller never established a

21  categorical rule that the constitution prohibits

22  regulations that forbid firearm possession in the

23  home.  In fact, our opinion stated that many such

24  prohibitions, like those on the possession of

25  firearms by felons and the mentally ill, are

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



1   presumptively lawful.

2          So I think -- I mean, based on that, it

3   shows that Rahimi isn't trying to overrule anything

4   that was said in Heller or Bruen, in terms of this

5   presumptively lawful category; that this really

6   shows to me pretty clearly that that is still good

7   law going forward.

8          If the Supreme Court wanted to, you know,

9   overturn that, it's a pretty big category of laws,

10  and it would be a sea change in Second Amendment

11  law.  I think they would probably go out of their

12  way to give it a little bit more analysis than say,

13  you know, Whoops, we forgot to mention it.  You

14  know, now, you can't -- now felon in possession laws

15  are presumptively unconstitutional.  Everything else

16  we said in Heller -- it's as simple as the fact that

17  it wasn't an issue in Rahimi, so they didn't really

18  need to raise it.  They raised it to justify their

19  conclusion there.  But other than that, they didn't

20  really need to raise it.

21         Now, I think it is important -- and I

22  won't hammer this too hard -- but it is important to

23  go back to the standard of why we're here today.

24  Preliminary injunctions are an extraordinary remedy.

25  The right to relief must be clear and unequivocal.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0988

1   We have a disfavored injunction, and this is an

2   injunction that's based on a facial challenge.

3          What the plaintiffs are trying to have the

4   Court do is what Rahimi tried to have, or did have

5   the Fifth Circuit do in that case, which is to

6   provide these hypotheticals for the Court to look

7   at.  For instance, the hypothetical of a domestic

8   abuse victim needing a firearm, and not being able

9   to buy one in seven days.

10          That's not this case.  I mean, perhaps it

11  does happen, but it's not alleged in this case.

12  There is no evidence that there is an imminent harm

13  in this case.  What they're asking you to do is slay

14  that strawman that Justice Roberts chided the Fifth

15  Circuit for doing.

16          Rather, as Justice Roberts put it, it is

17  the Court's duty in these facial challenges to seek

18  harmony, and to find the areas of the law that are

19  constitutional, to see if there are circumstances

20  where it is constitutional.

21          And here, you heard it from the witness --

22  from plaintiffs' witnesses themselves -- that -- I

23  believe it was the director at Calibers -- he

24  admitted that sometimes these background checks come

25  back as that yellow, as that pause.  And their

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0989

 1  official policy is if that background check stays

 2  yellow that seven days, at the end of it, go ahead,

 3  take our firearm.  We don't know if you're a

 4  prohibited possessor or not.

 5         So that clearly, in my mind at least, is a

 6  constitutional application of this waiting period

 7  law.  It is complimentary to the presumptively

 8  lawful --

 9         THE COURT:  But if I understood what he

10  was testifying, that's just Calibers' policy, right?

11  That wasn't anything in the law.  That's just their

12  policy, right?

13         MR. DUFFY:  Yes, that's correct.  And I

14  guess my point is, though, that this waiting period

15  law ensures that that doesn't happen.  So it says --

16  it helps ensure at least that that doesn't happen,

17  by saying you've got to wait that seven days.  And I

18  believe there is a section in our law saying, if you

19  haven't received a background check, you have to

20  wait up to, I think 20 days is the max.  And then

21  you can do that.

22         So part of this law is to compliment and

23  to make sure that these background checks are run,

24  and completed before these firearms are passed on to

25  people who could be prohibited possessors.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: support.com

App. 0990

1      And so that is a constitutional

2  application.  And that makes this case, in that

3  sense, right on point with the McRory case out of

4  the Fifth Circuit, where the Fifth Circuit said, you

5  know, waiting periods of up to 10 days in order for

6  the federal government to perform this enhanced

7  background check on 18 through 20 year olds, those

8  are, you know, lawful.  They say -- they admit that

9  in -- I believe it's in Heller or Bruen -- that

10 there may come, you know, a lengthy -- these

11 background checks may sometimes become so lengthy as

12 to become, quote, "abusive," they say:  Well, 10

13 days clearly, it doesn't fall within that period.

