## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

**SAMUEL ORTEGA, and**
**REBECCA SCOTT,**

    **Plaintiffs/Appellants,**

v.

**MICHELLE LUJAN GRISHAM, in**
**her official capacity as Governor of the**
**State of New Mexico, and RAÚL**
**TORREZ, in his official capacity as**
**Attorney General of the State of New**
**Mexico,**

    **Defendants/Appellees.**

**Case No. 24-2121**

---

Appeal from the Honorable James O. Browning of the
United States District Court for the District of New Mexico
No. 1:24-cv-00471-JB-SCY

## DEFENDANTS/APPELLEES' CORRECTED ANSWER BRIEF

### -ORAL ARGUMENT IS REQUESTED-

HOLLY AGAJANIAN
*Chief General Counsel*
KYLE P. DUFFY
*Deputy General Counsel*
Office of Governor Michelle Lujan Grisham
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2200

ALETHEIA ALLEN
*Solicitor General*
VAN SNOW
*Deputy Solicitor General*
CHRISTA STREET
*Assistant Solicitor General*
New Mexico Department of Justice
408 Galisteo Street, Villagra Building
Santa Fe, NM 87501
(505) 490-4060

-December 9, 2024-

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................iii -vii

STATEMENT OF PRIOR OR RELATED APPEALS ......................................... vii

INTRODUCTION ..................................................................................1

STATEMENT OF THE ISSUES....................................................................3

STATEMENT OF THE CASE......................................................................3

    I.      Gun violence in the United States and New Mexico ...........................3

    II.     New Mexico's enactment of the waiting period ..................................5

    III.    The instant lawsuit...................................................................8

SUMMARY OF THE ARGUMENT ......................................................12

ARGUMENT .......................................................................................13

    I.      Plaintiffs face a particularly heavy burden to reverse the district court's denial of their requested preliminary injunction ..................................13

    II.     The district court did not abuse its discretion in holding that Plaintiffs were unlikely to succeed on the merits of their Second Amendment challenge.............................................................................16

        A.     Plaintiffs fail to meet their burden under *Bruen* step one.........18

            1.    The Second Amendment's plain text does not cover the "purchase" or "acquisition" of firearms, let alone the immediate acquisition of purchased firearms.................18

            2.    Waiting periods are presumptively lawful commercial regulations.......................................................................28

      B.      The waiting period is consistent with the principles that underpin our tradition of firearm regulation ..............................................33

III.      The district court did not abuse its discretion in concluding that the waiting period does not cause Plaintiffs irreparable harm..............41

IV.      The district court did not abuse its discretion in holding that the balance of the equities and public interest weighed against injunctive relief ...........................................................................................43

CONCLUSION .....................................................................................44

STATEMENT REGARDING ORAL ARGUMENT REQUEST ..........................44

CERTIFICATE OF COMPLIANCE ......................................................46

CERTIFICATE REGARDING DIGITAL SUBMISSION AND PRIVACY REDACTIONS ....................................................................................46

CERTIFICATE OF SERVICE ..............................................................46

## TABLE OF AUTHORITIES

### CASE LAW

**U.S. Supreme Court Cases**

*Benisek v. Lamone*,
    138 S. Ct. 1942 (2018).......................................................................42

*District of Columbia v. Heller*,
    554 U.S. 570 (2008).....................................2, 10, 17-20, 22-23, 25-26, 28-29

*Harrel v. Raoul*,
    144 S. Ct. 2491 (2024).....................................................................42

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010).................................................................. 17, 19, 22, 29

*Moody v. NetChoice*, LLC,
    144 S. Ct. 2383 (2024)........................................................................ 15-16

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022)................... 1-2, 8, 10-13, 16, 18-19, 21, 23-29, 31-36, 38, 40

*United States v. Rahimi*,
    144 S. Ct. 1889 (2024)..... 2, 9, 15-16, 19-20, 22, 28-29, 31, 34-35, 37-38, 41

**U.S. Courts of Appeals Cases**

*Antonyuk v. James*,
    120 F.4th 941 (2d Cir. 2024).........................................................36

*B & L Productions, Inc. v. Newsom*,
    104 F.4th 108 (9th Cir. 2024)................................................. 10, 19, 21, 23-24

*Bevis v. City of Naperville, Illinois*,
    85 F.4th 1175 (7th Cir. 2023).......................................................42

*Chamber of Com. of U.S. v. Edmondson*,

594 F.3d 742 (10th Cir. 2010) .......................................................44

*Coastal States Energy Co. v. Hodel,*
    816 F.2d 502 (10th Cir. 1987)..................................................26

*Diné Citizens Against Ruining Our Env't v. Jewell,*
    839 F.3d 1276 (10th Cir. 2016) ..............................................14

*First W. Capital Mgmt. Co. v. Malamed,*
    874 F.3d 1136 (10th Cir. 2017) ......................................... 41-42

*GTE Corp. v. Williams,*
    731 F.2d 676 (10th Cir. 1984) .................................................42

*Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives,*
    5 F.4th 407 (4th Cir. 2021) .....................................................10

*Maryland Shall Issue, Inc. v. Moore,*
    116 F.4th 211 (4th Cir. 2024)..................................................21

*McRorey v. Garland,*
    99 F.4th 831 (5th Cir. 2024) .............................................. 10, 21

*M.G. through Garcia v. Armijo,*
    117 F.4th 1230 (10th Cir. 2024).............................................14

*Nat'l Rifle Ass'n v. Bondi,*
    61 F.4th 1317 (11th Cir. 2023).................................................21

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.,*
    565 F.3d 683 (10th Cir. 2009) ...................................................4

*O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft,*
    389 F.3d 973 (10th Cir. 2004) .................................................15

*Peterson v. Martinez,*
    707 F.3d 1197 (10th Cir. 2013) .............................................8, 31

*Rocky Mountain Gun Owners v. Polis,*
    121 F.4th 96 (10th Cir. 2024) ...................................................2

iv

*Schrier v. Univ. of Colorado*,
    427 F.3d 1253 (10th Cir. 2005) ....................................................................14

*Silvester v. Harris*,
    843 F.3d 816 (9th Cir. 2016)............................................................ 25, 27, 30

*State v. U.S. EPA*,
    989 F.3d 874 (10th Cir. 2021) ....................................................................13

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) ............................................................... 11, 24

*United States v. Duarte*,
    101 F.4th 657 (9th Cir. 2024) ....................................................................11

*United States v. Rodriguez*,
    945 F.3d 1245 (10th Cir. 2019) ..................................................................26

*Bronson v. Swensen*,
    500 F.3d 1099 (10th Cir. 2007) ..................................................................35

**U.S. District Court Cases**

*Mills v. N.Y.C.*,
    2024 WL 4979387 (S.D.N.Y. Dec. 4, 2024)...............................................21

*Rocky Mountain Gun Owners v. Polis*,
    701 F. Supp. 3d 1121 (D. Colo. 2023) ........................................................14

*Rocky Mountain Gun Owners v. Polis*,
    2023 WL 5017257 (D. Colo. Aug. 7, 2023)................................................15

*Vermont Fed'n of Sportsmen's Clubs v. Birmingham*,
    --- F. Supp. 3d ---, 2024 WL 3466482 (D. Vt. July 18, 2024)..... 25, 27, 36-38

## STATUTES AND LAWS

Cal. Penal Code § 26815(a) .........................................................................7

Colo. Rev. Stat. § 18-12-115 ...................................................................7

D.C. Code § 22-4508 ...............................................................................7

Fla. Stat. § 790.0655(1)(a) ......................................................................7

Haw. Rev. Stat. § 134-2(a), (e).................................................................7

H.B. 129, 56th Leg., 2nd Sess. (N.M. 2024)…………………………………5

720 Ill. Comp. Stat. 5/24-3(A)(g) ............................................................7

Md. Code Ann., Pub. Safety, § 5-123(a)...................................................7

Minn. Stat. § 624.7132..............................................................................7

N.J. Stat. Ann. § 2c:58-2(a)(5)(a) .............................................................7

N.M. Stat. Ann. § 30-7-7.3 (2024)........................................................ 3, 6

R.I. Gen. Laws § 11-47-35(a)(1), -35.2(a)................................................7

Vt. St at. Ann. tit. 13, § 4019a.................................................................7

Wash. Rev. Code § 9.41.092(2) ................................................................7

## CONSTITUTIONS

N.M. Const. art IV, § 23 ...........................................................................6

U.S. Const. amend. II........................................................................ 16, 22

## OTHER AUTHORITIES

*Comprehensive Report on Gunshot Victims Presenting at Hospitals in New Mexico*, N.M. Dep't of Health (Sept. 28, 2023), https://www.nmhealth.org/publication/view/report/8463/....................................................................5

*Continuing Trends: Five Key Takeaways from 2023 CDC Provisional Gun Violence Data*, Johns Hopkins Univ. (Sept. 12, 2024), https://publichealth.jhu.edu/center-for-gun-violence-solutions/2024/continuing-trends-five-key-takeaways-from-2023-cdc-provisional-gun-violence-data#:~:text=Overall%20Gun%20Deaths%20Decreased%2C%20But,resulting%20in%201%2C476%20fewer%20deaths ...4

*Firearm Deaths Grow, Disparities Widen*, Ctrs. for Disease Ctr. & Prevention, https://www.cdc.gov/vitalsigns/firearm-deaths/index.html ........................................4

*Firearm Mortality by State*, Ctrs. for Disease Ctr. & Prevention, https://www.cdc.gov/nchs/pressroom/sosmap/firearm_mortality/firearm.htm .........5

*Handgun Waiting Periods Reduce Gun Deaths*, 114 Proc. Nat'l Acad. Sci. 12162 (2017) ................................................................................................................33

*What the data says about gun deaths in the U.S.*, Pew Research Ctr. (Apr. 26, 2023), https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s/#:~:text=In%202021%2C%20the%20most%20recent,U.S.%2C%20according%20to%20the%20CDC ........................................4

**STATEMENT OF PRIOR OR RELATED APPEALS**

Pursuant to Tenth Circuit Rule 28.2(C)(3), Defendants state that there are no prior or related appeals.

