No. 24-2121

_____

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____

SAMUEL ORTEGA and REBECCA SCOTT,
*Plaintiffs-Appellants,*

v.

MICHELLE LUJAN GRISHAM, in her official capacity as Governor
of New Mexico, and RAUL TORREZ, in his official capacity as Attorney
General of New Mexico,
*Defendants-Appellees.*

_____

On Appeal from the U.S. District Court for the District of
New Mexico (No. 1:24-cv-00471)
The Honorable James O. Browning

_____

## BRIEF OF AMICI CURIAE BRADY CENTER TO PREVENT GUN
## VIOLENCE AND GIFFORDS LAW CENTER TO PREVENT GUN
## VIOLENCE IN SUPPORT OF APPELLEES AND AFFIRMANCE

_____

Scott L. Winkelman
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington, DC 20002
Phone: (202) 624-2500
swinkelman@crowell.com

Nicholas W. Dowd
Amy M. Pauli
CROWELL & MORING LLP
1601 Wewatta St., Suite 815
Denver, CO 80202
Phone: (303) 524-8660

Harry Cohen
Joshua Sohn
Luke Taeschler
Emily Strickland
Crowell & Moring LLP
375 Ninth Ave
New York, NY 10001
Phone: (212) 223-4000

## CORPORATE DISCLOSURE STATEMENT

*Amici* Brady Center to Prevent Gun Violence and Giffords Law Center to Prevent Gun Violence state that each organization does not have parent organizations. *Amici* do not issue stock and therefore no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT............................................i

TABLE OF AUTHORITIES..................................................iv

STATEMENT OF INTEREST ................................................ 1

SUMMARY OF ARGUMENT .............................................. 2

ARGUMENT ..................................................................... 4

    I.    THE WAITING PERIOD ACT DOES NOT
           IMPLICATE THE PLAIN TEXT OF THE SECOND
           AMENDMENT. ........................................................ 4

    II.    THE WAITING PERIOD ACT ADDRESSES THE
           UNPRECEDENTED PUBLIC HEALTH
           CATASTROPHE OF FIREARM SUICIDES AND
           IMPULSIVE FIREARM KILLINGS. .................................. 11

           A.    SUICIDE AND IMPULSIVE KILLING BY
                 FIREARM IS A MODERN PHENOMENON ............ 13

           B.    THE FOUNDERS AND ENSUING
                 GENERATIONS DID NOT CONFRONT THIS
                 CRISIS ......................................................... 16

    III.    ANALOGOUS WAIT-CENTRIC REGULATIONS
           PROVIDE AMPLE HISTORICAL PRECEDENT FOR
           THE WAITING PERIOD ACT. ..................................... 20

           A.    GUN LICENSING .......................................... 22

           B.    SURETY LAWS ............................................ 24

           C.    RESTRICTIONS ON THE INTOXICATED .............. 25

    IV.    SUICIDE AND IMPULSIVE ACTS OF FIREARM
           VIOLENCE ARE A GRAVE PUBLIC CONCERN,
           WHICH THE WAITING PERIOD ACT
           EFFECTIVELY ADDRESSES. ....................................... 27

           A.    WAITING PERIODS REDUCE FIREARM
                 SUICIDES .................................................... 28

# TABLE OF CONTENTS

**Page**

    B.    WAITING PERIODS REDUCE FIREARM
HOMICIDES ................................................................. 33

CONCLUSION .......................................................................... 34

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Barron v. Baltimore,*
  *32 U.S. 243 (1833) (Marshall, C.J.)* ...................................................... 6

*Cal. Rifle & Pistol Ass'n Inc. v. L.A. Cnty. Sheriff's Dep't,*
  *2024 WL 4875390 (C.D. Cal. Aug. 20, 2024)*........................................ 23

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ............................................................... 4,5,6,7,10

*Ezell v. Chicago,*
  *651 F.3d 684 (7th Cir. 2011)*.................................................................. 9

*Hanson v. Dist. of Columbia,*
  671 F. Supp. 3d 1 (D.D.C. 2023) ........................................................ 12

*Jones v. Bonta,*
  2023 WL 8530834 (S.D. Cal. Dec. 8, 2023) ........................................ 28

*Md. Shall Issue, Inc. v. Moore,*
  *116 F.4th 211 (4th Cir. 2024)* .............................................................. 23

*Miller v. California Attorney General Bona,*
  *Case No. 19-01537 (S.D. Cal. 2019)* .................................................... 19

*New York State Rifle & Pistol Assn, Inc. v. Bruen,*
  597 U.S. 1 (2022) ............................... 3,4,5,7,8,10,11,12,21,22,23,24,28

*Ocean State Tactical, LLC v. Rhode Island,*
  646 F. Supp. 3d 368 (D.R.I. 2022) ...................................................... 28

*Ortega v. Grisham,*
  *2024 WL 3495314 (D.N.M. July 22, 2024)*.................. 9,22,23,26,28,34

*Rocky Mountain Gun Owners v. Polis,*
  2023 WL 8446495 (D. Colo. Nov. 13, 2023) ...................................... 4,9

*Second Amendment Found., Inc. v. Bureau of Alcohol,*
*Tobacco, Firearms & Explosives,*
2023 WL 7490149 (N.D. Tex. Nov. 13, 2023) ...................................... 28

*Tracy Rifle & Pistol LLC v. Harris,*
118 F. Supp. 3d 1182 (E.D. Cal. 2015) .................................................. 28

*United States v. Austin,*
2024 WL 1580079 (S.D.N.Y. Apr. 11, 2024) ......................................... 8

*United States v. King,*
646 F. Supp. 3d 603 (E.D. Pa. 2022) ..................................................... 9

*United States v. Libertad,*
681 F. Supp. 3d 102(S.D.N.Y. 2023)...................................................... 8

*United States v. Rahimi,*
602 U.S. 680 (2024) ........................................................................ 10, 12

*Vt. Fed'n of Sportsmen's Clubs v. Birmingham,*
2024 WL 3466482 (D. Vt. July 18, 2024) ........................... 8, 19, 21, 23

