No. 24-2121

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____

SAMUEL ORTEGA and REBECCA SCOTT,

*Plaintiffs-Appellants*,

v.

MICHELLE LUJAN GRISHAM, in her official capacity as Governor of New Mexico, and RAÚL TORREZ, in his official capacity as Attorney General of New Mexico,

*Defendants-Appellees*.

_____

On Appeal from the United States District Court for the
District of New Mexico,
No. 1:24-CV-00471-JB-SCY (Hon. James O. Browning)

_____

## REPLY BRIEF FOR APPELLANTS

_____

MICHAEL D. MCCOY
ROBERT A. WELSH
MOUNTAIN STATES LEGAL
  FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227



JOSEPH G.S. GREENLEE
ERIN M. ERHARDT
NATIONAL RIFLE
  ASSOCIATION OF AMERICA
11250 Waples Mill Road
Fairfax, VA 22030

PAUL D. CLEMENT
ERIN E. MURPHY
  *Counsel of Record*
MATTHEW D. ROWEN
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

CARTER B. HARRISON IV
HARRISON & HART
924 Park Avenue SW, Suite E
Albuquerque, NM 87102

*Counsel for Plaintiffs-Appellants*

ORAL ARGUMENT REQUESTED

January 9, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION ....................................................................................... 1

ARGUMENT .............................................................................................. 4

I.      Plaintiffs' Second Amendment Claim Is Likely To Succeed ........................ 4

      A.     HB129 Regulates Conduct the Second Amendment Presumptively Covers ........................................................... 4

      B.     HB129 Is Not "Presumptively Lawful" ................................. 9

      C.     HB129 Does Not Comport With This Nation's Historical Tradition of Firearm Regulation ........................................... 18

II.     The Remaining Factors Support Injunctive Relief ....................................... 23

CONCLUSION ......................................................................................... 27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*District of Columbia v. Heller*,
554 U.S. 570 (2008)................................................ 4-5, 10, 13, 15-16, 24, 26-27

*Doe #6 v. Miami-Dade Cnty.*,
974 F.3d 1333 (11th Cir. 2020) ...........................................................27

*Free the Nipple-Fort Collins v. City of Fort Collins*,
916 F.3d 792 (10th Cir. 2019)...............................................................25

*Integrity Staffing Sols., Inc. v. Busk*,
574 U.S. 27 (2014)...............................................................................10

*McDonald v. City of Chicago*,
561 U.S. 742 (2010)................................................................... 1, 9, 16

*McRorey v. Garland*,
99 F.4th 831 (5th Cir. 2024)........................................................... 7, 14

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022).......................................6-7, 10, 13, 15, 18-19, 27

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982)...............................................................................9

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*,
389 F.3d 973 (10th Cir. 2004)....................................................... 25-26

*Range v. Att'y Gen.*,
--- F.4th ----, 2024 WL 5199447 (3d Cir. Dec. 23, 2024)........................... 21, 23

*Riley v. Nat'l Fed'n of the Blind, Inc.*,
487 U.S. 781 (1988)...............................................................................9

*Rocky Mt. Gun Owners v. Polis*,
121 F.4th 96 (10th Cir. 2024)......................................... 3-5, 9, 11-13, 16-18, 23

*Rocky Mt. Gun Owners v. Polis*,
701 F.Supp.3d 1121 (D. Colo. 2023) ................................................26

*United States v. Daniels*,
    101 F.4th 770 (10th Cir. 2024)............................................................. 1, 13-14, 23

*United States v. Duarte*,
    101 F.4th 657 (9th Cir. 2024)...............................................................19

*United States v. Perez*,
    6 F.4th 448 (2d Cir. 2021) ...................................................................21

*United States v. Rahimi*,
    602 U.S. 680 (2024)........................................... 1, 3-5, 7-8, 13-14, 16-17, 20, 22

*United States v. Williams*,
    113 F.4th 637 (6th Cir. 2024) ...............................................................23

*Wood v. Milyard*,
    566 U.S. 463 (2012)............................................................................18

## Statutes

N.M. Stat. §30-7-7.3(A) .................................................................... 4, 8, 20

N.M. Stat. §30-7-7.3(H)(2) ..................................................................12

N.M. Stat. §30-7-7.3(H)(3) ..................................................................12

N.M. Stat. §30-7-7.3(H)(5) ................................................................. 12

## Other Authorities

Brief for Plaintiffs-Appellees, *Rocky Mt. Gun Owners v. Polis*,
    No. 23-1251, 2024 WL 578692 (10th Cir. filed Feb. 7, 2024)...........................11

Kim Parker et al., Pew Rsch. Ctr., *America's Complex Relationship*
    *with Guns* (June 22, 2017), https://tinyurl.com/mry4nzyd............................... 24

Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure*
    (2d ed. 1995) ..................................................................................25

## INTRODUCTION

The Supreme Court has made crystal clear that state efforts to "broadly restrict arms use" without regard to individualized concerns defy this Nation's historical tradition of firearm regulation. *United States v. Rahimi*, 602 U.S. 680, 698 (2024). That is exactly what New Mexico House Bill 129 does. Indeed, requiring everyone who wants to purchase a firearm to "cool off" for a week before trusting them to keep and bear arms, even after they pass a background check, is the *ne plus ultra* of impermissibly "look[ing] with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way." *United States v. Daniels*, 101 F.4th 770, 778 (10th Cir. 2024). It is also yet another example of impermissibly treating the Second Amendment "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality). This Court should reverse and remand with instructions to enjoin enforcement of HB129 pending resolution of this litigation.

