# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

SAMUEL ORTEGA, and
REBECCA SCOTT,

    **Plaintiffs/Appellants,**

v.

MICHELLE LUJAN GRISHAM, in
her official capacity as Governor of
the State of New Mexico, and RAÚL
TORREZ, in his official capacity as
Attorney General of the State of New
Mexico,

    **Defendants/Appellees.**

Case No. 24-2121

---

Appeal from the Honorable James O. Browning of the
United States District Court for the District of New Mexico
No. 1:24-cv-00471-JB-SCY

## DEFENDANTS/APPELLEES' PETITION FOR REHEARING EN BANC

HOLLY AGAJANIAN
*Chief General Counsel*
KYLE P. DUFFY
*Deputy General Counsel*
Office of Governor Michelle Lujan Grisham
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2200

ALETHEIA ALLEN
*Solicitor General*
VAN SNOW
*Deputy Solicitor General*
CHRISTA STREET
*Assistant Solicitor General*
New Mexico Department of
Justice
408 Galisteo Street, Villagra
Building
Santa Fe, NM 87501
(505) 490-4060

-September 2, 2025-

**<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES .................................................................ii-iii

INTRODUCTION AND RULE 40(b) STATEMENT..............................................1

BACKGROUND ...........................................................................3

    I.    New Mexico's waiting period .........................................................3

    II.   The instant lawsuit .................................................................4

REASONS FOR GRANTING REHEARING EN BANC ........................................7

    I.    The majority's decision conflicts with *RMGO*............................................7

        A.    The waiting period is presumptively lawful under *RMGO* ....................9

        B.    The waiting period does not serve "abusive ends" under *RMGO* ........11

    II.   The majority's decision conflicts with Supreme Court precedent.............13

    III.  The majority's decision conflicts with authoritative decisions from sister circuit ...................................................................15

    IV.  This case involves questions of exceptional importance..........................16

CONCLUSION ...........................................................................17

CERTIFICATE OF COMPLIANCE.........................................................19

CERTIFICATE REGARDING DIGITAL SUBMISSION AND PRIVACY REDACTIONS ...........................................................................19

CERTIFICATE OF SERVICE .............................................................19

# TABLE OF AUTHORITIES

## CASE LAW

### U.S. Supreme Court Cases

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)............................................................................ 1, 4, 13

*Hutto v. Davis*,
    454 U.S. 370 (1982)......................................................................................11

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022)............................................... 1-2, 5, 8, 12-14, 16-17

*United States v. Rahimi*,
    144 S. Ct. 1889 (2024).......................................................................... 14-15

### U.S. Courts of Appeals Cases

*B & L Productions, Inc. v. Newsom*,
    104 F.4th 108 (9th Cir. 2024).....................................................................15

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
    108 F.4th 194 (3d Cir. 2024) .....................................................................16

*McRorey v. Garland*,
    99 F.4th 831 (5th Cir. 2024) ......................................................................15

*Nat'l Ass'n for Gun Rights v. Lamont*,
    --- F.4th ---, 2025 WL 2423599 (2d Cir. Aug. 22, 2025).............................16

*Rocky Mountain Gun Owners v. Polis*,
    121 F.4th 96 (10th Cir. 2024) .....................................................1-2, 4-12, 16

*United States v. Baker*,
    49 F.4th 1348 (10th Cir. 2022)................................................................2, 11

*United States v. Duarte*,
    137 F.4th 743 (9th Cir. 2025) (en banc).....................................................16

*United States v. Harrison*,
    --- F.4th ---, 2025 WL 2452293 (10th Cir. Aug. 26, 2025).....................15-16

*United States v. Jackson*,
    110 F.4th 1120 (8th Cir. 2024) .......................................................16

*United States v. Vereen*,
    --- F.4th ---, 2025 WL 2394444 (2d Cir. Aug. 19, 2025).............................15

## STATUTES AND RULES

N.M. Stat. Ann. § 30-7-7.3 (2024).......................................................... 3-4

Fed. R. App. P. 40 ............................................................................... 1, 7

## INTRODUCTION AND RULE 40(b) STATEMENT

The Supreme Court has repeatedly affirmed that the Second Amendment is "not unlimited" and that certain gun regulations are "presumptively lawful," including "laws imposing conditions and qualifications on the commercial sale of arms." *D.C. v. Heller*, 554 U.S. 570, 626-627 n.26 (2008); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 81 (2022) (Kavanaugh, J., concurring). Less than a year ago, this Court addressed this category of laws for the first time post-*Bruen* and held that a Colorado law requiring virtually all 18-to-20-year-olds to wait *years* to purchase a firearm was a presumptively lawful commercial regulation and did not employ abusive ends. *See Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024) (*RMGO*). Yet a divided panel here found that a law requiring a mere *seven-day* wait only on certain groups, like those who have not gone through the state's shall-issue licensing process, is not such a regulation and violates the Second Amendment.

This case meets every criterion for rehearing en banc under Fed. R. App. P. 40(b)(2). First and foremost, the majority's "sidestep[p]ing" of *RMGO*, Dissent at 5, disrupts the uniformity of the Court's decisions on questions of life-and-death importance. As the dissent points out, New Mexico's waiting period is "similar in all material respects" to the Colorado law in *RMGO*—if not less burdensome. Dissent at 6. Both laws apply to (and exclude) the same kinds of sales. And both

effectively require a subset of the population to wait a certain amount of time before completing the purchase of a firearm to help ensure they are law-abiding, responsible citizens. Yet only New Mexico's less burdensome law is unconstitutional.

The majority never provided a valid basis for this conclusion. The majority asserted that *RMGO* did not foreclose its holding because it failed to grapple with the arguments that the majority found persuasive. This is incorrect. The *RMGO* Court *was* confronted with the same arguments, and it expressly or necessarily rejected them. Regardless, "*RMGO*'s holding 'is the law of this Circuit *regardless of what might have happened had other arguments been made to the panel that decided the issue first.*'" Dissent at 8 (quoting *United States v. Baker*, 49 F.4th 1348, 1358 (10th Cir. 2022) (Holmes, J.)). Unless this Circuit is prepared to abandon such a foundational principle and allow this precedent "sidestep," Dissent at 5, whenever a panel is persuaded by an argument the prior panel may or may not have considered, it must act now.

In addition to effectively overruling *RMGO*, the majority's decision contradicts the Supreme Court's clear directions by preventing states from enacting life-saving measures that are less restrictive than many shall-issue licensing regimes and treating history as a "regulatory straightjacket." *Bruen*, 597 U.S. at 30. The majority also parts ways with the authoritative decisions of sister circuits in several important respects. Lastly, this case involves questions of exceptional importance

involving the Second Amendment and presumptively lawful commercial regulations. Courts and governments in this circuit will continue to struggle with these issues until this Court provides uniform answers en banc. Defendants urge this Court to do so now.

## BACKGROUND

### I.     New Mexico's waiting period

To help stem a surge of gun violence, New Mexico recently enacted a seven-day waiting period on the sale of firearms. N.M. Stat. Ann. § 30-7-7.3 (2024). The waiting period (1) helps prevent impulsive firearm homicides and suicides and (2) narrows a loophole in which purchasers can receive a firearm without completing a federal background check if the results do not come back within three business days. Op. at 4-5. The law generally prohibits "sellers" from transferring firearms to "buyers" without waiting seven days. Section 30-7-7.3(C). In enacting the law, New Mexico joined nearly a dozen other states and the District of Columbia that impose waiting periods ranging from three to thirty days. Dissent at 11.

Importantly, New Mexico's waiting period does not apply to everyone. Those who have obtained a concealed carry license are exempt. Section 30-7-7.3(H)(2). Likewise, law enforcement agencies are also exempt. Section 30-7-7.3(H)(3)-(4). So too are those who have a federal firearms license. Section 30-7-7.3(H)(1). Additionally, sales between immediate family members and law enforcement

officers are not subject to the waiting period. Section 30-7-7.3(H)(5). And gifts, by definition, are exempt. *See* § 30-7-7.3 (regulating only "buyers" and "sellers").

## II.    The instant lawsuit

Plaintiffs—two individuals who own multiple guns—deliberately waited to purchase firearms from commercial establishments and sued the day the waiting period went into effect, claiming it violated the Second Amendment and requesting that it be preliminarily enjoined. Op. at 5-6. The district court denied Plaintiffs' request in a thorough opinion. Aplt. App. Vol. V at 1024-1121. Plaintiffs appealed, and divided panel reversed. After first concluding that the Second Amendment's plain text covers the right to "purchase" arms, the majority analyzed whether the waiting period qualified as a presumptively constitutional "law[] imposing conditions and qualifications on the commercial sale of arms." Op. at 16 (quoting *Heller*, 554 U.S. at 626-27 n.36). The majority acknowledged that this Court recently held that a Colorado law setting twenty-one as the minimum age to purchase a firearm qualified as such a law in *RMGO*, 121 F.4th 96. Op. at 17. Nonetheless, the majority reasoned that the waiting period did not qualify as a commercial regulation because it is "not tailored to commercial sales" and "does not fit with other known conditions and qualifications in this category." *Id.* at 18.

Specifically, the majority faulted the law for applying to some "non-commercial sales" and not applying to some "commercial sales" like those between

federal firearms licensees. *Id.* at 18-19. It also concluded the waiting period did not impose a "condition because it cannot be met by any action, and it is not a qualification because it is universally applicable." *Id.* at 20. The majority believed its holding was consistent with *RMGO* because the Court there "did not grapple with the full scope of arguments defining conditions and qualifications that [the Court] face[s] here, and declined to reach the issues that are most pertinent in this case." Op. at 22.

Even if the waiting period was a presumptively lawful commercial regulation, the majority noted, Plaintiffs would have overcome the presumption because "waiting periods are neither longstanding nor widespread practices, and diverge from history and tradition [under *Bruen*'s second step]." Op. at 23. The majority would have also found that the presumption was overcome because "[a] supposed condition or qualification that applies as broadly as this one, put toward an end that is justified only by assuming that citizens cannot be trusted with their own rights, is put toward an abusive end." *Id.* at 23 n.7.

The majority then turned to *Bruen*'s second step. In search of a "ringer," Op. at 24, the majority rejected the three categories of historical analogues presented by Defendants: intoxication laws, license regimes, and group-based restrictions. While the majority recognized that intoxication laws burdened Second Amendment rights in a "similar" manner, it rejected the analogy because intoxication laws "place[d] an

individualized burden on intoxicated individuals" whereas the waiting period "applies a blanket burden across all of society." *Id.* at 29. The majority similarly rejected the analogy to licensing regimes because waiting periods "assum[e] that all people are dangerous if they desire to exercise their rights unless special circumstances apply." *Id.* Lastly, the majority rejected historical restrictions on disfavored groups such as Native Americans, non-loyalists, and Catholics because those laws were motivated by discriminatory bias and would be otherwise unconstitutional under modern jurisprudence. *Id.*

Finally, the majority turned to the non-merits factors. It summarily rejected the unchallenged evidence demonstrating the waiting period's life-saving impact given Plaintiffs' likelihood of success, stating that the constitutional injury necessarily "overbears that burden." *Id.* at 35. Accordingly, the majority reversed the district court's denial of a preliminary injunction. *Id.* at 35-38.

Judge Matheson dissented. In his view, *RMGO* should have constrained the panel to uphold the district court's denial of a preliminary injunction. Dissent at 1. He would have held that the waiting period is a presumptively lawful condition or qualification on the commercial sale of arms like the sales restriction in *RMGO* because it "regulates only the 'selling and purchasing [of] firearms.'" Dissent at 5 (quoting *RMGO*, 121 F.4th at 120). He found the majority's arguments to the contrary unpersuasive and "effectively sidestep[ping]" *RMGO*. Dissent at 5-6. He

would have further held that Plaintiffs could not overcome the waiting period's presumptive constitutionality because it shares many characteristics with the minimum age law in *RMGO*. Dissent at 10-12.

## REASONS FOR REHEARING EN BANC

This case meets every criterion for rehearing en banc under Rule 40(b)(2). It "sidesteps" binding Tenth Circuit precedent. It runs contrary to the Supreme Court's clear directions. It departs from numerous authoritative decisions from sister circuits. And it involves questions of exceptional importance. This Court should not hesitate to grant rehearing en banc.

