No. 24-2121

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

SAMUEL ORTEGA and REBECCA SCOTT,

*Plaintiffs-Appellants*,

v.

MICHELLE LUJAN GRISHAM, in her official capacity as Governor of New Mexico, and RAÚL TORREZ, in his official capacity as Attorney General of New Mexico,

*Defendants-Appellees*.

On Appeal from the United States District Court for the
District of New Mexico,
No. 1:24-CV-00471-JB-SCY (Hon. James O. Browning)

## RESPONSE IN OPPOSITION TO PETITION
## FOR REHEARING EN BANC

<table>
<tr><td>

MICHAEL D. MCCOY
ROBERT A. WELSH
MOUNTAIN STATES LEGAL
  FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227



JOSEPH G.S. GREENLEE
ERIN M. ERHARDT
NATIONAL RIFLE
  ASSOCIATION OF AMERICA
11250 Waples Mill Road
Fairfax, VA 22030

</td><td>

PAUL D. CLEMENT
ERIN E. MURPHY
  *Counsel of Record*
MATTHEW D. ROWEN
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

CARTER B. HARRISON IV
HARRISON & HART
924 Park Avenue SW, Suite E
Albuquerque, NM 87102

</td></tr>
</table>

*Counsel for Plaintiffs-Appellants*

October 9, 2025

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. ii

INTRODUCTION ........................................................................................... 1

BACKGROUND .............................................................................................. 3

REASONS FOR DENYING REHEARING ....................................................... 8

I.    The Panel Decision Is Correct ....................................................... 8

II.   The Panel Decision Does Not Conflict With *RMGO* ................... 10

III.  The Panel Decision Does Not Conflict With Any Other Circuit's Cases ............................................................................................. 15

CONCLUSION ............................................................................................. 17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*District of Columbia v. Heller*,
554 U.S. 570 (2008)........................................................................10

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022)................................................... 6, 8, 9, 12, 14

*Nat'l Rifle Ass'n, Inc. v. Glass*,
No. 24-1185 (U.S. *pet'n filed* May 16, 2025).........................................2

*Nguyen v. Bonta*,
140 F.4th 1237 (9th Cir. 2025)............................................... 2, 15, 16

*Reese v. ATF*,
127 F.4th 583 (5th Cir. 2025).................................................16

*Rocky Mountain Gun Owners v. Polis*,
121 F.4th 96 (10th Cir. 2024)........................... 1, 6, 10, 12, 13, 14, 15

*United States v. Daniels*,
101 F.4th 770 (10th Cir. 2024)...............................................15

*United States v. Rahimi*,
602 U.S. 680 (2024)................................................... 1, 3, 8, 9, 10, 13

*United States v. Vereen*,
2025 WL 2394444 (2d Cir. Aug. 19, 2025).......................................16

**Statutes**

N.M. Stat. §30-7-7.3(A).............................................................4

N.M. Stat. §30-7-7.3(B).............................................................12

N.M. Stat. §30-7-7.3(C).............................................................12

N.M. Stat. §30-7-7.3(H).............................................................4

**INTRODUCTION**

In *United States v. Rahimi*, 602 U.S. 680 (2024), the Supreme Court made explicit what had been implicit in its prior precedent: While the Second Amendment may tolerate some "laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse," laws that "broadly restrict arms use by the public generally" are anathema to this Nation's historical tradition of firearm regulation. *Id.* at 698. This Court's cases reflect that critical distinction. On the one hand, this Court held in *Rocky Mountain Gun Owners v. Polis* ("*RMGO*"), 121 F.4th 96 (10th Cir. 2024), that a state may ban the sale of firearms to 18-to-20-year-olds, on the theory that young adults are especially susceptible to impulsivity. On the other hand, the panel here held that New Mexico may not impose an across-the-board "cooling-off" period under which all members of the general public must wait a week before they can take possession of a firearm, even if they pass a background check instantly, on the theory that no one can be trusted not to act impulsively with a firearm unless they first take a timeout. Far from "sidestep[p]ing" precedent, Pet.1, the panel properly applied it. New Mexico House Bill 129 ("HB129") "regulates arms-bearing conduct" but is not at all "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 691-92. The panel thus correctly held that it "is unconstitutional." Op.38. Nothing about that decision warrants en banc rehearing.

