FILED
United States Court of Appeals
Tenth Circuit

December 22, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

SAMUEL ORTEGA; REBECCA SCOTT,

    Plaintiffs - Appellants,

v.

MICHELLE LUJAN GRISHAM, in her official capacity as Governor of the State of New Mexico; RAUL TORREZ, in his official capacity as Attorney General of the State of New Mexico,

    Defendants - Appellees.

------------------------------

BRADY CENTER TO PREVENT GUN VIOLENCE; GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE; STATE OF COLORADO; EVERYTOWN FOR GUN SAFETY,

    Amici Curiae.

No. 24-2121
(D.C. No. 1:24-CV-00471-JB-SCY)
(D. N.M.)

_____

**ORDER**
_____

Before **HOLMES**, Chief Judge, **HARTZ**, **TYMKOVICH**, **MATHESON**, **BACHARACH**, **PHILLIPS**, **McHUGH**, **MORITZ**, **EID**, **CARSON**, **ROSSMAN**, and **FEDERICO**, Circuit Judges.
_____

    This matter is before the court on *Defendants/Appellees' Petition for Rehearing En Banc*, and Plaintiffs-Appellants' *Response in Opposition to Petition for Rehearing En*

*Banc*. The petition and the response were circulated to all judges of the court who are in regular active service, and a poll was called. The poll did not carry. Consequently, the petition is DENIED.

Judges Moritz and Federico would grant the petition. Judge Federico has filed a separate dissent from the denial of en banc rehearing, which is joined by Judge Moritz.

Entered for the Court,

PER CURIAM

No. 24-2121, *Ortega v. Grisham*
**FEDERICO**, Circuit Judge, dissenting from denial of petition for rehearing en banc.

This is an important and obvious case to rehear en banc, so this court should grant the petition and proceed accordingly to en banc review. For reasons that follow, I firmly believe the court's decision to deny en banc review merits a dissent.

En banc proceedings are "extraordinary" and "disfavored." 10th Cir. R. 40.1(B). It has been the accepted wisdom for some time that where "there is a difference in view among the judges upon a question of fundamental importance, . . . it is advisable that the whole court have the opportunity, if it thinks it necessary, to hear and decide the question." *Commissioner of Internal Revenue v. Textile Mills Securities Corporation*, 117 F.2d 62, 71 (3d Cir. 1940), *aff'd,* 314 U.S. 326 (1941). To offset the time and costs to the court and parties of an en banc review, we properly insist that a petitioner demonstrate that the case involves "an issue of exceptional public importance" or "a panel decision that conflicts with a decision of the United States Supreme Court or of this court." 10th Cir. R. 40.1(B). But where either of these conditions are satisfied, the costs of the en banc process are usually considered worthwhile. And where, such as here, *both* these conditions are satisfied, the smooth functioning of the federal court system depends upon our exercise of en banc review.

The petition involves a New Mexico statute with grave public safety consequences. The petition argues that a panel of this court failed to apply this circuit's binding precedent. This case therefore involves an issue of the *most* "exceptional public importance," which we have now addressed in conflicting panel decisions.

Today's decision to deny en banc review is wrong for three reasons. First, it discards the exceptionally important public safety issues that surround New Mexico's firearms regulation, which we have now held to be unconstitutional. Second, it ignores the tension between this case and our prior decision in *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024) [hereinafter *RMGO*]. Third, it relies too heavily on the possibility that the Supreme Court will grant review in a pending petition for certiorari, and therefore overlooks several discretionary factors that militate in favor of our own en banc review.

# I

In 2024, after experiencing "high state-wide rates of gun violence," New Mexico enacted the Waiting Period Act, which required a "cooling-off" period for firearm purchases. *Ortega v. Grisham*, 148 F.4th 1134, 1139 (10th Cir. 2025). Although it contains several exceptions, the statute passed by the New Mexico Legislature and signed by Governor Michelle Lujan Grisham generally requires sellers to wait seven calendar days before transferring a firearm to a buyer. *Id.* at 1139–40 (citing N.M. Stat. § 30-7-7.3). During the seven-day

2

waiting-period, a federal background check must be conducted. *Id.* If seven days lapse without completion of a federal background check, the waiting-period can be extended until a background check is completed. *Id.* However, "[i]f the required federal instant background check has not been completed within twenty days, the seller may transfer the firearm to the buyer." N.M. Stat. § 30-7-7.3(A).