14 And I think we have that same thing here.

15      So, again, I mean, this could be the first

16 case where Judge Browning issues a two-page opinion

17 saying this is a facial challenge.  Here is

18 application of the law, where it is plainly

19 constitutional; the preliminary injunction is

20 denied.  I understand, you know, if the Court wants

21 to go into more nuance and to see more, as applied

22 for other options, but that is one option for the

23 Court.

24      So going to the likelihood of success on

25 the merits.  For three reasons plaintiffs are

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

**App. 0991**

```
 1  unlikely to succeed:  Plain text doesn't cover their
 2  proposed course of conduct.  The waiting period is a
 3  presumptively lawful regulation on the commercial
 4  sale of firearms, and history and tradition justify
 5  the regulation.
 6          Moving first to the plain text argument.
 7  As the discussion you had earlier alluded to, this
 8  simply isn't covered.  The right to immediately
 9  acquire a firearm is not covered by the plain text.
10  It is not covered by the right to bear arms or to
11  keep arms, which are, you know, to possess arms that
12  you've already acquired.  And while I think the
13  Court is correct that there may come a time, a time
14  period that is so long, that, you know, forces
15  somebody to wait that seven days, clearly is not
16  that time period.  And I think the Court is correct
17  on that analysis there.
18          And to that extent, you know, as I know
19  the Ninth Circuit recently, in B & L Productions,
20  recently kind of wrestled with this plain text, and
21  whether it covers the right to acquire firearms.
22  And what they concluded in that case was that, no,
23  it doesn't, unless and until it meaningfully
24  infringes upon the right to keep a firearm.
25          And seven days, I would submit to the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0992

1   Court, does not meaningfully infringe upon that

2   right.  Because, as the Supreme Court has noted,

3   states with Shall Issue regimes, they have basically

4   gone out of their way to not suggest

5   unconstitutionality of these Shall Issue regimes,

6   with requirements like background checks and safety

7   courses, things that take time.  That indicates that

8   those things do not meaningfully infringe upon the

9   Second Amendment.  And what we have here is

10  something that is very similar.  And I will get into

11  the justification for this later on, and why this is

12  analogous to background checks.  But I think on the

13  first step plaintiffs lose.

14          Then going to the second step, you know,

15  this is a presumptively lawful commercial

16  regulation.  It regulates only buyers and sellers.

17  That falls within the definition of commercial.

18  And, you know, this fits comfortably within Bruen's

19  acknowledgment of the constitutionality of these

20  Shall Issue regimes.  And this is the analysis that

21  Judge Kane did in Rocky Mountain Gun Owners.  And

22  it's the analysis that -- more or less -- that the

23  Fifth Circuit did in McRory, and the Ninth Circuit

24  in the pre Bruen case, Silvester.  And so I don't

25  believe that plaintiffs have given this Court any

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0993

1    other reason to reach another conclusion.

2              But even if the Court decides, you know,

3    the plain text covers this, this is not a

4    presumptively lawful commercial regulation, I think

5    defendants still win.  Because the waiting period is

6    consistent with the principles that underlie our

7    regulatory tradition.

8              I will admit a big part of why we called

9    Professor Roth here today, and why we had Professor

10   Spitzer submit a declaration, is to show that we are

11   addressing unprecedented societal changes, and

12   issues and technological changes, in order for the

13   Court to apply Bruen's, quote, "more nuanced

14   approach" to analogies.

15             However, after Rahimi, I'm not even sure

16   that that was as necessary.  Because, in Rahimi, the

17   issue was domestic abuse, interpersonal violence.

18   And, as Justice Thomas noted in his dissent, that

19   problem has persisted since the 18th century.  Yes,

20   the majority in Rahimi applied this more nuanced

21   approach, and used analogies, of surety laws and

22   going on laws to justify this -- by no means

23   identical law that prohibited those under domestic

24   violence restraining orders --

25             THE COURT:  How are you using the word

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0994

1   "nuanced"?  In the sense that the analog doesn't

2   have to be as tight as maybe Bruen suggested.  Is

3   that what you mean by "nuanced"?

4           MR. DUFFY:  Yes.  And where I get that

5   language from is in Bruen itself.  They say, I

6   believe, at the end of their analysis, they say:

7   This is a relatively straightforward case.  Maybe

8   it's at the beginning of their analysis.  But they

9   say:  This is straightforward.  But in some cases

10  that involve unprecedented societal issues or

11  technological changes that were unimaginable to The

12  Founders, it may require more nuanced approach,

13  where courts look to historical analogies.  And then

14  they go into why -- you know, looking at whether

15  laws are relatively similar, and the how and why.

16          And so, plaintiffs have argued in this

17  case, before Rahimi came out, that this was a

18  straightforward case.  And they have, essentially,

19  argued that we need a historical trend.  They keep

20  going back to the fact that there was no waiting

21  period in 1791 or 1868.  They want an historical

22  claim.  Our point -- and this point is justified by

23  Rahimi -- is that that's not required.

24          And I think this is particularly helpful.

25  Justice Barrett's concurrence in Rahimi, she says,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: bean@beanreporting.com

App. 0995

1   quote, "Bruen emphasized that analogical reasoning

2   is not a regulatory straightjacket.  To be

3   consistent with historical limits, a challenged

4   regulation need not be an updated model of a

5   historical counterpart.  Besides, imposing a test

6   that demands overly specific analogs has serious

7   problems.  To name two:  It forces 21st century

8   regulations to follow late 18th century policy

9   choices, giving us a law 'trapped in amber.'  And it

10  assumes that Founding Era legislatures maximumly

11  exercised their power to regulate, thereby adopting

12  a 'use it or lose it' view of legislative authority.

13  Such assumptions are flawed and Originalism does not

14  require it."

15          And so I think, you know, even if -- I

16  submit that we have shown evidence that we are