# INTRODUCTION

New Mexico, like the country as a whole, is experiencing historic levels of gun violence. To combat this public health crisis, New Mexico enacted a law in early 2024 establishing a modest seven-day waiting period on most gun purchases. Such waiting periods have been proven to significantly reduce impulsive gun suicides and homicides. They also reduce the likelihood that firearm dealers will transfer firearms to those who may be prohibited under federal law from possessing firearms, which is currently made possible by a loophole allowing the transfer of firearms if the federal background check is not completed within three business days. In other words, these waiting periods are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law abiding, responsible citizens.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022).

Plaintiffs, two individuals who already own multiple firearms, sought a disfavored preliminary injunction blocking this commonsense safety measure and preventing New Mexico from protecting its citizens on the basis that having to wait a few extra days to pick up additional guns allegedly violates their Second Amendment rights. In so doing, they discount the waiting period's demonstrable benefits, and they focus on hypothetical and exceedingly rare scenarios that have no actual bearing on Plaintiffs' purported injuries. They ignore the Second Amendment's plain text, disregard clear direction from the Supreme Court on

1

presumptively constitutional "laws imposing conditions and qualifications on the commercial sales of arms," *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008), and advocate for a "law trapped in amber," *United States v. Rahimi*, 144 S. Ct. 1889, 1897-98 (2024).

The district court properly rejected Plaintiffs' request for a disfavored preliminary injunction prohibiting enforcement of the waiting period in all its applications. Like the district court, this Court should find Plaintiffs' extraordinary request woefully lacking—especially considering the Court's recent decision in *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024), in which the Court rejected a challenge to a law setting 21 as the minimum age to purchase a firearm. Plaintiffs' claims are exceedingly likely to fail on the merits for several reasons. First, Plaintiffs cannot meet their burden under *Bruen*'s first step because the Second Amendment's plain text does not cover the "purchase" or "acquisition" of firearms, let alone the *immediate* acquisition of purchased firearms. Similarly, New Mexico's waiting period does not infringe upon the Second Amendment's plain text because it is a presumptively constitutional law imposing conditions and qualifications on the commercial sales of arms, and Plaintiffs fail to overcome this presumption given the law's objective nature and legitimate purpose. But even if Plaintiffs *did* meet their burden at *Bruen*'s first step, the waiting period survives *Bruen*'s second step because it is consistent with the principles that underpin our

Nation's tradition of firearm regulation, as evidenced by historical intoxication laws, licensing regimes, and group-based sales restrictions.

Plaintiffs fare no better in terms of the other requirements for a preliminary injunction. Plaintiffs fail to demonstrate irreparable harm when they cannot show any likely constitutional injury or, indeed, any actual harm in having to wait a few days to pick up additional firearms. And they fail to show that the balance of the equities and public interest favor the extraordinary remedy of a preliminary injunction considering the substantial evidence demonstrating the effectiveness of waiting periods. This Court should have no difficulty affirming.

## STATEMENT OF THE ISSUES

1.    Did the district court abuse its discretion in refusing to preliminarily enjoin New Mexico's waiting period law, N.M. Stat. Ann. § 30-7-7.3 (2024)?

## STATEMENT OF THE CASE

### I.    Gun violence in the United States and New Mexico

Both the country and New Mexico have experienced a tragic increase in gun violence in recent years, with implications that extend beyond mere statistics. *See* Aplt. App. Vol. V at 1030. From 2019 to 2021, the firearm homicide rate in the United States increased by about 45%, reaching the highest recorded rate in over 25

3

years.[1] Firearm suicides likewise increased by 10% during this period. Gramlich, *supra* note 1. The result is that 48,830 men, women, and children died from gun violence in 2021 alone—the highest number of gun deaths ever recorded. *Id.* While that number went down slightly in 2022 and 2023, the sheer number of people losing their lives due to gun violence has remained significantly elevated: 48,204 people died in 2022, and approximately 46,728 people died in 2023.[2]

Sadly, the situation is worse in New Mexico, which has historically suffered from greater rates of gun violence than the country as a whole. For example, New

---

[1] John Gramlich, *What the data says about gun deaths in the U.S.*, Pew Research Ctr. (Apr. 26, 2023), https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s/#:~:text=In%202021%2C%20the%20 most%20recent,U.S.%2C%20according%20to%20the%20CDC; *Firearm Deaths Grow, Disparities Widen*, Ctrs. for Disease Ctr. & Prevention, https://www.cdc.gov/vitalsigns/firearm-deaths/index.html (last visited Nov. 13, 2024). The Court may take judicial notice of the facts discussed in this section that are not contained in the record below. *See New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 & n.22 (10th Cir. 2009) (taking judicial notice of facts on government websites and observing that "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web" (cleaned up)).

[2] *Continuing Trends: Five Key Takeaways from 2023 CDC Provisional Gun Violence Data*, Johns Hopkins Univ. (Sept. 12, 2024), https://publichealth. jhu.edu/center-for-gun-violence-solutions/2024/continuing-trends-five-key-take aways-from-2023-cdc-provisional-gun-violence-data#:~:text=Overall%20Gun %20Deaths%20Decreased%2C%20But,resulting%20in%201%2C476%20fewer% 20deaths.

Mexico had the seventh highest gun death rate in the nation in 1999.[3] And it has only gotten worse, with New Mexico's age-adjusted gun death rate increasing by 87% between 2010 and 2021.[4] In 2022, the most recent year for which complete data is available, New Mexico had the *third* highest gun death rate in the nation, with 550 New Mexicans dying from gun violence. N.M Dep't of Health, *supra* note 3, at 7. The state's gun violence increased at an especially concerning rate within the past few years. For example, there was a 70% increase in homicides with a firearm from 2018 to 2021. *See* Aplt. App. Vol. V at 1031; N.M Dep't of Health, *supra* note 3, at 7. Likewise, the number of patients in New Mexico's trauma centers with gun injuries increased by 39% between 2019 and 2022. *See* N.M Dep't of Health, *supra* note 3, at 4-5.

## II.    New Mexico's enactment of the waiting period

To help stem the surge of gun violence, the New Mexico Legislature considered House Bill 129 during the 2024 legislative session, which sought to impose a minimal waiting period on the sale of firearms. *See* H.B. 129, 56th Leg., 2nd Sess. (N.M. 2024). House Bill 129 addressed two primary issues: (1) preventing

---

[3] *Comprehensive Report on Gunshot Victims Presenting at Hospitals in New Mexico*, at 5, N.M. Dep't of Health (Sept. 28, 2023), https://www.nmhealth.org/publication/view/report/8463/.

[4] Aplt. App. Vol. V at 1030-31; N.M. Dep't of Health, *supra* note 3 at 5; *Firearm Mortality by State*, Ctrs. for Disease Ctr. & Prevention, https://www.cdc.gov/nchs/pressroom/sosmap/firearm_mortality/firearm.htm (last visited Nov. 12, 2024).

impulsive firearm homicides and suicides and (2) closing or narrowing the "Charleston loophole" in which firearm purchasers can receive a firearm without completing a federal background check should the background check results not come back within three business days.[5] *See* Aplt. App. Vol. V at 1031. The Legislature passed House Bill 129 on February 12, 2024. Aplt. App. Vol. I at 73. The Governor signed House Bill 129 on March 4, 2024. *See* Aplt. App. Vol. V at 1025. House Bill 129 was subsequently codified as N.M. Stat. Ann. § 30-7-7.3 (2024), and became effective May 15, 2024. *See* N.M. Const. art IV, § 23.