**Statutes**

1825 Tenn. Priv. Acts 306, ch. 292 § 3...................................................... 25

Mass. Gen. Laws ch. 134, § 16 (Boston, Dutton & Wentworth 1836) .... 24

N.M.S.A. § 30-7-7.3................................................................................ 9

The Waiting Period Act ....... 3,4,9,10,11,13,14,15,20,21,22,23,25,26,27,28

...................................................................................... 31,32,33,34

**Constitutional Provisions**

Fourteenth Amendment of the United States Constitution................... 12

Second Amendment of the United States Constitution............. 3,4,5,6,7,8

...................................................... 9,10,11,16,17,20,23,25,28

**Other Authorities**

Allen C. Guelzo, *Our Ancient Faith: Lincoln, Democracy and the American Experiment* (Knopf 2024) ............................................... 20

Andrew Conner, et al., *Suicide Case-Fatality Rates in the United States, 2007 to 2014: A Nationwide Population-Based Study,* 171 Ann. Intern. Med., 885 at 887 (2019) .............. 29,30

Brady Handgun Violence Prevention Act or the Brady Law .......... 33, 34

Brady Law and RTC Laws ...................................................... 33

CDC Leading Causes of Death Visualization Tool, https://wisqars.cdc.gov/lcd .................................................... 13

CDC, Suicide Data and Statistics, https://www.cdc.gov/suicide/suicide-data-statistics.html .................. 14

David M. Studdert et al., *Handgun Ownership and Suicide in California*, 382 New Eng. J. Med. 2220 (2020) .............................. 29

*Fiscal Impact Report H.B. 129, Firearm Sale Waiting Period Changes* ....................................................................... 15,27

*Gun Violence: Purchase Waiting Periods*, Nat'l All. on Mental Illness https://www.nami.org/Advocacy/Policy-Priorities/Stopping-Harmful-Practices/Gun-Violence-Purchase-Waiting-Periods .................................................. 30

Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *Firearms and the Common Law: History and Memory*, Washington, D.C.: Smithsonian Institution Scholarly Press, 117 (2019) ................................................ 19

Kevin Sweeney, *An Eighteenth-Century Gun Culture Shaped by Constraints*, Duke Center for Firearms Law (Sept. 6, 2023) ....................................................................... 18

Lisa A. B. Shields, et al., *Trends of Suicide in the United States During the 20th Century*, Forensic Pathology Reviews, vol. 3. Humana Press, (2005) ................................................. 17

Madeline Drexler, Harv. Pub. Health, *Guns & Suicide: The Hidden Toll* ........................................................................ 32

Michael Luca, Deepak Malhotra, and Christopher Poliquin, *Handgun Waiting Periods Reduce Gun Deaths*, Proceedings of the National Academy of Sciences 114, no. 46 (2017) ................................................................... 31,33

Matthew Miller et al., *Household Firearm Ownership and Rates of Suicide Across U.S. States*, 62 J. of Trauma 1029 (2007) .......................................................................... 29

New Mexico. Fiscal Impact Report H.B. 129, *Firearm Sale Waiting Period Changes* ..................................................... 15

Nicholas Quinn Rosenkranz, *The Objects of the Constitution,* 63 Stan. L. Rev. 1006 (2011) ................................................. 6

Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies: Making Sense of Limits on the Right to Keep and Bear Arms in the Founding Era*, 51 Fordham Urb. L. J. 25, 38 (2023) .................................................. 16,19

Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 Fordham Urb. L. J. 1695, 1713 (2012) ........................... 17

*Suicide Rates and State Laws Regulating Access and Exposure to Handguns*, AM. J. Pub. Health https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4566524/ (Oct. 2015) ........................................................................... 32

United States. CDC, Suicide Rates by State, https://www.cdc.gov/suicide/suicide-rates-by-state.htmllat .............. 14

*What Many People Get Wrong About Suicide*, Vox
    https://www.vox.com/2015/7/30/9068255/suicide-
    impulsive-gun-control (Sep. 17, 2015)................................................29

*Which States Require a Waiting Period Before Gun
    Purchases?*, Everytown for Gun Safety Support Fund,
    https://everytownresearch.org/rankings/law/waiting-
    periods/ (Jan. 4, 2024).........................................................................31

## STATEMENT OF INTEREST

Amicus curiae Brady Center to Prevent Gun Violence ("Brady") is the nation's oldest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, legal advocacy, and political action. Brady works to free America from gun violence by passing and defending gun violence prevention laws, reforming the gun industry, and educating the public about responsible gun ownership. Brady has a substantial interest in ensuring that the Constitution is construed to allow democratically elected officials to address the Nation's gun-violence epidemic, and to safeguard the interest of every American in living safe and secure lives in their homes and communities.

Amicus curiae Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun-violence survivors, and others who seek to reduce gun violence. Founded in 1993 after a gun massacre at a San Francisco law firm, the organization was renamed Giffords Law Center in October 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords. Today, through partnerships with gun violence researchers, public-

health experts, and community organizations, Giffords Law Center researches, drafts, and defends laws, policies, and programs proven to effectively reduce gun violence.[1]

## SUMMARY OF ARGUMENT

While firearm-related deaths have been rising across the nation, New Mexico has been hit particularly hard. Between 2010 and 2021, New Mexico's age-adjusted firearm death rate increased 87%. New Mexico's gun-death rate is 84% higher than the national average and is the third-highest in the country. In 2022, there were 571 firearm-related deaths in New Mexico, more than half of which were suicides and nearly 40% of which were homicides.

This calamity is neither endemic to New Mexico nor historically precedented. This new crisis includes both murder-by-firearm and suicide-by-firearm that occur at frequencies that would have been inconceivable to the Founders. Deciding that this new crisis requires new

---

[1] Plaintiffs-Appellants and Defendants-Appellees have consented to *amici* filing this brief. *See* Fed. R. App. P. 29(a)(2). Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence submit this brief in support of Defendants-Appellees. No counsel for a party authored this brief in whole or in part. No person other than *amici* or their counsel contributed money to fund this brief's preparation or submission.

tools, New Mexico took a reasonable and modest step to reduce these ills. Seeking to blunt the gun-death crisis plaguing the state, New Mexico governor Michelle Lujan Grisham signed House Bill 129, which imposes a seven-day waiting period on firearm purchases ("Waiting Period Act" or "Act"). The primary purpose of the Waiting Period Act is to lower the number of gun deaths in New Mexico, particularly by preventing impulsive acts of gun violence, including suicide and homicide.