New Mexico's efforts to resist that result fail. The state begins by arguing that Plaintiffs' case stumbles at the threshold because the Second Amendment's text does not explicitly say "purchase" or "acquire" alongside "keep" and "bear." N.M.Br.18-22. That contention does not pass the straight-face test. If it really were the case that restrictions on acquiring the firearms people wish to keep and bear do not even *implicate* the Second Amendment, then the Amendment's days would be numbered,

as states could ban all firearm purchases with impunity. That presumably explains why the state ultimately abandons its absolutist position and admits that the Constitution protects the right to "acqui[re] firearms *as a general matter*." N.M.Br.26 (emphasis added). But that unavoidable admission ends all debate about whether HB129 implicates the Second Amendment. Under HB129, a first-time gun buyer cannot keep or bear a firearm at all for seven days. No reasonable person would understand that as anything other than a restriction on Second-Amendment-protected conduct, even if it lasts only a week rather than an eternity.

The state complains that if it must justify HB129 by reference to historical tradition, then "any law regulating commerce generally would be subject to *Bruen*'s historical review if it creates any delay on a person's ability to possess or use a firearm." N.M.Br.19. But *this* case does not involve a "law regulating commerce generally" that incidentally creates such a delay. HB129 applies only to firearms transactions, and its sole purpose is to cause delay. Whatever may be said for laws of general applicability, it should come as no surprise that a law that singles out firearms acquisitions for special restrictions implicates the constitutional amendment that specifically protects the right to keep and bear arms.

As a last-ditch effort to evade its historical-tradition burden, New Mexico contends that HB129 does not implicate the Second Amendment because (it says) the statute "impos[es] conditions and qualifications on the commercial sales of

arms." N.M.Br.2, 13, 28. But a condition or qualification is something a person can satisfy, and there is no way to satisfy HB129; as even the state admits, all people can do is wait. That is not a condition or qualification; it is a prohibition. And nothing in *Rocky Mountain Gun Owners v. Polis* ("*RMGO*"), 121 F.4th 96 (10th Cir. 2024), is to the contrary, as that case did not confront any argument about whether prohibitions qualify as conditions.

The burden to justify HB129 thus rests with the state. And once the burden shifts, this case is all but over. Indeed, the historical record is so clear that New Mexico could not prevail even if Plaintiffs bore the burden of proving that HB129 is *not* "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. New Mexico admits that no waiting period on firearm purchases came about until "the early twentieth century." N.M.Br.30. And it has no answer for the (more relevant) reality that the first law that forces people *who have already passed a background check* to "cool off" for a set time-period before they may take possession of a firearm was not enacted until the 1990s. New Mexico is thus left with strained analogies to odious and racist laws from our Nation's darkest days that look nothing like HB129. In short, HB129 is patently inconsistent with this Nation's historical tradition. It should be preliminarily enjoined.

## ARGUMENT

**I.    Plaintiffs' Second Amendment Claim Is Likely To Succeed.**

**A.    HB129 Regulates Conduct the Second Amendment Presumptively Covers.**

As this Court recently explained, the threshold inquiry in Second Amendment cases asks whether the challengers are "part of 'the people' whom the Second Amendment protects," "whether the item at issue is an 'arm,'" and whether the challengers' "proposed course of conduct falls within the Second Amendment." *RMGO*, 121 F.4th at 113-14.  If the answer to any of those questions is "no," then "the inquiry ends," and "the government may regulate … without infringing upon the Second Amendment." *Id.* at 114.  But if the answer to all three is "yes," then the government has "regulate[d] arms-bearing conduct," and it bears the burden to "'justify its regulation'" by showing that it "is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 691-92.

Here, the first two questions are not disputed, so the threshold inquiry turns on whether Plaintiffs' "proposed course of conduct falls within the Second Amendment." *RMGO*, 121 F.4th at 114.  It does.  Plaintiffs wish to keep and bear arms, and HB129 restricts their ability to do so.  "'Keep' means to 'have weapons,'" *id.* at 117 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)), and HB129 prevents law-abiding citizens from having a firearm for seven days.  N.M. Stat. §30-7-7.3(A).  Likewise, "'bear' means to 'wear, bear, or carry … upon the

person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person,'" *RMGO*, 121 F.4th at 117 (quoting *Heller*, 554 U.S. at 584), and HB129 prevents law-abiding citizens from being armed and ready for seven days.  HB129 thus plainly "regulates arms-bearing conduct."  *Rahimi*, 602 U.S. at 691.