## I. The majority's decision conflicts with *RMGO*

In *RMGO*, this Court held that a Colorado law raising the minimum age to purchase a firearm from 18 to 21 was a presumptively lawful "aged-based condition or qualification on the sale of arms" that does not implicate the Second Amendment's plain text. 121 F.4th at 119, 127-28; *id.* at 142 (McHugh, J., concurring). Notably, the law applied to *all* "sales" of firearms—not just those at businesses. *Id.* at 100-05. And the law prohibited sales to *all* individuals under 21, with only limited exceptions for active-duty members of the military, on-duty peace officers, and those certified by a peace officer training board. *Id.*

The plaintiffs argued that the law was not a commercial regulation because it "prohibit[ed] non-commercial as well as commercial sales." Brief of Plaintiffs-

Appellees at 19, *RMGO*, 121 F.4th 96. They also argued that the law did not impose a true "condition" or "qualification" because young adults could not "jump through any hoop" but could only wait. *See id.* at 19-20; Oral Argument at 18:30-20:20, *RMGO*, 121 F.4th 96; *see also* Oral Argument at 29:45-30:00, No. 24-2121 (highlighting this). Nor was it like shall-issue licensing regimes "because it sweeps into its ambit law-abiding and non-law-abiding 18-to-20-year-olds alike." Brief of Plaintiffs-Appellees at 20, *RMGO*, 121 F.4th 96. The Court considered and rejected these arguments, concluding that the restriction was a presumptively constitutional law imposing conditions and qualifications on the commercial sale of arms because it regulated "sellers and purchasers." *Id.* at 119-20, 127-28; *id.* at 142 (McHugh, J., concurring) (agreeing on this point).

*RMGO* also held that the plaintiffs could not overcome the presumption of constitutionality by showing that it was put to "abusive ends." *Id.* at 122 (citing *Bruen*, 597 U.S. at 38 n.9). The Court concluded that the law was not abusive because it imposed a nondiscretionary condition or qualification on the commercial sale of arms aimed at ensuring that guns are used by law-abiding, responsible persons. *Id.* at 122-23. In so holding, the Court noted that many other jurisdictions have similar minimum age laws, and that the evidence showed that the law will reduce gun violence. *Id.* at 126-27. Thus, the Court upheld the law under *Bruen*'s first step. *RMGO*, 121 F.4th at 128.

## A.     The waiting period is presumptively lawful under *RMGO*

*RMGO* held that a law is a presumptively lawful commercial regulation if it regulates "sellers and purchasers," even if it simply requires purchasers to wait. 121 F.4th at 119-20. That is precisely what the waiting period does. It follows that the majority was obligated to reach the same conclusion as *RMGO*. The majority does not provide a workable framework for concluding otherwise.

The majority first criticized the waiting period for "not [being] tailored to commercial sales" because it is "imposed on many non-commercial transfers, while many commercial transfers are excluded." Op. at 18. But, as Judge Matheson pointed out, the same could be said—and *was* said—of the minimum age law in *RMGO*. Dissent at 6-7. Both laws apply to private sales, and both laws exclude federally licensed firearm dealers and law enforcement. So, how is one presumptively constitutional and the other not? The majority does not say.

The majority also asserted the waiting period "is not a condition because it cannot be met by any action, and it is not a qualification because it is universally applicable." Op. at 20. According to the majority, the waiting period is "just an artificial delay on possession," which does not satisfy its definition of "condition," and requiring people to simply wait does not "qualify" them to use a firearm like a shall issue licensing regime does. *Id.* But again, as Judge Matheson pointed out, the same could be said—and *was* said—of the law in *RMGO*, which made virtually all

18-to-20-year-olds wait *years* to purchase a firearm. Dissent at 7. While the waiting period applies to people over the age of 21, it is significantly narrower in that it only imposes a seven-day wait and allows *anyone* (over 21) to get an exemption by obtaining a concealed carry license. How is a law that imposes a years' long wait on virtually all 18-to-20-year-olds "presumptively lawful," but a law that imposes a mere one-week wait on those who have not availed themselves of the shall-issue licensing process not? Again, the majority does not say.[1]

The majority's attempt to distinguish *RMGO* is factually and legally flawed. The majority said its holding was not foreclosed by *RMGO* because it supposedly "did not grapple with the full scope of arguments defining conditions and qualifications that [the Court] face[d] here, and declined to reach the issues that are most pertinent in this case." Op. at 22. But the Court *was* confronted with the same arguments in *RMGO*, and it "reached" (i.e., rejected) them when it concluded the law was presumptively constitutional. 121 F.4th at 119-21, 28. In any event, as Judge Matheson pointed out: "*RMGO*'s holding 'is the law of this Circuit *regardless of what might have happened had other arguments been made to the panel that decided*

---

[1] The majority also failed to address Defendants' argument that the waiting period satisfies even the more restrictive definition of "condition" or "qualification" since it allows individuals to exempt themselves by obtaining a concealed carry permit. Defendants/Appellees' Corrected Answer Brief ("Answer Brief") at 29-30. In other words, individuals *can* satisfy a "condition" that shows they are "qualified" to receive a newly purchased firearm immediately.

*the issue first.*'" Dissent at 8 (quoting *Baker*, 49 F.4th at 1358); *cf. Hutto v. Davis*, 454 U.S. 370, 375 (1982) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be."). Respectfully, the majority did not heed this fundamental principle.

At bottom, the majority's "sidestep" of *RMGO* all but overrules it. According to the majority's logic, neither the waiting period nor the Colorado law is presumptively lawful because neither is tailored to "commercial sales" and neither imposes a true "condition" or "qualification." District courts and future panels of this Court will be forced to follow one binding precedent or the other when addressing Second Amendment challenges to commercial regulations, leaving them in an impossible position. This Court must grant rehearing en banc to maintain uniformity of its decisions.

## B.    The waiting period does not serve "abusive ends" under *RMGO*

The majority's decision also creates an unworkable conflict with *RMGO*'s "abusive ends" analysis. The waiting period does not serve abusive ends under *RMGO* because: (1) it "sets a narrow, objective, and definite standard that applies uniformly to all potential sellers and buyers"; (2) it is "aimed at ensuring guns are held by law-abiding, responsible persons," as demonstrated by *unchallenged* evidence demonstrating it will significantly reduce gun violence; and (3) a large

number of jurisdictions have adopted similar laws. Dissent at 10-11 (quoting *RMGO*, 121 F.4th at 122-23). Respectfully, the majority fails to justify its conclusion to the contrary.

The majority stated that Plaintiffs would have overcome any presumptive constitutionality because "waiting periods are neither longstanding nor widespread practices, and diverge from history and tradition." Op. at 23. But as Judge Matheson pointed out, *RMGO* "squarely held that under *Bruen* step one, conditions and qualifications on commercial sale do not implicate the Second Amendment's plain text, obviating any need to show that such a law has a historical analogue under *Bruen* step two." Dissent at 10 n.8 (citing *RMGO*, 121 F.4th at 121, 127-28). *RMGO* "also held that a condition or qualification need not be 'longstanding' to be presumptively lawful." Dissent at 10 n.8 (citing 121 F.4th at 120-21). To the extent the majority suggested otherwise, its holding is plainly at odds with *RMGO*.

The majority also asserted Plaintiffs could overcome any presumptive constitutionality simply because the waiting period has a broad application and is purportedly "justified only by assuming that citizens cannot be trusted with their own rights." Op. at 23 n.7. But as Judge Matheson again pointed out, the same could be said—and *was* said—of the law at issue in *RMGO*, which applied without regard to individual characteristics. Dissent at 12 n.9. And while the waiting period may apply to more people, it only imposes a seven-day wait, and it broadly exempts

anyone with a concealed carry permit. So how is it that only the less restrictive law is "abusive"? There is no principled answer; the Court must grant rehearing en banc to provide one.

## II. The majority's decision conflicts with Supreme Court precedent

The majority's decision also contradicts the Supreme Court's clear guidance—which emphasizes that the Second Amendment is not "unlimited" and allows for a "variety" of regulations. *Heller*, 554 U.S. at 626, 36. For example, the majority concluded that a law employs "abusive ends" simply because it has a broad application that allegedly "assumes that citizens cannot be trusted with their own rights." Op. at 23 n.7. However, Judge Matheson noted this conflicts with the Supreme Court's direction that shall-issue licensing regimes are generally permissible. Dissent at 12 n.9 (citing *Bruen*, 597 U.S. at 39 n.9). After all, those regimes could equally be said to "assume[] that citizens cannot be trusted with their own rights" since they can broadly require *everyone* seeking to purchase a firearm to satisfy certain conditions. The waiting period is no different: it simply requires most people who have not gone through the state's shall-issue licensing process to wait seven days when they purchase a new firearm.

Plaintiffs tried to distinguish waiting periods from shall-issue regimes on the basis that the former is not designed to ensure that purchasers are law-abiding and responsible since they apply to those who have already passed a background check.

13

Corrected Brief for Appellants at 37. But Defendants pointed out the substantial evidence demonstrating that waiting periods help ensure that those purchasing a firearm will not misuse it in ways a background check cannot. Answer Brief at 38-39. Indeed, Defendants highlighted, New Mexico's law is significantly less burdensome than the shall-issue licensing regimes that the Supreme Court tacitly approved. *Id.* at 25. If a state can *indefinitely* bar someone from purchasing a firearm until they go through a shall-issue license process, why would it be prohibited from allowing individuals to bypass this process in return for waiting a few days to help ensure they do not impulsively misuse the weapon? *Id.* at 26. The majority never addressed this point, and its holding effectively prevents states from enacting less restrictive alternatives to the shall-issue regimes approved by the Supreme Court.

Additionally, the majority required a literal "ringer" to uphold the waiting period under *Bruen*'s second step, Op. at 24, contrary to *Rahimi*'s clear direction. *See United States v. Rahimi*, 602 U.S. 680, 692 (2024) (stating that the law "need not be a 'dead ringer' or a 'historical twin.'"); *see also id.* at 739 (Barrett, J., concurring) (explaining that "imposing a test that demands overly specific analogues has serious problems"). This is not mere semantics, as demonstrated by the majority's critical treatment of Defendants' historical analogues. The majority required that the analogues share a near identical "how" and "why" to the waiting

period;[2] in contrast, the Supreme Court upheld a modern law that differed quite dramatically from its historical analogues in both these respects. *Compare* Op. at 23-36, *with Rahimi*, 602 U.S. at 693-700; *see United States v. Harrison*, --- F.4th ---, 2025 WL 2452293, at **22 (10th Cir. Aug. 26, 2025) (explaining *Rahimi*'s relaxed analogical reasoning). Respectfully, the majority's analysis creates the very "law trapped in amber" the Supreme Court cautioned against. *Rahimi*, 602 U.S. at 691. The Court must grant rehearing en banc to correct this.

## III. The majority's decision conflicts with authoritative decisions from sister circuits

In addition to breaking with binding precedent, the majority's decision is at odds with decisions from other circuits in several respects. For example, several circuits have held that only "meaningful constraints" or "de facto prohibitions" on the purchase of arms implicate the Second Amendment's plain text. *See United States v. Vereen*, --- F.4th ---, 2025 WL 2394444, at *4 (2d Cir. Aug. 19, 2025); *B&L Productions, Inc. v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024); *McRorey v. Garland*, 99 F.4th 831, 839 n.18 (5th Cir. 2024). But the majority expressly rejected this approach. Op. at 11-16.

---

[2] The majority also mischaracterized the waiting period's application by saying that it "burdens an entire population" rather than "narrower subsets," Op. at 35-36, leaving them "slaying a straw man." *Rahimi*, 602 U.S. at 701; *see* Dissent at 11.

Likewise, several circuits have held that (admittedly odious) historical group-based restrictions can be used to support a modern, otherwise constitutional law under *Bruen*'s second step. *See, e.g.*, *United States v. Duarte*, 137 F.4th 743, 759-61 (9th Cir. 2025) (en banc); *United States v. Jackson*, 110 F.4th 1120, 1126-29 (8th Cir. 2024). But the majority concluded that these laws can *never* be relied upon. Op. at 32-34.[3]

Other circuits have also held that proving a likelihood of success on a Second Amendment challenge does not automatically entitle a challenger to a preliminary injunction. *See, e.g.*, *Nat'l Ass'n for Gun Rights v. Lamont*, --- F.4th ---, 2025 WL 2423599, at **23-24 (2d Cir. Aug. 22, 2025); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202-06 (3d Cir. 2024). The majority disagreed. Op. at 35 n.13. This Court should address these questions en banc to ensure that this circuit does not unnecessarily depart from the law of other circuits.