To be sure, Plaintiffs believe that *RMGO* is incorrect, and that no historical tradition supports disarming the particular category of persons singled out there. But the validity of laws prohibiting 18-to-20-year-olds from acquiring firearms is likely to reach the Supreme Court in the coming months, *see, e.g.*, *Nat'l Rifle Ass'n, Inc. v. Glass*, No. 24-1185 (U.S. *pet'n filed* May 16, 2025), so rehearing this case en banc just to hold that *RMGO* was wrong in its bottom-line conclusion would be a poor use of this Court's resources. And while Plaintiffs do not think that *RMGO* got the threshold analysis correct either, there is no need to revisit that issue here, because the panel faithfully applied the principles *RMGO* established. The state's contrary argument rests on a misreading of *RMGO*. Far from holding that all sales restrictions short of outright bans are presumptively (let alone conclusively) constitutional, *RMGO* made clear that any such presumption exists only if a law actually imposes a condition or qualification on the commercial sale of arms, and evaporates if the law is abusive. As the panel took pains to explain, HB129 satisfies neither criterion. There is thus no conflict among this Court's cases that warrants rehearing.

Nor is there any conflict between the panel decision and any other circuit's law. In fact, the only other circuit to confront a law that temporally metered the general public's ability to acquire firearms held the law unconstitutional. *Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025). And all circuits to reach the issue to date have held that laws that restrict the general public's ability to acquire firearms burden

Second Amendment rights. Only by adopting the state's crabbed view of *RMGO* would this Court create a circuit split.

There is no reason to follow the state down that baleful path. This case satisfies none of the criteria for rehearing. The Court should deny the petition.

## BACKGROUND

1. Since the Founding, states have limited firearm access for those thought to be predisposed to violence. Sometimes, these laws were rooted in an individualized assessment of whether someone had engaged or threatened to engage in violent or other dangerous conduct; other times, they were rooted in virulent racism or other class-based prejudices. But what ties these laws together is that they at least endeavored to distinguish (1) individuals determined (either on a class basis or via past misconduct) to "pose a credible threat to the physical safety of others" if armed from (2) everyone who wants a firearm. *Rahimi*, 602 U.S. at 700. The Supreme Court has been explicit about this: Laws "distinguish[ing] citizens who have been found to pose a credible threat to the physical safety of others from those who have not" are consistent with "our Nation's tradition of firearm regulation," but laws "broadly restrict[ing] arms use by the public generally" are not. *Id.* at 698, 700.

Cooling-off laws fall decidedly in the latter camp. The most that can be said of them from a historical perspective is that they are vestiges of waiting-period laws, which began to emerge in the 1920 and 1930s alongside early background-check

laws.  Because it took much longer in that era to run a background check, waiting periods were a necessary concomitant guaranteeing time for sellers to forward the purchaser's information to law enforcement and for law enforcement to conduct a rudimentary background check.  *See* Opening.Br.7-8.  Waiting periods continued to fulfill that role of identifying potentially dangerous individuals in other states (though never a majority) throughout the pre-Internet era.  But with the advent of instant background-check technology, many states with waiting-period laws acknowledged that they no longer served their individualized-investigation purpose.  So, starting in the 1990s, many states abandoned waiting periods as they adopted instant background-check requirements.  *See* Opening.Br.9.

2. Recently, however, New Mexico went in the opposite direction, enacting HB129 in 2024.  HB129 requires "[a] waiting period of seven calendar days" between a firearms transaction "and the transfer of the firearm to the buyer."  N.M. Stat. §30-7-7.3(A).  That period is not keyed to the time it takes to complete a background check, *see id.*; even if the check clears instantly (as most do), the purchaser still must wait seven days to "cool off" before she may lawfully take possession of her firearm.  The only sales exempt from HB129 are sales to federally licensed firearms dealers, sales to law-enforcement agencies or between law-enforcement officers, sales to individuals with valid New Mexico concealed-handgun licenses, and sales between immediate family members.  *Id.* §30-7-7.3(H).

3. The day HB129 took effect, Plaintiffs—both of whom are law-abiding adults, and one of whom is a former law-enforcement officer—filed suit, seeking a declaration that HB129 violates the Second Amendment and preliminary and permanent injunctions blocking its enforcement. App.16, 1028-29.