New Mexico enacted the law in response to a troubling problem. According to the bill's fiscal impact report, New Mexico had experienced "550 firearm-related deaths in New Mexico in 2022," over half of them attributed to suicides. N.M. Leg. Finance Committee, 56th Leg., 2d Reg. Sess., House Bill 129 Fiscal Impact Report 3 (N.M. Feb. 13, 2024) [hereinafter Fiscal Impact Report]. "The state's firearm death rate in 2022 was 26.5 deaths per 100 thousand residents, 84 percent higher than the nationwide rate of 14.4 deaths per 100 thousand residents and the third-highest firearm age-adjusted death rate in the nation." *Id.* These drastic figures are part of a larger pattern: over the past two decades, New Mexico's firearm-related casualties have "escalated significantly, moving from the seventh highest in the nation in 1999 to the third highest in 2022." *Id.*

Suicides represent a significant proportion of firearm-related deaths in New Mexico and waiting period or cooling-off laws are particularly useful for suicide prevention. *Id. See also Ortega v. Lujan Grisham*, 741 F. Supp. 3d 1027,

3

1096 (D.N.M. 2024). The Legislature relied on several studies that demonstrated at least moderate support for the proposition that waiting periods reduce suicides in particular and homicides in general. Fiscal Impact Report at 3.

The purposes of New Mexico's statute may not be dispositive as to the ultimate merits analysis under the Second Amendment. But the substantiated nexus between New Mexico's statute and the public health and safety of its citizens presents an issue of "exceptional public importance" that warrants our consideration of the statute's constitutionality in the petition before us. 10th Cir. R. 40.1(B). The *Ortega* majority acknowledged that the statute "serves two purposes. First, it seeks to reduce impulsive gun violence or suicides. Second, it aims to close a perceived loophole in federal law that sometimes permits a purchaser to acquire a gun without completing a background check if the process takes more than three days." 148 F.4th at 1140. But our panel decision prevents New Mexico from vindicating those purposes by its chosen aims. Upon en banc review, we might ultimately agree with the panel that the Second Amendment erects a barrier to the law that New Mexico has duly enacted. But New Mexico's stated, uncontradicted, and indisputable interest in the public safety and health of its citizens warrants a closer look before we extinguish it.

As best I can tell, *Ortega* also appears to be the first time this court has *ever* struck down a firearms statute for violating the Second Amendment. *See*

*also* Eric Ruben & Joseph Blocher, *From Theory to Doctrine: An Empirical Analysis of the Right to Keep and Bear Arms After* Heller, 67 Duke L.J. 1433, 1498 (2018) (as of publication and pre-*Bruen*, half of all circuits including the Tenth Circuit had never encountered a successful Second Amendment challenge). Even setting aside the immediate public safety consequences in New Mexico, *Ortega* will have widespread ramifications for courts in this circuit that must wrestle with Second Amendment challenges. The jurisprudential consequences alone justify en banc review. That these jurisprudential consequences occur in a case with powerful public safety interests only underscores that this is a case of "exceptional public importance" worthy of the time and effort for en banc review.

## II

Even so, issues of exceptional public importance come and go before this court with some frequency without the intervention of the full court. So perhaps if this case was only a matter of first impression, I might join my colleagues' votes against rehearing the case despite its impact on public safety and health. But the petition for rehearing also identifies a possible conflict between *Ortega* and one of our prior, published decisions.

In *RMGO*, this court upheld a Colorado statute that set the minimum age for the sale and purchase of firearms within the state to twenty-one. 121 F.4th 96, 104 (10th Cir. 2024). The court examined the Supreme Court's Second

5

Amendment precedents, including *D.C. v. Heller*, 554 U.S. 570 (2008), *N.Y. State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024). 121 F.4th at 118–19. *RMGO* explained that, beginning with *Heller*, these cases all recognized that there are certain categories of laws, including those "imposing conditions or qualifications on the commercial sale of arms," that are "presumptively lawful." *RMGO*, 121 F.4th at 118–19 (quoting *Heller*, 554 U.S. at 626–27, 626 n.26). The court ultimately determined that the Colorado law fit within the category of a presumptively lawful regulatory measure. *Id.* at 119–20. The court further held that because the Colorado law placed conditions upon the commercial sales of arms and was not adapted to "abusive ends," it did not implicate the text of the Second Amendment, so "the inquiry end[ed]" at step-one of the *Bruen* framework and without resort to historical analogues. *Id.* at 114, 120–28.[1] We have since applied *RMGO* to reject Second Amendment challenges three times. *United*

---

[1] Our colleague, Judge McHugh, authored a thoughtful concurrence in *RMGO* that disagreed with part of the rationale for the court's decision but ultimately agreed that the Colorado law was constitutional. Judge McHugh would have housed the relevant inquiry at step-two of *Bruen* rather than step-one. *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 133 (10th Cir. 2024) (McHugh, J., concurring). As a result, Judge McHugh would have required that a challenged regulation be "longstanding" in order to benefit from the presumption of lawfulness. *Id.* at 135. Nevertheless, all three judges on the panel in *RMGO* agreed that the Colorado regulation was "presumptively lawful" and constitutional. *Id.* at 143.