17  addressing unprecedented societal issues of firearm

18  violence, both homicides and suicides, and

19  technological changes.

20          But even if we didn't show that mountain

21  of evidence, I think Rahimi shows that the Court can

22  look to these analogies, and not require a

23  historical twin, like a waiting period back in the

24  1700s.

25          Here are two analogs that we point to, our

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0996

1   intoxication laws and licensing regimes.

2   Intoxication laws, plaintiffs say, you know, they're

3   not similar, because they only lasted as long as the

4   person was drunk.  Well, they are, I believe,

5   similar to the waiting period law in the sense that

6   when the person is intoxicated, they're generally in

7   a more impulsive state.  They might not be as

8   responsible.  And so that law, you know, it goes

9   away, the prohibition goes away, when that person

10  presumably becomes a little bit more responsible

11  because they sobered up.

12         Well, our waiting period law is analogous

13  to that in the sense that, you know, we understand

14  that maybe not everyone who is purchasing

15  firearms -- the vast majority of people who are

16  purchasing firearms -- aren't going to use it to go

17  commit impulsive violence.  But there is a not

18  insignificant amount who do go on to do that.  And

19  so we do give them this sobering up period of seven

20  days, as the studies have shown, in order to give

21  them this cooling off period, and hopefully not go

22  out and shoot up a school or shoot themselves.

23         So in that sense, they are analogs.

24  Plaintiffs again require an historical twin.  But

25  that is not required under Bruen or Rahimi.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



PROFESSIONAL COURT
REPORTING SERVICE

App. 0997

1        And also historical licensing regimes are

2  also sufficient to justify a waiting period.  There

3  have been various forms of licensing regimes since

4  the 1600s -- or for quite some time at least.  And

5  while it is true that today's, you know, universal

6  licensing regime didn't really emerge under the

7  early 20th century, as you heard Professor Roth

8  testify, that's right when our, you know, proportion

9  of gun homicides hit today's levels.

10       So this -- and I believe, as Your Honor

11  mentioned earlier today, that laws that were in the

12  early 20th century are not necessarily, you know,

13  automatically rejected under Bruen.  I think that's

14  especially so because Bruen goes out of its way to

15  acknowledge the constitutionality, or to not suggest

16  unconstitutionality of Shall Issue regimes.

17       And just as those are meant to temporarily

18  delay a person's ability to possess or use a

19  firearm, in order to make sure that they responsibly

20  use it, so, too, do the waiting periods.

21       Now, plaintiffs argue that the waiting

22  period really serves no purpose in the sense that,

23  if someone's background check comes back clean,

24  they're just simply being penalized by waiting seven

25  days.  But waiting period is attacking a different

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492
                                                              1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 0998

1   problem, and that's the impulsivity, the impulsive

2   homicide and suicides.  Somebody can have a clean

3   background, never have a speeding ticket.  And they

4   could have a nasty break-up.  And they can go in and

5   buy a gun with the intent to go kill their ex-lover

6   and themselves.  And, you know, any law that

7   requires a gun shop to say:  Hey, do you intend to

8   do that, I don't think that would be very effective.

9   The only real meaningful way to prevent those sorts

10  of things is to impose this waiting period.

11          So I think plaintiffs are mistaken in the

12  sense that this doesn't serve any purpose.  Because

13  it really does.

14          So I believe that waiting periods, under

15  this second step in Bruen, fit comfortably within

16  the tradition and the principles that have been

17  established by intoxication laws and licensing

18  regimes.

19          Moving on to irreparable injury.  Again,

20  you know, plaintiffs waited -- and it was based,

21  allegedly, on a faulty legal conclusion -- at least

22  in my opinion.  So the Court should at least

23  substantially discount any claim of irreparable

24  injury.  More importantly, because plaintiffs have

25  failed to show the likely unconstitutionality of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 0999

 1  law.  They cannot rely on a purported constitutional

 2  violation to justify irreparable harm.

 3           Lastly, plaintiffs cannot show a

 4  meaningful impact upon their right to self-defense.

 5  And I read the Court's previous opinion on this, and

 6  that footnote dealing with -- you know,

 7  understandably disagreeing with some of the

 8  principles the Supreme Court has put forth,

 9  emphasizing that self-defense is the central

10  component of the Second Amendment, and how there is

11  a history that rebellion and all that was also very

12  important.  But it does remain the fact that the

13  Supreme Court has repeatedly emphasized self-defense

14  as the central component.

15           And what we have here today are two

16  plaintiffs who have testified that before the

17  waiting period law went into effect, they already

18  had firearms.  Mr. Ortega already had about five

19  firearms, I believe, including, you know, a pistol,

20  which is what he wanted to buy.

21           So, too, with the other plaintiff.  So we

22  really don't have any irreparable harm.

23           THE COURT:  It seems to me -- now, this is

24  totally academic -- but if the Supreme Court were,

25  all of a sudden, very persuaded by my footnote and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   decided to change the core theme of the Second

2   Amendment, that would actually help your argument,

3   rather than being against it.  Because I think, I

4   tend to agree just, you know, that it does

5   undercut -- to have a waiting period does undercut

6   the central theme of protection, given that some

7   people need it immediately.  They don't need it

8   seven days from now, they need it immediately;

9   whereas, the right to rebel, we, as a society, and

10  constitutional government, might have more of an

11  interest in delaying the purchase of weapons to

12  rebel.

13          MR. DUFFY:  Yes, I agree.  And unless and

14  until that day comes, you know, that will have a

15  different argument there.

16          However, you know, if the Supreme Court

17  wanted to adopt that reasoning, I would also

18  encourage them to adopt your other conclusion that

19  the Second Amendment should not have been