The final version of House Bill 129 makes it unlawful for any seller to "transfer . . . ownership, possession or physical control of [a] firearm from the seller to the buyer before the end of the required seven-calendar-day waiting period[.]" H.B. 129 § 1(C). This period may be extended to twenty calendar days if the seven-day waiting period has expired without the completion of a required federal instant background check. *Id.* § 1(A). Several categories of individuals are excepted from this seven-day waiting period requirement, including those who have a valid concealed carry permit pursuant to the New Mexico Concealed Handgun Carry Act. *See id.* § 1(H). Both buyers and sellers may be charged with a misdemeanor for

---

[5] Aplt. App. Vol. V at 1031; *See generally The Effects of Waiting Periods*, RAND (Jan. 10, 2023), https://www.rand.org/research/gun-policy/analysis/waiting-periods.html ("In 2021, for instance, 5,203 firearms were confirmed to be transferred from federally licensed firearm dealers to prohibited persons because of delays in NICS background checks that exceeded three business days.").

transferring or receiving a firearm before the end of the required waiting period. *See id.* §1(D), (G).

In passing House Bill 129, New Mexico joined at least a dozen other states that require waiting periods for commercial firearms sales. New Mexico's seven-day waiting period falls squarely in the middle in terms of its length. Rhode Island, Maryland, and New Jersey also have seven-day waiting periods. *See* R.I. Gen. Laws § 11-47-35(a)(1), -35.2(a) (7 days for all firearms); Md. Code Ann., Pub. Safety, § 5-123(a) (7 days for regulated firearms); N.J. Stat. Ann. § 2c:58-2(a)(5)(a) (7 days for handguns). Colorado, Florida, Illinois, and Vermont have three-day waiting periods. *See* Colo. Rev. Stat. § 18-12-115; Fla. Stat. § 790.0655(1)(a); 720 Ill. Comp. Stat. 5/24-3(A)(g); Vt. St at. Ann. tit. 13, § 4019a. And California, Hawaii, Minnesota, and Washington have longer waiting periods. *See* Minn. Stat. § 624.7132 (eff. 8/1/23) (30 days for handguns, assault weapons); Haw. Rev. Stat. § 134-2(a), (e) (14 days for all firearms); Wash. Rev. Code § 9.41.092(2) (10 business days for semiautomatic rifles); Cal. Penal Code § 26815(a) (10 days for all firearms); D.C. Code § 22-4508 (10 days for all firearms).

III.    **The instant lawsuit**

Plaintiffs, two individuals who own and collect firearms, deliberated waited

to sue the Governor[6] and Attorney General the day House Bill 129 went into effect,

claiming the laws seven-day waiting period violates the Second Amendment. Aplt.

App. Vol. I at 9-23. In response to Plaintiffs' request for a temporary restraining order

and preliminary injunction, Defendants argued that Plaintiffs were unlikely to

succeed on the merits because the waiting period survived both steps of the test

outlined in *Bruen*, 597 U.S. 1, for three reasons. First, the plain text of the Second

Amendment does not cover Plaintiffs' proposed course of conduct (i.e., immediately

acquiring a newly purchased firearm). Aplt. App. Vol. I at 77-81. Second, the waiting

period is a presumptively lawful condition or qualification on the commercial sale

of firearms. *Id.* at 81-83. Third, the waiting period is consistent with the principles

underlying our nation's historical tradition of firearm regulations based on two

categories of historical laws: those prohibiting intoxicated persons from purchasing

or possessing firearms and licensing regimes. *Id.* at 83-86, 129-226; Aplt. App. Vol.

II at 227-419. Notably, these arguments were supported by three robust declarations

---

[6] The Governor, sued in her official capacity, enjoys 11th Amendment immunity from any claims for prospective relief because she does not "have a particular duty to enforce the statute in question." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (cleaned up). However, the Governor agreed to waive her sovereign immunity and consented to be sued in this case, only in her official capacity, and only for prospective relief. *See* Aplt. App. Vol. I at 75 n.7.

from respected historians, Professors Robert Spitzer, Randolph Roth, and Eric Ruben, complete with hundreds of pages of historical analogues. Aplt. App. Vol. I at 129-226; Aplt. App. Vol. II at 227-419, 434-75. Defendants also provided a significant amount of evidence confirming the effectiveness of waiting periods, including a declaration from Professor Christopher Poliquin, which demonstrated that the public interest weighed heavily against granting a preliminary injunction. Aplt. App. Vol. I at 88-89; Aplt. App. Vol. II at 434-35, 477-517.

After holding an evidentiary hearing and receiving supplemental briefing on the impact of the Supreme Court's then-newly issued decision, *Rahimi*, 144 S. Ct. 1889, the district court denied Plaintiffs' motion for a preliminary injunction. *See* Aplt. App. Vol. V at 1024-1126. The court concluded that Plaintiffs were unlikely to succeed for several reasons. First, the court determined that the Second Amendment's plain text does not cover Plaintiffs' proposed course of conduct (i.e., purchasing or acquiring firearms) because the normal and ordinary meaning of "keep" and "bear" arms does not include "obtaining" or "acquiring" them. *Id.* at 1078-83. The court noted that history supported this conclusion because the concerns motivating the founding generation in drafting the Second Amendment "focus[] on retention rather than acquisition of arms." *Id.* at 1083-84. While the court acknowledged that the right to acquire firearms must receive some Second Amendment protection, it agreed with the Fifth and Ninth Circuit's recent decisions

determining that only "functional prohibitions" or "meaningful constraints" on acquiring arms implicated the Second Amendment's plain text. *Id.* at 1087-88 (quoting *McRorey v. Garland*, 99 F.4th 831, 839 (5th Cir. 2024), and *B & L Productions, Inc. v. Newsom*, 104 F.4th 108, 118 (9th Cir. 2024)). And the court concluded that a brief, seven-day waiting period did not rise to this level. *Id.* at 1088-89.

Second, the court determined that the waiting period is the type of "longstanding," presumptively constitutional "law[] imposing conditions and qualifications on the commercial sale of arms." *Id.* at 1088 (quoting *Heller*, 554 U.S. at 626-27). The court found that the waiting period qualifies as such because it only applies to the commercial sale of firearms and it merely imposes a condition or qualification that did not amount to a "functional prohibition on buyers." *Id.* at 1092-96 (quoting *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 417 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021)). The court also found that waiting period laws were sufficiently "longstanding" because they date back to the early twentieth century. *Id.* at 1097-1104. And the court concluded that Plaintiffs could not rebut the waiting period's presumptive constitutionality because it only imposed a short delay and contained "only narrow, objective, and definite standards." *Id.* at 1106 (quoting *Bruen*, 597 U.S. at n.9).

Lastly, the court determined that the waiting period is consistent with the principles underlying our nation's historical tradition of firearm regulations. *See* Aplt. App. Vol. V at 1106-1120. Though the court did not rely on some of Defendants' proffered historical analogues (i.e., intoxication laws), it found that laws "prohibiting and restricting the sale of firearms to large swaths of the population out of a fear that some among these groups would use the purchased firearms to do harm" supported waiting period laws. *Id.* at 1107.[7] The court found these historical laws were relevantly similar to the waiting period because: (1) they were also enacted to "decrease the chance that gun purchasers will use purchased firearms to commit acts of violence against others in society," (2) they imposed a greater burden on Second Amendment rights than a brief waiting period, and (3) they imposed greater penalties than New Mexico's law. Aplt. App. Vol. V at 1113-15. And while the court acknowledged the repugnant nature of many of these laws, which were rooted in racism and bias, it observed that "the Supreme Court has not suggested that courts may analogize only to those regulations that would not be viewed as

---

[7] Plaintiffs claim the district court violated the principles of party presentation in relying on these laws. *See* Aplt. Br. At 38-39. However, most, if not all, of these historical laws were contained in Professor Spitzer's declaration or caselaw cited by Plaintiffs or Defendants. *See, e.g.*, Aplt. App. Vol. I at 107-26 (discussing cited laws), 132-78 (listing cited secondary sources); Aplt. App. Vol. II at 228-343 (listing cited laws); Aplt. App. Vol. III at 527 (citing *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024), *reh'g en banc granted, opinion vacated*, 108 F.4th 786 (9th Cir. 2024)), 531 (citing *Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc)).

discriminatory or unconstitutional today," and that rejecting the laws on this basis "would result in an inversion of the *Bruen* test." Aplt. App. Vol. V at 1119. Thus, the court concluded Plaintiffs were unlikely to succeed.

The district court also concluded that Plaintiffs failed to meet any of the non-merits factors required for a preliminary injunction. The court found that Plaintiffs' purported loss of their Second Amendment rights did not constitute an irreparable injury because they failed to demonstrate a likelihood of success. *Id.* at 1120-21. It also found that Plaintiffs did not suffer any irreparable harm in having to wait an additional week to obtain new firearms because they already owned multiple that they could use for self-defense. *Id.* at 1121-22. Lastly, the court found that the balance of the equities and public interest weighed in Defendants' favor given the significant evidence showing that the waiting period would help reduce the unprecedented levels of gun violence in New Mexico. *Id.* at 1124-26. Accordingly, the court denied the request for a preliminary injunction. This appeal followed.