The district court rightly found the Waiting Period Act consistent with the Second Amendment. As explained in Part I below, the Waiting Period Act's narrow, time-limited regulation of certain commercial firearm sales does not implicate the plain text of the Second Amendment and is therefore constitutional. But even if it did implicate the Second Amendment, any *Bruen* analysis of the Act must consider that the ills the law addresses—a crisis of deaths by firearm—did not exist when the Founders ratified the Second Amendment nor in the ensuing decades. Part II addresses the reality of the death-by-firearm crisis that laws like the Waiting Period Act prevent. Part III shows that the Waiting Period Act fits comfortably within the line of historical analogues of firearm regulation, and that the immediate purchase of firearms was neither

customary nor expected at the Founding. Part IV shows that, when weighing the public interest of the requested injunction, the district court rightly found that the Waiting Period Act is a narrow and sensible means of curbing firearm-related deaths and promoting public health and safety.

This Court should affirm the district court's denial of Plaintiffs' motion for preliminary injunction.

## ARGUMENT

I. **The Waiting Period Act Does Not Implicate The Plain Text Of The Second Amendment.**

"Like most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Courts must therefore begin Second Amendment analysis by determining whether a challenged regulation restricts a right covered by the Amendment's "plain text." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 113 (10th Cir. 2024) (hereinafter "*RMGO II*") ("At step one, the plaintiff is tasked with establishing that the Second Amendment's explicit text, as informed by history, encompasses the conduct they seek to engage in.") (internal quotation marks and citations omitted). If the

regulated conduct falls outside the original scope of the Second Amendment's plain text, it is "categorically unprotected" and the constitutional challenge fails. *Bruen*, 597 U.S. at 18 (internal quotation marks and citations omitted); *see also RMGO II*, 121 F.4th at 114 ("[S]elf-evidently, if the people, weapons, or conduct at issue are outside the Second Amendment's protection, then the government may regulate them without infringing upon the Second Amendment."); *Vincent*, 80 F.4th at 1203 (Bacharach, J., concurring) (similar).

The Second Amendment says this: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. It speaks of no right to obtain a firearm—immediately or otherwise. The "substance of the right" set forth in the Second Amendment consists of two verbs: to "keep" and to "bear." *Heller*, 554 U.S. at 581. The Supreme Court has meticulously described the meaning of both words and neither establishes a right to buy or obtain new firearms instantly. This word-choice reality means that the plain text of the Amendment speaks only of an *existing* possessory right, not some constitutional guarantee of on-demand access to new firearms.

In examining the Constitution's plain text, the Founders' word choices matter. Alexander Hamilton, Chief Justice Marshall, and their contemporaries painstakingly parsed the verbs, tenses, and related features of the Constitution's text. *See, e.g., Barron v. Baltimore,* 32 U.S. 243, 249 (1833) (Marshall, C.J.) (examining the Takings Clause's passive voice and the "words [] employed"); THE FEDERALIST No. 83, at 503 (Alexander Hamilton) (Clinton Rossiter ed. 1961) (the drafters' choice of "The United States" means that this entity is "the OBJECT to which all general provisions in the Constitution must necessarily be construed to refer").[2] Recent Second Amendment jurisprudence has been equally scrupulous. After all, a supposed plain-text assessment not focused faithfully on the words is neither textual nor plain.

Begin with "keep." *Heller* defines it to mean "[t]o retain; not to lose" and "[t]o have in custody." *Heller*, 554 U.S. at 582 (quoting 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978) ("Johnson") (internal quotation marks omitted) (alteration in original)). Looking to Webster's dictionary, the Supreme Court found a similar definition: "[t]o

---

[2] *See generally* Nicholas Quinn Rosenkranz, *The Objects of the Constitution,* 63 Stan. L. Rev. 1006 (2011) (studying the objects, subjects, and verb choices of various Constitutional provisions).

hold; to retain in one's power or possession." *Id.* (quoting N. Webster, Am. Dictionary of the Eng. Language (1828) (reprinted 1989) (internal quotation marks omitted) (alteration in original)). Neither definition suggests or even implies "obtain," "acquire," "transact," or "purchase." To the contrary, "keep" is synonymous with "retain": to maintain possession of something *one already has*.

The Amendment's second verb, to "bear," is even more removed from reflecting a right to purchase, or have new, instant access to, firearms. As the *Heller* Court explained, to "bear" means to "carry," or when used together with the word "arms," means "carrying for a particular purpose—confrontation." *Id.* at 584 (citing *Muscarello v. United States*, 524 U.S. 125 (1998)). Thus, to "bear" refers to use of a firearm one already has. Like the verb "keep," it presupposes that the object, an "arm," is already in the relevant individual's possession.

Thus, both *Heller* and *Bruen* couch the Second Amendment right in the language of possession and use – "to possess a handgun" (*Bruen*, 597 U.S. at 8-9 (citing *Heller*, 554 U.S. at 626)), and "the possession and use of [weapons]" (*Heller*, 554 U.S. at 721). *Heller* adds that "the right was codified" to "prevent elimination of the militia" (*id*. at 599) – that is, to

prevent the *taking away* of weapons owned, not to protect obtaining them.