New Mexico cannot resist that straightforward conclusion.  The state contends that Plaintiffs' claim fails at the threshold because the Second Amendment does not explicitly say "purchase" or "acquire" (or "have") alongside "keep" and "bear." N.M.Br.18-22.  That misses the point.  The conduct in which Plaintiffs seek to engage is keeping and bearing firearms, which HB129 indisputably prevents people from doing for seven days.  Indeed, that is the whole point of the law.  That it accomplishes that end by prohibiting the transfer of an arm rather than prohibiting its possession or carrying makes no difference, as the textual inquiry focuses on Plaintiffs' "proposed course of conduct," *RMGO*, 121 F.4th at 113-14, not the means by which the state has frustrated it.  By the state's logic, it could ban all firearm acquisitions with impunity; after all, if the "conduct at issue [is] outside the Second Amendment's protection, then the government may regulate [it] without infringing upon the Second Amendment."  *Id.* at 114.  That likely explains why *RMGO* notably declined to embrace the position New Mexico advances.  *See id.* at 118.  The Second

Amendment would be no right at all if laws preventing people from acquiring the arms they wish to keep and bear did not trigger any constitutional scrutiny.

The state ultimately admits that the Second Amendment must "protect the purchase or acquisition of firearms *as a general matter*," but it insists that Plaintiffs' claim still fails at the threshold because the Second Amendment's text does not explicitly confer a right to "the *immediate* acquisition of new firearms." N.M.Br.26 (first emphasis added). That argument is foreclosed by *Bruen*. The restriction in *Bruen* precluded citizens from carrying handguns in public. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 12 (2022). Yet the Court did not ask at the threshold whether the Amendment's text explicitly confers a right to carry handguns "in public." To the contrary, the Court found it sufficient at the threshold stage that "the Second Amendment's text" does *not* "draw[] a home/public distinction with respect to the right to keep and bear arms," *id.* at 32, meaning any effort to draw such a distinction would instead have to be grounded in historical tradition. Here, too, the text says nothing about how long people may be forced to wait to keep and bear arms, so any government effort to delay the exercise of that right must be assessed against historical tradition.

The state's contrary approach would leave the threshold inquiry covering virtually nothing, as nearly all laws restricting arms-bearing conduct save a blanket prohibition on keeping or bearing arms *at all* will regulate something more specific

6

than keeping and bearing arms simpliciter.  Indeed, that appears to be precisely what New Mexico envisions, as it insists that HB129 should escape constitutional scrutiny entirely because it is not "so burdensome as to amount to 'a de facto prohibition'" on keeping or carrying firearms.  N.M.Br.23 (quoting *McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024)); *see* N.M.Br.22-26.  While that is not even true for the week that HB129 prevents someone who has already passed a background check from taking possession of a firearm, it is also not a plausible reading of Supreme Court precedent. Not one word in *Heller*, *McDonald*, *Bruen*, or *Rahimi* even so much as hints that there is a secret sliding scale under which the degree of burden is relevant to the plaintiff's threshold showing, let alone suggests that laws do not implicate the Second Amendment unless they foreclose the exercise of the right entirely.

To be sure, "*how* [a law] burdens the Second Amendment right" certainly matters—at the historical-tradition stage.  *See Rahimi*, 602 U.S. at 698 (emphasis added); *Bruen*, 597 U.S. at 29.  But all that matters at the threshold stage is that the challenged law "regulates arms-bearing conduct."  *Rahimi*, 602 U.S. at 691. Whether people could "take possession of a firearm immediately upon deciding to purchase one" "in the 18th and 19th centuries," N.M.Br.27, is therefore beside the point.  That is an argument about whether HB129 is consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*,

597 U.S. at 18-19, not about whether it "regulates arms-bearing conduct," *Rahimi*, 602 U.S. at 691.

The state complains that defending laws regulating arms-bearing conduct might sometimes be onerous. But it should go without saying that a state cannot be excused from justifying its restrictions on constitutionally protected conduct just because doing so may take real time and effort. To paraphrase Justice Kavanaugh: "Deciding constitutional cases in a still-developing area of this Court's jurisprudence can sometimes be difficult. But that is not a permission slip" for a state (or a court) to eschew "constitutional analysis." *Id*. at 736 (Kavanaugh, J., concurring). The state posits that if this law implicates the Second Amendment, then "any law regulating commerce generally would be subject to *Bruen*'s historical review if it creates any delay on a person's ability to possess or use a firearm." N.M.Br.19. But HB129 is not a law "regulating commerce generally"; it applies only to the sale and transfer *of firearms*. *See* N.M. Stat. §30-7-7.3(A) (imposing "[a] waiting period of seven calendar days … for the sale of a firearm and the transfer of the firearm to the buyer"). And HB129 does not create delay incidentally; delaying the exercise of Second Amendment rights is its *raison d'être*. So whatever the rule may be for laws

8

that burden Second Amendment rights only incidentally, HB129 falls at the opposite end of the spectrum.[1]

In sum, the key question at the threshold here is whether the challengers' "proposed course of conduct falls within the Second Amendment." *RMGO*, 121 F.4th at 113-14.  Plaintiffs wish to keep and bear arms, and HB129 prevents them from doing so for (at least) seven days.  The notion that a law explicitly and exclusively designed to prevent people from keeping and bearing arms does not even *implicate* the Second Amendment is impossible to square with the Supreme Court's repeated admonitions that the Second Amendment is not "a second-class right." *McDonald*, 561 U.S. at 780 (plurality).