## IV. This case involves questions of exceptional importance

Lastly, the questions in this case (and *RMGO*) are exceptionally important. Does the Second Amendment's plain text extend to "purchasing" firearms? What laws qualify as presumptively lawful commercial regulations? How can a challenger

---

[3] Indeed, another panel of this Court just came to the opposite conclusion on this very issue—further justifying en banc review. *See Harrison*, 2025 WL 2452293, at **15-23.

rebut this presumption? How should courts perform *Bruen*'s second step following *Rahimi*? Does proving a likelihood of success on a Second Amendment challenge always entitle the challenger to a preliminary injunction? Courts across the country and within this circuit are struggling with these issues—leaving governments in the dark about what firearm regulations are permissible. This Court should provide uniform and definitive answers now.

## CONCLUSION

For the foregoing reasons, this Court should grant rehearing en banc.

Respectfully submitted,


*/s/ Holly Agajanian*
**HOLLY AGAJANIAN**
*Chief General Counsel*
**KYLE P. DUFFY**
*Deputy General Counsel*
Office of Governor Lujan Grisham
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2200
holly.agajanian@exec.nm.gov
kyle.duffy@exec.nm.gov

*Counsel for Governor Michelle Lujan Grisham*

**ALETHEIA ALLEN**
*Solicitor General*
**VAN SNOW**
*Deputy Solicitor General*
**CHRISTA STREET**
*Assistant Solicitor General*
New Mexico Department of Justice
408 Galisteo Street, Villagra Building
Santa Fe, NM 87501
(505) 490-4060
AAllen@nmdoj.gov
VSnow@nmdoj.gov
CStreet@nmdoj.gov

*Counsel for Attorney General Raúl Torrez*

# CERTIFICATE OF COMPLIANCE

1.   This filing complies with the word limitation of Fed. R. App. P. 40(d)(3) because it contains 3,898 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.   This filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Times New Roman type.

*/s/ Holly Agajanian*
Holly Agajanian


# CERTIFICATE REGARDING DIGITAL SUBMISSION
# AND PRIVACY REDACTIONS

1.   All required privacy redactions have been made to this document and, with the exception of those redactions, this document and any other document(s) submitted in Digital Form or scanned PDF format are an exact copy of any written document(s) required to be filed with the Clerk.

2.   The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program and, according to the program, are free of viruses.

*/s/ Holly Agajanian*
Holly Agajanian


# CERTIFICATE OF SERVICE

I certify that on September 2, 2025, I filed the foregoing electronically through the CM/ECF system, which caused all parties or counsel of record in this matter to be served by electronic means.

*/s/ Holly Agajanian*
Holly Agajanian

FILED
United States Court of Appeals
Tenth Circuit

**PUBLISH**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

**August 19, 2025**

Christopher M. Wolpert
Clerk of Court

_____

SAMUEL ORTEGA; REBECCA SCOTT,

    Plaintiffs - Appellants,

v.

MICHELLE LUJAN GRISHAM, in her
official capacity as Governor of the State of
New Mexico; RAUL TORREZ, in his
official capacity as Attorney General of the
State of New Mexico,

    Defendants - Appellees.

-------------------------------

BRADY CENTER TO PREVENT GUN
VIOLENCE; GIFFORDS LAW CENTER
TO PREVENT GUN VIOLENCE,

    Amici Curiae.

No. 24-2121

_____

Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:24-CV-00471-JB-SCY)
_____

Matthew D. Rowen, Clement & Murphy, PLLC, Alexandria, Virginia (Paul D. Clement,
Erin E. Murphy, and Kevin Wynosky, Clement & Murphy, PLLC, Alexandria, Virginia;
Michael D. McCoy, D. Sean Nation and Robert A. Welsh, Mountain States Legal
Foundation, Lakewood, Colorado; Joseph G.S. Greenlee and Erin M. Erhardt, National
Rifle Association of America, Fairfax, Virginia; and Carter B. Harrison IV, Harrison &
Hart, Albuquerque, New Mexico, with him on the briefs), for Plaintiff-Appellants.

Kyle P. Duffy, Deputy General Counsel, Office of Governor Michelle Lujan Grisham, Santa Fe, New Mexico (Holly Agajanian, Chief General Counsel, Office of Governor Michelle Lujan Grisham, Santa Fe, New Mexico; and Aletheia Allen, Solicitor General, Van Snow, Deputy Solicitor General, and Christa Street, Assistant Solicitor General, New Mexico Department of Justice, Santa Fe, New Mexico, with him on the brief), for Defendants-Appellees.

Scott L. Winkelman, Crowell & Moring LLP, Washington, D.C.; Nicholas W. Dowd and Amy M. Pauli, Crowell & Moring LLP, Denver, Colorado; and Harry Cohen, Joshua Sohn, Luke Taeschler and Emily Strickland, Crowell & Moring LLP, New York, New York, filed an Amici Curiae Brief of Brady Center to Prevent Gun Violence and Giffords Law Center to Prevent Gun Violence in Support of Appellees and Affirmance.

———————————————————

Before **TYMKOVICH**, **MATHESON**, and **EID**, Circuit Judges.

———————————————————

**TYMKOVICH**, Circuit Judge.

———————————————————

New Mexico enacted a law in 2024 that imposes a categorical seven-day "cooling-off" period for nearly all consumer purchases of a firearm. No matter how urgent the need, or how much physical danger a prospective buyer might be in, buyers must wait seven days before New Mexico deems them safe to carry arms. Even buyers with previous firearms background checks or security clearances are not eligible for waivers from the prohibition. In short, the law requires no individualized reason to conclude that a prospective consumer is a danger to himself or the community, nor can anyone be excused from the waiting period because of personal danger.

Asserting their rights under the Second and Fourteenth Amendments, Samuel Ortega and Rebecca Scott sued the State of New Mexico to enjoin the Waiting Period Act, N.M. Stat. § 30-7-7.3. The district court declined to preliminarily enjoin the

law.  It found that a seven-day wait did not infringe on Second Amendment rights since the right to *acquire* a firearm does not impede the right to *keep* or *bear* a firearm, and, in any event, the Second Amendment tolerates cooling-off periods.

We disagree, and **REVERSE** and **REMAND**.  Cooling-off periods infringe on the Second Amendment by preventing the lawful acquisition of firearms.  Cooling-off periods do not fit into any historically grounded exceptions to the right to keep and bear arms, and burden conduct within the Second Amendment's scope.  In this preliminary posture, we conclude that New Mexico's Waiting Period Act is likely an unconstitutional burden on the Second Amendment rights of its citizens.  We also conclude the other preliminary injunction factors are met and that Plaintiffs are entitled to an injunction.

## I.     Background

### A.     *Legislative Backdrop*

In response to high state-wide rates of gun violence, the New Mexico Legislature adopted a seven-day waiting period for most consumer firearm purchases. N.M. Stat. § 30-7-7.3.  The statute states: "[a] waiting period of seven calendar days shall be required for the sale of a firearm and the transfer of the firearm to the buyer." § 30-7-7.3(A).

> The seven-calendar-day waiting period shall include the period required to conduct a federal instant background check, . . . if the seven-calendar day waiting period has expired without the completion of a required federal instant background check, the seller shall not transfer the firearm to the buyer until the federal instant background check is completed.

3

*Id.* If the background check process is not completed quickly, the waiting period can be extended for up to twenty days, at which point the seller may transfer the firearm even if the background check has not been completed. Until the waiting period is over, the firearm must remain with the seller or the licensee performing the background check, even if the transaction has been completed.

The statute makes it "[u]nlawful" for anyone to transfer "ownership, possession or physical control of [a] firearm from the seller to the buyer before the end of the required seven-calendar-day waiting period." § 30-7-7.3(C). Each party to an unlawful sale—transferee or transferor—is guilty of a misdemeanor if the transfer is made before the seven-day waiting period. § 30-7-7.3(D), (G).

Exemptions are made for sales and transfers between two firearm dealers, buyers who have concealed carry permits, law enforcement purchasers, and transactions between two law enforcement officers or between immediate family members. § 30-7-7.3(H)(1)–(5).

The law serves two purposes. First, it seeks to reduce impulsive gun violence or suicides. Second, it aims to close a perceived loophole in federal law that sometimes permits a purchaser to acquire a gun without completing a background check if the process takes more than three days. *See* 18 U.S.C. § 922(t)(1)(B)(ii),

(C)(iii).  The state legislature adopted the law on February 12, 2024, the Governor of New Mexico signed it on March 4, 2024, and it became effective May 15, 2024.[1]

### B.    *Factual History*

The same day that the law went into effect, Paul Ortega tried to purchase a handgun from a New Mexico firearms dealer.  Mr. Ortega is a retired law enforcement officer who already legally owned multiple firearms.

Although Mr. Ortega paid for the handgun and immediately passed a background check, he was subject to the waiting period and could not get his gun for seven days.  According to the firearms dealer, the only reason he could not immediately acquire the handgun was the waiting period.

Rebecca Scott similarly tried to purchase a firearm and quickly passed her background check.  She too had to wait out the week only because of the cooling-off period.

Both Mr. Ortega and Ms. Scott plan to purchase more firearms, and brought this suit before their waiting periods expired.  They sought preliminary and permanent injunctive relief to enjoin the New Mexico law.  They sued the Governor

---

[1] Three other states have seven-day waiting periods: Rhode Island; Maryland; and New Jersey.  Four states have three-day waiting periods: Colorado; Florida; Illinois; and Vermont (Maine's three-day waiting period is currently enjoined and the subject of active litigation).  Three states have ten-day waiting periods: Hawaii; Minnesota; and Washington.  And one state, California, imposes a thirty-day waiting period.

and Attorney General of New Mexico.[2]  Both Mr. Ortega and Ms. Scott knew of the law's existence and restrictions before it went into effect.  But rather than bring a pre-enforcement challenge, they waited to bring their suit until the law was in effect and the waiting period was imposed on them.  So they knew they would be restricted by the cooling-off period when they bought their guns.

### C.    *Procedural History*

After an evidentiary hearing, the district court denied preliminary relief on three grounds.  *First*, it found that the right to "keep and bear" arms did not cover the right to acquire arms.  *Second*, it found that the waiting period was a presumptively constitutional commercial condition on firearm sales, carved out by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008).  Because waiting periods have existed for almost a century, and their burdens are supposedly minimal, Plaintiffs did not overcome the presumption.  *Third*, the court ruled in the alternative that the waiting period fit within the principles underlying our historical tradition of regulating firearms.  The district court found that historical examples denying outright the ability to possess firearms for certain demographic categories served as

---

[2] The Governor does not "have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty."  *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (cleaned up).  So she would ordinarily enjoy Eleventh Amendment immunity.  *Id.*  But she has agreed to waive her sovereign immunity and consented to this suit, only in her official capacity, and only for prospective relief.  *See MCI Telecomms. Corp. v. Pub. Serv. Comm'n of Utah*, 216 F.3d 929, 935 (10th Cir. 2000) ("[A] state may waive its sovereign immunity by consenting to suit in federal court.").

an acceptable historical analogue.  From these analogues, the court determined that the Second Amendment's text permitted waiting periods for broad swathes of society out of fear that some individuals would misuse their firearms.

The district court also ruled that Plaintiffs did not meet other factors in the test for injunctive relief.  That is, the injury was not irreparable because Plaintiffs owned other firearms, and the balance of equities and public interest weighed in favor of reducing gun violence.

Plaintiffs appeal, seeking reversal with instructions to preliminarily enjoin the Waiting Period Act.  They bring both a facial and as-applied challenge, except as to the law's provisions that affect buyers whose background checks fail to immediately clear.

## II.    Discussion

Modern doctrine on the right to keep and bear arms is shaped in large part by the Supreme Court's decision in *District of Columbia v. Heller*, which recognized an individual's Second Amendment right to possess firearms.  554 U.S. 570 (2008).  But "the right secured by the Second Amendment is not unlimited.  From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.* at 627.

This case represents the efforts of many states and courts to discern the Second Amendment's outer limits.

### A.      Preliminary Injunction Standard

We review a district court order denying a preliminary injunction for abuse of discretion. *Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010). "An abuse of discretion occurs when the district court commits an error of law or makes clearly erroneous factual findings." *Colorado v. Griswold*, 99 F.4th 1234, 1240 (10th Cir. 2024) (quoting *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 775 (10th Cir. 2009)). Claims of legal error are reviewed de novo. *Id.*

A preliminary injunction requested under Federal Rule of Civil Procedure 65(a) is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs seeking an injunction must establish: (1) a substantial likelihood that they will ultimately succeed on the merits of their suit; (2) that they are likely to suffer irreparable harm without preliminary relief; (3) this threatened harm outweighs the harm a preliminary injunction may pose to the opposing party; and, (4) if issued, the injunction will not adversely affect the public interest. *Winter*, 555 U.S. at 20. When a party seeks an injunction that would change the status quo, rather than to preserve it, it faces a higher burden. *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). "In seeking such an injunction, the movant must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Fish v. Kobach*, 840 F.3d 710, 725 (10th Cir. 2016).