The district court denied Plaintiffs' preliminary-injunction motion. The court first held that, because the Second Amendment does not say "purchase" or "acquire" alongside "keep and bear," laws regulating the acquisition of firearms do not implicate the Second Amendment at all unless they "function[] as a de facto prohibition on the right to keep and bear arms," which, in the court's view, a seven-day prohibition does not. App.1088. Alternatively, the court held that any law "cover[ing] the sale of firearms" that has a pedigree "extending back to some point in the twentieth century" is constitutional. App.1094-99. Finally, in yet another alternative conclusion, the court posited that HB129 is relevantly similar to colonial-era laws "prohibiting and restricting the sale of firearms to large swaths of the population"—everyone from "blacks, slave and free; Indians; propertyless whites; non-Protestants or potentially unruly Protestants"—"out of a fear that some among these groups would use the purchased firearms to do harm." App.1107, 1112.

4. Plaintiffs appealed, and a panel of this Court reversed. The majority began by asking whether HB129 "implicate[s] the plain text of the Second Amendment." Op.10. It easily answered yes. Both "[c]ommon sense" and standard principles of

"[l]egal interpretation" "dictate[] that the right to bear arms requires a right to acquire arms, just as the right to free press necessarily includes the right to acquire a printing press." Op.11. Thus, HB129—which does nothing *but* burden people's ability to acquire arms—implicates the Second Amendment. Op.10-16. In so holding, the panel joined every other circuit to reach the issue post-*Bruen*. Op.13-14.

The majority then turned to *RMGO*, which it found distinguishable. Unlike the 18-to-20 law in *RMGO*, HB129 does not restrict sales based on some quality tethered to who the legislature thinks is a "responsible citizen[]"—e.g., whether she is of a certain age or has passed a background check. Op.20 (citing *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022)). Nor does HB129 impose a "condition" or "qualification" on arms sales. Op.20 (citing relevant definitions from Black's Law Dictionary). "A blanket waiting period is simply not of a kind with the conditions and qualifications imposed by other presumptively lawful measures." Op.21. Thus, HB129 is not "presumptively constitutional." Op.18.

That said, the majority concluded that HB129 would still "burden Second Amendment rights" even if it *did* enjoy an initial presumption of validity under *RMGO*. Op.23. As the majority noted, *RMGO* "read *Bruen*'s 'abusive ends' limitation to mean that any condition or qualification on the sale or purchase of firearms, if found to have such abusive ends, negates the presumption that the law or regulation is lawful." Op.23 n.7 (quoting 121 F.4th at 122). And whatever may

be said of a condition premised on the notion that certain persons or categories of persons are too dangerous to entrust with arms, "[a] supposed condition or qualification that applies as broadly as this one, put toward an end that is justified only by assuming that citizens cannot be trusted with their own rights, is put toward an abusive end." Op.23 n.7; *see also* Op.28 n.10.

Moving to historical tradition, the majority made quick work of the state's proffered analogies. Early waiting-period laws do not fit the *Bruen* bill, both because they were unheard of before 1923 and because they were passed for a fundamentally different investigatory purpose than modern cooling-off laws. Op.25-26. Founding-era laws preventing people from carrying firearms while intoxicated fare no better, as they temporarily dispossessed only demonstrably dangerous individuals. Op.28-30. As for odious colonial laws categorically disarming "slaves, Native Americans, and other 'disfavored' ethnic or cultural groups," those "misguided" laws applied only to certain groups deemed to be particularly dangerousness, not "society-wide." Op.32-33. Finally, whereas "shall-issue" licensing regimes condition firearm possession on individualized determinations, HB129 "treat[s] *all* those seeking a firearm as unusually dangerous," no matter how many background checks they pass. Op.31. The majority accordingly held that HB129 "is unconstitutional" and remanded for the district court to consider the proper scope of relief. Op.37.

Judge Matheson dissented. Although he did not address New Mexico's proffered historical analogues, he explained that he understood *RMGO* to mean that HB129 "falls outside the Second Amendment" entirely. Dissent.1. According to Judge Matheson, *RMGO* held that, short of an outright ban on sales, *any* law restricting firearm sales in *any* way is immune from scrutiny, no matter whether it involves a class-based determination of dangerousness (as in *RMGO*) or a universal restriction on sales (as here). *See* Dissent.5-8.