6

States v. Harrison*, 153 F.4th 998, 1009 (10th Cir. 2025); *United States v. Morgan*, 150 F.4th 1339, 1346 (10th Cir. 2025); *United States v. Jackson*, 138 F.4th 1244, 1252–53 (10th Cir. 2025).

*Ortega* takes a different approach. *Ortega* starts with the premise that "acquiring, purchasing, and possessing firearms is a necessary predicate to keeping and bearing them." 148 F.4th at 1143. From there, *Ortega* reasoned that laws or regulations of commercial firearms sales are covered by the Second Amendment – precisely the opposite of what the court said in *RMGO*. *Compare RMGO*, 121 F.4th at 120 ("We agree and hold that laws imposing conditions and qualifications on the sale and purchase of arms do not implicate the plain text of the Second Amendment.") *with Ortega*, 148 F.4th at 1144 ("New Mexico's argument that limitations on firearm sales or transfers do not implicate the Second Amendment's plain text is wrong[.]"). *Ortega*'s attempts to distinguish *RMGO* may not withstand further scrutiny.

First, *Ortega* offered that "cooling-off periods are not tailored to commercial sales." 148 F.4th at 1146. It is not clear whether *Ortega* meant that cooling-off periods can never be appropriately tailored to commercial sales, or only that New Mexico's statute was overinclusive with respect to certain kinds of firearm transfers. *Id.* at 1146–47. For example, *Ortega* acknowledged that the New Mexico "statute refers only to 'buyers' and 'sellers' and seems to

7

exclude gifts." *Id.* at 1146.[2] But even if the panel was correct in finding some unlawful applications of New Mexico's law, that would not be a basis upon which facial relief could be granted on remand. *Rahimi*, 602 U.S. at 693; *United States v. Salerno*, 481 U.S. 739, 745 (1987) (outside the First Amendment context, a facial "challenger must establish that no set of circumstances exists under which the [challenged regulation] would be valid"). Nor would it be an appropriate basis for us to hold "that the law is unconstitutional." *Ortega*, 148 F.4th at 1156.

Second, *Ortega* suggests that a cooling-off or waiting period is not a condition or qualification for sale "any more than the price of a firearm is." *Id.* at 1147. *Ortega* then hints at a test for determining whether a regulation is (not) a condition or qualification for sale: "It is not enough that a regulation sometimes affects a commercial sale. . .[Otherwise,] an outright ban on commercial sales would also be a condition or qualification on commercial sales, and presumptively lawful." *Id.* But this hypothetical fear is easily addressed. Under *Bruen* and *RMGO*, a challenger can rebut the presumption of legality with evidence that the regulation at issue is adapted to "abusive

---

[2] Nor can I glean any clarity from the panel's examples of hypothetical "non-commercial conduct" that plainly involve commercial conduct. *Ortega v. Grisham*, 148 F.4th 1134, 1146 (10th Cir. 2025) (stating that "a collector *selling* firearms to a museum collection" is not engaged in commercial conduct (emphasis added)).

ends" – evidence that the regulation sweeps so indiscriminately as to ensnare law-abiding, responsible citizens and their self-defense rights. *RMGO*, 121 F.4th at 122 (citing *Bruen*, 597 U.S. at 38 n.9).

Third, *Ortega* argues that in *RMGO* the court did not "grapple with the full scope of arguments defining conditions and qualifications." *Ortega*, 148 F.4th at 1148. But our precedent confirms that is not a basis upon which to depart from a prior published decision of this court. *United States v. Baker*, 49 F.4th 1348, 1358 (10th Cir. 2022). The strict and broad rule of stare decisis that subsists in this circuit does not allow a future panel to break from precedent based on its own view of the party-presented arguments in a prior panel decision. *Thompson v. Weyerhaeuser Co.*, 582 F.3d 1125, 1130 (10th Cir. 2009) ("[U]nless and until the holding of a prior decision is overruled by the Supreme Court or by the en banc court, that holding is the law of this Circuit *regardless of what might have happened had other arguments been made to the panel that decided the issue first*." (internal quotations omitted, emphasis in original)). But in any event, *Ortega* itself acknowledges that the "pertinent" arguments *were* addressed. 148 F.4th at 1148. *Ortega* cites the *RMGO* concurrence for the proposition that some arguments were not presented or decided, 148 F.4th at 1148, but that citation implicitly acknowledges that the *RMGO* court was aware of – and rejected – the arguments later presented in

9

*Ortega*. *See also* 148 F.4th at 1159 (Matheson, J., dissenting) (discussing the briefed arguments in *RMGO*).