20  incorporated against the states.  I believe that has

21  much more argumentative force when using Originalist

22  principles truly.

23          But moving to the last factor:  The Public

24  interest and the balancing of the equities.  Again,

25  I think the Court should consider this, regardless

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 1001

1   of Bruen's statement that it's inappropriate when

2   looking to the merits of the law.  They do nothing

3   to overrule Winters, and that four-factor test,

4   which is now three factors, when we are the

5   government.

6          And I think this factor is, as Judge Kane

7   observed, not even close.  What we have here are two

8   plaintiffs, who already had multiple firearms, who

9   have to wait seven extra days to purchase additional

10  firearms.

11         And I would note that both plaintiffs --

12  they didn't even know when they were going to

13  purchase another firearm.  One said he would wait

14  until he had the money.  Well, we don't know when

15  that will be.

16         Part of the preliminary injunction

17  standard, I think, is to prevent imminent

18  irreparable harm.  Well, someday, I might buy

19  another gun.  That's not really imminent to me.  So

20  you have this reduced harm on one side.  And on the

21  other side, you have the State's interest, and the

22  public's interest in preventing impulsive gun

23  suicides and homicides.

24         And I know we can debate all day long

25  whether it's -- how much of an impact this will

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

email: bean@beansupport.com

App. 1002

1   truly have -- and I'm no expert on that -- but I do

2   know -- and we do cite -- there are experts on this.

3   And there is unbiased, peer-reviewed studies showing

4   that these laws do have an effect on it.  And I

5   believe one that was cited in the Colorado case that

6   was particularly persuasive to Judge Kane said there

7   was about a 17 percent decrease in gun homicides.

8   And again, translating that to New Mexico's

9   population, yearly, that's nearly 100 New Mexicans.

10          So, when you have this minimal harm on one

11  side -- and as plaintiffs have said this case might

12  go on for years -- you have 100, 200 New Mexicans'

13  lives on the other side, it is as Judge Kane

14  concluded, not even close.

15          And for that reason, Your Honor, we would

16  ask that the Court deny the preliminary injunction.

17          THE COURT:  All right.  Thank you,

18  Mr. Duffy.

19          Mr. McCoy, I'll give you the last word on

20  your motion.

21          MR. McCOY:  First, Your Honor, I want to

22  correct something.  Calibers' witness, Robert Pohl,

23  his testimony that it wasn't his policy, or their

24  policy to release the firearm at the end of the

25  seven days.  That's actually -- he testified that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



App. 1003

1   that was a federal regulation.  And it's my

2   understanding that, at that period of time, after

3   seven days, basically, the feds, the federal

4   government says that you can release, you may

5   release or transfer the firearm.

6            THE COURT:  Y'all are more expert on this.

7   I thought that federal law said, if you didn't have

8   an answer --

9            MR. McCOY:  Yeah.

10           THE COURT:  -- you could get your firearm

11  after --

12           MR. McCOY:  Seven days.

13           THE COURT:  Is it seven days?

14           MR. McCOY:  That was his testimony.  So

15  the seven-day mark is where then, at least Calibers,

16  has the authority -- they can either transfer it or

17  not at that period of time.

18           THE COURT:  Well, where does this 20 days

19  come in?  I thought that was -- if you didn't get an

20  answer after 20 days, you got the firearm.

21           MR. McCOY:  That's built into the statute.

22           THE COURT:  That's the statute.

23           MR. McCOY:  That's the statute.  Which,

24  yeah, I don't know what that is based on.  But I do

25  know, based on his testimony, that that seven days

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email bean support.com




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 1004

1  is a federal regulation or federal requirement.

2  They can't release the gun during that seven-day

3  period.  So Mr. Duffy --

4          THE COURT:  Where did I get it that, if

5  you had a yellow, they could only hold the gun --

6  that you could legally give them the gun after three

7  days, or two days, or something?  Where did I get

8  that.

9          MR. McCOY:  It wasn't the testimony today,

10  Your Honor.  And I'm not familiar with where that's

11  coming from.  I don't know.

12          I want to just state a couple of other

13  points that Mr. Duffy raised.

14          THE COURT:  Doesn't sound like either one

15  of us know what the federal law requires.  We're

16  relying on somebody from Calibers to tell us what

17  federal law is?

18          MR. McCOY:  Correct.

19          In regards to the nuances with the

20  different colors, when it comes to a background

21  check, I have not looked into that.  I'm happy to do

22  that, and provide -- it's my understanding, at least

23  based on his testimony, I just want to make it clear

24  it's not their policy to release it.  Mr. Duffy was

25  indicating that that's another reason why we need to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email-bean-support.com

App. 1005

1    have this seven-day waiting period, because these

2    gun stores throughout New Mexico act willy-nilly

3    with different policies in regards to when it's

4    yellow, when they transfer or don't transfer, or

5    red, for that matter.  That's not my understanding

6    and that was not the testimony from the witness.

7         In regards to his discussion about

8    historical twin.  He's right, they were clear, it

9    does not have to be historical twin.  But the

10   intoxication laws are absolutely not analogous.  He

11   says, just like with intoxicated people, we're

12   trying to prevent people from acting impulsively.

13   People who are intoxicated with firearms oftentimes

14   misuse them or act impulsively with them, because

15   when you're intoxicated that's a potential problem

16   that might happen.

17        But the fact of the matter is, is that I

18   heard no testimony -- the Court has heard no

19   testimony here today -- as to why this seven days,

20   which appears to have been pulled out of the air, is

21   somehow this magical period of time, in which, if

22   someone is going to act impulsive or not, they're

23   going to do it in that seven days.

24        To my knowledge there was no testimony

25   establishing why that specific timeframe was

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: bean@beansupport.com

**App. 1006**