## SUMMARY OF THE ARGUMENT

This Court may readily affirm the district court, as Plaintiffs fail to meet *any* of the requirements for a preliminary injunction. Plaintiffs cannot show any likelihood of success on the merits (let alone a *strong* likelihood) for three independent reasons. First, Plaintiffs cannot meet their burden under *Bruen*'s first step because the Second Amendment's plain text does not cover the "purchase" or

12

"acquisition" of firearms, not to mention the *immediate* acquisition of purchased firearms. Second, New Mexico's waiting period does not infringe upon the Second Amendment's plain text because it is a presumptively constitutional law imposing conditions and qualifications on the commercial sales of arms, and Plaintiffs cannot overcome this presumption given the law's objective nature and legitimate purpose. Third, the waiting period survives *Bruen*'s second step because it is consistent with the principles that underpin our Nation's tradition of firearm regulation, as evidenced by historical intoxication laws, licensing regimes, and group-based sales restrictions laws. Plaintiffs further failed to demonstrate irreparable harm because they cannot show any likely constitutional injury or any real harm in having to wait a few days to pick up additional firearms. And finally, Plaintiffs failed to show that the balance of the equities and public interest favor (let alone *strongly* favor) the extraordinary remedy of a preliminary injunction in light of the substantial evidence demonstrating the effectiveness of waiting periods.

## ARGUMENT

### I.    Plaintiffs face a particularly heavy burden to reverse the district court's denial of their requested preliminary injunction

The standard to obtain a preliminary injunction is high; the standard to reverse the denial of one is even higher. Because a "preliminary injunction is an extraordinary remedy never awarded as of right," the movant "must make a clear and unequivocal showing it is entitled to such relief." *State v. U.S. EPA*, 989 F.3d

874, 883 (10th Cir. 2021) (cleaned up). To obtain a preliminary injunction, the movant must prove: "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest." *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (cleaned up). And whether to grant or deny a preliminary injunction is left to the sound discretion of the district court. *See M.G. through Garcia v. Armijo*, 117 F.4th 1230, 1239 (10th Cir. 2024). Thus, this Court will only reverse for an abuse of discretion, and it will defer to factual findings absent clear error. *See id.*

But Plaintiffs here are not seeking an ordinary preliminary injunction; they seek a twice-disfavored injunction requiring a higher burden of proof. "Because the limited purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," this Court specifically disfavors preliminary injunctions that alter the status quo. *Schrier v. Univ. of Colorado*, 427 F.3d 1253, 1258-59 (10th Cir. 2005) (cleaned up). Plaintiffs' requested injunctive relief would alter the status quo because the challenged waiting period was the law of the land when they made their request. *See Rocky Mountain Gun Owners v. Polis*, 701 F. Supp. 3d 1121, 1131 (D. Colo. 2023) ("The Governor is correct that, because Plaintiffs seek to enjoin a law that is in effect, the injunction

14

they seek would disrupt the status quo and is thus disfavored.").[8] Plaintiffs must, therefore, "make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms[.]" *O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc).

If this were not a difficult enough burden, Plaintiffs also seek a preliminary injunction based on a facial challenge. *See* Aplt. App. Vol. I at 40 (requesting a preliminary injunction against the "Waiting Period Act" without any limitations). The Supreme Court has made this sort of challenge "hard to win" because it "threaten[s] to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Moody v. NetChoice*, LLC, 144 S. Ct. 2383, 2397 (2024) (cleaned up). It "is the most difficult challenge to mount successfully, because it requires a [challenger] to establish that no set of circumstances exists under which the [challenged law] would be valid." *Rahimi*, 144 S. Ct. at 1898 (cleaned up). Conversely, "the Government need only demonstrate that [the challenged law] is constitutional in some of its applications" to survive a

---

[8] Plaintiffs asserted they intentionally waited to file their lawsuit to avoid having it dismissed for lack of standing as a pre-enforcement challenge, similar to what happened in *Rocky Mountain Gun Owners v. Polis*, 2023 WL 5017257 (D. Colo. Aug. 7, 2023). Aplt. App. Vol. III at 530-31. However, no such barrier stood in Plaintiffs' way regarding New Mexico's waiting period since it applies to both buyers and sellers. Aplt. App. Vol. IV at 777-78; *RMGO*, 2023 WL 5017257, at *4 (finding that gun buyers lacked standing to bring a pre-enforcement challenge to Colorado's waiting period law since it only applied to gun sellers).

facial challenge. *Id.* Thus, Plaintiffs must demonstrate that New Mexico's waiting period is unconstitutional in all its applications to show a strong likelihood of success on the merits. *See Moody*, 144 S. Ct. at 2396-97 (holding that a party seeking a preliminary injunction barring enforcement of a law in its entirety must show they are likely to succeed on their facial challenge).

## II.    The district court did not abuse its discretion in holding that Plaintiffs were unlikely to succeed on the merits of their Second Amendment challenge

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Bruen*, the United States Supreme Court adopted a new two-part test for Second Amendment claims, in which the challenger must first demonstrate that "the Second Amendment's plain text covers an individuals' conduct." 597 U.S. at 2129-30. If "the challenged law regulates activity falling outside the scope of the right as originally understood . . . the analysis can stop there; the regulated activity is categorically unprotected." *Bruen*, 597 U.S. at 18. But if the plain text does apply to the proposed course of conduct, "the burden then shifts to the government to justify its regulation by demonstrating that it is 'consistent with the *principles* that underpin our' Nation's historical tradition of firearm regulation." *RMGO*, 121 F.4th at 113 (quoting *Rahimi*, 144 S. Ct. at 1898).

16

Of course, the right protected by the Second Amendment is "not unlimited." *Heller*, 554 U.S. at 595. "[I]ndividual self-defense is 'the central component' of the Second Amendment right." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599) (emphasis omitted). Accordingly, the *Heller* Court stated that its decision should not be read to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sales of arms." *Heller*, 554 U.S. at 626-27; *accord McDonald*, 561 U.S. at 786 (repeating *Heller*'s assurances). Such laws are "presumptively lawful regulatory measures." *See Heller*, 554 U.S. at 627 n.26. As such, they "do not implicate the plain text of the Second Amendment." *RMGO*, 121 F.4th at 120.

Plaintiffs argue the district court erred in concluding: (1) the Second Amendment's plain text does not cover the "purchase" or "acquisition" of firearms, (2) the waiting period is a presumptively lawful commercial regulation, and (3) the waiting period is consistent with the principles that underlie our history and tradition of firearm regulation. As explained below, Plaintiffs are wrong on all fronts.

**A.      Plaintiffs fail to meet their burden under *Bruen* step one**

**1.      The Second Amendment's plain text does not cover the "purchase" or "acquisition" of firearms, let alone the immediate acquisition of purchased firearms**

"At step one, the plaintiff is tasked with establishing that the Second Amendment's explicit text, 'as informed by history,' encompasses the conduct they seek to engage in." *RMGO*, 121 F.4th at 113 (quoting *Bruen*, 597 U.S. at 17). In making this determination, courts must give the text its "[n]ormal meaning . . . [as] known to ordinary citizens in the founding generation." *Id.* (quoting *Heller*, 554 U.S. at 576-77). "To aid in interpreting the plain text, the challenger may consult 18th century dictionaries and treatises, utilize corpus linguistics, put forth historical sources such as the Federalist and Anti-Federalist Papers, ratification debates, and writings of the framers, examine early American court cases, and refer to English common law." *Id.* Additionally, precedent providing insight on the plain text, even if not from early American history, "may be authoritative[.]" *Id.*

Plaintiffs do not, and cannot, demonstrate that the waiting period regulates conduct protected by the plain text of the Second Amendment. Plaintiffs attempt to paint the waiting period as a law implicating the possession and carry of firearms. *See* Corrected Brief for Appellants ("Aplt. Br.") at 27-28. However, as the district court noted, the waiting period by its express terms only applies to the "sale" and "transfer" of firearms. Aplt. App. Vol. V at 1087 n.7. Unlike the laws at issue in

18

*Heller*, *McDonald*, *Bruen*, and *Rahimi*, the waiting period does not make possession of any weapon illegal, does not deprive anyone of their firearms, and places no limits on the firearms that are kept by anyone. That Plaintiffs may not possess the firearms they are purchasing for a few days as a result of the law does not, *ipso facto*, mean it infringes upon the Second Amendment's plain text protection of "keeping" and "bearing" arms. Otherwise, any law regulating commerce generally would be subject to *Bruen*'s historical review if it creates any delay on a person's ability to possess or use a firearm, including shall-issue licensing regimes. *See B & L Prods.*, 104 F.4th at 118 n.19; *see also Bruen*, 597 U.S. at 39 n.9 (recognizing that shall-issue licensing regimes "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry" (quoting *Heller*, 554 U.S. at 635)).

Instead, waiting period laws merely impose a brief delay on the transfer of a commercially sold firearm to the purchaser. In other words, the conduct regulated by New Mexico's waiting period is the acquisition of commercially sold firearms. More specifically, the conduct regulated is the acquisition of commercially sold firearms *without delay*. Thus, the question is: does the plain text of the Second Amendment cover acquiring or purchasing firearms, and if so, does it cover the *immediate* acquisition of commercially sold firearms? The answer is no.