Accordingly, to find within the Second Amendment an ever-present right to acquire or buy a firearm would require rewriting the text to create a new, different right well beyond the text's "normal and ordinary" meaning. *Id.* at 576. As this Court recently noted, "the terms 'sale,' 'acquire,' or 'purchase' are not included in the definitions of 'keep' or 'bear.'" *RMGO II*, 121 F.4th at 117-18 (citations omitted). Several other courts post-*Bruen* have likewise declined to construe the Second Amendment's plain text as including a right to buy or sell firearms. *See, e.g.*, *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, 2024 WL 3466482, at *23 (D. Vt. July 18, 2024) (finding that "acquiring a firearm though a commercial transaction on-demand [] is not covered by the plain text of the Second Amendment"); *United States v. Austin*, 2024 WL 1580079, at *7 (S.D.N.Y. Apr. 11, 2024) (unlicensed commercial sale of firearms for profit not protected by plain text of the Second Amendment); *United States v. Libertad*, 681 F. Supp. 3d 102, 111(S.D.N.Y. 2023) (statute prohibiting interstate transfer of firearms did not "on its face operate to prevent anyone from keeping or bearing arms; it merely prescribe[d] and

proscribe[d] particular modes of acquiring guns"); *United States v. King*, 646 F. Supp. 3d 603, 607 (E.D. Pa. 2022) (rejecting defendant's argument that "buying and selling firearms" was protected by the Second Amendment because "the Court looks at the Second Amendment's plain text; it does not consider 'implicit' rights that may be lurking beneath the surface of the plain text").[3]

The Waiting Period Act does not impair an individual's right to "have weapons" or "carry" them. It prohibits no one from possessing or using firearms. The Waiting Period Act is instead transactional, imposing a temporary delay before purchasers can possess a newly acquired firearm. N.M.S.A. § 30-7-7.3. The district court thus correctly concluded that the Act does not regulate conduct protected by the plain text of the Second Amendment. *Ortega v. Grisham*, 2024 WL 3495314, at *26 (D.N.M. July 22, 2024); *see also Rocky Mountain Gun Owners v. Polis*, 701 F. Supp. 3d 1121, 1131-32 (D. Colo. 2023), (hereafter referenced as "*RMGO I*").

---

[3] *But see Ezell v. Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire . . . .").

9

In addition, the Waiting Period Act falls within the "presumptively lawful regulatory measures" that "presumptively do not implicate the plain text of the Second Amendment at the first step of the *Bruen* test." *RMGO II*, 121 F.4th at 119-20 (internal quotation marks and citation omitted). In *RMGO II*, this Court held that Colorado's minimum age law for gun sales did "not implicate the plain text of the Second Amendment" because it is the type of commercial firearm regulation that the Supreme Court has identified as "presumptively lawful regulatory measures," first in *Heller* and then in *Bruen* and *Rahimi*, that fall outside the Second Amendment's text. *Id* at 120. (quoting *Bruen*, 597 U.S. at 19). Faithfully applying *Heller*, this Court noted that the minimum age restriction at issue was a "nondiscretionary condition" that set "a narrow, objective, and definite standard that applies uniformly to all potential sellers and buyers." *RMGO II*, 121 F.4th at 122-23. Because the Waiting Period Act likewise imposes a commercial, non-discretionary, uniform, and narrow condition on firearm sales, it too is a "presumptively lawful regulatory measure" that does not implicate the Second Amendment's plain text. *Id* at 121.

Because the Waiting Period Act does not implicate the plain text of the Second Amendment and the context in which that text was adopted, it is constitutional.

## II. The Waiting Period Act Addresses The Unprecedented Public Health Catastrophe Of Firearm Suicides And Impulsive Firearm Killings.

The Waiting Period Act should be upheld at *Bruen*'s first step because it is a presumptively lawful commercial restriction. *RMGO II*, 121 F.4th at 121.  However, even if this Court were to proceed to *Bruen*'s second step, the Waiting Period Act would survive because its brief delay in the commercial transfer of firearms adheres to our nation's historical tradition of firearm regulation.

In *Bruen*, the Supreme Court established the test for determining whether a firearm regulation that implicates conduct covered by the Second Amendment is nevertheless constitutional. Under this test, the government "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. In the Court's view, the content and scope of the Second Amendment can often be surmised from historical analysis of how gun

rights were understood when the Second and Fourteenth Amendments were ratified. *See id.* at 20-21.

In articulating this test, the *Bruen* Court held that cases "implicating unprecedented societal concerns or dramatic technological changes" that were not present or anticipated at the time of the Founding require a "more nuanced approach" that relies on "historical analogies." *Id.* at 27; *see also United States v. Rahimi*, 602 U.S. 680, 692 (2024). This is because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 at 3.[4] When considering this kind of "unprecedented societal concern," courts must distill the principles underpinning the regulatory tradition. *Id.* at 27; *see Rahimi*, 602 U.S. 680 at 739 ("[I]mposing a test that demands overly specific analogues has serious problems . . . it forces 21st-century regulations to follow late-18th-century policy choices, giving us 'a law trapped in amber.'" (citation omitted) (Barrett, J., concurring)).

---

[4] *See also Hanson v. District of Columbia*, 671 F. Supp. 3d 1, 18 (D.D.C. 2023) (explaining that "[large-capacity magazines] are the object of 'dramatic technological changes' and implicate 'unprecedented societal concerns,' and thus its ban requires 'nuanced' consideration") (quoting *Bruen*, 597 U.S. at 27), *affirmed*, 120 F.4th 223 (D.C. Cir. 2024).

12

The Act requires such a nuanced approach: it is intended to address the unprecedented societal scourge of gun suicides and impulsive gun violence—calamities not prevalent during the Founding and Reconstruction Eras.

## A.    Suicide and Impulsive Killing by Firearm Is A Modern Phenomenon

The Waiting Period Act confronts the recent and horribly tragic phenomenon of individuals being able to near-instantaneously acquire a new firearm to engage in acts of self-harm or impulsive violence. *See* H.B. 129 *Consumer and Public Affairs Committee* (Jan. 25, 2024) (floor debate describing the Waiting Period Act as "evidence-based policies…that conclusively show that waiting periods decrease suicide and firearm homicide."). [5]

Across modern American society, firearms have become a pervasive cause of death by suicide, posing a contemporary problem the Founders could not have envisioned. According to the Centers for Disease Control and Prevention, suicide is currently "one of the leading causes of death

---

[5] https://sg001-harmony.sliq.net/00293/Harmony/en/PowerBrowser/PowerBrowserV2/20240125/-1/74484

in the United States." CDC, Suicide Data and Statistics ("CDC Suicide Statistics").[6] In 2021, more than 48,000 people in the United States died by suicide, and firearms were used in over half of those deaths. *Id.* Firearms are by far the most common cause of suicides, representing 55%—more than double the next most common method (suffocation). *Id.*