## B.    HB129 Is Not "Presumptively Lawful."

The state contends that it ultimately does not matter whether HB129 regulates arms-bearing conduct, because (it claims) HB129 is "a lawful condition and qualification on the sale of arms," which (it says) immunizes HB129 from historical-tradition scrutiny altogether.  N.M.Br.28.  That argument fails at every turn.

---

[1] That said, there is nothing anomalous about the prospect that a state might have to justify a law of general applicability to the extent it intrudes on a fundamental right.  Scores of generally applicable laws have been subjected to—and failed—heightened scrutiny as applied to protected speech. *See, e.g.*, *Riley v. Nat'l Fed'n of the Blind, Inc.*, 487 U.S. 781, 789 n.5 (1988); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 912-14 (1982).

1. First, HB129 is not a "law imposing conditions and qualifications on the commercial sales of arms." *Contra* N.M.Br.29; *cf. Bruen*, 597 U.S. at 30 (rejecting state's "attempt to characterize New York's proper-cause requirement as a 'sensitive-place' law").   As Plaintiffs explained in their opening brief, a "condition" or "qualification" is something that can be satisfied, like paying a licensing fee or undergoing a background check.   Opening.Br.42-44.   There is no way to satisfy HB129—all anyone can do is wait.

New Mexico does not meaningfully argue otherwise.   Instead, it insists that the ordinary meanings of the words condition and qualification "are not" "applicable in this context."   N.M.Br.29.   But judicial "opinions use[] … words in their ordinary sense."   *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 33 (2014).   And despite accusing Plaintiffs of "resorting to cherry-picked definitions of the words 'condition' and 'qualification,'" N.M.Br.29, the state notably offers no countervailing definitions.   That omission is telling.   When *Heller* mentioned "laws imposing conditions and qualifications on the commercial sale of arms," 554 U.S. at 626-27, it did not secretly mean something other than what it said.   And surely any uncertainty about the precise meaning of that dicta should be resolved in favor of protecting the fundamental right that *Heller* recognized, not insulating laws restricting its exercise from scrutiny.

The state has no answer for the mismatch between a law that just makes people wait to "cool off" and a law that actually imposes conditions or qualifications on the sale of arms.  Indeed, it all but admits the mismatch, conceding that the only way to "'satisfy' the waiting period's requirements" is to "wait the required amount of time."  N.M.Br.29.  The state's felt-need to use scare quotes for "satisfy" gives away the game.  One does not satisfy a condition by waiting; one simply waits.

The state seems to think that *RMGO* "already disposed of [this] argument."  N.M.Br.30.  But no one raised this argument in *RMGO*.  The argument pressed there was that a law prohibiting individuals under 21 years of age from purchasing firearms "is not a condition or qualification *of* '*sale*,'" but instead a condition of *purchase*, because it turns on the *buyer*'s characteristics.   Brief for Plaintiffs-Appellees 19-20, *Rocky Mountain Gun Owners v. Polis*, No. 23-1251, 2024 WL 578692 (10th Cir. filed Feb. 7, 2024) (emphasis added).  This Court rejected that argument, holding that "a presumption that laws imposing conditions and qualifications on the commercial *sale* of arms are lawful extends equally to laws imposing conditions and qualifications on the commercial *purchase* of arms."  *RMGO*, 121 F.4th at 120.  But the challengers in *RMGO* nowhere argued that an age restriction—let alone a government-imposed waiting period—is not a condition or qualification at all.  And an opinion cannot "dispose of" an argument it never

considered—especially when it begins by confirming that it is "follow[ing] the principle of party presentation." *Id.* at 113.[2]

As a fallback, the state makes the curious argument that because "obtaining a concealed carry permit … would exempt [individuals] from [HB129]," HB129 must be a "condition." N.M.Br.29-30. That makes no sense. A person does not *satisfy* HB129 by "obtaining a concealed carry permit"; as the state notes, a person with such a permit is *exempted* from HB129's cooling-off period. The statute is explicit about this: "The provisions of this section *do not apply* to the sale of a firearm … to a buyer who holds a valid New Mexico concealed handgun license." N.M. Stat. §30-7-7.3(H)(2) (emphasis added). The same provision goes on to state that HB129's waiting period "do[es] not apply" to sales "to a law enforcement agency" or "between immediate family members." *Id.* §30-7-7.3(H)(3), (5). No one would say that an individual can "satisfy" HB129 by buying a firearm from his father; they would say what the statute says: HB129 does not apply to that sale. In all events, the requirement to obtain a concealed-carry permit is self-evidently not a condition

---

[2] If anything, *RMGO* supports the conclusion that waiting periods are not conditions or qualifications. When discussing "conditions and qualifications for obtaining a 'shall-issue' concealed carry permit," the only things the Court identified—"undergoing fingerprinting, a background check, a mental health records check, passing a firearms safety course, and receiving training in firearms handling and laws regarding the use of force"—are all things people can satisfy. *RMGO*, 121 F.4th at 122. None is remotely analogous to a law that requires everyone to just wait.

"on the commercial sale of arms," which is the only sort of condition that matters for purposes of the presumptively-lawful issue. *Heller*, 554 U.S. at 626-27.