8

When a plaintiff is asserting an injury in the form of a violated constitutional right, we presume that the injury will be irreparable if it exists.  *See Elrod v. Burns*, 427 U.S. 347, 373–74 (1976).  The difficulty in calculating or determining adequate monetary damages for a constitutional injury is so well-settled that "the principle collapses the first and second preliminary-injunction factors, equating likelihood of success on the merits with a demonstration of irreparable injury."  *Free the Nipple v. City of Fort Collins*, 916 F.3d 792 (10th Cir. 2019).  Similarly, the third and fourth factors "merge" when, as here, the government is the opposing party.  *Nken*, 556 U.S. at 435.

### B.    *Second Amendment Framework*

Our Second Amendment analysis begins with the text: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. CONST. amend. II.  This "right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.'"  *United States v. Rahimi*, 602 U.S. 680, 690 (2024) (quoting *McDonald v. Chicago*, 561 U.S. 742, 778 (2010)).

In *Heller*, the Supreme Court held that the Second Amendment codified a preexisting "individual right," and the Court adopted that "original understanding of the Second Amendment."  554 U.S. at 570, 626.  The right recognized by the Second Amendment and held by the people today is the same common-law right enjoyed by Englishmen and colonists.  That historic right, however, did not guarantee a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

purpose." *Id.* at 626.  Rather, it is the job of the courts to determine whether modern laws restricting or punishing firearms use come into conflict with that historically understood right.  The Supreme Court has explained that the Second Amendment, as historically understood, protected an individual right to possession of a handgun in the home.  554 U.S. at 636.  But the Court did "not undertake an exhaustive historical analysis [in that case] of the full scope of the Second Amendment." *Id.* at 626.  So, the Court instructed, "nothing in [its] opinion should be taken to cast doubt on longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27.

Following *Heller*, the Supreme Court in *New York State Rifle & Pistol Assoc., v. Bruen* and in *United States v. Rahimi* cemented the approach to Second Amendment interpretation by first assessing whether a law implicated the plain text of the Second Amendment, and then, analyzing "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692 (citing *Bruen*, 597 U.S. at 26–31).  A focus on the historical principles ensconced in our tradition is necessary to "apply faithfully the balance struck by the founding generation to modern circumstances." *Id.* (alterations omitted) (quoting *Bruen*, 597 U.S. at 30).  Or, as Justice Barrett put it, "[o]riginal history . . . plays two roles in the Second Amendment context.  It elucidates how contemporaries understood the text—for example, the meaning of the phrase 'bear Arms.'  It also plays the more complicated role of determining the scope of the

10

pre-existing right that the people enshrined in our fundamental law." *Rahimi*, 602 U.S. at 738–39 (Barrett, J., concurring).

Under this framework, we assess the three alternative holdings of the district court.

### 1.    The Waiting Period Act Burdens Second Amendment Rights

Our first consideration is whether "the Second Amendment's plain text covers" the conduct curtailed by the enactment, "as informed by history." *Bruen*, 597 U.S. at 17, 19.  If it does, then "the Constitution presumptively protects that conduct." *Id.* at 17.

Common sense dictates that the right to bear arms requires a right to acquire arms, just as the right to free press necessarily includes the right to acquire a printing press, or the right to freely practice religion necessarily rests on a right to acquire a sacred text.  Legal interpretation follows that common sense.

When "a text authorizes a certain act, it implicitly authorizes whatever is a necessary predicate of that act."  Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 96, 192–94 (2012) (explaining Predicate-act canon); *see also Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring) ("Constitutional rights . . . implicitly protect those closely related acts necessary to their exercise.").  The Constitution has carried such a construction throughout our nation's history.  *See* Scalia & Garner, READING LAW, 192 ("[W]here a general power is conferred or duty enjoined, every particular power necessary for the exercise of the one or the performance of the other, is also conferred." (quoting

Thomas M. Cooley, LEGISLATIVE POWER ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 63 (1868))); THE FEDERALIST No. 44, at 285 (James Madison) (Clinton Rossiter ed., 1961) ("No axiom is more clearly established in law, or in reason, than that wherever the end is required, the means are authorized; wherever a general power to do a thing is given, every particular power necessary for doing it, is included.").

As paper or a computer is a necessary predicate to the right to print, or the ability to own property is a necessary predicate of the right to just compensation for a taking—acquiring, purchasing, and possessing firearms is a necessary predicate to keeping and bearing them. *See Reese v. ATF*, 127 F.4th 583, 589–90 (5th Cir. 2025) ("Of course, the words 'purchase,' 'sale,' or similar terms describing a transaction do not appear in the Second Amendment. But the right to 'keep and bear arms' surely implies the right to purchase them."); *Nguyen v. Bonta*, 140 F.4th 1237, 1240 (9th Cir. 2025) ("the ability to acquire firearms through purchase without meaningful constraints [is] protected by the Second Amendment").[3]

---

[3] New Mexico points to dictionary definitions of "keep" and "bear" that do not include acquisition. But dictionary definitions of those terms, in isolation, cannot denote the preexisting right's bounds that the text sought to concretize. *In re Mallo*, 774 F.3d 1313, 1321 (10th Cir. 2014). The Second Amendment's text is not limited to direct prohibitions on possessing or using firearms. It states that the "right of the people to keep and bear Arms, *shall not be infringed*." U.S. CONST. amend. II. (emphasis added). One cannot keep or bear arms if one cannot acquire them. That is an infringement, even if it is not a direct prohibition or ban. *Accord United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000) (Even if a law "does not impose a

New Mexico argues, however, that the waiting period law does not implicate the ability of anyone to "keep and bear arms," at least not directly.  Instead, it argues that firearm *possession* is distinct from firearm *sales and transfers*.  According to New Mexico, the Second Amendment's plain text does not cover acquiring or purchasing firearms, especially immediate acquisition of purchased firearms.  Yet New Mexico acknowledges that severe or abusive limitations on acquisition would burden the Second Amendment, and that the waiting period here survived because the burden is minimal.  So, by New Mexico's illogic, a restriction on firearm sales does not burden the Second Amendment—until it does.

That argument provides no limiting principle.  It inevitably leads to case-by-case judicial interest balancing.  But the Supreme Court and the Constitution reject the notion that a right should be restricted simply because the government believes its interests, on balance, are more important than the individual's.  *Heller*, 554 U.S. at 634 ("We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach.").  "The very enumeration of the right" removes it from the Judiciary's "power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.*

New Mexico's argument that limitations on firearm sales or transfers do not implicate the Second Amendment's plain text is wrong, and the district court's

---

complete prohibition," "laws burdening and laws banning speech . . . must satisfy the same rigorous scrutiny.").

engagement in limited means-end scrutiny is also wrong.  The district court's analysis, crediting what it saw as a minimal burden, circumvented *Heller*, *Bruen,* and *Rahimi*—landing right back at the "freestanding 'interest-balancing' approach" that those cases explicitly rejected.  *Id.*; *Rahimi*, 602 U.S. at 711 (Gorsuch, J., concurring) ("In *Bruen*, we rejected [the interest-balancing] approach for one guided by constitutional text and history."); *Bruen*, 597 U.S. at 26 ("[J]udicial deference to legislative interest balancing is understandable . . . it is not deference that the Constitution demands here.  The Second Amendment is the very product of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." (internal quotation marks omitted)).

Another court—also faced with the assertion that keeping and bearing did not include acquiring when considering a waiting period law post-*Bruen/Rahimi*—also rejected the argument.  It stated:

> If a citizen cannot take possession of a firearm then his or her right to possess a firearm or to carry it away is indeed curtailed, even if, as [the State] claims, the curtailment is modest.  However, the threshold inquiry is whether the Second Amendment covers the conduct curtailed by the Act, not a qualitative assessment of how modest the imposition on the right happens to be. . . . That is indiscriminate dispossession, plain and simple.

*Beckwith v. Frey*, 766 F. Supp. 3d 123 (D. Me. 2025) (appeal filed).  A blanket waiting period prevents a citizen from possessing a firearm for a flat period and is an infringement on the right to bear arms.  It must be scrutinized as one.

14

The burden imposed by a cooling-off period is brought into sharper focus when considered in the context of other constitutional rights. A carte blanche one-week cooling-off period to publish news stories? Unconstitutional. *United States v. Quattrone*, 402 F.3d 304, 309–10 (2d Cir. 2005) ("A prior restraint is not constitutionally inoffensive merely because it is temporary."). Temporary closures of churches during COVID-19? Unconstitutional. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))). If a criminal defendant had to wait thirty days after his arraignment before he could seek legal counsel so that he would not unduly resist his prosecution? Unconstitutional, of course. *See Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 213 (2008) ("[C]ounsel must be appointed within a reasonable time after attachment to allow for adequate representation at any critical stage before trial."). The Second Amendment is no different. *See Bruen*, 597 U.S. at 70 ("The constitutional right to bear arms . . . is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" (quoting *McDonald*, 561 U.S. at 780)).

As a general matter, the government cannot delay the exercise of a right because it believes that citizens might misuse it without sufficient time to reflect beforehand. *Silvester v. Becerra*, 583 U.S. 1139 (2018) (Thomas, J., dissenting from

denial of cert.) (collecting unconstitutional waiting periods on other rights).[4]  Our law

rarely generalizes the potential for abuse.  It requires an individualized assessment.

In short, regardless of paternalistic intent, waiting periods burden the right to

keep and bear arms.

## 2.    *Presumptively Lawful Conditions on Firearm Sales*

But *Heller* also carved out certain laws from the exacting historical scrutiny

that followed in *Bruen* and *Rahimi*.  *Heller* declined to examine "longstanding

prohibitions," including "laws imposing conditions and qualifications on the

commercial sale of arms."  *Heller*, 554 U.S. at 626–27, n.36.  In a footnote, the Court

referred to these laws as "presumptively lawful regulatory measures."  *Id.*

Those laws "were supported without any explanation of how they would fare

in light of the Second Amendment's original meaning."  *United States v. McCane*,

573 F.3d 1037, 1049 (10th Cir. 2009) (Tymkovich, J., concurring).  This "summary

treatment . . . foreclose[d] the possibility of a more sophisticated interpretation."  *Id.*

Despite this lack of an explanation, despite the passage's status as dicta, and despite

---

[4] To be fair, this instinct has not always borne out.  In some cases, "waiting
periods have been found to be constitutionally permissible as to other rights."
Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense:
An Analytical Framework*, 56 UCLA L. REV. 1433, 1439–40 (2009) (cataloguing
constitutional approval for cooling-off or waiting periods for abortions, assisted
suicide and sterilization, as well as notice requirements for marriage licenses,
demonstrations, or parade permits).  But those examples do not suggest that waiting
periods do not burden those rights.  Caselaw consistently looks with skepticism at
inescapable delays on the exercise of enumerated rights.  *Id.* (collecting cases
suggesting that any waiting period and delay must have exceptions for emergencies
or special circumstances).

the "possible tension between *Heller*'s dictum and its underlying holding," *id.*
at 1047, these categories have been carried forward and enmeshed into Second
Amendment jurisprudence.

We recently held that some longstanding prohibitions, such as minimum age
limits, not only survive *Bruen* and *Rahimi*, they also presumptively do not burden the
Second Amendment. *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 119–22
(10th Cir. 2024) (*RMGO*) ("Because the 'presumptively lawful regulatory measures'
language, first stated in *Heller*, has not been abrogated, it remains good law.").[5] Still,
courts have only partially fleshed out the boundaries of these commercial conditions
and qualifications in other Second Amendment challenges, and we acknowledged the
lack of fully fleshed out guidance on these "safe harbor" provisions in *RMGO*. *See
id.*[6]

---

[5] *RMGO*'s holding that "presumptively lawful" measures are assessed at
*Bruen*'s first step has not been followed in many other circuits. *See e.g.; Zherka v.
Bondi*, 140 F.4th 68, 94 (2d Cir. 2025); *Lara v. Comm'r Penn. State Police*, 125 F.4th
428, 442 (3d Cir. 2025); *Range v. Attorney Gen.*, 124 F.4th 218, 228–29 (3d Cir.
2024); *McCoy v. ATF*, 140 F.4th 568, 580 (4th Cir. 2025); *Reese*, 127 F.4th at 590,
n.2; *United States v. Knipp*, 138 F.4th 429, 434 (6th Cir. 2025); *but see B & L
Productions, Inc. v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024).