## REASONS FOR DENYING REHEARING

### I. The Panel Decision Is Correct.

The first question under *Bruen* and *Rahimi* is whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If it does—i.e., if the state has "regulate[d] arms-bearing conduct"—then the state must "'justify its regulation'" by showing that the law "is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 691-92 (quoting *Bruen*, 597 U.S. at 24, 29). As the panel correctly held, HB129 plainly restricts conduct covered by the Second Amendment's plain text: It prevents everyone in the state from taking possession of—and thus "keep[ing] and "bear[ing]"—a firearm for a week, even if they pass a background check instantly (as Plaintiffs did). Op.11-15.

New Mexico does not directly challenge the panel's threshold-textual holding. And while it does contest the panel's holding that HB129 is not consistent with

historical tradition, *see* Op.23-37, its arguments are far off-base. As the panel recognized, our historical tradition tolerates at least some restrictions premised on "particularized determinations that a person or subcategory of persons represent a known danger." Op.30. That tradition may well justify modern background-check and "shall-issue" licensing schemes. Like the historical laws New Mexico cites that prohibited drunk people from carrying firearms, such regimes are focused on differentiating people who are, "in fact, 'law-abiding responsible citizens,'" from those who are not. *Bruen*, 597 U.S. at 38 n.9. And, of course, the premise of such regimes is that the government may restrict the Second Amendment rights of all who fit into a subcategory of the people whose rights it may permissibly restrict.[1] While it is doubtful that historical tradition supports the notion that "young legal adults" is one of those categories, at least age-based restrictions are grounded in the notion that a particular "categor[y]" of people "present[s] a special danger of misuse." *Rahimi*, 602 U.S. at 698.

HB129, by contrast, is decidedly not. The law "makes no effort to distinguish the dangerous from the law-abiding, instead choosing to 'broadly restrict arms use by the public generally.'" Op.30 (quoting *Rahimi*, 602 U.S. at 698). And there is no

---

[1] *Contra* Pet.16, the majority did not conclude that historical group-ban laws "can *never* be relied upon." It merely made the commonsense point that trying to analogize to historical laws that restricted groups of people who were not thought to possess *any* Second Amendment rights at the time is risky business. *See* Op.33-34.

historical tradition supporting such sweeping restrictions.  Thus, *contra* Pet.14, the majority did not hold HB129 unconstitutional because it "required a literal 'ringer' … under *Bruen*'s second step."  It held that HB129 fails historical scrutiny because it is not remotely (let alone relevantly) similar to *any* law "that our tradition is understood to permit."  *Rahimi*, 602 U.S. at 692.  Under a straightforward application of *Bruen* and *Rahimi*, that conclusion is correct.

## II.    The Panel Decision Does Not Conflict With *RMGO*.

Unable to seriously argue that the panel decision conflicts with *Bruen* or *Rahimi*, New Mexico claims that it conflicts with this Court's decision in *RMGO*.  It does not.

**A.** *RMGO* held that "'laws imposing conditions and qualifications on the commercial sale of arms'" enjoy a "presumption of legality," and that "an aged-based condition or qualification on the sale of arms … is covered by th[at] safe harbor."  121 F.4th at 119 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008)).  Plaintiffs disagree with that conclusion.  *See* Reply.Br.16-17.  But that conclusion does not undermine the panel decision here in the slightest.  Nowhere in *RMGO* did the Court hold (or even hint) that a law like HB129—which does *not* impose conditions or qualifications on the sale of arms, and instead just makes everyone "cool off" for a week before they can take possession of a firearm (even after passing the background check that proves their qualifications)—is

presumptively lawful. Nor does anything in *RMGO* suggest that *every* law that "regulates only the 'selling and purchasing of firearms'" must be a condition or qualification on the commercial sale of arms, let alone that all such laws are presumptively lawful. *Contra* Dissent.5; *see* Op.22.

New Mexico does not really argue otherwise. Instead, it just repeats mantralike that if, as *RMGO* held, making young adults wait until their 21st birthday to acquire a firearm is a condition or qualification on the commercial sale of arms, then making everyone else wait seven days to acquire a firearm must be one too. But as the panel majority took pains to explain, that (il)logic does not work.