Finally, *Ortega* suggests that the New Mexico statute, even if presumptively lawful, could not withstand further scrutiny. *Id.* at 1148–49. But instead of assessing whether the New Mexico law is adapted towards abusive ends, *Ortega* instead struck down waiting periods (apparently as a class) because they "are neither longstanding nor widespread practices, and diverge from history and tradition." *Id.* at 1149. That was not the majority approach in *RMGO*. Instead, it was partially the approach the *RMGO* concurrence would have taken. *Polis*, 121 F.4th at 135 ("I believe the government has the burden of showing the regulation at issue is longstanding[.]"). The *RMGO* majority weighed a broader set of factors, like the amount of discretion required to implement the regulation, the widespread adoption of identical or similar regulations, the history of identical or similar regulations, and the evidence tying the regulation to an accurate determination of citizen responsibility. *Id.* at 123–27. *Ortega*, however, treated the third factor as dispositive, simultaneously redefining "abusive ends" as those "justified only by assuming that citizens cannot be trusted with their own rights." 148 F.4th at 1149 n.7.

*Ortega* elicited a persuasive dissent. New Mexico's "waiting period is similar in all material respects," wrote Judge Matheson, to the Colorado age

10

restriction we upheld in *RMGO*. 148 F.4th at 1158 (Matheson, J., dissenting). Indeed, if anything, the Colorado law imposed a far more burdensome waiting period – up to three years – for adults who wished to purchase a firearm. *Id.* And under both the New Mexico and Colorado laws, a potential firearm buyer must wait for conditions that are out of their control. *Id.* at 1159. Still this court upheld the Colorado law. The *Ortega* majority's principal response to the dissent was that the dissent failed "to give 'any consideration' to 'what defines a condition or qualification on a commercial sale.'" *Id.* at 1158 (quoting majority at 1148). But as Judge Matheson pointed out, the definition of a condition or qualification can be found by reference to what we upheld in *RMGO*. *Id.* And in any event, the *Ortega* majority stands on no better ground, for it did not provide a definition that would permit the outcomes in both *RMGO* and *Ortega*.

It is therefore no surprise that Colorado, whose law was upheld in *RMGO*, now joins New Mexico and urgently asks us to review *Ortega* en banc. Colorado's age restriction, which was upheld only last year, may once again be placed in jeopardy. Colorado Am. Br. at 12. But Colorado is not alone among those in the Tenth Circuit who may endure additional litigation after *Ortega*: Kansas, Oklahoma, Utah, and the federal government all establish age restrictions, some exceeding the age of eighteen, depending on the type of weapon purchased. *RMGO*, 121 F.4th at 123 n.9. And Colorado imposes a three-day waiting period for gun purchases. *Ortega*, 148 F.4th at 1140 n.1. It

is an open question whether *Ortega* casts doubt on the constitutionality of all these laws, notwithstanding our prior opinion in *RMGO*.

But it is not only the interests of governments at stake. In *RMGO*, it was the plaintiffs who lost. If *Ortega* is correct about its approach to the Second Amendment, then this court may have erroneously denied relief in *RMGO*. The constitutional rights of those people affected by our decision in *RMGO* are profoundly and unfairly undermined by the ambiguity we needlessly inject into the law after *Ortega*. Responsible, law-abiding citizens who wish to exercise their Second Amendment rights are entitled to, at a minimum, clear rules and expectations as to how their rights may be constitutionally limited. But the lack of harmony in our Second Amendment jurisprudence invites the perception – fair or not – that the Second Amendment rights of Americans might rise or fall depending on the district court where they file or the panel of appellate judges they draw. Particularly in high profile matters like this one, our consistent application of one rule is therefore of paramount importance.

I find implicit in *Ortega*'s attempts to distinguish *RMGO* an entirely respectable instinct: fair-minded disagreement about Second Amendment jurisprudence. However, there are additional compelling reasons for initiating the en banc process above and beyond the necessary predicates of exceptional public importance or an intracircuit conflict in opinions.