```
 1  selected, which just goes to the argument that it's
 2  arbitrary.  It started at 14, the legislative notes
 3  show.  And obviously from wheeling and dealing in
 4  the legislature, they got down to seven in order to
 5  get the thing passed.  It's just a number they
 6  pulled out of the air.  That has nothing to do when
 7  impulsivity sobers up.  The intoxication laws are
 8  very clear:  You can't have a gun while you're
 9  stumbling drunk.  When you stop stumbling around
10  drunk, you get your gun.
11          Here, in New Mexico, now, I don't care how
12  law abiding you are, how sober you are, how the
13  opposite of impulsive you are, you're not getting
14  your gun, period, for seven days.  Why seven days?
15  Who knows?  Just a random day we picked out of a hat
16  for the sake of what?
17          Again, isn't the background check that
18  gatekeeper that should be used to control who is
19  mostly likely to offend with the firearm?  And the
20  irony is:  Who is this waiting period impacting the
21  most?  It's impacting law-abiding citizens who are
22  buying their guns at gun stores, going through the
23  regular, lawful practice of acquiring a firearm.
24          The vast majority, and the Court can take
25  judicial notice of this.  I, as a prosecutor, can
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 1007

```
 1   affirm it as well.  The vast majority of gun crime
 2   and gun violence in this country is committed by
 3   people who are not acquiring a firearm.  It's
 4   typically firearms that were stolen, and have passed
 5   through five, 10, 15 hands before they're showing up
 6   in a homicide on the south side of Chicago.  That's
 7   the typical place.  That's where the gun violence is
 8   happening.  And that's who's committing it.  Not
 9   people going to gun stores, and willingly putting
10   their name on a background check to make sure that
11   they're clean and good to go for a firearm.  Yet,
12   those are the people whose rights are being
13   restricted here.  For what purpose?  The why is
14   important, as well as the how in this particular
15   situation.
16          In regards to irreparable harm, I'd just
17   note a particular case.  This is a U.S. Supreme
18   Court case, Elrod versus Burns.  And in that case
19   the court was talking about the fact that even a
20   brief violation of constitutional rights constitutes
21   irreparable injury.  And in that case, quote, loss
22   of constitutional freedom for even minimal periods
23   of time, unquestionably constitutes irreparable
24   injury.
25          Whether Ms. Scott or Mr. Ortega were
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 1008

1   denied their firearm for seven minutes longer than

2   they needed to be or seven days or seven weeks, is

3   really irrelevant.  The fact of the matter is that

4   they could not exercise their right to purchase that

5   firearm and keep and bear that firearm at home.  As

6   they testified, their plan was to take that firearm

7   home for their self-defense.  They couldn't do it

8   for seven days because of this arbitrary waiting

9   period law.  They suffered irreparable injury.  The

10  fact that that injury has been rectified seven,

11  eight days later is irrelevant, because, if and

12  when, as they said, they're going to buy another

13  gun, they're going to be subjected to the same

14  waiting period, as well as every other resident of

15  the State of New Mexico.

16          A constitutionality infirm law does not

17  just impact our plaintiffs in this case, it impacts

18  every law-abiding resident in the state.  And for

19  that reason, there is irreparable injury in this

20  case.

21          As far as commercial regulations go,

22  what's interesting, we have a law here that applies

23  not just to the seller, but places a burden on the

24  buyer as well.  There is a law here that imposes

25  criminal penalties, not just on the seller, but on

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 1009

1   the buyer as well, if they end up not abiding by the

2   seven-day waiting period.

3          THE COURT:  And what is the significance

4   of that?

5          MR. McCOY:  Well, when you're talking

6   about constitutional rights, and you're talking

7   about a commercial regulation of firearms, in the

8   past that has been directed at the seller of the

9   firearms themselves; firearms, they can or cannot

10  sell, or restrictions on who they can and cannot

11  sell certain things to, regardless of what might be,

12  ammunition or firearms related.

13         But now this applies both equally to the

14  buyer and the seller.  Why it's important for the

15  buyer, is because the buyer is simply trying to

16  exercise their Second Amendment rights to acquire

17  this firearm.  And because of this law, they're not

18  able to do that.

19         And citing a case here -- this is actually

20  out of the District of Maryland.  So, as you can

21  imagine, you know, Your Honor, case law since 2022

22  is rapidly developing, and has not necessarily

23  always made it up through court of appeals yet.  But

24  the decision dealing with whether or not a similar

25  law was a commercial regulation, they said a blatant

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beanreport.com



App. 1010