19

As the Supreme Court in *Heller* noted, the 1773 edition of Samuel Johnson's dictionary defined "keep" as, "most relevantly, '[t]o retain; not to lose,' and '[t]o have in custody.'" 554 U.S. at 581 (quoting 1 Dictionary of the English Language 1095 (4th ed.) (reprinted 1978)), and the 1828 edition of Webster's American Dictionary of the English Language defined "keep" as "[t]o hold; to retain in one's power or possession," *id.* (quoting N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)). Other dictionaries at the time are in accord. *See, e.g.*, Thomas Sheridan, A Complete Dictionary of the English Language (6th ed.1796) (defining "to keep" as "[t]o retain; to have in custody"). Thus, the most natural reading of the phrase "keep arms," as known to ordinary citizens in the founding generation, is to retain arms. And the phrase "bear arms" "has a meaning that refers to carrying for a particular purpose – confrontation." *Heller*, 554 U.S. at 584.

In an effort to distort the Constitution's plain text to support their claims, Plaintiffs focus on a word that is *not* in the Second Amendment: "have." Aplt. Br. at 28. This is not a plain text inquiry, to say the least. *See Rahimi*, 144 S. Ct. at 1911 (Kavanaugh, J., concurring) ("The first and most important rule in constitutional interpretation is to heed the text—that is, the actual words of the Constitution—and to interpret that text according to its ordinary meaning as originally understood."). Moreover, Plaintiffs' definition of the word "have" actually supports the conclusion

that the phrase "keep arms" means to retain them. *See id.* (defining "have" as "to be in possession of (*something received, acquired, earned, etc.*); to possess" (citing *Have*, Oxford English Dictionary (3d ed. 2015) (emphasis added)); Aplt. App. Vol. V at 1085-86 (rejecting Plaintiffs' reliance on definitions of the word "have").

It is no surprise then that courts across the country have concluded that the Second Amendment's plain text does not encompass the purchase or acquisition of new firearms. *See McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024) ("[O]n its face 'keep and bear' does not include purchase[.]"); *B & L Prods.*, 104 F.4th at 117 ("On its face, that language says nothing about commerce[.]"); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1324-25 (11th Cir. 2023) ("[T]he Second Amendment's plain text includes only a right 'to keep and bear arms,' not a right to buy them."), *reh'g en banc granted, opinion vacated*, 72 F.4th 1346 (11th Cir. 2023); *RMGO*, 701 F. Supp. 3d at 1133; *accord Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 222 (4th Cir. 2024) (en banc) (holding "that non-discretionary 'shall-issue' licensing laws are presumptively constitutional and generally do not 'infringe' the Second Amendment right to keep and bear arms under step one of the *Bruen* framework"); *Mills v. N.Y.C.*, 2024 WL 4979387, at *9 (S.D.N.Y. Dec. 4, 2024) ("[N]othing in the text of the Second Amendment suggests that plaintiffs have a right to immediately obtain firearms 'on demand' as opposed to having to wait a short period of time.").

History confirms this to be the case. The Supreme Court recognized in *McDonald* that "King George III's attempt to *disarm* the colonists in the 1760's and 1770's 'provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms.'" 561 U.S. at 768 (quoting *Heller*, 554 U.S. at 594)) (emphasis added). And the Court explained in *Rahimi* that "[t]he spark that ignited the American Revolution was struck at Lexington and Concord, when the British governor dispatched soldiers to *seize* the local farmers' arms and powder stores," and highlighted language from "a leading and early proponent of emancipation," who expressed: "*Disarm* a community and you rob them of the means of defending life. *Take away* their weapons of defense and you take away the inalienable right of defending liberty." 144 S. Ct. at 1897 (quoting Cong. Globe, 40th Cong., 2d Sess., 1967 (1868) (statement of Rep. Stevens)) (emphases added). As the district court put it, "This history demonstrates why the Second Amendment's 'keep and bear' language focuses on retention rather than acquisition of arms." Aplt. App. Vol. V at 1084. (quoting U.S. Const. amend. II.).

Of course, this does not mean that governments can evade the Second Amendment by simply prohibiting all citizens from purchasing or acquiring firearms indefinitely. As recognized by the district court (and the Ninth Circuit), "unless the right to acquire firearms receives some Second Amendment protection, the right to keep and bear firearms would be meaningless." Aplt. App. Vol. V at 1087 (quoting

*B & L Prods.*, 104 F.4th at 118). Thus, courts should still inquire as to whether a restriction or condition on purchasing or acquiring firearms is so burdensome as to amount to "a de facto prohibition," *McRorey*, 99 F.4th at 839 n.18, or a "meaningful constrain[t]," *B & L Prods.*, 104 F.4th at 119, on the right to keep and bear arms.

Contrary to Plaintiffs' arguments, this approach is entirely consistent with Supreme Court precedent, which recognizes that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 626-27 & n.26; *see also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring). After all, any law that is "'presumptively lawful' . . . necessarily must not implicate the plain text of the Second Amendment. Otherwise, *Bruen* makes clear that the Constitution would "presumptively *protect*[] that conduct[.]" *B & L Productions*, 104 F.4th at 119 (quoting *Bruen*, 597 U.S. at 17); *see RMGO*, 121 F.4th at 120 (agreeing with this logic). The same law cannot be both presumptively constitutional and presumptively unconstitutional. And until the Supreme Court provides guidance on how to overcome this presumption of lawfulness, "requiring that a regulation meaningfully constrain the right to keep and bear arms for the purpose of self-defense faithfully tracks the Second Amendment's plain text." *B & L Prods.*, 104 F.4th at 119 (cleaned up).

Notably, most of the authorities cited by Plaintiffs accords with, or at least does not contradict, this approach. *See* Aplt. Br. at 29. For example, Plaintiffs cite

*Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc), *Andrews v. State*, 50 Tenn. 165 (1871), and a concurring opinion from *Maryland Shall Issue*, 116 F.4th 211. But *Teixeira* took virtually the same approach used in *B & L Prods*. *See* 104 F.4th at 119 ("In assessing whether particular 'laws imposing conditions and qualifications on the commercial sale of arms' implicate that right, the approach we took in *Teixeira*—whether a challenged regulation meaningfully impairs an individual's ability to access firearms—remains appropriate."). The Tennessee Supreme Court's 150-year-old dicta in *Andrews* merely observed that the right to "keep" arms "*involves* the right to purchase them." 50 Tenn. at 178 (emphasis added). And Judge Rushing's concurring opinion in recognized that "[d]espite [the] fact [that a person entitled to a license will temporarily be prevented from exercising his rights while he awaits government approval], the Supreme Court was untroubled by a licensing regime requiring advance permission to carry a gun[.]" *Maryland Shall Issue*, 116 F.4th at 234 (Rushing, J., concurring) (citing *Bruen*, 597 U.S. at 13 n.9, 38 n.9).

A short, objectively applied waiting period like the seven-day period imposed by New Mexico does not rise to the level of a functional prohibition or meaningful constraint on the right to keep and bear arms. Aplt. App. Vol. V at 1088-89; *see McRorey*, 99 F.4th at 839 ("[T]here is some point at which a background check becomes so lengthy that it is 'put towards abusive ends' or subject to *Bruen*'s

historical framework as a de facto prohibition on possession. But a period of 10 days does not qualify."); *Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016) (concluding that "[t]he burden of the 10-day waiting period here, requiring an applicant to wait ten days before taking possession of the firearm" does not "place[ ] a substantial burden on a Second Amendment right");[9] *Vermont Fed'n of Sportsmen's Clubs v. Birmingham*, --- F. Supp. 3d ---, 2024 WL 3466482, at \*23 (D. Vt. July 18, 2024) ("The objective nature of Vermont's law, combined with its relatively short period of delay, reveals that it does not unduly burden the protected right[.]").

Indeed, New Mexico's waiting period is significantly less burdensome than the shall-issue licensing regimes that the Supreme Court tacitly approved. *See Bruen*, 597 U.S. at 38 n.9 (stating that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, . . . . which often require applicants to undergo a background check or pass a firearms safety course" (cleaned up)); *id.* at 80 (Kavanaugh, J., concurring) (stating that "shall-issue regimes may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements"); *see also*

---

[9] While *Silvester* was decided pre-*Bruen*, it is still good law to the extent its analysis focused on history and tradition. *See Bruen*, 597 U.S. at 19 (stating that the first step of the pre-*Bruen* framework "is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history").

*Maryland Shall Issue, Inc.*, 116 F.4th at 227 n.15 (rejecting argument that a potential two-week delay in taking possession of a handgun as a result of licensing regime was "so lengthy as to deny individuals their Second Amendment rights"). If the State can lawfully prohibit individuals from *ever* purchasing a firearm unless they pay a fee, pass a background check, mental health screening, and take a firearm safety course, certainly it can allow individuals to bypass most of these measures in return for waiting a few days to help "ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635); *see generally Coastal States Energy Co. v. Hodel*, 816 F.2d 502, 506 n.6 (10th Cir. 1987) ("The power to do the greater includes the power to do the lesser."). Given the minimal burden New Mexico's waiting period imposes, Plaintiffs cannot meet their burden under *Bruen* step one.