Firearm-related suicides are currently matters of grave concern in New Mexico, where the statistics are grimmer still. In 2022, New Mexico had the third-highest number of suicide deaths per capita in the United States. CDC, Suicide Rates by State.[7] Alarmingly, between 2018 and 2022, New Mexico saw a 10% spike in suicide deaths by firearm. State of New Mexico, Gun Violence Dashboard.[8] In passing the Waiting Period Act, New Mexico sought to address this issue of suicide-by-firearm head on and protect its citizens, including, in particular, its military veterans. *See* H.B. 129, House Floor Debate (statement of Rep. Andrea Romero)

---

[6] https://www.cdc.gov/suicide/facts/index.html. For the 25-34 age group, suicide is the second most common cause of death, followed by homicide. *Id.*

[7] https://www.cdc.gov/suicide/facts/rates-by-state.html?CDC_AAref_Val=https://www.cdc.gov/suicide/suicide-rates-by-state.html

[8] https://www.governor.state.nm.us/gun-violence-dashboard/

(Feb. 2, 2024) (noting that the Waiting Period Act is designed to "meet the same goal of trying to reduce particularly suicide deaths by firearm by giving someone the space of time to consider their actions or maybe seek help").[9]

The use of firearms in acts of homicide is also a matter of profound concern in New Mexico. Fiscal Impact Report H.B. 129, *Firearm Sale Waiting Period Changes*, at 3 (N.M. Feb. 1, 2024); *see also* H.B. 129, House Floor Debate (statement of Rep. Andrea Romero) (Feb. 2, 2024) ("We are at epidemic proportions when it comes to gun deaths in our state.").[10] Between 2018 and 2022 alone, New Mexico endured a shocking 62% increase in homicides with a firearm. State of New Mexico, Gun Violence Dashboard.[11]

As the New Mexico Legislature recognized, the Waiting Period Act is likely to help ameliorate these pernicious suicide-by-firearm and

---

[9] https://sg001-harmony.sliq.net/00293/Harmony/en/PowerBrowser/PowerBrowserV2/20240202/-1/74625

[10] https://sg001-harmony.sliq.net/00293/Harmony/en/PowerBrowser/PowerBrowserV2/20240202/-1/74625

[11] https://www.governor.state.nm.us/gun-violence-dashboard/

homicide-by-firearm problems in New Mexico by delaying immediate access to firearms. *See Consumer and Public Affairs Committee* (Jan. 25, 2024).

## B. The Founders and Ensuing Generations Did Not Confront This Crisis

The present and dire threat of firearm suicides and impulsive killings was not one confronting the Framers or Reconstruction-era legislators. "Gun homicide, mass shootings, and suicide, the three forms of gun violence that dominate the modern gun debate, were simply not problems for those who enacted the Second Amendment." Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies: Making Sense of Limits on the Right to Keep and Bear Arms in the Founding Era*, 51 Fordham Urb. L. J. 25, 38 (2023).

We know of no historical evidence to suggest, much less establish, that the present epidemic of firearm suicides was an issue the Founders would have recognized or anticipated. Rather, firearm-related suicides appear to have been a rarity in the Founding and Reconstruction eras, remaining so until the twentieth century. While statistics are sparse, available data suggests that firearms became a common tool for self-inflicted killing only within the last century or so. *See* Lisa A. B. Shields,

et al., *Trends of Suicide in the United States During the 20th Century*, Tsokos, NJ. (eds) Forensic Pathology Revs., vol. 3. Humana Press, 2 (2005).

Even as late as 1860, after firearm technology began to evolve beyond muzzle-loaded weapons, firearms remained an uncommon method of suicide. *Id.* Firearms became the second-most common method of suicide in 1900 and then the most common method in 1910—more than a century after the Second Amendment was ratified. *Id.* Firearms have remained the predominant method of suicide in the United States in each decade since. *See id.*

Similarly, impulsive homicides, facilitated by immediate access to newly acquired firearms, were not the significant societal concern at the Founding that they are today. "Interpersonal violence, including gun violence, simply was not a problem in the Founding era that warranted much attention and therefore produced no legislation." Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 Fordham Urb. L. J. 1695, 1713 (2012).

This was in large part because of the era's "economic and technological constraints" and limited firearm production and

distribution. Kevin Sweeney, *An Eighteenth-Century Gun Culture Shaped by Constraints*, Duke Center for Firearms Law (Sept. 6, 2023).[12] Eighteenth-century America had limited means of producing new firearms—building a musket from scratch could take a week or more. *Id.* Most new firearms had to be imported from England, while American gunsmiths typically focused on repairing firearms. For example, "[a] rare surviving account book of an inland gunsmith, . . . indicates that he made only three new guns over a period of 20 years from 1768 to 1788, while performing 452 repairs on existing firearms." *Id.* Import statistics suggest that "the number of newly made firearms available for sale during the later eighteenth century would have been modest in comparison to the size of the growing population." *Id.*

Beyond the difficulty of instantly obtaining a firearm, homicides committed with guns were also a relative rarity in the Colonial period, partly because the weapons then available were poor tools for that end. As Professor Randolph Roth has explained, "[b]lack powder, muzzle-loading weapons, were too unreliable and took too long to load to make

---

[12] https://firearmslaw.duke.edu/2023/09/an-eighteenth-century-gun-culture-shaped-by-constraints

them effective tools of homicide and most crimes of passion." Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies,* 51 Fordham Urb. L. J. at 38. "Given this fact it is easy to understand why modern discussions of guns and individual self-defense were so rare in Founding-era public debate." *Id.* Professor Roth's studies have shown that homicides around the time of the Founding "were committed almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives"—not firearms. Declaration of Randolph Roth ("Roth Decl.") ¶ 12, *Miller v. California Attorney General Bona*, Case No. 19-01537 (S.D. Cal. 2019) (citing "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History,*" in *Firearms and the Common Law: History and Memory,* Washington, D.C.: Smithsonian Institution Scholarly Press, 117 (2019); *see also Vt. Fed'n of Sportsmen's Clubs*, 2024 WL 3466482, at *27 ("[R]ash and impulsive decisions to buy firearms and shoot others or the self were not a problem at the founding . . . because guns were infrequently used for violence (and when they were, the muzzle-loading nature of the weapons made it difficult to use them impulsively)").

Simply put, "[g]uns were not the weapons of choice in homicides that grew out of the tensions of daily life." Roth Decl. ¶ 12. And, for obvious reasons, it would have been physically challenging to use an eighteenth-century musket or long rifle in a suicide attempt.