2. Even if HB129 were such a condition or qualification, it would not be a "presumptively lawful" one. For one thing, *RMGO* held that a law is "disqualif[ied] … from the presumption of lawfulness" if it "employ[s] 'abusive ends.'" 121 F.4th at 122; *see Bruen*, 597 U.S. at 38 n.9. And as *Rahimi* reiterated, there is a fundamental difference between laws that restrict the Second Amendment rights of "citizens who have been found to pose a credible threat to the physical safety of others," and laws that "broadly restrict arms use by the public generally." 602 U.S. at 698, 700. Laws that simply "look with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way," *Daniels*, 101 F.4th at 778, are therefore the very definition of laws put toward "abusive ends."

The minimum-age law in *RMGO* did not fit that bill because it is "aimed at ensuring guns are held by law-abiding, responsible persons." *RMGO*, 121 F.4th at 122. HB129, by contrast, has nothing to do with keeping firearms out of the hands of felons, or the mentally ill, or people too young to be entrusted with them. The law simply requires *everyone* to wait seven days to exercise their right to keep and bear arms, no matter their age or their reason for wanting a firearm. And HB129 cannot be justified as an effort to determine who is law-abiding and responsible, as it forces people to wait even *after* they pass a background check, while conversely

13

requiring no investigation beyond that check during the "cooling-off" period. The state has just arbitrarily decided that it cannot trust *anyone* to exercise Second Amendment rights without being given seven days to reconsider, on the apparent view that *everyone* who wants to do so may be harboring murderous or suicidal intentions. If that is not a law that "look[s] with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way," *Daniels*, 101 F.4th at 778, it is difficult to imagine what is.

It is no answer that a handful of people *do* need to cool off, or that a handful of other states have recently embraced New Mexico's approach. *See* N.M.Br.22-32. A vastly and intentionally overinclusive law is abusive *precisely because* it is vastly and intentionally overinclusive—and it remains so no matter how many states adopt it. *See, e.g.*, *McRorey*, 99 F.4th at 838 (noting that a vastly overinclusive "sensitive place" law would be "the quintessential example of putting a presumptively constitutional regulation 'toward abusive ends'"). The notion that such a law should escape constitutional scrutiny entirely is fundamentally incompatible with the notion of fundamental rights.

At any rate, any presumption of constitutionality that might attach to HB129 could be rebutted by showing that HB129 is *not* consistent with "our Nation's tradition of firearm regulation." *Rahimi*, 602 U.S. at 700. After all, all it means for a law to be "presumptively" constitutional is that the plaintiff, not the government,

14

bears the burden of proving it unconstitutional; it does not mean that the governing metric of constitutionality (here, historical tradition) evaporates. And nothing in *Heller*, *McDonald*, *Bruen*, or *Rahimi* remotely suggests that the Court meant to declare conditions and qualifications on the commercial sale of arms constitutional even when they are *not* consistent with historical tradition. To the contrary, *Bruen* refutes that argument, as the Court there examined which locations qualified as "sensitive places" as a *historical* matter, *see Bruen*, 597 U.S. at 30-31, notwithstanding *Heller*'s statement that "laws forbidding the carrying of firearms in sensitive places" are "presumptively lawful," 554 U.S. at 626-27 & n.26. At most, then, *Heller* simply shifts the burden on historical tradition to the plaintiff, and Plaintiffs have amply carried that burden here. *See infra* Part I.C.

3. In all events, New Mexico's argument that it need not prove certain restrictions on arms-bearing conduct constitutional cannot be squared with Supreme Court precedent. *Bruen* was crystal clear that when, as here, "'the regulated activity is *not* categorically unprotected,'" "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 597 U.S. at 18-19 (citation omitted). The idea that there is some third category of laws that regulate protected conduct but nonetheless need not be historically justified would blow a gaping hole in *Bruen*.

Plaintiffs recognize that *RMGO* "h[e]ld that laws imposing conditions and qualifications on the sale and purchase of arms do not implicate the plain text of the Second Amendment." 121 F.4th at 120. Plaintiffs respectfully submit that that holding is irreconcilable with Supreme Court precedent. If this Court were to reach the issue here, Plaintiffs would implore this Court to revisit that holding through rehearing en banc.

To be sure, *Heller* stated that certain "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful." 554 U.S. at 626-27 & n.26. But the Court could not have been clearer that that is true only if such laws are "longstanding." *Id.* at 626-27. Subsequent Supreme Court opinions said the same. *See, e.g.*, *McDonald*, 561 U.S. at 786 (plurality) ("We made it clear in *Heller* that our holding did not cast doubt on … longstanding regulatory measures …."); *Rahimi*, 602 U.S. at 735 (Kavanaugh, J., concurring) (reiterating that point). Far from absolving all "laws imposing conditions and qualifications on the commercial sale of arms" (and the various other laws it mentioned) from historical scrutiny, *Heller* merely presaged *Bruen* and *Rahimi* when it comes to history's critical role.