[6] The district court granted the Waiting Period Act presumptive
constitutionality because of its characterization of waiting periods as "longstanding."
In *RMGO*, we observed that "[i]t may be right that the Supreme Court expressly
created a list of 'presumptively lawful regulatory measures' in *Heller* because they
are 'longstanding,' and thus necessarily part of our Nation's history and tradition, but
none of the Court's quartet of Second Amendment cases states this explicitly." *Id.*
Treating a law as presumptively constitutional based solely on the length of
its pedigree strikes us an unstable foundation for protecting rights. *See McCane*,
573 F.3d at 1049–50 (Tymkovich, J., concurring). Even if we accepted that premise,

But even in this murky territory, the Waiting Period Act falls far short of a presumptively constitutional law.  It is not limited to commercial sales, and it does not fit with other known conditions and qualifications in this category.

*First*, cooling-off periods are not tailored to commercial sales.  They are imposed on many non-commercial transfers, while many commercial transfers are excluded.  *Heller* carved out "laws imposing conditions and qualifications on the *commercial sales* of arms."  554 U.S. at 627 (emphasis added).  But the Waiting Period Act does not distinguish between commercial and non-commercial.  While the statute refers only to "buyers" and "sellers" and seems to exclude gifts, not every exchange of a firearm for money is commercial in nature.  For example, a collector selling firearms to a museum collection must wait seven days.  If a hobbyist with a federal firearms license decides to sell a gun to a friend?  He must still wait seven days.  A waiting period cannot solely be a qualification on commercial sales if it applies equally to non-commercial conduct.  True, some non-commercial transfers, such as those between immediate family members, are excluded from the statute.  N.M. Stat. § 30-7-7.3(H)(5).  But that small carve out is thin gruel.

---

the district court mistook what could be considered longstanding.  It identified the earliest waiting period law as enacted in 1923.  Other laws like it did not proliferate for years, and still exist only in a minority of states.  On a constitutional scale, even "innovations of the mid- to late-19th-century come too late to provide insight into the meaning of [the Constitution in 1787]."  *Bruen*, 597 U.S. at 36–37 (alteration in original) (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting)).  Laws birthed in the 1920s fall short of that standard by decades.

Other entries in the list of exceptions reveal that many explicitly commercial sales are not affected by the waiting period. For instance, a purchaser with a federal firearms license does not have to wait seven days. § 30-7-7.3(H)(1). As a result, transactions between manufacturers, distributors, and gun stores—progenitor commercial firearm sales—will not be subject to the waiting period. Since nearly every firearm bought by an individual in New Mexico must first be sold to a distributor with a federal firearm license, there is a least one explicitly commercial sale exempted for every prospective sale subject to the waiting period. Added to the exclusion for law enforcement agencies and officers, who often purchase bulk firearms, at least half of all commercial sales in New Mexico would not be effected by the Waiting Period Act. *See* §§ 30-7-7.3(H)(1)–(5).

Thus it cannot be said that the waiting period subjects only *commercial* sales to a condition or a qualification. The criteria for what transfers are affected by the law have nothing to do with the sales' commercial nature.

*Second*, the Waiting Period Act does not impose a condition or qualification like other restrictions considered presumptively constitutional. In *Heller*, the Court listed "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" as a non-exhaustive list of "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 627 n.6. In *McDonald v. City of Chicago*, the Court reiterated that "such longstanding regulatory measures" were not

19

"imperil[ed]" by the Second Amendment.  561 U.S. at 787.  And in *Bruen*, in an

apparent nod to these categories, the Court noted that "shall-issue" licensing

regimes—under which ordinary citizens presumptively qualify for licenses unless

investigation reveals otherwise—are meant to ensure that purchasers were

"law-abiding responsible citizens." *Bruen*, 597 U.S. at 38, n.9.  And because they

use "only 'narrow, objective, and definite standards'" they were not constitutionally

suspect. *Id.*

      But a cooling-off period is not such a condition or qualification.  Plaintiffs

argue that it is not a condition because it cannot be met by any action, and it is not a

qualification because it is universally applicable.  They are right.  A seven-day

waiting period is not a "condition" on a sale any more than the price of a firearm is.

The sale happens regardless, and the waiting period is just an artificial delay on

possession.  *Condition*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("An act or

event, *other than a lapse of time*, that must exist or occur before a duty to perform

something promised arises."  (emphasis added)).  Nor is it a qualification.

*Qualification*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("[T]he possession of

qualities or properties (such as fitness or capacity) inherently or legally necessary to

make one eligible for a position or office, or to perform a public duty or function.").

For that would imply that a buyer who has not waited seven days is somehow

presumptively unqualified to purchase a firearm—an obviously unconstitutional

implication.  *See United States v. Daniels*, 101 F.4th 770, 778 (10th Cir. 2024)

("[I]f we are to take seriously the normative thrust of the Supreme Court's recent

decision in [*Bruen*] then we cannot look with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way." (citing *Bruen*, 597 U.S. at 70)).

It is not enough that a regulation sometimes affects a commercial sale.  A blanket waiting period is simply not of a kind with the conditions and qualifications imposed by other presumptively lawful measures.  *See Bruen*, 597 U.S. at 38, n.9 ("only 'narrow, objective, and definite standards'"); *Pena v. Lindley*, 898 F.3d 969, 976, 1007 (9th Cir. 2018) (Bybee, J., concurring in part, dissenting in part) ("[T]he Supreme Court in *Heller* could not have meant that *anything* that *could* be characterized as a condition and qualification on the commercial sale of firearms is immune from more searching Second Amendment scrutiny."  (emphases added)); *Beckwith*, 766 F. Supp. 3d at 131–32 ("[W]hat kind of regulations fall within this particular regulatory safe harbor . . . might well entail background checks, age restrictions, shop security measures, and the like.  It does not automatically extend to a standardless, temporary disarmament measure.").  By New Mexico's logic, adopted by the dissent, an outright ban on commercial sales would also be a condition or qualification on commercial sales, and presumptively lawful.

New Mexico points to a concurrence in a Ninth Circuit case for support, which argued that California's waiting period "is a condition or qualification on the sale of guns: It imposes a brief delay—to permit compliance with background check requirements and provide a 'cooling-off' period—as a prerequisite to acquiring a gun." *Silvester v. Harris*, 843 F.3d 816, 830 (9th Cir. 2016) (Thomas, C.J.,

concurring).  But that view never garnered a majority on any court.  The majority in
*Silvester* instead employed intermediate scrutiny under *Heller*, an approach later
abrogated by *Bruen*.  *See Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023)
(recognizing abrogation).  Rather than help New Mexico, *Silvester* shows that courts
have consistently held waiting periods impose burdens on the Second Amendment
and are not presumptively constitutional.

New Mexico and the dissent argue that our decision in *RMGO* forecloses the
conclusion that the Second Amendment is burdened by a waiting period.  But we
explicitly declined to define "the full scope of concomitants rights, if any, to 'keep
and bear.'"  *RMGO*, 121 F.4th at 118.  We resolved that case instead by concluding
that limiting firearm sales to those over 21 years old was a presumptively lawful
condition or qualification.  *Id.*  The dissent would do the same today.  But it does so
without any consideration for what defines a condition or qualification on a
commercial sale.  It is content to assume that any law which "regulates only the
'selling and purchasing [of] firearms'" is presumptively constitutional.  Dissent Op.
at 5.  That shortcut analysis could prop up laws that lay heavy burdens on the rights
of ordinary citizens, without a glance at whether the supposed condition or
qualification is in any way like others given safe harbor.

In any event, *RMGO* did not grapple with the full scope of arguments defining
conditions and qualifications that we face here, and declined to reach the issues that
are most pertinent in this case.  *See RMGO*, 121 F.4th 96, 133 (McHugh, J.
concurring) ("[T]he majority offers no guidance for determining where the

presumption applies in any given case."); Brief for Plaintiffs-Appellees at 19-20, *RMGO*, 121 F.4th 96 (10th Cir. 2024) (arguing age-restriction was not commercial or limited to sales, but not raising the meaning of condition or qualification).  Our decision today accords with *RMGO*.

Even with a presumption, New Mexico would not prevail.  Just because a law is *presumed* constitutional does not mean it *is* constitutional.  It may still be shown to burden Second Amendment rights.  As we show below, waiting periods are neither longstanding nor widespread practices, and diverge from history and tradition. Plaintiffs would overcome any presumption of constitutionality.[7]

### 3.     *Fit with Historical Tradition of Firearm Restrictions*

Outside the presumptively constitutional exceptions, the validity of laws that fall under the Second Amendment's text is determined by history and tradition.  In *Bruen* and *Rahimi*, the Supreme Court instructed lower courts to follow an originalist

---

[7] Even if we found the Waiting Period Act to be presumptively lawful, we could not end our inquiry there.  Because the Plaintiffs also argue that the Waiting Period Act would be put to "abusive ends."  *See Bruen*, 597 U.S. at 38, n.9 ("[B]ecause any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry."); *RMGO*, 121 F.4th at 122 ("We read *Bruen*'s 'abusive ends' limitation to mean that any condition or qualification on the sale or purchase of firearms, if found to have such abusive ends, negates the presumption that the law or regulation is lawful.").  A supposed condition or qualification that applies as broadly as this one, put toward an end that is justified only by assuming that citizens cannot be trusted with their own rights, is put toward an abusive end.  The dissent concludes otherwise only by confusing *who* was burdened by the law in *RMGO* with *how* ordinary citizens are burdened by New Mexico's law.  *See* Dissent Op. at 9, n.6.

methodology in conducting this inquiry.  In doing so, we "examine our 'historical tradition of firearm regulation' to help delineate the contours of the right." *Rahimi*, 602 U.S. at 691 (quoting *Bruen*, 597 U.S. at 17).  "[I]f a challenged regulation fits within that tradition, it is lawful under the Second Amendment." *Id.*  Because these laws may infringe on constitutional rights, it is the government's burden to "justify its regulation." *Id.*  To meet this burden, the government must show a "well established and representative" principle, derived from the history and tradition that would inform the text's meaning. *Bruen*, 597 U.S. at 30.

Modern restrictions must be "relevantly similar" to historical practices in both the "why" and "how" they regulate firearms. *Id.*  "Why and how the regulation burdens the right are central to this inquiry." *Rahimi*, 602 U.S. at 692.  "Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Bruen*, 597 U.S. at 29 (quoting *McDonald*, 561 U.S. at 767).  Such a principle may be drawn from "historical analogue[s]" to the modern statute, and a "historical twin" is not needed. *Id.*  The Supreme Court does not expect us to find a "dead ringer," *Rahimi*, 602 U.S. at 691, but the state must at least present us with a "ringer."

"Why do we require those showings?  Through them, we seek to honor the fact that the Second Amendment 'codified a *pre-existing* right' belonging to the American people, one that carries the same 'scope' today that it was 'understood to have when the people adopted' it." *Rahimi*, 602 U.S. 709 (Gorsuch, J., concurring) (quoting

24

*Heller*, 554 U.S., at 592, 634–635)).  "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century," the failure to identify "a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26.  Because the burden is on the government at this stage, we consider the historical examples provided by New Mexico and its experts.

*First*, we reject the notion that other waiting period laws themselves carve out a historically grounded principle.  They are mostly a modern innovation.  New Mexico points out that the Waiting Period Act's historical pedigree stretches back to 1923, but that is an oversimplification.  True, California imposed the first (one-day) waiting period in that year, intended to give officials time to conduct a background check.  *Silvester*, 843 F.3d at 824.  A few states followed suit over the next few decades.  But those early examples are easily distinguished from this one because they were explicitly tied to the time it took to conduct a background check.  Until the 1990s, no waiting period law required a prospective buyer to wait longer than was necessary to conduct a background check.

Federal law briefly required a universal waiting period during the completion of a background check from 1993 to 1998.  *See* Brady Handgun Violence Prevention Act of 1993.  But Congress sunsetted that law from the start, and the waiting period requirement lapsed when the federal government implemented the national instant background check system in 1998.  *See Printz v. United States*, 521 U.S. 898, 902–04 (1997).

25

The first state waiting periods that were untethered to the time that it takes to pass a background check or complete a certification course did not appear until the 1990s. *Silvester v. Harris*, 41 F. Supp. 3d 927, 946–47 (E.D. Cal. 2014) (recounting history). Even now, only about a dozen states impose waiting periods of some kind. *See supra* note 1, at 5.