For starters, whatever one might say of a requirement to be a certain age, a cooling-off period imposes no qualification or condition. "Qualifications" are "qualities or properties (such as fitness or capacity)" that are "legally necessary to make one eligible for [something]." Op.20 (quoting Black's Law Dictionary). HB129 does not impose qualifications in any meaningful sense; it just makes people wait, no matter their "qualities or properties." Being a person who waited seven days bears no resemblance to any kind of seller, let alone buyer, qualification. Indeed, holding that HB129 imposes a qualification on arms purchases "would imply that a buyer who has not waited seven days is somehow presumptively unqualified to purchase a firearm—an obviously unconstitutional implication." Op.20

Nor does HB129 impose conditions on commercial sales.  A "condition" is something "*other than a lapse of time*[] that must exist or occur before a duty to perform something promised arises."  Op.20 (quoting Black's Law Dictionary).  HB129 does nothing *but* impose a state-mandated lapse of time.  Furthermore, even if one could (mis)conceptualize HB129 as imposing a "condition" (Thou shalt wait), that "condition" is not a condition *of sale*.  Under HB129, "[t]he sale happens regardless, and the waiting period is just an artificial delay on possession."  Op.20.  That is clear on the face of HB129, which provides that a "firearm shall remain in the custody of the seller … during … the waiting period" and clarifies that a violation "consists of the transfer of … *possession or physical control* of the firearm … before the end of the … waiting period."  N.M. Stat. §30-7-7.3(B), (C) (emphasis added).  That further distinguishes HB129 from minimum-age requirements like the one in *RMGO*, which condition the *sale* on proof of age.

In short, whatever may be said of minimum-age requirements, HB129 "does not fit with other known conditions and qualifications in this category."  Op.18.  That explains the different outcomes in the two cases.

**B.**  That is not the only distinction that explains the different outcomes.  As *RMGO* made clear, even when it comes to actual conditions or qualifications on arms sales, any "presumption that [a] law … is lawful" is "negate[d]" if the law is "found to have … abusive ends."  121 F.4th at 122 (quoting *Bruen*, 597 U.S. at 38 n.9).  And

12

as the panel majority here correctly held, HB129 is "put toward an end that is justified only by assuming that citizens cannot be trusted with their own rights." Op.23 n.7.

The state protests that, in its view, HB129's *means* are more modest than a sales ban for 18-to-20-year-olds. But that is not the relevant metric. Under *RMGO*, when it comes to rebutting the presumption of validity, what matters are the *ends* to which the law is put. *See* 121 F.4th at 122-24. And on that score, HB129 is categorically different from the law *RMGO* upheld. Colorado's 18-to-20 law at least targets a "categor[y] of persons thought by [the] legislature to present a special danger of misuse." *Rahimi*, 602 U.S. at 698. HB129, by contrast, does not distinguish from the general public *either* people found to pose a threat based on individualized conduct *or* a subset of people who as a class are thought particularly likely to act violently or impulsively. HB129 instead "broadly restrict[s] arms use by the public generally," *id.*, which is exactly what *Bruen* meant by "abusive ends."

New Mexico insists that HB129 "does not serve abusive ends under *RMGO*" because "it 'sets a narrow, objective, and definite standard that applies uniformly to all potential sellers and buyers'" and "is 'aimed at ensuring guns are held by law-abiding, responsible persons.'" Pet.11 (quoting 121 F.4th at 122-23). But *RMGO* did not say that commercial sales regulations are presumptively constitutional so long as they impose objective standards. It said that requiring people to "undergo[]

13

fingerprinting, a background check, [and] a mental health records check, pass[] a firearms safety course, and receiv[e] training in firearms handling" to obtain a "concealed carry permit[]" is "permissib[le]" because those "conditions and qualifications … 'contain only narrow, objective, and definite standards *guiding licensing officials*'" in their assessment of whether an applicant is, "*in fact, '[a] law-abiding, responsible citizen[].*'" 121 F.4th at 122 (emphasis added) (quoting *Bruen*, 597 U.S. at 38 n.9).

HB129, by contrast, does not set a "standard" for determining who is and is not "a law-abiding, responsible individual." It just makes everyone wait seven days. No investigation happens during that "cooling-off" period (which, for Plaintiffs and for most everyone else, runs for a week *after* they pass a background check). That gives the lie to the state's claim that HB129 does anything to ensure that firearms are held only by law-abiding, responsible persons.[2] As the majority explained, "[t]o say that a desire to purchase a firearm renders one dangerous or presumptively not law-abiding for a time would … penalize someone for exercising a constitutional right, which is obviously unconstitutional." Op.28 n.10.