## III

In addition to the Rule 40 factors discussed above, there are two related, discretionary factors that also counsel in favor of en banc. First, allowing a potential intracircuit split to persist will inevitably cause judicial inefficiencies in the district courts and on appeal. Second, we bear a duty to opine on this issue of critical importance. The gravitational pull of the Supreme Court does not displace that duty – in fact, it enhances our institutional responsibilities. Our failure to resolve the questions presented by New Mexico's petition for rehearing en banc therefore wastes the reservoir of discretion we purposely reserve for moments such as this.

The tension between *Ortega* and *RMGO* will inspire judicial inefficiency. Potential intracircuit splits make the work of district courts more difficult, as they must struggle to cobble together a workable theory of circuit law without offending two binding opinions. "A district court must follow the precedent of this circuit[.]" *United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990). But just as we are incapable of resolving perceived inconsistencies in the Supreme Court's caselaw, *United States v. Maloid*, 71 F.4th 795, 808 (10th Cir. 2023) ("We must apply Supreme Court precedent even when that precedent rests on shaky grounds."), so too are district courts unable to resolve our intracircuit splits for us. And just as perceived inconsistencies in the

13

Supreme Court's jurisprudence generate inefficient and inconsistent applications of the law, so too do inconsistencies in our own jurisprudence.[3]

Comparing the retrospective and prospective effects of this intracircuit tension illustrates the harms. Retrospectively, *Ortega* endangers Colorado's reliance on the outcome in *RMGO*, without appropriate notice or an opportunity to participate in the proceedings that may affect Colorado. Prospectively, *Ortega* makes it difficult to predict how district courts and ultimately this court will approach and resolve similar questions of law. As explained above, that uncertainty affects not only government interests, but also the interests of those wishing to lawfully exercise their constitutional rights. The en banc process exists precisely to avoid these inequitable results.

Lastly, I am aware that some litigants and courts have expressed confoundment by the Supreme Court's Second Amendment jurisprudence. Thus, it is tempting to take comfort in the possibility that the Supreme Court

---

[3] Our recently amended local rule cautions that en banc review is disfavored in part because we generally circulate opinions to be published internally before they are filed. 10th Cir. R. 40.1(B). But the internal review procedure was originally devised not to replace en banc, but to more easily ferret out the cases that were ripe for en banc. Judah I. Labovitz, *En Banc Procedure in the Federal Courts of Appeals*, 111 U. Penn. L. Rev. 220, 226–27 (1962) (citing Letter from Hon. Alfred P. Murrah, Chief Judge, Tenth Circuit U.S. Court of Appeals, Dec. 27, 1961). I am certain that our internal review procedure does not substitute for en banc review in a case of such magnitude and complexity.

may soon address the issues confronted in *Ortega* and *RMGO*. *See, e.g.*, Pet. for Writ of Certiorari in *NRA v. Glass*, No. 24-1185 (docketed May 20, 2025) (question presented: "[w]hether Florida's law banning 18-to-20-year-olds from purchasing firearms violates the Second Amendment"). But possibility is not certainty, and the Supreme Court may well defer this issue for further percolation in the lower courts. If we deny en banc review in *Ortega* and the Supreme Court denies certiorari in *Glass*, our jurisprudence will be left in a state of unremedied confusion, with little to no path for correction, at least not in the near term.[4]

The Supreme Court may or may not soon provide clarity on how the "presumptively lawful regulatory measures" or safe harbor laws, first expressed in *Heller*, overlap with the *Bruen* two-step framework. But until it does, we must keep in mind that it is not "desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant." *Spector Motor Service v. Walsh*, 139 F.2d 809, 823 (2d Cir. 1943) (Hand, J., dissenting). Instead, at our middling level, we keep our eye on our own paper, which is in turn confined by circuit precedent. That is why, where colleagues across panels seem to disagree on a

---

[4] If the Supreme Court were to grant certiorari in *Glass* or another case that would provide binding guidance on this case after we granted rehearing en banc, we could simply abate the en banc review until the Supreme Court decided the case before it and rendered an opinion.

complex legal issue, there is an established procedure for conclusively resolving that disagreement. In my view, that is our duty, and we should get on with it.

## IV

I am concerned that the denial of en banc review leaves much of our Second Amendment jurisprudence in a state of confusion. However, two points of clarity still emerge from amidst the fog. First, attention from the Supreme Court on the issue at hand – regulations of commercial firearm sales – would be welcome. Second, because the court today declines en banc reconsideration, *RMGO* remains the law of the circuit until the Supreme Court says otherwise. *Haynes v. Williams*, 88 F.3d 898, 900 n.4 (10th Cir. 1996). With these thoughts, I respectfully dissent from the denial of rehearing en banc.