```
 1  prohibition on possession of a firearm is not a
 2  commercial regulation.  Commercial regulations are
 3  those that do not intrinsically implicate an
 4  individual's right of possession.  Moreover, in
 5  terms, apply equally to both -- when they apply
 6  equally to both private and commercial sales,
 7  transfers.
 8            In this case, it's terms apply equally to
 9  both private and commercial sales.  So this applies
10  to both private and commercial sales as well.  So
11  the father selling his son a firearm also is
12  obligated to follow this as well -- actually, it
13  isn't, because there is a family exception in this
14  case.  But outside of those exceptions, this applies
15  to private, as well as commercial sales.  And for
16  that reason, we do not believe this is a commercial
17  regulation.
18            Finally, Your Honor, going back to the
19  plain text argument one more time.  And again, I'm
20  pulling from cases from other circuits at this
21  period of time.  This is a case out of the Ninth
22  Circuit.  It's Texaria versus County of Alameda.  In
23  that case, the Ninth Circuit, and the Ninth Circuit
24  held that, "As with purchasing ammunition and
25  maintaining proficiency in firearms use, the core
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email@beansupport.com



**App. 1011**

1   Second Amendment right to keep and bear arms for

2   self-defense wouldn't mean much without the ability

3   to acquire the arms."

4           Again, I think, if you apply this

5   reasoning to any other constitutional right, whether

6   it's the First Amendment right, and the ability to

7   speak, or to use your hands to gesticulate, or in

8   the case of a newspaper, right, the ability to

9   acquire the actual paper and the ink to produce the

10  political speech that you want to, you can't take

11  those things away.  You can't say you cannot move

12  your lips, or you cannot move your hand in a First

13  Amendment case, or the newspaper, we're not going to

14  give you the paper to the ink to produce.  We're

15  still not violating your rights, right, you still

16  have the right to do those things.  Well, if you

17  don't have the means and the implements to actually

18  exercise the right, then what good is the right?

19  And in this situation what good is a right to keep

20  and bear arms if your ability to acquire that

21  firearm is being delayed for any period of time, at

22  a time when you think you need that firearm.

23          So, for that reason, Your Honor, we

24  believe that plain text is implicated, and we

25  believe and respectfully request that the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail:bean@beansupport.com

App. 1012

 1  preliminary injunction be issued.

 2          Thank you.

 3          THE COURT:  All right.  Thank you, Mr.

 4  McCoy.

 5          Mr. Harrison, are you going to tell me

 6  what to do?

 7          MR. HARRISON:  I was, Your Honor.  Your

 8  Honor, I just wanted to briefly propose a slight

 9  modification from -- and I apologize, we did agree

10  with the proposal from the defense on supplemental

11  briefing for Rahimi.  The first part of this, I

12  think we already tentatively agreed to, and I think

13  the date, although it differs from the motion that

14  was submitted, I would propose that we submit briefs

15  on July 3, which, again, is a two-day, next

16  Wednesday, that would be two days back from what's

17  in the motion.  But I think one of my co-counsel

18  orally agreed.  And then we can keep the July 8 --

19  that's next Monday -- response deadline.  We would

20  ask -- this is a change.  We would ask that we be

21  allowed to -- we basically, just a holistic brief, I

22  guess, covering everything.  That, obviously, will

23  heavily -- of course, will discuss Rahimi, and how

24  Rahimi has changed the field.  Obviously, it's not

25  like no one is going to be ignoring that case.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

**BEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE



**App. 1013**

Appellate Case: 24-2121   Document: 31-4   Date Filed: 11/08/2024   Page: 279

```
 1              Then we'd ask that we open up the page
 2   limits.  I mean, the time limits are going to be
 3   tight enough to where that will hopefully create a
 4   natural page limit.  But that, basically, anything
 5   we need to say to the Court, we can.  I think this
 6   is going to be -- the Court will be entering
 7   probably the first post Rahimi Second Amendment case
 8   anywhere.  And so we think it would be helpful for
 9   us to do that.  And, again, that would be next
10   Wednesday.  And then the following Monday, I
11   guess -- could we get a transcript by Monday?  And
12   so that's what we would propose.  And that's all --
13   again, the dates are consistent with, again, the
14   motions currently on file, except they already
15   agreed to move to the 3rd.  But we would ask for
16   basically -- I guess I'd just say -- unlimited pages
17   to discuss anything -- I'm happy to limit it to,
18   like, the substantial likelihood of success on the
19   merits prong, I don't know that we need to go rehash
20   some of these other things.
21              But Rahimi, to be frank, I think Rahimi
22   did change the field maybe more than we appreciated.
23   It came out after briefing was complete.  And,
24   frankly, looking at it more, I think it's something
25   that is very much intertwined with the overall and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

email@beanreport.com

App. 1014

 1   overarching Second Amendment analysis in this case.

 2        So I guess we would ask the Court, in lieu

 3   of some of the other things that are done, like

 4   proposed findings and conclusions, if the Court

 5   wants those, we can do them for the Court, but we'd

 6   ask that we submit kind of a final brief to the

 7   Court covering everything, and, of course, obviously

 8   incorporating any changes to the field that, you

 9   know, obviously an important case came out last

10   Friday.

11        THE COURT:  Well, I want to be a good

12   judge.  And y'all have been very patient, on the

13   plaintiffs' side to not demand the TRO and to give

14   time.  I don't know if this was intentional on your

15   part, to get Rahimi out before you got here.  But

16   focusing on me, when do you want my decision?

17        MR. HARRISON:  Your Honor, I mean, we

18   would like it relatively quickly.  And again --

19        THE COURT:  Give me a date.

20        MR. HARRISON:  I think if the Court could

21   turn something around in two weeks after we submit

22   our last brief, the Monday after next, that would be

23   workable.

24        THE COURT:  So two weeks from July 8th, or

25   July 1st?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



PROFESSIONAL COURT
REPORTING SERVICE

App. 1015

```
 1            MR. HARRISON:  Two weeks from July 8th.
 2   Don't let us dictate it to the Court --
 3            THE COURT:  No, you do get to dictate
 4   here, because you're the plaintiff, and you've been
 5   patient with the request for injunctive relief.  So
 6   I believe that would be July 22nd.  I've got my
 7   calendar here.
 8            MR. HARRISON:  I'm told, yes.
 9            MS. AGAJANIAN:  That's correct.
10            THE COURT:  So I'll have an opinion out to
11   you by the end of business on July 22nd.
12            MR. HARRISON:  Okay.
13            THE COURT:  Let me -- by 5:00 on July 22,
14   Monday.
15            Let me make a few comments so you know
16   what you're shooting at with this.  I think
17   throughout the day I am more fossilized where I was
18   at the beginning of the day, in the sense that I --
19   maybe I had some hand wringing in the middle of the
20   day about whether Rahimi destroyed the first two
21   steps that I think that State regulations or any
22   government regulation has to go through.
23            I am troubled by the plaintiffs' position
24   that -- I'm not pinning you down; you get to think
25   about this as you brief Rahimi -- but the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: bean@beansupport.com

App. 1016

1   suggestion, either that it implicitly overrules the
2   first step, or that you can incorporate the
3   historical analog into the first step, or something
4   else is going on there, I still think that the first
5   step in Bruen is live, it's important.  And that
6   you've got to run any sort of government regulation
7   through it.  And I think that the text does not --
8   if plain language means anything, I don't think keep
9   and bear arms covers acquisition and purchase of
10  sales.
11          I agree with the plaintiffs -- and unlike
12  Judge Kane, I do think that there is a limit -- and
13  it's a constitutional limit -- that at some point
14  the State cannot so undermine the right to purchase,
15  that it basically eviscerates the Second Amendment.
16          So -- but I don't think this seven days
17  does it.  I probably will not stop there, though,
18  because somebody might disagree with me.  And so I
19  probably will go to these categorical things that
20  Heller said.  And I think that those remain valid.
21  I think I misspoke when I was asking Mr. Duffy about
22  the example of -- I think it was actually Bruen that
23  came back -- Justice Thomas that came back and found
24  the historical analog to the place there.  It wasn't
25  the Chief Justice.  I think it was -- but I do think

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: mail@litsupport.com



1  that those remain.

2           And I do think that this is a commercial

3  regulation, and that, therefore, it's presumptively

4  constitutional, and, therefore, the burden somewhat

5  falls on the plaintiffs to establish why these

6  commercial regulations are not remaining

7  constitutional.

8           And so I'm inclined to think, on two

9  scores, the seven-day waiting period is

10  constitutional.  Once again, I think that commercial

11  regulations can become so onerous and burdensome

12  that they undermine the Second Amendment right.

13          But again, I don't think that this waiting

14  period does.  Partly, because -- while this one, I

15  don't think is really intertwined with the

16  background check, it may be an additional reason the

17  State can advance.  But if you started finding

18  periods of this length unconstitutional, then I

19  think you would, in certain circumstances, start

20  unraveling background checks.  So I think we're in a

21  safe zone as far as commercial litigation.

22          If, however, the plaintiffs are right

23  that, basically, you've got to have a historical

24  analog, I don't think that the defendants have

25  identified a historical analog that I think is close

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: info@litsupport.com

App. 1018

```
 1  enough to justify the second step of Bruen.

 2          So I'm not persuaded that these drunk laws

 3  or licensing laws are close enough to the historical

 4  analogs that even Rahimi, with its more liberal

 5  approach, justified -- I don't think that they've

 6  identified one.

 7          So those are my thinking as I'm leaving

 8  the bench.  That was pretty much my thinking before

 9  I confused myself this morning, or at least raised

10  some concerns about what Rahimi did.

11          But I think the more I thought about it

12  during the day and listened to arguments and

13  listened to testimony, and I've been reading up here

14  as well, that's kind of where I am.

15          That sounded like thunder, didn't it?  I

16  hope it's not a firearm.

17          But if you want to pardon the pun, aim

18  your guns at what I'm thinking, that gives you some

19  idea where I am as I leave the bench today, which is

20  not too different than where I was this morning.

21          But I appreciate the arguments.  And I do

22  appreciate the arguments, appreciate the hard work

23  today, both in your briefing and the witnesses, and

24  your arguments today.

25          Is there anything else we need to discuss
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
email: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 1019

1    while we're together?  Anything else I can do for

2    you today, Mr. Harrison?

3              MR. HARRISON:  I just wanted to verify.

4    So is the Court okay with the proposed submissions

5    that I laid out?

6              THE COURT:  You're in control.  Whatever

7    you want to give me, that's fine.

8              MR. HARRISON:  All right.  Thank you.

9              MR. NATION:  Just one loose end, Your

10   Honor.  Did you want those two citations to Third

11   and Ninth Circuit?  The first is a Ninth Circuit, US

12   v. Duarte, Reported at 101 F4th 657.  The underlying

13   felony was vandalism.

14              The Third Circuit --

15              THE COURT:  And what are you saying that

16   the Ninth Circuit said?

17              MR. NATION:  The Ninth Circuit held that

18   the underlying non-violent crime that was a felony

19   vandalism charge, was unconstitutionally applied to

20   limit Mr. Duarte's Second Amendment rights.  They

21   drew a distinction between violent and non-violent

22   felonies.  Similarly in Range --

23              THE COURT:  Is that an en banc or panel?

24              MR. NATION:  That was a panel opinion.

25              THE COURT:  Do you know who wrote the

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

App. 1020

1  opinion?

2          MR. NATION:  I can tell you in one second.

3  Judge Bea, Carlos T. Bea, joined by Lawrence

4  VanDyke, with a dissent by Milan Smith.

5          And the Third Circuit was en banc.  It was

6  Range v. Attorney General of the United States of

7  America, reported at 69 F.4th 96.  There, the

8  underlying crime was food stamp fraud.

9          THE COURT:  Okay.  Anything else we need

10  to discuss while we're together?

11          Anything else I can do for you, Mr.

12  Harrison?

13          MR. HARRISON:  No, Your Honor.

14          THE COURT:  All right.  How about you, Mr.

15  Duffy?  Anything else we need to discuss while we're

16  together?  Anything else I can do for you today?

17          MR. DUFFY:  No, Your Honor.  Thank you.

18          THE COURT:  Mr. Allen, anything else we

19  need to discuss while we're together?  Anything else

20  I can do for you today?

21          MR. ALLEN:  No, Your Honor.  Thank you.

22          THE COURT:  All right.  I appreciate

23  y'all's hard work.

24          I'll have an opinion out to you at the end

25  of business on July 22nd.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 1021

1          Y'all be safe in your travels.

2          (The Court was adjourned.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

App. 1022

```
 1               C-E-R-T-I-F-I-C-A-T-E

 2

 3   UNITED STATES OF AMERICA

 4   DISTRICT OF NEW MEXICO

 5

 6

 7          I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

 8   Official Court Reporter for the State of New Mexico,

 9   do hereby certify that the foregoing pages constitute

10   a true transcript of proceedings had before the said

11   Court, held in the District of New Mexico, in the

12   matter therein stated.

13        In testimony whereof, I have hereunto set my

14   hand on June 30, 2024.

15

16

17

18        _____
          Jennifer Bean, FAPR, RMR-RDR-CCR
19        Certified Realtime Reporter
          United States Court Reporter
20        NM CCR #94
          333 Lomas, Northwest
21        Albuquerque, New Mexico 87102
          Phone:  (505) 348-2283

22

23

24

25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
E-mail: info@litsupport.com

App. 1023