But even if the plain text *did* protect the purchase or acquisition of firearms as a general matter, it certainly does not protect the *immediate* acquisition of new firearms.[10] Plaintiffs present no historical evidence that the plain text of the Second Amendment was originally understood to guarantee a right to immediately acquire

---

[10] The district court did not address this specific point below given its broader conclusion that the Second Amendment's plain text does not cover purchase or acquisition at all. Nevertheless, this Court may affirm the district court on this alternative basis because it was fully briefed and argued below. *See United States v. Rodriguez*, 945 F.3d 1245, 1250 (10th Cir. 2019); *see, e.g.*, Aplt. App. Vol. I at 79-81; Aplt. App. Vol. III at 525.

purchased firearms. To the contrary, Defendants presented substantial evidence demonstrating that many states and localities enacted licensing requirements for owning or discharging firearms in the 18th and 19th centuries. *See* Aplt. App. Vol. I at 107-119. And, as Professor Spitzer observed in his declaration, "licensing by its nature thwarts any ability to acquire or use firearms on demand." *Id.* at 108. As the Ninth Circuit has explained,

> There is . . . nothing new in having to wait for the delivery of a weapon. Before the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one. As a purely practical matter, delivery took time. Our 18th and 19th century forebears knew nothing about electronic transmissions. Delays of a week or more were not the product of governmental regulations, but such delays had to be routinely accepted as part of doing business.

*Silvester*, 843 F.3d at 827; *see also Vermont Fed'n of Sportsmen's Clubs*, 2024 WL 3466482, at *27 ("There is substantial evidence in the record highlighting that instant availability of a wide variety of guns would not have been anticipated at the founding."); *RMGO*, 701 F. Supp. 3d at 1133 (concluding that "the Founders would not have expected instant, widespread availability of the firearm of their choice"). Thus, it is clear "the Second Amendment's explicit text, 'as informed by history,' [does not] encompass[] the conduct [Plaintiffs] seek to engage in." *RMGO*, 121 F.4th at 113 (quoting *Bruen*, 597 U.S. at 17).[11]

---

[11] Contrary to Plaintiffs arguments, such a conclusion is not inconsistent with the treatment of other constitutional rights. *See Silvester*, 843 F.3d at 832 (Thomas, C.J.,

### 2. Waiting periods are presumptively lawful commercial regulations

Even if the Second Amendment's plain text covered Plaintiffs' proposed course of conduct, their Second Amendment claim still fails because New Mexico's waiting period is a lawful condition and qualification on the sale of arms. The Supreme Court has repeatedly emphasized that the right protected by the Second Amendment is "not unlimited." *Rahimi*, 144 S. Ct. at 1897 (quoting *Heller*, 554 U.S. at 626). Accordingly, the *Heller* Court stated that it should not be read to "cast doubt on . . . laws imposing conditions and qualifications on the commercial sales of arms." *Heller*, 554 U.S. at 626-27. Such laws, the Court stated, are "presumptively lawful regulatory measures." *Id.* at 627 n.26.

*Heller*'s discussion of "presumptively lawful" regulations has not been abrogated, contrary to Plaintiffs' arguments. *Bruen* did not disturb this portion (or arguably *any* portion) of *Heller*. Three justices concurred in *Bruen* to specifically emphasize the continuing validity of this presumptively lawful category of regulatory measures. *See Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring) (explaining that "[p]roperly interpreted, the Second Amendment allows a 'variety'

---

concurring) ("The Supreme Court has permitted waiting periods of varying duration in several other constitutional contexts, including before obtaining a marriage license, and permits for gathering to protest or parade."); Aplt. App. Vol. V at 1095 ("Like 'time, place, and manner restrictions' in the context of the First Amendment, [the waiting period] merely affects the time that an individual may purchase a gun." (cleaned up)).

of gun regulations" and quoting *Heller*'s discussion of these presumptively lawful regulatory measures); *id.* at 72 (Alito, J., concurring) (stating that *Bruen* did not "disturb[] anything that we said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns") (cleaned up)). And the Supreme Court's most recent Second Amendment opinion, *Rahimi*, further reinforces the continuing validity of *Heller*'s list of "presumptively lawful" firearm regulations. *See Rahimi*, 144 S. Ct. at 1902 (recognizing that "our opinion [in *Heller*] stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful'" (quoting *Heller*, 554 U.S. at 626, 627, n.26); *accord id.* at 1923 (Kavanaugh, J. concurring) (discussing *Heller*'s recognition of "presumptively constitutional" measures). Thus, as this Court recently concluded, the "'presumptively lawful regulatory measures' language, first stated in *Heller* . . . remains good law." *RMGO*, 121 F.4th at 119.

New Mexico's waiting period is a presumptively constitutional law imposing conditions and qualifications on the commercial sales of arms. Plaintiffs argue otherwise by resorting to cherry-picked definitions of the words "condition" and "qualification" and claiming that one cannot "satisfy" the waiting period's requirements. *See* Aplt. Br. at 42-43. Assuming, *arguendo*, Plaintiffs' definitions were applicable in this context (they are not), an individual *can* "satisfy" the waiting period's requirements: they can wait the required amount of time. Even if this were

not a true "condition" (it is), individuals can "satisfy" the condition of obtaining a concealed carry permit, which would exempt them from the waiting period. *See* § 30-7-7.3(H)(2); *accord* Aplt. Br. at 43 (acknowledging that the requirement to secure a background check is a valid condition of qualification on the sale of a firearm).

More importantly, however, this Court's decision in *RMGO* has already disposed of Plaintiffs' argument. In *RMGO*, this Court held that a Colorado law setting 21 as the minimum age to purchase a firearm constitutes a presumptively lawful age-based condition and qualification on the commercial sales of arms because it regulates the selling and purchasing of firearms. 121 F.4th at 120. If a law that requires people to wait *years* before purchasing a firearm constitutes a presumptively lawful condition and qualification on the commercial sales of arms, then a seven-day waiting period surely qualifies as well.

Plaintiffs also attempt to argue that New Mexico's waiting period is not presumptively lawful because waiting periods are not "longstanding." Aplt. Br. at 44. To begin with, this is simply not true. As the district court found, waiting periods "are sufficiently longstanding" because "laws imposing a waiting period on the sale of firearms have a longstanding tradition of enforcement in the United States dating to the early twentieth century." Aplt. App. Vol. V a 1103 (citing *Silvester*, 843 F.3d at 831 (Thomas, C.J., concurring)); *accord RMGO*, 121 F.4th at 135 (McHugh, J., concurring) ("I would require the government to show that the challenged regulation

existed or is sufficiently analogous to regulations that existed sometime in the twentieth century [for it to qualify as 'longstanding].").

Plaintiffs attempt to distinguish these earlier waiting periods because they purportedly existed solely to give licensing authorities time to conduct background checks. *See* Aplt. Br. at 44-45. Even assuming this is true, Plaintiffs ignore the fact that one of the primary purposes of New Mexico's waiting period *is* to ensure federal authorities have sufficient time to complete a background check. *See* Aplt. App. Vol. V at 1031. That it may also serve another purpose does not render these earlier laws inapt, especially for a facial challenge. *See Rahimi*, 144 S. Ct. at 1903. Regardless, *RMGO* forecloses Plaintiffs' argument. While the concurrence in *RMGO* would have adopted Plaintiffs' position, the majority rejected this approach as out-of-step with *Bruen* and difficult to administer. 121 F.4th at 121.

Importantly, Plaintiffs do not, and cannot, overcome the waiting period's presumptive constitutionality under either the district court's approach or this Court's approach in *RMGO*. The district court concluded that a challenger can overcome this presumption by showing that it has "more than a de minimis effect upon his right," Aplt. App. Vol. V at 1104 (quoting *Peterson*, 707 F.3d at 1218 n.1), or that "the regulation provides a licensing official an impermissible amount of discretion in deciding whether to allow an individual to exercise his or her Second Amendment right," *id.* at 1105. And, as the district court concluded, neither of these

are true with regard to the waiting period. *Id.* at 1104-06. Indeed, Plaintiffs do not even attempt to argue otherwise on appeal. *See* Aplt. Br. at 41-45.

Similar to the district court's approach, this Court concluded that a challenger can overcome the presumption by showing that the law has "abusive ends." 121 F.4th at 122 (citing *Bruen*, 597 U.S. at 38 n.9). In other words, the challenger must show that the law's purpose is wrongful or improper, as opposed to legitimate. *See id*. at 124. In *RMGO*, this Court concluded that the Colorado law setting 21 as the minimum purchase age for firearms was not abusive because it imposed a nondiscretionary condition or qualification on the commercial sale of arms aimed at ensuring that guns are used by law-abiding, responsible persons. *Id.* at 122-23. In reaching this conclusion, the Court took note of the fact that many other states had similar minimum age laws, as well as evidence presented by the defendants demonstrating that those younger than 21 were more likely to use firearms irresponsibly given their lack of brain development and maturity. *See id.* at 126-27.

The Court should reach the same conclusion here. First, it is undisputed that the waiting period is objectively applied uniformly to all firearm purchasers who do not fit within an enumerated exception. Second, Defendants have "adduce[d] significant evidence that waiting period laws may help reduce this tidal wave of gun violence." Aplt. App. Vol. V at 1125. For example, one peer-reviewed study concluded that waiting periods reduce gun homicides by roughly 17%. *Id.* (citing

Michael Luca, Deepak Malhotra & Christopher Poliquin, *Handgun Waiting Periods Reduce Gun Deaths*, 114 Proc. Nat'l Acad. Sci. 12162 (2017)). And the State's chosen 7-day waiting period falls comfortably within the span of waiting periods enacted by jurisdictions across the nation. *See* Statement of the Case § II *supra*; *cf. RMGO*, 121 F.4th at 124 (noting that many other states set 21 as the minimum age to purchase a firearm or subset of firearms). Accordingly, it cannot be said that New Mexico's waiting period has "abusive ends." It is, therefore, constitutional without reference to *Bruen*'s second step. *See id.* at 127.

### B.     The waiting period is consistent with the principles that underpin our tradition of firearm regulation

Putting aside Plaintiffs' failure to meet their burden to demonstrate that the waiting period regulates conduct covered by the Second Amendment's plain text, their challenge still fails because the law is consistent with the principles that underpin our tradition of firearm regulation. Under *Bruen*'s second step, the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24. Some courts initially took this to impose a difficult burden on governments to prove that every modern-day firearm regulation could be traced back to a widespread and distinctly similar body of firearm regulations from the 18th and 19th centuries. However, the Supreme Court subsequently clarified this "misunderst[anding]," explaining, "These precedents were not meant to suggest a law trapped in amber. . . . [T]he Second

33

Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." *Rahimi*, 144 S. Ct. at 1897-98 (cleaned up). As Justice Barrett explained more fully in her concurrence:

> *Bruen* emphasized that 'analogical reasoning' is not a 'regulatory straightjacket.' To be consistent with historical limits, a challenged regulation need not be an updated model of a historical counterpart. Besides, imposing a test that demands overly specific analogues has serious problems. To name two: It forces 21st-century regulations to follow late-18th-century policy choices, giving us 'a law trapped in amber.' And it assumes that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority. Such assumptions are flawed, and originalism does not require them. "Analogical reasoning" under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold.

*Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring) (cleaned up).

Therefore, the Court clarified, "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898 (citing *Bruen*, 597 U.S. at 26-31) (emphasis added). In other words, "[t]he law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 597 U.S. at 30). To determine this, a court must ask "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to

modern circumstances.'" *Id.* (quoting *Bruen*, 597 U.S. at 29 & n.7). "Why and how the regulation burdens the right are central to this inquiry." *Id.*[12]

Three broad categories of laws demonstrate that New Mexico's waiting period is consistent with the principles that underpin our nation's regulatory tradition given their "how" (i.e., temporarily delaying the transfer of a firearm) and "why" (i.e., to avoid gun violence): intoxication laws, licensing regimes, and group-based sales restrictions laws.

While the district court here did not address whether intoxication laws are sufficiently analogous to waiting periods, other courts have found them to be apt comparators—based on nearly identical evidence presented by Defendants. As Professor Spitzer explained in his declaration, "[f]rom the 1600s through the early 1900s, at least 30 states regulated, restricted, and punished inebriation in connection

---

[12] Plaintiffs disputed below whether this form of analogical reasoning (sometimes referred to as the "more nuanced" approach under *Bruen*) applied given the purported absence of "unprecedented societal concerns" or "dramatic technological changes." *See, e.g.*, Aplt. App. Vol. III at 528-29, 610-11. This not factually accurate. *See, e.g.*, Aplt. App. Vol. II at 345, 438-58. Assuming, *arguendo*, it was, *Rahimi* made clear that courts should use analogical reasoning even if general problems like gun violence existed at the Founding. *Compare Rahimi*, 144 S. Ct. at 1899-1902 (relying on historical analogues to support federal law prohibiting persons subject to certain domestic violence restraining orders from possessing a firearm), *with id.* at 1933 (Thomas, J., dissenting) (asserting that the federal law "addresses a societal problem—the risk of interpersonal violence—that has persisted since the 18th century, yet was addressed through the materially different means of surety laws" (cleaned up)). Regardless, Plaintiffs do not make this argument on appeal and have therefore abandoned it. *See* Aplt. Br.; *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007).

35

with the ownership or use of weapons. These regulations included at least 20 states that criminalized the carrying or use of firearms when intoxicated." Aplt. App. Vol. I at 101. Two district courts found this sufficient to establish a "historical tradition of regulating the carrying and use of firearms by intoxicated individuals." *RMGO*, 701 F. Supp. 3d at 1144; *Vermont Fed'n of Sportsmen's Clubs*, 2024 WL 3466482, at *25; *see generally Antonyuk v. James*, 120 F.4th 941, 971-72 (2d Cir. 2024) (explaining that even a few instances of historically comparable regulations can be sufficient to meet *Bruen*'s second step, particularly in the absence of evidence that the regulations' lawfulness was disputed). And these courts concluded that intoxication laws are proper analogues for waiting period laws because they "both work to prevent individuals in a temporary impulsive state from irresponsibly using a firearm." *RMGO*, 701 F. Supp. 3d at 1144, at **17-18; *Vermont Fed'n of Sportsmen's Clubs*, 2024 WL 3466482, at *26. As the Vermont district court put it:

> These restrictions on firearm use associated with alcohol are an apt historical analogue for Vermont's waiting period. In both cases, the relevant legislature identifies a period during which it believes that firearms pose an extreme risk to public safety. It then mandates that individuals refrain from carrying or using firearms until those people can exercise their Second Amendment rights safely and effectively.

*Id.* at *26.

Plaintiffs give this Court no reason to reach a different conclusion. They characterize intoxication laws as "narrowly tailored" to only burden those "in a temporary state of inebriation that predisposes them to dangerous or impulsive

36

behavior," whereas waiting periods "impose[] a blunderbuss burden on nearly everyone's arms-bearing right, on the theory that anyone looking to acquire guns might be disposed to impulsive acts of violence." Aplt. Br. at 36. Yet these laws *did* assume that every intoxicated person with a firearm presented a potential danger regardless of whether they actually did, similar to New Mexico's waiting period. And the fact that the waiting period applies a bit more broadly in the sense that it applies to most people who purchase a new firearm and imposes a few additional days of delay on a purchaser's ability to take possession of their firearm does not require this Court to reject it as a proper analogue. As one district court observed,

> Perhaps the state could impose a more narrowly tailored requirement, but that is not the inquiry here. The intoxication laws prevented all individuals from becoming intoxicated and engaging in the prohibited conduct. They did not apply only to those people who would have certainly used a firearm irresponsibly while intoxicated.

*RMGO*, 701 F. Supp. 3d at 1144-45; *accord Vermont Fed'n of Sportsmen's Clubs*, 2024 WL 3466482, at *26 (rejecting similar argument); *cf. Rahimi*, 144 S. Ct. 1889 (finding surety laws relevantly similar to 18 U.S.C. § 922(g)(8) even though they only required an individual to post a small bond).

In addition to intoxication laws, historical licensing regimes confirm that waiting periods are consistent with the principles that underpin our nation's regulatory tradition. Professor Spitzer presented hundreds of examples of historical licensing laws. *See* Aplt. App. Vol. I at 92-128. These laws are proper analogues for

waiting period laws "because they support that the Founders and Reconstruction generation would have accepted a modest delay on the delivery of a firearm in order to ensure that those receiving a firearm are law-abiding, responsible citizens." *RMGO*, 701 F. Supp. 3d at 1145. As one court explained, "Waiting periods are similar to 'shall-issue' licensing regimes in that they require that an action be taken—delivery of the purchased firearm—after a defined requirement is met" and they "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right[s]." *Id.* (quoting *Bruen*, 142 S. Ct. at 2138 n.9). And, as another observed, "[b]oth allow for background checks and mandate delay so the government can ensure that the individuals acquiring firearms are, in fact, law-abiding and responsible citizens." *Vermont Fed'n of Sportsmen's Clubs*, 2024 WL 3466482, at *26. This Court should reach the same conclusion.

Plaintiffs' arguments to the contrary are unpersuasive. Plaintiffs assert that licensing regimes are not analogous because they are designed to ensure that purchasers are law-abiding citizens whereas waiting periods' "sole effect is to prevent someone who has *already* passed a background check from keeping and carrying a firearm." Aplt. Br. at 37. However, this argument ignores the burden Plaintiffs must meet to mount a facial challenge against New Mexico's waiting period, which also applies to those who have *not* already passed a background check. See *Rahimi*, 144 S. Ct. at 1898. More importantly, Plaintiffs' argument is based on

the logical fallacy that background checks are a perfect means of ensuring that a purchaser will use a firearm responsibly. If that were the case, 19 children and two adults in Uvalde, Texas would still be alive today.[13] The unfortunate fact is that people in a temporary state of rage or depression can pass a background check, and it is impossible to read a purchaser's mind and predict whether they plan to kill themselves or others with a newly purchased firearm. One of the only ways to ameliorate this risk is to impose a brief delay on the transfer of a newly purchased firearm. Thus, waiting periods, like licensing regimes, are designed to ensure that those receiving a firearm are law-abiding, responsible citizens.

Lastly, the group-based firearm sales restrictions identified by the district court support the constitutionality of waiting periods. After conducting an exhaustive overview of historical laws identified by Professor Spitzer and other caselaw and sources cited by the parties, the district court concluded that our nation has "a deeply rooted historical tradition of restricting and even outright prohibiting the sale of firearms to large groups out of a fear that some among those groups might use those firearms to do harm in society." Aplt. App. Vol. V at 1107-12. And the district court correctly found that New Mexico's waiting period was "relevantly

---

[13] *See* Reese Oxner, *Uvalde gunman legally bought AR rifles days before shooting, law enforcement says*, Texas Tribune (May 25, 2022), https://www. texastribune.org/2022/05/25/uvalde-shooter-bought-gun-legally/ (reporting that the Uvalde gunman legally purchased the assault rifles he used to massacre 19 children and two adults days before the tragedy).

similar" to these restrictions because they were both aimed at "decreas[ing] the chance that gun purchasers will use purchased firearms to commit acts of violence against others in society," and the challenged waiting period imposes a similar, if not substantially reduced, burden on an individual's Second Amendment rights. *Id.* at 1113-15.

Again, Plaintiffs' counterarguments are unavailing. While Plaintiffs are correct that many of these laws are odious and racist, that does not mean that they cannot be considered when determining whether a modern-day law (that is otherwise constitutional) is consistent with the principles behind our nation's history and tradition of firearm regulation. As the district court observed, "the Supreme Court has not suggested that courts may analogize only to those regulations that would not be viewed as discriminatory or unconstitutional today" and "adopting the Plaintiffs' position would result in an inversion of the *Bruen* test: rather than assessing whether a modern regulation is consistent with founding-era Constitutional understanding, the Court would be required to judge founding-era regulations against modern Constitutional interpretations." Aplt. App. Vol. V at 1119 (citations omitted). Likewise, Plaintiffs attempt to distinguish these laws as simply targeting "discrete" populations misses the mark, as historical group-based restrictions were also "overinclusive" in the sense that they applied to large swaths of the population even

though many targeted individuals seek to purchase firearms for lawful use. Aplt. App. Vol. V. at 1115-16.

At bottom, Plaintiffs urge this Court to make the same methodological mistake Supreme Court cautioned against in *Rahimi* by requiring proof of a "historical twin." But this is not required. While the foregoing groups of laws are "by no means identical" to waiting periods, they "not need to be." *Rahimi*, 144 S. Ct. at 1901. Rather, they demonstrate that our country has a historical tradition of imposing measures that briefly delay a person's ability to possess or use firearms to ensure that they do not misuse them. Accepting Plaintiffs' arguments to the contrary would result in a "law trapped in amber." *Id.* at 1897; *id.* at 1925 (Barrett, J., concurring).

## III.   The district court did not abuse its discretion in concluding that the waiting period does not cause Plaintiffs irreparable harm

"[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction[.]" *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (cleaned up). Plaintiffs failed to make this showing for several reasons. First and foremost, Plaintiffs' failure to demonstrate a strong likelihood of success on their merits negates any possible showing of irreparable harm based on the purported loss of a constitutional right. *See RMGO*, 121 F.4th at 128. But even supposing Plaintiffs *could* establish a likelihood of success, they cannot show irreparable harm from a seven-day waiting period when they both already own multiple firearms suitable for self-defense,

including the firearms they sought to purchase at the beginning of the lawsuit. *See* Aplt. App. Vol I at 45-52; Aplt. App. Vol. V at 1122; *RMGO*, 701 F. Supp. 3d at 1146 (finding no irreparable harm when the plaintiffs "have alleged no harm associated with the right of self-defense"); *see generally Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1202 (7th Cir. 2023) (saving "for another day" the question of "whether an alleged Second Amendment violation gives rise to a presumption of irreparable harm, and if so, whether any such presumption is rebuttable or ironclad"), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024).

Relatedly, the Court should reject Plaintiffs' claims of irreparable harm given that they intentionally *waited months* to file this action despite being aware of the passage of House Bill 129 solely to manufacture the need for the extraordinary remedy of a preliminary injunction. *See* Aplt. App. Vol. I at 74; *GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984) ("[D]elay is an important consideration in the assessment of irreparable harm for purposes of injunctive relief."); *see also Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("A party requesting a preliminary injunction must generally show reasonable diligence."). Either way one cuts it, the district court did not abuse its discretion in holding that Plaintiffs failed to demonstrate a likelihood of irreparable harm, and therefore, this Court should affirm. *See Malamed*, 874 F.3d at 1141.

**IV. The district court did not abuse its discretion in holding that the balance of the equities and public interest weighed against injunctive relief**

Like the first two factors, the final two (merged) factors weigh heavily in Defendants' favor. Firearm-related homicides and suicides in the United States and New Mexico have risen to unprecedented levels in recent years. *See* Statement of the Case § I *supra*. It cannot be gainsaid that Defendants (and the public) have a compelling interest in ensuring that authorities have sufficient time to complete background checks, as well as preventing impulsive murders and suicides. See *RMGO*, 121 F.4th at 128 ("[T]he public interest strongly favors Colorado's enforcement of [a law setting 21 as the minimum age to purchase a firearm], particularly as guns became the leading cause of death in Colorado among this age group." (cleaned up)). And research clearly demonstrates that waiting periods prevent many of these unnecessary deaths. Aplt. App. Vol. I at 88-89; Aplt. App. Vol. II at 434-35, 477-517; Aplt. App. Vol. V at 1125. For example, one peer reviewed study credited by the district court concluded that "waiting periods reduce gun homicides by roughly 17%," which would translate to saving about 37 New Mexicans every year from gun homicides alone. Aplt. App. Vol. V at 1125-26. As the district court concluded, the public's interest in saving lives "significantly outweighs" Plaintiffs' minimal and fleeting "harms" of simply waiting a few extra days to pick up additional firearms. *Id.*

43

Plaintiffs give this Court no reason to doubt this conclusion, other than asserting that Defendants do not have any "interest in enforcing a law that is likely constitutionally infirm." Aplt. Br. at 47-48 (quoting *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010)). However, this argument falls apart when Plaintiffs fail to show any likely constitutional infirmity. Accordingly, the district court did not abuse its discretion in weighing the third and fourth preliminary injunction factors.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's decision not to preliminarily enjoin the waiting period.

## STATEMENT REGARDING ORAL ARGUMENT REQUEST

Defendants/Appellees' request oral argument because these consolidated appeals involve constitutional questions about state policies and present complex methodological questions about the application of the Second Amendment under *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022) and *United States v. Rahimi*,144 S. Ct. 1889 (2024).

Respectfully submitted,

*/s/ Holly Agajanian*
**HOLLY AGAJANIAN**
*Chief General Counsel*
**KYLE P. DUFFY**
*Deputy General Counsel*

44

Office of Governor Lujan Grisham
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2200
holly.agajanian@exec.nm.gov
kyle.duffy@exec.nm.gov

*Counsel for Governor Michelle Lujan Grisham*

**ALETHEIA ALLEN**
*Solicitor General*
**VAN SNOW**
*Deputy Solicitor General*
**CHRISTA STREET**
*Assistant Solicitor General*
New Mexico Department of Justice
408 Galisteo Street, Villagra Building
Santa Fe, NM 87501
(505) 490-4060
Aallen@nmdoj.gov
VSnow@nmdoj.gov
CStreet@nmdoj.gov

*Counsel for Attorney General Raúl Torrez*

## CERTIFICATE OF COMPLIANCE

1.  This filing complies with the word limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,015 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type.

*/s/ Holly Agajanian*
Holly Agajanian

## CERTIFICATE REGARDING DIGITAL SUBMISSION
## AND PRIVACY REDACTIONS

1.  All required privacy redactions have been made to this document and, with the exception of those redactions, this document and any other document(s) submitted in Digital Form or scanned PDF format are an exact copy of any written document(s) required to be filed with the Clerk.

2.  The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program and, according to the program, are free of viruses.

*/s/ Holly Agajanian*
Holly Agajanian

## CERTIFICATE OF SERVICE

I certify that on December 9, 2024, I filed the foregoing electronically through the CM/ECF system, which caused all parties or counsel of record in this matter to be served by electronic means.

*/s/ Holly Agajanian*
Holly Agajanian