## III. Analogous Wait-Centric Regulations Provide Ample Historical Precedent for the Waiting Period Act.

Even supposing, for argument's sake, that a purely two-action amendment—the two actions being "keep" and "bear"—were expanded beyond its plain text to protect additional actions not mentioned, like "acquire" and "transact," the Founders and Americans of their times would not have understood the Second Amendment to guarantee an individual's ability to obtain a firearm *right away*. In 1791, and throughout much of the nineteenth century, delayed delivery of goods was a practical reality of the country's commerce. It is easy to forget that, even as late as Abraham Lincoln's birth in 1809, an American could move no faster than horse or sail or river flow; much of the country had little to no currency to speak of; and the economy in much of the country was still primarily agricultural. Allen C. Guelzo, *Our Ancient Faith: Lincoln, Democracy and the American Experiment,* at 50-51 (Knopf 2024). Put

simply, times and commerce were slower—well slower than the Waiting Period Act's seven days of waiting.

As multiple courts have found, "immediate availability of firearms is a modern development that requires modern regulation." *Vt. Fed'n of Sportsmen's Clubs*, 2024 WL 3466482, at \*25; *RMGO I*, 701 F. Supp. 3d, at \*1133 ("Even if purchasing a firearm could be read into the terms 'keep' or 'bear,' receipt of a firearm *without any delay* could not be, because the Founders would not have expected instant, widespread availability of the firearm of their choice[.]") (internal quotation marks and citation omitted).  Courts have thus applied the "nuanced approach" to the historical tradition analysis required under *Bruen* when analyzing laws like New Mexico's. *Vt. Fed'n of Sportsmen's Clubs*, 2024 WL 3466482, at \*14 (internal quotation marks and citation omitted); *Bruen*, 597 U.S. at 27 (nuanced approach applies to "unprecedented societal concern"). *Bruen* instructs courts to look for "analogous" regulations in the historical record and specifies that a "historical twin" is not required. *Id.* at 30. Under this approach, the Act's modest temporal restriction on firearm sales passes Constitutional muster under *Bruen* and its progeny.

Here, as the district court correctly found, the Waiting Period Act is "consistent with the principles underpinning our Nation's historical tradition" because it restricts the purchase of firearms for a short period "out of a fear that some [purchasers] . . . would use the purchased firearms to do harm." *Ortega*, 2024 WL 3495314, at *36. At least three categories of longstanding gun regulations—licensing and storage regimes, surety laws, and intoxication regulations—similarly reflect a centuries-old tradition of temporarily impeding immediate access to firearms out of fear for public safety. Because these age-old regulatory regimes temporarily restricted firearm possession for similar reasons as those motivating the Waiting Period Act, the Act is aligned with the Nation's historical tradition of firearm regulation.

## A.    Gun Licensing

Shall-issue licensing regulations, which *Bruen* specifically recognized as constitutionally permissible, are analogous to the Waiting Period Act. *See Bruen*, 597 U.S. at 38 n. 9 ("nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes") (citation omitted). Shall-issue licensing requirements "do not necessarily prevent 'law-abiding, responsible

citizens' from exercising their Second Amendment right to public carry." *Id.* (citation omitted). Constitutional shall-issue requirements merely mandate "applicants to undergo a background check or pass a firearms safety course" before owning or publicly carrying a firearm. *Id.* Similarly, the Waiting Period Act, like a background check or safety course, does not prevent gun ownership or gun purchase.

The district court recognized that gun licensing regimes, with the wait they inherently impose, are appropriate analogues for the Waiting Period Act. *Ortega*, 2024 WL 3495314, at *34. Other courts have found the same. *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 226 (4th Cir. 2024) (rejecting argument that "*any* delay" resulting from Maryland's shall-issue licensing regime infringed the Second Amendment and upholding 15-day wait for application processing); *Vt. Fed'n of Sportsmen's Clubs*, 2024 WL 3466482, at *23 (upholding waiting period statute because under *Bruen* regimes that "may delay acquisition of a firearm (or firearm permit)" nonetheless "survive constitutional scrutiny"); *Cal. Rifle & Pistol Ass'n Inc. v. L.A. Cnty. Sheriff's Dep't*, 2024 WL 4875390, at *8, n.16 (C.D. Cal. Aug. 20, 2024) ("a mere delay" in issuing a concealed carry permit does not violate the Second Amendment

because "*Bruen* implicitly accepts some sort of waiting period by approving so-called 'shall-issue' licensing schemes that . . . inevitably involve some period of delay").

## B.    Surety Laws

Surety laws were initially enacted in this country in or around the 1830s. *See, e.g.*, Of Proceedings to Prevent the Commission of Crimes, Mass. Gen. Laws ch. 134, § 16, (Boston, Dutton & Wentworth 1836). These laws required individuals who were "likely to breach the peace" to "post bond before carrying weapons in public." *Bruen*, 597 U.S. at 55-56 (internal quotation marks and citation omitted). The posted bond "would be forfeited if [the individual] breached the peace or injured others." *Id.* at 56-57 (internal quotation marks and citation omitted).

Thus, while surety laws created a restriction intended to discourage dangerous use of firearms, they "did not *prohibit* public carry." *Id.* at 56. The Supreme Court has thus held that surety laws did not impose "a substantial burden on public carry." *Id.* at 50. And because they were intended "merely for prevention and not meant as any degree of punishment," courts have found surety laws to be a constitutional means

24

of protecting public health and safety. *See id.* at 57 (internal quotation marks and citations omitted).

The district court correctly found the Waiting Period Act similar to surety laws. *Id.* at 37-38. Like surety laws, the brief waiting period the Act imposes preserves public health and safety, and does so in a narrow, tailored way that avoids imposing any "substantial burden" on protected Second Amendment rights. *Id.* at 50. Like the need to post bond, the Waiting Period Act's delay does not prohibit anyone from owning, carrying, or acquiring firearms. If anything, the Act is less restrictive than historical surety laws, given that securing a bond may very well have been too expensive for many people.

## C.    Restrictions on the Intoxicated

Our Nation has a history stretching back centuries of barring the use of firearms while drinking alcohol. *See, e.g.*, 1655 Va. Acts 401, Act of March 10, 1655, Act XII ("What persons or persons soever shall, after publication hereof, shoot any guns at drinking . . . that such person or persons so offending shall forfeit 100 lb. of tobacco to be levied"); *see also* 1825 Tenn. Priv. Acts 306, ch. 292 § 3 ("That said mayor and aldermen may, and shall, have power and authority to make any rules and laws

regulating the police of said town . . . to restrain and punish drinking . . . shooting and carrying guns, and enact penalties and enforce the same"); *Supplement to the Revised Statutes of Wisconsin*, 848, Ch. 181, § 4397B(3) (A.L. Sanborn & J.R. Berryman EDS., 1883) ("It shall be unlawful for any person in a state of intoxication to go armed with any pistol or revolver. Any person violating the provisions of the act shall be punished by imprisonment.").

The district court agreed that Founding-era laws prohibiting intoxicated people from purchasing firearms are similar to the Waiting Period Act. *Ortega*, 2024 WL 3495314, at *34. That was right: what is an intoxication-based regulation if not a waiting regulation, akin to the Act? Its very purpose was to require intoxicated people to *wait to buy* until they are sober. These historical restrictions reflect a well-established understanding at the time of the Founding that the government may regulate firearm access or use to prevent harm from individuals caught up in a dangerous but transient state of mind. Like the Waiting Period Act, such waits are by definition temporary, do not impose any permanent prohibition on ownership, and inhibit impulsive, mindless

26

killing by firearm. As such, they reasonably promote public safety in a targeted and narrow fashion, as does the Waiting Period Act.

## IV. Suicide and Impulsive Acts of Firearm Violence Are A Grave Public Concern, Which the Waiting Period Act Effectively Addresses.

The Waiting Period Act was enacted to advance a crucial state goal: protecting the health and safety of New Mexicans by reducing firearm-related suicides and homicides. *See* Fiscal Impact Report H.B. 129, *Firearm Sale Waiting Period Changes*, at 3 (N.M. Feb. 1, 2024) (explaining that studies on waiting periods show their "potential life-saving effects" including "delay[ing] immediate access to firearms and "preventing impulsive acts of violence, including suicides and homicides."); *see also* H.B. 129, House Floor Debate, (statement of Rep. Andrea Romero) ("What we are trying to do here is to essentially address the suicide rates in our states . . . including our active military and veterans et cetera who unfortunately could do harm to themselves or others."). [13] Barring enforcement of the Act, even temporarily, will prevent the State from achieving that laudable societal goal.

---

[13] https://sg001-harmony.sliq.net/00293/Harmony/en/PowerBrowser/PowerBrowserV2/20240202/-1/74625

A court may consider these potential harms to the State and the public interest when determining whether to preliminarily enjoin a law implicating Second Amendment rights, as courts have done in the wake of *Bruen*.[14] The district court thus rightly weighed these considerations here. *Ortega*, 2024 WL 3495314, at *41. As another district court put it, "[t]he costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime, violence, and suicide, would be grave." *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193 (E.D. Cal. 2015), *aff'd*, 637 F. App'x 401 (9th Cir. 2016).

## A.    Waiting Periods Reduce Firearm Suicides

There is an indisputable public interest in reducing suicide deaths in New Mexico.  Even temporarily blocking enforcement of the Waiting Period Act—a demonstrably effective means of reducing suicide deaths— poses a serious risk of public harm.

Firearms exacerbate the suicide epidemic. For one, firearms are by far the most lethal method of suicide. A 2019 national study found that

---

[14] *See, e.g.*, *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 401 (D. R.I. 2022) *aff'd*, 95 F.4th 38 (1st Cir. 2024); *Jones v. Bonta*, 705 F. Supp. 3d 1121, 1138-40 (S.D. Cal. 2023); *Second Amend. Found., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 702 F. Supp. 3d 513, 543 (N.D. Tex. 2023).

while only 8.5% of all suicidal acts between 2007 and 2014 were fatal, 89.6% of suicidal acts with a firearm resulted in death. Andrew Conner, et al., *Suicide Case-Fatality Rates in the United States, 2007 to 2014: A Nationwide Population-Based Study*, 171 Ann. Intern. Med., 885 at 887 (2019).

Moreover, studies have also found that places where firearms are more readily accessible have higher suicide rates. *See, e.g.*, Matthew Miller et al., *Household Firearm Ownership and Rates of Suicide Across U.S. States*, 62 J. Trauma 2007, at 1029. And research shows that suicide typically stems from a temporary crisis, rather than an act planned far in advance. David M. Studdert et al., *Handgun Ownership and Suicide in California*, 382 New Eng. J. Med. 2020, at 2221; *see also* German Lopez, *What Many People Get Wrong About Suicide*, Vox, Sept. 17, 2015, ("[T]he majority of suicide attempts are within three hours of people deciding to kill themselves.").

Because firearms are the deadliest method of suicide, access to firearms increases instances of suicide, and suicidal urges are usually transitory, waiting periods are narrowly tailored and effective means of preventing suicide. Waiting periods interpose a "cooling off" period,

during which a transitory suicidal crisis likely will pass. [15] Because suicidal crises often escalate quickly and suddenly, "limiting access to means of suicide can play a significant role in prevention." *Gun Violence: Purchase Waiting Periods*, Nat'l All. on Mental Illness. [16] Even if a waiting period does not deter an individual from attempting suicide, merely redirecting the individual to a different, less lethal, method might prevent a loss of life. The next-most lethal methods of suicide, drowning, and hanging, are significantly less deadly, ending in death 56.4% and 52.7% of the time, respectively, compared with the nearly 90% fatality rate for firearms. *See* Andrew Conner, et al., *Suicide Case-Fatality Rates in the United States, 2007 to 2014: A Nationwide Population-Based*

---

[15] M.J. Kresnow, et al., An unmatched case-control study of nearly lethal suicide attempts in Houston, Texas: research methods and measurements 32 Suicide and Life-Threatening Behavior (2001), (study finding that that among survivors of nearly-lethal suicide attempts, one in four deliberated for less than 5 minutes); Eberhard A Deisenhammer et al., *The duration of the suicidal process: how much time is left for intervention between consideration and accomplishment of a suicide attempt?*, J. Clin. Psychiatry (Jan. 2009) (study finding that that 48% of patients in a hospital following a suicide attempt thought about it for just 10 minutes or less).

[16] https://www.nami.org/Advocacy/Policy-Priorities/Stopping-Harmful-Practices/Gun-Violence-Purchase-Waiting-Periods

*Study*, 171 Ann. Intern. Med., 885 at 887 (2019). And other methods, such as drug poisoning, are even less lethal. *Id.* at 885.

Several studies confirm that brief waiting periods effectively reduce suicide deaths. In enacting the Waiting Period Act, New Mexico joined 13 other states that impose a waiting period for firearm purchases. *See Which States Require a Waiting Period Before Gun Purchases?*, Everytown for Gun Safety Support Fund, (Jan. 4, 2024).[17]

One study of states with waiting periods found that they led "to a 7-11% reduction in gun suicides . . . which is equivalent to 22-35 fewer gun suicides per year for the average state." Michael Luca, Deepak Malhotra, and Christopher Poliquin, *Handgun Waiting Periods Reduce Gun Deaths*, Harv. Bus. Sch. vol. 114, no. 46 at 12162-12165 (2017). Another recent study concluded that background checks and mandatory waiting periods are correlated with lower firearm-related suicide rates in states that implemented such laws as compared to those that did not. *See* Bradley Kawano, et al., *Restrictive Firearm Laws and Firearm-Related Suicide*, 236 J. Am. Coll. of Surg. at 37 (2023).

---

[17] https://everytownresearch.org/rankings/law/waiting-periods/

Significantly, states that have removed mandatory waiting periods have seen, to their horror, increased numbers of suicide deaths. In the year following South Dakota's repeal of its 48-hour waiting period requirement, the state's overall suicide rate increased by 7.6%, more than twice the 3.3% increase across the United States during the same period. *See* Michael Anestis & Joye Anestis, *Suicide Rates and State Laws Regulating Access and Exposure to Handguns*, Am. J. Pub. Health, vol. 105, no. 10, 2015, at 5.[18] And between 2010 and 2013, South Dakota's overall suicide rate climbed even higher to 8.9%. *See id.*

Individual cases help illustrate the tragedies the Waiting Period Act is intended to prevent. In November 2008, a 21-year-old man named Ryan Frazier shot himself with a handgun soon after suing a priest who had molested him as a teenager. Madeline Drexler, Harv. Pub. Health, *Guns & Suicide: The Hidden Toll*, 2013, at 27. Ryan went to a gas station five minutes from his home, bought a semiautomatic handgun, and killed himself that day in his car at an abandoned railroad station. *Id.* According to his wife, Emily Frazier, Ryan had never before used a gun. *Id.*

---

[18] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4566524/

### B.    Waiting Periods Reduce Firearm Homicides

Waiting period laws are demonstrably effective in reducing firearm-related homicides. Studies of states that have implemented waiting period laws show that waiting periods have "a large and robust effect" on reducing homicides. *See* Luca et al., *supra*. Based on an analysis of 45 years' worth of data, researchers found that waiting periods "reduce gun homicides by roughly 17%." *Id.* at 12162 The 17% reduction in firearm homicides equates to about 36 "fewer gun homicides per year for a state with an average number of gun deaths." *Id.* at 12163. If every state without waiting period requirements enacted legislation like the Waiting Period Act, the United States could avoid about "910 gun homicides per year." *Id.* at 12164.

A post-Hurricane Katrina study bolsters the finding that waiting periods reduce homicides. La Valle, James M., *Rebuilding at Gunpoint: A City-Level Re-Estimation of the Brady Law and RTC Laws in the Wake of Hurricane Katrina.* The study explored the effect of waiting periods in regions recovering from the hurricane. It found that a five-day waiting period law—The Brady Handgun Violence Prevention Act or the Brady

Law—accounted for "statistically significant (using a 'one-tailed' test) reductions in both total homicide rates and gun-homicide rates." *Id.*

Given these considerations, the district court correctly concluded that there were demonstrable public safety benefits of a firearm waiting period and that "the harm that the Defendants stand to suffer if the Court were to enjoin the Waiting Period Act—e.g., the loss of New Mexican lives—significantly outweighs the Plaintiffs threatened injury." *Ortega*, 2024 WL 3495314, at *42; *see also RMGO I*, 701 F. Supp. 3d, at *1149 ("saving approximately one hundred people . . . outweighs the aggregate harm of minimal expenditures of time and sacrificed business opportunities.").

## CONCLUSION

The Court should affirm the district court's decision.

CROWELL & MORING LLP

*/s/ Amy M. Pauli*
Amy M. Pauli
Nicholas W. Dowd
1601 Wewatta St., Suite 815
Denver, CO 80202
Phone: (303) 524-8660
Fax: (303) 524-8650
ndowd@crowell.com
apauli@crowell.com

Scott L. Winkelman
1001 Pennsylvania Ave., NW
Washington, DC 20002
Phone: (202) 624-2500
Fax: (202) 628-5116
swinkelman@crowell.com

Harry Cohen
Joshua Sohn
Luke Taeschler
Emily Strickland
375 Ninth Ave
New York, NY 10001
Phone: (212) 223-4000
Fax: (212) 223-4134
hcohen@crowell.com
jsohn@crowell.com
ltaeschler@crowell.com
estrickland@crowell.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation contained in Fed. R. App. P. 32(a)(7) because, excluding the portions exempted by Rule 32(f), this brief contains 6,477 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Schoolbook.

*/s/ Amy M. Pauli*
Amy M. Pauli

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing brief:

(1) all required privacy redactions have been made pursuant to 10th Cir. R. 25.5;

(2) if required to file additional hardcopies, that this ECF submission is an exact copy of those documents;

(3) this digital submission has been scanned for viruses with the most recent version of Microsoft Defender, version 1.411.31.0, and according to the program is free of viruses.

*/s/ Amy M. Pauli*
Amy M. Pauli

## CERTIFICATE OF SERVICE

I certify that on December 19, 2024, I electronically filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Tenth Circuit through the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


*/s/ Amy M. Pauli*
Amy M. Pauli