Indeed, this Court acknowledged in *RMGO* that "[i]t may be right that the Supreme Court expressly created a list of 'presumptively lawful regulatory measures' in *Heller* because they are 'longstanding' and thus necessarily part of our

16

Nation's history and tradition."  121 F.4th at 121 (citations omitted).  And the Court seemed to embrace that position in footnote 6, which "limited" the Court's "holding" to "laws imposing conditions and qualifications on the commercial sale of arms," and made clear that only "other *longstanding* laws or regulations may be deemed presumptively lawful under *Bruen* step two."  *Id.* at 120 n.6 (emphasis added). Nevertheless, *RMGO* ultimately rejected that understanding of *Heller*, due largely to "administrability concerns" borne from the misguided view that there is some delta between "'longstanding'" and "'consistent with the principles that underpin our' Nation's historical tradition of firearm regulation."  *Id.* at 121 (quoting *Rahimi*, 602 U.S. at 681).

In reality, the Court's initial observation was correct.  Saying that a restriction on arms-bearing conduct that has long been a part of our Nation's tradition is "presumptively lawful" is just another way of saying that it is exceedingly unlikely that a law that *is* part of our Nation's historical tradition nonetheless is inconsistent with the principles underlying that tradition.  That does not mean that longstanding restrictions "dilute[]" the state's burden at "step two."  *Contra id.*  It just means that the state will be able to carry its historical-tradition burden without much trouble. To the extent the Court considers *RMGO*'s contrary holding dispositive here, *RMGO* should be reconsidered.

17

**C.   HB129 Does Not Comport With This Nation's Historical Tradition of Firearm Regulation.**

Once the burden shifts, this case is effectively over.  Indeed, the historical record is so one-sided that Plaintiffs would prevail even if they bore the burden of proving that HB129 is *not* consistent with historical tradition.  The district court concluded otherwise only by engaging in a frolic and detour into patently irrelevant laws that not even the state was willing to label "analogues" to HB129.

1. *RMGO* made pellucid that "the principle of party presentation" limits a district court to "the historical record as compiled by the parties."  121 F.4th at 113.  But as New Mexico frankly acknowledges, the district court eschewed the historical theories New Mexico argued and upheld HB129 on an alternate theory it cobbled together based on independent research into Slave Codes and other racist laws from the colonial era.  Making matters worse, the court came to the state's aid even though *Bruen* assigns the state the burden to prove that HB129 "is consistent with the Nation's historical tradition of firearm regulation."  597 U.S. at 24.  The court's decision to violate party-presentation principles in service of absolving the state of that burden was a manifest "abuse of discretion."  *Wood v. Milyard*, 566 U.S. 463, 472-73 (2012).

New Mexico claims in a footnote that "most, if not all, of the[] historical laws" from which the district court concocted its theory appeared elsewhere in the record.  N.M.Br.11 n.7.  The state is mistaken.  The district court cited 12 historical laws.

18

*See* App.1108-15.  Not one appears in the state's district court briefing, or in the body of the expert report New Mexico cites in footnote 7.  Only two (a 1763 Pennsylvania law and an 1815 Illinois law) even appear in the expert report's lengthy appendix listing historical analogs purportedly supporting New Mexico's (inapposite) licensing-regime analogy.  *See* App.228-343.  And the only other law that even arguably was fair game is a 1784 Georgia law that the state never cited or discussed, but that was discussed in the now-vacated panel opinion in *United States v. Duarte*, 101 F.4th 657, 686 (9th Cir. 2024), which *Plaintiffs* cited below, *see* App.527.

In any event, whether the number is two or three, "three" historical examples do not "suffice to show a [historical] tradition" that can justify a modern restriction on arms-bearing conduct.  *Bruen*, 597 U.S. at 46.  The district court thus blew past party-presentation principles and upheld a state law on grounds the state did not proffer.  This Court can and should reverse for that reason alone.

2.  Even if this Court looks past the party-presentation problem, New Mexico cannot carry its burden.  New Mexico does not dispute that the first state law imposing an unadorned "cooling-off" period—under which people must wait a set period of time to acquire a firearm even after demonstrating that they are eligible to keep and bear arms—was not enacted until 1996.  *See* Opening.Br.11-12.  Nor does it deny that the (few) waiting period laws of the early twentieth century were designed "to give licensing authorities time to conduct background checks," which

took much longer before computers. N.M.Br.31. Instead, it claims that those differences do not matter because HB129 serves that purpose too, and that the early twentieth century is long-ago enough to establish a historical tradition. The state is doubly wrong.

HB129's proponents were explicit that its "primary purpose is to … prevent [] impulsive suicides and homicides," not to facilitate conducting a background check. App.1030 (citing legislative report). That is why the "cooling-off" period is not keyed to the time it takes to complete a background check. HB129 specifies expressly that "[t]he seven-calendar-day waiting period shall include the period required to conduct a federal instant background check." N.M. Stat. §30-7-7.3(A). Even if (as is typically the case) the background check comes back clean *instantly*, the purchaser still must wait seven days. New Mexico does not cite a single historical restriction that worked that way. That is because there are none; the first such law was enacted while President Clinton was in office. That dooms any analogy to 1920s waiting-period laws, as the Supreme Court has instructed that courts must examine *both* the "how" *and* the "[w]hy," *Rahimi*, 602 U.S. at 692, and the "why" of facilitating a background check is self-evidently different from the "why" of a "cooling-off" period—as HB129 recognizes by divorcing the two.

In all events, even if early-twentieth-century waiting-period laws could be considered relevantly similar, they come far too late "given the *Rahimi* Court's focus

on Founding-era sources" and "the *Bruen* Court's emphasis on Founding-and-Reconstruction-era sources." *Range v. Att'y Gen.*, --- F.4th ----, 2024 WL 5199447, at *6 (3d Cir. Dec. 23, 2024) (en banc).

3. With no historical tradition of "cooling-off"—or even waiting—periods to point to, the state reluctantly embraces the district court's theory that HB129 is relevantly similar to colonial laws restricting firearm sales to Native Americans and slaves. But it has no answer for the problems Plaintiffs raised with this analogy. For one, in the colonial era, Native Americans and slaves were not understood to have the right to keep and bear arms *at all*. *See United States v. Perez*, 6 F.4th 448, 462 (2d Cir. 2021) (Menashi, J., concurring in the judgment). Historical laws restricting firearm sales to people who did not have a right to buy them say nothing about how the Founding Era would have viewed restrictions on firearm sales to people who *did* have a right to buy them.

What is more, colonial race-based restrictions did not outlaw *all* firearm sales because some Native Americans might buy guns. They outlawed firearm sales only to Indians and slaves on the (odious) premise that all Indians and slaves were predisposed to violence. Stunningly, New Mexico depicts this racist reasoning as a feature, not a bug. Because these "historical group-based restrictions were also 'overinclusive' in the sense that they applied to large swaths of the population even though many" Indians and slaves "s[ought] to purchase firearms for lawful use,"

21

New Mexico claims it can restrict the Second Amendment rights of its entire population even though most New Mexicans seek to purchase firearms for lawful use.  N.M.Br.40-41.  There are many reasons to reject that argument, but the most straightforward is *Rahimi*, which did not equivocate:  "[O]ur Nation's tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not."  602 U.S. at 700.  Efforts to "broadly restrict arms use" without regard to individualized concerns defy that tradition.  *Id.* at 698.

4.  In the end, the most that can be said for the district court's reasoning is that it correctly declined to rely on New Mexico's proposed analogies for HB129:  historical intoxication laws and historical licensing regimes.  This Court should too.

The analogy to historical intoxication laws runs aground on the "how."  America's "tradition of firearm regulation" allows "the Second Amendment right" to "be burdened once a defendant has been found to pose a credible threat to the physical safety of others" (as for intoxicated individuals), but it does not countenance laws "broadly restrict[ing] arms use by the public generally."  *Id.* at 698, 700.  The state identifies no law that restricted everyone's ability to carry a gun on the theory that some might carry while drunk, and for good reason:  The Founders were manifestly unwilling to "assume that every … person with a firearm present[s] a potential danger regardless of whether they actually d[o]."  *Contra* N.M.Br.37.  By

22

embracing that assumption, the state flouts this Nation's historical tradition and ignores this Court's command that a state "cannot look with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way." *Daniels*, 101 F.4th at 778; *see also Range*, 2024 WL 5199447, at *6.

The analogy to licensing regimes runs aground on the "why." To be sure, it took time in the horse-and-buggy days to assess whether someone was law-abiding. But *that* was what the wait was for; "the officials of old" were looking into "each individual's specific characteristics." *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024). Under HB129, however, someone who has *already proven their law-abiding character* by passing a background check still must wait seven days based on the state's view that making everyone "cool off" before taking possession is in the public good. The state cannot identify any historical tradition whatsoever of intentionally delaying the exercise of Second Amendment rights—or any fundamental right, for that matter—for the express *purpose* of delaying their exercise. That suffices to doom any claim that HB129 is consistent with historical tradition no matter who bears the burden of proof on that question.

## II.    The Remaining Factors Support Injunctive Relief.

1. It is black-letter law that "the infringement of a constitutional right" justifies an injunction without any "further showing of irreparable injury." *RMGO*, 121 F.4th at 128. Because they are likely to succeed on the merits, this factor favors Plaintiffs.

New Mexico claims Plaintiffs disqualified themselves from seeking a preliminary injunction by waiting too long to sue. N.M.Br.42. Nonsense. Plaintiffs filed suit *on the day HB129 took effect*. To be sure, they could have tried to bring a pre-enforcement challenge during the two-and-a-half-month interregnum after the Governor signed HB129 but before it took effect. But the state identifies no support for its seeming view that a plaintiff cannot seek a preliminary injunction unless it brings a pre-enforcement challenge—because there is none. Plaintiffs waited until they indisputably had standing, but not a day longer. Far from undermining Plaintiffs' diligence, that underscores their sense of urgency.

New Mexico emphasizes that Plaintiffs already owned guns when HB129 took effect. But far from providing a reason to deny injunctive relief, *see Heller*, 554 U.S. at 629 ("It is no answer to say … that it is permissible to ban the possession of handguns so long as the possession of other firearms … is allowed."), that just highlights the illogic of the state's position. New Mexico claims HB129 is necessary to prevent impulsive violence, but Plaintiffs—like most firearm purchasers—are already gun-owners. *See* Kim Parker et al., Pew Rsch. Ctr., *America's Complex Relationship with Guns* 22 (June 22, 2017), https://tinyurl.com/mry4nzyd ("Most gun owners (66%) say they own more than one gun."). HB129 will do nothing to stop them from acting on any fleeting passions. Nor will it stop those with criminal intentions from acquiring a gun illegally. All HB129 does is delay law-abiding

citizens from exercising their constitutional rights—a delay that could prove deadly for domestic-violence victims and others facing imminent threats.

In all events, whether Plaintiffs already had firearms is of no moment to the irreparable-harm inquiry. "What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019). "Any deprivation of any constitutional right fits that bill," *id.*; just as it is impossible to put a dollar-amount on an incursion of a person's First (or Third) Amendment freedoms, it is impossible to put a price on an incursion of the constitutional right to keep and bear arms.

2. Turning to the public-interest factors, New Mexico again points to Plaintiffs' decision to sue on the day HB129 took effect rather than the day before, arguing that Plaintiffs face "a higher burden of proof" because "the challenged waiting period was the law of the land when" they requested a preliminary injunction. N.M.Br.14. But "'[s]tatus quo' does not mean the situation existing at the moment the law suit is filed, but the 'last peaceable uncontested status existing between the parties before the dispute developed.'" *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (McConnell, J., concurring) (quoting 11A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* §2948 (2d ed. 1995)). The status quo ante here is the world before HB129. By seeking to load the dice against Plaintiffs' effort "to *restore* the status

quo ante," the state stands "traditional principle[s] of equity practice" on their head. *Id.* at 1013 & n.2. In any event, whatever burden Plaintiffs face, they plainly clear it given New Mexico's (wise) admission that states lack any "interest in enforcing a law that is likely constitutionally infirm." N.M.Br.44.

The bottom-line does not change just because some purchasers may possess fleeting violent thoughts that could subside if a week passed. This case is not about whether suicide and impulsive gun violence are pressing public-policy problems. They plainly are. Nor is this case about whether states have "a variety of tools for combating th[ose] problem[s]." *Heller*, 554 U.S. at 636. They plainly do. This case is about whether the Founders would have countenanced the state's judgment that the risk that a gun buyer who satisfied a background check might nonetheless be inflamed by fleeting violent passions justifies delaying all citizens' ability to acquire a firearm. They plainly would not have. *See Rocky Mt. Gun Owners v. Polis*, 701 F.Supp.3d 1121, 1142 (D. Colo. 2023) (observing that cooling-off period laws are "modern regulation[s] that w[ere] unimaginable at the founding").

Reasonable minds may disagree about whether the right to acquire a gun as soon as one passes a background check "is *really worth* insisting upon" given the problem of suicide and impulsive gun violence. *Heller*, 554 U.S. at 634. But New Mexico does not write upon a blank slate: "The Second Amendment 'is the very product of an interest balancing'" that "'surely elevates above all other interests the

right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 597 U.S. at 26 (emphasis omitted) (quoting *Heller*, 554 U.S. at 635).  The Court should instruct the district court to enjoin HB129 as applied to individuals who have passed the background check required under federal law.[3]

## CONCLUSION

The Court should reverse.

Respectfully submitted,

*s/*Erin E. Murphy

| | |
|---|---|
| MICHAEL D. MCCOY | PAUL D. CLEMENT |
| ROBERT A. WELSH | ERIN E. MURPHY |
| MOUNTAIN STATES LEGAL | *Counsel of Record* |
| FOUNDATION | MATTHEW D. ROWEN |
| 2596 South Lewis Way | KEVIN WYNOSKY |
| Lakewood, CO 80227 | CLEMENT & MURPHY, PLLC |
| | 706 Duke Street |
| | Alexandria, VA 22314 |
| JOSEPH G.S. GREENLEE | (202) 742-8900 |
| ERIN M. ERHARDT | |
| NATIONAL RIFLE | CARTER B. HARRISON IV |
| ASSOCIATION OF AMERICA | HARRISON & HART |
| 11250 Waples Mill Road | 924 Park Avenue SW, Suite E |
| Fairfax, VA 22030 | Albuquerque, NM 87102 |

*Counsel for Plaintiffs-Appellants*

---

[3] For clarity, Plaintiffs do not seek to enjoin HB129 as applied to buyers who have *not* passed a background check. *Cf. Doe #6 v. Miami-Dade Cnty.*, 974 F.3d 1333, 1338 (11th Cir. 2020) ("a plaintiff asserting a facial challenge does not need to amend her complaint to bring an as-applied challenge," because seeking as-applied relief is "not stating a new claim, [but] only clarifying the scope of [the] desired remedy").

27

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,499 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(B).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

January 9, 2025

*s/*Erin. E. Murphy
Erin E. Murphy

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

a.      all required privacy redactions have been made;

b.      the hard copies submitted to the clerk are exact copies of the ECF submission;

c.      The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Windows Security, and according to the program is free of viruses.

January 9, 2025

*s/*Erin. E. Murphy
Erin E. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/*Erin. E. Murphy
Erin E. Murphy