Given the few states in which they have persisted and their duration, waiting period laws cannot satisfy the government's burden. *Bruen*, 597 U.S. at 81–82 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights."). Any "innovations of the mid-to late-19th-century come too late to provide insight into the meaning of [the Constitution in 1787]." *Bruen*, 597 U.S. at 36–37 (alteration in original) (quoting *Sprint Commc'ns Co.*, 554 U.S. at 312 (Roberts, C.J., dissenting)). Comparing this history with the Supreme Court's analysis of other originalist sources, waiting periods lack a strong historical pedigree. *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 482 (2020) (A practice that "arose in the second half of the 19th century . . . cannot by itself establish an early American tradition").

*Second*, New Mexico contends that a variety of firearm restrictions are analogous to the Waiting Period Act: intoxication laws; license and permitting regimes; and targeted group bans on firearm carry or possession.[8]

New Mexico argues that all three categories indicate that Founding-era governments could limit access to firearms to ensure that those keeping and bearing arms were "responsible and law abiding citizens." *See Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635).[9] True, shall-issue licensing regimes, background checks, and many other barriers to firearms access serve that purpose. But the only way that the Waiting Period Act fits into that principle is if *anyone* seeking to purchase a firearm can be presumed irresponsible or non-law-abiding, purely by dint of their intention to purchase a firearm. Constitutionally, they cannot.

In *Bruen*, the Court rejected the government's "attempt to characterize New York's proper-cause requirement as a 'sensitive-place' law" when "there is no historical basis for New York to effectively declare the island of Manhattan a

---

[8] New Mexico also argues that a waiting period is no less burdensome than typical delivery periods in the era before FedEx, online ordering, and modern shipping methods. That comparison is unpersuasive. Necessary or unavoidable delays in possession resulting from ordinary physical limitations and private market forces are not prohibited by the Constitution. Government-erected barriers to possession, resulting in artificially manufactured delays, are covered by the Second Amendment's text.

[9] Even though many of these historical examples arose before the Fourteenth Amendment's passage (and therefore before state incorporation of the Second Amendment), neither the experts nor the State's brief discuss whether these historical restrictions were subject to a similar protection under state constitutions or common law. This silence adds to our skepticism of these analogies' relevance.

'sensitive place' simply because it is crowded and protected generally by the New York City Police Department."  597 U.S. at 3.  We similarly reject New Mexico's attempt to declare the entire population of New Mexico presumptively dangerous to themselves or others only because they want to acquire firearms.[10]  In *Bruen*'s terms, the Waiting Period Act does not impose a "comparable burden on the right of armed self-defense" as its supposed historical analogues.  *Id.*

A closer examination into the three categories reveals the differences.[11]

### *Intoxication Laws*

In the years after ratification, at least twenty states criminalized firearm use or carry by drunks through various intoxication laws.  R. Vol. 1 at 101.  And in at least thirty states, and even in 17th Century England, governments regulated firearm use and carry by the inebriated.  *Id.*  Once the drunk sobered up, he could carry or use a gun once again.  This burdened the Second Amendment rights of individual would-be

---

[10] To say that a desire to purchase a firearm renders one dangerous or presumptively not law-abiding for a time would also penalize someone for exercising a constitutional right, which is obviously unconstitutional.  *Daniels*, 101 F.4th at 778 ("[W]e cannot look with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way.").

[11] Amici Brady Center to Prevent Gun Violence and Giffords Law Center to Prevent Gun Violence suggest another category of historical analogues: Surety Laws.  Surety laws forced certain dangerous individuals to post a bond in order to possess or carry firearms, and forfeited their firearms and their bond if they misused their guns.  This analogue is easily distinguishable, because the individuals disarmed by Surety Laws could not be disarmed without some kind of due process, and were still able to possess their guns while under suspicion of dangerousness.  If the Waiting Period Act forced purchasers to deposit a bond for their first week of ownership, perhaps the similarity would stick.

purchasers, but only for a short time.  The goal of these laws, of course, was preventing unpredictable and dangerous firearm use by the intoxicated.  District courts have recognized the historic acceptance of intoxication laws as permissible under the Second Amendment.  *See, e.g.*, *RMGO*, 701 F. Supp. 3d at 1144 (D. Colo. 2024); *Vermont Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172 (D. Vt. 2024).

"How" intoxication laws burden Second Amendment Rights is ostensibly similar to how the Waiting Period Act works.  Both burden the Second Amendment by imposing a temporary inability to acquire firearms.  Intoxication laws even go further than the Waiting Period Act in the burden imposed because they reflect a Founding-era willingness to prohibit both firearm acquisition and use, while the Waiting Period Act is limited to acquisition.  New Mexico seeks to ground the analogy in the burdens' temporary nature: Deriving a principle from that analogy that the Second Amendment tolerates disarming anyone in a supposed state of dangerousness.

But New Mexico ignores key distinctions that shatter the analogy.  The scope and underlying justifications for the burdens are vastly different.  Intoxication laws place an individualized burden on intoxicated individuals, which distinguishes those who "pose a credible threat to the physical safety of others from those who have not." *Rahimi*, 602 U.S. at 700.  The Waiting Period Act, however, applies a blanket burden across all of society, assuming that everyone is dangerous or unstable before they can exercise their Second Amendment right.  While the justification for both laws at the

highest level of generality is the same—preventing gun crime by dangerous or unstable people—one need look only one level deeper to see that who New Mexico treats as dangerous (everyone) is not comparable to who historic intoxication laws treated as dangerous (intoxicated individuals).

"History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns. But that power extends only to people who are *dangerous*." *Kanter v. Barr,* 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting), *majority abrogated by Bruen*, 597 U.S. 1. New Mexico makes no effort to distinguish the dangerous from the law-abiding, instead choosing to "broadly restrict arms use by the public generally." *See Rahimi*, 602 U.S. at 698 (noting that history and tradition supported "laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse . . . only once a court has found that the defendant 'represents a credible threat to the physical safety' of another."). In other words, individual or particularized determinations that a person or subcategory of persons represent a known danger is one thing. But blanket burdens on the public's right to keep and bear arms are another.[12]

Temporal similarity is not enough to carry the day.

---

[12] This also distinguishes the age restriction in *RMGO*. Like intoxication, an individual's age can give rise to particularized concern about their firearm use. New Mexico's triggering concern applies to all ordinary citizens seeking to exercise their Second Amendment rights.

### *Permitting and Licensing Regimes*

Historic licensing laws—similar to modern shall-issue licensing regimes—required a person to submit some kind of information or receive some certification to acquire a gun.  They typically applied universally or near-universally.  New Mexico's experts listed many examples of historic licensing restrictions, including concealed carry licenses, gunpowder licenses, commercial dealer licenses, and hunting licenses.  These licenses limited access much like "shall-issue" licensing regimes restrict today.  Also like modern licensing regimes, their historical function insured that "law-abiding, responsible citizens" were the only ones who possessed firearms.  *Bruen*, 597 U.S. at 38 n. 9.  But very few of these licensing restrictions applied to all guns, all people, or all places, much less all three.

It is this distinction in breadth—treating *all* those seeking a firearm as unusually dangerous—that sets the cooling-off period apart from all historical permitting regimes.  New Mexico cannot justify a populace-wide burden using only class-wide foundations.  Nowhere in the historical record have universal restrictions on firearm sales survived originalist scrutiny.  "Other point-of-sale restrictions such as background checks and waiting periods are better characterized as regulations in support of who may lawfully possess (much less purchase) firearms."  *Pena*, 898 F.3d at 1009 n.19 (Bybee, J., concurring in part).  Whereas this waiting period, applicable to nearly all individual purchasers and untethered to a background check or satisfiable condition, is a "when" restriction, not a "who" restriction.  Volokh,

*Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework*, 56 UCLA L. REV. at 1444.

Licensing and permitting laws typically require the completion of a course, certification, background check, or training before a person can acquire a firearm. But the key to their constitutionality is that they presume a person can qualify for the license unless proven otherwise. *Bruen*, 597 U.S. at 38 n.9 ("Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry." (internal quotation marks omitted)). *Bruen* found a licensing law that required applicants to show a special need before they could exercise their rights to be out of step with the historical tradition. *Id.* at 38. Likewise, assuming that all people are dangerous if they desire to exercise their rights unless special circumstances apply is historically out of step.

### *Group Bans and Restrictions*

Easily the least applicable historical analogue is the last category that New Mexico points to: group bans. These types of bans categorically denied access to firearms by freedmen or black slaves, Native Americans, and other "disfavored" ethnic or cultural groups.

No doubt, these types of laws proliferated in Colonial and Founding-era society. Whether out of misguided cultural beliefs that these groups were prone to violence, or a more realistic belief that slaves might turn arms against their owners, most of these laws were justified by concluding that those populations were

dangerous. And some laid a burden even heavier than what the Waiting Period Act imposes (though the scope was still narrower, because none was society-wide).

But as with intoxication laws, the justifying principle used to identify who qualified as dangerous differed from the law before us. Racism, classism, and other discriminatory biases motivated these targeted laws, not a general fear that all citizens could not be trusted to exercise their rights responsibly. *See* William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 NOTRE DAME L. REV. 1467, 1513 (2024) ("The legal principle governing these examples is that certain individuals are not part of the political community . . . in whom the right to keep and bear arms is vested, particularly those in a state of war with the political community or who would rise up against it if given the opportunity."). Once again, New Mexico cannot justify a populace-wide burden using only class-based foundations. *See Nguyen*, 2025 WL 1718079, at *22.

And even if these historical practices categorically denying firearm sales to ethnic or cultural groups established a helpful principle, they would not be proper comparators. The district court acknowledged that "[m]any founding-era gun regulations, including the historical analogues discussed by the Court, undoubtably are repugnant." *Ortega v. Lujan Grisham*, 741 F. Supp. 3d 1027, 1093 (D.N.M. 2024). But it recognized that "the Supreme Court has not suggested that courts may analogize only to those regulations that would not be viewed as discriminatory or unconstitutional today." *Id.* That is wrong. *See Heller*, 554 U.S. at 610–16 (discussing the unconstitutionality of post-Civil War laws disarming Blacks); *Bruen*,

33

597 U.S. at 28 ("[N]ot all history is created equal.").  Relying on these analogues would commit us to consider "a law trapped in amber"—amber formed in an era when blatant racism escaped constitutional scrutiny.  *Rahimi*, 602 U.S. at 691.

But proper originalist interpretation requires a comparison between people enjoying the same sets of rights.  Comparing the Second Amendment rights of a citizen today with the Second Amendment rights of a slave before emancipation and reconstruction tells us nothing.  Just as a comparison between the voting rights of an adult today and a minor in 1800 tells us nothing.  As New Mexico's own expert explained, "[t]he chief problem facing African Americans in a racist American society was not a singular deprivation of gun rights, but the deprivation of *all* rights."  R. Vol. 1 at 126 (emphasis added) (citing ROBERT J. SPITZER, THE GUN DILEMMA 11–13 (NY: Oxford University Press, 2023)).  The groups New Mexico and the district court identified did not possess the same rights in the Founding era as more favored classes (an error corrected by the Thirteenth and Fourteenth Amendments), so we cannot rely on them to inform our understanding of the right's coverage today.  *See* Baude & Leider, *The General-Law Right to Bear Arms,* at 1513 ("The once-acceptable idea that a state may adopt more restrictive gun control laws applied only to certain races based on their peculiar status has been thoroughly abrogated by the Thirteenth and Fourteenth Amendments." (internal citations omitted)).  It would be a category error.  Originalists—or those analyzing text, history, and tradition—must take care to consider whether the historical practices brought to their attention actually speak to a right's scope.

* * * * *

New Mexico asks us to accept a principle so broad that it is obviously incorrect. Recall that the district court perceived a historical principle justifying prohibitions on sales to the general populace on the grounds that some among them would harm the public. If that principle were accepted, *any* regulation could be justified. Any class of people could be the subject of a targeted ban, including any age group, demographic, and any geographic area. Any class could be denied access to firearms if the government feared that some among them would harm the public. It is hard to imagine an exception more likely to swallow the rule.[13]

For this reason, the burden imposed by New Mexico's law is simply of a greater scale than historic sobriety laws and class-wide bans on possession. *Nguyen*,

---

[13] Although New Mexico has put forth evidence that waiting periods save lives and prevent impulsive violence, the countervailing injury to the Second Amendment across the entire state of New Mexico overbears that burden. For, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)). And "[w]hen a constitutional right hangs in the balance, . . . 'even a temporary loss' usually trumps any harm to the defendant." *Free the Nipple*, 916 F.3d at 806 (quoting 11A WRIGHT & MILLER's FEDERAL PRACTICE & PROCEDURE § 2948.2 & n.10 (3d ed. 2018)). Therefore, the balance of the equities and public interest favor the Plaintiffs.

The district court concluded the third and fourth factors weighed against the Plaintiffs. But that was only after holding that the Waiting Period Act did not implicate or burden Second Amendment rights. Even though the potential to reduce impulsive gun violence might be true, once we acknowledge that the Waiting Period Act likely burdens Second Amendment activity, that potential is outweighed. The balance of the equities and the public interest favor injunctive relief. And the State can have "no interest in keeping an unconstitutional law on the books." *Id.*

2025 WL 1718079, at *21–23 ("easily" concluding that modern law requiring a blanket wait of thirty days between firearm purchases was not "relevantly similar" to historic examples of laws targeted at "Indians, foreigners, and the intoxicated"). None of those laws imposed a burden on the entire population. They burdened narrower subsets or individuals. And many of those laws contained exceptions or conditions that would allow an otherwise disqualified person to show himself capable of safely possessing firearms. *See Range v. Att'y Gen. United States*, 124 F.4th 218, 261–63, 265 n.85 (3d Cir. 2024) (Matey, J., concurring) (collecting sources). While some historic laws resulted in would-be purchasers waiting a short time before acquiring their firearms, those waits were incidental to other lawful purposes.[14]

Nothing in the record suggests that the historically understood right to keep and bear arms tolerated universal and indiscriminate burdens on purchasing or acquiring firearms with no way to enjoy the full right. This principle cannot clarify the Second Amendment's scope because the principle itself contradicts the Second Amendment's existence. No meaningful limitation could be placed on the government's power to regulate firearms, disarm the citizenry, or criminalize firearm

---

[14] Distinguishing incidental features of our historic tradition from essential elements or underlying principles ensures fidelity to the balances struck by the Constitution's Framers. *See* J. Joel Alicea, Bruen *was Right*, 174 U. PA. L. REV. __, *35–36 (forthcoming 2025); Darrell A.H. Miller, *Text, History, and Tradition: What the Seventh Amendment Can Teach Us About the Second*, 122 YALE L. J. 852, 877–84 (2014).

use if we accepted every regulation that is based on a fear that someone somewhere would likely misuse a gun.[15]

### C.    Scope of Injunctive Relief

Finally, a word regarding the scope of relief sought by the Plaintiffs. The Plaintiffs request both facial and as-applied injunctive relief.[16] Because the district court did not grant any relief, it made no findings about the proper scope of any injunction. We remand so that it may do so now. "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 119 (1976).

While the parties have fully briefed the issue on appeal, the Supreme Court has since held that courts are without authority to issue remedies beyond what provides complete relief to the plaintiffs actually involved in the suit. *See Trump v. CASA*, 2025 WL 1773631, 606 U.S. ---, slip op. at *15 (June 27, 2025) (remanding so lower courts may determine the appropriate scope of relief). Because the parties did not have the aid of this decision when they submitted their briefs, we would have to craft

---

[15] We also find that the constitutional injury to the Plaintiffs is so broad and clear that they have met their higher burden entitling them to an injunction changing the status quo. *Fish*, 840 F.3d at 725.

[16] At oral argument, the Plaintiffs conceded that they seek only "limited facial" relief. They seek to have the entire Waiting Period Act enjoined except as to its effect on those whose background checks are not cleared within three days. That particular provision seeks to keep guns out of dangerous individuals' hands in a way that is more consistent with historical traditions surrounding background checks and licensing laws. So the Waiting Period Act's application to those individuals is not obviously unconstitutional in the way it is when applied to the Plaintiffs.

a remedy under the Supreme Court's new standards sua sponte. *See United States v. Kovach*, 208 F.3d 1215, 1220 (10th Cir. 2000) ("Absent extraordinary circumstances, this court will not consider an issue on appeal that was not decided first in the district court.").

The district court should determine the proper scope of relief given our holding that the law is unconstitutional and the Supreme Court's recent decision, with the aid of briefs from the parties.

## III.   Conclusion

For these reasons, we reverse and remand to the district court, with instructions to enter injunctive relief consistent with this opinion.

24-2121, *Ortega v. Grisham*
**MATHESON**, Circuit Judge, dissenting.

This court's recent decision in *Rocky Mountain Gun Owners v. Polis* (*RMGO*), 121 F.4th 96 (10th Cir. 2024), should constrain this panel to uphold the district court's denial of a preliminary injunction. Under *RMGO*, the Appellants have not made a "clear showing" that they are "likely to succeed on the merits" of their claim that the Waiting Period Act violates the Second Amendment. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quotations omitted). The Waiting Period Act establishes a condition or qualification on the commercial sale of arms that does not serve abusive ends. Under *RMGO*, it falls outside the Second Amendment. *See* 121 F.4th at 127-28.

## A. *The Waiting Period Act*

The Waiting Period Act generally prohibits a seller from transferring a firearm to a buyer before the passage of seven days. A buyer who passes a background check in fewer than seven days must wait until the seven-day period expires.[1] A buyer who has not passed a background check within seven days must wait until it is complete, except the Act allows transfer if the background check is not completed within 20 days.

---

[1] Plaintiffs argue that the law is unconstitutional as applied to any buyer who has passed a background check. Aplt. Reply Br. at 27 & n.3.

N.M. Stat. Ann. § 30-7-7.3(A).[2]  The Act does not apply to state concealed handgun license holders.  *Id.* § 30-7-7.3(H).[3]

## B. *Legal Background*

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held unconstitutional a District of Columbia prohibition on the possession of a handgun in one's home.  *Id.* at 635.  It said that "nothing in [its] opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms," referring to such measures (and other widely accepted firearm regulations) as "presumptively lawful."  *Id.* at 626-27, 626 n.26.

In *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Supreme Court adopted a two-step burden-shifting framework to analyze Second Amendment claims.  At step one, the plaintiff must show that "the Second Amendment's plain text covers" the regulated conduct.  *Id.* at 24.  If the plaintiff meets that burden, at step two the government must demonstrate that the challenged regulation is "consistent with the

---

[2] Federal law requires a background check for purchases from federally licensed dealers.  18 U.S.C. § 922(t).  A New Mexico state law requires background checks for most other firearms sales.  N.M. Stat. Ann. § 30-7-7.1.  Both allow transfer in three business days if the background check is not completed, but the Waiting Period Act extends this to 20 days.

[3] The waiting period also does not apply to sales to a buyer with a federal firearms license, to a law enforcement agency, between two certified law enforcement officers, and between immediate family members.  N.M. Stat. Ann. § 30-7-7.3(H).

Nation's historical tradition of firearm regulation." *Id.* *Bruen* said nothing about the "presumptively lawful" regulations identified in *Heller*.

In *RMGO*, this court interpreted and applied these precedents to hold that "laws imposing conditions and qualifications on the sale and purchase of arms do not implicate the plain text of the Second Amendment." 121 F.4th at 120. Under *Bruen* step one, such regulations are "presumptively lawful" and remain "outside the scope of the [Second] Amendment's protections" unless they are "employed for abusive ends." *Id.* at 127-28. *RMGO* rejected a challenge to a Colorado law that prohibits the sale of a firearm to, or the purchase of a firearm by, a person under the age of 21. The law does not otherwise prohibit those under 21 from keeping and bearing arms. *Id.* at 104-05.

*RMGO* first determined that the challenged law is "an aged-based condition or qualification on the sale of arms" that "falls outside of the scope of the Second Amendment's right to 'keep and bear' arms." *Id.* at 119-20. We said the law regulates the "selling and purchasing of firearms," and such "commercial restrictions" are presumptively lawful. *Id.* at 120 (quoting *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024)). We rejected the argument that commercial restrictions are presumptively lawful only if the government can satisfy the *Bruen* step two historical burden. *Id.* at 120-21 (holding commercial restrictions are presumptively constitutional regardless of whether the government can prove a type of regulation is "longstanding"). Instead, we upheld the law without "proceed[ing] beyond *Bruen* step one." *Id.* at 120.

*RMGO* next held the challenged law does not serve abusive ends, noting that "a minimum age requirement of 21 is a nondiscretionary condition or qualification on the

3

commercial sale of arms aimed at ensuring guns are held by law-abiding, responsible citizens." *Id.* at 122.  The law sets "a narrow, objective, and definite standard that applies uniformly to all potential sellers and buyers, eliminating any possibility for subjective interpretation or exceptions," and some minimum age requirement had been adopted by "the federal government, almost all 50 states, and the District of Columbia." *Id.* at 123. We also found relevant Colorado's argument that the challenged law "neither prohibits anyone from possessing a gun nor prohibits certain non-purchase gun transfers of ownership." *Id.* at 122.

Continuing to address the abusive-ends issue, we asked whether setting the age threshold at 21 was "arbitrary or improper, in order to determine whether the statute serves legitimate purposes or is being put to abusive ends." *Id.* at 124.  For four reasons, we found the law serves the legitimate purpose of ensuring that "those who 'keep and bear' arms in Colorado are, in fact, law-abiding, responsible persons." *Id.* at 124-27. First, a significant number of jurisdictions (at least 20) had made the same choice as Colorado (setting the minimum purchase age at 21). *Id.* at 124.  Second, Justice Alito "strongly alluded to the constitutionality of a minimum purchase age of 21" when he noted in his *Bruen* concurrence that federal law bars the sale of a handgun to anyone under 21. *Id.*  Third, "the minimum age for firearm purchases need not rise or fall entirely with the age at which most states currently set as the age of majority." *Id.* at 126. Fourth, Colorado presented compelling scientific evidence that setting the age threshold at 21 "is designed to ensure purchasers are law-abiding and responsible." *Id.*  This evidence demonstrated that the law would "likely reduce the numbers of firearm

4

homicides, nonhomicide violent crimes, suicides, and accidental firearm injuries." *Id.*
at 127 (quotations omitted).

## C. *Analysis*

Under *RMGO*, the Waiting Period Act is (1) a presumptively lawful condition or
qualification on the commercial sale of arms that (2) is not employed for abusive ends.

### 1. **Condition or Qualification on Sale**

The Waiting Period Act imposes a condition or qualification that no firearm sale
may be completed in fewer than seven days. It regulates only the "selling and purchasing
[of] firearms." *RMGO*, 121 F.4th at 120. Thus, under *RMGO*, the Act is presumptively
constitutional. *See id.* at 118 n.4, 120 (explaining that "the conduct at issue" was "sale
and purchase" and that "the prohibition on conduct contained within [the Colorado law]
does not require us to proceed beyond *Bruen* step one"). The majority's arguments to the
contrary are not persuasive and effectively sidestep *RMGO.*

First, the majority says this dissent fails to give "any consideration" to "what
defines a condition or qualification on a commercial sale." Maj. Op. at 22. To the
contrary, the dissent considers *RMGO*'s holding that the Colorado age restriction is a
condition or qualification on commercial sale to determine whether the New Mexico
waiting period is as well.

Second, the majority says the dissent merely "assume[s]" that any law regulating
only sale and purchase is presumptively constitutional. *Id.* But rather than "assume," the
dissent follows and applies *RMGO*, which determined the age restriction law is a
presumptively lawful condition or qualification on commercial sale. The age law

regulates only sale and purchase, does not prevent anyone from possessing or carrying guns acquired through non-sale means, and does not merely delay but rather prohibits underage people from buying firearms. *See RMGO*, 121 F.4th at 104-05. The waiting period is similar in all material respects.

Third, the majority argues the dissent's "shortcut analysis could prop up laws that lay heavy burdens on the rights of ordinary citizens," Maj. Op. at 22, including even a law banning all firearm sales, *id.* at 21. Again, the dissent follows *RMGO* and does not trigger this overstated concern. The dissent's analysis is *RMGO*'s analysis. Banning all firearm sales is a far cry from a seven-day waiting period or a minimum-age law and plainly would impose more than a mere condition or qualification on sale because there would be no sales. Also, a ban would surely serve abusive ends and therefore could be upheld only under *Bruen* step two.

Fourth, the majority says the Act is "not tailored to commercial sales,"[4] conceding the Act regulates only the sale and purchase of arms, but noting it also covers certain non-commercial sales while exempting certain commercial sales. *Id.* at 18. For example, the majority says the waiting period applies to certain "non-commercial" sales, such as a hobbyist who wishes to sell a gun to a friend or a collector who wishes to sell to a

---

[4] Plaintiffs have not argued that the Waiting Period Act is "not tailored to commercial sales." Maj. Op. at 18. We ordinarily decline to consider arguments for reversing a district court when the appellant fails to raise them. *See, e.g.*, *Tachias v. Sanders*, 130 F.4th 836, 843-44 (10th Cir. 2025).

6

museum, but does not apply to certain "commercial" sales, such as sales made to law enforcement officials or federal firearms licensees. *Id.* at 18-19.

But the Colorado age restriction upheld in *RMGO* covers and excludes the same types of sales. The majority's hobbyist would break the law if the friend were under 21, *see* Colo. Rev. Stat. § 18-12-112(e); *id.* § 18-12-112.5(1)(a.3), and the age restriction contains no carve-out for transactions between collectors, *see RMGO*, 121 F.4th at 105 (listing the exceptions). On the flip side, the Colorado law exempts sales to law enforcement, Colo. Rev. Stat. § 18-12-112(g)(I), (II); *id.* § 18-12-112.5(1)(a.5)(I), (II), and does not apply to federal firearms licensees because a person must be 21 years old to hold such a license, 18 U.S.C. § 923(d)(1)(A).

<u>Fifth</u>, the majority asserts the Act "is not a condition because it cannot be met by any action, and it is not a qualification because it is universally applicable." Maj. Op. at 20. But the Colorado law upheld in *RMGO* shares those characteristics. A person under 21 cannot meet an age restriction's requirement "by any action" and simply must wait to turn 21, just as a purchaser must wait seven days. And the age restriction is similarly universally applicable—no one under 21 and subject to the law can buy a gun, just as no one subject to the waiting period can buy a gun without waiting seven days.[5]

_____

[5] Plaintiffs and others could have acted to avoid the waiting period by obtaining a concealed handgun license in the two months between the Act's enactment and its effective date. *See* H.R. 129, 56th Leg., 2d Reg. Sess. (N.M. 2024) (Act signed on March 4, 2024; effective date of May 15, 2024); *see Bruen*, 597 U.S. at 13 n.1, 38 n.9 (explaining how "shall-issue" licensing regimes like New Mexico's "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'" (quoting *Heller*, 554 U.S. at 635)). An application for a concealed

7

Sixth, the majority contends *RMGO* does not control because it "did not grapple with the full scope of arguments defining conditions and qualifications that we face here." Maj. Op. at 22. But the *RMGO* plaintiffs argued that the age law is not "a commercial regulation of the sort contemplated by *Heller*" because it "prohibits non-commercial as well as commercial sales." Brief of Plaintiffs-Appellees at 19, *RMGO*, 121 F.4th 96 (No. 23-1251). And the State of Colorado argued the law is a condition or qualification on sale because it regulates only the sale and purchase of firearms and does not prohibit anyone from possessing a gun or from engaging in non-sale transfers. Appellant's Brief at 37-38, *RMGO*, 121 F.4th 96 (No. 23-1251); *see also* Appellant's Reply Brief at 15, *RMGO*, 121 F.4th 96 (No. 23-1251) ("*Heller* did not say that 'regulations on commercial dealers' are longstanding, but conditions on the *sale* transaction itself."). *RMGO* agreed with Colorado. 121 F.4th at 120.

In any event, *RMGO*'s holding "is the law of this Circuit regardless of what might have happened had other arguments been made to the panel that decided the issue first." *United States v. Baker*, 49 F.4th 1348, 1358 (10th Cir. 2022) (emphasis removed) (quoting *Thompson v. Weyerhaeuser Co.*, 582 F.3d 1125, 1130 (10th Cir. 2009)).

\*    \*    \*    \*

---

handgun license must be approved or denied within 30 days of the completion of a background check. N.M. Stat. Ann. § 29-19-6(A).

8

Under *RMGO*, the Waiting Period Act imposes a condition or qualification on commercial arms sales and is presumptively constitutional.[6]

### 2. Abusive Ends

The Waiting Period Act is constitutional under *RMGO* unless it serves abusive ends. *RMGO*, 121 F.4th at 127-28. *RMGO* did not decide which party bears the burden on this question. *Id.* at 122 n.8. Because conditions and qualifications on commercial sale are presumptively constitutional under *Bruen* step one, Plaintiffs should bear the

---

[6] The majority states that "the right to bear arms requires a right to acquire arms." Maj. Op. at 11. Although "[t]he right to 'keep and bear' can implicate the right to purchase," *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024), if a right to acquire were unlimited, it would swallow *Heller*'s dictum that "imposing conditions and qualifications on the commercial sale of arms" is "presumptively lawful," *Heller*, 554 U.S. at 626-27, 627 n.26; *see also RMGO*, 121 F.4th at 120 (holding "laws imposing conditions and qualifications on the sale and purchase of arms do not implicate the plain text of the Second Amendment"). And it would make background checks and licensing requirements constitutionally suspect at *Bruen* step one. *But see McRorey*, 99 F.4th at 836-41 (upholding background check law); *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 224-29 (4th Cir. 2024) (en banc) (upholding law requiring license to purchase a handgun). As the majority notes, courts have found waiting periods related to certain rights are suspect and others are not. Maj. Op. at 15, 16 n.4.

Under *RMGO*, we apply the abusive ends inquiry to decide whether a law that regulates only sale and purchase implicates the right to keep and bear. *See* 121 F.4th at 127-28 (holding conditions and qualifications on sale and purchase "do[] not fall within the protections of the plain text of the Second Amendment" unless "employed for abusive ends"). As explained below, the Waiting Period Act does not serve abusive ends.

9

burden.  *See id.* at 113 (holding plaintiff bears burden under *Bruen* step one).[7]  They have not done so.[8]

*RMGO* provides a roadmap for the abusive ends analysis.  It held the Colorado law does not do so because the age restriction is a nondiscretionary condition "aimed at ensuring guns are held by law-abiding, responsible persons," *id.* at 122, and because Colorado's evidence demonstrated that the age limit imposed is not arbitrary or improper, *see id.* at 124-27.  The same is true of the waiting period.

First, as in *RMGO*, the Act "sets a narrow, objective, and definite standard that applies uniformly to all potential sellers and buyers, eliminating any possibility for subjective interpretation or exceptions."  *Id.* at 123; *see Bruen*, 597 U.S. at 38 n.9.

Second, the Act seeks to keep guns from those who may act impulsively or illegally, *see* App., Vol. V at 1031 (explaining the Act's primary purpose is to "prevent[] impulsive suicides and homicides"), and is thus "aimed at ensuring guns are held by law-abiding, responsible persons," *RMGO*, 121 F.4th at 122.  Consistent with this

---

[7] As in *RMGO*, the record is likely sufficient to conclude that the law does not serve abusive ends regardless of which party bears the burden.

[8] The majority contends that Plaintiffs could "overcome any presumption of constitutionality" because "waiting periods are neither longstanding nor widespread practices, and diverge from history and tradition."  Maj. Op. at 23.  But again, this contention runs counter to *RMGO*.  We squarely held that under *Bruen* step one, conditions and qualifications on commercial sale do not implicate the Second Amendment's plain text, obviating any need to show that such a law has a historical analogue under *Bruen* step two.  *See RMGO*, 121 F.4th at 121, 127-28.  We also held that a condition or qualification need not be "longstanding" to be presumptively lawful. *See id.* at 120-21.

purpose, the Act exempts from the waiting period concealed handgun license holders, who are required to pass background checks and complete safety training, N.M. Stat. Ann. § 29-19-4(A)(10); *id.* § 29-19-5(D), which belies the majority's criticism that the law "treat[s] *all* those seeking a firearm as unusually dangerous," Maj. Op. at 31.

Further, the record "support[s] the legislation's purpose." *RMGO*, 121 F.4th at 126 n.10. The district court found that "waiting periods reduce gun homicides by roughly seventeen percent" and "have been shown to decrease suicides." App., Vol. V at 1031-32. It also found that the Act's waiting period "is likely to save approximately thirty-seven lives per year." *Id.* at 1032; *see RMGO*, 121 F.4th at 127 (noting evidence that the minimum age requirement would "likely reduce the numbers of firearm homicides, nonhomicide violent crimes, suicides, and accidental firearm injuries in Colorado"). Plaintiffs do not challenge these factual findings on appeal.

Third, nearly a dozen states plus the District of Columbia have enacted waiting period laws that apply to some or all firearms. Aplee. Br. at 7; *compare RMGO*, 121 F.4th at 124 (noting 20 states had set the minimum purchase age for a firearm at 21). Four states set shorter periods, *see* Colo. Rev. Stat. § 18-12-115(1)(a)(I) (three days); Fla. Stat. § 790.0655(1)(a) (same); 720 Ill. Comp. Stat. 5/24-3(A)(g) (same); Vt. Stat. Ann. tit. 13, § 4019a(a) (same), five set longer ones, *see* Cal. Penal Code § 26815(a) (10 days); D.C. Code § 22-4508 (10 days); Wash. Rev. Code § 9.41.092(2) (10 business days); Haw. Rev. Stat. § 134-2(a), (e) (14 days); Minn. Stat. § 624.7132 (30 days), and three set the same seven-day period, *see, e.g.*, 11 R.I. Gen. Laws § 11-47-35(a)(1), -35.2(a); Md. Code Ann., Pub. Safety § 5-123(a); N.J. Stat. Ann.

11

§ 2C:58-2(a)(5)(a). *See RMGO*, 121 F.4th at 124 (pointing to other jurisdictions with age restriction laws to show Colorado's is not "arbitrary or improper").

In short, the law does not serve abusive ends. It does not "meaningfully constrain[] the right to keep and bear arms." *B & L Prods*., 104 F.4th at 119 (quotations omitted). Like the minimum age requirement upheld in *RMGO*, the Act "neither prohibits anyone from possessing a gun nor prohibits certain non-purchase gun transfers of ownership," *RMGO*, 121 F.4th at 122, but rather imposes a modest delay on commercial acquisition of arms. And like shall-issue licensing regimes generally, the Act "do[es] not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right[s]," but rather is "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635).[9]

---

[9] The majority states that "[a] supposed condition or qualification that applies as broadly as this one, put toward an end that is justified only by assuming that citizens cannot be trusted with their own rights, is put toward an abusive end." Maj. Op. at 23 n.7. But this characterization cannot be squared with *RMGO*. Although the waiting period covers a broader age demographic than the law upheld in *RMGO*, it applies more narrowly to only seven days. In any event, a commercial regulation having broad application, such as a background check requirement, does not necessarily serve abusive ends. *See Bruen*, 597 U.S. at 38 n.9 (suggesting laws requiring anyone who wishes to publicly carry firearms to pass a background check are generally constitutional).

The majority's statement could equally be made about an age requirement. *RMGO* held that the plaintiff in that case had Second Amendment rights, 121 F.4th at 114-16, yet determined that the age restriction did not serve abusive ends in light of evidence that the law would reduce homicides, suicides, and accidental shootings, *id.* at 127. That a waiting period, like an age requirement, may be overinclusive thus does not necessarily mean it serves abusive ends.

**CONCLUSION**

The Waiting Period Act accords with *RMGO*.  I would affirm.

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert
Clerk of Court

Jane K. Castro
Chief Deputy Clerk

August 19, 2025

Paul D. Clement
Erin E. Murphy
Matthew Rowen
Kevin Joseph Wynosky
Clement & Murphy
706 Duke Street
Alexandria, VA 22314

Erin Marie Erhardt
NRA Office of the General Counsel
11250 Waples Mill Road
Fairfax, VA 22030

Joseph Gary Samuel Greenlee
National Rifle Association Institute of Legislative Action
11250 Waples Mill Road
Fairfax, VA 22030

Carter B Harrison
Harrison & Hart
924 Park Avenue SW, Suite E
Albuquerque, NM 87102

Michael McCoy
Robert Austin Welsh
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227

Donald Sean Nation
Nares Law Group
501 South Cherry Street, Suite 100
Denver, CO 80246

**RE:**     **24-2121, Ortega, et al v. Lujan Grisham, et al**
        Dist/Ag docket: 1:24-CV-00471-JB-SCY

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(d)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rule 40 and 10th Cir. R. 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc:     Holly Agajanian
        Aletheia V.P. Allen
        Harry P. Cohen
        Nicholas Dowd
        Kyle P Duffy
        Seth C. McMillan
        Amy M Pauli
        Van Snow
        Joshua S. Sohn
        Christa Street
        Emily Strickland
        Luke Taeschler
        Scott L. Winkelman

CMW/jjh