---

[2] It also suffices to dispel New Mexico's puzzling claim that the panel decision "conflicts with the Supreme Court's direction that shall-issue licensing regimes are generally permissible." Pet.13. Again, those regimes are designed to assess whether people are, in fact, law-abiding. HB129 just forces people to wait, even after that assessment has been made.

At bottom, HB129 "look[s] with suspicion on citizens" just because they want to exercise their Second Amendment rights. *But see United States v. Daniels*, 101 F.4th 770, 778 (10th Cir. 2024) ("[I]f we are to take seriously the normative thrust of the Supreme Court's recent decision[s] …, then we cannot look with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way."). If that is not "wrongful or improper," *see RMGO*, 121 F.4th at 124 (explaining what it means to be "abusive"), then it is hard to see what is. There is thus no conflict between *RMGO* and the panel's application of it here.

## III. The Panel Decision Does Not Conflict With Any Other Circuit's Cases.

Nor does the panel's decision conflict with any decision from any other circuit. Despite arguing that it conflicts with a half-dozen cases from other circuits across three distinct issues, *see* Pet.15-16, New Mexico notably avoids the one relevantly similar decision from a sister circuit. Among other circuits, only the Ninth has confronted a law that "temporally meter[ed]" people's ability to acquire firearms. *Nguyen*, 140 F.4th at 1243. The law there made people wait for 30 days after a firearm purchase before they could take possession of a new firearm. *Id.* at 1240. Like the panel here, the Ninth Circuit held in *Nguyen* that laws that force people to wait a set time before they can acquire a new firearm restrict conduct covered by the Second Amendment's plain text and are inconsistent not only with historical

tradition, but with the very notion that the Second Amendment secures a fundamental right. *Id.* at 1241-49.

As for the cases it does cite, New Mexico misrepresents what they held. For instance, New Mexico claims that the Fifth Circuit holds that only "'de facto prohibitions' on the purchase of arms implicate the Second Amendment's plain text." Pet.15. That is wrong. As the majority noted, Op.12—but the state inexplicably ignores—the Fifth Circuit has expressly held that "the Second Amendment 'covers' … commercial purchases" and expressly rejected the argument that laws restricting sales to certain groups are "not covered by the Second Amendment simply because of [their] targeted application." *Reese v. ATF*, 127 F.4th 583, 590 (5th Cir. 2025). *United States v. Vereen*, 2025 WL 2394444 (2d Cir. Aug. 19, 2025), does not aid the state's cause either. *Vereen* expressly recognized that the Second Amendment protects the right to acquire firearms, before holding only that a restriction on importing firearms from out-of-state "minimally affects the ability to acquire a firearm." *Id.* at *4-5.

In short, no circuit has adopted the cartoonish view of *Bruen* that New Mexico (wrongly) claims *RMGO* embraced. There is thus no reason to go en banc, let alone to become the first circuit to do so.

16

## CONCLUSION

The Court should deny the petition.

Respectfully submitted,

s/Erin E. Murphy

| | |
|---|---|
| MICHAEL D. MCCOY | PAUL D. CLEMENT |
| ROBERT A. WELSH | ERIN E. MURPHY |
| MOUNTAIN STATES LEGAL | *Counsel of Record* |
| FOUNDATION | MATTHEW D. ROWEN |
| 2596 South Lewis Way | KEVIN WYNOSKY |
| Lakewood, CO 80227 | CLEMENT & MURPHY, PLLC |
| | 706 Duke Street |
| | Alexandria, VA 22314 |
| JOSEPH G.S. GREENLEE | (202) 742-8900 |
| ERIN M. ERHARDT | |
| NATIONAL RIFLE | CARTER B. HARRISON IV |
| ASSOCIATION OF AMERICA | HARRISON & HART |
| 11250 Waples Mill Road | 924 Park Avenue SW, Suite E |
| Fairfax, VA 22030 | Albuquerque, NM 87102 |

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 40(d)(3)-(4) because it contains 3,885 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(B).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

October 9, 2025

s/Erin E. Murphy
Erin E. Murphy

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

a.      all required privacy redactions have been made;

b.      the hard copies submitted to the clerk are exact copies of the ECF submission;

c.      The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, SentinelOne, version 22.2.4.558, and according to the program is free of viruses.


October 9, 2025

s/Erin E. Murphy
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on October 9, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy